IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **ACCREDITED HOME LENDERS** | § | **Case No. 09- 11516 (MFW)** |
| **HOLDING CO., et al.** | § | |
| | § | |
| **Debtors.**[1] | § | **JOINTLY ADMINISTERED** |

## DECLARATION OF MEADE MONGER IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS

### Table of Contents

Prologue ........................................................................................................................... 2
Sec. 1    Introduction and Background Facts ........................................................................ 2
  Sec. 1.1    Introduction ........................................................................................................ 2
  Sec. 1.2    Background Facts ............................................................................................... 3
    Sec. 1.2.1    History of AHL—1990 to 2007 ..................................................................... 3
    Sec. 1.2.2    History of AHL—Acquisition by Lone Star to the Present ......................... 5
    Sec. 1.2.3    Operations ..................................................................................................... 6
    Sec. 1.2.4    Outstanding Liabilities ................................................................................. 7
    Sec. 1.2.5    Assets ............................................................................................................ 7
Sec. 2    Procedural First-Day Motions ............................................................................... 8
  Sec. 2.1    Joint Administration ........................................................................................... 8
Sec. 3    Substantive First-Day Motions Not Governed by Rule 6003 ................................. 9
  Sec. 3.1    Cash Management & Bank Accounts .................................................................. 9
Sec. 4    Substantive First-Day Motions Governed By Rule 6003 ..................................... 13
  Sec. 4.1    Pre-Petition Employee Wages and Benefits ..................................................... 13
  Sec. 4.2    Utilities Motion ................................................................................................ 18
Sec. 5    Pleadings Filed on the First Day for which the Debtors are not Seeking Expedited
             Consideration ...................................................................................................... 20
  Sec. 5.1    Rejection of Executory Contracts ..................................................................... 20
  Sec. 5.2    Rejection of Unexpired Leases .......................................................................... 21
  Sec. 5.3    Implementation of Severance Policy ................................................................ 22
  Sec. 5.4    Retention of KCC .............................................................................................. 23
  Sec. 5.5    Sale of De Minimis Assets ................................................................................ 24

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's' federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

**Prologue**

I, Meade Monger, state:

This Declaration is divided into four sections. **Section 1** explains my role with the Debtors, the bases for the factual assertions I have made herein, and the history of the Debtors and the nature of their businesses, capital structures, and assets. **Section 2** sets forth the specific facts that support the Debtors' procedural first-day motions. **Section 3** sets forth the specific facts that the support the Debtors' substantive first-day motions that are not governed by Federal Rule of Bankruptcy Procedure 6003. **Section 4** sets forth the specific facts that support the Debtors' substantive first day motions that are governed by Federal Rule of Bankruptcy Procedure 6003. **Section 5** sets forth the facts supporting the motions that the Debtors are filing on the first-day, but for which the Debtors do not seek expedited consideration.

## Sec. 1 Introduction and Background Facts

### Sec. 1.1 Introduction

I am the Chief Restructuring Officer ("CRO") of Accredited Home Lenders, Inc. ("AHL"), a California Corporation, and have personal knowledge about the operations of AHL's debtor and debtor-in-possession subsidiaries and affiliates. I have served in this position since March 26, 2009 and am familiar with the Debtors' day-to-day operations, business affairs, books and records. I have personal knowledge of the statements set forth herein.

On May 1, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors will continue to operate their businesses as debtors-in-possession.

In order to operate effectively and to minimize the adverse effects of a Chapter 11 filing, the Debtors has requested various types of relief in their "First Day" motions and applications filed with this Court. I am one of the primary parties responsible for implementing Debtors'

restructuring efforts and am authorized to submit this declaration in support of such motions and applications.

As CRO of AHL, I have personal knowledge about the operations of AHL's debtor and debtor-in-possession subsidiaries and their integral relationship to AHL and its business. I have reviewed their business and financial affairs and have participated in strategic planning associated with the preparation of these bankruptcy cases. As a result of my first-hand experience and knowledge, and through my review and knowledge of the Debtors' books and records and other information, including discussions with management, employees, key creditors, and affiliates, as well as outside professional advisors, I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in their First Day motions and applications in order to permit the Debtors to continue to operate effectively and manage these chapter 11 cases efficiently.

I submit this Declaration in support of the emergency motions by the Company seeking entry of the First Day orders. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, information conveyed to me by other representatives of the Debtors, including discussions with managers, other employees, and outside advisors, as well as my experience and knowledge of the Debtors' operations and financial condition. I am competent to testify to these matters, and, if I were called as a witness, I would testify to the facts and opinions set forth below. Where my opinions relate to legal matters, I have consulted with and am relying upon the advise of the Debtors' lawyers with respect to such matters.

### Sec. 1.2    Background Facts

### Sec. 1.2.1    History of AHL—1990 to 2007

AHL was founded in San Diego, California in 1990. It grew to become one of the nation's premier mortgage banking institutions with over 2,500 employees engaged in the business of originating, servicing, and selling residential mortgage loans that did not generally conform to the credit or other criteria established by the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. At is peak in 2006, AHL originated in excess of $2 billion in residential home mortgages.

AHL's parent, Accredited Home Lenders Holding Co. ("AHL Holding") became a public company in 2003 and its initial public offering was the NASDAQ's best-performing IPO that year.

The rest is history—the downturn in the United States' real estate markets first manifested itself as the subprime mortgage crisis, which all but wiped out AHL and its competitors. In the midst of the liquidity crisis, the origination of non-prime residential mortgage loans ceased for all practical purposes. Since the origination of non-prime residential mortgage was AHL's primary area of business, AHL's revenues fell precipitously in 2007.

AHL Holding's SEC filings from August 2007 explained:

> The nonprime lending industry is experiencing increases in mortgage-loan defaults and sharp declines in the market for mortgages originated, which have led us to experience losses on the loans we originate and significant reductions in our liquidity, and have required us to obtain waivers of compliance with certain covenants under our credit facilities. In connection with the challenges facing the nonprime lending industry, several of our competitors have recently stopped originating loans or sought protection under bankruptcy laws. Unless the values of our mortgage products cease their decline, and we are able to obtain new sources of liquidity and waivers and modification of the covenants in our credit facilities, we may suffer a similar fate.[2]

In August 2007, AHL ceased accepting new loan submissions and laid off more than half of its workforce.

---

[2] Accredited Home Lenders Holding Co., Annual Report (Form 10-K), at 36 (Aug. 2, 2007).

### Sec. 1.2.2 History of AHL—Acquisition by Lone Star to the Present

In June 2007 Lone Star Funds V ("LSFV") made an offer to buy the outstanding stock of AHL Holding for $15.10 per share. Over the next two months the United States housing markets took a sharp turn for the worst and many of AHL's competitors filed for bankruptcy or were absorbed by larger financial institutions. LSFV balked at closing on the merger, but after it was sued by AHL Holding, LSFV ultimately agreed to consummate the transaction for $11.75 per share in September, 2007. On October 11, 2007, an affiliate of LSFV, LSF5 Accredited Investments, LLC ("LSF5 Investments") purchased the outstanding shares of AHL Holding and obtained control of AHL.

Subsequent to obtaining control of AHL Holding, LSF5 Investments made a capital infusion of approximately $100 million in AHL Holding, which was used to repay outstanding pre-acquisition indebtedness owed by AHL and AHL Holding. Since that time, AHL funded operations by utilizing infusions of equity, and several loans from affiliates of LSFV, with those affiliates providing forbearances to AHL, releasing various liens to allow AHL to sell certain assets, and converting debt to equity to allow AHL to comply with various loan and servicing agreement covenants.

AHL resumed accepting new loan submissions on October 15, 2007, but since then residential real-estate transactions and mortgage originations have continued to decrease across the nation. During the time since AHL resumed lending money secured by mortgages, the secondary mortgage market was virtually non-existence and AHL was unable to sell many of its mortgages. AHL has never returned to profitability, though AHL's monthly losses decreased over the time since it was acquired by LSF5 Acquisition. AHL has drastically reduced its

operations and its workforce. These bankruptcy cases will finalize the wind-up and liquidation of AHL.

### Sec. 1.2.3    Operations

Understanding the nature of AHL's assets and capital structure requires understanding how the company operated. The operations of AHL can be generally divided into mortgage origination, mortgage servicing, and other miscellaneous mortgage-related activities.

AHL was a mortgage lender specializing in providing non-prime residential loans. It worked with potential borrowers and the lenders to arrange loans for the purchase of residential property secured by mortgages on such properties. AHL earned various fees for processing and originating such loans and mortgages. After originating these loans and mortgages, AHL transferred the loans to AHL Mortgage Loan REIT Trust ("AHL REIT"), a subsidiary of AHL Holding. AHL REIT securitized the mortgages and sold the securities backed by those mortgages. AHL REIT retained a residual income stream from these mortgage-backed securities.

After securitizing and selling the loans and mortgages it originated, AHL often retained the role of servicing these loans. AHL's servicing activities include collecting and applying the payments from borrowers and policing the borrowers' obligations under the mortgages and loans. The trustees of the investment trusts holding these loans compensate AHL for providing these services.

Finally, AHL and its affiliates provide other services relating to residential mortgages, such as servicing and managing foreclosures, providing various insurance-related services such as core title and settlement services, and providing expanded insurance services for mortgage brokerage and mortgage lending operations.

74392.000004 EMF_US 26986190v11

AHL has numerous affiliates that, like AHL, are wholly owned subsidiaries of AHL

Holding.[3] AHL's other debtor-in-possession affiliates are:

- Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company wholly owned by AHL Holding that provides various insurance-related services,

- Inzura Insurance Services, Inc., a Delaware corporation wholly owned by AHL that provides various insurance-related services, and

- Windsor Management Co. d/b/a AHL Foreclosure Services Company, a California corporation wholly owned by AHL that manages foreclosures for mortgages serviced by AHL.

### Sec. 1.2.4     Outstanding Liabilities

On the Petition Date, the Debtors do not have any secured debt. The remaining liabilities

of the Debtors relate to (1) outstanding real property leases, (2) mortgage repurchase claims, (3)

litigation claims, and (4) trade debt.

### Sec. 1.2.5     Assets

In January and February of 2009 AHL sold its mortgage servicing rights related to

seventeen securitizations to Select Portfolio Servicing for approximately $117 Million. Proceeds

in the amount of approximately $85 Million from this sale were used to pay off a lending facility

with Wachovia secured by the mortgage servicing rights. AHL retained the remaining proceeds

---

[3] These non-debtor affiliates are AHL REIT, a Maryland investment trust, AHL Acquisition, LLC, a Maryland limited liability company wholly owned by AHL Holding, Accredited Preferred Securities Trust I, a Delaware statutory trust wholly owned by AHL Holding, Vendor Management Services of Alabama, LLC d/b/a Inzura Settlement Services, an Alabama limited liability company wholly owned by Vendor Management Services, LLC, Aames Investment Acceptance Corp., a Delaware corporation wholly owned by AHL REIT, Accredited Home Lenders Canada, Inc., a Canada corporation wholly owned by AHL, Accredited Processing Services, Inc., a Canada corporation wholly owned by Accredited Home Lenders Canada, Inc., Aames Capital Corp., a California corporation wholly owned by AHL, Aames Capital Acceptance Corp., a Delaware corporation wholly owned by AHL, One Stop Mortgage, Inc., a Wyoming corporation wholly owned by AHL, Rossmore Financial Insurance Services, Inc., a California corporation wholly owned by AHL, Windsor Management of Washington, Inc., a Washington corporation wholly owned by AHL, Accredited Acceptance Corp., a Delaware corporation wholly owned by AHL, Accredited Receivables Funding, LLC, a Delaware limited liability company wholly owned by AHL, Accredited REO Properties, LLC, a Delaware limited liability company wholly owned by AHL, and Accredited REO Properties II, LLC, a Delaware limited liability company wholly owned by AHL.

paid by SPS. As of the Petition Date, SPS was in default for failing to pay $7 Million required by the purchase agreement.

Generally speaking, AHL's remaining assets consist of cash, certain servicing advances, subordinated bonds, a few whole loans and mortgage servicing rights, some residuals from its Canadian operations, tax refunds for net operating losses, AHL's servicing platform, miscellaneous personal property, fixed assets, and real property leases, and interests in various subsidiaries, including Windsor Management, Inc., the Inzura entities, and the REO entities. As of the Petition Date, the Debtors' cash on hand totaled approximately $10 million.

## Sec. 2 Procedural First-Day Motions

### Sec. 2.1      Joint Administration

Joint administration of the Debtors' cases is proper in that many of the Debtors' debts are guaranteed or joint obligations. Additionally, joint administration is proper due to the ownership structure of the Debtors in these cases.

The Debtors intend to file with the Court motions and applications, including the various motions and applications which have been filed on the first day of these cases. Joint administration for procedural purposes of these cases will avoid considerable unnecessary delay and expense by obviating the need for the Debtors to file duplicative motions and applications and for the Court to enter duplicative orders in each of these Chapter 11 cases. Joint administration will also avoid the burdensome necessity of duplicating notices to numerous creditors. Finally, supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee for the District of Delaware will be simplified by joint administration of the cases.

74392.000004 EMF_US 26986190v11

The rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these cases since joint administration is purely procedural and is in no way intended to affect substantive rights.

### Sec. 3 Substantive First-Day Motions Not Governed by Rule 6003

#### Sec. 3.1    Cash Management & Bank Accounts

Prior to the Petition Date, the Debtors maintained, in the ordinary course of their businesses, various bank accounts (the "Bank Accounts") at U.S. Bank. The Debtors seek to be excused from the U.S. Trustee's requirements that the Bank Accounts be closed and new post-petition bank accounts be opened. If enforced in this case, the U.S. Trustee's requirements would cause serious disruption in the Debtors' businesses and would impair their ability to efficiently administer these bankruptcy estates.

The maintenance of the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to post-petition operations and would allow the Debtors to avoid delays in payment of debts incurred on a post-petition basis. Closing and transferring the Bank Accounts would be expensive and time-consuming.

The Debtors will not intentionally pay, and each of the banks where the Bank Accounts are maintained will be specifically directed not to pay, any debts incurred by the Debtors prior to the Petition Date, other than as expressly authorized by this Court.

The Debtors are aware of several outstanding checks that were issued pre-petition to various parties. The Debtors have implemented safeguards to prevent pre-petition checks from clearing post-petition. These safeguards include freezing accounts, issuing stop-payment orders, and may require the closing of certain of the Bank Accounts. Allowing the Debtors flexibility in the maintenance of their existing accounts will help prevent unauthorized post-petition payments on pre-petition debts.

74392.000004 EMF_US 26986190v11

Some of the Debtors have the ability to designate the moniker "Debtor in Possession" on their checks and business forms through a software change. The Debtors that can do so are committed to doing so following the Petition Date. The Debtors that have pre-printed checks will use up the checks they had pre-petition and then obtain new checks with the "Debtor in Possession" moniker.

The Debtors maintain a complex cash management system, utilizing six (6) different groups of accounts to manage cash flow, make payments, and pay employees. Separate sets of accounts are generally maintained for each debtor or non-debtor affiliate, with little interplay or tie-in between the account groups.

From time to time, the Debtors will remit funds from one debtor or non-debtor affiliate to another as necessary to meet cash flow needs. Typically this is done through an intercompany ledger entry, with a resulting intercompany payable or receivable generated in the appropriate entity. It is anticipated that Debtors will continue to utilize this system of intercompany debits and credits on a post-petition basis. No banking activity occurs at any of the entities outside those listed herein, and a summary of Debtors' cash management system is described below.

**Accredited Home Lenders, Inc. ("AHL")**

As AHL is the main operating company among the Debtors, it stands to reason that most of the key bank accounts reside in AHL. U.S. Bank is the depository used by each of the Debtors including AHL. The main operating account is where most bank activity occurs and is the central point of focus for Accredited's cash management system.

Cash in AHL's main operating account is swept overnight into a commercial paper investment account, pegged to a balance of zero. Separate zero-balance accounts ("ZBAs") are

maintained for payroll and account payable purposes. The other main set of accounts residing in AHL are the AHL Servicing accounts.

AHL Servicing is integral to AHL's mortgage servicing operations. Borrower payments and payoffs are received via mail, Western Union, ACH transfer, and other methods. All these payments ultimately flow into the payment-clearing account. AHL's servicing system, Fiserve's MortgageServe, generates a daily activity report and data file that indicates where any received payments should be applied. A data file is uploaded to U.S. Bank's website, which generates ACH transfers to send the payments to the appropriate accounts consistent with this system-generated data file. Depending on the amount of payment, type of payment, and other factors, payments may be split among more than one account. The system-generated data file can also pull funds out of the payment-clearing account as necessary to fund servicer advances, or repay previous servicer advances AHL's main operating account. Other accounts linked to this automated system include three disbursement clearing accounts and borrower escrow accounts.

### Accredited Home Lenders' Holdings ("AHL Holdings")

AHL Holdings' cash management structure is similar to that of AHL, as described above. Accordingly, AHL Holdings has its own operating account and a related commercial paper investment overnight sweep account at US Bank. Since most business activity occurs outside the Holding Company level, most banking activity does as well. These accounts are not heavily used.

### Windsor Management Co. d/b/a/ AHL Foreclosures Services Co. ("Windsor")

Windsor utilizes a cash-flow management system slightly different than that of all entities listed previously. Instead of only utilizing an operating account and a commercial paper investment account, Windsor utilizes its own operating account, and a ZBA payroll account, both

of which are at U.S. Bank, which it uses to compensate employees on an as-needed basis. Accounts receivable are paid directly into the operating account, which acts as a conduit for all payment outflows. Windsor also maintains a separate trust account for funds held in trust for escrow closings.

### Vendor Management Services, LLC d/b/a Inzura Settlement Services ("VMS")

VMS holds two accounts at U.S. Bank, an operating account and a ZBA payroll account. These are used strictly for payroll purposes; all other banking activity for VMS occurs at Wachovia Bank, N.A. VMS' Wachovia accounts include accounts for receivable, payables, and various deposIt and disbursement accounts related to operations in different states.

The Debtors hereby seek authority to continue using their current centralized cash management system to pay certain debts and obligations as authorized by this Court. The going-concern value of the Debtors' businesses simply cannot be maintained if there is substantial disruption in their cash management procedures.

Furthermore, the costs of administering the estates will be unnecessarily increased if the Debtors have to redo their cash management procedures. The Debtors are familiar with the current cash management system in place, as it has been used by the Debtors for the past several years, and constitutes Debtors' ordinary, usual and essential business practices. The cash management system is similar to those commonly employed by corporate enterprises comparable in size and complexity to Debtors. Given Debtors' corporate and financial structure, it would be unnecessarily difficult for Debtors to establish an entirely new system of accounts and a new cash management system, especially in light of the recurring monthly payments which Debtors must make to vendors, independent sales contractors, employees, and other parties in interest.

Under the circumstances, maintenance of Debtors' cash management system is not only essential, but also in the best interest of Debtors' estate and creditors. The Debtors will continue to maintain strict records with respect to all transfers of cash, so that all transactions can readily be ascertained, traced, and recorded properly on applicable inter-company accounts. It is critical both to the continued operation of the Debtors' businesses and to the preservation of the value of such businesses that the Debtors continue to use their existing cash management systems without disruption.

## Sec. 4 Substantive First-Day Motions Governed By Rule 6003

### Sec. 4.1 Pre-Petition Employee Wages and Benefits

The Debtors currently employ approximately 70 employees in the aggregate. The Debtors provide compensation and benefits to their work force in the ordinary course of business. The Debtors pay their employees on a bi-weekly basis through the use of direct deposits and checks, with the pay bi-weekly period ending one week before the pay date. Thus, upon every pay date the Debtors owe the employees one week of wages. Because the payroll was funded prior to the Debtors' petitions being filed on the Petition Date, the Debtors owe their employees compensation for one week of services rendered pre-petition.

As of the Petition Date, Debtors also owed their employees paid time off ("PTO"). Debtors view unpaid PTO as wages and propose to pay employees for PTO accrued pre-petition in the ordinary course of business.

1. The Debtors seek authority to pay the employees their regular compensation on the first post-petition pay date, regardless of the fact such compensation will include amounts for both pre- and post-petition services rendered. It is vital for employee morale and the continuation of The Debtors' businesses that the employees receive their regular compensation on the first post-petition pay date, within the Debtors' ordinary course of business. To do less

would severely hinder the employees' confidence in the Debtors' business, and would likely cause attrition, damaging the Debtors' estates by a much greater amount than the amount of prepetition wages paid on that pay date. Furthermore, these current and former employees' pre-petition claims would likely be paid in full because these claims are entitled to priority under the Bankruptcy Code, and Debtors have sufficient unencumbered assets to pay priority claims. Thus, paying these claims at this time will not decrease the amounts available to the Debtors' general unsecured creditors. The unpaid pre-petition wages owed to all of Debtors' employees as of the Petition Date is approximately $94,770.61. The PTO owed to all of Debtors' employees as of the Petition Date is approximately $33,578.72.

In the ordinary course of business, in each pay period, the Debtors make deductions from employees' compensation for obligations such as medical benefits, state income taxes, state disability insurance contributions, federal income taxes and Social Security and Medicare contributions (collectively, the "Payroll Deductions"). The amounts deducted are generally held in trust by the Debtors until they are remitted to the relevant governmental authority. In addition, the Debtors make deductions from the employee direct deposits for employee contributions with respect to: (i) 401(k) plans, (ii) plans for benefits for medical and prescription drugs, (iii) long term disability, life, dependent life, and accidental death and dismemberment insurance coverage, (iv) vision coverage, (v) 401(k) loans, and (vi) flex spending accounts. Typically such contributions to employee benefit plans, once deducted from the employees' paychecks, are remitted by the Debtors to third parties (collectively, the "Benefits Deductions"). As of the Petition Date, the Debtors had collected, but not remitted, certain Payroll Deductions and Benefits Deductions.

To the extent that the Debtors are holding funds belonging to employees that are collected from employees and remitted to others, the Debtors maintain that such funds are not property of their bankruptcy estates.

As of the Petition Date, the Debtors are obligated to make certain contributions and provide certain benefits under various employee benefit programs. As of the Petition Date, the Debtors have obligations to current and former employees under these employee benefit programs (the "Employee Benefits"). The Debtors have a sizeable number of former employees that may still be owed Employee Benefits. The Debtors reduced their personnel from 269 to 95 on March 17, 2009 and subsequently down to 73 on April 3, 2009. The Debtors provide their employees with medical and prescription drug insurance, dental care insurance, vision care insurance, accident and disability insurance, short-term disability insurance, and unemployment insurance.

Debtors also offer employees tuition reimbursement, and provide one employee with a car allowance. However, Debtors are unaware of any amounts owed for tuition reimbursement as of the Petition Date, and the employee's car allowance has been paid for the period in which the Petition Date falls.

The Debtors pay for a portion of comprehensive medical and prescription drug coverage for all employees. The Debtors provide their employees with a self-insured health plan, under which claims for medical and prescription drug benefits are administered through third party administrators. The Debtors pay claims arising under their health plan as those claims are filed and approved. Debtors also provide former employees with COBRA coverage.

The Debtors offer a defined contribution 401(k) plan for all employees. The Debtors deduct contributions from the semi-monthly direct deposits and checks of participating

74392.000004 EMF_US 26986190v11

employees and remit the employee contributions and employer matching amounts to the plan administration.

The Debtors provide other miscellaneous benefits to their Employees aside from those listed above. These benefits include the provision of basic life and accidental death and dismemberment insurance, long and short term disability benefits, workers' injury benefits plan, unemployment benefits, COBRA benefits to recently terminated employees, certain employee business expense reimbursements, and other miscellaneous but non-material benefits normally paid in the ordinary course of the Debtors' businesses (the "Miscellaneous Benefits"). It is difficult for the Debtors to accurately estimate the amounts due and payable under the various Miscellaneous Benefit plans as of the Petition Date. However, it is anticipated that the total contributions due and payable on behalf of the Debtors' Employees for all Miscellaneous Benefits will not be material as of the Petition Date.

Payment of pre-petition wages and Employee Benefits at this time is appropriate and necessary. Continuation of Employee Benefits is also appropriate and necessary. As of the Petition Date, no employees of Debtors are owed more than $10,950.00 in pre-petition wages, and all unpaid Employee Benefit obligations (together with accrued but unpaid Employee salaries and wages, the "Employee Obligations") are less than $10,950 per current or former employee in the aggregate. The Debtor believes that all unpaid Employee Benefits owed as of the Petition Date are less than $10,950 for each individual employee, but the Debtor cannot say this for sure because there may be pre-petition claims that have not yet been presented to the Debtors.

Not paying employees in the ordinary course of business would inflict severe hardship on them and their families. If these employees do not get paid the wages that they are owed, they

may be unable to provide for themselves and their families. These employees' confidence in and dedication to their jobs would be significantly undermined, leading to decreased productivity and increased departures. These negative consequences will also occur if these employees know that the Debtors cannot pay their obligations to their former employees. Replacing employees at this juncture would be expensive, time-consuming, and disruptive, at best, and next to impossible at worst.

In an effort to cut costs and preserve the value of their estates, the Debtors have paired back their staff to an absolute minimum. The remaining employees in the Debtors' corporate department are vital to the administration of these cases. The remaining employees in the Debtors' servicing department are vital to maintaining the going-concern value of that business, which the Debtors intend to sell.

Allowing the Debtors to pay all unpaid pre-petition Employee Obligations will also reduce the administrative burden in these cases, as the Debtors will not be tasked with determining to what extent individual current and former employees hold priority or general unsecured claims for unpaid Employee Obligations. Avoiding the administrative tasks of segregating and administering the claims created by unpaid Employee Obligations will allow for a more efficient and effective administration.

The total amount of unpaid pre-petition Employee Obligations is relatively modest compared with the size of the Debtors' estates and the importance of these individuals to the Debtors and their estates.

Continuing to pay the Employee Obligations in accordance with the Debtors' pre-petition business practices and the continuation of such practices on a post-petition basis is in the best interests of the Debtors, their estates, and will enable the Debtors to continue to operate their

businesses in an economic manner without disruption. Indeed, the Employees are central to the Debtors' operations and are vital to maintaining and maximizing the Debtors' estates.

Continuing to pay the Employee Obligations in accordance with the Debtors' pre-petition business practices is essential to the Debtors' liquidation. Without such relief, the Debtors will suffer immediate and irreparable harm. Indeed, without such relief, Debtors feel certain that many, if not most of the Employees will cease working, and attempt to find other employment.

Any delay in paying the Employee Obligations will adversely affect Debtors' relationship with the employees and could irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of the employees is most crucial. Further, the morale of current employees will be harmed if Debtors do not pay their obligations to former employees as those obligations become due.

The Debtors' remaining staff is essentially a skeleton crew. These employees are the bare minimum required for administering the Debtors' estate and finishing the liquidation process. The Debtors' estates will suffer severe and irreparable impairment if they are unable to immediately continue paying Employee Obligations in accordance with the Debtors' pre-petition business practices.

### Sec. 4.2    Utilities Motion

to the Petition Date, the Debtor had operations throughout the United States in over seventy locations. As the Debtors have been winding down their affairs, the number of locations that the Debtor continues to operate from has been reduced. Of these locations that were in operation, AHL has closed all but two of these facilities: the Data Center and the Warehouse, both located in San Diego. Further, prior to the Petition Date, the Debtors' headquarters were located at a three-building complex at 15232 Avenue of Science in San Diego, which bore monthly rent at more than $450,000 per month. Effective as of May 1, 2009, the Debtors moved

out of their headquarters from this complex into a smaller facility located at 9915 Mira Mesa Boulevard, San Diego. The rent on this new facility is significantly less. However, the utility expenses for this new facility are currently unknown.

In connection with the operation of their business in the ordinary course, the Debtors use gas, water, electric, telephone and other services provided by various utility providers (the "Utilities"), and incur expenses for such services on a monthly basis. The Debtors' operations are dependent on continued utility services. An interruption of utility services would severely disrupt the Debtors' business operations and could adversely effect the value of their assets. Thus, the utility services are critical to the success of the Debtors' chapter 11 cases. The Debtors are concerned that the Utilities may terminate, alter, or refuse to provide services, or may demand an unreasonably large deposit in order to continue providing services post-petition.

Prior to the Petition Date, the Debtors endeavored to pay the Utilities for its facilities in a timely fashion and are current on those payments as of this date, except for those payments that would have been made in the ordinary course of the Debtors' businesses post-petition, but for the filing of these chapter 11 cases.

Based upon the Debtors' current cash flow projections, the Debtors anticipate that they will have adequate cash and sufficiently available funds with which to pay all post-petition charges for the utility services they need.

Further, some Utilities may be in possession of funds deposited by Debtors on a prepetition basis that are now property of Debtors' bankruptcy estates. The Debtors will suffer immediate and irreparable harm if they do not have enough time to negotiate favorable adequate protection provisions. This will cost the estates a significant amount of additional funds and incurs the risk that the Utilities might discontinue services to the Debtors altogether.

**Sec. 5 Pleadings Filed on the First Day for which the Debtors are not Seeking Expedited Consideration**

### Sec. 5.1      Rejection of Executory Contracts

Prior to the Petition Date, the Debtors entered into various contracts, including but not limited information technology leases and servicing agreements, equipment leases and servicing agreements, marketing agreements, employment agreements, and severance agreements. As the Debtors are winding down their businesses and liquidating their remaining assets, many of these contracts and agreements (the "Executory Contracts") are no longer be necessary or beneficial to the Debtors' estates. Thus, the Debtors' continued compliance with the terms of the Executory Contracts would be burdensome and provide no corresponding benefit to the Debtors or their estates. In sum, the Debtors, in the exercise of their business judgment, have determined that the Executory Contracts are not necessary or beneficial to the Debtors' continued operations, and that rejection of the Executory Contracts *nunc pro tunc* to the Petition Date is in the best interest of the Debtors and their estates.

In the exercise of their business judgment, the Debtors have determined that the rejection of the Executory Contracts is in the best interests of their estates and creditors. Due to a winding down of the Debtors' operations, the Debtors simply don't need the services and/or goods provided in connection with the Executory Contracts. Thus, the Executory Contracts are burdensome, provide no corresponding benefit to Debtors' estates and should be rejected. Further, rejection of the Executory Contracts will preclude or limit the amount of administrative expense claims against the Debtors' estates.

The Debtors are hereby stating their unequivocal intent to reject the Executory Contracts.

### Sec. 5.2    Rejection of Unexpired Leases

Prior to the Petition Date, the Debtors entered into various real property leases for its headquarters in San Diego, California and various offices located throughout the United States. As the Debtors began winding down their businesses, all of the offices other than the headquarters and certain related warehouse and IT buildings were closed pre-petition. Further, effective May 1, 2009, the Debtors moved their last employees from their former headquarters office complex to a smaller, less expensive facility. Pre-petition, the Debtors did attempt to find subtenants or assignees for these leases, but given the recent decline in real estate markets, most if not all these leases are above-market, and the Debtors could not find anyone willing to pay a premium for the leases. The Debtors, in the exercise of their business judgment, have determined that all leases with respect to closed offices, well as certain subleases, are not necessary or beneficial to the Debtors' continued operations, and that rejection *nunc pro tunc* of these leases (the "Leases") is in the best interest of the Debtors and their estates.

On the Petition Date, the Debtors informed all of the landlords for the Leases that they were filing seeking and requesting authority to reject the Leases *nunc pro tunc* to the Petition Date. The Debtors are surrendering the property subject to the Leases by sending the keys to the Leases to the landlords and providing all landlords with copies of this Motion. The Debtors are hereby unequivocally stating that they are abandoning the Leases. The Debtors waive their right to withdraw this Motion prior to hearing.

The Debtors may have minor items of property left on the properties that are subject to the Leases. The Debtors do not believe that these assets have any realizable value.

The Debtors have determined that the rejection of the Leases is in the best interests of their estates and creditors. The Debtors do not need the continued use of the leased properties, and therefore the Leases are burdensome and should be rejected. The Debtors made a reasonable

effort to obtain value from these Leases by attempting to find subtenants or assignees. These efforts were generally not successful. Now, unless the Leases are rejected forthwith, the Debtors' estates may become liable for rent accruing post-petition.

Since the Debtors stopped using the Lease locations prior to the Petition Date, the Debtors removed or disposed of all property remaining at the Lease locations with realizable value prior to the Petition Date. The Debtors have concluded that the cost of retrieving the remaining property from the Lease locations exceeds the value of such property. Thus, this property is of inconsequential value and benefit to the Debtors' bankruptcy estates. However, to the extent that the landlords may sell such property to mitigate these claims against the Debtors' estates, they should be allowed to do so.

### Sec. 5.3    Implementation of Severance Policy

The Accredited Home Lenders, Inc. Severance Policy for Eligible Employees (the "Severance Policy,") will be generally applicable to all full-time employees and generally continues the Debtors' pre-petition severance policy. No employee will receive a payment under the Severance Policy that exceeds 10 times the amount of the average severance pay given to the Debtors' non-management employees over the previous calendar year.

Under the Severance Policy, the Debtors would promise to pay employees in the Debtors' mortgage loan servicing department two months' salary if those employees remain with the Debtors until the Debtors terminate their employment and if they enter into and abide by a confidential separation and release agreement with the Debtors. The same package would be available to employees in the Debtors' corporate department. Finally, three officers would be eligible for a severance payment of five months' salary if they remain with the Debtors until the Debtors terminate their employment and if they enter into and abide by a confidential separation and release agreement with the Debtors.

The Severance Policy is generally applicable to all full-time employees—the Debtors have no remaining full-time employees that are not covered by the Severance Policy. Pre-petition, the Debtors' employees were eligible for a substantially identical severance policy that provided them with two months' salary upon their termination. Indeed, the employees who were terminated as part of the Debtors' pre-petition reductions in force on March 17 and April 3, 2009 all received severance packages of two months' salary.

Over the past twelve months, the Debtor terminated 321 full-time non-management employees. These employees received total severance payments of $2,963,472. The mean severance payment given to full-time non-management employees over the past calendar year was therefore $9,232. No insider will receiver greater than $92,320—ten times $9,232—under the Severance Policy.

The ability of the Debtors to maximize the value returned to their creditors depends upon the continued dedication of the Debtors' employees. These employees know that the Debtors have drastically reduced their workforces over the past two years. These employees know that there is a substantial likelihood that they will lose their jobs in the near future. These employees know that the Debtors have been making severance payments to employees who were terminated pre-petition. If the Debtors are not able to continue to make severance payments, employee morale will be drastically undermined and the Debtors' reorganization efforts would  be seriously threatened. Denying the Debtors' employees severance payments because they were terminated post-petition would be grossly unfair and unjust.

### Sec. 5.4     Retention of KCC

These cases are large and complex. The Debtors have hundreds or even thousands of creditors. Retaining a noticing, claims registering, and plan balloting agent is necessary for the efficient administration of these cases. KCC is one of the leading firms in the nation that

provides such services. KCC's services are necessary in these cases, and will benefit the Debtors, their estates, their creditors, and the other parties-in-interest.

### Sec. 5.5       Sale of De Minimis Assets

As the Debtors continue the process of winding down their operations, they will continue to identify surplus assets—generally furniture, fixtures, and equipment (the "De Minimis Assets")—that are not necessary to support Debtors' operations. At this time, the Debtors project such De Minimis Assets have an approximate book value of less than $250,000.00. It is anticipated that the sale of the De Minimis Assets will only produce *de minimis* proceeds for Debtors' estates, and it is out of a desire to affect the least-costly, and most convenient method for their disposal that the Debtors file this Motion.

The De Minimis Assets are primarily located at the Debtors' facilities in San Diego, California, although there may be some assets at other locations. The Debtors believe that the De Minimis Assets are unencumbered by any liens, claims, or security interests.

While the Debtors seek to sell the vast majority of the De Minimis Assets through the procedures proposed to the Court, certain of the De Minimis Assets were sold prior to the Petition Date, and are being stored for their purchasers on the Debtors' premises until the purchasers can remove them.

The Debtors anticipate that the cost of filing motions to seek approval of each sale would be disproportionate to the dollar amounts involved, and would be unduly burdensome to the Debtors and their estates. The Debtors currently possess (and may identify in the future) certain De Minimis Assets that they want to sell or transfer because such assets are no longer necessary for operating the Debtors' businesses. To defray any operational, carrying or storage expenses associated with these assets, the Debtors have determined in their business judgment that it is in the best interests of the estates to sell these De Minimis Assets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 30, 2009.

_Meade Monger_

Meade Monger
Chief Restructuring Officer