IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et al. | § | |
| | § | JOINTLY ADMINISTERED |
| Debtors.[1] | § | |

**DEBTORS' MOTION FOR ORDERS (A) APPROVING AUCTION PROCEDURES FOR THE SALE OF ASSETS OF THE DEBTORS, (B) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (C) AUTHORIZING THE SALE OF ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (D) AUTHORIZING BID INCENTIVES**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby file this Motion, which seeks orders (a) approving auction procedures for the sale of certain mortgage loans and real property (the "Assets") owned by the Debtors and certain non-debtor subsidiaries, (b) scheduling a hearing to approve such sale and approving the form of notice thereof, (c) authorizing the sale of those certain Assets that are owned by the Debtors free and clear of liens, claims, encumbrances, and other interests, and (d) authorizing the payment of certain bid incentives. In support of the Motion, the Debtors would respectfully show the Court as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding under 28 U.S.C.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

§ 157(b)(2). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A. General Background

2. These bankruptcy cases were filed on May 1, 2009 (the "Petition Date"). The Debtors continue to operate their businesses and manage their property as debtors-in-possession. The United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") on June 16, 2009, and re-appointed one member and added two new members to the Committee on July 23, 2009. No trustee or examiner has been appointed.

3. The Debtors' main business was originating, servicing, and selling residential mortgage loans that did not generally conform to the credit or other criteria established by the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. Around August, 2007, the Debtors ceased originating and selling residential mortgage loans.

4. The Debtors typically sold the mortgage loans they originated to securitization trusts. Under the terms of these sales, the Debtors were obligated to repurchase certain mortgage loans if certain conditions were met, such as the borrower ceasing to make payments within a certain period of time after the sale of the mortgage loans to the securitization trusts. Also, the Debtors were not able to sell a few of the mortgage loans that they had originated due to non-performance by the borrower or other factors.

### B. Sales Efforts Regarding the Assets

5. As a result of these circumstances, as of the Petition Date, Debtor Accredited Home Lenders, Inc. ("AHL") owned approximately 100 mortgage loans and two parcels of real estate, which had been obtained through foreclosure. Most of these mortgage loans were sold pursuant to an order entered by this Court on July 31, 2009. *See Order Authorizing the Sale of*

*Certain Loans of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests*, Docket No. 531. The Debtors have also sold one piece of real estate pursuant to an order entered by this Court on December 1, 2009. *See Order Authorizing the Sale of Real Property Located in Dorchester, Massachusetts, the Payment of Outstanding Tax Obligations Relating to the Property, and the Settlement of Claims with Thomas Romano, Sr., Thomas Romano, Jr., and Mary Romano*, Docket No. 1117. As a result of these sales, AHL currently owns thirteen mortgage loans and one parcel of real estate.

6. In addition, non-debtor Accredited REO Properties II, LLC ("Accredited REO"), which is a wholly-owned subsidiary of AHL, owned ten parcels of real estate as of the Petition Date. One of these parcels was sold early in the case, and Accredited REO now owns nine parcels of real estate.

7. Selling these Assets in a cost-effective and timely fashion has presented considerable challenges. The Debtors were unable to sell their remaining mortgage loans in the prior loan sale in these bankruptcy cases due to lack of interest among potential buyers. It should be noted that the majority of the mortgage loans in that prior sale had been non-performing, which may indicate the undesirability of the remaining mortgage loans. Finding willing buyers for the remaining parcels of real estate has been equally difficult. Foreclosure in and of itself usually impairs the value of real estate, and current market conditions are not favorable to sellers. Inventories remain high, and a "shadow inventory" presently exists of millions of foreclosed homes that have not yet been put on the market. The facts that these ten parcels of real estate are located in nine different states, and that the thirteen mortgage loans are secured by property in an additional five states, compound the problem of marketing and selling the Assets.

8.  Selling the Assets piecemeal would not be cost-effective The Debtors have less than a dozen remaining employees, who cannot coordinate efforts to sell dozens of parcels of real estate and loans on parcels of real estate located across the nation. Trying to effectuate piecemeal sales would also incur considerable professional fees and additional delays. The Debtors were also unable to find any brokers willing to undertake the task of selling the Assets on a contingency fee basis, and the Debtors did not want to retain an agent to market and sell these Assets on a fixed or hourly fee basis because interest in these Assets has not been significant.

9.  Dave Osborn, the Debtors' treasurer, with the advice and assistance of the AP Services, the Debtors' restructuring advisors, contacted or has been contacted by approximately ten parties regarding the sale of the Assets. Many of these parties had expressed interest in the prior loan sale. Other parties were contacted due to their general interest in investing in real estate and mortgage loans. Other parties contacted the Debtors upon the recommendation of the Committee's financial advisors.

10. Out of all of these interested parties, West Coast Realty Services, Inc. ("West Coast") provided the only firm offer for the Assets. Furthermore, West Coat's offer was more than quadruple that of the next highest non-committal indication of interest. The Debtors considered simply accepting the West Coast offer and moving forward with a private sale, but decided that it would be preferable to implement some sort of auction process since that would enable to the Debtors to take advantage of other potential offers for the Assets. West Coast agreed to participate in this auction process as a stalking horse in exchange for a $20,000 break-up fee (the "Termination Fee"), which West Coast will only be entitled to receive in the event that it does not buy the Assets. West Coast has finalized its due diligence, signed an Asset

Purchase Agreement ("APA," attached hereto as *"Exhibit A"*), and provided the Debtors with a firm, irrevocable offer of $409,000 for the Assets.

C.  **General Sales Terms**

11. The APA sells the Assets on an as-is, where-is basis. The APA allocates the purchase price between AHL and Accredited REO on a pro-rata basis according to the values of the Assets as estimated by Green River Capital, LC, which provided the Debtors with a valuation of the Assets and the Debtors' other mortgage loans. The Debtors do intend to liquidate Accredited REO (a wholly owned subsidiary of AHL) and bring its assets, which would consist solely of cash as a result of the sale contemplated herein, into their bankruptcy estates for distribution to creditors pursuant to a chapter 11 plan.

12. The Debtors now seek to sell the Assets that are owned by Debtor AHL free and clear of liens, claims, encumbrances and other interests. The Assets that are owned by non-debtor Accredited REO will not be sold free and clear of liens, claims, encumbrances and other interests. The Assets will be sold to either West Coast or the winning bidder at a public auction (the "Auction") conducted pursuant to the bid procedures (the "Bid Procedures") proposed in this Motion. A copy of the Bid Procedures is attached hereto as *"Exhibit B."* As the Bid Procedures explain, the Auction will not be held if no Qualified Bids are received before the Bid Deadline. The Debtors shall provide notice of the Auction per the proposed Auction Notice, which is attached hereto as *"Exhibit C."*

**RELIEF REQUESTED & APPLICABLE AUTHORITY**

13. The relief requested by the Debtors in this Motion is predicated upon sections 105, 363, and 503 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure, and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

14. The Debtors anticipate holding two hearings on the Motion—a "Procedures Hearing" and a "Sale Hearing." Accordingly, two proposed orders shall be filed along with this Motion. The first is an order to be entered after the Procedures Hearing approving the procedures for the Auction, setting a hearing date for the Sale Hearing, dictating the appropriate notice procedures for the Sale Hearing, approving the Auction Notice, and giving approval to the Termination Fee. A copy of the proposed Bid Procedures Order is attached hereto as "*Exhibit D.*" The second is an order to be entered after the Sale Hearing approving the sale of the Assets and authorizing the Debtors to execute the APA. A copy of the proposed Sale Order is attached here to as "*Exhibit E.*"

I. **Bid Procedures**

   A. **The Auction**

15. Pursuant to Federal Rule of Bankruptcy Procedure 6004(f)(1), a sale of a debtor's assets may be accomplished through public or private auction. The Debtors believe that if there is other genuine interest in the Assets, a public sale would be the most fair, transparent, and profitable method for selling the Assets, and therefore seeks authority to conduct a public auction in the event that Qualified Bids are received from other parties.

   B. **The Bid Procedures**

16. The Debtors requests that the Court authorize them, in accordance with the Bid Procedures, to solicit Qualifying Bids for the Assets[2]. At the Auction, Qualifying Bidders would

---

[2] Bid Procedures, § 4.

offer competing bids, and the Debtors will determine which bid is the highest and/or best offer for the Assets. Winning bids will be submitted to the Court for approval at the Sale Hearing.

17. The Debtors currently do not intend to accept any deferred offers for the Assets. The Successful Bidder will be required to pay the full purchase price upon closing the sale of the Assets, but the Debtors reserve the right, in their reasonable business judgment, to change this requirement as necessary to maximize the estates' realization from the Sale.

18. The Debtors believe that the Auction and proposed Bid Procedures will promote active bidding from any seriously interested parties and maximize the value obtained from the Assets. The proposed Bid Procedures will allow the Debtors to conduct the Auction in a fair and efficient fashion that will encourage participation by financially capable bidders who demonstrate the ability to close the Sale. The Debtors believe that the Bid Procedures are sufficient to encourage bidding for the Assets, consistent with other procedures previously approved by this Court in other cases, and appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy cases.

### C. Qualified Bids and Qualified Bidders

19. The Bid Procedures require a Qualified Bidder's initial bid to be delivered by the bid deadline of January 14, 2010—five days before the Auction, which is scheduled for January 19, 2010.[3] West Coast, as stalking horse bidder, will automatically be deemed a Qualified Bidder.

20. Under the Bid Procedures, for a bidder to become a Qualified Bidder, the bidder's initial bid must be irrevocable and in an amount at least $40,000 more than West Coast's stalking horse bid.[4] The bidder must also provide written evidence of its ability to pay cash to purchase

---

[3] Bid Procedures, § 4.
[4] Bid Procedures, § 5(a).

the Assets, an earnest money deposit of $40,000, a marked-up version of the APA, and various other written acknowledgements relating to the Qualified Bidder's authority to enter the sale and the bidder's agreement to be bound by the terms of the Bid Procedures.[5]

### D. Right to Modify Bid Procedures

21. The Debtors reserve the right, in their reasonable business judgment, to (i) waive terms and conditions set forth herein with respect to any or all potential bidders; (ii) impose additional terms and conditions with respect to any or all potential bidders; (iii) extend the deadlines set forth herein; (iv) cancel the sale of any or all Assets without further notice; (v) remove, any time before Closing, some or all of the loans or real estate from the Assets to be sold; and (vi) amend the Sale Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.[6]

### E. Closing with Alternative Backup Bidders

22. The Debtors seek permission to accept and close a Sale with the Second Best Bidder at the Auction in the event that the bidder selected as the Successful Bidder at the conclusion of the auction fails to close the Sale within the specified period of time.[7]

## II. Sale Hearing and Form and Manner of Notice Thereof

23. The Debtors request that the Court schedule the Sale Hearing on the Motion on January 27, 2010, which the Court has already designated as a regular omnibus hearing day in these bankruptcy cases. The Debtors seek the Court's approval of the Auction Notice and the Court's permission to hold the Sale Hearing on that day.

24. Pursuant to Local Bankruptcy Rule 2002-1(b), a copy of the Auction Notice will be provided to the United States Trustee, counsel for the Committee, all parties who have filed a

---

[5] Id., § 5(b)-(h).
[6] Id., § 10.
[7] Id., § 9.

request for service of notices in these cases, and all parties who have expressed an interest in buying the Assets. The Debtors will also provide notice to all borrowers on the mortgage loans being sold. A copy of the Auction Notice will also be posted on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants.

III. **Sale of Assets Free and Clear of Liens, Claims, Encumbrances, And Interests**

25. The Debtors seek to sell the Assets that are owned by Debtor AHL to West Coast or the Successful Bidder at the Auction free and clear of all liens, claims, encumbrances, and other interests per the terms of the APA. The Assets owned by non-debtor Accredited REO will not be transferred free and clear of any liens, claims, encumbrances, and other interests. The Debtors also seek to waive the 10-day stay imposed by Bankruptcy Rule 6004.

   A. **The Sale of the Assets Is An Exercise Of Sound Business Judgment And Should Be Approved.**

26. The Bankruptcy Code provides that a trustee or debtor-in-possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

27. The sale of the Assets is within the Debtors' sound business judgment. Selling the Assets is in the best interests of the Debtors' estates because the Assets are no longer needed for the Debtors' operations, and do not produce sufficient income to justify keeping them on the Debtors' books or placing them in a residual trust for the benefit of the creditors of the Debtors.

The Debtors have thoroughly marketed the Assets. In the event that other interested buyers submit genuine bids, the Assets will be publicly auctioned, thereby maximizing the value that the Debtors' estates receive for the Assets. The Debtors will be prepared to submit evidence at a hearing on this Motion showing that the purchase price for the Assets is adequate and fair under the circumstances.

### B. The Assets Owned by Debtor AHL Should Be Sold Free and Clear of Liens, Claims, Encumbrances, and Interests.

28. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property "free and clear of any interest in such property of an entity other than the estate, only if —

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f). The Debtors do not believe that any of the Assets being sold are subject to lien, claim, encumbrances, or security interest. Moreover, the Assets are going to be sold for a price that is greater than the aggregate value of any liens on the Assets, and any liens, claims, or encumbrances that do exist are going to attached to the proceeds of the Assets. The Debtors also propose that the absence of objection to this Motion should be deemed "consent" to any sales or transfers within the meaning of the Bankruptcy Code. Thus, the Assets owned by Debtor AHL should be sold free and clear of all liens, claims, encumbrances, and interests. The proposed Sale Order makes it clear that only the Assets owned by Debtor AHL—namely, all of the loans and the real property located in Hollywood, Florida—will be sold with the benefit of the provisions of section 363(f) of the Bankruptcy Code.

### C. The Sale Will Be Negotiated At Arm's Length And In Good Faith.

29. The Debtors intend to produce evidence at the Sale Hearing that any sale consummated with either West Coast or the Successful Bidder at the Auction was negotiated in good faith and at arms' length. As a result, West Coast or the Successful Bidder shall be entitled to the protections of a good-faith purchaser under section 363(m) of the Bankruptcy Code, and may rest assured that the sale does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

### D. Closing Deadline.

30. The Sale should close on the later of (i) February 3, 2010; or (ii) the fifth Business Day after the Sale Order becomes final.[8] If the Successful Bidder fails to close, the Debtors intend to close the Sale with the Second Best Bidder a day later.

### E. Requested Findings as to Successor Liability.

31. The Debtors propose explicitly ordering that the buyer of the Assets shall not have any successor liability.

### G. Relief from Bankruptcy Rule 6004(h).

32. Bankruptcy Rule 6004(h) states "[a]n order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that any order entered granting the relief requested in this Motion be effective immediately, thereby waiving the 10-day stay imposed by Bankruptcy Rule 6004. This waiver or elimination of the 10-day stay is necessary for the sale of the Assets to close as expeditiously as possible and within the time frames contemplated by the Debtors and the interested parties. The Debtors believe that the bids for the Assets will be higher if potential

---

[8] Bid Procedures, § 9.

purchasers are assured that the Sale will close expeditiously. Accordingly, the Debtors hereby request that the Court eliminate the 10-day stay imposed by Bankruptcy Rule 6004.

### IV. Bidding Incentives

33. The Debtors also seek approval of the Termination Fee at the Procedures Hearing. In *Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context. Accordingly, to be approved by a Bankruptcy Court, bidding incentives must provide benefit to a debtor's estate. *Id.* at 533. The focus is on the "correlation between the request for break-up fees and break-up expenses and the value ultimately brought to the estate by the competitive bidding process." *Id.* at 536.

34. Bidding incentives may provide compensable benefit to a debtor's bankruptcy estate if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Bidding incentives may also provide benefit to a debtor's bankruptcy estate where the availability of bidding incentives induced a bidder to research the value of the assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely. In such circumstances, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

35. In exchange for acting as stalking horse, the Debtors propose paying West Coast the Termination Fee of $20,000 in the event that it is not the successful bidder at the Auction. West Coast has measurably and demonstrably benefited the Debtors' bankruptcy estates. By

providing the Debtors with a firm offer for the Assets while still agreeing to participate in the Auction, West Coast has set a floor bid on which other bidders can rely. West Coast will not be eligible to receive the Termination Fee if it wins the Auction, or if there is no Auction due to a lack of bidders. Since the initial minimum overbid increment is $40,000—double the $20,000 Termination Fee—the Debtors' estates are all but assured to benefit from this arrangement, since if West Coast loses the Auction, the price received for the Assets will have increased by at least $20,000 more than the Termination Fee, and if West Coast wins the Auction, then it will not be eligible for the Termination Fee.

36. West Coast's firm offer for the Assets is $409,000 which means that the Termination Fee amount to less than 4.89% of the purchase price. The Termination Fee is, relatively speaking, somewhat larger than the standard bidding incentives approved in comparable chapter 11 bankruptcy cases. *See In re Worldwide Direct, Inc.*, No. 99-108 (MFW) (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the proposed purchase price); *In re Medlab, Inc.*, No. 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (approving break-up fee of 3.12%); *In re US One Communications Corp.*, No. 97-1196 (PJW) (Bankr. D. Del. Oct. 17, 1997) (approving break-up fee of 3%). However, several factors justify the slight upward departure in this situation:

- this sale is relatively small, meaning that the ratio of any termination fee to the sale price will relatively large;

- in absolute terms the $20,000 Termination Fee is not significant compared to the magnitude of these bankruptcy cases;

- the Assets are distressed, meaning that the costs of due diligence for West Coast were higher than normal; and

- West Coast's initial offer was more than double the other offers received by the Debtors, meaning that the Debtors have benefitted greatly from having West

Coast agree to participate in an uncertain and time-consuming public auction process, as opposed to a private sale.

Accordingly, the Termination Fee should be approved as reasonable, necessary, and beneficial to the Debtors, their bankruptcy estates, and their creditors.

## NOTICE

37. Notice of the filing of this Motion has been provided to: (a) the United States Trustee for the District of Delaware, (b) counsel for the Official Committee of Unsecured Creditors, (c) all parties who have filed a request for service of notices in these cases, (d) the thirty largest creditors of the Debtors, (e) all borrowers on the mortgage loans being sold, and (f) all parties who have expressed an interest in buying the Assets. A copy of the Motion has been made available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order (a) approving the Bid Procedures (b) scheduling a hearing to approve the sale of the Assets and approving the form of notice of the Auction and the sale of the Assts, (c) authorizing the sale of the Assets free and clear of liens, claims, encumbrances, and other interests, and (d) authorizing the payment of Termination Fee, and granting such other and further relief as the Court may deem just and proper.

Dated: December 11, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  ljones@pszjlaw.com
    joneill@pszjlaw.com
    kmakowski@pszjlaw.com

-and-

HUNTON & WILLIAMS LLP
Gregory G. Hesse (Texas Bar No. 09549419)
Lynnette R. Warman (Texas Bar No. 20867940)
Jesse T. Moore (Texas Bar No. 24056001)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
Email:  ghesse@hunton.com
    lwarman@hunton.com
    jtmoore@hunton.com

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION