DAVID OSBORN
And
BART A. BROWN, JR.
c/o 9777 East Dreyfus Avenue
Scottsdale, Arizona 85260

October 26, 2010

The Honorable Mary F. Walrath
United States Bankruptcy Court
District of Delaware
824 North Market Street, 3rd Floor
Wilmington, Delaware 19801

RE: Accredited Home Lenders Holding Co., et al
Case No. 09-11516

Dear Judge Walrath:

We have recently received and read the Disclosure Statement filed with your Court in Accredited Home Lenders Holding Co. (Case No. 09-11516) consolidated cases (collectively, "Accredited"). Throughout this entire case, it is our opinion that the bankruptcy professionals for Accredited have failed to disclose to your Court, the United States Trustee, the Creditors Committee, Kodiak, and the other creditors many material facts in these cases. These non-disclosures have now been perpetuated in the Disclosure Statement. The undersigned ask that, in your consideration of the Disclosure Statement, you and the Office of the United States Trustee consider all the information set forth in this letter.

Initially, you must ask what do the undersigned know and how have the undersigned obtained this information that we deem so important to call to the attention of the Court at this time. The answer is simply that we were there and have seen first hand what Hunton & Williams ("Hunton"), AP Services ("Alix") and the Lone Star Funds and its affiliates, the parent company of Accredited (collectively, "Lone Star") have done and continue to do in this case. Mr. Osborn was one of the three officers of the Accredited companies when they filed for bankruptcy protection, having served in several financial management positions at Accredited since 2001, most recently as its Vice President and Treasurer, until January 2010 when he resigned to accept other employment. Mr. Brown is a former Director of Alix Partners who worked extensively on the Accredited cases from the first day Alix was on the project until November, 2009 when he resigned from Alix because of his misgivings about the manner in which the Accredited cases were being handled by Hunton and Alix. Before becoming involved in the Accredited bankruptcy, Mr. Brown had 19 years experience working exclusively for bankrupt and/or troubled companies. His major assignments during this 19 year period have included Chairman and CEO of The Circle K Corporation, of Phoenix, Arizona (a $5 billion convenience store operator) responsible for managing its bankruptcy process; President and CEO of Color Tile Corporation prior to and during its filing for Chapter 11 protection in Delaware; President and CEO of the largest franchise of the T.G.I Friday's restaurant chain with over 50 operating restaurants; and Chapter VII Trustee in the FoxMeyer Corp. bankruptcy case in Delaware.

From the very beginning, the three officers of the Accredited companies, Hunton and Alix understood that the Accredited cases were simply about the very substantial claims that Accredited held against Lone Star. Aside from these claims, the Accredited companies only had about $30 million in assets against some $500 million in anticipated liabilities, or a potential recovery for creditors (except for any recovery from Lone Star) of about $.06 on the dollar (at the onset of this case there was no major federal tax refund in the offing. The tax refund claim only arose in late 2009 when Congress changed the tax laws to extend the net operating loss carry back period).

ON THE OTHER HAND, THE VIABLE CLAIMS AGAINST LONE STAR ARE IN THE $240 MILLION RANGE, OR APPROXIMATELY A MULTIPLE OF EIGHT TIMES, ALL THE OTHER ASSETS OF THE ACCREDITED COMPANIES!

These viable claims consist of the following:

| ITEM | CLAIM AMOUNT |
|---|---|
| Payments to Lone Star in January and February, 2008 | $130 Million |
| Deepening Insolvency Claim (from August 1, 2008 to May 1, 2009) | 80 Million |
| Senior Secured Claim | 30 Million |
| Five relatively minor claims | 10 Million |
| Total Viable Claims against Lone Star | $240 Million |

On the other side of the equation, Lone Star has asserted a claim of $96 million against Accredited based upon a valuation issue (the "MRA Issue").

Let us now turn to the specific facts upon which the undersigned rely to support their allegations of material non-disclosures by the bankruptcy professionals of Accredited in their Disclosure Statement and throughout this case. (These facts are set forth in sequential order for purposes of clarity).

- **The McCartin Discoveries.** In the Spring of 2008 Lone Star directed Accredited to employ Steve McCartin, a bankruptcy lawyer with the Gardere law firm of Dallas, Texas to become General Counsel of the Accredited companies. When he began this engagement, McCartin, with the assistance of principally the legal staff of Accredited, attempted to make a comprehensive analyses of the legal position of the Accredited companies. By July 2008 McCartin had concluded that the Accredited companies were hopelessly insolvent and that, if the Accredited companies filed for bankruptcy, Lone Star would be faced with a potential $130 million Preference Claim based on the $130 million payments Lone Star received in January and February 2008. McCartin disclosed all of this to both Lone Star and Accredited in early July 2008. Later in July 2008, the Gardere firm received $800,000 from the Accredited companies as a retainer for the filing of a Bankruptcy Petition. Later that month, at the direction of Lone Star, the Gardere firm was terminated as Counsel for the Accredited companies and a large portion of the $800,000 bankruptcy retainer was returned to Accredited. The undersigned believe that the evidence will conclusively establish that Lone Star deferred any bankruptcy filing by Accredited until March 2009 in an effort to avoid any potential insider Preference Claim arising out of the $130 million in payments it received from Accredited in January and February 2008. None of the facts involving McCartin's involvement in the Accredited case nor his conclusions nor the actions taken by Lone Star as a result thereof are set forth in the Disclosure Statement.

- **The August 2008 Engagement Letter between Hunton and Accredited.** Following the termination of the Gardere firm, Lone Star directed Accredited to hire the Hunton firm as its bankruptcy counsel. In mid-August 2008, an Engagement Letter was entered into between Hunton and Accredited to reflect this representation. This Engagement Letter detailed the prior legal representations by Hunton of Lone Star and its affiliates. After detailing these prior retentions, this Engagement Letter states that HUNTON CANNOT ASSERT ANY POSITION THAT IS CONTRARY TO THE INTERESTS OF LONE STAR and then further provides that IN THE EVENT ACCREDITED SUBSEQUENTLY FILES FOR BANKRUPTCY, HUNTON CANNOT SERVE AS ACCREDITED'S GENERAL BANKRUPTCY COUNSEL. Shortly before the filing of the bankruptcy petition in the Accredited case, Hunton, through Greg Hesse, had Chad Patton, Accredited's sole director and an employee of Lone Star, execute a new Engagement Letter between Hunton and Accredited which does not disclose the existence of the prior August, 2008 Engagement Letter nor the information set forth therein. The two Engagement Letters cannot be reconciled nor has the August, 2008 Engagement Letter ever been

properly disclosed to this Court or the United States Trustee or any of the creditors. During Mr. Brown's tenure at Accredited, he repeatedly implored Meade Monger (the CRO of Accredited and a partner of Alix) to look into the two separate Engagement Letters and to seek an independent legal opinion as to whether Hunton had a conflict in the Accredited case and whether the existence of the August, 2008 Engagement Letter needed to be disclosed to this Court and the United States Trustee. However, at all times his requests were rebuffed by Mr. Monger and Hunton was allowed to continue as General Bankruptcy Counsel for Accredited. The existence of this August, 2008 Engagement Letter between Hunton and Accredited was not disclosed to this Court or to the United States Trustee at the time Hunton was approved as General Bankruptcy Counsel for the Accredited companies.

- **The $30 Million Payment on the Senior Secured Facility.** In February and early March 2009 Accredited sold its last remaining substantial asset to SPS, receiving approximately $32 million as the net proceeds of sale. The assets sold to SPS were pledged to an affiliate of Lone Star, as a result of which Lone Star claimed the net proceeds of sale. A substantial dispute ensued between Lone Star and Accredited as to whether any of the net proceeds of sale should be paid over by Accredited to Lone Star. Within ten days after the completion of the sale to SPS, this dispute was resolved based upon a factual and legal analysis made by Gregory Hesse, a partner of Hunton and now the Engagement Partner for Accredited in its bankruptcy, as a result of which Accredited paid $30 million to Lone Star. David Osborn and the other officers of Accredited believe that the $30 million payment made by Accredited to Lone Star was not a true arm's length payment as it was controlled solely by Chad Patton and Lone Star and based solely upon Hesse's legal analysis. Management of Accredited asked Patton to have a neutral bankruptcy attorney review both the $30 million payment and Hesse's legal analysis. But, management's views were ignored and Patton directed that the $30 million payment be made. Subsequently, Lynnette Warman, another Hunton partner, who is working on the Accredited bankruptcy, analyzed this transaction and the $30 million payment to Lone Star. She concluded that <u>only</u> $13 million should have been paid over to Lone Star. Mr. Hesse's role in Accredited making this $30 million payment to Lone Star is not reflected in the Disclosure Statement nor is Ms. Warman's conclusion that only $13 million (not $30 million) legitimately should have been paid over to Lone Star. Moreover, Mr. Hesse's role in Accredited making this $30 million payment to Lone Star was not disclosed to this Court or the United States Trustee when Hunton was approved as General Bankruptcy Counsel for Accredited in this bankruptcy proceeding.

- **Investigation by the Bankruptcy Professionals of the Claims Against Lone Star.** With an Estate of only approximately $30 million and potential claims against Lone Star in the $240 million range as set forth above, Mr. Brown believes that the entire focus of particularly Hunton, should have been to thoroughly and completely analyze all the facts in connection with the claims against Lone Star, assemble all the relevant documents and depose all the parties having any knowledge or participation in the events leading up to the Lone Star claims. In fact, virtually none of this has been done. Ms. Warman made a "preliminary investigation" by interviewing the three officers of Accredited and interviewing a few of the officers of Lone Star. In addition, she assembled some documents but neither of the undersigned knows exactly what documents she has assembled. To the knowledge of the undersigned, (i) no depositions have ever been taken; (ii) McCartin's deposition has never been taken nor were his documents ever requested; (iii) several employees of Lone Star who worked extensively on the Accredited case have never been deposed nor have their documents been requested. All such former employees have knowledge of these events and, if a proper, unbiased investigation had been made, all the information such former employees had would have been brought to the surface; and (iv) no independent computer specialist has been employed by Accredited bankruptcy professionals to access the Lone Star e-mail files to determine what its internal communications disclose about its intentions with respect to Accredited. In Mr. Brown's judgment, all of this should have been standard operating procedures in a case involving claims of $240 million against a related entity. The Disclosure Statement does not set forth the fact that none of these standard investigative procedures have been followed in evaluating the case against Lone Star.

- **The $60 million Settlement Offer by Accredited to Lone Star.** In August 2009, two of the three Accredited executives and the bankruptcy professionals of Hunton and Alix ( including Mr. Brown) met for three days to review the claims against Lone Star and to reach agreement as to a final settlement proposal --- a take it or leave it final proposal -- to present to Lone Star. After three days of careful review and analysis and the preparation of a "Settlement Report", a final Settlement Proposal to Lone Star of $60 million was agreed upon. The only dissenter to this Settlement Report and the Settlement Proposal was Greg Hesse, the Hunton partner in charge of the Accredited bankruptcy. Hesse wrote the professionals raising several issues and concluded "Lone Star won't like this." The conclusion of the undersigned was and continues to be "who cares what Lone Star likes --- it is the adversary." Thereafter, the Settlement Proposal was submitted to Lone Star and summarily rejected by it. Again, the fact that this $60 million Settlement Proposal was carefully evaluated by management and Accredited's bankruptcy professionals and presented to Lone Star as a "take it or leave it" proposition is not reflected in the Disclosure Statement nor was this information ever conveyed to the Creditors' Committee or Kodiak. At the conclusion of this August 2009 meeting among management and Accredited's bankruptcy professionals, Mr. Brown met privately with Mr. Monger. At this private meeting, Mr. Monger advised Mr. Brown that Accredited could not accept any offer from Lone Star of less than $60 million. Monger stated "$60 million is the absolute lowest we can go. These Lone Star guys are dirty, really dirty."

- **Debtors' Professionals Investigation and Report.** In September 2009 and at the request of the Creditors' Committee, Hunton prepared a report entitled "Preliminary Investigation of Lone Star Issues". When submitted to Accredited's management for its review before being submitted to the Creditors' Committee, Accredited's management, Mr. Brown and Mr. Haftl of Alix complained that the report was extremely one-sided in favor of Lone Star. They then met with Hunton's representatives and agreed with them on essentially re-writing the report to include many changes in an effort to make it more balanced. In spite of agreeing to these substantial changes, the final report that was submitted to the Creditors' Committee was substantially unchanged with respect to the major complaints of management, Mr. Brown and Mr.Haftl. Overall, this report described the major claims against Lone Star but put none of these claims into a perspective where the Accredited claims could be understood in the context of what was happening at Accredited and Lone Star at the time. When management and Mr. Brown continually raised this "context" question, they were told by Mr. Hesse that "we have given the Committee the basic information and if they ask the 'right questions' we will give the Committee the rest of what it needs." So, instead of working with the Creditors' Committee against Lone Star, our common adversary, our bankruptcy professionals instead treated the Committee as the true enemy. Why? None of this information is set forth in the Disclosure Statement.

- **The MRA Issue.** As set forth previously on page 2 above, Lone Star has asserted a $96 million claim against Accredited with respect to the MRA issue. Accredited owed Lone Star approximately $287 million under a promissory note that was secured by a group of mortgage loans. Lone Star had a right, under the MRA, to cause Accredited to re-purchase the mortgages for the amount owed to Lone Star. In March 2009 Lone Star exercised its right to require Accredited to re-purchase these mortgages for the approximate $287 million owed. Accredited was unable to do so and as a result Lone Star retained the mortgages and asserted a claim against Accredited for $96 million representing what it claimed was the difference between the amount owed by Accredited to Lone Star and the value of the collateral it retained. The $96 million claim implied a value of $.45 per dollar of the unpaid principal balance of the mortgage loans that were collateral for the MRA loan. About six weeks before asserting its $96 million claim, in February 2009 Lone Star provided Accredited with an analysis that Lone Star prepared, that valued the loans housed in the MRA at $.79 per dollar of the unpaid principal

balance of the mortgage loans that were collateral for the MRA. Thus, this MRA issue involves nothing more than a valuation question with Lone Star providing Accredited with an analysis suggesting a value of $.79 on the dollar that Accredited was to use for its reports to governmental agencies and another valuation at $.45 on the dollar that was implied in its claim against Accredited. As a result, Lone Star has provided Accredited with two totally different and irreconcilable valuations for the exact same assets -- one at $.79 on the dollar and the other at $.45 on the dollar. In addition, if Lone Star has a claim with respect to the MRA, Mr. Brown is of the opinion that such claim should be subordinated as a claim of an "insider". None of the information concerning the February valuation submitted by Lone Star to Accredited is reflected in the Disclosure Statement. Likewise, the fact that, if Lone Star has any claim against Accredited, it should be "subordinated" as a claim of an "insider" is not set forth in the Disclosure Statement. Moreover, as soon as Lone Star filed its $96 million claim, the three officers of Accredited pleaded with the bankruptcy professionals at Hunton and Alix to file immediately an Objection to the Lone Star $96 million claim and put Lone Star to its burden of proving up its claim, particularly in light of its February 2009 valuation of the collateral at $.79 on the dollar. The bankruptcy professionals refused to do so thereby attempting to retain (in the opinion of Mr. Brown) the ability to use this claim as "trade bait" in an effort to justify a "low-ball" settlement with Lone Star.

- **Description of the Claims against Lone Star in the Disclosure Statement.** With a 78 page Disclosure Statement and the $240 million of viable claims against Lone Star, you would expect that the Disclosure Statement would include a schedule detailing the amount of each claim against Lone Star; a definitive description of each claim; the evidence supporting each claim and the possible defenses of Lone Star against each such claim; and an evaluation of the likelihood of success as to each such claim. Only by means of such a complete disclosure could a creditor fairly evaluate whether the proposed $15.6 million settlement with Lone Star is good, bad, or ugly. The quick answer is that the Disclosure Statement sets forth none of this! This is consistent with the practices followed by Accredited's bankruptcy professionals throughout this case -- a compete failure to disclose material information concerning this case to the Court, to the United States Trustee, to the Creditors' Committee, to Kodiak and to the other creditors of Accredited.

- **Kodiak's Motion to Convert to Chapter VII.** As a final matter, early in this case, Kodiak filed a Motion to Convert the Accredited cases to a Chapter VII proceedings. In her response, the United States Trustee identified virtually all of the concerns of the undersigned with what has transpired in this case except for the prior affiliations between Hunton and Lone Star which the Trustee could not address because these affiliations had been concealed by Hunton. In fact, the Trustee states in her response to the Motion "The United States Trustee is concerned that this is not simply a liquidating Chapter XI case but, rather the 'tail end' of an extensive pre-bankruptcy liquidation in which affiliates were intimately involved." The Trustee precisely identified the problems in this case. However, this Motion to convert has continued to be pushed out and never heard by the Court for reasons unknown to either of the undersigned.

Your Honor, we apologize for the length of this letter but consider all of the above to be essential to your understanding of what has actually transpired in this case. Throughout this case it is our opinion that the goal of the bankruptcy professionals of Accredited and Lone Star has been to continue to "hide the ball" as to material information from the Court, the United States Trustee, the Creditors' Committee and the creditors of Accredited.

Throughout this process, while the undersigned were still involved in the Accredited estate we repeatedly requested that Hunton and Alix disclose more fully all the material facts that are set forth in this letter. We were repeatedly assured that all these facts would be fully disclosed as the bankruptcy process unfolded. However, as this case nears its conclusion and we see the facts set forth in the Disclosure Statement that was submitted to your Court, we believe the material facts have still not been adequately disclosed. This is why we are sending this letter to you at this time. In order to get to the bottom of what has been truly going on in the Accredited cases, we implore you to call the undersigned to testify on the record as to what has transpired in this case. Additionally, there are still officers of Accredited who we believe should be subpoenaed in order to bring the full magnitude of this case to light.

Respectfully submitted,

David Osborn
Telephone: 858-663-2041

Bart A. Brown, Jr.
602-502-6173

cc: United States Trustee
     Andrew I. Silfen, Esq.
     Jeffrey N. Rothleder, Esq.
     Neil R. Lapinski, Esq.
     Stuart M. Brown, Esq.
     Gregory G. Hesse, Esq.
     Lynnette R. Warman, Esq.
     Meade Monger
     Laura Davis Jones, Esq.