IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS HOLDING CO., et al. | § | Case No. 09-11516 (MFW) |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION

Dated: October 29, 2010

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT. THE DEBTORS INTEND TO REQUEST APPROVAL OF THIS DISCLOSURE STATEMENT CONCURRENTLY WITH CONFIRMATION OF THE PROPOSED LIQUIDATING PLAN OF ACCREDITED HOME LENDERS, INC. AND ITS AFFILIATED DEBTORS.

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE

DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTOR SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

> **PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISERS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

Page

I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ...................................1

II. SHORT SUMMARY OF THE PLAN.......................................................................................1

III. SOLICITATION AND VOTING PROCEDURES....................................................................6

    A. CHAPTER 11 GENERALLY ...................................................................................6
    B. SOLICITATION OF ACCEPTANCES OF THE PLAN ..................................................7
    C. VOTING ON THE PLAN .......................................................................................8
    D. OTHER GENERAL INFORMATION ......................................................................10

IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO
THE COMMENCEMENT OF THE CASES ........................................................................11

    A. EXPLANATION OF AHL'S BUSINESS ..................................................................11
    B. EVENTS LEADING UP TO THE LONE STAR ACQUISITION .....................................13
    C. MAJOR EVENTS FROM LONE STAR ACQUISITION TO AHL BANKRUPTCY .............14
    D. REVIEW OF MAJOR TRANSACTIONS...................................................................17
    E. SIGNIFICANT POST-PETITION DATE FILINGS AND EVENTS ....................................22

V. THE PLAN .............................................................................................................................28

    A. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS............................29
    B. CONVENIENCE CLASSES...................................................................................40
    C. ALLOWANCE AND DISALLOWANCE OF CLAIMS AND INTERESTS ...........................40
    D. SUBORDINATION ...............................................................................................41
    E. DEEMED CONSENT ...........................................................................................41
    F. LIQUIDATING TRUST .........................................................................................41
    G. LONE STAR SETTLEMENT...................................................................................47
    H. MEANS FOR IMPLEMENTATION OF THE PLAN .....................................................50
    I. EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................................56
    J. VESTING OF ASSETS..........................................................................................57
    K. DISTRIBUTIONS ................................................................................................58
    L. RELEASES & EXCULPATIONS .............................................................................59
    M. PRESERVATION OF DEBTORS' CAUSES OF ACTION ..............................................61
    N. PLAN INJUNCTION ............................................................................................61
    O. CONDITIONS PRECEDENT TO EFFECTIVE DATE OF PLAN......................................62
    P. RETENTION OF JURISDICTION .............................................................................63

VI. CONFIRMATION AND CONSUMMATION PROCEDURE .................................................67

    A. DISCLOSURE AND SOLICITATION ......................................................................67
    B. ACCEPTANCE OF THE PLAN...............................................................................67
    C. CLASSIFICATION ..............................................................................................67
    D. CONFIRMATION................................................................................................67

# TABLE OF CONTENTS

Page

VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................69

    A.    TAX TREATMENT OF THE LIQUIDATING TRUSTS .......................................70
    B.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS ...............72
    C.    FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS .........................................................................73

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ....................................79

    A.    FORWARD LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT MAY PROVE TO BE INACCURATE .......................................................................79

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .....................................................................................................79

    A.    LIQUIDATION UNDER CHAPTER 7 .......................................................80
    B.    ALTERNATIVE PLAN(S) OF REORGANIZATION........................................80

X. CONCLUSION.............................................................................................80

# EXHIBITS

Exhibit A          Liquidating Plan of Debtors' Chapter 11

Exhibit B          Liquidation Analysis

Exhibit C          Plan Support Agreement and Term Sheet

# I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This First Amended Disclosure Statement (the "Disclosure Statement") is submitted by the Debtors, which are the proponents of the Debtors' First Amended Chapter 11 Plan of Liquidation (the "Plan"). The purpose of the Disclosure Statement is to provide Creditors and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan. The purpose of the Plan is to effect a liquidation of the Debtors' Assets and to distribute the proceeds of the Debtors' Assets to Creditors in a manner that will maximize recoveries by Creditors. *Defined terms used, but not defined in this Disclosure Statement, shall have the meaning ascribed to such terms in the Plan. Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.*

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Creditors under the Plan (Section V, *The Plan*);
- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);
- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Information Regarding the Debtors and Events Leading to the Commencement of the Cases*);
- Describes the significant events that have occurred during the Chapter 11 Cases (Section IV.E, *Significant Events During the Chapter 11 Cases* );
- Describes the means for implementing the Plan (Section VI.E, *The Liquidation of the Debtors*);
- Projects the total percentage recovery that each Class of Allowed Claims and Interests is likely to receive (Section II, *Short Summary of the Plan*); and
- Evaluates liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX.A, *Liquidation Under Chapter 7*).

# II. SHORT SUMMARY OF THE PLAN

The Plan is a liquidating plan. It does not contemplate the continuation of the Debtors' collective businesses. The Plan:

(i) incorporates and implements the Plan Support Agreement and Term Sheet entered by various creditors and parties-in-interest;

(ii) substantively consolidates the assets and liabilities of Accredited Home Lenders Holding Co. ("Holdco") with those of its wholly owned subsidiary, Vendor Management Services, LLC (collectively referred to herein with Holdco as "Consolidated Holdco");

(iii) establishes a Liquidating Trust for Consolidated Holdco that will acquire the Consolidated Holdco Liquidating Trust Assets (as defined herein), liquidate those assets,

and distribute the proceeds of those assets to creditors of Consolidated Holdco pursuant to the terms of the Plan;

(iv) substantively consolidates the assets and liabilities of Accredited Home Lenders, Inc., Inzura Insurance Services, Inc. and Windsor Management Co. (collectively referred to herein as the "Consolidated Debtors");

(v) establishes a second Liquidating Trust that will acquire the Consolidated Debtors Liquidating Trust Assets, liquidate those assets, and distribute the proceeds of those assets to the creditors of the Consolidated Debtors pursuant to the terms of this Plan;

(vi) resolves the intercompany claims of the Consolidated Debtors and Consolidated Holdco; and

(vii) settles all Claims that the Consolidated Debtors may have against Lone Star Entities in exchange for a cash payment from the Lone Star Entities in the amount of $15,600,000 and the subordination or waiver of the Claims asserted by the Lone Star Entities that have been asserted in the approximate amount of $100,000,000.

The releases in the Plan are (i) essential to the success of the Debtors' liquidation and maximization of the value of their assets, (ii) based upon critical financial or other contributions of the parties being released, (iii) necessary to make the Plan feasible, (iv) fair to creditors, and (v) integral to obtaining the value provided under the settlement with the Lone Star Entities. The Debtors will seek at the Confirmation Hearing to bind and enforce these releases.

The following table briefly summarizes the treatment of Allowed Claims and Interests and the provisions of the Plan. **Most of the claims of borrowers, employees, and vendors will be initially classified in Class 3 C. Such claimants will have the option to opt for treatment under Class 4 C or Class 6 C. Most of the claims of REIT Preferred Shareholders will be classified in Class 8 H.** For a more detailed description of the terms and provisions of the Plan, see Section V below.

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan. Similarly, Professional Fee Claims are not classified under the Plan. Section V.A.1 below describes the treatment of such Unclassified Claims.

| *Class* | *Impairment and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1 H** **Secured Claims against Consolidated Holdco** | Unimpaired. Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 2 H** **Priority Claims Other than Priority Tax Claims against Consolidated Holdco** | Unimpaired. Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |
| **Class 3 H** **All Allowed Unsecured Claims against Consolidated Holdco, except for the Unsecured Claims separately classified** | Impaired. Entitled to Vote. | $1 Million to 1.4 Million | 24-30% |
| **Class 4 H** **All Allowed Unsecured Claims against Holdco held by LSF-MRA, LLC** | Impaired. Entitled to Vote. | $97 Million[2] | 0% (provided that Class 7 H votes to accept the Plan) |
| **Class 5 H** **All Allowed Unsecured Claims against Consolidated Holdco held by the REIT** | Impaired. Entitled to Vote. | $20 Million | 24-30% |
| **Class 6 H** **All Convenience Claims against Consolidated Holdco** | Impaired. Entitled to Vote. | $200,000 | 75% |

---

[2] Various parties have questioned the amount of this Claim and this Claim has not been determined or allowed by the Court. In accordance with the terms of the settlement embodied in the Plan Term Sheet and Support Agreement, the Lone Star Entities are waiving their right to receive distributions on this Claim and an objection to the allowance of this claim is not contemplated at this time.

| *Class* | *Impairment and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 7 H**<br><br>**All Claims against Consolidated Holdco arising from or related to any securities or promissory notes issued by the Accredited Preferred Securities Trust I** | Impaired.<br><br>Entitled to Vote. | $60 Million | 24-30% |
| **Class 8 H**<br><br>**All Claims against Consolidated Holdco arising from the REIT Preferred Holder's Subordinated Guaranty Claims** | Impaired.<br><br>Not Entitled to Vote and Deemed to Reject Plan. | $102,000,000 | 0 % |
| **Class 9 H**<br><br>**All other Subordinated Claims against Holdco** | Impaired.<br><br>Not Entitled to Vote and Deemed to Reject Plan. | $0 | 0% |
| **Class 10 H**<br><br>**All Interests in Consolidated Holdco** | Impaired.<br><br>Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |

| *Class* | *Impairment and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1 C**<br><br>**Secured Claims against the Consolidated Debtors** | Unmpaired.<br><br>Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |
| **Class 2 C**<br><br>**All Allowed Unsecured Claims against the Consolidated Debtors entitled to priority under §§ 507(a)(3) through (a)(7) of the Bankruptcy Code** | Unimpaired.<br><br>Not Entitled to Vote and Deemed to Accept the Plan. | $100,000[3] | 100% |
| **Class 3 C**<br><br>**All Allowed Unsecured Claims against the Consolidated Debtors (including Allowed Unsecured Claims held by borrowers, employees, and vendors), except for the Unsecured Claims separately classified** | Impaired.<br><br>Entitled to Vote. | $106 Million | 67-100% |
| **Class 4 C**<br><br>**All Allowed Unsecured Claims ) against the Consolidated Debtors opting out of the Creditor Release** | Impaired.<br><br>Entitled to Vote. | $ Unknown | Unknown %[4] |

---

[3] This estimate excludes the IRS Priority Tax Claim.

[4] The amount of Allowed Claims in Class 4 C and recoveries obtained by Holders of such Claims cannot be estimated since participation in Class 4 C is optional for Holders of Unsecured Claims against the Consolidated Debtors in Class 3 C and Holder of Convenience Claims against the Consolidated Debtors in Class 6 C.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 5 C**<br><br>**All Allowed Unsecured Claims against the Consolidated Debtors held by the Lone Star Entities** | Impaired.<br><br>Entitled to Vote. | $100 Million | 0% |
| **Class 6 C**<br><br>**All Convenience Claims against the Consolidated Debtors** | Impaired.<br><br>Entitled to Vote. | $1 Million to 2 Million | 75% |
| **Class 7 C**<br><br>**All Subordinated Claims against the Consolidated Debtors** | Impaired.<br><br>Not Entitled to Vote and Deemed to Reject Plan. | $15 Million | 0% |
| **Class 8 C**<br><br>**All Interests in the Consolidated Debtors** | Impaired.<br><br>Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |

## III. SOLICITATION AND VOTING PROCEDURES

### A. Chapter 11 Generally

Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest. The confirmation and consummation of a plan of reorganization is the objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor. Subject to certain limited exceptions, the confirmation order discharges the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan.

Generally, the holders of claims against or interests in a debtor that are classified under the plan are permitted to vote to accept or reject the Plan. For the Bankruptcy Court to confirm a plan, the plan must be accepted by at least one class of creditors whose interests or rights are impaired under the plan. The Bankruptcy Code provides that a plan has been accepted by a class

of claimants if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed claims of that class have voted in favor of the plan.

**ONLY THE VOTES OF HOLDERS WHO SUBMIT PROPERLY COMPLETED BALLOTS VOTING FOR OR AGAINST THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUISITE ACCEPTANCES OF THE CLASSES OF CLAIMS AND INTERESTS HAVE BEEN RECEIVED. FAILURE BY A HOLDER TO DELIVER A DULY SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY THAT HOLDER WITH RESPECT TO THE VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN AND THEREFORE WILL HAVE NO EFFECT. FURTHERMORE, THE DEBTORS RESERVE THE RIGHT PRIOR TO CONFIRMATION OF THE PLAN TO SEEK TO HAVE ANY PARTY'S VOTE ESTIMATED SOLELY FOR PURPOSES OF COUNTING SUCH VOTE IN ACCORDANCE WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018.**

The Bankruptcy Code also requires that the solicitation of acceptances of the proposed plan must be accompanied by a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. That is the purpose of this Disclosure Statement.

The Plan provides for specified distributions to the various Classes of Holders of Claims and Interests, which are described in detail herein. The Debtors believe that the Plan provides consideration to all Classes of Claims and Interests that reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of Claims and Interests. In addition to the voting requirements discussed above, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed.

## B.    Solicitation of Acceptances of the Plan

Under the Plan, all Claims and Interests have been placed in various Classes based on the nature and priority of the Claim or Interest. Each Class is either impaired or unimpaired under the Plan, as such terms are defined in § 1124 of the Bankruptcy Code. A Class of Claims or Interests that is unimpaired is conclusively presumed to have accepted the Plan pursuant to §1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in impaired Classes that are to receive distributions under the Plan or are entitled to the right to vote as provided under the Plan Support Agreement and Term Sheet. As discussed above, for impaired Classes, § 1126 of the Bankruptcy Code provides that an impaired Class of Claims or Interests is deemed to accept the Plan if Holders of at least two-thirds in dollar amount and a majority in number of the Claims who cast Ballots vote to accept the Plan.

Only those Holders who vote to accept or reject the Plan will be counted for purposes of determining whether the Plan is accepted or rejected. Therefore, the Plan could be accepted by any impaired Class of Claims with the affirmative vote of significantly less than two-thirds in dollar amount and a majority in number of the Claims in a Class.

## C. Voting on the Plan

The Debtors have requested that the Bankruptcy Court set December 7, 2010 as the deadline for casting ballots approving or rejecting the Plan.

### 1. Who May Vote

Only Holders of Claims in Classes that are impaired are eligible to vote on the Plan. Accordingly, only Holders of Claims in Classes 3 H, 4 H, 5 H, 6 H, 7 H, 3 C, 4 C, 5 C and 6 C are eligible to vote.

> **The Ballot Deadline is December 7, 2010. You must return your completed Ballot to the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, so that it is actually received by 4:00 p.m., prevailing Pacific Time, on December 7, 2010.**

### 2. Voting Deadline and Extensions

To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, and after consultation with the Creditors' Committee and the Lone Star Entities, to extend the Ballot Deadline, in which case the term "Ballot Deadline" will mean the latest date on which a Ballot will be accepted. To extend the Ballot Deadline, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that the Debtors are extending the Ballot Deadline for a specified period of time, or on a daily basis until 5:00 p.m., Eastern Time, on the date on which we have received sufficient acceptances to seek confirmation of the Plan.

### 3. Voting Procedures

An appropriate Ballot is enclosed in the solicitation package included with this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, at the address indicated on the Ballot, by no later than 5:00 p.m., Eastern Time, on December 7, 2010.

If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions thereon, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the aggregate amount of the Claim for voting purposes will be the amount shown on the Debtors' books and records and listed in the Debtors' Schedules of Assets and Liabilities, unless otherwise ordered by the Bankruptcy Court. If the aggregate amount of the Claims filled in on your Ballot exceeds the amount indicated by the Debtors' books and records and listed in the Debtors' schedules, the Debtors reserve the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Bankruptcy Rule 3018. Failure of a Holder to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan.

The Plan provides for a settlement with the Loan Star Entities that includes a release by certain creditors. The Ballot for creditors in Classes 3 C and 4 C will also give such creditors the ability to opt out of a release of creditor's claims against the Loan Star Entities. While creditors in Classes 3 C and 4 C will receive Pro-Rata distributions of interests in the Consolidated Debtors Liquidating Trust, creditors exercising the right to opt out of the release of the Lone Star Entities will not receive distributions from the Lone Star Settlement Payment. For the avoidance of any doubt, if a creditor holding an allowed claim elects to opt-out of the creditor release of claims against Lone Star, such creditor *will only receive a distribution of interests in the Consolidated Debtors Liquidating Trust*.

Submission of all Ballots must be made directly to the balloting agent appointed in the Bankruptcy Proceeding, Kurtzman Carson Consultants, LLC, in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

If you must return your Ballot to your bank, broker, agent, or nominee, then you must return your Ballot to such bank, broker, agent, or nominee in sufficient time for them to process your Ballot and return it to the above address before the deadline. Your Ballot will not be counted if received after this deadline.

Should you have any questions regarding vote, please contact counsel to the Debtors, Gregory G. Hesse, at (214) 979-3000, or counsel to the Creditors' Committee, Jeffrey N. Rothleder, at (202) 828 3472.

4.    Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Ballot Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to Kurtzman Carson Consultants, LLC at its address set forth on the Ballot at any time prior to the Ballot Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;
- contain the description of the Claim; and
- be signed by the Holder in the same manner as on the Ballot.

The Debtors expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to Kurtzman Carson Consultants, LLC prior to the Ballot Deadline a subsequent properly completed Ballot. If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted. If more than one Ballot is submitted, and the later dated Ballot(s) supplement rather than supersede the earlier Ballot(s), the subsequent Ballot(s) must be marked with the words "Additional Votes" or other language customarily used to indicate additional votes that are not meant to revoke earlier votes.

### D. Other General Information

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS THAN OTHER AVAILABLE ALTERNATIVES. A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE IS ANNEXED HERETO AS **EXHIBIT B**. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE APPLICABLE DEBTOR AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS, INTERESTS, AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES

**FOR A FULL UNDERSTANDING OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.**

General information regarding the Debtors, their businesses and material events leading to their commencement of the Cases and the proposal of the Plan is set forth in Section IV. Except where otherwise noted, this information is provided by the Debtors and their management. **THE STATEMENTS AS TO THE APPLICABLE DEBTOR'S FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF JULY 31, 2010 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE, NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Certain risk factors and other considerations are described in Section VII below. Alternatives to confirmation and consummation of the Plan are described in Section IX below.

**THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE APPLICABLE DEBTOR AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

## IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES

### A. Explanation of AHL's Business

Accredited Home Lenders, Inc. ("AHL, Inc.") was founded in San Diego, California in 1990. It grew to become one of the nation's premier mortgage banking institutions with over 5,000 employees engaged in the business of originating, servicing, and selling residential mortgage loans that did not generally conform to the credit or other criteria established by the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. At its peak in 2006, AHL, Inc. originated in excess of $2 billion in residential home mortgages per month. AHL, Inc.'s parent company, Accredited Home Lenders Holding Co. ("Holdco"), became a public company in 2003 and its initial public offering was the NASDAQ's best-performing IPO that year.

AHL, Inc. was a mortgage lender specializing in providing non-prime residential loans in the United States[5]. It worked with potential borrowers and lenders to arrange loans for the

---

[5] A wholly owned subsidiary of Holdco, Accredited Home Lenders Canada, Inc. ("AHL Canada") conducted operations similar to AHL, Inc. in Canada. AHL Canada was a subsidiary of Holdco until September 2008, at which time Holdco transferred the ownership of the equity interests in AHL Canada to AHL, Inc.

purchase of residential property secured by mortgages on such properties. The key market drivers for AHL, Inc's loan origination business were home prices and interest rates. Increasing home prices drove higher collateral values and more demand for financing new mortgages and refinancing existing mortgages. Low interest rates resulted in more affordable mortgage payments and also drove new loan origination and refinancing demand.

AHL, Inc. focused its business operations in three areas: (i) retail originations; (ii) wholesale originations; and (iii) servicing. In the retail business, AHL, Inc. served as both the mortgage broker and lender working directly with the borrower to obtain, underwrite and close the mortgage loan, and AHL, Inc. typically received a fee for both of these services. AHL, Inc. targeted new borrowers for its retail business through branch retail offices until September 2007 and also through its call center operations responding to internet and phone leads from customers. In the wholesale business, AHL, Inc. only served as the lender and had account executives that targeted third party retail mortgage brokers that originated the loans.

In 2004, AHL, Inc. formed the Accredited Mortgage Loan REIT Trust (the "REIT"), which was a wholly owned subsidiary of AHL, Inc. As part of its formation, the REIT issued $102 million of 9.75% perpetual, cumulative preferred shares. After originating loans and mortgages, AHL, Inc. would contribute as capital the loans to the REIT, which would in turn securitize the mortgages, sell the securities backed by those mortgages and upstream the proceeds from the securitizations to AHL, Inc. as either dividends or inter-company loans. The securitization process was a major source of cash for continuing AHL, Inc.'s lending operations. The REIT retained a residual income stream from these mortgage-backed securities. Pursuant to agreements between AHL, Inc. and the REIT, AHL, Inc. earned and received a management fee for managing the REIT. Further, as payments were received from the residuals, the REIT transferred the cash to AHL, Inc. in the form of dividends and transfers recorded as inter-company loans. As of the end of 2007, the REIT had allegedly transferred over $190 million to AHL, Inc. and by the end of 2008, the REIT had allegedly transferred over $220 million to AHL, Inc. However, there were no explicit plans made at any time for repayment of the accumulated balance of the transfers from the REIT to AHL. The REIT asserts that the non-dividend transfers described above were loans and to the extent any party asserts to the contrary, the REIT reserves all of its rights, claims and defenses. The transactions involving REIT are the subject of the REIT Adversary, which is discussed below in Section III.D.7.

Pending the sale of any loan, and after securitizing the loans and mortgages it originated, AHL, Inc. often retained the role of servicing these loans for the benefit of the owner of the loan. AHL, Inc.'s servicing activities included collecting and applying the payments from borrowers and policing the borrowers' obligations under the mortgages and loans. The owners of these loans compensated AHL, Inc. for providing these services. As was customary in the loan servicing business, AHL, Inc. often advanced funds (1) to the holders of the securitization bonds/certificates for principal, interest and fee payments, (2) to pay taxes and insurance on behalf of the borrower to protect the collateral and (3) for corporate advances. These servicing advances were regularly recorded on AHL, Inc.'s books as receivables and were generally considered to be collectible.

In addition, AHL, Inc. and its affiliates provided other services relating to residential mortgages, such as servicing and managing foreclosures, providing various insurance-related services such as core title and settlement services, and providing expanded insurance services for mortgage brokerage and mortgage lending operations.

## B.  Events Leading Up To The Lone Star Acquisition

On or about September 29, 2006, AHL, Inc., as borrower, Holdco, as guarantor, and JPMorgan Chase Bank, as lender ("JP Morgan") entered into that certain $75 million revolving senior secured facility (the "Senior Secured Facility"). The Senior Secured Facility was secured by (1) AHL, Inc.'s master servicing rights and (2) servicer advances made by AHL, Inc.

On or about October 1, 2006, Holdco acquired a competing subprime lender, Aames Investment Corporation ("Aames") for stock valued at the time at approximately $235 million and cash in the amount of $94 million. Holdco acquired Aames in order to expand its retail lending operations.

The year 2007 brought a severe downturn in the United States' real estate markets and a subprime mortgage crisis. In the midst of this crisis, the secondary market for non-prime residential loans ceased to exist for all practical purposes, which in turn resulted in the cessation of originations of non-prime residential mortgages. Since the origination and sale of non-prime residential mortgages was AHL, Inc.'s primary area of business, the Debtors suffered severe liquidity issues because of its inability to sell the loans that it originated and became distressed.

In January, 2007, Holdco established an affiliate, Accredited Preferred Securities Trust I, a Delaware statutory trust ("APS"), and issued debentures to APS, which in turn sold trust preferred securities the public (the "Trust Preferred Securities"). The current owners of the Trust Preferred Securities are the Kodiak CDOs and JP Morgan (the "TRUPs Holders"). As a result of these transactions, Holdco raised approximately $56 million and Holdco became liable to APS for the amount raised plus interest. APS became obligated under the Trust Preferred Securities to the TRUPs Holders for the same amount. APS is not a debtor in these chapter 11 proceedings.

In early 2007, AHL, Inc's warehouse lenders reduced collateral values and placed large margin calls on AHL, Inc. that totaled over $200 million. In order to create liquidity, in March, 2007, AHL, Inc. sold mortgages to Citigroup with an unpaid principal balance of approximately $2.7 billion at a discount of approximately 7%. To provide further liquidity, around this time, Holdco, AHL, Inc., and the REIT obtained a $230 million bridge loan from Farallon Capital Management, LLC ("Farallon"), which loan was secured by all or substantially all of the assets of Holdco, AHL, Inc. and the REIT (the "Farallon Loan").

On or about March 30, 2007, Wachovia Bank ("Wachovia") agreed to provide AHL, Inc. with a $750 million warehouse line of credit that was in the form of a master repurchase agreement (the "Wachovia MRA"). Subsequently, the Wachovia MRA was amended numerous times, including an amendment that increased the maximum availability from $750 million to $1 billion.

As 2007 progressed, the sub-prime lending industry was imploding. For example HSBC took an $11 billion write down due to subprime mortgages, marking the first of many write downs for large banks. New Century Financial and American Home Mortgage collapsed and filed for bankruptcy. Most major banks closed subprime lending arms. Overall, almost all of the top 25 subprime originators from 2006 ceased to exist.

In June, 2007, Lone Star Fund V, a fund that targets distressed investments, made an offer to buy all of the outstanding shares of Holdco for $15.10 per share (approximately $400 million).

Lone Star Fund V subsequently announced that it believed that the conditions of the tender offer would not be met and that it would not tender for shares. As a result, Holdco and Lone Star Fund V sued each other in Delaware Chancery Court.

On or about August 22, 2007, Holdco issued a press release announcing steps that it was taking to respond to the "ongoing turmoil in the non-prime mortgage industry." Among the operational restructuring initiatives were (1) the closing of 60 retail branch locations and 5 centralized retail support locations; (2) the closing of 5 wholesale lending divisions; and (3) ceasing to accept new loan applications.

In September, 2007, Holdco and Lone Star Fund V resumed negotiations which culminated on September 18, 2007, with Holdco and LSF5 Accredited Investments, LLC ("LSF5 Investments") executing an amended merger agreement. Pursuant to the terms of the amended merger agreement, on September 18, 2007, LSF5 Mortgage Line, LLC, a Lone Star affiliate, ("LSF5 Mortgage Line") purchased the Senior Secured Facility at par from JP Morgan for $33 million. Furthermore, on September 18, 2007, LSF5 Mortgage Line advanced approximately $15 million in additional funds under the Senior Secured Facility to AHL, Inc. and extended the maturity date until September, 2008.

On October 12, 2007, LSF5 Investments, a Lone Star affiliate, acquired Holdco for $11.75 per share (approximately $300 million).

## C.     Major Events From Lone Star Acquisition To AHL Bankruptcy

### 1.     Market Conditions

Since the Lone Star Entities acquired the Debtors, the United States has suffered through one of the worst economic down turns since the Great Depression. The economic down turn initially started in the non-prime mortgage lending arena and has spread to almost every other segment of the economy. Among the major events that occurred after the Lone Star Entities acquired the Debtors, but before the Debtors filed for bankruptcy, are:

- December, 2007--the U.S. economy enters into a recession as announced by the Business Cycle Dating Committee on December 11, 2008.

- January, 2008--Bank of America acquires Countrywide Financial.

- March 17, 2008--Bear Stearns is acquired by JP Morgan with financial assistance from the Federal Reserve Bank of New York.

- July 11, 2008--IndyMac Bank, a large residential mortgage lender, fails.

- September 7, 2008--Fannie Mae and Freddie Mac are placed into government conservatorship.

- September 15, 2008--Lehman Brothers files for bankruptcy.

- September 15, 2008--Bank of America announces that it will purchase Merrill Lynch.

- September 16, 2008--AIG avoids collapse as a result of an $85 billion bailout by the Federal Reserve Bank of New York.

- September 25, 2008--Washington Mutual Bank, a large residential mortgage lender, fails.

- September 29, 2008--The FDIC announces that Citigroup will buy the assets of Wachovia, financed in part by the FDIC.

- October 3, 2008--Wells Fargo Bank makes a competing offer for Wachovia, which is ultimately accepted.

- October 3, 2008--Congress passes and President Bush signs legislation establishing the $700 billion Troubled Asset Relief Program ("TARP").

- October 24, 2008--PNC Financial Services Group purchases National City Corporation.

- October 28, 2008--U.S. Treasury purchases a total of $125 billion of preferred stock in nine U.S. banks. This is the first of many purchases by the U.S. Treasury of preferred stock in U.S. banks with funds from TARP.

- November 23, 2008--U.S. Treasury, the Federal Reserve Board and the FDIC jointly announce an agreement with Citigroup to provide a package of guarantees, liquidity access and capital, including an investment of $20 Billion by the U.S. Treasury.

- December 19, 2008--the U.S. Treasury authorizes loans of up to $13.4 billion for General Motors and $4 Billion for Chrysler from TARP.

- December 22, 2008--Federal Reserve Board approves application of CIT Group to become a bank holding company.

- December 24, 2008--Federal Reserve Board approves application of GMAC to become a bank holding company.

- December 29, 2009--U.S. Treasury announces that it will purchase $5 billion of equity in GMAC.

- January 16, 2009--U.S. Treasury, Federal Reserve and FDIC jointly announce an agreement with Bank of America to provide a package of guarantees, liquidity access and capital, including an investment of $20 billion by the U.S. Treasury.

- March 19, 2009--U.S. Treasury announces the Auto Supplier Support Program that will provide up to $5 billion of financing to the automotive industry.

## 2. Management and Governance of AHL

Immediately after LSF5 Investments acquired Holdco, the board of directors of Holdco consisted of two pre-acquisition directors, Jim Konrath and Joe Lydon, and six directors affiliated with the Lone Star Entities, Len Allen, Marc Lipshy, Catharon Miller, Leigh Rea, Michael Thompson and Benjamin Velvin. The members of the board of directors changed frequently until finally in March, 2009, each Debtor had only one director, Chad Patton, a Lone Star affiliate. At all times after the acquisition at least a majority of the members of the Debtors' boards of directors were affiliated with the Lone Star Entities.

## 3. Operations

Through the first half of 2008, AHL, Inc. focused its efforts on restarting its loan origination business, which was stopped prior to the acquisition of Holdco by LSF5 Investments. In order for the loan origination business to be successful, a secondary market for the mortgages must exist. AHL, Inc. had very limited success in identifying a secondary market for its loans. So, the Lone Star Entities attempted to provide a portion of the secondary mortgage market and it purchased the securities issued by three "residential loan pools" (each a "RLP" and collectively, the "RLPs") established by AHL, Inc. at a total purchase price of $193 million.

The first, and largest, sale was $133 million of loans sold at 101.6% ($62 million "legacy" loans (pre-Lone Star) at 100% and $71 million "new" loans at 103%) in March, 2008. Because these loans were generally financed on the Wachovia MRA at less than par, the sale of the March, 2008 RLP resulted in excess cash paid to AHL, Inc. in the amount of approximately $31 million. The second sale in May 2008, was $39 million of loans sold at par, which resulted in excess cash paid to AHL, Inc. in the amount of $9 million. The third, and final, sale in June was $17 million of loans sold at 99%, which resulted in excess cash paid to AHL, Inc. in the amount of $4 million.

As part of the transaction, the RLPs had typical repurchase rights. AHL, Inc. honored approximately $2.5 million of repurchases from the RLPs, during a period when it was generally not honoring repurchase demands from other parties. AHL, Inc.'s honoring of these repurchase demands could give rise to an action under Chapter 5 of the Bankruptcy Code against the Lone Star Entities, which, if pursued could result in a recovery for the Estates. AHL, Inc. serviced these loans on behalf of the RLPs, on terms substantially similar to those available in an arm's length transaction, until the RLPs terminated AHL, Inc.'s right to service the loans on or about March 17, 2009.

As a result of limited success in identifying a secondary market for its loans, in June, 2008, AHL, Inc. implemented certain operational restructurings, including the closing of four of its five wholesale operations centers and consolidating its wholesale business in San Diego. In addition, AHL, Inc. laid off close to one-half of its workforce.

AHL, Inc. commenced further operational restructuring initiatives beginning in the second half of August, 2008. The restructurings included the suspension by AHL, Inc. of its wholesale operations that had been previously consolidated into the San Diego office in June.

However, AHL, Inc. retained 40 wholesale personnel that were repurposed for other tasks. The retail operations were consolidated in Irving, Texas, and the San Diego and Cincinnati retail operations were shut down. Overall, AHL, Inc. terminated another one-third of its workforce at this time, leaving under 400 people employed.

After the August, 2008, restructuring, AHL, Inc. had approximately 40 wholesale staff including account executives positioned throughout housing markets, 40 retail staff that were focusing on FHA and conventional loan activity, and a servicing team of approximately 185 people. In addition to the retail, wholesale and servicing personnel, AHL, Inc. also employed approximately 90 corporate personnel and approximately 25 personnel at its Inzura business providing insurance services. At this time, AHL, Inc. was trying to develop synergies with other of the Lone Star Entities' mortgage-related resources.

Throughout the summer 2008, AHL, Inc. worked on a number of loan sales including sales to Countrywide ($30 million) and Beal Bank ($46 million). As part of the transaction with Countrywide, LSF5 Mortgage Line arranged a $1 million guarantee to Countrywide, which was executed in August, 2008. The Countrywide guarantee was a material term included in the July 21, 2008 Amendment to the Senior Secured Facility. Since both sales closed after LSF MRA, a Lone Star affiliate, purchased the Wachovia MRA from Wachovia on August 13, 2008,[6] LSF MRA had the right under that former Wachovia MRA to require all proceeds be used to pay down the former Wachovia MRA (the "Amended MRA"). However, LSF MRA chose not to exercise that right and allowed AHL, Inc. to retain approximately $9 million of proceeds, which was the excess of the sale price over the advance rate under the Amended MRA.

AHL, Inc. appeared to be executing its business strategies during the months of September and October of 2008 while its liquidity position continued to place pressure on the company. As noted above, external market conditions took a dramatic turn for the worse in September, 2008, when Lehman Brothers filed for bankruptcy and AIG was, effectively, taken under government control. In an effort to provide liquidity to the company, in mid October, AHL, Inc. was in negotiations with Caliber Funding, LLC ("Caliber"), a Lone Star affiliate, regarding the potential sale of Inzura and Windsor to Caliber Funding, LLC, which sales never materialized.

## D.    Review Of Major Transactions

### 1.    Repayment of Farallon

On or about October 12, 2007, Farallon delivered to Holdco written notice demanding payment in full of the Farallon Loan, which Farallon was accelerating under the loan agreement's change-in-control provisions. Immediately after acquiring Holdco, LSF5 Investments contributed $100 million into Holdco as equity and, on or about November 21, 2007, LSF5 Affiliate Finance, LLC, a Lone Star affiliate, ("Affiliate Finance") made an unsecured short term loan in the amount of $130 million to Holdco (the "$130 Million

---

[6] The loan sale to Beal Bank closed on August 28, 2008. The loan sale to Countrywide had multiple closings throughout September, 2008.

Unsecured Loan"). While the promissory note evidencing the $130 Million Unsecured Loan was executed by Holdco, the company's accounting records reflect the debt as an obligation of AHL, Inc. The proceeds of the capital contribution and the $130 Million Unsecured Loan along with cash on hand was used to satisfy, in full, the Farallon Loan, including principal, interest in the amount of $6.7 million, pre-payment fees of $4 million, and expenses of $581,000. The $130 Million Unsecured Loan was a five month loan with interest payable at 13% which the parties anticipated would be paid from an expected tax refund in excess of the loan amount.

In January 2008, a tax refund in the approximate amount of $150 million was received by Holdco as the parent of the Debtors' consolidated tax group. While Holdco received the payment, the refund was primarily based on the operations of AHL, Inc., and the tax refund was listed as an asset of AHL, Inc. on each of the companies' internal accounting records. On January 31, 2008, Holdco made a payment in the amount of $65 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to partially satisfy the principal balance of the $130 Million Unsecured Loan. On or about January 31, 2008, Holdco transferred most of the remaining proceeds from the tax refund to AHL, Inc. On February 25, 2008, AHL, Inc. made a payment in the amount of $65 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to satisfy the remaining principal balance of the $130 Million Unsecured Loan. Both payments were made in advance of the maturity of the underlying loan. During the period of time that the $130 Million Unsecured Loan was outstanding, it accrued interest in the amount of approximately $3.9 million. On or about July 30, 2008, within the one year period prior to the commencement of these chapter 11 cases, AHL, Inc. paid $3 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, in partial satisfaction of the outstanding interest owed and Holdco converted to equity the remaining $900,000 in interest owing on the $130 Million Unsecured Loan. Had the Debtors sought protection under the Bankruptcy Code before January 31, 2009, the entire $130 Million Unsecured Loan repayment would have been within the one year period in which the Debtors' bankruptcy estates could have sought to recover such payments as preferences under § 547 of the Bankruptcy Code. Since the Debtors did not file bankruptcy until May 1, 2009, the $130 Million Unsecured Loan repayment is not avoidable as a preference under § 547 of the Bankruptcy Code; however, as discussed below, the Creditors Committee asserts that the Debtors delayed commencement of these cases so as to prevent subjecting these payments to potential avoidance. The Lone Star Entities dispute this allegation.

2.  Senior Secured Facility

As was noted above, in September, 2007, LSF5 Mortgage Line acquired the Senior Secured Facility from JP Morgan. From September, 2007 through early March, 2009,

(1) LSF5 Mortgage Line and/or Affiliate Finance made several advances to AHL, Inc. under the Senior Secured Facility,

(2) AHL, Inc. made several payments to LSF5 Mortgage Line on the Senior Secured Facility,

(3) LSF5 Mortgage Line agreed to convert to equity certain amounts owing under the Senior Secured Facility, and

(4) the parties amended the Senior Secured Facility several times.

Pursuant to the amendment to the Senior Secured Facility executed on March 19, 2008, AHL, Inc. granted LSF5 Mortgage Line a lien on all its property (except property pledged by AHL to Wachovia on the Servicer Advance Facility). LSF5 Mortgage Line did not fully perfect its lien until July 2008, which is within the one year prior to the commencement of these bankruptcy cases.

On or about March 9, 2009, LSF5 Mortgage Line and AHL, Inc. agreed to a discounted payoff of the Senior Secured Facility. At that time, the total amount outstanding on the Senior Secured Facility was approximately $58 million. LSF5 Mortgage Line agreed to release its liens on all the assets of all AHL entities in exchange for a cash payment in the amount of $30 million, and a non-recourse lien in the amount of $5 million on a receivable owed to AHL, Inc. by Select Portfolio Services, Inc. ("SPS"). As is noted in more detail below, ultimately, the Debtor compromised the amount of the SPS receivable for $1.25 million, and the lien asserted by LSF5 Mortgage Line will be released pursuant to the Plan.

## 3. Wachovia Servicer Advance Facility

On February 20, 2008, Wachovia and Accredited Receivables Funding, LLC ("ARF"), a subsidiary of AHL, Inc., entered into a one-year $100 million Credit Agreement (the "Servicer Advance Facility").[7] Under the Servicer Advance Facility, AHL, Inc. was able to borrow against advances it made as servicer for payment of principal and interest ("P&I"), corporate advances, and taxes and insurance ("T&I") at advance rates up to 90%. Structurally, AHL, Inc sold its advances to ARF pursuant to a Receivables Purchase Agreement, which was guaranteed by Holdco. ARF would then borrow against these advances and upstream the cash to AHL, Inc. The Servicer Advance Facility resulted in upwards of $70 million of fresh liquidity to AHL, Inc. in early 2008. In order to complete this transaction, LSF5 Mortgage Line released its lien on the Servicer Advances, which were previously collateral under the Senior Secured Facility.

The facility was amended from time to time (often in conjunction with the Wachovia MRA). On January 19, 2009, Wachovia granted an extension of the maturity date to April 2, 2009, which allowed for the close of a transaction with SPS (which is discussed in detail below.) Prior to the Petition Date, AHL, Inc. repaid the $85 million outstanding on the Servicer Advance Facility with proceeds from the sale by AHL, Inc. of certain Master Servicing Rights to SPS (discussed below).

## 4. Wachovia MRA

As was noted above, on or about March 30, 2007, Wachovia agreed to provide AHL, Inc. with the Wachovia MRA, a $750 million warehouse line of credit in the form of a repurchase agreement. Throughout the third quarter of 2007 and into 2008, Wachovia exercised its rights under the Wachovia MRA to make margin calls on AHL, Inc., which ultimately totaled

---

[7] Wachovia Capital Markets, LLC was Agent and Accredited Home Lenders, Inc. was Servicer on the Servicer Advance Facility.

approximately $115 million. In the face of a $36 million margin call delivered on July 29, 2008, AHL, Inc. initiated a lawsuit against Wachovia seeking a temporary restraining order to prevent Wachovia from exercising its rights under the Wachovia MRA. To resolve the disputes and the litigation, on August 13, 2008, LSF MRA, LLC ("LSF MRA") purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 million. This transaction included 2,583 mortgages with an unpaid principal balance of $621 million. AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.

After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA, which converted the Amended MRA into a term facility, provided for accelerated payment, eliminated the right of LSF MRA to make margin calls, and terminated the obligation of LSF MRA to purchase mortgage loans from AHL, Inc. LSF MRA, AHL, Inc. and the REIT entered into several amendments to the Amended MRA to extend the maturity dates four times to terminate in November, 2008, December, 2008, February 2009 and on March 17, 2009. When the Amended MRA finally matured on March 17, 2009, AHL, Inc. and the REIT defaulted on the Amended MRA due to their failure to repurchase the mortgages. According to LSF MRA, LSF MRA retained the mortgages in partial satisfaction of the damages that it sustained, and to mitigate its damages. In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 Million.[8] The Lone Star Entities subsequently offset from this damage claim about $1.3 Million it owed to AHL, Inc. for mortgage servicing rights, which are further described below. LSF MRA subsequently filed a proof of claim in an amount of approximately $96 Million.

5. The Mortgage Servicing Rights

Part of AHL, Inc's business model was to service the mortgages that it originated and securitized. In the role of servicer, AHL, Inc. would earn fee income. Throughout 2008, AHL, Inc. was the servicer for the 17 securitizations that it created, the Residential Loan Pools, the loans subject to the Wachovia MRA and Amended MRA and the mortgages that AHL owned.

In August, 2008, AHL, Inc. began actively marketing its servicing rights to its securitizations ("MSRs"). Initially, Ocwen Financial expressed an interest in purchasing the MSRs, but Ocwen terminated its discussions with AHL, Inc. in mid-September, 2008. On September 24, 2008, AHL, Inc. engaged Phoenix Capital to sell the MSRs.

With the assistance of Phoenix Capital, SPS was identified as a purchaser of the MSRs. The purchase price to be paid by SPS was the reimbursement to AHL, Inc. of the outstanding servicer advances (approximately $117 million) plus a $7 million premium. As the negotiations progressed, the parties agreed that the payment of the premium would be conditioned upon delivery on or before May 1, 2009, of "no downgrade letters" for each of the securitizations from the various rating agencies. The first closing of this sale occurred on February 2, 2009 when

---

[8] The Creditors Committee asserts that this $96 Million figure is based on a fraction of the value placed on the mortgages by the Lone Star Entities a few months before. The Lone Star Entities dispute this assertion. As provided in the Term Sheet and Plan Support Agreement, the parties will not challenge the valuation, at this time.

AHL, Inc. received proceeds in the approximate amount of $85 million. On March 2, 2009, the final SPS closing occurred, and AHL, Inc. received $32 million of additional cash. From the proceeds of the sale of the MSR's to SPS, AHL, Inc. repaid approximately $85 Million owed to Wachovia under the Servicer Advance Facility.

AHL, Inc. and SPS did not receive the no-downgrade letters from all the ratings agencies. Consequently, SPS did not pay the $7 million premium to AHL, Inc., which required AHL, Inc. to retain the law firm of Quinn Emmanuel. On or about April 30, 2009, AHL, Inc. initiated a lawsuit against SPS to collect the unpaid $7 million premium arising from the sale of the MSRs. After the commencement of this suit and the Petition Date, AHL, Inc. and SPS have agreed to settle this litigation with SPS making a payment to AHL, Inc. in the amount of $1.25 million, which payment was received on January 15, 2010, after approval of the settlement by the Bankruptcy Court. The pleading further detailing this settlement can be found at Docket No. 1112.

With regard to the servicing rights for the mortgages subject to the Amended MRA, LSF MRA exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. LSF MRA did not pay AHL, Inc. approximately $1.3 million for servicer advances. On April 27, 2009, LSF MRA sent AHL, Inc. a notice that it set off the damages under the Amended MRA against those unpaid servicer advances.

With regard to the servicing rights for the mortgages subject to the Residential Loan Pools, the trustee for the Residential Loan Pools at the direction of the holders of the securities (an affiliate of Lone Star Fund VI) exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. The Residential Loan Pools paid AHL, Inc. for all fees and reimbursed AHL, Inc. for all servicer advances.

6. Transfer of AHL Canada

To conduct lending operations in Canada, Holdco formed AHL Canada. In general terms, the operations of AHL Canada were very similar to the operations of AHL, Inc. Ultimately, AHL Canada stopped originating loans in 2008. Effective as of September 30, 2008, Holdco transferred the ownership of AHL Canada to AHL, Inc.

While AHL Canada has no ongoing operations, its liquidation value is estimated by the Debtors to be worth approximately $24 Million. The assets of AHL Canada consist of cash of approximately $2.2 Million and residuals from two securitizations that have an estimated value of approximately $18 to $25 Million, net of estimated tax obligations. AHL Canada has no debt of any significance. It may have certain tax obligations which the Debtors are currently investigating.

Since the stock of AHL Canada was contributed by Holdco to AHL, Inc. as capital, the Debtors believe that such transfer may be avoidable as a fraudulent transfer. The Plan proposes to resolve the potential fraudulent transfer by transferring ownership of AHL Canada to the

Consolidated Holdco Liquidating Trust to be monetized for the benefit of Consolidated Holdco Creditors.

### 7. REIT Claim

As was noted above, since AHL, Inc. formed the REIT, the REIT transferred cash to AHL, Inc. (on an intercompany basis) and, ultimately, the accounting records reflect an intercompany payable from AHL, Inc. to the REIT of approximately $227 Million. Effective as of December 31, 2008, AHL, Inc. transferred ownership of the common stock of the REIT to Holdco and Holdco assumed AHL, Inc.'s obligation to the REIT and an adjustment in the intercompany liabilities between these companies. The ad hoc committee of REIT preferred shareholders filed proofs of claims against both Holdco and AHL, Inc. reflecting this alleged intercompany debt that were unliquidated but stated that the amounts due exceeded $227,000,000 (the "REIT Claims").

In early 2010, the Debtors consented to the Bankruptcy Court granting the Creditors Committee standing to investigate, pursue, prosecute and settle any and all causes of action that may arise out of the transactions with REIT. The Bankruptcy Court entered an order approving the Creditors Committee standing (Docket No. 1323) and, on May 11, 2010, after further investigation and due diligence, the Creditors Committee initiated an adversary proceeding styled *Official Committee of Unsecured Creditors v. Accredited Mortgage Loan REIT*, Adversary No. 10-50980-MFW (the "REIT Adversary"). In the REIT Adversary, the Creditors Committee has, among other things, objected to the REIT Claims, seeks to subordinate the REIT Claims, and seeks to recharacterize the REIT Claim as equity. The REIT has answered the complaint filed in the REIT Adversary and denies that the Creditors Committee is entitled to any of the relief sought in the REIT Adversary. The Plan will settle the REIT Adversary by compromising the allowed amount of the REIT Claims in the manner described below.

## E. Significant Post-Petition Date Filings and Events

### 1. First Day Motions

On the Petition Date, the Debtors filed a number of "first day" motions, which were designed to ensure the Debtors' ability to continue to operate with minimal disruption following the filing of these Cases. The Bankruptcy Court granted many of these first day motions, entering various orders, that, among other things:

- authorized the Debtors to make payments related to outstanding wage, vacation, severance and related withholding tax obligations;
- allowed the Debtors' various bankruptcy cases to be jointly administered;
- excused the Debtors from the U.S. Trustee's requirements that their pre-petition bank accounts be closed and new post-petition bank accounts be opened;
- prohibited utility service providers from refusing to provide services;
- allowed the Debtors to promise their employees a modest severance payment to induce those employees to remain with the Debtors through this bankruptcy process; and

- appointed Kurtzman Carson Consultants as noticing, claims, and solicitation agent for these cases.

2. Debtors' Retention of Professionals

In order to liquidate their operations and assets and administer these chapter 11 cases, the Debtors have retained various professionals, including Hunton & Williams, LLP as lead bankruptcy counsel, Pachulski Stang Ziehl & Jones LLP as co-counsel for the Debtors, and AP Services, LLC to provide restructuring and management services to the Debtors. The Debtors have also retained the law firm of Quinn Emanuel Urquhart Oliver & Hedges, LLP as litigation counsel to advise the Debtors in matters in which Hunton & Williams is disqualified, and the law firms of Kirkland & Ellis LLP and Luce, Forward, Hamilton & Scripps LLP to represent the Debtors in an ongoing class-action securities fraud case, which the Debtors are settling for an amount that will be covered by their insurance carriers  Finally, the Debtors retained Phoenix Capital, Inc. to help market and sell certain assets.

3. The Official Committee of Unsecured Creditors

On June 16, 2009 the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors Committee"), consisting of a commercial institution, a trade vender, and an individual borrower. The Creditors Committee has retained the law firm of Arent Fox, LLP as lead bankruptcy counsel, Elliott Greenleaf as co-counsel, and Weiser LLP as financial advisors. Subsequently, on July 23, 2009, the U.S. Trustee reconstituted the Creditors Committee such that it currently consists of two financial institutions; a trade vendor, an individual borrower and a litigation claimant. The Creditors Committee has been an active participant in these bankruptcy cases, including participating in sales of the Debtors' assets, attending hearings, analyzing various proposed settlements, investigating potential claims against the Debtors' current and former directors and officers and the Lone Star Entities, negotiating the proposed settlement with the Lone Star Entities that is set forth in the Plan Support Agreement and Term Sheet and is included in the Plan, and participating with the Debtors in the formulation of the Plan and this Disclosure Statement.

4. Rejection of Leases and Contracts

On the Petition Date, the Debtors filed a motion to reject approximately 56 leases of real property throughout the United States that had been used as local branch offices for the Debtors' loan origination and servicing operations. This motion was granted, relieving the Debtors' estates from the burden of paying for such leases. Also, on the Petition Date, the Debtors filed motions to reject almost 300 other executory contracts for the supply of various goods and services that the Debtors no longer required. These motions were also granted. The Debtors have also relocated their offsite electronic data storage systems to a smaller and more cost effective facility.

5. Asset Sales

On July 2, 2009, the Court approved the sale of the Debtors' residential mortgage servicing platform for a purchase price of $495,000 plus the assumption of certain liabilities to an affiliate of the Debtors, Vericrest Financial, a Lone Star affiliate, which sale closed on or about July 6, 2009. After this sale, the Debtors were left with less than fifteen employees, who are essential to completing the liquidation of the assets of the Debtors and their subsidiaries and the wind-up of the Debtors' affairs.

On July 7, 2009, the Court entered an order approving the procedures for auctioning the Debtors' remaining 90 mortgage loans. This auction was a success. The winning bidder, NPA I, LLC, offered $3.525 million for these loans, and the Court entered approved this sale by an order entered on July 31, 2009. The sale of the mortgage loan pool closed on or about August 19, 2009.

On December 1, 2009 and January 28, 2010 the Court entered orders permitting the Debtors to sell their remaining mortgage loans and real estate assets.

Pursuant to the *de minimis* asset sale motion, the Debtors have sold various assets generating proceeds for the estate in excess of $250,000. The Debtors continue to market and sell the remaining *de minimis* assets.

6.  Atlas Class Action Settlement

Prior to the Petition Date, Holdco was a defendant in a class action securities fraud case styled, *Atlas v. Accredited Home Lenders Holding Co.*, Case No. 3:07-CV-00488-H-CAB pending in the United States District Court for the Southern District of California (the "Atlas Litigation"). The parties to the Atlas Litigation settled the matter within the policy limits of the a prior D & O insurance policy. The Creditors Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. The Bankruptcy Court approved the settlement on August 27, 2009. As a result of the settlement of the Atlas Litigation, proceeds in the amount of $994,068.09 from the applicable D & O insurance were paid to reimburse the Debtors for defense costs previously advanced.

7.  SPS Settlement

Prior to the Petition Date, and as discussed above, AHL, Inc. sued SPS seeking payment of $7 million arising from the sale of the MSRs to SPS. AHL, Inc. and SPS settled the dispute and SPS made a payment to AHL, Inc. in the amount of $1.25 million. The Creditors Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. On November 25, 2009, the Debtors filed a motion seeking approval of the SPS settlement, which motion was approved. The Debtors and SPS consummated the settlement on or about January 15, 2010. One of the Lone Star Entities, LSF5 Mortgage Line, has asserted that it has a lien against the proceeds of the SPS settlement. As part of the Plan Support Agreement and Term Sheet, LSF5 LSF5 Mortgage Line has agreed to release its alleged lien on the proceeds of the SPS settlement.

8.  Investigation of Insider Causes of Action

Since the Petition Date, the Debtors and the Creditors Committee have investigated the facts and circumstances surrounding, among other things (1) the acquisition of the Debtors by the Lone Star Entities, (2) transactions between the Lone Star Entities and its affiliates, on the one hand and the Debtors, on the other hand, and (3) the operation of the Debtors since they were acquired by the Lone Star Entities, to determine if causes of action exist against the Lone Star Entities or the Debtors' officers, directors, shareholders and affiliates.

On January 6, 2010, the Creditors Committee filed its *Motion for Entry of An Order Granting Leave, Standing and Authority to Investigate and Prosecute Claims and Causes of Action on Behalf of the Committee, Debtors and Debtors' Estates and Settle Claims on Behalf of the Debtors' Estates* (Docket No. 1203, the "Authority Motion"). In the Authority Motion, Creditors Committee alleged that the Debtors have conflicts of interest resulting from, among other things, the Debtors sole director being an employee of a Lone Star Entity, and sought standing to investigate, prosecute, and settle claims on behalf of the Debtors against the Debtors' officers and directors and the Lone Star Entities. In addition, in the Authority Motion, the Creditors Committee outlined some of the Debtors' potential causes of action against the Lone Star Entities (a) breaches of fiduciary duties resulting from the numerous pre-bankruptcy transactions between the Debtors and the Lone Star Entities, (b) aiding and abetting breaches of fiduciary duties, (c) corporate waste, and (d) piercing the corporate veil. The Authority Motion remains pending and, to the extent creditors require additional information, they should consult the Authority Motion, which is available on the Bankruptcy Court docket.

As is set forth in more detail below, the Plan proposes to settle any Claims that the Consolidated Debtors may have against the Debtors' officers and directors and the Lone Star Entities. Any Claims that Consolidated Holdco may have against the Lone Star Entities, however, will be assigned by Consolidated Holdco to the Consolidated Holdco Liquidating Trust to be resolved post-confirmation. This partial settlement is the product of substantial investigation performed by the Debtors, the preparation and submission of the Debtors' findings to the Creditors Committee, the Creditors Committee's own substantial investigation, and protracted arms'-length negotiations amongst the Debtors, the Creditors Committee, the Lone Star Entities, Citigroup (a substantial creditor of the Consolidated Debtors), the REIT, and the ad hoc committee of REIT preferred shareholders. These parties all believe that the settlement proposed in the Plan and embodied in the Plan Support Agreement and Term Sheet is reasonable, appropriate, and in the best interests of their constituents and the Debtors' estates and creditors, and accordingly are supporting the Plan.

In addition, the Debtors have extended their D&O insurance coverage. Under the Plan, the Debtors' rights in their D&O Policies and the proceeds thereof shall be transferred to the Consolidated Holdco Liquidating Trust, and certain of the REIT's interests in its the D&O Policies will also be transferred to the Consolidated Holdco Liquidating Trust, thereby preserving these assets for the creditors of Consolidated Holdco.

9. Kodiak Litigation

Kodiak and Wells Fargo Bank, N.A., as indenture trustee under the indenture agreement Trust Preferred Securities, also initiated a separate lawsuit in the Bankruptcy Court against

certain of the Lone Star Entities asserting direct causes of action (Adversary Proceeding 09-53276, the "Kodiak Adversary"). Recently, the Lone Star Entities and Wells Fargo Bank, N.A., as indenture trustee under the Trust Preferred Indenture, filed a motion seeking to compel mediation of the Kodiak Adversary and requesting that the D&O insurance providers attend. The Court approved this request. Mediation was held in October 2010. The parties have not reached a resolution but are continuing discussions.

The Plan does not settle any claims amongst the Lone Star Entities and Kodiak or any other holders of Trust Preferred Securities. Also, the Plan does not settle any claims between the Lone Star Entities and Holdco, the Debtor against which the holders of the Trust Preferred Securities have asserted claims.

### 10. Discovery Issues

In June, 2009, the holders of Trust Preferred Securities served upon each of the Debtors and Lone Star a request for production of documents under Fed. R. Bankr. P 2004. After the Creditors Committee was formed, it joined the document requests. By agreement, the Debtors produced to over 17,700 documents consisting of 144,807 pages in response to this request. Additionally, the Lone Star Entities voluntarily produced to Kodiak, other holders of Trust Preferred Securities, and the Creditors Committee over 8,580 documents consisting of 185,164 pages. The Creditors Committee analyzed certain of these documents in its investigation into claims and causes of action that could be asserted against the Lone Star Entities and the Debtors' officers and directors, which are highlighted in the Authority Motion that is available on the Bankruptcy Court's docket.

### 11. Tax Issues

The Debtors are part of a consolidated group for the purpose of filing income tax returns, with the named taxpayer being Holdco. The consolidated income tax return includes all of the Debtors and most of the non-debtor subsidiaries of the Debtors. The REIT is not a member of the consolidated tax reporting group, therefore it files its own, separate tax return. While Holdco is the "named taxpayer," it historically has had negligible operations which resulted in nomimal profits and losses. The profits and losses reported to the taxing authorities were primarily generated by AHL, Inc.

For the 2007 tax year, the Debtors filed a consolidated federal income tax return reflecting net operating losses ("NOLs") in the amount of approximately $757 Million. The Debtors elected to carry back the NOLs for 2007 to offset all net income for tax years 2005 and 2006, resulting in a tax refund received by the Debtors in January 2008, in the approximate amount of $144 Million. After the Petition Date, the Internal Revenue Service filed priority claims in excess of $144 Million against the Debtors. The Debtors objected to these claims and the Internal Revenue Service responded, arguing that the claims should not be adjusted by the Court without the normal auditing process being concluded. The Debtors agreed with this position and objections to the Internal Revenue Service's claims have accordingly been abated. This audit process has been concluded, and on October 22, 2010 the Debtors received a letter from the IRS stating that the Congressional Joint Committee on Taxation has completed its

consideration of the special report of the IRS on this audit and did not take exception to the conclusions reached by the IRS. As a result of this audit process, the Internal Revenue Service has concluded that (1) the claims of the Internal Revenue Service will be significantly reduced, to the appropriate amount of $4 Million, which shall be netted against the amounts received from the Tax Refunds described below, and (2) the Debtors overpaid the Internal Revenue Service the total amount of approximately $2.4 Million in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, which amount the Debtors have requested be refunded by the Internal Revenue Service.

On or about September 15, 2009, the Debtors filed their consolidated tax return for 2008 reflecting NOLs of approximately $163 Million. Subsequently, in early November, 2009, Congress passed and President Obama signed legislation that allows businesses that incurred NOLs in 2008 or 2009 to elect to increase the carry back period for either the 2008 NOL or the 2009 NOL from two years to three, four or five years. In March, 2010, the Debtors requested a refund of about $57 Million based upon the previously filed 2008 consolidated federal income tax return, which after being netted against amounts owing by the Debtors to the IRS described in the previous paragraph will result in a payment to the Debtors of approximately $53 Million (excluding the alternative minimum tax correction). The Debtors expect to receive this amount in the very near term.

The Debtors continue to work with their advisors to evaluate the tax situation to determine if additional refunds can be requested as a result of additional losses that may be available for tax year 2008. At this time, the Debtors believe there may be additional losses in tax year 2008 that may result in approximately $10 to $51 Million in additional tax refunds available over and above the $57 Million refund already requested. The Debtors, with the assistance of the accounting firm Deloitte, are in the process of preparing an amended 2008 tax return.

Since the tax refund is the result of NOLs being offset against prior years' income, all or substantially all of the refund belongs to the Consolidated Debtors. As will be discussed in more detail below, the Plan clarifies that the tax refunds belong to the Consolidated Debtors and provides that all Tax Refunds will be paid to the Consolidated Debtors Liquidating Trust to be distributed to the creditors of the Consolidated Debtors.

12. Other Asset Recoveries

The Debtors have obtained Court approval of settlements with various workers compensation insurance carriers that lead to those insurers returning over $1 million in cash collateral to the Debtors' estates. The Debtors have also recovered over $1 million from a Court -approved settlement with the trustee for the Debtors' terminated deferred compensation trust. The Debtors have also retained experts who are in the process of recovering unclaimed property held by various governmental authorities. These assets will be vested with the Consolidated Debtors pursuant to the Plan.

13. Claims Administration

The Bar Dates for creditors to file proofs of claim have passed. The Debtors received over 1260 proofs of claim. Many of the proofs of claims were grossly inflated, unsupported, or incorrectly asserted secured or priority status. The Debtors have made substantial progress in reviewing, evaluating, and objecting, where appropriate, to the numerous claims filed against their estates. The Debtors have filed eighteen omnibus claim objections. The large majority of these objections have been either sustained or consensually resolved. The Debtors have also settled three major class claims asserted by various groups of former employees. The Debtors have been working on resolving and liquidating the numerous unliquidated claims filed by various investment vehicles for contractual claims relating to the mortgages sold to those investment vehicles by the Debtors. Nineteen omnibus claims objections have been filed, along with various other objections to specific claims. Further, many claims have been resolved consensually without the need for objection. Out of the approximately 1260 proofs of claim filed, almost 775 have been allowed in reduced amounts, reclassified, expunged, or withdrawn pursuant to agreements or orders entered by the Court. In addition, objections remain pending to almost 300 claims, and various other settlements are still expected to be finalized and submitted to the Court for approval.

14. REIT Adversary

In addition, the Creditors Committee commenced the REIT Adversary to, in part, disallow or significantly to reduce the REIT's large asserted Claims against all of the Debtors. As part of the settlement proposed by the Plan, this litigation will be settled by providing the REIT with allowed claims against AHL, Inc. and Holdco that are significantly reduced from those initially asserted by the REIT. Indeed, REIT will be entitled to an allowed unsecured claim against the Consolidated Debtors in the amount of $37.5 million, an allowed unsecured claim against Consolidated Holdco in the amount of $20 Million, and an allowed subordinated claim against the Consolidated Debtors in the amount of $15 million. Further, the REIT will agree to not enforce the subordination provisions of the Trust Preferred Indenture against the holders of Trust Preferred Securities as part of the settlement.

The prosecution of the REIT Adversary proceeding is stayed until December 15, 2010, which stay can be further extended upon agreement of the parties.

The holders of the Trust Preferred Securities and the Trust Preferred Indenture Trustee filed motions to intervene and/or obtain derivative standing to pursue the claims asserted in the REIT Adversary. The Creditors Committee filed oppositions to those motions, which are currently pending before the Bankruptcy Court.

## V. THE PLAN

**THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED**

## A. Classification and Treatment of Claims and Interests

The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

### 1. Unclassified Claims – Administrative Claims and Priority Tax Claims

#### (a) Administrative Claims

Administrative Claims other than Professional Fee Claims need to be asserted on or before thirty (30) days after the Effective Date (the "Administrative Claim Bar Date"). Any Holder of an Allowed Administrative Claim shall receive the full amount of the Holder's Allowed Administrative Claim in one cash payment from the Consolidated Debtors or Holdco, as applicable and as part of the Effective Date Distribution. An Administrative Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Administrative Claim. Upon the entry of a Final Order allowing an Administrative Claim, the Holder of that Claim shall receive the full amount of such Claim in one cash payment from the applicable Liquidating Trust. The applicable Liquidating Trustee or the applicable Debtor and the Holder of an Allowed Administrative Claim may agree to less favorable treatment of such Allowed Administrative Claim. An Administrative Claim not filed prior to the Administrative Claim Bar Date shall be deemed forever waived and barred, the Holder thereof shall not be entitled to a distribution under the Plan, and the Debtors or applicable Liquidating Trustee shall have no obligation with respect thereto.

Professional Fees Claims need to be asserted on or before forty-five (45) days after the Effective Date (the "Professional Fee Bar Date"). The Debtors or the applicable Liquidating Trustee will pay or cause to be paid an Allowed Professional Fee Claim, in cash, within five (5) days after the entry of a final order from the Court allowing such Claim. All Allowed Professional Fee Claims shall be ratably paid, with 75% paid by the Consolidated Debtors or the Consolidated Debtors Liquidating Trust and 25% paid by Consolidated Holdco or the Consolidated Holdco Liquidating Trust. To the extent that the Consolidated Debtors have previously paid more than 75% of the Allowed Professional Fee Claims, the Consolidated Debtors shall have an Administrative Claim against Consolidated Holdco or the Consolidated Holdco Liquidating Trust for any amount paid in excess of 75% of the Allowed Professional Fee Claims which shall be paid, in cash, within five (5) days after the entry of a Final Order allowing such Allowed Professional Fee Claims.

In addition, with regard to the services provided by AP Services, LLC (the "CRO Expenses") since the Petition Date, such CRO Expenses shall be ratably paid, with 75% paid by the Consolidated Debtors or the Consolidated Debtors Liquidating Trust and 25% paid by Consolidated Holdco or the Consolidated Holdco Liquidating Trust. To the extent that the Consolidated Debtors have previously paid more than 75% of the CRO Expenses, the Consolidated Debtors shall have an Allowed Administrative Claim against Consolidated Holdco or the Consolidated Holdco Liquidating Trust for any amount paid in excess of 75% of the CRO

Expenses which shall be paid, in cash, within five (5) days after such CRO Expenses shall become allowed.

The proposed allocation of CRO Expenses and Professional Fee Claims amongst the different Liquidating Trusts is based on an analysis performed by AP Services of the tasks performed by those professionals and the estates benefitting from such tasks. This allocation is something of an estimate. Many of these tasks benefitted all of the Debtors' estates, rendering a more precise allocation impossible.

(b)     Priority Tax Claims

Any Holder of an Allowed Priority Tax Claim shall receive the full amount of the Holder's Allowed Priority Tax Claim in one cash payment from Consolidated Holdco or the Consolidated Debtors, as applicable, as part of the Effective Date Distribution. A Priority Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Priority Tax Claim. Upon the entry of a Final Order allowing an Priority Tax Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one cash payment  from the Consolidated Holdco Liquidating Trust except as otherwise provided under Section 3.3 of the Plan. Upon the entry of a Final Order a Priority Tax Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one cash payment  from the Consolidated Debtors Liquidating Trust except as otherwise provided under Section 3.3 of the Plan. The applicable Liquidating Trustee or Debtor and the Holder of an Allowed Priority Tax Claim may agree to less favorable treatment of such Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, it will be classified as a Class 1 Secured Claim.

(c)     IRS Priority Tax Claim

The Holder of the IRS Priority Tax Claim shall be paid in full from the Tax Refunds, and the IRS Priority Claim will be considered an obligation of the Consolidated Debtors or the Consolidated Debtors Liquidating Trust.

2.     Treatment of Classes of Claims and Interests under the Consolidated Holdco Plan

Class 1 H - Secured Claims: Class 1H Secured Claims are unimpaired. Any Holder of a Class 1H Allowed Secured Claim shall, at the sole option of Consolidated Holdco, receive (a) the full amount of the Holder's Class 1H Allowed Secured Claim in one cash payment as part of the Effective Date Distribution from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1H Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 1H Allowed Secured Claim. Upon the entry of a Final Order allowing the Class 1H Allowed Secured Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall, at the sole option of the Consolidated Holdco Liquidating Trustee, receive (a) the full amount of such Claim in one

cash payment from the Consolidated Holdco Liquidating Trust, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated, at the sole option of the Consolidated Holdco Liquidating Trustee. The Consolidated Holdco Liquidating Trustee or Debtor and the Holder of a Class 1H Allowed Secured Claim may agree to less favorable treatment of such Class 1H Allowed Secured Claim.

**BECAUSE CLASS 1 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 2 H - Priority Claims, other than Priority Tax Claims: Class 2H Priority Claims are unimpaired. Any Holder of a Class 2 H Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2 H Allowed Priority Non-Tax Claim in one cash payment as part of the Effective Date Distribution from Consolidated Holdco. A Class 2 H Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2 H Allowed Priority Non-Tax Claim. Upon the entry of a Final Order allowing the Class 2 H Allowed Priority Non-Tax Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one cash payment from the Consolidated Holdco Liquidating Trust. The Consolidated Holdco Liquidating Trustee or Debtor and the Holder of a Class 2 H Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2 H Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 3 H - General Unsecured Claims against Consolidated Holdco: The Class 3H Claims are impaired. Holders of Class 3H Allowed Claims shall receive a Pro Rata Share of interests in the Consolidated Holdco Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of Consolidated Holdco Liquidating Trust Assets made by the Consolidated Holdco Liquidating Trustee out of the Consolidated Holdco Liquidating Trust in accordance with the Consolidated Holdco Liquidating Trust Agreement. In calculating the distribution to the Holders of Class 3H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims included in Class 3H, 4H, 5H and 7H. On the Effective Date, or as soon thereafter as is practicable, the Consolidated Holdco Liquidating Trustee shall make a distribution to each Holder of an Allowed Class 3H Claim in an amount equal to such Holder's Pro Rata Share of the balance in the Consolidated Holdco Liquidating Trust Account remaining after creation of the Consolidated Holdco Liquidating Trust Reserve.

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Consolidated Holdco Liquidating Trustee, in his sole discretion, may make an Interim Distribution to the holder of such Claim from the Consolidated Holdco Liquidating Trust Reserve, or may release funds from the Consolidated Holdco Liquidating Trust Reserve to such Claim Holder in a Subsequent Distribution. The holders of Allowed Class 3 H Unsecured

Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from the Consolidated Holdco Liquidating Trust.

Upon full administration of the Assets vested in the Consolidated Holdco Liquidating Trust, the Consolidated Holdco Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Consolidated Holdco Liquidating Trustee to the Class 3 H Unsecured Claim Holders shall be satisfied. In the event that the Holders of Class 3 H Allowed Unsecured Claims are paid in full, together with interest thereon from the Petition Date through the date on which such claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, any funds remaining in the Consolidated Holdco Liquidating Trust Account, net of expenses, shall be distributed to the Holders of the Class 4 H and 5 H Claims, and potentially Class 7 H Claims, in accordance with the provisions of the Plan.

In the event Class 3 H votes in favor of the Plan, the payment of Class 4 H Claims will be subordinated and junior to the payment of Class 3 H Claims and Class 4 H Claims shall not receive any distribution until Class 3 H Claims are paid in full under the Plan. Holders of Class 3 H claims are expected to receive increased recoveries if the Plan is confirmed with this voluntary subordination by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Class 3 H recoveries are estimated to be between 24% and 30% under the Plan, as opposed to 1.3% to 10.6% in liquidation.

**BECAUSE CLASS 3 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 3 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 4 H - Unsecured Claims Against Consolidated Holdco held by LSF-MRA, LLC</u>: The Class 4 H Claims <u>are</u> impaired. Holders of Class 4H Allowed Claims shall receive a Pro Rata Share of interests in the Consolidated Holdco Liquidating Trust. In calculating the distribution to the Holder of Class 4H Claims, the Pro Rata Share shall include in the calculation the claims included in Class 3H, 4H, 5H and 7H. Until the Holders of the Class 4H Allowed Claims are satisfied in full with interest thereon from the Petition Date through the date on which such Claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, the Holder of Class 4H Allowed Claims shall be entitled to receive its Pro Rata Share of the proceeds of the Consolidated Holdco Liquidating Trust.

Notwithstanding the foregoing, in the event Class 3 H votes in favor of the Plan, the payment of Class 4 H Claims will be subordinated to the payment of Class 3 H Claims and Class 4 H Claims shall not receive any distribution until Class 3 H Claims are paid in full as provided under the Plan.

Further, in the event Class 5 H votes in favor of the Plan and does not object to the confirmation of the Plan, the payment of Class 4 H Claims will be subordinated to the payment of Class 5 H Claims.

Pursuant to the terms of Holdco's guaranty to the Holders of Allowed Class 7 H Claims, Class 7 H Claims are subordinated to the Class 4 H Claims and any payment attributable to Class

7 H Claims are to be paid to the Holders of, inter alia, Allowed Class 4 H Claims. Notwithstanding the foregoing, in the event that that Class 7 H votes to accept the Plan and does not object to confirmation of the Plan, payment of Class 4 H Claims shall be subordinated to payment of the Allowed Class 7 H Claims.

Notwithstanding the foregoing, the subordination of claims of the Lone Star Entities against Consolidated Holdco, including, but not limited to, claims of the Lone Star Entities that are Class 4H Claims, as set forth herein shall not in any way affect or be deemed to affect the availability of such claims for use as setoff or any other defenses of the Lone Star Entities to or against claims against the Lone Star Entities asserted by Consolidated Holdco or the Consolidated Holdco Liquidating Trust.

**BECAUSE CLASS 4 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 5 H - Unsecured Claims Held by the REIT: The Class 5 H Claims are impaired. The Class 5H Claim of the REIT shall be Allowed in the amount of Twenty Million Dollars ($20,000,000) and, on account of such claim, the Holder of the Allowed Class 5 H Claim shall receive its Pro Rata Share of interests in the Consolidated Holdco Liquidating Trust. In calculating the distribution to the Holder of Class 5 H Claim, the Pro Rata Share shall include in the calculation the claims included in Class 3 H, 4 H, 5 H and 7 H. Until the Class 5 H Claim is satisfied in full with interest thereon from the Petition Date through the date on which such Claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, the Holder of the Allowed Class 5 H Unsecured Claims shall be entitled to Pro Rata Share of the proceeds of the Consolidated Holdco Liquidating Trust. The Holder of the Allowed Class 5 H Claim will waive its right to enforce any subordination provisions relating to Class 7 H Claims and in the event Class 5 H votes in favor of the Plan, payment of Class 4 H Claims will be subordinated to the payment of the Allowed Class 5 H Claim.

In the event Class 5 H votes in favor of the Plan, payment of Class 4 H Claims will be subordinated to the payment of the Class 5 H Claim. The REIT is expected to receive increased recoveries if the Plan is confirmed with this voluntary subordination by the Lone Star Entities— as explained in more detail in the Liquidation Analysis attached as Exhibit B, the REIT's recoveries are estimated to be between 24% and 30% under the Plan, as opposed to 1.3% to 10.6% in liquidation.

**BECAUSE CLASS 5 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 6 H - Convenience Class Claims: Each Holder of a Consolidated Holdco Convenience Claim in Class 6 H shall receive 75% of the Holder's Class 6 H Convenience Claim in one cash payment as part of the Effective Date Distribution from Consolidated Holdco, or such other, less favorable treatment as is agreed upon by Consolidated Holdco and the Holder of such Consolidated Holdco Convenience Claim.

Holders of Class 6 H claims are expected to receive increased recoveries if the Plan is confirmed with this voluntary subordination by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Class 6 H recoveries are estimated to be 75% under the Plan, as opposed to 1.3% to 10.6% in liquidation.

**BECAUSE CLASS 6 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 6 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 7 H- Claims against Consolidated Holdco relating to Accredited Preferred Securities Trust I: The Class 7H Claims are impaired. Class 7H consists of Allowed Claims against Holdco that relate to the Trust Preferred Securities, Trust Preferred Notes and the Trust Preferred Note Claims. Holders of Allowed Claims 7H Claims shall receive their Pro Rata Share of interests in the Holdco Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

Pursuant to the terms of Trust Preferred Indenture, the Class 7 H Claims are subordinated to the Class 3 H, 4 H, and 5 H Claims and any payments attributable to Class 7 H Claims are to be paid to the holders of Class 4 H and 5 H Claims. If Class 7 H rejects the Plan, then, until distributions are made in an amount sufficient to pay Holders of Class 4 H and 5 H Claims in full with interest thereon from the Petition Date through the date on which such Claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, the subordination provisions relating to Class 7 H will be enforced and the Pro Rata Share attributable to Class 7 H shall be distributed pursuant to the terms of Sec. 4.4 and 4.5 of the Plan.

Notwithstanding the foregoing, if Class 7 H votes in favor of confirmation of the Plan and the Holders of Class 7 H Claims do not object to confirmation of the Plan, the subordination provisions relating to the Class 7 H Claims will not be enforced and, the holders of Class 4 H Claims shall have payment of their Claims subordinated to the payment of all other Claims against Consolidated Holdco, and Class 7 H shall be entitled to receive the Pro Rata Distribution from the Consolidated Holdco Liquidating Trust.

Holders of Class 7 H claims are expected to receive increased recoveries if the Plan is confirmed with this waiver of subordination rights and voluntary subordination by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Class 7 H recoveries are estimated to be between 24% and 30% under the Plan, as opposed to nothing in liquidation.

**BECAUSE CLASS 7 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 7 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 8 H – REIT Preferred Holders' Subordinated Guaranty Claims: The Class 8 H Claims are impaired. Class 8 H consists of the claims of the Holders of the REIT's Preferred Securities, who have guaranty claims against Holdco that are subordinated to general unsecured Holdco creditors. Unless otherwise agreed to by the Creditors Committee and the REIT

Committee, on the Effective Date (i) the Holders of Allowed Class 8 H Claims shall not receive beneficial interests in the Consolidated Holdco Liquidating Trust or be deemed to be beneficial holders of the Consolidated Holdco Liquidating Trust until all beneficial holders with Allowed Claims in Classes 3 H, 4 H, 5 H, and 7 H have been paid in full as provided under the Plan prior to the termination of the Consolidated Holdco Liquidating Trust, (ii) the Holders of Allowed Class 8 H Claims shall not be entitled to any reports or notices from the Consolidated Holdco Liquidating Trustee until they receive beneficial interests in the Consolidated Holdco Liquidating Trust and are beneficial holders of the Consolidated Holdco Liquidating Trust, and (iii) the Consolidated Holdco Liquidating Trust Agreement shall be drafted in a manner that avoids any material adverse consequences to the Consolidated Holdco Liquidating Trust under applicable securities and tax laws.

In the event the Holders of Class 3 H, 4 H, 5 H, and 7 H Claims who are beneficial holders of the Consolidated Holdco Liquidating Trust are not paid in full as provided in the Plan, or the Consolidated Holdco Liquidating Trust is terminated prior to such senior unsecured creditors who are beneficial holders being paid in full, then the Holders of Allowed Class 8H Claims shall not receive any distribution under the Plan.

If the senior unsecured creditors who are beneficial holders of the Consolidated Holdco Liquidating Trust are paid in full prior to the termination of the Consolidated Holdco Liquidating Trust, then Holders of Holders of Allowed Class 8 H Claims shall receive beneficial interests in the Consolidated Holdco Liquidating Trust as provided under the Plan (unless such claims are disallowed pursuant to a Final Order).

**BECAUSE CLASS 8 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 8 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 9 H - Subordinated Claims against Holdco: The Class 9 H Claims are impaired. Class 9 H consists of claims against Holdco that are subordinated for any reason under § 510 of the Bankruptcy Code. Holders of Class 9H Claims shall not receive any distributions until the Holders of Class 3H, 4H, 5H and 7H Claims against Holdco have been paid in full with interest as provided under the Plan, in which event the holders of Class 9H Claims shall receive their Pro Rata Share of Subsequent Distributions from the Holdco Liquidating Trust.

**BECAUSE CLASS 9 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 10 H- Interests: The Class 10 H interests are impaired. Class 10 H consists of the Interests in Holdco, including those Interests held by the Lone Star Entities. All Interests, including those Interests held by the Lone Star Entities, shall be canceled as of the Effective Date and the Holders thereof shall receive no distribution under the Plan, unless Holders of all Class 8 H and 9 H Claims against Holdco are paid in full with interest as provided under the Plan.

**BECAUSE CLASS 10 H INTERESTS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 10 H INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

> 3. <u>Treatment of Classes of Claims and Interests under the Consolidated Debtors' Plan</u>

<u>Class 1 C - Secured Claims</u>: Class 1 C Secured Claims are unimpaired. Any Holder of a Class 1 C Allowed Secured Claim shall, at the sole option of the Consolidated Debtors, receive (a) the full amount of the Holder's Allowed Class 1 C Secured Claim in one cash payment as part of the Effective Date Distribution from the Consolidated Debtors, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1 C Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Class 1 C Secured Claim. Upon the entry of a Final Order allowing the Allowed Class 1 C Secured Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall, at the sole option of the Consolidated Debtors Liquidating Trustee, receive (a) the full amount of such Claim in one cash payment from the Consolidated Debtors Liquidating Trust, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) the reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim, subject to the requirements of § 1124(2) of the Bankruptcy Code. The Consolidated Debtors Liquidating Trustee or Consolidated Debtors and the Holder of an Allowed Class 1 C Secured Claim may agree to less favorable treatment of such Allowed Class 1 C Secured Claim.

**BECAUSE CLASS 1 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 2 C - Priority Claims, other than Priority Tax Claims</u>: The Class 2C Claims are unimpaired. Any Holder of a Class 2C Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2C Allowed Priority Non-Tax Claim in one cash payment as part of the Effective Date Distribution from the Consolidated Debtors. A Class 2C Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2C Allowed Priority Non-Tax Claim. Upon the entry of a Final Order allowing the Class 2C Allowed Priority Non-Tax Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one cash payment from the Consolidated Debtors Liquidating Trust. The Consolidated Debtors Liquidating Trustee or Debtor and the Holder of a Class 2C Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2C Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 3 C - General Unsecured Claims (including Allowed Unsecured Claims of most borrowers, employees, and vendors) against the Consolidated Debtors: The Class 3 C Claims are impaired. Most of the claims of borrowers, employees, and vendors will be classified in Class 3 C. Holders of Class 3 C and 4 C Allowed Unsecured Claims shall be entitled to receive distributions commencing on the Effective Date to the extent funds of the Consolidated Debtors are available after satisfaction of the Consolidated Debtors' Plan obligations to higher priority claimants, establishment of the Consolidated Debtors Liquidating Trust Reserve, and reservation of sufficient funds to pay the projected expenses of the Consolidated Debtors Liquidating Trust, and continuing on each Subsequent Distribution Date, equal to their Pro Rata Share of any distributions of Consolidated Debtors Liquidating Trust Assets made by the Consolidated Debtors Liquidating Trustee out of the Consolidated Debtors Liquidating Trust.

In addition to the distributions described above, Holders of Class 3 C General Unsecured Claims shall be entitled to receive a Pro Rata Share of the Lone Star Settlement Payment subject to the terms of this Plan. Holders of Class 3 C General Unsecured Claims and Class 6 C Convenience Claims are deemed to have accepted the Creditor Release, thereby releasing any personal or direct claims they have against the Lone Star Releasees, as discussed below in Section V.L.1 of this Disclosure Statement.

Upon full administration of the Assets vested in the Consolidated Debtors Liquidating Trust, the Consolidated Debtors Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Consolidated Debtors Liquidating Trustee to the Holders of Allowed Class 3 C Claims shall be satisfied. In the event that the Holders of Allowed Class 3 C Claims are paid in full, together with interest thereon from the Petition Date through the date on which such claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, any funds remaining in the Consolidated Debtors Liquidating Trust Account, net of expenses, shall be distributed first to the Holders of the Allowed Class 4 C and then to the Holders of Allowed Class 7 C Claims in accordance with the provisions of the Plan.

The Lone Star Entities have agreed to waive the right to receive distributions from the Consolidated Debtors Liquidating Trust if the Plan is confirmed. Thus, Class 3 C claims are expected to receive increased recoveries if the Plan is confirmed with this voluntary waiver by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Class 3 H recoveries are estimated to be between 67% and 100% under the Plan, as opposed to 19.1% to 49.3% in liquidation.

Class 4 C - General Unsecured Claims (including Allowed Unsecured Claims of home loan borrowers) against the Consolidated Debtors opting out of the Creditor Release: The Class 4C Claims are impaired. Holders of Allowed Class 3C and 4C Claims shall be entitled to receive a Pro Rata Share of interests in the Consolidated Debtors Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of the Consolidated Debtors Liquidating Trust Assets made by the Consolidated Debtors Liquidating Trustee out of the Consolidated Debtors Liquidating Trust in accordance with the Consolidated Debtors Liquidating Trust, and continuing on each Subsequent Distribution Date, equal to their Pro Rata Share of any distributions of Consolidated Debtors Liquidating Trust Assets made by the Consolidated Debtors Liquidating Trustee out of the Consolidated Debtors Liquidating Trust.

For the avoidance of doubt, Holders of Class 4 C Non-Releasing General Unsecured Claims opting out of the Creditor Release shall not be entitled to receive any distributions from the Lone Star Settlement Payment.

Upon full administration of the Assets vested in the Consolidated Debtors Liquidating Trust, the Consolidated Debtors Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Consolidated Debtors Liquidating Trustee to the Holders of Allowed Class 4C Claims shall be satisfied. In the event that the Holders of Allowed Class 4C Claims are paid in full, together with interest thereon from the Petition Date through the date on which such claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, any funds remaining in the Consolidated Debtors Liquidating Trust Account, net of expenses, shall be distributed to the Holders of Allowed Class 7C Claims in accordance with the provisions of the Plan.

The Lone Star Entities have agreed to waive the right to receive distributions from the Consolidated Debtors Liquidating Trust if the Plan is confirmed. Thus, Class 4 C claims are expected to receive increased recoveries if the Plan is confirmed with this voluntary waiver by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Class 4 C recoveries are estimated to be only 19.1% to 49.3% in liquidation.

**BECAUSE CLASS 4 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 5 C - Unsecured Claims Against the Consolidated Debtors held by the Lone Star Entities</u>: The Class 5 C Claims <u>are</u> impaired. The Claims of the Lone Star Entities shall be waived and shall receive no distributions under this Plan.

**BECAUSE CLASS 5 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 6 C - Convenience Class Claims</u>: Each Holder of a Consolidated Debtor Convenience Claim in Class 6 C shall receive 75% of the Holder's Class 6 C Convenience Claim in one cash payment as part of the Effective Date Distribution from the Consolidated Debtors or such other less favorable treatment as is agreed upon by the Consolidated Debtors, and the Holder of such Consolidated Debtor Convenience Claim.

Holders of Class 6 C Convenience Claims are deemed to have accepted the Creditor Release, thereby releasing any personal or direct claims they have against the Lone Star Releasees, as discussed below in Section V.L.1 of this Disclosure Statement, and therefore will be entitled to receive distributions from the Lone Star Settlement Payment.

An Allowed Unsecured Claim against any of the Consolidated Debtors that has a face amount equal to or less than $25,0000 shall be treated as a Class 6 C Claim, <u>provided, however</u> that a Holder of such a Claim may opt for that Claim to be treated as a Class 4 C Claim by making that designation on a properly cast Ballot.