## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **ACCREDITED HOME LENDERS** | § | **Case No. 09-11516** |
| **HOLDING CO., et al.** | § | |
| | § | |
| **Debtors.**[1] | § | **JOINTLY ADMINISTERED** |

### THIRD SUPPLEMENTAL DECLARATION OF GREGORY G. HESSE PURSUANT TO RULES 2014 AND 2016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN SUPPORT OF DEBTORS' APPLICATION FOR AN ORDER APPROVING THE EMPLOYMENT OF HUNTON & WILLIAMS LLP AS COUNSEL FOR DEBTORS AND DEBTORS-IN-POSSESSION

"I, Gregory G. Hesse, hereby declare as follows:

1.      I am a partner at Hunton & Williams LLP ("Hunton" or the "Firm"), a national and international law firm with approximately 900 lawyers located in 18 offices domestically and abroad, including offices in the District of Columbia, Virginia, New York, Texas and other states. I am an attorney-at-law, duly admitted and in good standing to practice in the State of Texas, the United States District Courts for all Districts in Texas, the United States Courts of Appeals for the Second and Fifth Circuits and the United States Supreme Court.

2.      I submit this third supplemental declaration in support of the application (the "Application") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), for an order authorizing the Debtors to retain and employ Hunton to represent them in the above-captioned chapter 11 cases, pursuant to and in compliance with section 327(a) of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management of Washington, Inc., d/b/a AHL Foreclosure Services Company, a Washington corporation (4056). A motion has been filed to jointly administer the bankruptcy cases for these debtors and debtors-in-possession under the bankruptcy case and style referenced above.

Title 11 of the United States Code (the "Bankruptcy Code) [Docket No. 22], as well as to provide the disclosures required under Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. I filed my original declaration contemporaneously with and in support of the Application [Docket No. 22], which declaration is fully incorporated herein by reference.

4. The Court entered an order granting the Application and thereby approving the retention of Hunton, as counsel to the Debtors, on May 28, 2009 [Docket No. 113].

5. I have personal knowledge of the facts hereinafter set forth.

6. I am filing this third supplemental declaration because Bart Brown, a former employee of Alix Partners, and David Osborn, a former employee of the Debtors, filed a letter on October 27, 2010, that makes incomplete statements about Hunton's pre-petition engagement by the Debtors.

7. In August, 2008, the Debtors retained Hunton as general outside counsel pursuant to the terms of an engagement letter dated August 18, 1008 (the "2008 Engagement Letter"). A true and correct copy of the 2008 Engagement Letter is attached hereto as Exhibit "A". The 2008 Engagement Letter disclosed to the Debtors four clients (Wachovia, Beal, Ocwen, and "Hudson/Lone Star") represented by Hunton in matters adverse to the Debtors.

8. In the 2008 Engagement Letter, the Debtors granted Hunton consent to represent four entities with regard to the following transactions with the Debtors:

- In July, 2007, Hunton began representing Wachovia Securities, LLC ("Wachovia") with regard to a residential mortgage repurchase agreement (the "Wachovia MRA") with the Debtors;

- In July, 2008, Hunton began representing Beal Bank with regard to an offer to purchase mortgage loans from the Accredited Home Lenders, Inc. ("AHL");

- In August, 2008, Hunton began representing Ocwen Financial with regards to an offer to purchase mortgage servicing rights from AHL; and

- In March, 2008, Hunton undertook representation in connection with "the acquisition and possible securitization of of certain of Accredited's mortgage loans." While the engagement letter referenced "Hudson Advisors ("Hudson") or "other companies affiliated with the Lone Star Funds family of companies," the representation relates to the 2008-1 Securitization, the 2008-2 Securitization and the 2008-3 Securitization described in more detail below.

9. The conflicts identified in the 2008 Engagement Letter either did not materialize or were ultimately resolved and did not exist on the Petition Date.

10. **Wachovia Securities**: On or about August 13, 2008, LSF MRA, LLC ("LSF MRA") purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 Million. Hunton did not represent the Debtors, Wachovia or LSF MRA with regard to this transaction. After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA and certain of the Debtors entered into an Amended Master Repurchase Agreement. Hunton did not represent LSF MRA or the Debtors with regard to this transaction. Subsequent to the Petition Date, LSF MRA filed a proof of claim in the amount of approximately $96 Million against both AHL and Holdco. Hunton did not represent LSF MRA with regards to the proof of claim that it filed.

On September 2, 2010, that certain Settlement Agreement and Term Sheet (the "Settlement Agreement") was executed by the Debtors, the Unsecured Creditors Committee (the "Committee"), Accredited Mortgage Loan REIT Trust (the "REIT"), the Ad Hoc Committee of REIT Preferred Holders (the "REIT Committee") and the "Lone Star Entities" (as that term is defined in the Settlement Agreement). A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "B." Under the terms of the Settlement Agreement, LSF MRA has agreed to (1) waive its right to receive any distributions from the "Consolidated Debtors" (as that

term is defined in the Settlement Agreement) and (2) subordinate its claims to the holders of general unsecured claims against Holdco (as that term is defined in the Settlement Agreement) that do not vote to reject the plan of liquidation filed by the Debtors.

11. **Beal Bank**: On or about August 28, 2008, Beal Bank closed on the purchase of a pool of loans from the Debtors for approximately $46 Million. Hunton represented Beal with regard to this transaction and the representation was completed prior to the Petition Date. Beal Bank has not filed a proof of claim against any of the Debtors.

12. **Ocwen**: In August, 2008, Ocwen made an offer to purchase mortgage servicing rights from AHL. Ocwen and the Debtors did not come to an agreement on the terms of the transaction. Hunton represented Ocwen with regard to this potential transaction and the representation was completed prior to the Petition date.

13. Ocwen filed a proof of claim against AHL in the amount of approximately $7 Million. Hunton did not represent Ocwen or the Debtors with regards to the transactions or litigation reflected in Ocwen's proof of claim. As set forth in Schedule 2 of my original declaration, Ocwen is a client of Hunton and, as a consequence, Pachulski, Stang, Ziehl & Jones has represented the Debtors with regard to all proofs of claim filed by Ocwen.

14. **Accredited 2008-1 Mortgage Loan Trust (the "2008-1 Trust")**: On March 31, 2008, AHL securitized approximately $133 Million of mortgage loans yielding a price of 101.6% (the "2008-1 Securitization"). Pursuant to the transaction, AHL transferred the mortgages to a wholly owned subsidiary, Accredited Acceptance Corp ("AAC"), which in turn transferred the loans to Deutsche Bank as trustee for the 2008-1 Trust. The 2008-1 Trust in turn issued trust certificates to LSF6 Bond Investments, LLC ("LSF6 Bond Investment"). As a result of this securitization, AHL received cash proceeds of approximately $135 Million.

Hunton's role in the 2008-1 Securitization was to act as transaction counsel, and in that role Hunton acted as (a) special counsel for AAC by drafting the transaction documents, forming the 2008-1 Trust, and issuing authority and tax opinions and (b) as special counsel for the 2008-1 Trust in issuing its trust certificates.

The undersigned was advised on November 5, 2010, that Deutsche Bank, it its capacity as trustee for the 2008-1 Trust, filed a proof of claim against AHL in an unliquidated amount. Hunton did not represent Deutsche Bank, as trustee, with regard to the filing of this proof of claim and is not representing the Debtors with regards to the review or evaluation of this proof of claim. As set forth in Schedule 2 of my original declaration, Deutsche Bank is a client of Hunton and, as a consequence, Pachulski, Stang, Ziehl & Jones has represented the Debtors with regard to all proofs of claim filed by Deutsche Bank (in any capacity) and Hunton did not review those proofs of claim. Neither AAC or LSF6 Bond Investments filed proofs of claim against the Debtors.

15. **Accredited 2008-2 Mortgage Loan Trust (the "2008-2 Trust")**: As of April 30, 2008, AHL securitized approximately $39 Million of mortgage loans at par (the "2008-2 Securitization"). Pursuant to the transaction, AHL transferred the mortgages to a wholly owned subsidiary, AAC; which in turn transferred the loans to Deutsche Bank as trustee for the 2008-2 Trust. The 2008-2 Trust in turn issued trust certificates to LSF6 Bond Investments. As a result of the 2008-2 Securitization, AHL received cash proceeds of approximately $39 Million.

Hunton's role in the 2008-2 Securitization was to act as transaction counsel, and in that role Hunton acted as (a) special counsel for AAC by drafting the transaction documents, forming the 2008-2 Trust, and issuing authority and tax opinions and (b) as special counsel for the 2008-2 Trust in issuing its trust certificates.

The undersigned was advised on November 5, 2010, that Deutsche Bank, it its capacity as trustee for the 2008-2 Trust, filed a proof of claim against AHL in an unliquidated amount. Hunton did not represent Deutsche Bank, as trustee, with regard to the filing of this proof of claim and is not representing the Debtors with regards to the review or evaluation of this proof of claim. As set forth in Schedule 2 of my original declaration, Deutsche Bank is a client of Hunton and, as a consequence, Pachulski, Stang, Ziehl & Jones has represented the Debtors with regard to all proofs of claim filed by Deutsche Bank (in any capacity) and Hunton did not review those proofs of claim. Neither AAC or LSF6 Bond Investments filed proofs of claim against the Debtors.

16. **Accredited 2008-3 Mortgage Loan Trust (the "2008-3 Trust")**: On June 30, 2008, AHL securitized slightly in excess of $17 Million of mortgage loans yielding a price of 99% (the "2008-3 Securitization"). Pursuant to the transaction, AHL transferred the mortgages to a wholly owned subsidiary, AAC, which in turn transferred the loans to Deutsche Bank as trustee for the 2008-3 Trust. The 2008-3 Trust in turn issued trust certificates to LSF6 Bond Investments. As a result of this securitization, AHL received cash proceeds of approximately $17 Million.

Hunton's role in the 2008-3 Securitization was to act as transaction counsel, and in that role Hunton acted (a) as special counsel for AAC by drafting the transaction documents, forming the 2008-3 Trust, and issuing authority and tax opinions and (b) as special counsel for the 2008-3 Trust in issuing its trust certificates.

The undersigned was advised on November 5, 2010, that Deutsche Bank, it its capacity as trustee for the 2008-3 Trust, filed a proof of claim against AHL in an unliquidated amount. Hunton did not represent Deutsche Bank, as trustee, with regard to the filing of this proof of

claim and is not representing the Debtors with regards to the review or evaluation of this proof of claim. As set forth in Schedule 2 of my original declaration, Deutsche Bank is a client of Hunton and, as a consequence, Pachulski, Stang, Ziehl & Jones has represented the Debtors with regard to all proofs of claim filed by Deutsche Bank (in any capacity) and Hunton did not review those proofs of claim. Neither AAC or LSF6 Bond Investments filed proofs of claim against the Debtors.

17.     As a result of the completion of the transactions or other resolution of the conflicts set forth in the 2008 Engagement Letter, on the Petition Date, Hunton did not represent any interests of Wachovia, Beal, Ocwen, the 2008-1 Trust, the 2008-2 Trust, the 2008-3 Trust, AAC, LSF6 Bond Investments, Hudson or Deutche Bank on any matter adverse to the Debtors.

18.     Hunton will continue to periodically review its files during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Hunton will use reasonable efforts to identify such further developments and will promptly file an additional supplemental declaration, as required by Bankruptcy Rule 2014(a).

19.     The foregoing constitutes Hunton's supplemental statement pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a).

20.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief."

Executed on November 9, 2010.


_____
GREGORY G. HESSE

74392.000009 EMF_US 33210162v4



HUNTON & WILLIAMS LLP
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202

TEL    214 · 468 · 3300
FAX    214 · 468 · 3599

JEFFREY W. GIESE
DIRECT DIAL: 214-468-3328
EMAIL:  jgiese@hunton.com

August 18, 2008

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**

Accredited Home Lenders, Inc.
9201 East Mountain View, 210
Scottsdale, Arizona 85258
Attn:  Jeff Walton

*Engagement of Hunton & Williams LLP*

Dear Jeff:

Hunton & Williams LLP is pleased to represent Accredited Home Lenders, Inc. ("Accredited").  This letter, and the accompanying Hunton & Williams Standard Terms of Engagement, will establish the terms of our representation.  If we fail to address any issues about which you have questions, please let me know.  Good communication is critical to the success of our relationship and we want you to be happy with our services.

<u>The Client - Whom We Represent</u>

With respect to the scope of the representation addressed herein, we will represent Accredited and you will be our primary contact.  We do not represent you individually, nor by undertaking this representation of Accredited do we represent the officers, directors, managers, members, partners, employees, parents, subsidiaries, or affiliates of Accredited with respect to the scope of representation addressed herein.  If you want us to represent any other persons or entities, please advise us and we will determine whether we can undertake that additional representation.

<u>Scope of Engagement - What We Will Do</u>

You have indicated that you wish to use the firm as your general outside counsel and expect that you will from time to time need representation and counsel regarding general corporate issues, ABS/Securitization, capital markets, real estate and other transactional representation and litigation, restructuring, labor and tax representation.  You understand that our ability to represent you on any particular matter depends on resolution of any conflicts issues as they may arise from time to time  We are specifically aware of four representations of other clients that require the firm to refrain from undertaking any matter for Accredited to the extent that it:

74392.000006 EMF_US 26149683v6



# HUNTON&
# WILLIAMS

- relates to Accredited's residential mortgage financing facility (as it existed originally or as it may be amended) and related matters (collectively, the "Accredited Facility") with Wachovia Securities, LLC and its subsidiaries and affiliates (collectively, "Wachovia");

- relates to an offer to purchase mortgage loans from Accredited from Beal Bank or its affiliates, BSB Capital and Loan Acquisition Corp. (collectively, "Beal");

- relates to a sale by Accredited of servicing rights to Ocwen Financial or its affiliates (collectively, "Ocwen"); and

- is adverse to the interests of Hudson Advisors LLC ("Hudson") or other companies affiliated with the Lone Star Funds family of companies (collectively, "Lone Star Funds").

If this does not accurately reflect your understanding about the scope of the legal services we will provide, please let me know. We will perform all services normally and reasonably associated with this type of engagement that are consistent with our ethical and professional obligations. As we proceed with this representation, if you request that we expand the scope of this engagement, and we agree to do so, this letter will govern that work as well.

## Lawyers and Others Assigned To Represent Accredited

I will coordinate the legal services for this representation. I will call upon other partners, associates, employees and paralegals whom I believe have the ability to serve you as efficiently and effectively as possible. Initially, I expect to involve the following individuals to work with me. We will bill at the following hourly rates:

| | | |
|---|---|---|
| Jeff Giese | Partner | $465.00 |
| Eric Burner | Partner | $575.00 |
| David McIndoe | Partner | $476.00 |
| Greg Hesse | Partner | $550.00 |
| Gregg Schmitt | Partner | $515.00 |

# HUNTON&
# WILLIAMS

| | | |
|---|---|---|
| Ed Douma | Partner | $536.00 |
| George Howell | Partner | $725.00 |
| Cecelia Horner | Partner | $550.00 |
| Peter Partee | Partner | $775.00 |
| Mike Wilson | Partner | $480.00 |
| Ben Browder | Associate | $375.00 |
| Scott Tuthill | Associate | $330.00 |
| Sophie Maleski | Paralegal | $205.00 |

Our rates may change from time to time to reflect increased expertise and seniority and promotions, and to reflect changes in economic conditions. Seniority and other adjustments occur annually, each April 1st.

It is important to us that Accredited be satisfied with our services. Please let me know promptly if you believe that we should staff the work differently or if you have any suggestions about how we can better serve Accredited.

## Fees/Expenses/Billing

We are committed to providing you with efficient, effective legal services. In return, you agree to pay us timely for our services and to reimburse us for reasonable expenses in connection with the representation, regardless of the outcome. We will bill you for fees and expenses on a monthly basis. Our statements will be due and payable upon receipt. Please see the attached Standard Terms of Engagement for additional terms applicable to our bills and your payment obligations.

## Conflicts of Interest

We are aware of representations of four other clients that present conflicts of interest relative to concurrent representation of Accredited. They are discussed below. In addition to the circumstances associated with those three clients, we depend on you to help us identify now

# HUNTON&
# WILLIAMS

and as the representation progresses persons, or entities that may be in a position directly adverse to Accredited's interests in this representation. We also depend on you to help us identify those who are likely to be adversely affected by our representation of Accredited. You have not yet specifically identified any other adverse or potentially adverse parties, but understand that our ability to represent you depends on resolution of any conflicts issues as they may arise from time to time.

Please advise us of any change in Accredited's owners, or affiliates, that might affect our analysis of actual or potential conflict of interests.

- ## Wachovia

As you know, in July, 2007 Hunton & Williams began representing Wachovia in connection with the Accredited Facility. This representation began before Lone Star Funds acquired Accredited on or about October 12, 2007, and took it private. When a dispute arose last month between Accredited and Wachovia related to the Accredited Facility, we declined to represent Wachovia adverse to Accredited in light of our relationship with Hudson and Lone Star Funds. In response, Wachovia retained other legal counsel to represent it's interests in the dispute with Accredited.

Although the firm's representation of Wachovia with respect to the Accredited Facility did not extend to the dispute between Wachovia and Accredited, Wachovia may seek to consult firm lawyers in the future concerning the Accredited Facility. Because of the conflict of interest arising from the firm's relationship with both Wachovia and Accredited, the firm could do so only with the consent of both. Accordingly, the firm asks that Accredited consent now to the firm's representation of Wachovia relative to the Accredited Facility provided that such representation would not extend to representation in connection with any litigation, receivership, bankruptcy or other dispute resolution process. By signing below, Accredited memorializes that consent.

- ## Beal

In July, 2008, another firm client, Beal, represented by Larry Adams, Ron Rosener and Michael Rist in our Dallas office, made an offer to purchase mortgage loans from Accredited. Conflict waiver letters were obtained from both Hudson and Beal for this matter due to Hudson's affiliation with Accredited. Undertaking representation of Accredited now requires that the firm also seek Accredited's consent to complete its representation of Beal in connection with this matter. Accordingly, the firm asks that Accredited consent now to the

## HUNTON&
## WILLIAMS

firm's representation of Beal relative to the offer to purchase mortgage loans from Accredited. By signing below, Accredited memorializes that consent.

- ### Ocwen

In August, 2008, another firm client, Ocwen, represented by Michael Nedzbala in our Charlotte office, made an offer to purchase servicing rights from Accredited. Conflict waivers were obtained from both Accredited and Ocwen for this matter due to the firm's pending representation of and engagement by Accredited. Undertaking representation of Accredited now requires that the firm also seek Accredited's consent to complete its representation of Ocwen in connection with this matter. Accordingly, the firm asks that Accredited consent now to the firm's representation of Ocwen relative to the offer to purchase servicing rights from Accredited. By signing below, Accredited memorializes that consent.

- ### Hudson/Lone Star Funds

In March, 2008, Hudson and Lone Star Funds engaged several lawyers, primarily in our New York and Richmond offices, to represent them in connection with an ongoing matter involving acquiring and possibly securitizing certain of Accredited's mortgage loans. Accredited was represented by separate legal counsel in that matter. Undertaking representation of Accredited now requires that the firm also seek Accredited's consent to continue its representation of Hudson and Lone Star Funds in connection with this matter. Accordingly, the firm asks that Accredited consent now to the firm's representation of Hudson and Lone Star Funds relative to the acquisition and possible securitization of certain of Accredited's mortgage loans. By signing below, Accredited memorializes that consent.

In our general representation of Accredited and any current or future implementation of any restructuring plans, if Accredited's objectives are met and Accredited avoids any insolvency or bankruptcy proceedings, we will nevertheless not be able to represent Accredited adverse to Wachovia, Beal, Ocwen, Hudson or Lone Star Funds and any such adverse representation would require Accredited to hire separate counsel. On the other hand, if Accredited's objectives are not met and an insolvency or bankruptcy proceeding is initiated, because of our existing relationships with Wachovia, Beal, Ocwen, Hudson and Lone Star Funds, we would not be able to serve as general bankruptcy counsel for Accredited. Rather, separate bankruptcy counsel would need to be engaged by Accredited and, if Accredited so desired, we would continue to represent Accredited generally.


HUNTON&
WILLIAMS

### Future Conflicts

We are a large international firm with many clients, including many financial institution clients. To protect our ability to represent Accredited and opportunities to represent other clients, we regularly address and work through potential conflicts with our clients. It is possible that we may in the future ask you to assist us in waiving a conflict that may arise. We do not ask for advance consent to a conflict other than as specifically addressed above, but only that you be open to consideration of a reasonable request for consent. We will seek your consent only where the applicable rules of professional conduct will permit a conflict to be waived by informed consent; where we have concluded and can reasonably demonstrate that the representation at issue will not adversely affect our ability to represent Accredited or the other client(s) involved, and that our obligation to protect Accredited's confidential information will not be compromised.

### Permission to List Accredited as a Firm Client

We take pride in the clients that have selected us to represent them. With increasing frequency, various third party rankings and companies seeking legal counsel ask law firms to respond to requests for representative clients. We request Accredited's permission to indicate that we represent Accredited in response to requests from third parties for lists of representative clients.

### Communications

Unless you tell us otherwise, we will send all correspondence and statements for services related to this representation to you in your Scottsdale office. We will depend on you to let us know if you are not receiving information or responses in a timely manner. We understand unless advised otherwise that we may communicate concerning this matter by fax, cell phone, e-mail, or letter.

### Complaint to State Bar

The State Bar of Texas requires that we advise you as follows:

> "The State Bar investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar Office of General Counsel will provide



**HUNTON&
WILLIAMS**

Accredited Home Lenders, Inc.
August 18, 2008
Page 7

you with information about how to file a complaint. Please call 1-800-932-1900 toll-free for more information."

If the terms of this letter are satisfactory, please sign a copy in the space provided, and return it to me. If you have any questions, please feel free to contact me. We appreciate the opportunity to represent Accredited Home Lenders, Inc.

Very truly yours,

Jeffrey W. Giese



## STATEMENT TO BE SIGNED BY ACCREDITED HOME LENDERS, INC.

I have read this letter and the accompanying Hunton & Williams LLP Standard Terms of Engagement. I understand their content, and hereby engage Hunton & Williams LLP in accordance with their terms and conditions on behalf of Accredited Home Lenders, Inc., which includes consent to the conflicts of interest discussed above and consent to identify Accredited as a client of Hunton & Williams LLP.


Agreed:

Accredited Home Lenders, Inc.

By: _____

Jeff Walton

Title: President and CEO

Date: August 18, 2008


cc:    Sam Laughlin

Enclosures:
Hunton & Williams "Standard Terms of Engagement"

### HUNTON & WILLIAMS LLP
### STANDARD TERMS OF ENGAGEMENT

**FEES.** Unless we agree in the engagement letter to alternate fee arrangements, we will bill for our services at the firm's applicable published hourly rates in effect at the time we render the services. Those rates are based on the fair value for the services we render after taking into consideration many factors, including, but not limited to: the complexity or novelty of the work performed; the seniority, experience, practice area and location of the lawyers, paralegals or law clerks performing the work; the time period within which the work is required to be completed; the likelihood that the engagement will preclude our acceptance of other employment; the number of hours required to perform the work; the nature and length of our professional relationship with the client; the results obtained; and the fees charged for similar services in the relevant geographic or subject matter market. We have established hourly rates (using the foregoing factors) for lawyers, paralegals, law clerks, and other staff timekeepers. We adjust those base rates periodically, in light of the factors enumerated above, as well as cost of living and market considerations.

**STATEMENTS.** We do our best to render monthly statements for fees, expenses and charges. We normally render separate invoices for each legal matter we handle. The client also will receive a monthly statement that shows any past due invoice, by number and date, for each of the client's matters.

**BILLING AND PAYMENT.** We record time in six-minute increments unless other arrangements are made. Our statements will be based on time recorded in those increments.

The client agrees to pay statements within 30 days. Failure to pay statements promptly may result in temporary or permanent cessation of service. Payment of statements should be made in U.S. dollars or other agreed upon foreign currency, by wire transfer or in checks or drafts payable to Hunton & Williams LLP. Please note the date and identification number of the statement being paid, and return the remittance copy of our statement with your payment.

If our invoices are not paid within 30 days of the invoice date the client agrees to pay an interest charge to outstanding balances at an interest rate of one and one-half percent (1.5%) per month or the maximum interest rate allowed by law, whichever is less, from the date due until paid. The client agrees to pay such interest on the outstanding balance in addition to the balance of fees and expenses due.

In the event the client fails to pay when due all amounts owed us, we will have the right to retain settlement proceeds received on behalf of client or recover the outstanding balance of fees and expenses and interest, as provided above, and all attorneys' fees incurred to collect these amounts. Such attorneys' fees will include payment for the time and expenses of any firm lawyers incurred in collection effort as well as fees and expenses of any outside counsel hired to collect the amounts due.

**RESPONSES TO AUDITORS' INQUIRIES.** We are frequently asked to provide information to auditing firms regarding legal matters of our clients. We respond to those inquiries with the same level of care and professionalism that we use to handle the client's other legal work and will charge for these services at the same rates. When an auditing firm requests information on

the client's behalf, that request will be deemed to be the client's consent for us to disclose that information to that firm.

**DISBURSEMENTS AND CHARGES.** In addition to payment of our fees, the client agrees to pay expenses incurred by us in connection with the representation. Such expenses may include long distance telephone calls, photocopying charges, travel expenses, couriers, filing fees, costs of subpoenas and depositions, and other costs and expenses advanced on our client's behalf. We manage our own telephone network, printing and document duplication services. We generally use our in-house printing and document duplicating services rather than third party services, due to timing and confidentiality concerns, unless the client requests otherwise. We set our charges for these services based upon our fully burdened cost of providing them to the client.

Before proceeding to incur expenses from an outside vendor in excess of $1,500 we will seek your approval. We do not intend to make any profit on such expenses and we will pass them on to you based as closely on our costs as possible. We may, however, receive certain benefits from having incurred certain costs, such as benefits accorded in connection with travel expenditures (i.e., frequent flyer points). Those benefits will be retained by the firm or the individual to whom they were awarded without credit to the client.

In certain instances, we make a profit from services rendered through the firm or its affiliated entities, when such services or technology involve the use of personnel not directly employed by Hunton & Williams LLP. In particular, certain services rendered by Hunton & Williams Litigation Support Center involve the use of personnel not directly employed by Hunton & Williams LLP, but for whom the firm accepts responsibility in connection with client's services. We will bill those services at a rate that may not be billed at our cost. Similarly, work performed at the Litigation Support Center may involve the use of technology that the firm will bill at competitive rates. The same applies to services rendered by TurnStone Investigative Services LLC and other entities affiliated with Hunton & Williams LLP.

**TRAVEL.** We generally record the time spent traveling while performing work in furtherance of the client's engagement. Time spent in travel on behalf of one client while working on a matter for another client, will be billed to the other client; we do not double-bill time. We book air travel at coach rates unless otherwise previously approved by the client or unless the air travel is transoceanic or overnight, in which case we generally book business or comparable class. Bookings for travel arrangements are generally made through an in-house travel service and the expenses charged to the client for travel include a transaction fee for each booking. Discounts applicable to particular travel purchases may be available through use of this in-house travel service and we pass them on to the client in our charges.

**TERMS OF ENGAGEMENT.** The client or Hunton & Williams may terminate the representation for any reason by written notice, subject on our part to applicable rules of professional conduct. In the event we terminate the engagement, we will take such steps as are reasonably practicable to protect the client's interests in this matter and, if the client so requests, we will suggest possible successor counsel and provide such counsel with material the client has provided us.

Upon the termination of our engagement, the client will pay within 30 days for all services rendered and disbursements and other charges paid or incurred in connection with our

engagement. If the client terminates our engagement or if Hunton & Williams terminates the engagement in accordance with the following paragraph, the client will also pay our fees and expenses in connection with any transition of the client's work to successor counsel.

If the client fails to honor the terms of the engagement, to cooperate, or to follow our advice on a material matter that would or could, in our view, render our continued representation unlawful or unethical, Hunton & Williams may withdraw from the representation. If we elect to withdraw, the client will take all steps necessary to free us of any obligation to perform further services, including the execution of any documents or pleadings necessary to complete our withdrawal.

Unless previously terminated or other arrangements are made, Hunton & Williams' representation will terminate upon our sending the client our final statement for services rendered. Unless we agree otherwise, we will have no continuing obligation to advise the client with respect to future legal developments once this matter concludes.

RECORD RETENTION. We will maintain necessary documents relating to this matter in our client files. If we receive no guidance from the client, we will employ the following procedure when a matter concludes:

1. Upon closure of the matter, any original documents that the client has provided to us will be returned.

2. Upon expiration of our normal retention period for this kind of matter, we will notify the client by mail at the client's last known address that the retention period has run, and seek the client's guidance on disposition of the file.

3. If we receive a response from the client within 2 months, we will follow the client's instructions for disposition of the file. If those instructions require substantial handling of the file, or continued retention of it, we will charge our normal fees for such procedures.

4. If we do not receive a response from the client within 2 months, the file will be destroyed pursuant to our normal procedure.

At the conclusion of a matter, it is the client's obligation to tell us which, if any, documents in our files that it wishes to receive. Electronic records relating to this matter will be made available to the client, if requested, and to the extent they are still easily accessible.

**SETTLEMENT BETWEEN ACCREDITED HOME LENDERS HOLDING CO., ET AL. ("DEBTORS"), LONE STAR, DEBTORS, THE REIT, THE REIT COMMITTEE AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ("COMMITTEE") RELATING TO A CONSENSUAL PLAN OF LIQUDATION**

September 2, 2010

This Term Sheet summarizes certain of the critical terms, elements and conditions of a plan to be proposed by the Debtors and supported by the Committee and LSF MRA LLC, LSF5 Mortgage Line LLC, Caliber Funding LLC, Vericrest Financial Inc., LSF5 Accredited Investments LLC, LSF5 Accredited Holdings, LLC, Lone Star Funds V (U.S.) L.P., Hudson Americas LLC, Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, (collectively, the "Lone Star Entities"), the REIT[1], and the Ad Hoc Committee of REIT Preferred Holders (the "REIT Committee")[2]. Notwithstanding the foregoing, this Term Sheet remains subject to, among other things, (a) resolution of any terms or items set forth herein that are bracketed or indicated as "to be provided" or "to be determined"; (b) resolution of technical and non-substantive terms not specifically set forth herein; and (c) acceptable definitive documentation of all matters contemplated herein, including a revised Plan and any agreements contemplated under the Plan or in re Term Sheet. The Debtors, Lone Star Entities, the Committee, the REIT, and the REIT Committee have agreed to work together in good faith to attempt to complete negotiations of the terms of the Plan and to resolve other outstanding issues. No vote in favor of any plan is being solicited by or agreed to by this Term Sheet, with such votes to be solicited in connection with a Disclosure Statement approved by the Bankruptcy Court and in accordance with Section 1125 of the Bankruptcy Code.

The Term Sheet is provided in connection with ongoing discussions between the Lone Star Entities, the Debtors, the Committee, the REIT and the REIT Committee, following the Settlement Agreement proposed by the Lone Star Entities to the Debtors on May 13, 2010, which was subsequently embodied in a draft plan of liquidation (the "Plan") provided by the Debtors to the parties.

This Term Sheet reflects the understanding that certain of the Debtors are entitled to a tax refund in an amount not less than $54 million and the REIT has always maintained its REIT status under the tax code and the foregoing discussions and is provided on a confidential basis as part of a comprehensive compromise, each element of which is consideration for the other elements and an integral aspect of the proposed terms of a plan of liquidation and settlement of certain claims and disputes. Nothing contained herein shall obligate the REIT to maintain its REIT status under the tax code following the Effective Date of the Plan. This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule

---

[1] Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.
[2] The members of the REIT Committee are set forth on Schedule A attached hereto.

tabbies®

EXHIBIT

B

of Evidence 408 and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.

The terms of the settlement proposal are as follows:

1.    The REIT and REIT Committee will support the Plan and take such action as is reasonably necessary to support confirmation and consummation of the Plan and, subject to Paragraph 3 below, will receive for purposes of the Plan (x) an allowed general unsecured claim against the Consolidated Debtors of $37.5 million; (y) an allowed subordinated unsecured claim against the Consolidated Debtors, subordinated to the claims of general unsecured creditors of the Consolidated Debtors in the amount of $15 million (the "Junior Claim"); and (z) an allowed unsecured claim against Accredited Home Lenders Holding Company ("Holdco") of $20 million. Any subordination rights the REIT may have will be waived under the terms of the Plan (excluding any benefits the REIT may receive as a result of Lone Star's agreement to subordinate its claim against Holdco as provided in Paragraph 2 below). The REIT will not receive any distribution on account of the Junior Claim until allowed unsecured claims against the Consolidated Debtors are paid in full (without any post-petition or post-emergence interest or costs). All agreements, contracts and obligations between the REIT and the Debtors will be terminated or rejected pursuant to the Plan without further liability on the part of the Debtors unless otherwise agreed by the Debtors, the REIT and the Committee. The Plan shall provide for a separate class of claims against Holdco comprised of the guaranty claims of the preferred shareholders of the REIT (the "Preferred Holder's Subordinated Guaranty Claims") which class shall be subordinate to unsecured claims against Holdco to the extent those claims are contractually senior. Unless otherwise agreed to by the Committee and REIT Committee, at the Effective Date (i) the Class of Preferred Holder's Subordinated Guaranty Claims (the "Preferred Holders Subordinated Class") shall not receive beneficial interests in the Holdco Liquidating Trust or be deemed to be beneficial holders of the Holdco Liquidating Trust until all beneficial holders with allowed senior unsecured claims against the Holdco Liquidating Trust have been paid in full prior to the termination of the Holdco Liquidating Trust, (ii) the Preferred Holders Subordinated Class shall not be entitled to any reports or notices from the Holdco Liquidating Trustee until they receive beneficial interests in the Holdco Liquidating Trust and are beneficial holders of the Holdco Liquidating Trust, and (iii) the liquidating trust agreement shall be drafted in a manner that avoids any material adverse consequences to the liquidating trust under applicable securities and tax laws. In the event the senior unsecured creditors who are beneficial holders of the Holdco Liquidating Trust are not paid in full or the Holdco Liquidating Trust is terminated prior to the senior unsecured creditors who are beneficial holders are paid in full, then the Preferred Holders Subordinated Class shall not receive any distribution under the Plan. If the senior unsecured creditors who are beneficial holders of the Holdco Liquidating Trust are paid in full prior to the termination of the Holdco Liquidating Trust, then Holders of Preferred Holder's Subordinated Guaranty Claims shall receive beneficial interests in the Holdco Liquidating Trust as provided under the Plan (unless such claims are disallowed pursuant to a Final Order).

2.    Provided that less than 25% in amount of the general unsecured claims against the Consolidated Debtors eligible to vote on the Plan (other than claims of the Lone Star Releasees) elect to withhold releases of direct and personal claims (as set forth in Paragraph 3 below) (the "Release Requirement"), under the Plan:

(x) one or more of the Lone Star Entities (other than LSF MRA, LLC) shall make a payment to the Consolidated Debtors on or before the Effective Date of the Plan in the amount of $15.6 million (the "Plan Payment") to be made available to those unsecured creditors (including the REIT) who grant releases as set forth in Paragraph 1;

(y) the Lone Star Entities shall be deemed to have waived, for purposes of the Plan and receiving distributions thereunder, all claims against the Consolidated Debtors or their respective properties, including those asserted in their Proofs of Claim; and

(z) the Lone Star Entities shall be deemed to have subordinated, for purposes of the Plan and receiving distributions thereunder, all claims asserted against Holdco in favor of those holders of allowed nonpriority unsecured claims that do not vote to reject the Plan, to the extent such claims of the Lone Star Entities are not disallowed, so that any distributions to the Lone Star Entities on account of claims against Holdco will first be distributed to such non-rejecting claims until such claims are paid in full (which distributions shall not be subject to disgorgement); provided, however, that subordination of the claims of the Lone Star Entities against Holdco as set forth herein shall not in any way affect or be deemed to affect the availability of such claims for use as setoff or any other defenses of the Lone Star Entities to or against claims against the Lone Star Entities asserted by Holdco (including by Holdco as assignee of the REIT Releasors (see Paragraph 3(b) below)), and further provided, that claims, if any, that may be brought by the Holdco estate or Holdco Liquidating Trustee against any of the Lone Star Entities must be brought within 120 days of the Effective Date unless further extended either by the written consent of the Lone Star Entities or by order of the court not to exceed an additional 120 days; and still further provided, that in the event of any Holdco distributions to non-rejecting creditors on account of the claims of the Lone Star Entities, the claims of the Lone Star Entities shall remain available for use by the Lone Star Entities for set off or as defenses, to the extent applicable, as if such distributions had not been made. The Lone Star Entities agree to toll, and to use reasonable efforts to cause the REIT, Holdco, and Canada directors and officers that are also employed by or are agents of the Lone Star Entities to toll, any applicable statute of limitations with respect to any Holdco claims set forth in this Paragraph 2(z) above to the end of such 120 day period (and the additional 120 days, if applicable).

3.     Upon the Effective Date of the Plan, the Lone Star Entities and current and former affiliates and all their respective officers, agents, employees, directors, attorneys, representatives, insurers, predecessors, successors and assigns (other than any Debtor, the REIT or a non-debtor subsidiary of any Debtor) but excluding[3] any attorneys, accountants, auditors, investment bankers, financial or other advisors, consultants or agents that provided professional, accounting, audit or other services to the REIT, Debtors and non-debtor subsidiaries of any of the Debtors, and further excluding any insurers who provided insurance to the Debtors or any non-debtor subsidiary of the Debtors including the REIT (collectively the "Lone Star Releasees", with the current and former Officers and Directors of the Debtors set forth on Schedule B attached hereto) shall receive a full release of all claims from the estates of the Consolidated Debtors and of all direct and personal claims relating to the Consolidated Debtors and their businesses from

---

[3] For the sake of clarity: this exclusion does not preclude or limit any usual and customary exculpation provision that is included within the Plan as confirmed.

individual creditors of the Consolidated Debtors (other than from the REIT) that elect to receive a distribution from the Plan Payment by not electing to withhold releases of direct and personal claims as of the Effective Date. The direct and personal claims of the REIT Releasors shall be treated as follows:

(a) The REIT and the members of the REIT Committee shall release the Lone Star Releasees and the current and former officers and directors (including trustees) of the Debtors but not the current and former directors and officers (including trustees) with respect to the REIT or the Lone Star Releasees in their capacities as directors or officers (or trustees) of the REIT (the "REIT Ds and Os") of all direct and personal claims including but not limited to any derivative claims held by the REIT that are assertable on behalf of the REIT Preferred Holders.

(b) The REIT and the members of the REIT Committee shall assign to Holdco (or the Holdco Liquidating Trust) all direct and personal claims with respect to the REIT (including but not limited to any derivative claims held by the REIT that are assertable on behalf of the REIT Preferred Holders) and of such REIT Committee member against the REIT Ds and Os; provided, however, that the REIT, the members of the REIT Committee and Holdco (and the Holdco Liquidating Trust and Holdco Liquidating Trustee), as assignee, shall be permitted to satisfy any judgment, settlement or other obligation due on account of any such claims against (i) the personal property or individual assets of any individual REIT Ds and Os up to an aggregate of $5,000,000 for all such claims and (ii) from the proceeds of any insurance policies that provide or are otherwise legally or contractually obligated to provide coverage with respect to the claims against the REIT Ds and Os or from any insurance company that has issued such policy ((i) and (ii) collectively, the "Litigation Recovery Sources"). The rights of any insured or actual or prospective claimant against the policies shall not be altered by the terms of these provisions. For the avoidance of doubt, the rights of the REIT, the members of the REIT Committee (and Holdco as assignee of the REIT claims) and the REIT Ds and Os against any of the policies are fully preserved.]

The foregoing notwithstanding, no party shall be released of any of its obligations under this Settlement Term Sheet or to perform its obligations under the Plan set forth herein.

4. In order to resolve inter-estate issues, disputed or challenged debtor assets shall be contributed or allocated as follows:

(a) Canadian Cash and Residual Value or equity in Canadian subsidiaries to Holdco, the Holdco Liquidating Trust or other liquidation vehicle, consistent with tax considerations and efficiency.

(b) Cash held by Vendor Management Services LLC ("Vendor") to Holdco or the Holdco Liquidating Trust.

(c) Trust Common Securities to Accredited Home Lenders, Inc. ("Inc.") or Consolidated Debtors Liquidating Trust.

(d)    Ownership of equity interest in REIT [to be discussed].

(e)    Proceeds of Tax Refunds to Inc. or the Consolidated Debtors Liquidating Trust

(f)    First American Trust, FSB Deferred Compensation settlement payment to Inc.

(g)    All of the Debtors' rights under the Debtors' and, to the extent applicable, the REIT's D&O or other Policies and the proceeds thereof shall be transferred to Holdco Liquidating Trust (except as otherwise specified hereunder) and Holdco shall have a priority as against any of the Consolidated Debtors with respect to any recovery under any such policy.

(h)    Vendor or its assets shall either be merged into Holdco or consolidated with Holdco consistent with tax considerations and efficiency.

(i)    The definition of Consolidated Debtors shall not include Vendor or Vendor's assets.

(j)    Non-Debtor subsidiaries (other than Canadian and REIT subsidiaries) shall be wound down and dissolved prior to Effective Date, subject to tax considerations and efficiency after review by the Debtors and the Committee.

(k)    Canadian subsidiaries shall pay all amounts owing to Consolidated Debtors.

5.    IRS Tax Claim shall be satisfied by the Consolidated Debtors out of Tax Refunds.

6.    The Consolidated Debtors and Consolidated Liquidating or Litigation Trustee shall agree and covenant not to make, assert or pursue any claim or commence any action or litigation against the Lone Star Releasees or the current or former Directors and Officers of the Debtors released as set forth herein or under or against the D&O Policies; provided, however, that any release of current or former Directors and Officers of the Debtors as set forth herein shall also be conditioned on such officer or director granting a full release of claims against the Consolidated Debtors and their respective properties (including all claims under or that could be asserted under filed proofs of claim, which claims shall be deemed expunged and relinquished).

7.    The REIT, the members of the REIT Committee, Holdco and the Holdco Liquidating Trust and Trustee shall agree not to satisfy or attempt to satisfy any judgment, settlement or other obligation due on account of any claims of the REIT or a member of the REIT Commitee against the REIT Ds and Os from any source other than from the Litigation Recovery Sources.

8.    Continuation and/or wind down of the Debtors and their respective non-debtor subsidiaries, and governance and post-emergence structure of the Consolidated Debtors and Holdco to be discussed further between the Debtors and the Parties. After giving effect to the transactions set forth in Paragraph 4 hereof, it is contemplated that all remaining cash, assets, interests and properties, including claims, actions, suits, counterclaims, or cross claims of the Consolidated Debtors and their Estates, whether asserted or unasserted or pending as of the Effective Date, or direct, indirect, derivative or otherwise or known or unknown (other than

(d)     Ownership of equity interest in REIT [to be discussed].

(e)     Proceeds of Tax Refunds to Inc. or the Consolidated Debtors Liquidating Trust

(f)     First American Trust, FSB Deferred Compensation settlement payment to Inc.

(g)     All of the Debtors' rights under the Debtors' and, to the extent applicable, the REIT's D&O or other Policies and the proceeds thereof shall be transferred to Holdco Liquidating Trust (except as otherwise specified hereunder) and Holdco shall have a priority as against any of the Consolidated Debtors with respect to any recovery under any such policy.

(h)     Vendor or its assets shall either be merged into Holdco or consolidated with Holdco consistent with tax considerations and efficiency.

(i)     The definition of Consolidated Debtors shall not include Vendor or Vendor's assets.

(j)     Non-Debtor subsidiaries (other than Canadian and REIT subsidiaries) shall be wound down and dissolved prior to Effective Date, subject to tax considerations and efficiency after review by the Debtors and the Committee.

(k)     Canadian subsidiaries shall pay all amounts owing to Consolidated Debtors.

5.      IRS Tax Claim shall be satisfied by the Consolidated Debtors out of Tax Refunds.

6.      The Consolidated Debtors and Consolidated Liquidating or Litigation Trustee shall agree and covenant not to make, assert or pursue any claim or commence any action or litigation against the Lone Star Releasees or the current and former Directors and Officers of the Debtors released as set forth herein or under or against the D&O Policies; provided, however, that any release of current or former Directors and Officers of the Debtors as set forth herein shall also be conditioned on such officer or director granting a full release of claims against the Consolidated Debtors and their respective properties (including all claims under or that could be asserted under filed proofs of claim, which claims shall be deemed expunged and relinquished).

7.      The REIT, the members of the REIT Committee, Holdco and the Holdco Liquidating Trust and Trustee shall agree not to satisfy or attempt to satisfy any judgment, settlement or other obligation due on account of any claims of the REIT or a member of the REIT Commitee against the REIT Ds and Os from any source other than from the Litigation Recovery Sources.

8.      Continuation and/or wind down of the Debtors and their respective non-debtor subsidiaries, and governance and post-emergence structure of the Consolidated Debtors and Holdco to be discussed further between the Debtors and the Parties. After giving effect to the transactions set forth in Paragraph 4 hereof, it is contemplated that all remaining cash, assets, interests and properties, including claims, actions, suits, counterclaims, or cross claims of the Consolidated Debtors and their Estates, whether asserted or unasserted or pending as of the Effective Date, or direct, indirect, derivative or otherwise or known or unknown (other than

claims specifically released pursuant to Paragraphs 3 and 6 hereof) shall be assigned, conveyed and transferred to the Consolidated Liquidating Trust or similar structure or other liquidating vehicle. After giving effect to the transactions set forth in Paragraph 4 hereof, it is further contemplated that all remaining cash, assets, interests, and properties of Holdco shall be assigned, conveyed and transferred to Holdco Liquidating Trust or similar structure or other liquidating vehicle. All claims, actions, suits, counterclaims or cross claims of Holdco, whether asserted or unasserted or pending as of the Effective Date or direct, indirect, derivative or otherwise or known or unknown shall be assigned, conveyed and transferred to Holdco Trust.

9.     Mechanics and structure related to debtor common estate claims or settling inter-debtor disputes or issues regarding these claims or rights to be determined.

10.    The Consolidated Debtors Liquidating or Litigation Trustee shall be selected by the Committee and be reasonably acceptable to the Debtors and the REIT. The Holdco Liquidating Trustee shall be selected by the Committee and be reasonably acceptable to Wells Fargo Bank and the REIT.

11.    The Trust Advisory Boards shall be selected by the Committee, be reasonably acceptable to the REIT and, in the case of the Holdco Advisory Board, also be reasonably acceptable to Wells Fargo, and be authorized to retain professionals (and such professionals shall be reimbursed by the respective trusts). None of the Lone Star Entities or their affiliates, officers, directors or employees shall serve on any of the Trust Advisory Boards or as Trustee.

12.    Debtors will negotiate employment or consulting contracts with current employees necessary to wind-down the Debtors' estates, with such contracts to be reasonably acceptable to the Committee.

13.    Upon the Effective Date of the Plan contemplated by this Term Sheet, the Debtors' remaining employees will be given a payment equal to three (3) months' salary, which payout shall be in satisfaction of any prior arrangements, agreements or employment policies with the Debtors.

14.    The obligations of the Consolidated Debtors to indemnify any person having served as an officer or director of the Consolidated Debtors, to the extent provided in any of the Consolidated Debtors' corporate governance documents or by written or other agreement or applicable law, shall be terminated and extinguished and, to any extent necessary, deemed an executory contract, terminated and rejected under the Plan. This provision does not apply to persons holding postpetition indemnifications from the Debtors that were approved by order of the Court.

15.    Each holder of a claim that receives a ballot or a distribution or any other benefit under the Plan shall be deemed to consent to and grant the releases under the Plan as set forth herein unless it timely returns its ballot marked to indicate that it has opted out of the release set forth in the Plan.

16.    Contractual, equitable and legal subordination shall not be altered or affected under the Plan except as specifically set forth therein consistent with this Term Sheet and any claims of subordination not specifically implemented or effected pursuant to the Plan shall be irrevocably

terminated and waived; provided, .that any disagreement with the priorities or distributions set forth herein or to the Plan shall be raised prior to and ahead of the Confirmation Hearing.

17.     The Plan Supplement Documents including all agreements, instruments and documents relating to Trusts shall be reasonably acceptable to the Committee and to the Lone Star Entities to the extent relevant to the Lone Star Entities. The Plan Supplement Filing Date shall be filed at least ten (10) days prior to the Voting Deadline.

18.     Consolidated Debtors Convenience Claim shall include creditors electing to reduce and fix their claim at $25,000.

19.     Holders of Lone Star's equity interests in Holdco shall not receive any distribution under the Holdco Plan and such interests shall be extinguished.

20.     Claims of Holdco shall not be affected, limited, or released and shall be specifically preserved.

21.     The claims of REIT Preferred Holders held in their individual capacity and not assertable on their behalf by the REIT shall not be affected, limited or released except as specifically set forth herein.

22.     Direct claims asserted by Wells/Kodiak in the Wells/Kodiak Adversary Proceeding shall not be affected by the Plan except as set forth in Paragraphs 1 and 2.

23.     The Repurchase and Breach Claims Protocol shall be reasonably acceptable to the Committee and approved.

24.     Holdco, the Committee, the Lone Star Entities, the REIT and the REIT Committee shall take such reasonable steps as may be requested by the Debtors (or the Consolidated Debtors Liquidating Trust or Trustee) to cooperate with and assist the Consolidated Debtors' in obtaining the tax refund; provided, however, that none of such parties shall be obligated to incur any material liability or unreimbursed cost in connection with such assistance. The Debtors shall take reasonable steps to collect and maximize the amount of the tax refund and, if necessary, direct all taxing authorities to pay the refunds to the Consolidated Debtors Liquidating Trust. Should Holdco or any successor of Holdco receive the tax refund, Holdco or such successor shall immediately deposit or remit such tax refund to the Consolidated Debtors Liquidating Trust.

25.     The Plan shall not be modified by the Debtors without the consent of the Committee and the Lone Star Entities, which, to the extent such modifications do not adversely effect the rights, treatment, benefits or obligations of the respective parties or constituencies, may not be unreasonably withheld.

26.     The Debtors shall promptly file a plan and disclosure statement to provide for the terms and distributions consistent with the terms of this Term Sheet and use reasonable best efforts to prosecute confirmation and consummation thereof.

27.     Provided this Term Sheet is still in effect and has not been made void as provided hereunder, the Lone Star Entities, the Committee, the REIT, and the REIT Committee will support prosecution, confirmation and consummation of the Plan consistent with the Term Sheet.

28.     None of the Lone Star Releasors shall sell, assign, transfer or pledge their respective claims against the Debtors or any right to vote such claims.

Nothing herein shall be interpreted to conflict with or to restrict the performance of any fiduciary duty of Committee or Committee members or impede or restrict a Committee member, not in its capacity as a member of the Committee but in its individual capacity, objecting to or contesting confirmation of the Plan.  In the event the Plan is not filed by September 24, 2010, confirmed by December 30, 2010 or effective by January 15, 2011 (unless extended by written consent of the parties hereto) or the Release Requirement is not satisfied (unless the Release Requirement is waived in writing by the Lone Star Entities), then the settlement and proposal hereunder shall be void and of no effect and all parties hereto shall revert to their prior positions without prejudice.

[Signature pages follow]

Accepted and agreed to this 2nd day of September, 2010.

**DEBTORS**
**ACCREDITED HOME LENDERS HOLDING**
**COMPANY**

By:_____
      Meade A. Monger
      Its: Chief Restructuring Officer

**ACCREDITED HOME LENDERS, INC.,**
**VENDOR MANAGEMENT SERVICES, LLC,**
**INZURA INSURANCE SERVICES, INC., and**
**WINDSOR MANAGEMENT CO.**

By:_____
      Meade A. Monger
      Their: Chief Restructuring Officer

**LONE STAR ENTITIES**

**LSF MRA, LLC**

By: _____
    Sandra Collins
    Vice President


**LSF5 MORTGAGE LINE, LLC**


By: _____
    Name: Stewart L. Motley
    Title:  Vice President

**CALIBER FUNDING LLC**


By: _____
    Name:
    Title:


**VERICREST FINANCIAL, INC.**


By: _____
    Name:
    Title:

**LSF5 ACCREDITED INVESTMENTS, LLC**
**LSF5 ACCREDITED HOLDINGS, LLC**


By: _____
    Name: Marc L. Lipshy
    Title:  Vice President

**LONE STAR ENTITIES**

**LSF MRA, LLC**

By: _____
    Sandra Collins
    Vice President


**LSF5 MORTGAGE LINE, LLC**

By: _____
    Name: Stewart L. Motley
    Title: Vice President

**CALIBER FUNDING LLC**

By: _____
    Name: Missy Hubbell
    Title: Vice President


**VERICREST FINANCIAL, INC.**

By: _____
    Name: Jennifer Lamprecht
    Title: Vice President

**LSF5 ACCREDITED INVESTMENTS, LLC**
**LSF5 ACCREDITED HOLDINGS, LLC**

By: _____
    Name: Marc L. Lipshy
    Title: Vice President

**LONE STAR FUND V (U.S.), L.P.**

By: Lone Star Partners V, L.P., its general partner
    By:   Lone Star Management Co. V, Ltd., its
         general partner

            By: _____
                Name: Stewart L. Motley
                Title:   Vice President

**HUDSON AMERICAS LLC**
**HUDSON ADVISORS LLC**
**LONE STAR U.S. ACQUISITIONS, LLC**

By: _____
    Name:    Steven R. Shearer
    Title:     Senior Vice President

<u>COMMITTEE</u>

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED BY THE UNITED STATES TRUSTEE IN THE CHAPTER 11 CASES OF ACCREDITED HOME LENDERS HOLDING COMPANY AND CERTAIN OF ITS AFFILIATES**

By: Arent Fox LLP, its counsel

By: _____
Name:
Title

<u>REIT</u>

**ACCREDITED MORTGAGE LOAN REIT TRUST**

By: _____
Name:
Title

**COMMITTEE**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED BY THE UNITED STATES TRUSTEE IN THE CHAPTER 11 CASES OF ACCREDITED HOME LENDERS HOLDING COMPANY AND CERTAIN OF ITS AFFILIATES**

By: Arent Fox LLP, its counsel

By: _____
Name:
Title

**REIT**

**ACCREDITED MORTGAGE LOAN REIT TRUST**

By: _____
Name:
Title    Thomas J. Sullivan
         Trustee

## THE REIT COMMITTEE

**FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,**
*On behalf of itself and various other preferred shareholders*

By: _____
    Name:
    Title

## DUPONT CAPITAL MANAGEMENT

By: _____
    Name:
    Title

_____
**SCOTT J. WEBER**

_____
**ANTHONY J. SUTTON**

## THE REIT COMMITTEE

**FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,**
*On behalf of itself and various other preferred shareholders*


By: _____
    Name:
    Title

## DUPONT CAPITAL MANAGEMENT
*In its capacity as investment adviser of the DuPont Pension Trust and various other entities*

By: _~Ming Shao~_____
    Name: Ming Shao
    Title   Director of Fixed Income Investments


By: _____
    Name:
    Title

SCOTT J. WEBER


**ANTHONY J. SUTTON**

**THE REIT COMMITTEE**

**FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,**
*On behalf of itself and various other preferred shareholders*


By: _____
    Name:
    Title

**DUPONT CAPITAL MANAGEMENT**


By: _____
    Name:
    Title


_____
**SCOTT J. WEBER**


_____
**ANTHONY J. SUTTON**

## **Members of the REIT Committee**

## MEMBERS OF THE AD HOC COMMITTEE OF
## PREFERRED SHAREHOLDERS OF ACCREDITED REIT

**Footprint Asset Management & Research, Inc.,**
*On behalf of itself and various other preferred shareholders*
11422 Miracle Hills Drive, Suite 208
Omaha, NE  68154
<u>Attn</u>:  Stephen J. Lococo, President

**Dupont Capital Management**
One Richter Parkway, Suite 3200
Wilmington, DE  19803
<u>Attn</u>:   Kris Kowal, Managing Director, Global Fixed Income

**Scott J. Weber**
4009 Overbrook Lane
Houston, TX  77027

**Anthony J. Sutton**
c/o  Blake C. Sutton
295 E. Evelyn Ave #218
Sunnyvale, CA  94086

## **Current and Former Officers and Directors of the Debtors**

[to come]

**Accredited Home Lenders Holding Company**

| Name | Position |
| --- | --- |
| A. Jay Meyerson (AHL) | Director |
| Benjamin D. Velvin III (LS) | Director |
| Bowers Espy (AHL) | Director |
| Catharon Miller (LS) | Director |
| Chad Patton (LS) | Director |
| David Osborn (AHL) | Treasurer, Vice President & Ass't Secretary |
| Gary Erickson (AHL) | Director |
| Greg Russell (LS) | Director |
| James A. Konrath (AHL) | Chief Executive Officer |
| James Berglund (AHL) | Director |
| James Konrath (AHL) | CEO & Director |
| James Moran (LS) | Director |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jody Gunderson (AHL) | Director |
| John Buchanan (AHL) | Chief Financial Officer |
| Joseph Lydon (AHL) | President & Chief Operations Officer, Director |
| Joshua Weiss (AHL) | Secondary Markets Counsel, Vice President |
| Karen Shields (AHL) | President, COO and Secretary |
| Leigh Rea (LS) | Director |
| Len Allen (LS) | Director |
| Marc Lipshy (LS) | Director |
| Michael Thompson (LS) | Director |
| Mike Prushan (LS) | Director |
| Richard Pratt (AHL) | Director |
| Stephen Wall (AHL) | Director |
| Stuart Marvin (AHL) | Executive Vice President & Secretary |
| Greg Strong (LS) | Executive Treasurer |
| James Ransom (AHL) | Controller, Vice President & Assistant Secretary |
| Jeff Walton (AHL) | President & CEO |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |

**Accredited Home Lenders, Inc.**

| Name | Position | |
|------|----------|---|
| A. Jay Meyerson (AHL) | Director | x |
| Bowers Espy (AHL) | Director | |
| David Osborn (AHL) | Treasurer, Vice President & Ass't Secretary | |
| Chad Patton (LS) | Director | |
| Gary Erickson (AHL) | Director | |
| Greg Strong (LS) | Executive Treasurer | |
| James A. Konrath (AHL) | Chief Executive Officer | |
| James Berglund (AHL) | Director | |
| James Konrath (AHL) | Director | |
| James Moran (LS) | CEO | |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary | |
| Jeffrey Walton (LS) | Director | |
| Jody Gunderson (AHL) | Director | |
| John Buchanan (AHL) | Chief Financial Officer | |
| John M. Robbins, Jr. (AHL) | Director | |
| Joseph Lydon (AHL) | President & Chief Operations Officer | |
| Joshua Weiss (AHL) | Secondary Markets Counsel, Vice President | |
| Karen Shields (AHL) | President, COO and Secretary | |
| Marc Lipshy (LS) | Director | |
| Mike Prushan (LS) | Director | |
| Ray W. McKewon (AHL) | Executive Vice President | |
| Richard Pratt (AHL) | Director | |
| Stephen Wall (AHL) | Director | |
| Stuart Marvin (AHL) | Executive Vice President & Secretary | |
| Stuart Marvin (AHL) | Director | |
| Meade Monger (APS) | Chief Restructuring Officer | |
| Michael Murphy (APS) | Chief Administrative Officer | |

**Inzura Insurance Services**

| Name | Position |
|------|----------|
| David Osborn (AHL) | Treasurer, Vice President & Ass't Secretary |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jeffrey N. Walton (AHL) | Director and Officer |
| Joseph J. Lydon (AHL) | Director and Officer |
| Joshua Weiss (AHL) | Secondary Markets Counsel, Vice President |
| Karen Shields (AHL) | President, COO and Secretary |
| Stuart D. Marvin (AHL) | Officer |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |

**Vendor Management Services, LLC**

| Name | Position |
|------|----------|
| David Osborn (AHL) | Treasurer, Vice President & Ass't Secretary |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| James W. Potter (AHL) | Director & Officer |
| Joshua Weiss (AHL) | Secondary Markets Counsel, Vice President |
| Karen Shields (AHL) | President, COO and Secretary |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |

**Windsor Management Co.**

| Name | Position |
|------|----------|
| David Osborn (AHL) | Treasurer, Vice President & Ass't Secretary |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jeffrey N. Walton (AHL) | Director and Officer |
| Joseph J. Lydon (AHL) | Officer |
| Joshua Weiss (AHL) | Secondary Markets Counsel, Vice President |
| Karen Shields (AHL) | President, COO and Secretary |
| Marc Lipshy (AHL) | Director |
| Mike Prushan (AHL) | Director |
| Stuart D. Marvin (AHL) | Director & Officer |
| Chad Patton (LS) | Director |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |

**REIT**

| Name | Position |
|------|----------|
| A. Jay Meyerson (AHL) | Trustee |
| Benjamin D. Velvin III (LS) | Trustee |
| Bowers Espy (AHL) | Trustee |
| Catharon Miller (LS) | Trustee |
| Chad Patton (LS) | Trustee |
| Gary Erickson (AHL) | Trustee |
| Greg Russell (LS) | Trustee |
| Greg Strong (LS) | Executive Treasurer & Trustee |
| James A. Konrath (AHL) | Chief Executive Officer |
| James Berglund (AHL) | Trustee |
| James Konrath (AHL) | Trustee |
| Jeff Walton (LS) | President/CEO/Secretary |
| Jeffrey Walton (LS) | Trustee |
| Jim Moran (LS) | Trustee |
| Jody Gunderson (AHL) | Trustee |
| John Buchanan (AHL) | Chief Financial Officer |
| Joseph Lydon (AHL) | President, Chief Operations Officer & Trustee |
| Leigh Rea (LS) | Trustee |
| Len Allen (LS) | Trustee |
| Marc Lipshy (LS) | Trustee |
| Michael Thompson (LS) | Trustee |
| Mike Prushan (LS) | Trustee |
| Richard Pratt (AHL) | Trustee |
| Stephen Wall (AHL) | Trustee |
| Stuart Marvin (AHL) | Executive Vice President, Secretary & Trustee |
| David Osborn (AHL) | Vice President, Treasurer & Assistant Secretary |
| Joshua Weiss (AHL) | Counsel, Vice President & Assistant Secretary |
| Karen Shields (AHL) | President & COO |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |