IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et. al. | § | |
| | § | |
| Debtors[1] | § | JOINTLY ADMINISTERED |
| | § | *Related Dockets No. 2018,* |
| | § | *2185, 2415, 2416* |

### OBJECTIONS OF PAMELA J. PEERCE-LANDERS AND BRUCE K. LANDERS TO "THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION" AND TO "DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION"

We, Pamela J. Peerce-Landers and Bruce K. Landers, members of Class 9 H, hereby file this objection ("Objection") to the "Third Amended Disclosure Statement With Respect To The Debtors' Second Amended Chapter 11 Plan Of Liquidation," ("the Third Amended Disclosure Statement") [Docket No. 2416] and to "Debtors' Second Amended Chapter 11 Plan Of Liquidation," ("the Plan" or "the Second Amended Plan") [Docket No. 2415]. Since neither of the above mentioned documents have addressed our previous objections made in Docket No. 2018 and Docket No. 2185, we hereby incorporate the arguments made in those filings herein by reference without having to repeat them. Certain of our previous objections will be repeated for continuity and for the convenience of the Court.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accreditied Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services , a Pennsylvania limited liability company (8047), Inzura Settlement Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all the Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

1

In support of this Objection, upon information and belief, we respectfully represent as follows:

## **PRELIMINARY STATEMENT**

1.      We will show that the Plan violates 11 U.S.C. § 1123(a)(4) because it provides for more favorable treatment of certain of the REIT's Series A Preferred Shareholders without the knowledge, much less, agreement of the REIT's other Series A Preferred Shareholders to accept far less favorable treatment.

2.      We will show that the Disclosure Statement is deficient because it merely states that:

**Most of the claims of REIT Preferred Shareholders will be classified in Class 9 H.**

but, never reveals which of the REIT's Preferred Shareholders will be afforded special treatment by not being classified in Class 9 H.

3.      We will show that this select group of the REIT's Preferred Shareholders are the members of the ad hoc REIT Committee whose cooperation, consent and approval is vital to persuading the Court to confirm the Plan.

4.      We will show that the both Disclosure Statement and the Plan seek to subvert the absolute priority rule of 11 U.S.C.§ 1129(b)(2)(B)  by misleading certain critical senior unsecured H classes into thinking that they may receive nothing or an unknown amount for their claims and that their receipt of any distribution could take 5 years or more unless they opt for election to a junior Convenience Class and accept the Plan and other terms.

5.      We will show that Lone Star's claims are not only of questionable validity, but that Lone Star's actions after the acquisition of Accredited, their conduct during this case and the detrimental consequences to other creditors satisfy the requirements stated by the 5th Circuit Court of Appeals for the equitable subordination of their claims.

6.      We will show that following the Court's receipt of the October 26, 2010 letter from Messrs. Osborn and Brown, the Debtors, who were very likely, strongly, influenced by Lone Star, made dramatic, inexplicable changes in their treatment of the claims of the Trust Preferred Securities Holders ("the TRUPs Holders").

7.      We will show that not only have "most" of the claims of the REIT's Preferred

Shareholders been misclassified relative to the claims of the TRUPs Holders, but that the REIT

Committee has helped to throw their fellow preferred shareholders "under the bus."

8.      We will show that the consistent exaggeration of the estimated amount of allowed

claims of the REIT's Preferred Shareholders and the failure of the Debtors to follow through on a

straightforward Certification of Counsel with respect to their Second (Substantive) Omnibus Objection

[Docket No. 1159] which would have eliminated over 99.8% of these claims, potentially saving the

Debtors over $101.8 million, served a critical purpose.

9.      Finally, we will show that despite the characterization of the REIT as a "non-Debtor

entity," the Plan exploits its assets and forces it to make unreasonable concessions to appease one

creditor with special leverage provided by Messrs. Osborn and Brown, the TRUPs Holders, resulting in

the REIT's substantive consolidation in the Consolidated Holdco to the detriment of the REIT's

creditors.

10.     With that said, we would will propose the outline of a more equitable Plan which will

benefit more of the Debtor's creditors.


## ARGUMENTS

## I.      THE PLAN VIOLATES 11 U.S.C. § 1123(a)(4) AND THE DISCLOSURE STATEMENT IS DEFICIENT BECAUSE IT DOES NOT REVEAL THE SPECIAL TREATMENT BEING AFFORDED TO THE MEMBERS OF THE REIT COMMITTEE

11.     On p. 3 of the Debtors' Third Amended Disclosure Statement [Docket 2146], it states
(emphasis is original):

> **Most of the claims of REIT Preferred Shareholders will be classified in Class 9H.** For a
> more detailed description of the terms and provisions of the Plan, see Section V below.

12.     Section V does not explain which claims of the REIT Preferred Shareholders will not be

classified in Class 9H.  In section V(A)(2), on p. 39 it states:

> Class 9 H - REIT Preferred Holders' Subordinated Guaranty Claims: The Class 9 H Claims <u>are</u>
> impaired.  Unless otherwise agreed to by the Committee and the REIT Committee, on the Effective Date (i) the
> Holders of Allowed Class 9 H Claims shall not be entitled to receive any direct distributions from Consolidated

Holdco until all Holders of Allowed Claims in Classes 3 H, 4 H, 5 H and 6 H have been paid in full as provided under the Plan...

> **BECAUSE CLASS 9 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

13.     The only hint we get that some members of Class 9 H will receive special treatment or "good and valuable consideration" is in Exhibit C, the Plan Support Agreement and Term Sheet, of the Debtors' Third Amended Disclosure Statement. On p.12, ¶ 33, it states (bold emphasis is ours):

> None of the parties hereto shall sell, assign, transfer or pledge their respective claims against the Debtors or any right to vote such claims prior to the occurrence of the Effective Date, **except that (i) the members of the REIT Committee may do so if the acquirer of such claim expressly agrees in writing to be bound by the REIT Committee member's obligation under this Term Sheet to support and not object to, and vote in favor of the Plan and consent to the releases specified herein...**

14.     Ah, so now we finally know why the REIT Committee has thrown their fellow REIT Preferred Shareholders "under the bus," inexplicably agreeing to a Plan which would provide them with nothing.  Because, they are not getting nothing, like the other less privileged REIT Preferred Shareholders in Class 9 H.  Instead, they have been secretly elevated to another class--an impaired class of course, so that they will receive a distribution and still be able to vote on the Plan.  But, the Disclosure Statement and the Plan are both silent on the details.

15.     How can we be sure that the REIT Committee is being compensated for their cooperation?  Because companies like Liquidity Solutions, who are in the business of buying bankruptcy claims at a discount, specify in their "Assignment of Claim" contract (see Exhibit A for a copy of Liquidity Solutions standard contract which we received in October, 2010) that:

> In the event that (i) the Claim is disallowed, reduced, subordinated, offset, setoff, objected to, treated differently in the Proceedings than general unsecured claims against the Debtor, or otherwise impaired, for any reason whatsoever, in whole or in part...Assignor agrees, upon demand of the Assignee, to make to Assignee immediate proportional restitution and repayment of the Purchase Price together with interest at the rate of ten percent (10%) per annum on the amount repaid for the period from the date of payment of the Purchase Price by Assignee through the date such repayment is made.

16.     What would be the point of granting the REIT Committee members the right to sell their claims if they **"WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION"?**  Surely, the REIT Committee

members, especially Footprint Asset Management & Research, Inc. and Dupont Capital Management,

realize that they will have to repay the entire Purchase Price of their claim/s with interest when the

Plan is confirmed and the company to which they sold their claim/s receives nothing.

17.     Liquidity Solutions also has another clause in their contract stating:

> Assignor...is not, and has not been, a member of any committee appointed in the Proceedings.

But, the REIT Committee members may be able to get around that one by claiming they were

members of an ad hoc committee and not appointed by the Court.

18.     This arrangement with the REIT Committee violates the Bankruptcy Code.

According to 11 U.S.C. § 1123(a)(4):

> ...a plan shall...provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

Since we were never consulted, much less did we agree to accept less favorable treatment

than the members of the ad hoc REIT Committee, the Plan conclusively violates § 1123(a)(4) of the

Bankruptcy Code.


## II.     THE PLAN AND DISCLOSURE STATEMENT SUBVERT THE ABSOLUTE PRIORITY RULE OF 11 U.S.C. § 1129(b)(2)(B)

18.     The absolute priority rule of 11 U.S.C.§ 1129(b)(2)(B) requires that, if a class of senior

claim-holders will not receive the full value of their claims under the plan and the class does not accept

the plan, no junior claim or interest-holder may receive any property under the plan on account of such

junior claim or interest.

19.     The table in the Disclosure Statement on p. 4 states that Class 3 H has $0 estimated

allowed claims with an expected recovery of 100%, the exact same characterization of the secure

Class 1 H and 2 H Claims, yet Class 3 H is impaired and eligible to vote whereas, Classes 1 H and 2

H are unimpaired and ineligible to vote.  This alone is confusing.  But, it goes on to assert that Class 4

H consists of an Unknown amount of claims with an Unknown % Recovery.  The explanation for this

confusion is that the Debtors don't expect anyone to opt for Class 3 H treatment and participation in Class 4 H is optional. However, participation is Class 7 H is also optional, yet the Debtors have no difficulty in estimating the amount of the allowed claims and the estimated recovery for this Class.

20. Class 3 H, the most senior of the unsecured classes, is first being told in the table that they will receive nothing. Odd treatment for the most senior unsecured class indeed. On p. 36, of the Disclosure Statement, they are told they will receive a Pro Rata share of any distributions from Consolidated Holdco and continuing on each Subsequent Distribution Date, but until the Allowed 3 H Claims are satisfied in full with interest,

> the Holders of the Class 4 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

Moreover, they must agree to the Creditor Release. On p. 37, they are told that the Holders of the 6 H Claims will receive the same treatment as the Class 3 H Claims, 3 levels below them, receiving between 63.7% and 86.5% of their claims. So, is the expected recovery for Class 3 H really between 63.7% and 86.5%? The table, which is what most people are going to look at, says Class 3 H gets nothing and then 34 pages later, that estimate appears to be contradicted and changed to 63.7% to 86.5%. Finally on p. 39, in the description of the Class 7 H Claims, the Disclosure Statement confirms that the estimated recoveries for the Holders of the Class 3 H Claims will be 63.7% to 86.5%, but this is not guaranteed. This is certainly not guaranteed since it is very doubtful that Holdco will have much money left after paying the TRUPs Holders. So, little in fact, that it no longer justifies setting up a Liquidation Trust.

21. The ballot will certainly explains the advantages to Class 3 H of electing for treatment in the more junior Convenience Class, Class 7 H, specifically, getting a guaranteed 65% on the Effective Date vs. who knows how much over a period of possibly 5 years or more if ever. If you are a member of Class 3 H and you have to accept the Creditor Release anyway, why not opt for the sure thing? The Debtors are so confident that all members of Class 3 H will take the sure thing that they do not expect anyone to remain in this most senior of unsecured classes.

6

22.     The treatment of those who do not accept the Creditor's Release and, thus, become part of Class 4 H is far less favorable. Not only will their distribution, if any (the amount and % recovery are unknown after all), be paid out over a period of possibly years, but they are not even eligible to become a member of the more favorably treated, junior class, Class 7 H.

23.     What the Disclosure Statement does not tell the members of Class 3 H and Class 4 H is that they hold all the cards. Since they are not receiving the full value of their claims, if either of them reject the Plan, the Plan will fail to meet the "fair and equitable" test because there are several junior classes who are receiving distributions under the Plan. In particular, Class 8 H is receiving a guaranteed 70% recovery, with 95% of it to be paid to them on the Effective Date--the most favorable treatment of any of the unsecured classes.

24.     Lone Star is certainly free to gift their distributions to junior classes, but the idea of a junior class leveraging their distribution to persuade a senior class, which should already be receiving full value and isn't, to elect treatment as a lower class sets the concept of seniority on its ear.

25.     It is very important to note that this curious interpretation of seniority in the H classes is not followed in the C classes. The C Class claims are treated according to seniority in payment order.

26.     So, why buffalo these senior H classes into choosing to be treated as a class several levels below them? The necessity to have them "choose" to be treated as Class 7 H. That way, they will certainly vote for the Plan, after all, if they were not in favor of the Plan, why would they have elected to become part of this Convenience Class? Insider Classes 5 H (Lone Star) and 6 H (the REIT) will of course vote for the Plan even though they are impaired and not receiving the full value of their claims, but that is not sufficient for confirmation because they are insiders. Now the way is clear for Class 8 H, the TRUPs Holders, to get their payday.


III.     **QUESTIONABLE VALIDITY OF LONE STAR CLAIMS AND AMPLE JUSTIFCATION FOR THE EQUITABLE SUBORDINATION OF THE LONE STAR CLAIMS:**

    A.     **Basis for the Lone Star Claims is Questionable**

27.    Wachovia delivered a $36 million margin call to AHL on July 29, 2008.  In response,

AHL filed suit to seeking a temporary restraining order.  On August 13, 2008, LSF MRA intervenes,

buying out Wachovia.

28.    According to Messrs. Osborn and Brown [Docket No. 2081], LSF MRA received 2,583

mortgages with an unpaid principal balance of $621 million in this transaction.

29.    Subsequently, on or about August 22, 2008, LSF MRA, AHL and REIT entered into

the Amended MRA.

30.    According to Messrs. Osborn and Brown [Docket No. 2081],

> In March 2009, Lone Star exercised its right to require Accredited to re-purchase these
> mortgages for the approximate $287 million owed.  Accredited was unable to do so and as a
> result Lone Star retained the mortgages and asserted a claim against Accredited for $96 million
> representing what it claimed was the difference between the amount owed by Accredited to Lone
> Star and the value of the collateral it retained.  The $96 million claim implied a value of $.45 per
> dollar of the unpaid principal balance of the mortgage loans that were the collateral for the MRA
> loan.  About six weeks before asserting its $96 million claim, in February 2009 Lone Star
> provided Accredited with an analysis that Lone Star prepared, that valued the loans housed in
> the MRA at $.79 per dollar of the unpaid principal balance of the mortgage loans that were
> collateral for the MRA.  Thus, this MRA issue involves nothing more than a valuation question
> with Lone Star providing Accredited with an analysis suggesting a value of $.79 on the dollar that
> Accredited was to use for its reports to governmental agencies and another valuation at $.45 on
> the dollar that was implied in its claim against Accredited.

31.    To summarize the math,

$$\$287MM \times 0.79 = \$227M$$
$$\$287MM \times 0.45 = \underline{\$129M}$$
$$\text{Difference:} \qquad \$\ 98M$$

or approximately $97M allowing for rounding errors.  Thus, Lone Star's $97 million claim against both

AHL (one of the Consolidated Debtors) and the REIT (a subsidiary of Holdco by virtue of the

transaction between AHL and Holdco on December 31, 2008) clearly appears to be is based on these

discrepant valuations by Lone Star as asserted by Messrs. Osborn and Brown.

32.    Despite the large amount of this claim, little if anything, was done to verify its validity.

Messrs. Osborn and Brown note in the letter to the Court dated October 26, 2010 [Docket No. 2081]:

> Moreover, as soon as Lone Star filed its $96 million claim, the three officers of Accredited
> pleaded with the bankruptcy professionals at Hunton and Alix to file immediately an Objection to
> the Lone Star $96 million claim and put Lone Star to the burden of proving up its claim,
> particularly in light of its February 2009 valuation of the collateral at $.79 on the dollar.  The
> bankruptcy professionals refused to do so...

8

Insiders' claims should be subjected to "rigorous scrutiny." Lone Star's claim appears to have been subjected to no scrutiny.

33.     There is no effort on the part of the Debtors to allocate the amount of this single $97M claim between AHL (Consolidated Debtors) and the REIT (Consolidated Holdco) as would be expected if the claim were legitimate and the Debtors were proposing this Plan independent of Lone Star's influence.

**B.     Justification for the Equitable Subordination of Lone Star's Claims--Evidence of Inequitable Conduct:**

34.     Section 510(c) of the Bankruptcy Code grants bankruptcy courts authority to relegate certain creditor's claims to the "bottom of the barrel" in terms of priority of payment under the Equitable Subordination doctrine. In re Lazar, 83 F.3d 306 (9th Cir. 1996), it was stated:

> Three findings are generally required before equitable subordination will be granted:
>     1) that the claimant engaged in some type of inequitable conduct,
>     2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and
>     3) that subordination would not be inconsistent with the Bankruptcy Code
> In order to justify equitable subordination, the court is required to make specific findings and conclusions with respect to each of the requirements.

35.     In the matter of Clark Pipe and Supply Co., Inc., 893 F.2d 693 (5th Cir. 1990), the Fifth Circuit Court of Appeals found that Associates Commercial Corporation did not deserve equitable subordination because they did not take any of the following actions indicative of inequitable conduct:

> 1. Appreciably alter its procedures for calculating credit availability or reporting requirements when the debtor fell into financial difficulty;
> 2. Contravene its loan agreement with the debtor;
> 3. Make management decisions for the debtor;
> 4. Instruct the debtor which creditors should and should not be paid from available funds;
> 5. Place any of its employees as either a director or officer of the debtor;
> 6. Influence the removal from office of any of the debtor's personnel;
> 7. Request that the debtor take any particular action at a shareholder meeting;
> 8. Get involved in handling the debtor's daily operations; or
> 9. Mislead creditors to continue supplying the debtor with goods or services.

In making their ruling, the Fifth Circuit Court distinguished between the existence of control versus the exercise of that control to direct the activities of the debtor to the detriment of other creditors.

36.     Upon information and belief, Lone Star did take actions in at least 5 of these 9 areas:

9

Items #3-6 and item #9 and possibly, Items #7 and #8.

37.     They were very likely involved in the Debtors' daily operations considering their admitted complete control of the Debtors (see Debtors' Third Amended Disclosure Statement, Docket No. 2146, Section IV(C)(2), p. 17.)

38.     On October 19, 2007, exactly one week after Lone Star completed its acquisition of Holdco, Holdco filed Form 8-K with the U.S. Securities and Exchange Commission delisting the shares of the REIT's Series A Preferred Shares from Nasdaq. (See Exhibit 3 in our "Response to Debtors' Second (Substantive) Omnibus Objection to Claims Pursuant to 11 U.S.C.§ 502(b) and Bankruptcy Rule 3007", Docket No. 1130). A benefit of this action was not having to file quarterly (Form 10-Q) and annual (Form 10-K) reports with the SEC. Although the release states that

Accredited and REIT currently intend to continue to hold annual meetings for REIT

since public reports were no longer required, there is no way to know if such meetings were held and if so, whether Lone Star influenced the non-Debtor entity, the REIT, during these meetings, but it is a good bet considering that Lone Star controlled the REIT's Board of Trustees.

Specific examples of Lone Star's actions with respect to Items #3-6 and 9 follow.

### Management Decisions Made by Lone Star for the Debtors (Item #3):

In Messrs. Osborn and Brown's letter to the Honorable Mary F. Walrath dated October 26, 2010 [Docket No. 2081], they made the following statements. Information in square brackets were added by us for clarity.

39.     Spring, 2008 through August, 2008--Who to Hire and Who to Fire:

In Messrs. Osborn and Brown's letter to the Honorable Mary F. Walrath dated October 26, 2010 [Docket No. 2081], they made the following statements. Information in square brackets were added by us for clarity.

> 1. In the Spring of 2008 Lone Star directed Accredited to employ Steve McCartin, a bankruptcy lawyer with the Gardere law firm of Dallas, Texas to become General Counsel of the Accredited companies.
> 2. Later that month [July 2008], at the direction of Lone Star, the Gardere firm was

terminated as Counsel for the Accredited companies and a large portion of the $800,000 bankruptcy retainer was returned to Accredited.

3. Following the termination of the Gardere firm, Lone Star directed Accredited to hire the Hunton firm as its bankruptcy counsel.

40.  March, 2009--Disposition of Major Receipts from Asset Sales:

In February and early March 2009 Accredited sold its last remaining substantial asset to SPS, receiving approximately $32 million as the net proceeds of the sale. The assets sold to SPS were pledged to an affiliate of Lone Star, as a result of which Lone Star claimed the net proceeds of the sale. A substantial dispute ensued between Lone Star and Accredited as to whether any of the net proceeds of sale should be paid over by Accredited to Lone Star. Within ten days after the completion of the sale to SPS, this dispute was resolved based upon a factual and legal analysis made by Gregory Hesse, a partner of Hunton and now the Engagement Partner for Accredited in its bankruptcy, as a result of which Accredited paid $30 million to Lone Star. David Osborn and the other officers of Accredited believe that the $30 million payment to Lone Star was not a true arm's length payment as it was controlled by Chad Patton [a Lone Star employee] and Lone Star and based solely on Hesse's legal analysis. Management of Accredited asked Patton to have a neutral bankruptcy attorney review both the $30 million payment and Hesse's legal analysis. But management's views were ignored and Patton directed that the $30 million payment be made.

Based on the above, upon information and belief, Lone Star made major management decisions and consistently overruled Accredited's management.

## Lone Star Instructed the Debtors which Creditors Should and Should Not Be Paid from Available Funds (Item #4):

41.  First Half of 2008--Repurchases under "Residential Loan Pools" (RLP's):

In the Debtors' Second Amended Disclosure Statement [Docket No. 2145], section IV(C)(3), it is noted that Lone Star

...purchased the securities issued by three "residential loan pools" (each a "RLP" and collectively, the "RLPs") established by AHL, Inc. at a total purchase price of $193 million...As part of the transaction, the RLPs had typical repurchase rights. AHL, Inc. honored approximately $2.5 million of repurchases from the RLPs, during a period when it was generally not honoring repurchase demands from other parties.

42.  March, 2009--Disposition of Major Receipts from Asset Sales:

This concerns the $30 million payment made to Lone Star by Accredited from the proceeds of the SPS sale, the details of which have already been presented in ¶ 39 above and are incorporated here by reference.

43.  Upon information and belief, both of these examples demonstrate that Lone Star did instruct the Debtors which Creditors should and should not be paid. In both cases, they instructed the

11

Debtors to pay Lone Star Entities.

## Lone Star Placed its Employees as Directors and Officers of the Debtors and as Trustees and Officers of the Non-Debtor Entity, the REIT (Item #5):

44.    Management of Holdco:
According to the Debtors' Third Amended Disclosure Statement [Docket No.2416], section IV(B)(2):

> Immediately after LSF5 acquired Holdco, the board of directors of Holdco consisted of two pre-acquisition directors, Jim Konrath and Joe Lydon, and six directors affiliated with the Lone Star Entities, Len Allen, Marc Lipshy, Catharon Miller, Leigh Rea, Michael Thompson and Benjamin Velvin. The members of the board changed frequently until finally in March, 2009, each Debtor had only one director, Chad Patton, a Lone Star affiliate. At all times after the acquisition at least a majority of the members of the Debtors' boards of directors were affiliated with the Lone Star Entities.

Omitted from this section is the fact that Chad Patton was also a trustee of the REIT, a non-Debtor entity (based on the list of former and current officers and trustees of the REIT provided by the Debtors in their own filings). Most likely, Mr. Patton was the only trustee after this same time in March, 2009. At a minimum, this raises serious concerns about the independence of the REIT's negotiations in these proceedings and their willingness to make major concessions while receiving little good or valuable consideration. This point will be discussed in greater detail below.

45.    Current and Former Officers, Directors and/or Trustees of the Debtors and the REIT:
In the Debtors' filings, as part of the "AHL Settlement Agreement," they have included lists of the Current and Former Officers and Directors of the Debtors. These lists show that 3 of the Debtors and the REIT had Lone Star employees as officers, directors and/or trustees: Accredited Home Lenders Holding Company (Holdco); Accredited Home Lenders, Inc. (AHL, Inc.) and Windsor Management Co., two of the Consolidated Debtors; and the REIT, a non-Debtor entity. It is not clear if all the named individuals were part of these companies and their boards at the same time, however, by the Debtors' own admission, following the acquisition, Lone Star controlled Debtors' boards. Mr. Greg Strong of Lone Star was the Executive Treasurer of Holdco, AHL, Inc. (one of the Consolidated Debtors) and the REIT (a non-Debtor entity).

## Lone Star Did Influence the Removal of at Least One of the Debtors' Key Personnel, Their General Counsel (Item #6):

46.    In Messrs. Osborn and Brown's letter to the Honorable Mary F. Walrath dated October 26, 2010 [Docket No. 2081], they made stated:

In the Spring of 2008 Lone Star directed Accredited to employ Steve McCartin, a bankruptcy lawyer with the Gardere law firm of Dallas, Texas to become General Counsel of the Accredited companies.

47.    Based on Holdco's last 10-K filing on August 2, 2007, as of July 31, 2007, approximately two and a half months before Holdco's acquisition by Lone Star, their General Counsel was Mr. David E. Hertzel.  Considering the information presented in ¶ 46 above, upon information and belief, we assert that Lone Star directed Holdco to replace Mr. Hertzel with Mr. McCartin in the Spring of 2008.

**Actions Taken to Mislead Creditors about the Financial Condition of the Debtors (Item #9):**

48.    March 2008--Lone Star Provides Letter to Debtors' Auditors to Prevent Auditors from Expressing Doubt about the Debtors' Ability to Remain a Going Concern:

In the Debtors' Third Amended Disclosure Statement [Docket No. 2416], p. 28, it is noted that in the Committee's "Motion for Entry of An Order Granting Leave, Standing and Authority to Investigate and Prosecute Claims and Causes of Action on Behalf of the Committee, Debtors and Debtors' Estates and Settle Claims on Behalf of the Debtors' Estates," (Docket No. 1203, "the Authority Motion"), the Committee

pointed out that in March, 2008, Lone Star Entities provided a letter to the Debtors' auditors stating that the Lone Star Entities intended to support the Debtors through December 31, 2008, thereby avoiding a qualification in the 2007 audit about the Debtors' ability to remain a going concern.

This action also demonstrates that Lone Star was aware of the Debtors' potential insolvency even before they directed Accredited to hire Mr. Steve McCartin.

49.    July, 2008--Lone Star Postpones Debtors' Bankruptcy Filing by Directing the Discharge of the Gardere Firm to Whom the Debtors Had Paid a Retainer to Commence a Bankruptcy Filing:

In Messrs. Osborn and Brown's letter to the Honorable Mary F. Walrath dated October 26, 2010 [Docket No. 2081], they asserted:

In the Spring of 2008 Lone Star directed Accredited to employ Steve McCartin, a bankruptcy lawyer with the Gardere law firm of Dallas, Texas to become General Counsel of the Accredited companies...By July 2008 McCartin had concluded that the Accredited companies were

13

hopelessly insolvent and that, if the Accredited companies filed for bankruptcy, Lone Star would be faced with a potential $130 million Preference Claim based on the $130 million payments Lone Star received in January and February 2008. McCartin disclosed all of this to both Lone Star and Accredited in early July 2008. Later in July 2008, the Gardere firm received $800,000 from the Accredited companies as a retainer for the filing of a Bankruptcy Petition. Later that month, at the direction of Lone Star, the Gardere firm was terminated as Counsel for the Accredited companies and a large portion of the $800,000 bankruptcy retainer was returned to Accredited. The undersigned believe that the evidence will conclusively establish that Lone Star deferred any bankruptcy filing by Accredited until March 2009 in an effort to avoid any potential insider Preference Claim...

50. August, 2008--LSF MRA Purchases the Wachovia MRA to End Debtors' Lawsuit Against Wachovia Seeking a Restraining Order to Prevent Wachovia's $36M Margin Call:

In the Debtors' Third Amended Disclosure Statement, section IV(D)(4), p.22, it is stated that:

To resolve disputes and litigation, on August 13, 2008, LSF MRA, one of the Lone Star Entities, purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $431 million. This transaction included 2,538 mortgages with an unpaid principal balance of $621 million. AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.

Upon information and belief, we believe that a primary purpose of this transaction was to contain any public disclosure about the financial condition of AHL, Inc., one of the Consolidated Debtors.

To the above list of actions indicative of inequitable conduct, we also include the following:

**Control and Influence of the Debtors' Bankruptcy Process:**

51. On January 6, 2010, the Committee filed their Authority Motion [Docket No. 1203]. The Committee asserted:

Due to multiple conflicts of interest, the Debtors are not in a position to pursue, through litigation, valuable claims possessed by the Debtors and their estates against insiders such as Lone Star and its affiliates and current and former directors and officers of the Debtors.

52. The Debtors responded on May 13, 2010 with their objection, Docket No. 1530, in which they stated that they had retained the services of Meade Monger of AP Services as an independent chief restructuring officer (CRO) charged with among other things, investigating potential clams that the Debtors may have against any party, including Lone Star. The Debtors contended that after several months of intensive negotiations, Lone Star made a significant settlement proposal to the

Debtors in September, 2009, "the Settlement Proposal." The Debtors used this Settlement Proposal to justify their not suing Lone Star. In ¶ 15, the Debtors characterize their efforts as the:

> ...diligent pursuit of the Lone Star claims...

In ¶ 20, the Debtors state:

> Here the evidence will show that Lone Star has not had any input into the Debtors' decisions regarding the Lone Star claims, and that instead the investigation and pursuit of these claims has been left up to the Debtors' professional advisers, led by Meade Monger, Chief Restructuring Officer...they have been pursuing the Lone Star claims with enough vigor to justify denying the Authority Motion for the time being.

53.    On September 15, 2010, the Debtors filed their "Disclosure Statement with Respect to the Debtors' Chapter 11 Plan of Liquidation," [Docket No. 1947] and their "Chapter 11 Plan of Reorganization *re Liquidation*," [Docket No. 1946]. On October 29, 2010, the Debtors filed their "Second Amended Disclosure Statement with Respect to the Debtors' First Amended Chapter 11 Plan of Liquidation," ("the Seconded Amended Disclosure Statement"), [Docket No. 2105] and their "Amended Chapter 11 Plan of Liquidation," ("the First Amended Plan"), [Docket No. 2103]. In all of these previous documents, the TRUPs Holders', then Class 7 H Claims, were clearly subordinate to the more senior Class 3 H Claims, the General Unsecured Claims against Consolidated Holdco. On p. 32 of the Seconded Amended Disclosure Statement, the descriptions of the 3 H Claims reads in part:

> In the event that the Holders of the Class 3 H Allowed Unsecured Claims are paid in full, together with interest thereon from the Petition Date through the date on which such Claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, any funds remaining in the Consolidated Holdco Liquidating Trust Account, net of expenses, shall be distributed to the Holders of the Class 4 H and 5 H Claims, and potentially Class 7 H Claims, in accordance with the provisions of the Plan.

The description of the TRUPs Holders' Class 7 H claims stated (information in square brackets is provided by us for clarity):

> Holders of Allowed Class 7 H Claims shall receive their Pro Rata Share of interests in the Holdco Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

> Pursuant to the terms of the Trust Preferred Indenture, the Class 7 H Claims are subordinated to the Class 3 H [General Unsecured Claims against Holdco], 4 H [Unsecured Claims against

15

Holdco held by LSF-MRA, LLC] and 5 H [Unsecured Claims Held by the REIT]. If Class 7 H rejects the Plan, then, until distributions are made in an amount sufficient to pay Holders of Class 4 H and 5 H Claims are paid in full with interest thereon from the Petition Date through the date on which such Claim is paid in full calculated at the federal judgment rate in effect as of the Petition Date, the subordination provisions relating to Class 7 H will be enforced and the Pro Rata Share attributable to Class 7 H shall be distributed pursuant to the terms of Sec. 4.4 and 4.5 of the Plan.

Notwithstanding the foregoing, if Class 7 H votes in favor of confirmation of the Plan and the Holders of Class 7 H Claims do not object to confirmation of the Plan, the subordination provisions relating to Class 7 H will not be enforced and, the holders of Class 4 H Claims shall have payment of their Claims subordinated to the payment of all other Claims against Consolidated Holdco, and Class 7 H shall be entitled to receive the Pro Rata Distribution from the Consolidated Holdco Liquidating Trust.

The estimated recovery at this time was estimated at 24-30%.

54.    On October 27, 2010, the Court received the letter from Messrs. Osborn and Brown, [Docket No. 2081]. That very same day, the Debtors filed an "Emergency Motion to Authorize *Debtors to Restrict Public Access to Response to Disclosure Statement With Respect to the Debtors' Chapter 11 Plan of Liquidation Filed by David Osborn and Bart A. Brown, Jr.,"* [Docket No. 2086]. Clearly, certain persons were panicked by Messrs. Osborn's and Brown's letter and by what they might testify about in Court.

55. After that, all hearings on the Disclosure Statement were continued to the following month. Then, The "Notice of Agenda of Matters Scheduled for Hearing on January 20, 2011 at 10:30 AM," [Docket No. 2319] stated that:

The hearing on this matter is continued to a date to be determined.

56.    Finally on February 23, 2011, the Debtors submitted their "Third Amended Disclosure Statement with Respect to the Debtors' Second Amended Chapter 11 Plan of Liquidation," [Docket No. 2416] and the  "Debtors' Second Amended Chapter 11 Plan of Liquidation," [Docket No. 2415]. The changes in these documents with regard to the treatment of the TRUPs Holders' claims were nothing short of dramatic.

57.    First, their estimated recovery had been increased to 60% (not a range, but a fixed percentage) up from 24-30%.

58.    Second, the TRUPs Claims were now excluded from the Pro Rata calculations for the

distributions to the more senior classes including, Class 3 H, 4 H, 5 H and 6 H.

59. Third, the Allowed Class 8 H Claims [the TRUPs Holders' Claims] were now

...fixed and Allowed as a single Unsecured Claim in favor of the Trust Preferred Indenture Trustee against Consolidated Holdco, and shall be deemed fully satisfied and paid in full by the Lone Star Trust Preferred Settlement Payment and the Trust Preferred Holdco Distributions to the Trust Preferred Indenture Trustee."

60. Fourth, instead of having to accept Pro Rata payments over time from the Consolidated Holdco Liquidating Trust, the TRUPS Holders would now receive all of their $42 million on the Effective Date.

61. Fifth, to ensure the TRUPs Holders would be paid and not have to wait for their money, like most of the more senior unsecured classes, the following payment plan was adopted:

a. on the Effective Date, Wells [the Trust Preferred Indenture Trustee] would receive $26.95 million in cash from certain insurers of the Lone Star Entities and the Debtors pursuant to a confidential agreement between such insurers and certain of the Lone Star Entities. (We believe that some, if not all, of this cash from certain insurers of Lone Star and Debtors is the same money specified on p. 52 of the Debtors' Second Amended Disclosure Statement. [Docket No. 2145]:

All of Debtors' rights in D&O Policies and the proceeds thereof shall be transferred to the Consolidated Holdco Liquidating Trust;
The REIT shall transfer (i) its direct and personal claims against REIT Ds and Os and (ii) its interest in the D&O Policies to the Consolidated Holdco Liquidating Trust...

which prior to the Messrs. Osbom's and Brown's letter of October 26, 2010, [Docket No. 2081] was going to benefit all Consolidated Holdco's creditors. Now it is being given in its entirety to only one class of junior creditors, the TRUPs Holders.)

b. on the Effective Date, Wells will also receive $3.05 million in cash from one or more of the Lone Star Entities for a total so far of $30 million, collectively, the "TRuP/Holdco Settlement Payment."

c. on the Effective Date, Wells will receive from the Holdco estate a $10 million first and final cash distribution, the "TRuP/Holdco Distribution."

d. finally, once the Debtors receive the Tax Refund due on their amended 2008

17

return, Wells will receive up to a maximum aggregate amount of $2 million more for a total of $42 million and a recovery of 70%.

62.     The treatment outlined in ¶ 61 above alone is already far more generous than that being received by any of the more senior unsecured classes. Class 7 H is only receiving a guarantee payment of 65% on their claims on the Effective Date. But, it gets even better for the Class 8 H Holders.

63.     There is the "TRuP Distribution Shortfall" provision. To the extent that the cash available for the TRuP First Distribution and the TruP/Holdco Settlement Payment is less than $40 million, the shortfall will be paid from the following sources in the following priority:

        a. First, from any amount by which the REIT First Distribution exceeds $9 million (Remember, this was originally a $227 million Claim);

        b. Second, to the extent of any remaining shortfall, up to a maximum of $8 million, 50% from the Lone Star Advance (not to exceed $4 million) and 50% from the REIT First Distribution (not to exceed $4 million); and,

        c. Thereafter, any remaining shortfall will come from the REIT First Distribution. If after all these sources of money are exhausted, there still is a shortfall in the TRuP First Distribution, the Plan will not become Effective until funds have been collected from the Canadian Residuals (net of Canadian taxes) or other sources sufficient to make such payment. That is, no senior unsecured creditors will see a dime until the TRUPs Holders are certain of receiving their guaranteed $40 million.

64.     What does Lone Star and the Debtors receive for such extraordinary concessions? Other than the TRUPs Holders dropping their lawsuits and agreeing not to initiate any new ones and of course, voting for the Plan, they get the following two, apparently very valuable, new considerations:

        The TRuP Entities shall withdraw the subpeonas issued to Bart Brown and Dave Osborne (the Plan, Docket No. 2415, Exhibit C, p. 6, ¶ 6).

        Any party in interest...except that the Lone Star Entities, the Trust Preferred Indenture Trustee, and the Trust Preferred Holders waive their right to object to or challenge the allowance or award of any Professional Fee Claims.

65.     Lone Star also gets the following new concession (reference the Seconded Amended

Plan, p.40, § 8.2(e) and p. 41 § 8.2(g) (bold emphasis is ours):

> Upon the Effective Date...the Lone Star Releasees shall be released from all claims...which are based upon, or arise out of, or in any way relate to the Debtors or their business or operations (including the business or operations of the REIT and the other Non-Debtor Subsidiaries and **any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law)...**

So, the Debtors have given up the idea of trying to recover the $2.5 million from AHL, Inc.'s honoring repurchase demands from Lone Star Entities when they were not honoring those from other parties.

66.     Finally, consider the statement of the U. S. Trustee as reported in Messrs. Osborn's and Brown's letter to the Court [Docket No. 2081]:

> "The United States Trustee is concerned that this is not simply a liquidating Chapter XI case but, rather the 'tail end' of an extensive pre-bankruptcy liquidation in which affiliates were intimately involved."

67.     Upon information and belief, we believe that the information provided in paragraphs 34 through 66 above are clear evidence of Lone Star's inequitable conduct.

## C.     Lone Star's Misconduct Injured Creditors and Conferred Unfair Advantage on Them:

68.     The Plan grants Lone Star a Class 5 H Claim and entitles them to be paid in full with interest before most of the Class 9 H and any of the Class 10 H Claims are paid.

69.     The Plan calculates the distributions to two more senior classes, 3 H and 4 H on a Pro Rata basis using Lone Star's $97 million claim as part of the denominator. Since Lone Star's claim is the largest of the three classes, 3 H, 4 H and 5 H, this method of calculating the distributions due these three classes unfairly discriminates against the more senior unsecured classes whose total claimed amounts are much smaller.

## D.     Equitable Subordination of Lone Star's Claims Is Consistent with the Bankruptcy Code:

70.     Based on the arguments and information above in paragraphs 34 through 69, the equitable subordination of Lone Star's claims is not inconsistent with the Bankruptcy Code. Insider's actions are subject to "rigorous scrutiny."

## IV.     MISCLASSIFICATION OF REIT'S PREFERRED SHAREHOLDERS' CLAIMS VS. TRUPS' HOLDERS CLAIMS

**A.    TRUPs Guarantee Is Not a Financial Obligation of Holdco and TRUPs Guarantee is Subordinate to Guarantee of REIT's Series A Preferred Shares:**

71.    As we demonstrated in our previous objection to the Debtors' Second Amended Disclosure Plan [Docket No. 2185], the industry standard Parent Guarantee for Trust Preferred Securities only requires that the Parent have the Trust pay the Trust Preferred Securities Holders their distributions, if and only if, the Trust has the funds to do so.  Under the penalties of perjury, I Pamela J. Peerce-Landers again swear that I personally examined the descriptions and terms of the guarantees in each of the Prospectuses for the159 publicly-traded, guaranteed Trust Preferred Securities outstanding as of October 25, 2010, including all 7 of Wells Fargo's trust perferred securities, and found no exceptions.

72.    Although both preferred securities are subordinated, Debtors only use the word "Subordinated" to describe the REIT's Series A Preferred Shares, unfairly prejudicing them. Concerning the subordination of the TRUPs, see Docket No. 2185, Exhibit D.  A portion of that Exhibit is reproduced below.  (Sections in square brackets and any emphasis within the body of the text were added by us for clarity.

> Furthermore, the Parent [Holdco] Guarantee will be effectively subordinated to all existing and future preferred equity and unsecured and secured liabilities of and guarantees issued by the Parent Collateral Entity's subsidiaries **[including Accredited Mortgage Loan REIT Trust]**, including the related Collateral Entity.

This is clear evidence that the TRUPs guarantee is and was intended to be subordinate to the guarantee of the REIT's Series A Preferred Shares.

73.    The extremely limited nature of the trust preferred guarantee is succinctly expressed in Prospectus Supplement dated June 16, 2006 for Wells Fargo's enhanced trust preferred securities issued by Wells Fargo Capital XI, p. 47:

> A trust preferred securities guarantee will not apply to any payment of distributions except to the extent a trust shall have funds available for such payments.

74.    Thus, the Parent in this case, Holdco, has no further obligation to the TRUPs Holders if Accredited Preferred Securities Trust I does not have the funds to pay them.

75. This point is further demonstrated by the section on "Commitments and Contingencies" (Section 14) in Holdco's final 10-Q filing for the period ended June 30, 2007 which was filed on October 19, 2007, approximately 10 months after Accredited Preferred Securities Trust I's issuance of their trust preferred stock. In this section of their 10-Q which is reproduced below in its entirety, Holdco does mention their obligation to the REIT's Series A Preferred Shareholders (bold emphasis is ours.) However, Holdco is silent about the TRUPs Holders because Holdco had no financial obligation to them. Their only obligation was to require the Trust to pay the TRUPs Holders distributions, but only if the Trust had the funds to do so. This did not merit mention because it was not a financial commitment.

### 14. COMMITMENTS AND CONTINGENCIES

In the normal course of business to meet the financing needs of its borrowers, Accredited is party to financial instruments with off-balance sheet risk. These financial instruments primarily represent commitments to fund loans. These instruments involve, to varying degrees, elements of interest rate risk and credit risk in excess of the amount recognized on the balance sheet. The credit risk is mitigated by Accredited's evaluation of the creditworthiness of potential mortgage loan borrowers on a case-by-case basis. Accredited does not guarantee interest rates to potential borrowers when an application is received. Interest rates conditionally approved following the initial underwriting of applications are subject to adjustment if any conditions are not satisfied. Accredited commits to originate loans, in many cases dependent on the borrower's satisfying various terms and conditions. These commitments totaled $528 million as of June 30, 2007.

Commitments to sell loans generally have fixed expiration dates or other termination clauses and may require payment of a commitment or a non-delivery fee.

Accredited periodically enters into other loan sale commitments. At June 30, 2007 forward loan sale commitments awaiting settlement amounted to $41 million.

Accredited's mortgage banking business is subject to the rules and regulations of the Department of Housing and Urban Development ("HUD"). Those rules and regulations require, among other things, that Accredited maintain a minimum net worth of $250,000. Accredited was in compliance with these requirements at June 30, 2007.

From time to time, Accredited enters into certain types of contracts that contingently require Accredited to indemnify parties against third party claims and other obligations customarily indemnified in the ordinary course of Accredited's business. The terms of such obligations vary and, generally, a maximum obligation is not explicitly stated. Therefore, the overall maximum amount of these obligations cannot be reasonably estimated. Historically, Accredited has not been obligated to make significant payments for these obligations and no liabilities have been recorded for these obligations on its balance sheet as of June 30, 2007.

**Accredited has irrevocably and unconditionally agreed to pay in full to the holders of each share of the REIT's Series A Preferred Shares: (i) all accrued and unpaid dividends, (ii) the redemption price, and (iii) the liquidation preference. See further discussion under Note 10—Minority Interest in REIT Subsidiary.**

76. From the pp. S-9 and S-10, under the section on "Risk Factors" of the Prospectus Supplement dated June 16, 2006 for Wells Fargo's enhanced trust preferred securities issued by Wells Fargo Capital XI, we quote the following risks to trust preferred holders (bold emphasis is

original):

- *Interest payments may be made on parity securities even though interest has not been paid on the junior subordinated debentures.*

  *The junior subordinated debentures and the guarantee will be effectively subordinated to the obligations of our subsidiaries.*

  *The guarantee only guarantees payments on the capital securities if the trust has cash available.*

77.     It is notable that the TRUPs Holders have not once challenged anything we said in our previous objection [Docket No. 2185], suggesting that they know it is correct and accurate description of their securities.

78.     The Committee has also expressed its own doubts as to whether the TRUPs (herein referred to as the "Movants") were really creditors of Holdco.  According to "Opposition of the Official Committee of Unsecured Creditors to Kodiak CDO I Ltd., Kodiak CDO II Ltd. and JP Morgan Chase Bank, N.A.'s Motion for Standing to Assert Claims of Accredited Home Lenders Holding Co.," [Adv. Case No. 10-50980, Docket No. 36, filed 9/16/10], ¶ 2, footnote 3 (emphasis is ours):

> "For purposes of the Standing Motion and this Opposition, the Committee will assume that Movants are creditors of Holdco.  **The Committee notes, however, that there has been no showing that Movants are estate creditors.**  Movants are holders of the trust preferred securities issued by the Accredited Preferred Securities Trust I (the "Trust"), a non-debtor Delaware statutory trust.  **Any right to payment owed to Movants is owed by the Trust.  The Trust itself is a creditor of the Debtors** as Holdco issued debentures to the Trust pursuant to the **Junior Subordinated Indenture** dated as of January 11, 2007, between Holdco and Wells Fargo Bank, N.A., as Trustee."

79.     Finally, from p. 12 of the same Prospectus, Wells Fargo warns their trust preferred investors about the effects of "structural subordination":

> In addition, if any of our subsidiaries becomes insolvent, the direct creditors of that subsidiary will have a prior claim on its assets. Our rights and the rights of our creditors will be subject to that prior claim, unless we are also a direct creditor of that subsidiary. This subordination of creditors of a parent company to prior claims of creditors of its subsidiaries is commonly referred to as structural subordination.

80.     Structural Subordination applies in the case of the REIT's creditors.  The Plan improperly uses the REIT's assets, in particular, any proceeds due it from its claim against Consolidated Holdco, to pay the TRUPs Holders.

**B.     REIT's Series A Preferred Shareholders Guarantee by Holdco is a Financial Obligation of Holdco:**

81.     As mentioned in our previous objection to the Second Amended Disclosure Plan,

[Docket No. 2185, Exhibit C], the Prospectus Supplement for the REIT's Series A Preferred Shares

specifically says that:

> The guarantee will constitute an unsecured obligation of Accredited...

82.     Moreover, following statement from p. S-99 of this same Prospectus Supplement makes it

very clear that Accredited's guarantee of the REIT's Series A Preferred Shares is a bona fide financial

obligation.  There is nothing equivocal about the following statement (emphasis is ours):

> Notwithstanding the foregoing, dividends on REIT's Series A Preferred Shares will accrue and be payable under Accredited's guarantee whether or not current payment of dividends is prohibited, whether or not REIT has earnings, whether or not there are funds legally available for the payment of such dividends and whether or not such dividends are declared.  Accrued but unpaid dividends on REIT's Series A Preferred Shares will accumulate as of the dividend payment date on which they first become payable.

## C.     Conclusions:

83.     The TRUPs guarantee is not a financial obligation of Holdco.  Therefore, the TRUPs are

not direct creditors of Holdco.

84.     The REIT's Series A Preferred Shares' guarantee is an unequivocal financial obligation

of Holdco.  Therefore, the REIT's Series A Preferred Shareholders are direct creditors of Holdco.

85.     Whether or not, the TRUPs Holders are allowable claimants in this bankruptcy case,

their claims are clearly subordinate to those of the REIT's Series A Preferred Shareholders and their

guarantee is, and was intended to be, subordinate to the guarantee of the REIT's Preferred

Shareholders.

86.     In any case, the principal of Structural Subordination prevents the REIT's assets from

being used to satisfy any allowed claim by and claimant before they are first used to completely satisfy

the REIT's creditors.


## V.     CONSISTENT EXAGGERATION OF THE SIZE OF THE REIT'S PREFERRED SHAREHOLDERS CLASS

87. We received two different copies of the Debtors' Second (Substantive) Omnibus Objection. The first was received on 11/16/09 [Docket No. 1040] and the second version, in which Exhibit A was materially revised was received on 11/24/09. *(It is noted that this material version which was sent out to the REIT's Series A Preferred Shareholders was never submitted to the Court. For that reason, we enclose a copy of the complete document as our Exhibit B.)*

88. Comparing the two versions of this Exhibit was difficult, because the claims are not listed in the same order. The claims listed in the original Exhibit A were alphabetized based on the first few letters of the claimant's name without regard to whether it was their first or last name, while in the revised version, the claimant's names are consistently listed in alphabetical order by last name. To facilitate comparison of these two documents, we created a spreadsheet listing all the original claims and revised claims and then sorted it by Claim Number. Since the Claim Numbers had not been altered, this method unequivocally matched up the claims from both documents. See Exhibit A in Docket No. 2185. A brief summary of the differences between these two documents is provided in the table below:

|  | Exhibit A--[Docket No. 1040] | Revised Exhibit A--not docketed |
|---|---|---|
| Total Estimated Claims | $14,869,197.55 | $2,105,107.93 |
| No. of Claims | 191 | 120 |

89. In Exhibit C, we list the claims which were removed from the revised version of the Debtors' Exhibit A. Among the largest of the claims in Docket No. 1040 which were eliminated in the Revised Exhibit A, were 4 claims, #449 and 457-459 belonging to Mr. Anthony J. Sutton and members of his family, Blake C. Sutton and Carey C. Sutton all originally of 3324 W. University Ave., #242, Gainesville, FL 32607. As of 11/5/10, Docket No. 2145 lists Mr. Anthony J. Sutton's and Blake C. Sutton's address as 295 E. Evelyn Ave., #218, Sunnyvale, CA 94086.

| Claim # | Estimated Claim | Claim Rank |
|---|---|---|
| 449 | $4,539,850.00 | 2 |
| 457 | 157,500.00 | 8 |
| 458 | 230,500.00 | 6 |
| 459 | 5,893,125.00 | 1 |

TOTAL SUTTON FAMILY CLAIMS ELIMINATED:        $10,820,975.00

90.      Of the 191 claims listed in Exhibit A of Docket No. 1040, 4 of the Sutton family claims ranked in the top ten in the amount claimed. These 4 Sutton family claims represented approximately 73% of the total claimed amount and approximately 85% of the claimed amount eliminated in the revised version of Exhibit A.

91.      After Exhibit A in Docket 1040 was revised, only one relatively minor Sutton family claim remained for $34,000 in the name of Blake C. Sutton, Claim #454.

92.      Several questions immediately arise:

a. Why was 99.7% of the amount originally claimed by the Sutton family removed from the Revised Exhibit A?

b. Why was this very material reduction in the amount claimed never reported by the Debtors to the Court?

c. Why was this $10,820,975.00 in Sutton family claims preemptively "rescued" from Class 9H, shielding the Sutton family from 99.7% of their potential losses, leaving a token 0.3% of their claims?

d. In which class or classes were claims #449 and #457-459 eventually placed?

93.      Of the members on the REIT Committee, only Mr. Sutton apparently filed his claims by the Claims Bar Date of October 6, 2009 since only his name appears in the original version of the Debtors' Exhibit A from Docket No. 1040. Footprint Asset Management & Research, Inc. and Scott J. Weber both appear in the Creditor Matrix, so they may have filed late claims. If so, their claims should be subordinated as Late Claims as provided in the Plan. Our search of the Creditor Matrix did not find Dupont Capital Management so we don't understand the basis for including them on the REIT Committee or honoring any of their claims.

94. Of the remaining 120 claims, 12 were for amounts larger than Blake C. Sutton's claim for $34,000. Two exceeded her Claim #454 by nearly 4 to 11 times, yet these claimants were ignored by the REIT Committee.

| Claim# | Claimants | Amount Claimed |
|--------|-----------|----------------|
| 246 | Russell & Elizabeth Ann Donaldson | $130,868.00 |
| 317 | Lewis H. Gaines | $191,200.00 |
| 535 | Joseph & Annette Losquadro | $373,475.85 |

95.    As noted in the "Certification of Counsel Regarding Debtors' Second (Substantive) Omnibus  Objection to Claims Pursuant to 11 U.S.C. §502(b) and Bankruptcy Rule 3007," [Docket No. 1159], Mr. and Mrs Donaldson were one of only four claimants to respond to the "Debtors' Second (Substantive) Omnibus Objection" on time. **MR. SUTTON DID NOT RESPOND AT ALL.** Yet, because the Debtors elected not to pursue this straightforward Certification of Counsel, Mr. Sutton remains an important member of the REIT Committee.

96.    At this point, additional questions arise:

a. Why do the Debtors persist in using $102 million as the estimated amount of allowed claims for the REIT's Preferred Shareholders when from Docket No. 1040, it appears that that figure was automatically reduced by approximately 85% due to late filings?

b. Why didn't the Debtors jump on the opportunity to reduce this class size even further, by 99.8% to just under $0.2 million (a when only 4 creditors responded on time to their Second (Substantive) Omnibus Objection?

c. Isn't the idea to look for ways to minimize allowed claims on the Debtors' estates?

d. Finally, why is Blake C. Sutton now mentioned as a member of the REIT Committee? Did they need someone who may still have a valid claim?

97.    The REIT Committee has been suggested as representing all the REIT's Preferred Shareholders.  Their actions are not consistent with this.  There actions are consistent with their representation of their own self-interest.  As further proof, we attempted to contact Mr. Power, the REIT Committee's counsel, at the suggestion of Mr. Jesse Moore of Hunton & Williams, to learn about what they were doing and see if we could participate.  Mr. Power never responded to our email, a copy of which is attached as Exhibit D.  We are certain that our email was received by Mr. Power because we did not receive a message saying it was undeliverable.

26

98. Upon information and belief, based paragraphs 87 to 97 above, we do not believe that REIT Committee was ever an independent body formed by some of the REIT's Preferred Shareholders to protect the interests of Class 9 H. We believe that this "ad hoc" committee was formed to advance the interests of certain individuals and entities by suggesting that the REIT's Preferred Shareholders supported the Plan.

## VI. REIT'S VIRTUAL SUBSTANTIVE CONSOLIDATION INTO CONSOLIDATED HOLDCO'S ESTATE:

99. The REIT is a non-Debtor entity. However, its assets and interests are being improperly exploited and subordinated by the Plan to appease certain creditors, especially the TRUPs Holders, resulting in its virtual substantive consolidation into Holdco's estate.

100. As specified in § 4.6 of the The Plan, the REIT, the Holder of the Class 6 H Claims:

> will waive its right to enforce any subordination provisions relating to Class 8 H Claims.

101. As previously mentioned, Holdco's guarantee of the REIT's Series A Preferred Shares is not, and was not intended to be, subordinate to any guarantee of the TRUPs.

102. Finally, the principal of Structural Subordination prevents the REIT's assets from being used to satisfy any allowed claim by and claimant before they are first used to completely satisfy the REIT's creditors.


## VII. ACTIONS AND REMEDIES REQUESTED:

In consideration of all the foregoing, we respectfully request that the Court:

1. Request the testimony of Messrs. Osborn and Brown on the record to determine what Lone Star and, possibly the Debtors are afraid of. In making this request, we believe that the TRUPs Holders may have deposed one or both of these gentlemen following the Court's receipt of their letter of October 26, 2010. We believe that the Court should know as much as the TRUPs do. Having Messrs. Osborn and Brown testify will also eliminate the leverage the TRUPs are exerting, allowing a more equitable overall settlement of this case.

2. Look into each of the areas described in Sections I through VI above and take

whatever action that the Court deems fit and proper.

Respectfully submitted this 17th day of March, 2011.


Pamela J. Peerce-Landers and Bruce K. Landers
550 N. Sanatoga Rd.
Sanatoga, PA 19464-2738
Telephone:     610-327-4736
Email:         pplanders@msn.com

**EXHIBIT A**

## ASSIGNMENT OF CLAIM

**Landers, Pamela J Peerce & Bruce K Landers**, having offices at **550 N Sanatago Rd, Sanatoga, PA 19464** ("Assignor") in consideration of the sum of **$11,105.51** ("Purchase Price"), does hereby transfer to Liquidity Solutions, Inc. ("Assignee"), having offices at One University Plaza, Suite 312, Hackensack, NJ 07601, all of the Assignor's right, title and interest in, to and under the claim or claims of Assignor, as more specifically set forth below (the "Claim"), against **Accredited Home Lenders Holding Co.**, Debtor or Debtors in the bankruptcy case (the "Debtor") pending in the United States Bankruptcy Court for the District of Delaware (the "Court"), jointly Administered as Case No. **09-11516** (the "Proceedings") in the currently outstanding amount of not less than **$18,822.89** (the "Purchased Amount"), and all rights and benefits of the Assignor relating to the Claim, including without limitation the Proof of Claim identified below (if any) and the Assignor's rights to receive payment of principal, and any interest, penalties and fees, which may be paid with respect to or in satisfaction of the Claim, all cash, securities, instruments and other property which may be paid or issued by Debtor or any other party with respect to or in satisfaction of the Claim, and all voting rights with respect to any of the foregoing. The Claim includes the foregoing rights and benefits, "cure" amounts within the meaning of section 365 of title 11 of the United States Code (the "Bankruptcy Code") and the right to receive all payments in respect thereof. The Claim is based on amounts, not less than the Purchased Amount, owed to Assignor by Debtor for services rendered and/or goods delivered by Assignor to Debtor. This Assignment of Claim (this "Assignment") shall be deemed an absolute and unconditional assignment of the Claim for the purpose of collection and shall not be deemed to create a security interest except as may be otherwise provided herein. Assignee is assuming no liabilities or obligations of the Assignor under this Assignment.

Assignor represents and warrants that *[check one of the following]*:

[    ] A Proof of Claim has not been filed in respect of the Claim.

[    ] A Proof of Claim in the amount of $_____ has been duly and timely filed in the Proceedings, and a true copy of such Proof of Claim is attached to this Assignment. If the Proof of Claim amount differs from the Claim amount set forth above, Assignee shall nevertheless be deemed the owner of that Proof of Claim subject to the terms of this Assignment and shall be entitled to identify itself as owner of such Proof of Claim on the records of the Court.

Assignor further represents and warrants that the Claim is a valid and allowed claim in the Proceedings in an amount not less than the Purchased Amount which will be treated no less favorably than general unsecured claims in the Proceedings, and the Claim is not subject to any defense, counterclaim, offset, setoff, dispute or objection. Assignor further represents and warrants that no payment has been received by Assignor, or by any third party claiming through Assignor, in full or partial satisfaction of the Claim, that Assignor has not previously assigned, sold or pledged the Claim to any third party, in whole or in part, that Assignor solely owns and has good title to the Claim free and clear of any and all liens, claims, security interests or encumbrances of any kind or nature whatsoever, and that there are no offsets or defenses or preferential payment demands that have been or may be asserted by or on behalf of Debtor or any other party to reduce or subordinate the amount of the Claim or to otherwise impair its value. Assignor represents that it is solvent and has no other relationship to the Debtor or any of its affiliates or principals other than as a creditor of the Debtor. Assignor is not an insider of the Debtor within the meaning of section 101(31) of the Bankruptcy Code and is not, and has not been, a member of any committee appointed in the Proceedings. All terms of this Assignment will be kept confidential.

Assignor is aware that the Purchase Price may differ from the amount ultimately distributed in the Proceedings with respect to the Claim and that such amount may not be absolutely determined until entry of a final order confirming a plan of reorganization or liquidation. Assignor acknowledges that, except as set forth in this Assignment, neither Assignee nor any agent or representative of Assignee has made any representation whatsoever to Assignor regarding the status of the Proceedings, the condition of the Debtor (financial or otherwise) or any other matter relating to the Proceedings, the Debtor or the Claim.

Assignor represents that it has adequate information concerning the business and financial condition of Debtor and the status of the Proceedings to make an informed decision regarding the sale of the Claim and that it has independently and without reliance on Assignee, and based on such information as Assignor has deemed appropriate (including information available from the files of the Court of the Proceedings), made its own analysis and decision to enter into this Assignment of Claim. Assignor and Assignee each hereby acknowledge to the other that (i) it currently has, or may in the future have, information with respect to the Claim, the Debtor or any of its affiliates and/or the Proceedings that is not known to the other party and that may be material to a decision to sell or purchase the Claim (as applicable) ("Excluded Information"), (ii) it has determined to sell or purchase the Claim (as applicable) notwithstanding its lack of knowledge of the Excluded Information and (iii) neither Assignor nor Assignee shall have any liability to the other or any other party whatsoever with respect to the nondisclosure of the Excluded Information in connection with the transactions contemplated hereby.

In the event that (i) the Claim is disallowed, reduced, subordinated, offset, setoff, objected to, treated differently in the Proceedings than general unsecured claims against the Debtor, or otherwise impaired, for any reason whatsoever, in whole or in part or (ii) any action or proceeding is commenced that could result in any of the foregoing or otherwise affect all or part of the Claim in any way, and such action or proceeding is not resolved within ninety (90) days of its commencement (each circumstance in subsections (i) and (ii), an "Impairment"), Assignor agrees, upon demand of Assignee, to make to Assignee immediate proportional restitution and repayment of the Purchase Price together with interest at the rate of ten percent (10%) per annum on the amount repaid for the period from the date of payment of the Purchase Price by Assignee through the date such repayment is made. Assignor further agrees to reimburse Assignee for all losses, costs and expenses, including reasonable legal fees and costs, incurred by Assignee as a result of such Impairment or any objection to the transfer of the Claim by Assignor. IN THE EVENT ASSIGNOR HAS PREVIOUSLY ASSIGNED OR PLEDGED THIS CLAIM TO ANY THIRD PARTY, OTHERWISE LACKS SOLE TITLE THERETO, OR IN THE FUTURE PURPORTS TO ASSIGN OR PLEDGE THE CLAIM TO A THIRD PARTY, ASSIGNOR AGREES TO IMMEDIATELY PAY ASSIGNEE UPON DEMAND OF ASSIGNEE, LIQUIDATED DAMAGES IN AN AMOUNT EQUAL TO DOUBLE THE AMOUNT PAID TO ASSIGNOR HEREUNDER.

In the event the Claim is ultimately allowed in amount greater than the Purchased Amount, at Assignee's sole option and after written notice (the "Notice") provided to Assignor by Assignee, Assignor shall, and is hereby deemed to, sell to Assignee, and Assignee hereby purchases, all, or any portion specified in the Notice, of such excess claim at the same price (expressed as a percentage of claim) provided for hereunder. Assignee shall remit such payment to Assignor after delivery to Assignor of the Notice and upon Assignee's satisfaction that the Claim has been allowed in the higher amount and is not subject to any Impairment.

Assignor hereby irrevocably appoints Assignee as its true and lawful agent and attorney-in-fact, solely with respect to the Claim, with the full power and authority to act in Assignor's name, place and stead, to demand, sue for, compromise and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Claim and to exercise all elections, voting rights and all other rights and remedies with respect thereto. Assignor further grants unto Assignee full authority to do all things necessary to enforce the Claim and its rights thereunder pursuant to this Assignment. Assignor agrees that the powers granted by this paragraph are coupled with an interest, and are therefore irrevocable, and are discretionary in nature and that Assignee may exercise or decline to exercise such powers at Assignee's sole option. Assignee shall have no obligation to take any action to prove or defend the Claim's validity or amount in the Proceedings. Assignor agrees to take such further actions, at its own expense, as requested by Assignee as necessary or desirable to effect the transfer of the Claim to Assignee (or its designees) and any payments or distributions on account of the Claim including, without limitation, the execution of appropriate transfer powers, corporate resolutions and consents.

Assignor agrees to forward to Assignee all notices received from Debtor, the Court or any third party with respect to the Claim assigned herein, to vote the Claim assigned herein and to take such action with respect to the Claim in the Proceedings, as Assignee may from time to time request. Assignor further agrees that any distribution received by Assignor on account of the Claim, whether in the form of cash, securities, instrument or any other property, shall constitute property of the Assignee to which the Assignee has an absolute right, and that (if received by Assignor) Assignor will hold such property in trust for the benefit of Assignee and will, at its own expense, promptly deliver to Assignee any such property in the same form received, together with any endorsements or documents necessary to transfer such property to Assignee.

The terms of this Assignment shall be binding upon, and shall inure to the benefit of, Assignor, Assignee and their respective successors and permitted assigns.

3185023

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | § | Chapter 11 |
|---|---|---|
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et al. | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

Hearing Date: December 18, 2009 at 10:30 a.m. prevailing Eastern time
Objection Deadline: December 11, 2009 at 4:00 p.m. prevailing Eastern time

## DEBTORS' SECOND (SUBSTANTIVE) OMNIBUS OBJECTION TO CLAIMS PURSUANT TO 11 U.S.C. § 502(b) AND BANKRUPTCY RULE 3007

THIS OBJECTION SEEKS TO DISALLOW CERTAIN PROOFS OF CLAIM FILED IN THIS CASE. ANY NON-DEBTOR PARTY WHO FILED A PROOF OF CLAIM SHOULD REVIEW THE ATTACHED EXHIBIT TO DETERMINE IF THE DEBTORS ARE SEEKING TO DISALLOW THEIR CLAIM.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby submit the second (substantive) omnibus objection to claims (the "Claims Objection") pursuant to section 502(b) of title 11 of the United States Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Delaware Local Bankruptcy Rule 3007-1 ("Local Rule 3007-1") to the claims (the "Disputed Claims") listed on Exhibit "A" to the proposed order submitted herewith (the "Order"). In support of this Claims Objection, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

8.      On July 27, 2009, the Court signed the *Order (I) Establishing the Bar Date for Filing Proofs of Claim, including Section 593(b)(9) Claims, (II) Approving the Form and Manner and Notice Thereof, and (III) Providing Certain Supplemental Relief* [Docket No. 478] (the "Bar Date Order"). Pursuant to the Bar Date Order, the general bar date for filing proofs of claim, other than those claims specifically excluded in the Bar Date Order, was October 6, 2009 (the "Bar Date").

9.      In accordance with the Bar Date Order, notice of the Bar Date and the approved proof of claim form was mailed to: (a) the Office of the United States Trustee; (b) all holders of Prepetition Claims (as defined in the Bar Date Order) listed on the Schedules at the address listed therein; (c) all counterparties to executory contracts and unexpired leases; (d) all current and former employees of the Debtors to the extent that contact information for former employees is available in the Debtors' records; (e) all taxing authorities for locations in which the Debtors do business; (f) all parties to litigation in which the Debtors are involved; (g) all providers of utility services to the Debtors; (h) all insurance providers; (i) all of the Debtors' ordinary course professionals; (j) all entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of this Order; (k) all parties that have filed proofs of claim in these cases as of the date of the filing of this Claims Objection; and (l) all parties on the Debtors' consolidated mailing matrix.

10.     To date, approximately 1003 proofs of claim (the "Proofs of Claim") have been filed in these cases. The Proofs of Claim are recorded on the official claims registry in these cases (the "Claims Registry"), which is maintained by the Claims Agent and filed as updated, from time to time.

Disputed Claims should be disallowed because such Disputed Claims assert ownership of securities owned by the Trust and not by any of the Debtors.

## Applicable Authority

15. Section 502(b) of the Bankruptcy Code provides in pertinent part that:

> the court, after notice and a hearing, shall determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that…such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

16. For the reasons set forth above and on Exhibit A to the Order, the Debtors request that the Disputed Claims be disallowed.

## Responses to Objections

17. **Filing and Service of Responses.** To contest this Claims Objection, a claimant must file and serve a written response to the Claims Objection (a "Response") so that it is received no later than 4:00 p.m. (Eastern time) on December 11, 2009. Claimants should read the Claims Objection and Order and the attached exhibits carefully. A claimant who has timely filed a written Response and wishes to oppose the Claims Objection must attend or make other arrangements to participate in the hearing on the objection, which hearing is scheduled to be held on December 18, 2009 at 10:30 a.m., before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 (the "Hearing").

Debtors should serve a reply to the Response and who possesses authority to reconcile, settle or otherwise resolve the objection to the Disputed Claim on behalf of the claimant.

20.   _Timely Response Required._  If a claimant fails to file and serve a timely Response, then <u>without further notice to the claimant or a hearing</u>, the Debtors will present to the Court an order disallowing the Disputed Claim in its entirety and authorizing and directing the Claims Agent to expunge the Disputed Claim.

21.   _Service Address._  If a Response contains an address for the claimant different from that stated on the Disputed Claim, the address in the Response shall constitute the service address for future service of papers upon the claimant with respect to the Claims Objection unless or until counsel for the Debtors receives written notice from the claimant or the claimant's counsel of a changed service address.

## Adjournment of Hearing

22.   The Debtors reserve the right to adjourn the Hearing on any Objection. In the event that the Debtors so adjourn the Hearing, they will state that the Hearing on the Objection and/or Response has been adjourned on the agenda for the Hearing on the Claims Objection, which agenda will be served on the person designated by the claimants in a Response pursuant to Paragraphs 19(e) and 21 above.

## Reservation of Rights

23.   The Debtors expressly reserve the right to amend, modify or supplement this Claims Objection, and to file additional objections to the Disputed Claims or to any other claims (filed or not) that may be asserted against the Debtors. Should one or more of the grounds of objection stated in this Claims Objection be overruled, the Debtors reserve their

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et al. | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

**Hearing Date:** December 18, 2009 at 10:30 a.m. prevailing Eastern time
**Objection Deadline:** December 11, 2009 at 4:00 p.m. prevailing Eastern time

## NOTICE OF DEBTORS' SECOND (SUBSTANTIVE) OMNIBUS OBJECTION TO CLAIMS PURSUANT TO 11 U.S.C. § 502(b) AND BANKRUPTCY RULE 3007

TO:   (i) the Office of the United States Trustee; (ii) the Official Committee of Unsecured Creditors; (iii) parties requesting notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (iv) all parties listed on the Exhibit to the proposed form of order attached hereto.

On November 13, 2009, the above-captioned debtors and debtors in possession (the "Debtors") filed the Second (Substantive) Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Bankruptcy Rule 3007 (the "Claims Objection"), which seeks to alter the rights of the parties listed on Exhibit "A" to the proposed order attached hereto by disallowing one or more of such parties' claims against the Debtors in their entirety.

You are required to file a response to the Second Omnibus Claims Objection on or before **December 11, 2009, at 4:00 p.m. prevailing Eastern time**. At the same time, you must also serve a copy of the response or objection upon the Debtors' attorneys at the addresses listed below so that it is *received* by 4:00 p.m. on December 11, 2009.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

Pachulski Stang Ziehl & Jones LLP    Hunton & Williams LLP
919 North Market Street, 17th Floor,    1445 Ross Avenue
P.O. Box 8705    Suit 3700
Wilmington, DE  19899-8705    Dallas, Texas 75202
(Courier 19801)    Attn: Gregory G. Hesse
Attn:  Laura Davis Jones, Esq.

IN THE EVENT THAT OBJECTIONS OR RESPONSES TO THE CLAIMS OBJECTION ARE TIMELY FILED, A HEARING SHALL BE HELD BEFORE THE HONORABLE MARY F. WALRATH, AT THE UNITED STATES BANKRUPTCY COURT, LOCATED AT 824 MARKET STREET, 5th FLOOR, COURTROOM NO. 4, WILMINGTON, DELAWARE 19801 ON **DECEMBER 18, 2009 AT 10:30 A.M.** PREVAILING EASTERN TIME.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE CLAIMS OBJECTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:  November 13, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:    ljones@pszjlaw.com
    joneill@pszjlaw.com
    tcairns@pszjlaw.com

-and-

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et al. | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

## DECLARATION OF MEADE MONGER IN SUPPORT OF DEBTORS' SECOND (SUBSTANTIVE) OMNIBUS OBJECTION TO CLAIMS

I, Meade Monger, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I was appointed Chief Restructuring Officer of the debtors and debtors in possession (the "Debtors") in the above captioned cases pursuant to the *Order Authorizing the Retention and Employment of AP Services, LLC to Provide Interim Management and Restructuring Services and Designating Meade Monger as Chief Restructuring Officer and Michael Murphy as Chief Administrative Officer of the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 2827].

2.    I submit this declaration (the "Declaration") in support of the Second (Substantive) Omnibus Objection To Claims (the "Claims Objection").[2]

3.    I am responsible for overseeing the claims review and objection process in the Bankruptcy Case.  In that capacity, I have reviewed the Claims Objection and am,

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056).  The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 100, San Diego, CA 92131.  The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Claims Objection.

8.   The information contained in this Declaration is true and correct to the
best of my knowledge and belief.



Meade Monger
Chief Restructuring Officer

Subscribed and sworn to before me
This 12th day of November, 2009.

NOTARY PUBLIC, State of _____
My Commission Expires: __/__/__

CHERYL C. CULLORS
Notary Public, State of Texas
My Commission Expires
May 04, 2012

entity and the Debtors have no liability with respect to these claims.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1. Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007, the claims listed on Exhibit "A" are hereby and shall be **EXPUNGED** and **DISALLOWED** in their entirety.

2. Kurtzman Carson Consultants LLC, the official claims agent appointed in these cases, is hereby authorized and directed to make such revisions to the official Claims Registry as are necessary to reflect the relief granted pursuant to this Order.

3. The Debtors' objection to each Disputed claim addressed in the Claims Objection constitutes a separate contested matter as contemplated by Fed. R. Bankr. P. 9014. This order shall be deemed a separate order with respect to each Disputed Claim. Any stay of the Order pending appeal by any of the Claimants whose Disputed Claim is subject to this Order shall only apply to the contested matter which involves such Claimant and shall not act to stay the applicability and/or finality of this Order with respect to the other contested matters covered hereby.

4. This order is without prejudice to the Debtors' right to object to any claims or interests filed in these chapter 11 cases.

## SECOND OMNIBUS OBJECTION

## REVISED EXHIBIT "A"

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| 489 | AASI CUST OF IRA FBO DOMINICK J GARIFO 317 S. Louis St. Mount Prospect, IL 60056-3450 | | | $23,250.00 | $23,250.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 218 | Ameriprise Trust Co ACF Jacqueline Harned IRA 10225 Quarry Road S Amherst, OH 44001 | | | $ 5,796.00 | $ 5,796.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 234 | Ameriprise Trust Co ACF Kenneth M. Arndt IRA 2200 Moser Lane Algonquin, IL 60102 | | | Unliquidated | Unliquidated | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 235 | Ameriprise Trust Co ACF Nancy J. Arndt IRA 2200 Moser Lane Algonquin, IL 60102 | | | Unliquidated | Unliquidated | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 413 | Ameriprise Trust Co ACF Ronald L. Harned IRA 301 Needles Drive Pataskala, OH 43062 | | | $ 18,950.00 | $ 18,950.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 546 | Ameriprise Trust Co ACF William Hubbard Carter IRA Unit 21 5501 E Lake Rd Sheffield Lake, OH 44054 | | | $ 17,566.00 | $ 17,566.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |

Subtotal: $65,562

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| | 28131 Summitrose Dr.<br>Menifee, CA 92584 | | | | | |
| 861 | Brown, Nick Defined Benefit Plan & Trust<br>Doyal N. Brown TTEE<br>Prime Asset Mgmt<br>42890 Wingate<br>Banning, CA 92220-1594 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 394 | Bruns, Murray A. Trustee<br>Murray A. Bruns and Jill A. Lamothe Trust<br>1609 Talonway<br>Somerset, KY 43503-9533 | | | $ 2,500.00 | $ 2,500.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 823 | Carson, Joseph M.<br>101 Walnut Avenue<br>St. Clairsville, OH 43950 | | | $ 50,000.00 | $ 50,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 816 | Carson, Joseph M.<br>101 Walnut Ave.<br>St. Clairsville, OH 43950 | | | $30,000.00 | $30,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 530 | Casagrande, Robert M and Sue H<br>19435 Mesa Drive<br>Villa Park, CA 92861 | | $ 10,609.40 | | $ 10,609.40 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 531 | Casagrande, Robert M and Sue H<br>Casagrande Living Trust<br>DTD March 31, 2008<br>19435 S Mesa Drive<br>Villa Park, CA 92861-2340O | | $ 5,619.38 | | $ 5,619.38 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 537 | Chappell, Norma Jean and James W.<br>1632 Elmart Ln.<br>Richmond, VA 23235-6210 | | | $8,752.95 | $8,752.95 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 260 | CHERN, RICHARD ROLLOVER IRA<br>TD AMERITRADE INC CUSTODIAN<br>3701 NE 100th St.<br>Kansas City, MO 64156-1153 | | | $2,560.94 | $2,560.94 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 647 | Corcoran, David J<br>C O York Securities Inc<br>160 Broadway 7th Fl EB | | $ 59,718.00 | | $ 59,718.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |

169,760.67



| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| | 2424 Goshen Rd.<br>Fort Wayne, IN 46808-1439 | | | | | |
| 193 | Devorss, Byron and Patricia TRS FBO<br>Devorss Trust<br>UA Oct 16, 1997<br>304 Melcanyon Rd<br>Duarte, CA 91010 | | | $ 43,311.10 | $ 43,311.10 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 176 | Devorss, Byron D IRA<br>TD Ameritrade Inc Custodian<br>304 Melcanyon Rd<br>Duarte, CA 91010 | | | $ 36,195.80 | $ 36,195.80 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 184 | Devorss, Patricia IRA<br>TD Ameritrade Inc Custodian<br>304 Melcanyon Rd<br>Duarte, CA 91010-1529 | | | $ 12,180.00 | $ 12,180.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 183 | Devorss, Patricia ROTH IRA<br>TD Ameritrade Inc Custodian<br>304 Melcanyon Rd<br>Duarte, CA 91010-1529 | | | $5,495.28 | $5,495.28 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 336 | DEWOSKIN TTEE, DAVID NORMAN<br>DAVID NORMAN DEWOSKIN LIV TRUS<br>821 Fairfield Lake Dr.<br>Chesterfield, MO 63017 | | | $10,000.00 | $10,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 232 | Diassi, Michael A<br>744 Norgate<br>Westfield, NJ 07090 | | | Unliquidated | Unliquidated | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 231 | Diassi, Patrick A<br>UTA Charles Schwab & Co Inc<br>IRA Contributory DTD 05/14/91<br>744 Norgate<br>Westfield, NJ 07090 | | | Unliquidated | Unliquidated | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 228 | Dietz, Jack and Margaret JTWROS<br>684 Meramac Station Rd.<br>Valley Park, MO 63088-1133 | | | $2,357.88 | $2,357.88 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 226 | Dodds, Shirley TTEE and Robert TTEE | | | Blank | Blank | Claim improperly asserts ownership |



109,540.06

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| 247 | FMT Co Cust IRA<br>FBO William J. Schnebel<br>PO Box 1551<br>Whitefish, MT 59937 | | | $ 5,000.000 | $ 5,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 907 | FMT Co Cust IRA<br>FBO Gregory dam Seib<br>1470 Valley Glen Way<br>Atlanta, GA 30338-5522 | | | $ 40,500.00 | $ 40,500.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 998 | FMT CO CUST IRA<br>FBO BARBARA ANNE BARTELS<br>2333 Misty Lane<br>Waukesha, WI 53186-1603 | $5,000.00 | | | $5,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 999 | FMT CO CUST IRA<br>FBO KENNETH FRANCES BARTELS<br>2333 Misty Lane<br>Waukesha, WI 53186-1603 | $5,000.00 | | | $5,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 345 | Fmt Co Cust IRA Rollover<br>FBO Augusto R. Gautier<br>76 Westerly Ter<br>Hartford, CT 06105-1115 | | | $ 18,125.00 | $ 18,125.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 487 | FMT Co Cust IRA Rollover<br>FBO Dennis A. Dunn<br>114 Oakledge Dr<br>Rockledge, FL 32955-5611 | | | $ 25,000.00 | $ 25,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 536 | FMT Co Cust IRA Rollover<br>FBO James W. Chappell<br>1632 Elmart Ln<br>Richmond, VA 23235-6210 | | | $ 13,990.95 | $ 13,990.95 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 631 | FMT Co Cust IRA Rollover<br>FBO Martin A. Schlotthauer<br>3729 N 152nd Dri<br>Goodyear, AZ 85338 | | | $ 5,362.00 | $ 5,362.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 646 | FMT CO TTEE FRP PS A/C<br>Lough Investment Advisory LLC<br>FBO David J. Lough | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |

Page -10-



117,977.95

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| 325 | FRYDMAN, RICHARD CUSTODIAN FOR TESS FRYDMAN UNDER KS UNIF TRF TO MIN ACT 701 Tennessee Lawrence, KS 90051-4429 | | | $2,100.00 | $2,100.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 315 | GAINES FAMILY FOUNDATION ATTN LEWIS H GAINES 1441 N. 40th St. Allentown, PA 18104-2127 | | | $47,000.00 | $47,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 317 | GAINES, FBO LEWIS H 1441 N. 40th St. Allentown, PA 18104-2127 | | | $191,200.00 | $191,200.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 206 | Green, Grant Stuart Charles Schwab & Co. Inc. Cust Roth Contributory IRA 321 Lupine Dr. Sequim, WA 98382 | | | $5,000.00 | $5,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 411 | GREER, CONSTANCE TOD David Greer and Elizabeth Taylor 9632 Gretina Green Dr. Tampa, FL 33626-5310 | | | $2,925.75 | $2,925.75 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 680 | Gross, Stephen F. and Jana M. 152 Chester Ct. Souderton, PA 18964-2232 | | | $4,835.05 | $4,835.05 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 611 | Haas, Carl and Frances 717 Garden Pl. Roswell, NM 88201-7766 | | | $5,693.78 | $5,693.78 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 762 | Hardin, Eulalia James E. Hardin, JT TEN Prime Asset Mgmt PO Box 687 Andersonville, TN 37705-0687 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |



258,754.58

Page -12-

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| 903 | Horwitz, Steven F. IRA FBO<br>1410 Rimer Dr<br>Moraga, CA 94556-2555 | | | $ 8,000.00 | $ 8,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 227 | Hunt, Billy D<br>Charles Schwab & Co Inc Cust<br>IRA Rollover<br>111 Bluegrass Pkwy<br>Lebanon, TN 37090 | $ 25,392.95 | | | $ 25,392.95 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 847 | Inland Hematology Oncology 401K<br>Samir Kubba & Rajiv Malik TTEES<br>Prime Asset Mgmt<br>12946 South Lane<br>Redlands, CA 92373-7446 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 251 | JACKS, HOWARD & MARILYN JACKS<br>JTWROS 636 182<br>102 WHITE OAK RIDGE RD<br>Lincroft, NJ 07738-1010 | | | $25,000.00 | $25,000.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 252 | Johnson, Richard A.<br>3113 Catcay<br>Corpus Christi, TX 78418-2910 | | | $22,500.00 | $22,500.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 409 | Kadish, Herbert and Phyllis<br>2905 Whiteway Dr.<br>Austin, TX 78757-1616 | | $4,138.00 | | $4,138.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 295 | Kane, Stanton and Marilyn C.<br>1607 Sand Castle Road<br>Sanibel, FL 33957 | | | $26,465.50 | $26,465.50 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 765 | Kopp, Leonard Trust- UAD 05/29/01<br>Leonard Kopp TTEE<br>Prime Asset Mgmt<br>1706 Plum Ln. Ste 117<br>Redlands, CA 92374-4578 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 848 | Kropp, James H. - IRA FBO<br>Pershing LLC As Custodian<br>483 Centre island<br>Golden Beach, FL 33160-2255 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |



111,496.45

| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| | 810 1st Street<br>Canonsburg, PA 15317-1970 | | | | | of stock in a non-Debtor entity. |
| (679) | Lavigno, William and Jessica C. JT/WROS<br>PO Box 118<br>Conyers, GA 30012-0118 | | | $9,922.50 | ($9,922.50) | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 535 | Losquadro, Joseph and Annette<br>94 Payne Whitney lane<br>Manhasset, NY 11030-3226 | | | $ 373,475.85 | $ 373,475.85 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 292 | Lovell, Robert<br>719 Seventeenth Ave.<br>Salt Lake City, UT 84103-3712 | | | $1,255.45 | $1,255.45 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 863 | Malik Family Trust<br>Rajiv Malik & Priya Malik TTEES<br>Prime Asset Mgmt<br>12946 South Lane<br>Redlands, CA 92373-7446 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 372 | March, Marian Jane TTEE and<br>March, Randall Dean TTEE<br>Marian Jane March Rev Trust<br>DTD 08/25/98<br>4989 E Wilson Turner Drive<br>Columbia, MO 65202-9244 | $ 7,500.00 | $ 7,500.00 | | $ 7,500.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 390 | MONTGOMERY, LYNN EDWARD<br>CHARLES SCHWAB & CO INC CUST<br>289 Twin Lakes Dr.<br>Union, MO 63084 | | | $13,485.95 | $13,485.95 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 859 | Murray, Beverly F. - IRA FBO<br>Pershing LLC As Custodian<br>Prime Asset Mgmt<br>11338 Walnut<br>Redlands, CA 92374-7611 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 696 | NEAF TTEE, GENEVIEVE E<br>GENEVIEVE E NEAF REV TRST<br>10341 Manchester Rd.<br>St. Louis, MO 63122-1520 | | | $26,828.14 | $26,828.14 | Claim improperly asserts ownership of stock in a non-Debtor entity. |

432,467.89



| Claim Number | Claimant Name and Address | Claimed Priority Amount | Claimed Secured Amount | Claimed Unsecured Amount | Total Claimed Amount | Basis for Proposed Disallowance |
|---|---|---|---|---|---|---|
| 851 | Wilson, Wanda K. - IRA FBO Pershing LLC As Custodian Prime Asset Mgmt 1650 Wabash Ave Redlands, CA 92373-7609 | | | Blank | Blank | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| 430 | WINTREFELD TTEE, HERMAN 9907 N. Belfort Cir Tamarac, FL 33321-1819 | | | $8,750.00 | $8,750.00 | Claim improperly asserts ownership of stock in a non-Debtor entity. |
| | | | | | | |

②

120 Claims          8750.00

Total: $ 2,105,107.93

Not Dismissed: 4 Claims

**EXHIBIT C**

**These are the 71 Claims in the Original Exhibit A from the Second
Omnibus Objections that are missing in the Revised Version**

**PLEASE NOTE THAT 3 WERE DUPLICATES: #645. 974 AND 975**

| No | Claim No. | Claimant | Total Claim |
|---|---|---|---|
| 1 | 55 | Thaxton, Cheryl L. | $10,844.69 |
| 2 | 196 | Scottrade Inc Cust FBO David J. Westly IRA | $5,085.00 |
| 3 | 220 | Meyerhoff, Ernest Ray TTEE Ernest Ray Meyerhof TR DTD 08-06-91 | $26,218.76 |
| 4 | 256 | Odaniel, Germaine A | $50,000.00 |
| 5 | 257 | Wenzel, Tom | $50,000.00 |
| 6 | 262 | Nax, Susan P TTEE David Nax Family Trust | $0.90 |
| 7 | 273 | Walter D Ames TR FBO Law Firm of Walter D Ames PSP FBO Walther D Ames TD Ameritrade Custodian | $15,000.00 |
| 8 | 281 | Riemersma, Elfrided K IRA Raymond James & Assoc Inc Csdn | $5,420.99 |
| 9 | 282 | Roll, Annette R IRA TD Ameritrade Inc Custodian | $14,805.55 |
| 10 | 285 | NFS/FMTC Rollover IRA FBO Robert N. Utley | $16,225.00 |
| 11 | 286 | Utley, Robert | $12,500.00 |
| 12 | 294 | Scottrade Inc Cust FBO Michael L. Wilson, IRA | $150,000.00 |
| 13 | 303 | Scottrade Inc Cust FBO Albert B. Roberton IRA | Unliquidated |
| 14 | 304 | Scottrade Inc Cust FBO Bradley C. Schroeder Roth IRS | $10,000.00 |
| 15 | 305 | Scottrade Inc Cust FBO Bernadette Lex Roth IRA | $2,500.00 |
| 16 | 306 | Scottrade Inc Cust FBO Bernadette Lex | $2,500.00 |
| 17 | 310 | Wnorowski, Gerald & Norma L Wnorowski JTWROS | $5,121.88 |
| 18 | 313 | Wood, Carolyn Kay IRA FBO Bank of the West as Custodian | $7,500.00 |
| 19 | 321 | Richard Frydman Custodian for Hannah Frydman under KS Unif Trf to Min Act | $2,100.00 |
| 20 | 324 | Minott, John D & Gl V Minott JT TEN | $5,000.00 |
| 21 | 337 | Mayer, Patricia R. Rev Trust DTD | $243.76 |
| 22 | 349 | Metzmeier, Frederick and Rosalind JTWROS | $5,000.00 |
| 23 | 359 | Talton R Embry IRA JPMCC Cust | $92,193.75 |
| 24 | 360 | Sterling, Donald Trustee Donald Stelling Rev Living Trust Dated 05/26/96 | $10,000.00 |
| 25 | 401 | Spencer, Leland S | $788,750.00 |
| 26 | 416 | Scott, William E. and Shelly | $13,378.91 |
| 27 | 446 | NFS/FMTC IRA FBO Sharon Ann Rusk | $5,176.00 |
| 28 | 447 | Totten, James M Roth IRA Etrade Custodian | $8,500.00 |
| 29 | 449 | Sutton, Anthony J. Rollover IRA Interactive Broker | $4,539,850.00 |
| 30 | 455 | Sutton, Anthony J. IRA TD Ameritrade 1 Custodian | $157,500.00 |

**These are the 71 Claims in the Original Exhibit A from the Second Omnibus Objections that are missing in the Revised Version**

**PLEASE NOTE THAT 3 WERE DUPLICATES: #645. 974 AND 975**

| No | Claim No. | Claimant | Total Claim |
|----|-----------|----------|-------------|
| 31 | 456 | Sutton, Anthony Cust for Blake Sutton Under North Carolina UTMA | $230,500.00 |
| 32 | 457 | Sutton, Carey C., IRA TD Ameritrade Inc Custodian | $5,893,125.00 |
| 33 | 461 | Robinson, John A IRA FBO Pershing LLC As Custodian Rollover Account | $2,500.00 |
| 34 | 485 | McShane, John and Jill JTWROS | $50,000.00 |
| 35 | 500 | Mark Wilson & Wynn E Wilson JT TEN | $17,500.00 |
| 36 | 538 | Thomas L Beckman IRA | $7,280.27 |
| 37 | 566 | Willian F Piskos William F Piskos Trust | $144.00 |
| 38 | 568 | Rosalind S Hoeg & Sigrid W. Weinschreider TTEES UWO Rolf S Schutz Art 6 | $914.07 |
| 39 | 586 | Scottrade Inc Cust FBO Charles A. Whiting Roth IRA | Blank |
| 40 | 620 | Melody, James E. Jr. Eileen Melody | $262,187.50 |
| 41 | 621 | NFS/FMTC IRA FBO James E. Melody | $26,218.76 |
| 42 | 622 | NFS/FMTC IRA FBO Eileen M. Melody | $52,437.50 |
| 43 | 638 | Paula M Miller & Clifton Miller JTTEN | $50,000.00 |
| 44 | 645 | Scottrade Inc Cust FBO David Lough IRA | Blank |
| 45 | 645 | Scottrade Inc Cust FBO David Lough IRA | Blank |
| 46 | 650 | Arkansas Teacher Retirement System Michael W. Etkin Esq & Ira M. Levee Esq | Unliquidated |
| 47 | 701 | Nimtz, Donald A Charles Schwab & Co Inc Cust IRA Rollover | $22,656.95 |
| 48 | 718 | Murray Family Trust UAC 08/04/99 C M Murray & B J Murray TTEES | Blank |
| 49 | 719 | Silver Family Trust E H Silver & F Silver TTEES | Blank |
| 50 | 743 | Sherrin, The Richard M. and Clara G. Family Trust UAD 11/05/91 Richard M. Sherrin & Clara G. Sherrin TTEES | $15,712.24 |
| 51 | 744 | Orr, Oscar Dale and Christine Marie TTEES Oscar Dale & Christine Marie Orr Rev Liv Tr DTD 3/17/93 | $11,250.00 |
| 52 | 853 | Summit Ent Medical Associates Andrew & Mary Moyce TTEES | Blank |
| 53 | 854 | Silver, Elizabeth H | Blank |
| 54 | 855 | Smith, Scot Simple IRA Pershing LLC Cust | Blank |
| 55 | 856 | Smith, Charles Simple IRA Pershing LLC Cust | Blank |
| 56 | 857 | Perfect Business Srvcs 401K PSP FBO Joe Hill | Blank |
| 57 | 858 | Perfect Business Services Inc 401K FBO Cynthia Morris | Blank |

Accredited Home Lenders Holding Co., et.al.
Case No. 09-11516 (MFW)

**These are the 71 Claims in the Original Exhibit A from the Second Omnibus Objections that are missing in the Revised Version**

**PLEASE NOTE THAT 3 WERE DUPLICATES: #645. 974 AND 975**

| No | Claim No. | Claimant | Total Claim |
|---|---|---|---|
| 58 | 859 | Murray, Beverly IRA FBO Pershing LLC As Custodian | Blank |
| 59 | 860 | Moyce Family Trust, The A W Moyce & M M Moyce TTEES | Blank |
| 60 | 875 | Scottrade Inc Cust FBO Subodh Shirkant Harmalkar Roth | $9,034.00 |
| 61 | 892 | Siegel, Helga J. | $10,950.00 |
| 62 | 904 | Sanders, Clara J., IRA FBO VFTC As Custodian | Blank |
| 63 | 974 | Viviano, William F & Katherine | $11,748.00 |
| 64 | 974 | William F Viviano & Katherine Viviano JT WROS | $11,748.00 |
| 65 | 975 | Viviano, William F Ridge Clearing Custodian | $5,870.00 |
| 66 | 975 | William F Viviano IRA Rollover | $5,870.00 |
| 67 | 983 | Robert S Asbury TTEE | $20,000.00 |
| 68 | 990 | Scottrade Inc Cust FBO Albert B. Robertson IRA | Unliquidated |
| 69 | 1000 | Rozenweig, Lenore S. Roth IRA TD Ameritrade Clearing Custodian | $5,000.00 |
| | | **TOTAL AMOUNT CLAIMED BEFORE ELIMINATING DUPLICATES** | $12,734,061.48 |

| | |
|---|---|
| **TOTAL AMOUNT CLAIMED AFTER ELIMINATING DUPLICATES, #645, 974, 975** | $12,716,443.48 |

**EXHIBIT D**

## Pamela Peerce-Landers

**From:** "Pamela Peerce-Landers" <pplanders@msn.com>
**To:** <mpower@hahnhessen.com>
**Sent:** Saturday, October 30, 2010 4:11 PM
**Subject:** Ad Hoc Committee of Preferred Shareholders of the Accredited Mortgage Loan REIT Trust

Mr. Power,

Mr. Jesse Moore of Hunton & Williams suggested that we contact you. My husband and I owned 735 shares of the REIT's Preferred A stock. We are claimants in Accredited Bankruptcy case no. 09-11516 (MFW).

Could you please briefly tell us what this committee is doing and whether you and it are representing our interests? Are you only representing a select few of the preferred shareholders? Are these shareholders pooling their resources to pay you (Mr. Moore said that you were not being paid by the Court.) What would it cost us to participate in this committee?

Thanks

Pamela J. Peerce-Landers
Bruce K. Landers
550 N. Sanatoga Rd.
Sanatoga, PA 19464
610-327-4736

2/21/2011