IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS HOLDING CO., et al. | § | Case No. 09-11516 (MFW) |
| | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

**FOURTH AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE
DEBTORS' THIRD AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Dated: March 29, 2011

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 120, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT. THE DEBTORS INTEND TO REQUEST APPROVAL OF THIS DISCLOSURE STATEMENT CONCURRENTLY WITH CONFIRMATION OF THE PROPOSED LIQUIDATING PLAN OF ACCREDITED HOME LENDERS, INC. AND ITS AFFILIATED DEBTORS.

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE· FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE

DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTOR SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISERS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

# TABLE OF CONTENTS

Page

I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ...................................1
II. SHORT SUMMARY OF THE PLAN.....................................................................................1
III. SOLICITATION AND VOTING PROCEDURES.....................................................................8
    A.    CHAPTER 11 GENERALLY ......................................................................8
    B.    SOLICITATION OF ACCEPTANCES OF THE PLAN ..........................................9
    C.    VOTING ON THE PLAN ......................................................................10
    D.    OTHER GENERAL INFORMATION ..........................................................12
IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO
    THE COMMENCEMENT OF THE CASES ...................................................13
    A.    EXPLANATION OF AHL's BUSINESS ......................................................13
    B.    EVENTS LEADING UP TO THE LONE STAR ACQUISITION .........................15
    C.    MAJOR EVENTS FROM LONE STAR ACQUISITION TO AHL BANKRUPTCY .............16
    D.    REVIEW OF MAJOR TRANSACTIONS AND POTENTIAL ESTATE CLAIMS
        AGAINST THE LONE STAR ENTITIES ......................................................20
    E.    SIGNIFICANT POST-PETITION DATE FILINGS AND EVENTS ......................25
V. THE PLAN .................................................................................................................38
    A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS............................39
    B.    CONVENIENCE CLASSES ....................................................................53
    C.    ALLOWANCE AND DISALLOWANCE OF CLAIMS AND INTERESTS .............54
    D.    SUBORDINATION OF LATE FILED CLAIMS. .............................................54
    E.    SUBORDINATION AND SUBROGATION RIGHTS AND CLAIMS OF
        SUBORDINATION AND SUBROGATION ...................................................54
    F.    DEEMED CONSENT ..........................................................................55
    G.    LIQUIDATING TRUST ........................................................................55
    H.    CONSOLIDATED HOLDCO PLAN ADMINISTRATOR.................................62
    I.    GLOBAL SETTLEMENT AND COMPROMISE OF DISPUTES .........................65
    J.    MEANS FOR IMPLEMENTATION OF THE PLAN .......................................70
    K.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................76
    L.    VESTING OF ASSETS..........................................................................77
    M.    DISTRIBUTIONS ...............................................................................78
    N.    EXCULPATIONS ...............................................................................81
    O.    PRESERVATION OF DEBTORS' CAUSES OF ACTION...................................81
    P.    PLAN INJUNCTION ...........................................................................82
    Q.    CONDITIONS PRECEDENT TO EFFECTIVE DATE OF PLAN. ......................83
    R.    RETENTION OF JURISDICTION ..............................................................84
VI. CONFIRMATION AND CONSUMMATION PROCEDURE ............................................89
    A.    DISCLOSURE AND SOLICITATION .........................................................89
    B.    ACCEPTANCE OF THE PLAN ................................................................89
    C.    CLASSIFICATION ..............................................................................89
    D.    CONFIRMATION ...............................................................................89
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN......................91
    A.    TAX TREATMENT OF THE LIQUIDATING TRUST .....................................92

# TABLE OF CONTENTS

B.     FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS ................93

C.     FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS OR INTERESTS ............................................................................94

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS...................................100

A.     FORWARD LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT MAY PROVE TO BE INACCURATE ................................................................100

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................101

A.     LIQUIDATION UNDER CHAPTER 7 ......................................................101

B.     ALTERNATIVE PLAN(S) OF REORGANIZATION.......................................101

X. CONCLUSION ..............................................................................................102

# EXHIBITS

Exhibit A              Debtors' Third Amended Chapter 11 Plan of Liquidation

Exhibit B              Liquidation Analysis

Exhibit C              Plan Support Agreement and Term Sheet

# I.  PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Third Amended Disclosure Statement (the "Disclosure Statement") is submitted by the Debtors, which are the proponents of the Debtors' Third Amended Chapter 11 Plan of Liquidation (the "Plan").  The purpose of the Disclosure Statement is to provide Creditors and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan.  The purpose of the Plan is to effect a liquidation of the Debtors' Assets and to distribute the proceeds of the Debtors' Assets to Creditors in a manner that will maximize recoveries by Creditors. ***Defined terms used, but not defined in this Disclosure Statement, shall have the meaning ascribed to such terms in the Plan.  Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.***

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Creditors under the Plan (Section V, *The Plan*);
- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);
- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Information Regarding the Debtors and Events Leading to the Commencement of the Cases*);
- Reviews the Debtors' major transactions with and the Estates' potential claims against the Lone Star Entities (Section IV.D, *Review of Major Transactions and Possible Estate Claims against the Lone Star Entities*);
- Describes the significant events that have occurred during the Chapter 11 Cases (Section IV.E, *Significant Events During the Chapter 11 Cases*);
- Describes the means for implementing the Plan (Section VI.E, *The Liquidation of the Debtors*);
- Projects the total percentage recovery that each Class of Allowed Claims and Interests is likely to receive (Section II, *Short Summary of the Plan*); and
- Evaluates liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX.A, *Liquidation Under Chapter 7*).

# II.  SHORT SUMMARY OF THE PLAN

At the beginning of these bankruptcy cases in May 2009, the Debtors and their advisors expected returns of 5-10% to unsecured creditors.  The housing crisis had increased the Debtors' liabilities while depleting the value of the Debtors' remaining assets, and the Debtors were faced with the prospect of initiating and funding prolonged, expensive, and risky litigation in an effort to increase recoveries to creditors.  Now, the Debtors and their advisors expect unsecured creditors of the operating companies to receive significant recoveries that very well may reach 100%, and expect unsecured creditors of the holding company to receive recoveries of approximately 65%.

These drastic improvements should be attributed in no small part to the partial recovery of the housing market and economic stimulus measures, including tax cuts, enacted by Congress. These improvements can also be attributed to the Debtors' successes in liquidating assets, minimizing ongoing expenses, and reducing claims through negotiation and litigation.

More importantly, however, the improvements in estimated unsecured creditor recoveries from 5-10% to 65-100% should be attributed to the global settlement reached between the Debtors, their major creditor constituencies, and their potential litigation targets. This settlement cuts through the knots entangling the Debtors' assets, freeing those assets for distributions to creditors, if the Plan is confirmed. If the Plan is confirmed, this settlement will prevent the resources of the Debtors' estates and creditors from being used to fund risky and expensive litigation, instead of payments to creditors. This settlement will provide fair and equitable treatment to the numerous and varied creditors in these cases, if the Plan is confirmed. **However, confirmation of the Plan and approval of this global settlement does depend upon a sufficient number of creditors casting Ballots to accept the Plan and this global settlement, including the Creditor Release.**

The Plan is a liquidating plan. It does not contemplate the continuation of the Debtors' collective businesses, although it does contemplate the continuation of Consolidated Holdco (defined below) for the limited purposes provided for under the Plan. The Plan:

(i) incorporates and implements the Plan Support Agreement and Term Sheet entered by the Debtors, the Committee, and various creditors and parties-in-interest;

(ii) substantively consolidates the assets and liabilities of Accredited Home Lenders Holding Co. ("Holdco") with those of its wholly owned subsidiary, Vendor Management Services, LLC (collectively referred to herein with Holdco as "Consolidated Holdco");

(iii) appoints a Plan Administrator to liquidate the assets of Consolidated Holdco and distribute the proceeds of those assets to creditors of Consolidated Holdco pursuant to the terms of the Plan;

(iv) substantively consolidates the assets and liabilities of Accredited Home Lenders, Inc., Inzura Insurance Services, Inc. and Windsor Management Co. (collectively referred to herein as the "Consolidated Debtors");

(v) establishes a Liquidating Trust that will acquire the Consolidated Debtors Assets, liquidate those assets, and distribute the proceeds of those assets to the creditors of the Consolidated Debtors pursuant to the terms of this Plan;

(vi) resolves the intercompany claims of the Consolidated Debtors and Consolidated Holdco;

(vii) settles all claims that the Debtors may have against Lone Star Releasees (including certain potential claims against current and former officers and directors of the Debtors and pre-petition professionals of the Debtors) in exchange for cash payments from the Lone Star Entities, their insurers, and insurers of the Debtors to certain of the Debtors and

certain creditors in amounts exceeding of $49,750,000, including the $4 million Lone Star Advance, and the subordination or waiver of the Claims asserted by the Lone Star Releasees that have been asserted in the approximate amount of $100,000,000; and

(viii) provides for the release of certain claims of the Debtors and certain creditors against the Lone Star Releasees and for the mutual release of various potential claims amongst the Debtors, the Lone Star Releasees, and various parties to the Plan Support Agreement and Term Sheet, as discussed below in Section V.I.

The releases in the Plan are (i) essential to the success of the Debtors' liquidation and maximization of the value of their assets, (ii) based upon critical financial or other contributions of or on behalf of the parties being released, (iii) necessary to make the Plan feasible, (iv) fair to creditors, and (v) integral to obtaining the value provided under the settlement with the Lone Star Releasees. The Debtors will seek at the Confirmation Hearing to bind and enforce these releases.

The following table briefly summarizes the treatment of Allowed Claims and Interests and the provisions of the Plan. **Most of the claims of borrowers, employees, and vendors will be initially classified in Class 4 C. Such claimants will have the option to elect for treatment under Class 3 C or Class 6 C. The REIT itself will have claims in Classes 6 H, 3 C, and 7 C. All of the claims of REIT Preferred Shareholders relating to or arising from their ownership of REIT shares will be classified in Class 9 H.** For a more detailed description of the terms and provisions of the Plan, see Section V below.

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan. Similarly, Professional Fee Claims are not classified under the Plan. Section V.A.1 below describes the treatment of such Unclassified Claims.

| *Class* | *Impairment and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1 H Secured Claims against Consolidated Holdco** | Unimpaired. Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 2 H**<br>**Priority Claims Other than Priority Tax Claims against Consolidated Holdco** | Unimpaired.<br>Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |
| **Class 3 H**<br>**All Allowed Unsecured Claims against Consolidated Holdco Accepting the Creditor Release** | Impaired.<br>Entitled to Vote. | $0 | Unknown[2] |
| **Class 4 H**<br>**All Allowed Unsecured Claims against the Consolidated Holdco, except for separately classified Claims** | Impaired.<br>Entitled to Vote. | $ Unknown | Unknown%[3] |
| **Class 5 H**<br>**All Allowed Unsecured Claims against Holdco held by LSF-MRA, LLC** | Impaired.<br>Entitled to Vote. | $97 Million[4] | 0% |

[2] The estimated recovery for Class 3 H is listed as unknown because the Debtors believe that there will be no creditors holding claims in Class 3 H. To the extent there are creditors holding Allowed Class 3 H Claims, this estimated recovery may be adjusted and be less than 100%.

[3] The amount of Allowed Claims in Class 4 H and recoveries obtained by Holders of such Claims cannot be estimated since participation in Class 4 H is optional for Holders of Unsecured Claims against Consolidated Holdco. Moreover, as discussed above in footnote 2, the Debtors do not believe there will be creditors who will hold Allowed General Unsecured Claims against Consolidated Holdco other than those creditors that are separately classified pursuant to the Plan.

[4] Various parties have questioned the amount of this Claim and this Claim has not been determined or allowed by the Court. In accordance with the terms of the settlement embodied in the Plan Term Sheet and Support Agreement, this Claim will be subordinated as provided under the Plan. Therefore an objection to the allowance of this Claim is not contemplated at this time.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 6 H** **All Allowed Unsecured Claims against Consolidated Holdco held by the REIT** | Impaired. Entitled to Vote. | $20 Million | 63% - 87% |
| **Class 7 H** **All Convenience Claims against Consolidated Holdco** | Impaired. Entitled to Vote. | $1.9 - 2.0 Million | 65% |
| **Class 8 H** **All Claims against Consolidated Holdco arising from or related to any securities or promissory notes issued by the Accredited Preferred Securities Trust I** | Impaired. Entitled to Vote. | $60 Million | 70% |
| **Class 9 H** **All Claims against Consolidated Holdco arising from the REIT Preferred Holder's Subordinated Guaranty Claims** | Impaired. Not Entitled to Vote and Deemed to Reject Plan. | $102 Million | 0 %[5] |

---

[5] Under the Plan, the REIT itself will be receiving large distributions from both Consolidated Holdco and the Consolidated Debtors. After paying expenses, the REIT has advised the Debtors that it intends on distributing these funds, together with other funds it is holding, to the REIT's creditors, if any, and to its Preferred Shareholders in accordance with the contracts governing the REIT and its Preferred Shareholders. The REIT is not a Debtor in the Bankruptcy Cases. The REIT has separate management and legal counsel. Nothing in the Plan affects or modifies the REIT's obligations to its creditors and the REIT Preferred Shareholders, including any claims held by REIT Preferred Shareholders against the REIT for unpaid dividends.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 10 H**<br>**All other Subordinated Claims (including Late Filed Claims) against Consolidated Holdco** | Impaired.<br>Not Entitled to Vote and Deemed to Reject Plan. | $0 | 0% |
| **Class 11 H**<br>**All Interests in Consolidated Holdco** | Impaired.<br>Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |
| **Class 1 C**<br>**Secured Claims against the Consolidated Debtors** | Unimpaired.<br>Not Entitled to Vote and Deemed to Accept the Plan. | $80,000 | 100% |
| **Class 2 C**<br>**All Allowed Unsecured Claims against the Consolidated Debtors entitled to priority under §§ 507(a)(3) through (a)(7) of the Bankruptcy Code** | Unimpaired.<br>Not Entitled to Vote and Deemed to Accept the Plan. | $363,000[6] | 100% |
| **Class 3 C**<br>**All Allowed Unsecured Claims against the Consolidated Debtors Accepting the Creditor Release** | Impaired.<br>Entitled to Vote. | $104-107 Million[7] | 100%[8] |

---

[6] This estimate excludes the IRS Priority Tax Claim and includes the expected Viera Claims.

[7] Includes a Claim of the REIT for $37,500,000.

[8] Assuming that the Debtors receive the full expected Tax Refunds, and assuming that the Allowed Claims against the Consolidated Debtors are resolved and liquidated within the estimated ranges.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|-------|-------------------------------------|---------------------------|---------------------|
| **Class 4 C** <br> **All Allowed Unsecured Claims against the Consolidated Debtors, except for separately classified Claims** | Impaired. <br><br> Entitled to Vote. | $ Unknown | Unknown %[9] |
| **Class 5 C** <br> **All Allowed Unsecured Claims against the Consolidated Debtors held by the Lone Star Entities** | Impaired. <br><br> Entitled to Vote. | $97 Million[10] | 0% |
| **Class 6 C** <br> **All Convenience Claims against the Consolidated Debtors** | Impaired. <br><br> Entitled to Vote. | $3.8 Million | 75% |
| **Class 7 C** <br> **REIT Junior Claim** | Impaired. <br><br> Entitled to Vote. | $15.0 Million | 0% - 20% |
| **Class 8 C** <br> **All Subordinated Claims (including Late Filed Claims) against the Consolidated Debtors** | Impaired. <br><br> Not Entitled to Vote and Deemed to Reject Plan. | $Unknown | 0% |

---

[9] The amount of Allowed Claims in Class 4 C and recoveries obtained by Holders of such Claims cannot be estimated since participation in Class 4 C is optional for Holders of Unsecured Claims against the Consolidated Debtors in Class 3 C and Holder of Convenience Claims against the Consolidated Debtors in Class 6 C.

[10] Various parties have questioned the amount of this Claim and this Claim has not been determined or allowed by the Court. In accordance with the terms of the settlement embodied in the Plan Term Sheet and Support Agreement, the Lone Star Entities are waiving their right to receive distributions on this Claim. Therefore an objection to the allowance of this Claim is not contemplated at this time.

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 9 C** <br> **All Claims against the Consolidated Debtors arising from or related to Trust Preferred Note, Trust Preferred Guarantee, Trust Preferred Note Claim, or the Trust Preferred Securities** | Impaired. <br><br> Not Entitled to Vote and Deemed to Reject Plan. | $5 Million | 0% |
| **Class 10 C** <br> **All Interests in the Consolidated Debtors** | Impaired. <br><br> Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |

## III. SOLICITATION AND VOTING PROCEDURES

### A. Chapter 11 Generally

Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest. The confirmation and consummation of a plan of reorganization is the objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor. Subject to certain limited exceptions, the confirmation order discharges the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan.

Generally, the holders of claims against or interests in a debtor that are classified under the plan are permitted to vote to accept or reject the Plan. For the Bankruptcy Court to confirm a plan, the plan must be accepted by at least one class of creditors whose interests or rights are impaired under the plan. The Bankruptcy Code provides that a plan has been accepted by a class of claimants if holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed claims of that class have voted in favor of the plan.

**ONLY THE VOTES OF HOLDERS WHO SUBMIT PROPERLY COMPLETED BALLOTS VOTING FOR OR AGAINST THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUISITE ACCEPTANCES OF THE CLASSES OF CLAIMS AND INTERESTS HAVE BEEN RECEIVED. FAILURE**

**BY A HOLDER TO DELIVER A DULY SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY THAT HOLDER WITH RESPECT TO THE VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN AND THEREFORE WILL HAVE NO EFFECT. FURTHERMORE, THE DEBTORS RESERVE THE RIGHT PRIOR TO CONFIRMATION OF THE PLAN TO SEEK TO HAVE ANY PARTY'S VOTE ESTIMATED SOLELY FOR PURPOSES OF COUNTING SUCH VOTE IN ACCORDANCE WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018.**

The Bankruptcy Code also requires that the solicitation of acceptances of the proposed plan must be accompanied by a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. That is the purpose of this Disclosure Statement.

The Plan provides for specified distributions to the various Classes of Holders of Claims and Interests, which are described in detail herein. The Debtors believe that the Plan provides consideration to all Classes of Claims and Interests that reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of Claims and Interests. In addition to the voting requirements discussed above, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed.

**B.      Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Interests have been placed in various Classes based on the nature and priority of the Claim or Interest. Each Class is either impaired or unimpaired under the Plan, as such terms are defined in § 1124 of the Bankruptcy Code. A Class of Claims or Interests that is unimpaired is conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in impaired Classes that are to receive distributions under the Plan or are entitled to the right to vote as provided under the Plan Support Agreement and Term Sheet. As discussed above, for impaired Classes, § 1126 of the Bankruptcy Code provides that an impaired Class of Claims or Interests is deemed to accept the Plan if Holders of at least two-thirds in dollar amount and a majority of the Claims who cast Ballots vote to accept the Plan.

Only those Holders who vote to accept or reject the Plan will be counted for purposes of determining whether the Plan is accepted or rejected. Therefore, the Plan could be accepted by any impaired Class of Claims with the affirmative vote of significantly less than two-thirds in dollar amount and a majority in number of the Claims in a Class.

**C.**     **Voting on the Plan**

The Debtors have requested that the Bankruptcy Court set [_____], 2011 as the deadline for casting ballots approving or rejecting the Plan.

1.     Who May Vote

Only Holders of Claims in Classes that are impaired are eligible to vote on the Plan. Accordingly, only Holders of Claims in Classes 3 H, 4 H, 5 H, 6 H, 7 H, 8 H, 3 C, 4 C, 5 C, 6 C and 7 C are eligible to vote.

---

**The Ballot Deadline is [_____], 2011 at 4:00 p.m. prevailing Pacific Time. You must return your completed Ballot to the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, so that it is actually received by 4:00 p.m., prevailing Pacific Time, on [_____], 2011.**

---

2.     Voting Deadline and Extensions

To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, and after consultation with the Committee and the Lone Star Entities, to extend the Ballot Deadline, in which case the term "Ballot Deadline" will mean the latest date on which a Ballot will be accepted. To extend the Ballot Deadline, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that the Debtors are extending the Ballot Deadline for a specified period of time, or on a daily basis until 5:00 p.m., Eastern Time, on the date on which we have received sufficient acceptances to seek confirmation of the Plan.

3.     Voting Procedures

An appropriate Ballot is enclosed in the solicitation package included with this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, at the address indicated on the Ballot, by no later than 4:00 p.m., prevailing Pacific Time, on [_____], 2011.

If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions thereon, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the aggregate amount of the Claim for voting purposes will be the amount shown on the Debtors' books and records and listed in the Debtors' Schedules of Assets and Liabilities, unless otherwise ordered by the Bankruptcy Court. If the aggregate amount of the Claims filled in on

your Ballot exceeds the amount indicated by the Debtors' books and records and listed in the Debtors' schedules, the Debtors reserve the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Bankruptcy Rule 3018. Failure of a Holder to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan.

The Plan provides for a settlement of (a) the Debtors' and Estates' claims and (b) certain unsecured creditors' claims against the Loan Star Entities (including claims against current and former officers and directors). The Ballot for creditors in Classes 3 H and 3 C will give such creditors the option to release that creditor's claims against the Loan Star Entities in exchange for higher recoveries. Creditors who do not cast a Ballot consenting to such release will be placed in to Classes 4 H and 4 C, as applicable. While creditors in Classes 4 H and 4 C will receive Pro-Rata distributions of their respective Debtor's assets, ***creditors of the Consolidated Debtors that do not provide the release of the Lone Star Releasees will not receive distributions from the Lone Star Consolidated Debtors Settlement Payment, and creditors of Consolidated Holdco that do not provide the release of the Lone Star Releasees will not share in LSF MRA, LLC's distributions from Consolidated Holdco. However, creditors who do not provide this release will preserve their right to bring an action against the Lone Star Releasees.***

Submission of all Ballots must be made directly to the balloting agent appointed in the Bankruptcy Proceeding, Kurtzman Carson Consultants, LLC, in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

If you must return your Ballot to your bank, broker, agent, or nominee, then you must return your Ballot to such bank, broker, agent, or nominee in sufficient time for them to process your Ballot and return it to the above address before the deadline. Your Ballot will not be counted if received after this deadline.

Should you have any questions regarding voting, please contact counsel to the Debtors, Gregory G. Hesse, at (214) 979-3000, or counsel to the Committee, Jeffrey N. Rothleder, at (202) 828-3472.

4.     Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Ballot Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to Kurtzman Carson Consultants, LLC at its address set forth on the Ballot at any time prior to the Ballot Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;
- contain the description of the Claim; and
- be signed by the Holder in the same manner as on the Ballot.

The Debtors expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to Kurtzman Carson Consultants, LLC prior to the Ballot Deadline a subsequent properly completed Ballot. If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted. If more than one Ballot is submitted, and the later dated Ballot(s) supplement rather than supersede the earlier Ballot(s), the subsequent Ballot(s) must be marked with the words "Additional Votes" or other language customarily used to indicate additional votes that are not meant to revoke earlier votes.

## D. Other General Information

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS THAN OTHER AVAILABLE ALTERNATIVES. A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE IS ANNEXED HERETO AS <u>EXHIBIT B</u>. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN AND PROVIDE THE RELEASES PROVIDED UNDER THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE APPLICABLE DEBTOR AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.**

**EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN AND TO DETERMINE WHETHER TO PROVIDE THE RELEASES SET FORTH IN THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS, INTERESTS, AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES**

**FOR A FULL UNDERSTANDING OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.**

General information regarding the Debtors, their businesses and material events leading to their commencement of the Cases and the proposal of the Plan is set forth in Section IV. Except where otherwise noted, this information is provided by the Debtors and their management. **THE STATEMENTS AS TO THE APPLICABLE DEBTOR'S FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF [_____] (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE, NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Certain risk factors and other considerations are described in Section VII below. Alternatives to confirmation and consummation of the Plan are described in Section IX below.

**THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE APPLICABLE DEBTOR AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

### IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES

**A.     Explanation of AHL's Business**

Accredited Home Lenders, Inc. ("AHL, Inc.") was founded in San Diego, California in 1990. It grew to become one of the nation's premier mortgage banking institutions with over 5,000 employees engaged in the business of originating, servicing, and selling residential mortgage loans that did not generally conform to the credit or other criteria established by the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. At its peak in 2006, AHL, Inc. originated in excess of $2 billion in residential home mortgages per month. AHL, Inc.'s parent company, Accredited Home Lenders Holding Co. ("Holdco"), became a public company in 2003 and its initial public offering was the NASDAQ's best-performing IPO that year.

AHL, Inc. was a mortgage lender specializing in providing non-prime residential loans in the United States.[11] It worked with potential borrowers and lenders to arrange loans for the

---

[11] A wholly owned subsidiary of Holdco, Accredited Home Lenders Canada, Inc. ("AHL Canada") conducted operations similar to AHL, Inc. in Canada. AHL Canada was a subsidiary of Holdco until September 2008, at which time Holdco transferred the ownership of the equity interests in AHL Canada to AHL, Inc.

purchase of residential property secured by mortgages on such properties. The key market drivers for AHL, Inc's loan origination business were home prices and interest rates. Increasing home prices drove higher collateral values and more demand for financing new mortgages and refinancing existing mortgages. Low interest rates resulted in more affordable mortgage payments and also drove new loan origination and refinancing demand.

AHL, Inc. focused its business operations in three areas: (i) retail originations; (ii) wholesale originations; and (iii) servicing. In the retail business, AHL, Inc. served as both the mortgage broker and lender working directly with the borrower to obtain, underwrite and close the mortgage loan, and AHL, Inc. typically received a fee for both of these services. AHL, Inc. targeted new borrowers for its retail business through branch retail offices until September 2007 and also through its call center operations responding to internet and phone leads from customers. In the wholesale business, AHL, Inc. only served as the lender and had account executives that targeted third party retail mortgage brokers that originated the loans.

In 2004, AHL, Inc. formed the Accredited Mortgage Loan REIT Trust (the "REIT"), which was a wholly owned subsidiary of AHL, Inc. As part of its formation, the REIT issued $102 million of 9.75% perpetual, cumulative preferred shares. After originating loans and mortgages, AHL, Inc. would contribute as capital the loans to the REIT, which would in turn securitize the mortgages, sell the securities backed by those mortgages and upstream the proceeds from the securitizations to AHL, Inc. as either dividends or inter-company loans. The securitization process was a major source of cash for continuing AHL, Inc.'s lending operations. The REIT retained a residual income stream from these mortgage-backed securities. Pursuant to agreements between AHL, Inc. and the REIT (including the Administration and Services Agreement dated October 1, 2004 between AHL, Inc. and the REIT),[12] AHL. Inc. earned and received a management fee for managing the REIT. Further, as payments were received from the residuals, the REIT transferred the cash to AHL, Inc. in the form of dividends and transfers recorded as inter-company loans. As of the end of 2007, the REIT had allegedly transferred over $190 million to AHL, Inc. and by the end of 2008, the REIT had allegedly transferred over $220 million to AHL, Inc. However, there were no explicit plans made at any time for repayment of the accumulated balance of the transfers from the REIT to AHL. The REIT and the REIT Committee assert that the non-dividend transfers described above were loans and to the extent any party asserts to the contrary, the REIT and the REIT Committee reserve all of their rights, claims and defenses. The transactions involving REIT are the subject of the REIT Adversary, which is discussed below in Section III.D.7.

Pending the sale of any loan, and after securitizing the loans and mortgages it originated, AHL, Inc. often retained the role of servicing these loans for the benefit of the owner of the loan. AHL, Inc.'s servicing activities included collecting and applying the payments from borrowers and policing the borrowers' obligations under the mortgages and loans. The owners of these loans compensated AHL, Inc. for providing these services. As was customary in the loan servicing business, AHL, Inc. often advanced funds (1) to the holders of the securitization bonds/certificates for principal, interest and fee payments, (2) to pay taxes and insurance on

---

[12] A copy of the Administration and Services Agreement between AHL, Inc. and the REIT is available upon request made to Debtors' counsel.

behalf of the borrower to protect the collateral and (3) for corporate advances. These servicing advances were regularly recorded on AHL, Inc.'s books as receivables and were generally considered to be collectible.

In addition, AHL, Inc. and its affiliates provided other services relating to residential mortgages, such as servicing and managing foreclosures, providing various insurance-related services such as core title and settlement services, and providing expanded insurance services for mortgage brokerage and mortgage lending operations.

## B. Events Leading Up To The Lone Star Acquisition

On or about September 29, 2006, AHL, Inc., as borrower, Holdco, as guarantor, and JPMorgan Chase Bank, as lender ("JP Morgan") entered into that certain $75 million revolving senior secured facility (the "Senior Secured Facility"). The Senior Secured Facility was secured by (1) AHL, Inc.'s master servicing rights and (2) servicer advances made by AHL, Inc.

On or about October 1, 2006, Holdco acquired a competing subprime lender, Aames Investment Corporation ("Aames") for stock valued at the time at approximately $235 million and cash in the amount of $94 million. Holdco acquired Aames in order to expand its retail lending operations.

The year 2007 brought a severe downturn in the United States' real estate markets and a subprime mortgage crisis. In the midst of this crisis, the secondary market for non-prime residential loans ceased to exist for all practical purposes, which in turn resulted in the cessation of originations of non-prime residential mortgages. Since the origination and sale of non-prime residential mortgages was AHL, Inc.'s primary area of business, the Debtors suffered severe liquidity issues and became distressed because of their inability to sell the loans they originated.

In January, 2007, Holdco established an affiliate, Accredited Preferred Securities Trust I, a Delaware statutory trust ("APS"), and issued debentures to APS, which in turn sold trust preferred securities to the public (the "Trust Preferred Securities"). The current owners of the Trust Preferred Securities are the Kodiak CDOs and JP Morgan (the "Trust Preferred Holders "). As a result of these transactions, Holdco raised approximately $56 million and Holdco became liable to APS for the amount raised plus interest. APS became obligated under the Trust Preferred Securities to the TRUPs Holders for the same amount. APS is not a debtor in these chapter 11 proceedings.

In early 2007, AHL, Inc's warehouse lenders reduced collateral values and placed large margin calls on AHL, Inc. that totaled over $200 million. In order to create liquidity, in March, 2007, AHL, Inc. sold mortgages to Citigroup with an unpaid principal balance of approximately $2.7 billion at a discount of approximately 7%. To provide further liquidity, around this time, Holdco, AHL, Inc., and the REIT obtained a $230 million bridge loan from Farallon Capital Management, LLC ("Farallon"), which loan was secured by all or substantially all of the assets of Holdco, AHL, Inc. and the REIT (the "Farallon Loan").

On or about March 30, 2007, Wachovia Bank ("Wachovia") agreed to provide AHL, Inc. with a $750 million warehouse line of credit that was in the form of a master repurchase

agreement (the "Wachovia MRA").  Subsequently, the Wachovia MRA was amended numerous times, including an amendment that increased the maximum availability from $750 million to $1 billion.

As 2007 progressed, the sub-prime lending industry was imploding.  For example HSBC took an $11 billion write down due to subprime mortgages, marking the first of many write downs for large banks.  New Century Financial and American Home Mortgage collapsed and filed for bankruptcy.  Most major banks closed subprime lending arms.  Overall, almost all of the top 25 subprime originators from 2006 ceased to exist.

In June, 2007, Lone Star Fund V, a fund that targets distressed investments, made an offer to buy all of the outstanding shares of Holdco for $15.10 per share (approximately $400 million).

Lone Star Fund V subsequently announced that it believed that the conditions of the tender offer would not be met and that it would not tender for shares.  As a result, Holdco and Lone Star Fund V sued each other in Delaware Chancery Court.

On or about August 22, 2007, Holdco issued a press release announcing steps that it was taking to respond to the "ongoing turmoil in the non-prime mortgage industry."  Among the operational restructuring initiatives were (1) the closing of 60 retail branch locations and 5 centralized retail support locations; (2) the closing of 5 wholesale lending divisions; and (3) ceasing to accept new loan applications.

In September, 2007, Holdco and Lone Star Fund V resumed negotiations which culminated on September 18, 2007, with Holdco and LSF5 Accredited Investments, LLC ("LSF5 Investments") executing an amended merger agreement.  Pursuant to the terms of the amended merger agreement, on September 18, 2007, LSF5 Mortgage Line, LLC, a Lone Star affiliate, ("LSF5 Mortgage Line") purchased the Senior Secured Facility at par from JP Morgan for $33 million.  Furthermore, on September 18, 2007, LSF5 Mortgage Line advanced approximately $15 million in additional funds under the Senior Secured Facility to AHL, Inc. and extended the maturity date until September, 2008.

On October 12, 2007, LSF5 Investments, a Lone Star affiliate, acquired Holdco for $11.75 per share (approximately $300 million).

## C.    Major Events From Lone Star Acquisition To AHL Bankruptcy

### 1.    Market Conditions

Since the Lone Star Entities acquired the Debtors, the United States has suffered through one of the worst economic down turns since the Great Depression.  The economic down turn initially started in the non-prime mortgage lending arena and has spread to almost every other segment of the economy.  Among the major events that occurred after the Lone Star Entities acquired the Debtors, but before the Debtors filed for bankruptcy, are:

- December, 2007--the U.S. economy enters into a recession as announced by the Business Cycle Dating Committee on December 11, 2008.

- January, 2008--Bank of America acquires Countrywide Financial.

- March 17, 2008--Bear Stearns is acquired by JP Morgan with financial assistance from the Federal Reserve Bank of New York.

- July 11, 2008--IndyMac Bank, a large residential mortgage lender, fails.

- September 7, 2008--Fannie Mae and Freddie Mac are placed into government conservatorship.

- September 15, 2008--Lehman Brothers files for bankruptcy.

- September 15, 2008--Bank of America announces that it will purchase Merrill Lynch.

- September 16, 2008--AIG avoids collapse as a result of an $85 billion bailout by the Federal Reserve Bank of New York.

- September 25, 2008--Washington Mutual Bank, a large residential mortgage lender, fails.

- September 29, 2008--The FDIC announces that Citigroup will buy the assets of Wachovia, financed in part by the FDIC.

- October 3, 2008--Wells Fargo Bank makes a competing offer for Wachovia, which is ultimately accepted.

- October 3, 2008--Congress passes and President Bush signs legislation establishing the $700 billion Troubled Asset Relief Program ("TARP").

- October 24, 2008--PNC Financial Services Group purchases National City Corporation.

- October 28, 2008--U.S. Treasury purchases a total of $125 billion of preferred stock in nine U.S. banks. This is the first of many purchases by the U.S. Treasury of preferred stock in U.S. banks with funds from TARP.

- November 23, 2008--U.S. Treasury, the Federal Reserve Board and the FDIC jointly announce an agreement with Citigroup to provide a package of guarantees, liquidity access and capital, including an investment of $20 Billion by the U.S. Treasury.

- December 19, 2008--the U.S. Treasury authorizes loans of up to $13.4 billion for General Motors and $4 Billion for Chrysler from TARP.

- December 22, 2008--Federal Reserve Board approves application of CIT Group to become a bank holding company.

- December 24, 2008--Federal Reserve Board approves application of GMAC to become a bank holding company.

- December 29, 2009--U.S. Treasury announces that it will purchase $5 billion of equity in GMAC.

- January 16, 2009--U.S. Treasury, Federal Reserve and FDIC jointly announce an agreement with Bank of America to provide a package of guarantees, liquidity access and capital, including an investment of $20 billion by the U.S. Treasury.

- March 19, 2009--U.S. Treasury announces the Auto Supplier Support Program that will provide up to $5 billion of financing to the automotive industry.

### 2. Management and Governance of AHL

Immediately after LSF5 Investments acquired Holdco, the board of directors of Holdco consisted of two pre-acquisition directors, Jim Konrath and Joe Lydon, and six directors affiliated with the Lone Star Entities, Len Allen, Marc Lipshy, Catharon Miller, Leigh Rea, Michael Thompson and Benjamin Velvin. The members of the board of directors changed frequently until finally in March, 2009, each Debtor had only one director, Chad Patton, a Lone Star affiliate. At all times after the acquisition at least a majority of the members of the Debtors' boards of directors were affiliated with the Lone Star Entities.

### 3. Operations

Through the first half of 2008, AHL, Inc. focused its efforts on restarting its loan origination business, which was stopped prior to the acquisition of Holdco by LSF5 Investments. In order for the loan origination business to be successful, a secondary market for the mortgages must exist. AHL, Inc. had very limited success in identifying a secondary market for its loans. So, the Lone Star Entities attempted to provide a portion of the secondary mortgage market and it purchased the securities issued by three "residential loan pools" (each a "RLP" and collectively, the "RLPs") established by AHL, Inc. at a total purchase price of $193 million.

The first, and largest, sale was $133 million of loans sold at 101.6% ($62 million "legacy" loans (pre-Lone Star) at 100% and $71 million "new" loans at 103%) in March, 2008. Because these loans were generally financed on the Wachovia MRA at less than par, the sale of the March, 2008 RLP resulted in excess cash paid to AHL, Inc. in the amount of approximately $31 million. The second sale in May 2008, was $39 million of loans sold at par, which resulted in excess cash paid to AHL, Inc. in the amount of $9 million. The third, and final, sale in June was $17 million of loans sold at 99%, which resulted in excess cash paid to AHL, Inc. in the amount of $4 million.

As part of the transaction, the RLPs had typical repurchase rights. AHL, Inc. honored approximately $2.5 million of repurchases from the RLPs, which benefitted certain Lone Star Entities, during a period when it was generally not honoring repurchase demands from other parties. AHL, Inc.'s honoring of these repurchase demands could give rise to an action under Chapter 5 of the Bankruptcy Code against the Lone Star Entities, which, if pursued could result in a recovery for the Estates. AHL, Inc. serviced these loans on behalf of the RLPs, on terms substantially similar to those available in an arm's length transaction, until the RLPs terminated AHL, Inc.'s right to service the loans on or about March 17, 2009. Those servicing rights were transferred to Vericrest, a Lone Star Entity, on or about March 17, 2009.

As a result of limited success in identifying a secondary market for its loans, in June, 2008, AHL, Inc. implemented certain operational restructurings, including the closing of four of its five wholesale operations centers and consolidating its wholesale business in San Diego. In addition, AHL, Inc. laid off close to one-half of its workforce.

AHL, Inc. commenced further operational restructuring initiatives beginning in the second half of August, 2008. The restructurings included the suspension by AHL, Inc. of its wholesale operations that had been previously consolidated into the San Diego office in June. However, AHL, Inc. retained 40 wholesale personnel that were repurposed for other tasks. The retail operations were consolidated in Irving, Texas, and the San Diego and Cincinnati retail operations were shut down. Overall, AHL, Inc. terminated another one-third of its workforce at this time, leaving under 400 people employed.

After the August, 2008, restructuring, AHL, Inc. had approximately 40 wholesale staff including account executives positioned throughout housing markets, 40 retail staff that were focusing on FHA and conventional loan activity, and a servicing team of approximately 185 people. In addition to the retail, wholesale and servicing personnel, AHL, Inc. also employed approximately 90 corporate personnel and approximately 25 personnel at its Inzura business providing insurance services. At this time, AHL, Inc. was trying to develop synergies with other of the Lone Star Entities' mortgage-related resources.

Throughout the summer 2008, AHL, Inc. worked on a number of loan sales including sales to Countrywide ($30 million) and Beal Bank ($46 million). As part of the transaction with Countrywide, LSF5 Mortgage Line arranged a $1 million guarantee to Countrywide, which was executed in August, 2008. The Countrywide guarantee was a material term included in the July 21, 2008 Amendment to the Senior Secured Facility. Since both sales closed after LSF MRA, LLC, a Lone Star Affiliate ("LSF MRA"), purchased the Wachovia MRA from Wachovia on August 13, 2008,[13] LSF MRA had the right under that former Wachovia MRA to require all proceeds be used to pay down the former Wachovia MRA (the "Amended MRA"). However, LSF MRA chose not to exercise that right and allowed AHL, Inc. to retain approximately $9 million of proceeds, which was the excess of the sale price over the advance rate under the Amended MRA.

AHL, Inc. appeared to be executing its business strategies during the months of September and October of 2008 while its liquidity position continued to place pressure on the company. As noted above, external market conditions took a dramatic turn for the worse in September, 2008, when Lehman Brothers filed for bankruptcy and AIG was, effectively, taken under government control. In an effort to provide liquidity to the company, in mid October, AHL, Inc. was in negotiations with Caliber Funding, LLC ("Caliber"), a Lone Star affiliate, regarding the potential sale of Inzura and Windsor to Caliber Funding, LLC, which sales never materialized.

---

[13] The loan sale to Beal Bank closed on August 28, 2008. The loan sale to Countrywide had multiple closings throughout September, 2008.

**D.     Review of Major Transactions and Potential Estate Claims against the Lone Star Entities**

1.     Repayment of Farallon

On or about October 12, 2007, Farallon delivered to Holdco written notice demanding payment in full of the Farallon Loan, which Farallon accelerated under the loan agreement's change-in-control provisions. Immediately after acquiring Holdco, LSF5 Investments contributed $100 million into Holdco as equity and, on or about November 21, 2007, LSF5 Affiliate Finance, LLC, a Lone Star affiliate, ("Affiliate Finance") made an unsecured short term loan in the amount of $130 million to Holdco (the "$130 Million Unsecured Loan"). While the promissory note evidencing the $130 Million Unsecured Loan was executed solely by Holdco, the companies' accounting records reflect the debt as an obligation of AHL, Inc. The proceeds of the capital contribution and the $130 Million Unsecured Loan along with cash on hand was used to satisfy, in full, the Farallon Loan, including principal, interest in the amount of $6.7 million, pre-payment fees of $4 million, and expenses of $581,000. The $130 Million Unsecured Loan was a five month loan with interest payable at 13%, which the parties anticipated would be paid from an expected tax refund in excess of the loan amount.

In January 2008, a tax refund in the approximate amount of $150 million was received by Holdco as the named taxpayer, due to its status as agent of the Debtors' consolidated corporate group. While Holdco received the funds, the refund was primarily based on the operations of AHL, Inc., and the tax refund was listed as an asset of AHL, Inc. on each of the company's internal accounting records. On January 31, 2008, Holdco made a payment in the amount of $65 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to partially satisfy the principal balance of the $130 Million Unsecured Loan. On or about January 31, 2008, Holdco transferred most of the remaining proceeds from the tax refund to AHL, Inc. On February 25, 2008, AHL, Inc. made a payment in the amount of $65 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to satisfy the remaining principal balance of the $130 Million Unsecured Loan. Both payments were made in advance of the maturity of the underlying loan. During the period of time that the $130 Million Unsecured Loan was outstanding, it accrued interest in the total amount of approximately $3.9 million. On or about July 30, 2008, within the one year period prior to the commencement of these chapter 11 cases, AHL, Inc. paid $3 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, in partial satisfaction of the outstanding interest owed and Holdco converted to equity the remaining $900,000 in interest owing on the $130 Million Unsecured Loan. Had the Debtors sought protection under the Bankruptcy Code before January 31, 2009, the entire $130 Million Unsecured Loan repayment would have been within the one year period in which the Debtors' bankruptcy estates could have sought to recover such payments as preferences under § 547 of the Bankruptcy Code. Since the Debtors did not file bankruptcy until May 1, 2009, the $130 Million Unsecured Loan repayment is not avoidable as a preference under § 547 of the Bankruptcy Code; however, as discussed below in Section IV.E.9, the Committee asserts that the Debtors, under Lone Star's direction and control, delayed commencement of these cases so as to prevent subjecting Lone Star to these potential avoidance claims, in violation of their fiduciary duties, during which time the Debtors' insolvency deepened by tens of millions of dollars. The Lone Star Entities dispute these allegations.

2.  <u>Senior Secured Facility</u>

As was noted above, in September, 2007, LSF5 Mortgage Line acquired the Senior Secured Facility from JP Morgan.  From September, 2007 through early March, 2009,

(1) LSF5 Mortgage Line and/or Affiliate Finance made several advances to AHL, Inc. under the Senior Secured Facility,

(2) AHL, Inc. made several payments to LSF5 Mortgage Line on the Senior Secured Facility,

(3) LSF5 Mortgage Line agreed to convert to equity certain amounts owing under the Senior Secured Facility, and

(4) the parties amended the Senior Secured Facility several times.

Pursuant to the amendment to the Senior Secured Facility executed on March 19, 2008, AHL, Inc. granted LSF5 Mortgage Line a lien on all its property (except property pledged by AHL to Wachovia on the Servicer Advance Facility).  LSF5 Mortgage Line did not fully perfect its lien until July 2008, which the Committee believes is a potentially avoidable transfer.  LSF5 Mortgage Line also received a $3 million payment on the Senior Secured Facility in July 2008, which the Committee also believes may be avoidable.  An amendment to the Senior Secured Facility dated July 21, 2008, which is about the time the Committee believes that the Debtors were considering filing bankruptcy petitions, reduced the principal amount of this line of credit from $150 million to $62 million, required all of AHL, Inc.'s affiliates to become guarantors, and restricted AHL, Inc.'s ability to use its assets.  The Committee believes that this amendment may be potentially avoidable as well.

The Lone Star Entities disagree.  They have argued that they provided new value to the Debtors after July 2008 in the form of unrepaid cash advances to the Debtors, releasing perfected liens upon assets of the Debtors, and advances to certain creditors of the Debtors, which in turn provided value to the Debtors due to those advances.

On or about March 9, 2009, less than two months before the Debtors initiated the Bankruptcy Cases, LSF5 Mortgage Line and AHL, Inc. agreed to payoff the Senior Secured Facility.   At that time, the total amount outstanding on the Senior Secured Facility was approximately $58 million.  LSF5 Mortgage Line agreed to release its liens on all the assets of all AHL entities in exchange for a discounted cash payment in the amount of $30 million, and a non-recourse lien in the amount of $5 million on a receivable owed to AHL, Inc. by Select Portfolio Services, Inc. ("SPS").  Chad Patton, director of the Debtors and Lone Star Affiliate, along with certain of the Debtors' employees and officers, negotiated this agreement on behalf of AHL, Inc.  The Committee has raised questions about the value of the assets securing the liens in favor of LSF5 Mortgage Line and the  validity of some of the liens themselves, but it should be noted that the assets securing the liens included all the Debtors' Assets, which included the owned portfolio of loans, which were sold during the course of the bankruptcy case for approximate $3.5 million (see Sec. IV.E.5 below) and the stock of AHL Canada, which the Debtors now estimate has a value of approximately $30 million (see Sec. IV.D.6 below).  As is

noted in more detail below, ultimately, the Debtor compromised the amount of the SPS receivable for $1.25 million, and the lien asserted by LSF5 Mortgage Line will be released pursuant to the Plan.

### 3. Wachovia Servicer Advance Facility

On February 20, 2008, Wachovia and Accredited Receivables Funding, LLC ("ARF"), a subsidiary of AHL, Inc., entered into a one-year $100 million Credit Agreement (the "Servicer Advance Facility").[14]  Under the Servicer Advance Facility, AHL, Inc. was able to borrow against advances it made as servicer for payment of principal and interest ("P&I"), corporate advances, and taxes and insurance ("T&I") at advance rates up to 90%.  Structurally, AHL, Inc sold its advances to ARF pursuant to a Receivables Purchase Agreement, which was guaranteed by Holdco.  ARF would then borrow against these advances and upstream the cash to AHL, Inc. The Servicer Advance Facility resulted in upwards of $70 million of fresh liquidity to AHL, Inc. in early 2008.  In order to complete this transaction, LSF5 Mortgage Line released its lien on the Servicer Advances, which were previously collateral under the Senior Secured Facility.

The facility was amended from time to time (often in conjunction with the Wachovia MRA).  On January 19, 2009, Wachovia granted an extension of the maturity date to April 2, 2009, which allowed for the close of a transaction with SPS (which is discussed in detail below.) Prior to the Petition Date, AHL, Inc. repaid the $85 million outstanding on the Servicer Advance Facility with proceeds from the sale by AHL, Inc. of certain Master Servicing Rights to SPS (discussed below).

### 4. Wachovia MRA

As was noted above, on or about March 30, 2007, Wachovia agreed to provide AHL, Inc. with the Wachovia MRA, a $750 million warehouse line of credit in the form of a repurchase agreement.  Throughout the third quarter of 2007 and into 2008, Wachovia exercised its rights under the Wachovia MRA to make margin calls on AHL, Inc., which ultimately totaled approximately $115 million.  In the face of a $36 million margin call delivered on July 29, 2008, AHL, Inc. initiated a lawsuit against Wachovia seeking a temporary restraining order to prevent Wachovia from exercising its rights under the Wachovia MRA.  To resolve the disputes and the litigation, on August 13, 2008, LSF MRA, one of the Lone Star Entities, purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 million.  This transaction included 2,583 mortgages with an unpaid principal balance of $621 million.  AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.

After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA, which converted the Amended MRA into a term facility, provided for accelerated payment, eliminated the right of LSF MRA to make margin calls, and terminated the obligation of LSF MRA to purchase mortgage loans from AHL, Inc. LSF MRA, AHL, Inc. and the REIT entered into several amendments to the Amended MRA to

---

[14] Wachovia Capital Markets, LLC was Agent and Accredited Home Lenders, Inc. was Servicer on the Servicer Advance Facility.

extend the maturity dates four times to terminate in November, 2008, December, 2008, February 2009 and on March 17, 2009. When the Amended MRA finally matured on March 17, 2009, AHL, Inc. and the REIT defaulted on the Amended MRA due to their failure to repurchase the mortgages. According to LSF MRA, LSF MRA retained the mortgages in partial satisfaction of the damages that it sustained, and to mitigate its damages. In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 million.[15] The Lone Star Entities subsequently offset from this damage claim about $1.3 million it owed to AHL, Inc. for mortgage servicing rights, which are further described below. LSF MRA subsequently filed a proof of claim in an amount of approximately $96 million.

5.   The Mortgage Servicing Rights

Part of AHL, Inc's business model was to service the mortgages that it originated and securitized. In the role of servicer, AHL, Inc. would earn fee income. Throughout 2008, AHL, Inc. was the servicer for the 17 securitizations that it created, the Residential Loan Pools, the loans subject to the Wachovia MRA and Amended MRA and the mortgages that AHL owned.

In August, 2008, AHL, Inc. began actively marketing its servicing rights to its securitizations ("MSRs"). Initially, Ocwen Financial expressed an interest in purchasing the MSRs, but Ocwen terminated its discussions with AHL, Inc. in mid-September, 2008. On September 24, 2008, AHL, Inc. engaged Phoenix Capital to sell the MSRs.

With the assistance of Phoenix Capital, SPS was identified as a purchaser of the MSRs. The purchase price to be paid by SPS was the reimbursement to AHL, Inc. of the outstanding servicer advances (approximately $117 million) plus a $7 million premium. As the negotiations progressed, the parties agreed that the payment of the premium would be conditioned upon delivery on or before May 1, 2009, of "no downgrade letters" for each of the securitizations from the various rating agencies. The first closing of this sale occurred on February 2, 2009 when AHL, Inc. received proceeds in the approximate amount of $85 million. On March 2, 2009, the final SPS closing occurred, and AHL, Inc. received $32 million of additional cash. From the proceeds of the sale of the MSR's to SPS, AHL, Inc. repaid approximately $85 million owed to Wachovia under the Servicer Advance Facility.

AHL, Inc. and SPS did not receive the no-downgrade letters from all the ratings agencies. Consequently, SPS did not pay the $7 million premium to AHL, Inc., which caused AHL, Inc. to retain the law firm of Quinn Emmanuel. On or about April 30, 2009, AHL, Inc. initiated a lawsuit against SPS to collect the unpaid $7 million premium arising from the sale of the MSRs. After the commencement of this suit and the Petition Date, AHL, Inc. and SPS have agreed to settle this litigation with SPS making a payment to AHL, Inc. in the amount of $1.25 million, which payment was received on January 15, 2010, after approval of the settlement by the

---

[15] The Committee asserts that this $96 Million figure is based on a fraction of the value placed on the mortgages by the Lone Star Entities a few months before. The Lone Star Entities dispute this assertion. As provided in the Term Sheet and Plan Support Agreement, the parties will not challenge the valuation, at this time.

Bankruptcy Court. The pleading further detailing this settlement can be found at Docket No. 1112.

With regard to the servicing rights for the mortgages subject to the Amended MRA, LSF MRA exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. LSF MRA did not pay AHL, Inc. approximately $1.3 million for servicer advances. On April 27, 2009, LSF MRA sent AHL, Inc. a notice that it set off the damages under the Amended MRA against those unpaid servicer advances. The Committee questions the right of LSF MRA to exercise this setoff.

With regard to the servicing rights for the mortgages subject to the Residential Loan Pools, the trustee for the Residential Loan Pools at the direction of the holders of the securities (an affiliate of Lone Star Fund VI) exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. The Residential Loan Pools paid AHL, Inc. for all fees and reimbursed AHL, Inc. for all servicer advances.

6.   Transfer of AHL Canada

To conduct lending operations in Canada, Holdco formed AHL Canada. In general terms, the operations of AHL Canada were very similar to the operations of AHL, Inc. Ultimately, AHL Canada stopped originating loans in 2008. Effective as of September 30, 2008, Holdco transferred the ownership of AHL Canada to AHL, Inc.[16]

The Debtors estimate the value of AHL Canada at approximately $30 million, which consists of $10.5 million in cash and the value of two loan portfolios, net of tax obligations.

Since the stock of AHL Canada was contributed by Holdco to AHL, Inc. as a capital contribution at a time when both AHL, Inc. and Holdco were potentially insolvent, the Debtors believe that such transfer may be avoidable as a fraudulent transfer. The Plan proposes to resolve the potential fraudulent transfer by transferring ownership of AHL Canada from AHL, Inc. to Consolidated Holdco to be monetized for the benefit of Consolidated Holdco Creditors.

7.   REIT Claim

As was noted above, in 2004 AHL, Inc. formed the REIT. Subsequently, the REIT transferred cash to AHL, Inc. (as either a dividend or as an intercompany loan) and, ultimately, the accounting records reflect an intercompany payable from AHL, Inc. to the REIT of approximately $227 million. Effective as of December 31, 2008, (1) AHL, Inc. executed a promissory note in the amount of approximately $227 million payable to the order of the REIT to evidence the intercompany obligation; (2) AHL, Inc. transferred ownership of the common stock of the REIT to Holdco and (3) Holdco assumed AHL, Inc.'s obligation to the REIT under the

---

[16] Copies of the documents relating to the transfer by Holdco to AHL, Inc. of the AHL Canada Stock are available upon request made to Debtors' counsel.

terms of the promissory note[17]. Additionally, as a result of the December 31, 2008, transaction, AHL, Inc. and Holdco made adjustments in the intercompany liabilities between each other. The ad hoc committee of REIT preferred shareholders filed proofs of claims against both Holdco and AHL, Inc. reflecting this alleged intercompany debt that were unliquidated but stated that the amounts due exceeded $227,000,000 (the "REIT Claims").

In early 2010, the Debtors consented to the Bankruptcy Court granting the Committee standing to investigate, pursue, prosecute and settle any and all causes of action that may arise out of the transactions with REIT. The Bankruptcy Court entered an order approving the Committee standing (Docket No. 1323) and, on May 11, 2010, after further investigation and due diligence, the Committee initiated an adversary proceeding styled *Official Committee of Unsecured Creditors v. Accredited Mortgage Loan REIT*, Adversary No. 10-50980-MFW (the "REIT Adversary"). In the REIT Adversary, the Committee has, among other things, objected to the REIT Claims, seeks to subordinate the REIT Claims, and seeks to recharacterize the REIT Claim as equity. The REIT has answered the complaint filed in the REIT Adversary and denies that the Committee is entitled to any of the relief sought in the REIT Adversary. The Plan will settle the REIT Adversary by compromising the Allowed amount of the REIT Claims in the manner described below.

**E.      Significant Post-Petition Date Filings and Events**

     1.      <u>First Day Motions</u>

On the Petition Date, the Debtors filed a number of "first day" motions, which were designed to ensure the Debtors' ability to continue to operate with minimal disruption following the filing of these Cases. The Bankruptcy Court granted many of these first day motions, entering various orders, that, among other things:

- authorized the Debtors to make payments related to outstanding wage, vacation, severance and related withholding tax obligations;
- allowed the Debtors' various bankruptcy cases to be jointly administered;
- excused the Debtors from the U.S. Trustee's requirements that their pre-petition bank accounts be closed and new post-petition bank accounts be opened;
- prohibited utility service providers from refusing to provide services;
- allowed the Debtors to promise their employees a modest severance payment to induce those employees to remain with the Debtors through this bankruptcy process; and
- appointed Kurtzman Carson Consultants as noticing, claims, and solicitation agent for these cases.

     2.      <u>Debtors' Retention and Payment of Professionals and Advisors</u>

---

[17] Copies of the promissory note and other documents relating to the December 31, 2008, transaction are available upon request made to Debtors' counsel.

In order to liquidate their operations and assets and administer these chapter 11 cases, the Debtors retained various professionals and advisors, including Hunton & Williams, LLP as lead bankruptcy counsel, Pachulski Stang Ziehl & Jones LLP as co-counsel for the Debtors, AP Services, LLC to provide restructuring and management services to the Debtors, and Deloitte Tax LLP to provide tax and accounting services to the Debtors. The Debtors also retained the law firm of Quinn Emanuel Urquhart Oliver & Hedges, LLP as litigation counsel to advise the Debtors in matters in which Hunton & Williams is disqualified, and the law firms of Kirkland & Ellis LLP and Luce, Forward, Hamilton & Scripps LLP to represent the Debtors in an ongoing class-action securities fraud case, which the Debtors settled for an amount covered by their insurance carriers  Finally, the Debtors retained Phoenix Capital, Inc. to help market and sell certain assets.

The Debtors have been paying these professionals and advisors, and the professionals and advisors retained by the Committee, in accordance with applicable law and orders of the Court. Most of these professionals and advisors are required to file monthly and quarterly fee statements and applications with the Court.  The Court has thus far approved all of the interim fee applications of the estates' professionals and advisors.  The Committee has filed reservations of rights with respect to interim applications of Hunton & Williams, LLP.  Other than the final application of Quinn Emanuel, the Court has not approved any final fee applications of these professionals, and thus the final allowance of these applications and payments remains subject to further Court approval.

3.    The Official Committee of Unsecured Creditors

On June 16, 2009 the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"), consisting of a commercial institution, a trade vender, and an individual borrower.  The Committee has retained the law firm of Arent Fox, LLP as lead bankruptcy counsel, Elliott Greenleaf as co-counsel, and Weiser LLP as financial advisors. Subsequently, on July 23, 2009, the U.S. Trustee reconstituted the Committee such that it currently consists of two financial institutions, a trade vendor, an individual borrower, and a litigation claimant.[18]  The Committee has been an active participant in these bankruptcy cases, including, among other things:

- participating in sales of the Debtors' Assets;
- reviewing and analyzing the Debtors' motions relating to Asset sales and attending hearings on the same;
- reviewing and analyzing the Debtors' motions relating to Claim settlements and attending hearings on the same;

---

[18] The claim of the borrower has been disallowed.  *See* Order Disallowing Certain Claim Filed by Carrie L. Luft and Denying as Moot Movant Luft's Motion for Relief from the Automatic Stay, March 30, 2010, Docket No. 1430.  Further, it appears that the trade vendor has sold its claim to a third party.  *See* Notice of Transfer for Sonar Credit Partners, LLC re: Transcontinental Valuations, Inc (Claim No. 1), November 2, 2010, Docket No. 2122.  The Debtors have been informed that, pursuant to the Committee's by-laws and the consent of such members, such persons have ceased to act as members of the Committee.

- investigating potential claims against the Debtors' current and former directors and officers, the Lone Star Entities, the REIT, and other potential target defendants;
- commencing litigation against the REIT;
- negotiating the proposed settlement with the Lone Star Entities, the REIT, the REIT Committee, the Trust Preferred Holders, and the Trust Preferred Indenture Trustee that is set forth in the Plan Support Agreement and Term Sheet and is included in the Plan; and
- participating with the Debtors in the formulation of the Plan and this Disclosure Statement.

4. <u>Rejection of Leases and Contracts</u>

On the Petition Date, the Debtors filed a motion to reject approximately 56 leases of real property throughout the United States that had been used as local branch offices for the Debtors' loan origination and servicing operations. This motion was granted, relieving the Debtors' estates from the burden of paying for such leases, immediately relieving the Debtors of millions of dollars in monthly operating expenses. Also, on the Petition Date, the Debtors filed motions to reject almost 300 other executory contracts for the supply of various goods and services that the Debtors no longer required. These motions were also granted. The Debtors have also relocated their offsite electronic data storage systems to a smaller and more cost effective facility.

5. <u>Asset Sales</u>

On July 2, 2009, the Court approved the sale of the Debtors' residential mortgage servicing platform for a purchase price of $495,000 plus the assumption of certain liabilities to Vericrest Financial, a Lone Star Affiliate, which sale closed on or about July 6, 2009. After this sale, the Debtors were left with less than fifteen employees, who are essential to completing the liquidation of the assets of the Debtors and their subsidiaries and the wind-up of the Debtors' affairs.

On July 7, 2009, the Court entered an order approving the procedures for auctioning the Debtors' remaining 90 mortgage loans. This auction was a success. The winning bidder, NPA I, LLC, offered $3.525 million for these loans, and the Court entered approved this sale by an order entered on July 31, 2009. The sale of the mortgage loan pool closed on or about August 19, 2009.

On December 1, 2009 and January 28, 2010 the Court entered orders permitting the Debtors to sell their remaining mortgage loans and real estate assets.

Pursuant to the *de minimis* asset sale motion, the Debtors have sold various assets generating proceeds for the estate in excess of $250,000. The Debtors continue to market and sell the remaining *de minimis* assets, although the Debtor's remaining tangible personal property, such as office equipment and computer components, has minimal value.

6. <u>Motion to Convert</u>

On June 19, 2009, the Trust Preferred Holders, Kodiak and JP Morgan Chase Bank, N.A., filed a motion to convert these cases to chapter 7, arguing that chapter 7 would yield greater returns for creditors. Citigroup Global Realty Markets, Inc. joined in this motion to convert. The Committee and the Debtors objected, arguing that a liquidation in chapter 11 could produce better results for creditors, and that cause did not exist for conversion. The movants have not pressed forward with the motion to convert.

7.    Atlas Class Action Settlement

Prior to the Petition Date, Holdco was a defendant in a class action securities fraud case styled, *Atlas v. Accredited Home Lenders Holding Co.*, Case No. 3:07-CV-00488-H-CAB pending in the United States District Court for the Southern District of California (the "Atlas Litigation"). The parties to the Atlas Litigation settled the matter within the policy limits of a prior D & O insurance policy. The Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. The Bankruptcy Court approved the settlement on August 27, 2009. As a result of the settlement of the Atlas Litigation, proceeds in the amount of $994,068.09 from the applicable D & O insurance were paid to reimburse the Debtors for defense costs previously advanced.

8.    SPS Settlement

Prior to the Petition Date, and as discussed above, AHL, Inc. sued SPS seeking payment of $7 million arising from the sale of the MSRs to SPS. AHL, Inc. and SPS settled the dispute and SPS made a payment to AHL, Inc. in the amount of $1.25 million. The Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. On November 25, 2009, the Debtors filed a motion seeking approval of the SPS settlement, which motion was approved. The Debtors and SPS consummated the settlement on or about January 15, 2010. One of the Lone Star Entities, LSF5 Mortgage Line, has asserted that it has a lien against the proceeds of the SPS settlement. As part of the Plan Support Agreement and Term Sheet, LSF5 LSF5 Mortgage Line has agreed to release its alleged lien on the proceeds of the SPS settlement.

9.    Investigation of Insider Causes of Action and Evolution of Settlement Discussions

Prior to the Petition Date, the Lone Star Entities approached the Debtors about purchasing the Debtors' remaining assets and obtaining a release of all claims that the Debtors may have had against any of the Lone Star Entities. The sole director of each of the Debtors was at that time, and still is, Chad Patton, an employee of one of the Lone Star Entities. Due to Mr. Patton's employment with one of the Lone Star Entities, he recused himself from all negotiations between the Debtors and any of the Lone Star Entities,[19] and Meade Monger, the Chief Restructuring Officer of the Debtors, was charged by the boards of directors of the Debtors with the responsibility of representing the Debtors in all negotiations between any of the Debtors and

---

[19] To be clear, Mr. Patton did not participate in any of the negotiations described herein.

any of the Lone Star Entities.[20]  The Debtors declined the initial offers from the Lone Star Entities to engage in settlement negotiations because Mr. Monger and the Debtors' professionals, including its primary counsel Hunton & Williams, concluded they needed time to identify and investigate any potential causes of action that might be asserted against the Lone Star Entities.[21]

After the Petition Date, during the late spring and summer of 2009, the Debtors conducted an investigation of potential causes of action against the Lone Star Entities.  The investigation included (a) interviews of current and former employees of the Lone Star Entities, (b) interviews of current and former employees of the Debtors and (c) a review of the Debtors' documents and records.

In August and September, 2009, Mr. Monger represented the Debtors in negotiations with the Lone Star Entities and presented a proposal to settle all of the Debtors' potential claims against the Lone Star Entities for $60 million, subject to Court approval.  After several weeks of negotiations, the Loan Star Entities made the following counter proposal:  (a) a cash payment from the Lone Star Entities to the Debtors in the amount of $10,050,000; (b) subordination of all claims asserted by the Lone Star Entities in the amount of approximately $100 million;[22] and (c) releases by the Debtors of the Lone Star Entities, except that any causes of action that could be asserted against directors and officers of the Debtors would be preserved against the D&O insurance coverage up to the amount of the insurance coverage (the "Sept. 2009 Settlement Proposal").  The expectation was that additional material recoveries from insurance would be possible.  Upon receipt of the offer, the Debtors advised the Lone Star Entities that it would be presented to the Committee, and if a global agreement was ultimately reached, the Debtors

---

[20] Mr. Monger is an employee of AP Services, which was engaged by the Debtors on or about March 24, 2009.

[21] The relationships between Hunton & Williams and various parties in interest in the case (including the Lone Star Entities) have been disclosed in the various Declarations filed in support of the retention application of Hunton & Williams.  See Docket Nos. 22, 1822, 2092, 2161, 2203 and 2285.  With regard to the Lone Star Entities, Hunton & Williams disclosed the following in paragraph 11 of its initial declaration (see Docket No. 22):

> ### *Beneficial Holders of the Debtors' Equity Securities*
>
> 11.  The ultimate principal beneficial holder of the Debtors' equity securities is Lone Star Fund V (US), L.P.  Hunton has performed or is performing legal services on unrelated matters for affiliates of Lone Star Fund V (US), L.P., including Bruno's Super Market, LLC, BI-LO, LLC, Vericrest Financial, Inc. and LSF5 Cookeville, LLC.  Hunton has not represented Lone Star Fund V (US), LP or any of its affiliates with regards to the Debtors.

Subsequently, in its fourth supplemental declaration, Hunton & Williams disclosed that subsequent to the Petition Date, it was retained by Caliber Funding, a "Lone Star Entity", to perform real estate work unrelated to the Debtors and the Bankruptcy Cases.  See Docket No. 2203.

[22] The Lone Star Entities filed proofs of claim against:  (1) AHL, Inc. in the approximate amount of $100 million and (2) Holdco in the approximate amount of $97 million.  AHL, Inc., as primary obligor, and Holdco, as guarantor,  were jointly liable on the most significant claim, which relates to the LSF MRA.

would propose a plan of liquidation that would substantively consolidate all the Debtors into one estate.

The Debtors presented Lone Star Entities' proposal to the Committee in September, 2009. The Committee neither approved nor rejected the September 2009 Settlement Proposal because it did not have sufficient information to make an informed decision on fairness and reasonableness of the proposed terms.

To assist the Committee in its evaluation, on or about October 12, 2009, the Debtors delivered to counsel for the Committee a comprehensive confidential report summarizing the Debtors' preliminary findings from its investigation of the Lone Star Entities. Both before and after receiving the report from the Debtors, the Committee conducted its own investigation of potential causes of action against the Lone Star Entities, including its review of the numerous documents produced by the Debtors and the Lone Star Entities.

In the fall of 2009, two significant events occurred that significantly affected the settlements proposed in this Plan. First, on October 6, 2009, the Bar Date for filing proofs of claim passed. Once the Debtors began reviewing and evaluating the proofs of claim filed against the estate, it became apparent that the amount of valid claims that would ultimately be allowed against the Debtors was significantly less than the Debtors' initial estimates prior to the Petition Date.

Second, on or about November 6, 2009, President Obama signed the "Worker, Homeowner and Business Assistance Act of 2009," which provided, among other things, for expanding the net operating loss carryback rules to allow the Debtors to carryback 2008 net operating losses for up to five years. As is discussed more fully *supra,* the result of the change in the net operating loss carryback rules, AHL, Inc. is entitled to a tax refund of approximately $94 million.

As a result of reduced valid claims and increased assets due to the tax refund, the course of the negotiations among the Debtors, the Committee and the Lone Star Entities changed dramatically. For example, these changed circumstances exacerbated a fissure between creditors that had claims solely against AHL, Inc. and other creditors that had claims solely against Holdco. Further, as a result of the additional assets and fewer claims, the value of the potential claims against the Lone Star were not worth as much as initially believed.

In addition, as a result of the continued discovery engaged in by the Debtors, the Committee, the Trust Preferred Security Holders and Lone Star, the analysis of potential claims that could be asserted against the Lone Stare Entities continued to change.

After obtaining the Sept. 2009 Settlement Proposal, the Debtors continued to evaluate its feasibility and ultimately concluded that it was structurally deficient. In December, 2009 the Debtors advised the Committee about the structural deficiencies and the Committee and the Debtors concluded that the Sept. 2009 Settlement Proposal should not be accepted.

On January 6, 2010, the Committee filed its *Motion for Entry of An Order Granting Leave, Standing and Authority to Investigate and Prosecute Claims and Causes of Action on*

*Behalf of the Committee, Debtors and Debtors' Estates and Settle Claims on Behalf of the Debtors' Estates* (Docket No. 1203, the "Authority Motion"). In the Authority Motion, the Committee alleged that the Debtors and their professionals may have conflicts of interest resulting from, among other things, the Debtors' sole director being an employee of a Lone Star Entity, and the Committee sought standing to investigate, prosecute, and settle claims on behalf of the Debtors against the Debtors' officers and directors and the Lone Star Entities.

In the Authority Motion, the Committee outlined some of the Debtors' potential causes of action against the Debtors' officers and directors and the Lone Star Entities, including: (a) breaches of fiduciary duty and aiding and abetting a breach of fiduciary duty resulting from the delay in the Debtors' filing for bankruptcy protection in order to protect the financial interest of the Lone Star Entities (for example delaying the bankruptcy filing so as not to subject the repayment of the $130 Million Unsecured Loan with Affiliate Finance to preference claims), (b) breaches of fiduciary duty and aiding and abetting breaches of fiduciary duties relating to the pre-bankruptcy transactions between the Debtors and the Lone Star Entities, which benefitted the Lone Star Entities and were not reviewed for fairness by persons independent of Lone Star, (c) veil-piercing, alter-ego, and/or substantive consolidation; (d) breach of representation regarding the Debtors' financing condition, negligent misrepresentation, and/or willful misrepresentation; (e) equitable subordination; (f) fraudulent transfers for, among other things, the value of the collateral seized in March 2009, the repayment of the $130 Million Unsecured Loan, payments made under the Senior Secured Facility, payments in connection with the Caliber transaction, servicing advances, and sales of the residential loan pools, as well as the restructuring of the REIT claim to Holdco from a subsidiary; (g) conversion; (h) tortious interference with business relationships; (i) preference recoveries for, among other things, the perfection of additional collateral in July 2008 under the Senior Secured Facility; and (j) corporate waste. Moreover, the Authority Motion asserted that in March 2008, one of the Lone Star Entities provided a letter to the Debtors' auditors, stating that the Lone Star Entities intended to support the Debtors through December 31, 2008, thereby avoiding a qualification in the 2007 audit by the auditor on the Debtors' ability to remain a going concern. Both the Debtors and the Lone Star Entities opposed the Authority Motion. The Authority Motion remains pending and, to the extent creditors desire additional information, they should consult the Authority Motion, which is available on the Bankruptcy Court docket.

Also in January of 2010, after extensive analyses performed by the Debtors, the Debtors presented the Committee with options on a deconsolidated plan of liquidation. The Debtors had concluded the following from their analyses: (i) substantive consolidation may not be appropriate; (ii) accepting Lone Star's proposal at AHL, Inc. could potentially provide full recoveries to the AHL, Inc. creditors; and (iii) preserving Consolidated Holdco's claims against the Lone Star Entities and the directors and officers of Consolidated Holdco would allow for the creditors of Holdco to pursue these claims and have direct decision making control of their own recoveries. The Committee was receptive to this approach and agreed that, while it continued its investigation, the Debtors should undertake discussions with Lone Star about a possible settlement under this construct.

In early 2010, the Debtors, represented by Mr. Monger as CRO, continued settlement negotiations with the Lone Star Entities, which resulted in the following settlement proposal: (a)

a cash payment from the Lone Star Entities to the AHL, Inc. in the amount of $10,050,000; (b) a waiver of all claims filed by the Lone Star Entities against the AHL, Inc. in the asserted amount of approximately $100 million; (c) releases by AHL, Inc. of the Lone Star Entities and certain of their affiliates and current and former employees; (d) preservation of all claims that could be asserted by Holdco against the Lone Star Entities and the officers and directors of Holdco; and (e) subordination of all claims filed by the Lone Star Entities against Holdco in the asserted amount of approximately $97 million in the event that creditor classes accepted the plan. (the "Deconsolidated Settlement Proposal"). The Deconsolidated Settlement Proposal was to be incorporated into "deconsolidated plans" for the Consolidated Debtors (*i.e.*, AHL, Inc., Inzura and Windsor) and Consolidated Holdco (*i.e.*, Holdco and Vendor Management).

The Debtors presented the Deconsolidated Settlement Proposal to the Committee and various major creditors including the Trust Preferred Holders (creditors of Holdco), Citigroup (a creditor of AHL, Inc.), the Sierra class action claimants (creditors of AHL, Inc.), the REIT (a creditor of both AHL, Inc. and Holdco) and the REIT Committee (consisting of REIT Preferred Security Holders with subordinated claims against Holdco). Negotiations based on the Deconsolidated Settlement Proposal continued through the winter and spring of 2010 until an agreement in principle was reached at a meeting in New York on May 26, 2010 among the Debtors, the Committee and the Lone Star Entities. In general terms, the agreement in principal was nearly identical to the Deconsolidated Settlement Proposal except that it increased the payment from the Lone Star Entities to AHL, Inc. from $10,050,000 to the amount of $15.6 million.

During the summer of 2010, the negotiations expanded to include the REIT and the REIT Committee resulting in the *Settlement Between Accredited Home Lenders Holding Co., et . al. (the "Debtors"), Lone Star, Debtors, the REIT, the REIT Committee and the Official Committee of Unsecured Creditors ("Committee") relating to a Consensual Plan of Liquidation* dated September 2, 2010 (the "September 2010 Term Sheet"). The September 2010 Term Sheet was incorporated into the first Chapter 11 Plan of Liquidation filed on September 15, 2010, which provided for (a) a cash payment in the amount of $15.6 million from the Lone Star Entities to the Consolidated Debtors, (b) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million, (c) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million, (d) releases by the Consolidated Debtors of all claims that it could assert against the Lone Star Releasees, and (e) the preservation of all claims that could be asserted by Consolidated Holdco against its officers and directors and the Lone Star Entities.

Also, while settlement negotiations continued throughout the summer of 2010, the Debtors continued to conduct their claims review and analysis and commenced objecting to claims that should be reduced or disallowed. As a result of the claims objection, the Debtors reduced the amount of Allowed General Unsecured Claims against the Consolidated Debtors to approximately $107 million to $110 million. Further, the Debtors and the Committee reduced

the amount of Allowed General Unsecured Claims (other than the Trust Preferred Claims) against Consolidated Holdco to approximately $22 million.[23]

In October, 2010, the Lone Star Entities and the Trust Preferred Holders entered into a three day mediation of the Trust Preferred Adversary Proceeding in New York. As a result of the mediation and subsequent negotiations, the Lone Star Entities, their D&O insurance carriers and the Debtors insurance carriers agreed to pay $30 million to the Trust Preferred Security Holders to be applied to the claims asserted by the Trust Preferred Security Holders against the Debtors and to settle the Trust Preferred Adversary Proceeding. This amount was not acceptable to the Trust Preferred Security Holders. While the mediation was not completely successful, it resulted in further negotiations among the Debtors, the Committee, the Lone Star Entities, the Trust Preferred Holders, the REIT and the REIT Committee, including an all hands meeting in New York on December 8, 2010, which culminated in the final agreement that is incorporated into the Plan.

A former officer of the Debtor has expressed concerns as to the reasonableness of the various settlements contained in the Plan and as to whether the process to obtain the settlement resulted in a settlement that is fair, equitable and in the best interests of the Estates. The Debtors dispute such allegations and believe that each contention is unfounded.

As is set forth in more detail below, the Plan proposes to settle any Claims that the Debtors may have against the Debtors' officers and directors and the Lone Star Releasees. This settlement is the product of substantial investigation performed by the Debtors, the preparation and submission of the Debtors' findings to the Committee, the Committee's own substantial investigation, and protracted arms'-length negotiations amongst the Debtors, the Committee, the Lone Star Entities, Citigroup, the REIT, REIT Committee, and the Trust Preferred Security Holders, all occurring over the past 18 months. These parties all believe that the resulting settlement proposed in the Plan and embodied in the Plan Support Agreement and Term Sheet is reasonable, appropriate, and in the best interests of their constituents and the Debtors' estates and creditors. Accordingly all these parties are supporting the Plan.

The settlement of the Claims that could be asserted against the Lone Star Releasees will result in (a) cash payments to the Consolidated Debtors in the amount of $15,750,000 from the Lone Star Entities; (b) cash payments to the Trust Preferred Holders of $30,000,000 from a combination of the Lone Star Entities, the D&O insurance carriers of the Lone Star Entities and the D&O insurance carriers of the Debtors; (c) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million; (d) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million and (e) the releases as set forth in more detail *supra*. The settlement of the Claims that could be asserted against the Lone Star Releasees further provides a foundation for the settlement between the Estates of the Consolidated Debtors

---

[23] Prior to the Petition Date, the Debtors estimated that total claims against the Debtors would exceed $500 million. After taking into consideration the settlements proposed in this Plan, the total claims against the Debtors will be approximately $180 million.

and Consolidated Holdco. It should be emphasized that the Lone Star Releasees will receive no distributions of cash or property under the Plan.

As a result of this settlement, the creditors of all the estates will receive significant, if not extraordinary, distributions without the delays and risks that would have attended any litigation against the Lone Star Releasees. Thus, the Debtors believe that the settlement proposed in the Plan is reasonable, appropriate, and in the best interests of the Debtors' Estates and Creditors.

10. Kodiak Litigation

Kodiak and Wells Fargo Bank, N.A., as indenture trustee under the indenture agreement Trust Preferred Securities, also initiated a separate lawsuit in the Bankruptcy Court against certain of the Lone Star Entities asserting direct causes of action (Adversary Proceeding 09-53276, the "Kodiak Adversary"). Both before and after initiating the Kodiak Adversary, Kodiak diligently and thoroughly investigated both its direct causes of action against the Lone Star Entities and the Debtors' causes of action against the Lone Star Entities, participating in the extensive discovery process discussed below.

The parties to the Kodiak Adversary eventually requested the Court to order mediation amongst those parties and the Debtors' insurers. The Committee and the Debtors filed limited objections to this request, concerned that the Debtors' insurance policies would be affected by this mediation. The Court ultimately granted the request for mediation, with certain terms and conditions designed to protect the interests of the Debtors' bankruptcy estates. This mediation, which was extended several times, helped lead to the global settlement provided in the Plan. The claims asserted in the Kodiak Adversary will be settled under the Plan and related agreements, discussed below.

11. Discovery Issues

In June, 2009, the holders of Trust Preferred Securities served upon each of the Debtors and the Lone Star Entities a request for production of documents under Fed. R. Bankr. P 2004. After the Committee was formed, it joined the document requests. By agreement, the Debtors produced over 17,784 documents consisting of 145,612 pages in response to this request. Additionally, the Lone Star Entities voluntarily produced to Kodiak, other holders of Trust Preferred Securities, and the Committee over 10,595 documents consisting of 205,285 pages. The Committee analyzed certain of these documents in its investigation into claims and causes of action that could be asserted against the Lone Star Entities and the Debtors' officers and directors, which are highlighted in the Authority Motion that is available on the Bankruptcy Court's docket.

12. Tax Issues

The Debtors are part of a consolidated group for the purpose of filing income tax returns, with the named taxpayer being Holdco. The consolidated income tax return includes all of the Debtors and most of the non-debtor subsidiaries of the Debtors. The REIT is not a member of the consolidated tax reporting group, therefore it files its own, separate tax return. While Holdco is the "named taxpayer," it historically has had negligible operations which resulted in nomimal

profits and losses. Therefore, historically, the profits and losses reported to the taxing authorities were primarily generated by AHL, Inc.

For the 2007 tax year, the Debtors filed a consolidated federal income tax return reflecting net operating losses ("NOLs") in the amount of approximately $757 million. The Debtors elected to carry back the NOLs for 2007 to offset all net income for tax years 2005 and 2006, resulting in a tax refund received by the Debtors in January 2008, in the approximate amount of $144 million[24]. After the Petition Date, the Internal Revenue Service filed priority claims in excess of $144 million against the Debtors. The Debtors objected to these claims and the Internal Revenue Service responded, arguing that the claims should not be adjusted by the Court without the normal auditing process being concluded. The Debtors agreed with this position and objections to the Internal Revenue Service's claims have accordingly been abated. This audit process has been concluded, and on October 22, 2010 the Debtors received a letter from the IRS stating that the Congressional Joint Committee on Taxation has completed its consideration of the special report of the IRS on this audit and did not take exception to the conclusions reached by the IRS. As a result of this audit process, the Internal Revenue Service has concluded that the claims of the Internal Revenue Service will be significantly reduced, to the appropriate amount of $4 million. The IRS has withdrawn its $144 million priority claim, although the IRS has filed a "protective" administrative priority claim in the amount of the refund it provided to the Debtors, as discussed below. Further, the Debtors believe they overpaid the Internal Revenue Service the total amount of approximately $2.4 million in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, which amounts the Debtors have requested be refunded by the Internal Revenue Service.

On or about September 15, 2009, the Debtors filed their consolidated tax return for 2008 reflecting NOLs of approximately $163 million. Subsequently, in early November, 2009, Congress passed and President Obama signed legislation that allows businesses that incurred NOLs in 2008 or 2009 to elect to increase the carry back period for either the 2008 NOL or the 2009 NOL from two years to three, four or five years. In March, 2010, the Debtors requested a refund of about $57 million based upon the previously filed 2008 consolidated federal income tax return. After this refund claim was netted against amounts owing by the Debtors to the IRS described in the previous paragraph, the Debtors received a refund of approximately $54 million by wire on November 4, 2010. The Debtors still expect to receive a further refund relating to the overpayments made in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, as described in the paragraph above.

After wiring the $54 million tax refund to the Debtors, the IRS withdrew its priority tax claim in the amount of approximately $144 million. However, the IRS subsequently filed a priority claim for administrative expenses in the amount of the $54 million tax refund, explaining that such claim is a "protective claim" with respect to the "refund received by Debtor[s]."

Further, on or about November 23, 2010, the Debtors, with the assistance of the accounting firm Deloitte, filed the Amended 2008 Tax Return, which requests an additional

---

[24] For the 2007 tax year, approximately $352 million of NOLs have not been used to offset net operating income.

refund in the amount of $39.77 million as a result of additional losses identified with respect to the 2008 tax year. The Amended 2008 Tax Return remains pending. As of the date hereof, the IRS has issued a preliminary information data request, to which the Debtors have responded.

Since the tax refund is the result of NOLs being offset against prior years' income, all or substantially all of the refund belongs to the Consolidated Debtors. Certain parties have argued that Holdco may be entitled to a portion of the Tax Refunds. As will be discussed in more detail below, the Plan resolves this dispute, provides that the Tax Refunds belong to the Consolidated Debtors, and provides that all Tax Refunds will be distributed to the creditors of the Consolidated Debtors, except for a payment of up to $2 million payment to be made to the Trust Preferred Indenture Trustee from any further Tax Refunds the Debtors may receive in the future from the amounts requested in the Amended 2008 Tax Return.

13. Other Asset Recoveries

The Debtors have obtained Court approval of settlements with various workers compensation insurance carriers that lead to those insurers returning over $1 million in cash collateral to the Debtors' estates. The Debtors have also recovered over $1 million from a Court -approved settlement with the trustee for the Debtors' terminated deferred compensation trust. The Debtors have also retained experts who are in the process of recovering unclaimed property held by various governmental authorities. These assets will be vested with the Consolidated Debtors pursuant to the Plan.

14. Remaining Employees

The Debtors currently have five full time employees remaining—a controller, an information technology support expert, a tax expert, a Canadian asset coordinator, and an administrative assistant. These employees are necessary to review Claims and related business records, ensure the estates' compliance with applicable laws, and complete the wind-down of the Debtors, among other things. These employees are entitled to certain severance payments, and under the Plan will receive payment equal to five (5) months' salary from the Consolidated Debtors, which payment shall be in satisfaction of such severance obligations. Further, prior to the Effective Date, the Debtors will negotiate employment or consulting contracts with any current employees necessary to wind down the Debtors' Estates, with such contracts to be reasonably acceptable to the Committee.

15. Claims Administration

The Bar Dates for creditors to file proofs of claim have passed. The Debtors have received over 1132 proofs of claim. Approximately 190 of these were filed after the applicable Bar Dates. Many of the proofs of claims were grossly inflated, unsupported, or incorrectly asserted secured or priority status. The Debtors' schedules listed approximately $555 million in claims, although a significant portion of these amounts were disputed. The Debtors subsequently received proofs of claim amounting to more than $2.7 billion.

The Debtors have made substantial progress in reviewing, evaluating, and objecting, where appropriate, to the numerous claims filed against their estates. The large majority of these

objections have been either sustained by the Court or consensually resolved. The Debtors have been working on resolving and liquidating the numerous unliquidated claims filed by various investment vehicles for contractual claims relating to the mortgages sold to those investment vehicles by the Debtors. Twenty-one omnibus claims objections have been filed, along with various other objections to specific claims. Further, many claims have been resolved consensually without the need for objection. Out of the approximately 1132 proofs of claim filed, almost 727 have been Allowed in reduced amounts, reclassified, expunged, or withdrawn pursuant to agreements or orders entered by the Court. In addition, objections remain pending to almost 260 claims, and various other settlements are still expected to be finalized and submitted to the Court for approval. So far, over $2.5 billion in Claims have been either disallowed by the Court, subjected to disallowance by pending claim objections filed by the Debtors, or subjected to disallowance pursuant to agreements reached by the Debtors, including the agreements embodied in the Plan. The Debtors estimate that the ultimate pool of allowed unsecured claims against the Consolidated Debtors will be between $104 million to $107 million, and that the ultimate pool of allowed unsecured claims against Consolidated Holdco will be around $82 million, including the claims that will be granted in favor of the REIT and the Trust Preferred Indenture Trustee if the Plan is confirmed.

Among the major Claims settlements in this case are three settlements of class actions brought by former employees alleging violations of California, New Jersey, and federal Worker Adjustment and Retraining Notification Acts and violations of California wage and hour laws. These settlements have been either approved by the Court or presented to the Court for approval. Further, the Plan includes settlements of the major unresolved Claims in these Cases, including the Claims of the REIT, the Claims of the Trust Preferred Holders and Trust Preferred Indenture Trustee, the Claims of Citigroup, and the Claims of the Lone Star Entities.

Generally speaking, the Debtors have been settling Claims that are relatively indisputable—such as WARN Act claims, lease rejection claims, or trade claims—for the dollar amounts that are appropriate under applicable law. For Claims that are less capable of being easily determined—such as repurchase claims, class wage-and-hour claims, and litigation claims—the Debtors have been able to negotiate significant reductions, especially where those Claims as filed were inflated or unliquidated.

Based on the notices of transfer of Claims filed with the Court, it appears that there are several claims traders who have been actively buying Claims in these Bankruptcy Cases.

16. <u>Preference Claims</u>

The Debtors, their advisors, the Committee and its advisors, have also begun the process of investigation whether any payments made by the Debtors prior to the commencement of these cases are avoidable under Chapter 5 of the Bankruptcy Code. The Debtors have presented the Committee with a high-level initial analysis of potential avoidable payments; however, the Debtors have not completed that analysis and are working with the Committee's financial advisors to do so.

Pursuant to Section 546 of the Bankruptcy Code, the Debtors must commence any action to avoid such pre-Petition Date payments on or before two (2) years after the Petition Date, *i.e.*, April 30, 2011. Given this upcoming statute of limitations, the Debtors will endeavor to either commence such avoidance actions or enter into tolling agreements with such creditors that received the payments so as to preserve these claims for the benefit of creditors (unless the Debtors and the Committee agree that such actions should not be brought).

17.   REIT Adversary

The Committee commenced the REIT Adversary to, in part, disallow or significantly to reduce the REIT's large asserted Claims against all of the Debtors. The holders of the Trust Preferred Securities and the Trust Preferred Indenture Trustee filed motions to intervene and/or obtain derivative standing to pursue the claims asserted in the REIT Adversary. The Committee filed oppositions to those motions, which are currently pending before the Bankruptcy Court. The REIT Adversary will be resolved by the Plan and related agreements, discussed below.

18.   Revised Plan and Disclosure Statement

As discussed above, after further negotiations between the Debtors, the Committee, the REIT, the REIT Committee, the Lone Star Entities, and the Trust Preferred Holders lead to a near-global settlement in December 2010, embodied in the *Plan Support Agreement and Term Sheet*, which is attached to this Disclosure Statement as *Exhibit C*. The Debtors modified the prior versions of the Plan and this Disclosure Statement to reflect the terms of this new agreement.

The Debtors also modified this Disclosure Statement to address certain issues raised by the informal comments and formal objections received to the prior disclosure statement and to the Third Amended Disclosure Statement, which was filed on February 24, 2011. Changes include:

- clarifying the classifications that will most likely apply to the Claims of borrowers, employees, and REIT shareholders,

- highlighting the release and exculpation provisions of this Disclosure Statement,

- providing more information about the post-confirmation existence of the Trust Preferred Indenture, and

- providing more information regarding the conduct of the Lone Star Entities with regard to the Debtors, the potential legal claims of the Debtors against the Lone Star Entities arising from this conduct, which this Plan proposes to settle, and the extensive negotiation and settlement processes leading to this settlement.

## V.   THE PLAN

**THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF**

THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE
READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED
DISCUSSION APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.

## A.     Classification and Treatment of Claims and Interests

The following sections describe more fully the classification and treatment of Claims and
Interests under the Plan.

### 1.     Unclassified Claims – Administrative Claims and Priority Tax Claims

(a)     Administrative Claims

Any Holder of an Allowed Administrative Claim shall receive the full amount of the
Holder's Allowed Administrative Claim in one Cash payment from the Consolidated Debtors, or
Consolidated Holdco, Liquidating Trustee, or Plan Administrator, as applicable, as part of the
Effective Date Distribution.  An Administrative Claim that is a Disputed Claim shall not receive
any distribution unless and until such Claim becomes an Allowed Administrative Claim.  Upon
the entry of a Final Order allowing an Administrative Claim, the Holder of that Claim shall
receive the full amount of such Claim in one Cash payment  from the Liquidating Trust, Plan
Administrator, Consolidated Debtors, or Consolidated Holdco, as applicable.  The Debtors,
Liquidating Trustee, or Plan Administrator, as applicable, may agree to less favorable treatment
of such Allowed Administrative Claim.  An Administrative Claim not filed prior to the
Administrative Claim Bar Date as provided in this Plan shall be deemed forever waived and
barred, the Holder thereof shall not be entitled to a distribution under the Plan, and the Debtors,
their Estates, the Plan Administrator, and the Liquidating Trustee shall have no obligation with
respect thereto.

With regard to fees and expenses owed by the Debtors in connection with services
provided by AP Services, LLC ("APS"), including those provided by the Chief Restructuring
Officer (collectively the "CRO Expenses"), since the Petition Date, such CRO Expenses shall be
paid pursuant to the terms of the *Order Under Bankruptcy Code Sections 105(a) and 363(B)*
*Authorizing the Retention and Employment of AP Services, LLC to Provide Interim Management*
*and Restructuring Services and Designating Meade Monger as Chief Restructuring Officer and*
*Michael Murphy as Chief Administrative Officer to the Debtors,* Nunc Pro Tunc *to the Petition*
*Date* entered by the Bankruptcy Court on or about July 2, 2009, Docket No. 282.

(b)     Professional Fee Claims

Professional Fees Claims need to be asserted on or before forty-five (45) days after the
Effective Date (the "Professional Fee Bar Date").  The Debtors or the Liquidating Trustee will
pay or cause to be paid an Allowed Professional Fee Claim, in Cash, within the later of (i) five
(5) days after the conditions specified in Section 3.1(b) of the Plan are satisfied, or (ii) five (5)
days after the entry of a Final Order allowing such Allowed Professional Fee Claims.

Any party in interest, including the Liquidating Trustee, but excluding the Plan Administrator, may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes and as provided under the Plan, except that the Lone Star Entities, the Trust Preferred Indenture Trustee, and the Trust Preferred Holders waive their right to object to or challenge the allowance or award of any Professional Fee Claims. Entities holding Professional Fee Claims that do not timely file and serve a fee application will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, the Plan Administrator, or their respective property.

Consolidated Holdco shall make the Consolidated Holdco Professional Fee Claim Payment in the amount of $2 Million ($2,000,000) to the Consolidated Debtors, which shall fully satisfy Consolidated Holdco's liabilities for Professional Fee Claims and CRO Expenses. Consolidated Holdco shall not be entitled to any refund of the Professional Fee Claim Payment based on any reductions or disallowance of such Claims. All Professional Fee Claims and CRO Expenses will be paid by the Consolidated Debtors or the Liquidating Trustee.

The proposed allocation of CRO Expenses and Professional Fee Claims amongst the different Debtors is based on an analysis performed by AP Services of the tasks performed by those professionals and the estates benefitting from such tasks. This allocation is something of an estimate. Many of these professional services benefitted all of the Debtors' estates, rendering a more precise allocation impossible. The fixing of the Consolidated Holdco Professional Fee Claim Payment at $2 Million was also part of the settlement compromise reached among the parties to the Plan Support Agreement and Term Sheet.

(c)     Priority Tax Claims

Any Holder of an Allowed Priority Tax Claim shall receive the full amount of the Holder's Allowed Priority Tax Claim in one Cash payment from Consolidated Holdco or the Consolidated Debtors, as applicable, as part of the Effective Date Distribution. A Priority Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Priority Tax Claim. Upon the entry of a Final Order allowing an Priority Tax Claim after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from Consolidated Holdco or the Liquidating Trust, as applicable, except as otherwise provided under Section 3.3 of the Plan. The applicable Liquidating Trustee, Plan Administrator, or Debtor and the Holder of an Allowed Priority Tax Claim may agree to less favorable treatment of such Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, it will be classified as a Class 1 Secured Claim.

(d)     IRS Priority Tax Claim

The Holder of the IRS Priority Tax Claim shall be paid in full from the Tax Refunds, and the IRS Priority Claim will be considered an obligation of the Consolidated Debtors or the Liquidating Trust. For the avoidance of doubt, the "protective" administrative priority claims filed by the IRS, including Claim No. 1123 in the approximate amount of $54 million, are

Disputed Claims pending resolution of issues relating to the Debtors' Amended 2008 Tax Return.

> 2. Treatment of Classes of Claims against and Interests in Consolidated Holdco

Class 1 H - Secured Claims: Class 1 H Secured Claims are unimpaired. Any Holder of a Class 1 H Allowed Secured Claim shall, at the sole option of Consolidated Holdco, receive (a) the full amount of the Holder's Class 1 H Allowed Secured Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1 H Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 1 H Allowed Secured Claim. Upon the entry of a Final Order allowing the Class 1 H Allowed Secured Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall, at the sole option of the Plan Administrator, receive (a) the full amount of such Claim in one Cash payment from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated, at the sole option of the Plan Administrator. The Plan Administrator or Debtor and the Holder of a Class 1 H Allowed Secured Claim may agree to less favorable treatment of such Class 1 H Allowed Secured Claim.

**BECAUSE CLASS 1 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 2 H - Priority Claims, other than Priority Tax Claims: Class 2 H Priority Claims are unimpaired. Subject to §§ 3.1 and 3.2 of the Plan, any Holder of a Class 2 H Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2 H Allowed Priority Non-Tax Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco. A Class 2 H Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2 H Allowed Priority Non-Tax Claim. Upon the entry of a Final Order allowing the Class 2 H Allowed Priority Non-Tax Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from Consolidated Holdco. The Plan Administrator or Debtor and the Holder of a Class 2 H Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2 H Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 3 H - General Unsecured Claims against Consolidated Holdco Accepting the Creditor Release: The Class 3 H Claims are impaired. Class 3 H consists of Allowed Unsecured Claims against Consolidated Holdco whose Holders cast a timely Ballot affirmatively accepting

and agreeing to the Creditor Release or provide written consent for to the Creditor Release to Consolidated Holdco. Subject to §§ 3.1 and 3.2 of the Plan, Holders of Class 3 H Allowed Claims shall receive distributions equal to their Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 3 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 3 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 3 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Plan Administrator in his sole discretion may make an Interim Distribution to the Holder of such Allowed Claim from the reserve established for such Disputed Claim, with the balance of the reserve, if any, held for such Disputed Claim to be released from the reserve and made part of Consolidated Holdco Assets available for general distribution under the Plan. The Holders of Class 3 H Allowed Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from Consolidated Holdco.

In the event Class 3 H votes in favor of the Plan, the payment of Class 5 H Claims will be subordinated and junior to the payment of Class 3 H Claims, any distributions that would have been made to Holders of Allowed Class 5 H Claims shall instead be made to Holders of Class 3 H Claims and Class 6 H Claims (if Class 6 H also votes to in favor of the Plan) on a Pro Rata Basis, and Holders of Allowed Class 5 H Claims shall not receive any distribution until Class 3 H Claims (and possibly Classes 6H and 9H claims) are paid in full under the Plan, and all subrogation rights of Class 5 H shall be deemed waived and released. In calculating, for a Holder of an Allowed Class 3 H Claim, its Pro Rata Share of the distribution to which Holders of Class 5 H Claim would be entitled, the Plan Administrator or Consolidated Holder, as applicable shall aggregate the total amount of the Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

**BECAUSE CLASS 3 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 3 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN**.

<u>Class 4 H - General Unsecured Claims against Consolidated Holdco, except for separately classified Claims</u>. The Class 4 H Claims <u>are</u> impaired. Class 4 H consists of Allowed Unsecured Claims against Consolidated Holdco that are not separately classified under the Plan. Subject to §§ 3.1 and 3.2 of the Plan, Holders of Class 4 H Allowed Claims shall receive distributions equal to their Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 4 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 4 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 4 H Allowed Claims shall be

entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Plan Administrator in his sole discretion may make an Interim Distribution to the Holder of such Allowed Claim from the reserve established for such Disputed Claim, with the balance of the reserve, if any, held for such Disputed Claim to be released from the reserve and made part of Consolidated Holdco Assets available for general distribution under the Plan. The Holders of Class 4 H Allowed Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from Consolidated Holdco.

For the avoidance of doubt, Holders of Allowed Class 4 H Claims opting out of the Creditor Release shall not be entitled to receive any distributions that would have been made to Holders of Allowed Class 5 H Claims.

**BECAUSE CLASS 4 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 5 H - Unsecured Claims Against Consolidated Holdco held by LSF-MRA, LLC</u>: The Class 5 H Claims <u>are</u> impaired. Class 5 H is the Allowed Claim of LSF-MRA, LLC in the amount of $96,764,904.97. Subject to the provisions of §§ 3.1, 3.2, 4.3, 4.5 and 4.6 of the Plan, Holders of Allowed Class 5 H Claims shall receive a Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 5 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 5 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 5 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

Notwithstanding the foregoing, in the event Class 3 H votes in favor of the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of Class 3 H Claims, and Holders of Allowed Class 5 H Claims shall not receive any distribution until Holders of Allowed Class 3 H Claims are paid in full or paid as otherwise provided under the Plan, and such distributions shall be treated and distributed as provided under this Plan.

In the event Class 6 H votes in favor of the Plan and does not object to the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of Class 6 H Claims and Holders of Allowed Class 5 H Claims shall not receive any distribution until Holders of Class 6 H Claims (and potentially Class 3 H and Class 9 H Claims) are paid in full under the Plan, and such distributions shall be treated and distributed as provided under this Plan and all subrogation rights of Class 5 H Claims shall be deemed waived and released. In calculating, for a Holder of an Allowed Class 3 H or Allowed Class 6 H Claim, its Pro Rata Share of the Distribution to which Holders of Class 5 H Claims would be entitled, the Plan

Administrator or Consolidated Holdco, as applicable, shall aggregate the total amount of Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

The Holders of Class 5 H Claims shall be deemed to have waived any rights of subrogation with respect to the subordination of their Class 5 H Claims.

**BECAUSE CLASS 5 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 6 H - Unsecured Claims Held by the REIT</u>:  The Class 6 H Claim <u>is</u> impaired.  The Class 6 H Claim of the REIT shall be fixed and Allowed as an Unsecured Claim against Consolidated Holdco in the amount of Twenty Million Dollars ($20,000,000) and, on account of such Claim, the Holder of the Allowed Class 6 H Claim shall receive a Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date.  In calculating the distribution to the Holder of Class 6 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H.  Until the Holder of the Class 6 H Claim is satisfied in full, without any post-petition interest thereon, the Holder of the Class 6 Claim shall be entitled to receive its Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.  The Holder of Allowed Class 6 H Claims will waive its right to enforce any subordination provisions relating to Class 8 H Claims.

In  the event Class 6 H votes in favor of the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of the Class 6 H Claim, any distributions that would have been made to Holders of Allowed Class 5 H Claims shall instead be made to Holder of the Class 6 H Claim (and Class 3 H Claims (if Class 3 H also votes to in favor of the Plan) and Class 9 H Claims) on a Pro Rata Basis, and Class 5 H Claims shall not receive any distribution until Class 3 H, Class 6 H, and Class 9 H Claims are paid in full under the Plan.  In calculating, for a Holder of an Allowed Class 6 H Claim, its Pro Rata Share of the Distribution to which Holders of Class 5 H Claims would be entitled, the Plan Administrator or Consolidated Holdco, as applicable, shall aggregate the total amount of Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

The REIT is expected to receive increased recoveries if the Plan is confirmed with this voluntary subordination by the Lone Star Entities and payment of other creditors by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Holders of Class 6 H Claims are estimated to recover between  63.7% and 86.5% of their Claims under the Plan, as opposed to 2.1% to 14.3% in liquidation.

**BECAUSE THE CLASS 6 H CLAIM <u>IS</u> IMPAIRED UNDER THE PLAN, THE HOLDER OF THE CLASS 6 H CLAIM <u>IS</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN**.

<u>Class 7 H - Convenience Class Claims</u>: The Class 7 H Claims <u>are</u> impaired.  Each Holder of an Allowed Consolidated Holdco Convenience Claim in Class 7 H shall receive the lesser of

(a) sixty-five percent (65%) of the Holder's Allowed Class 7 H Convenience Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco or (b) their Pro Rata Share of One Million Five Hundred Thousand Dollars ($1,500,000), or such other, less favorable treatment as is agreed upon by Consolidated Holdco and the Holder of such Consolidated Holdco Convenience Claim. Any Holder of an Allowed General Unsecured Claim against Consolidated Holdco, other than Claims in Class 4 H, 5 H, 6 H, 8 H, and 9 H, may make the Consolidated Holdco Convenience Class Election. Such election must be made on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

Holders of Class 7 H Claims will recover 65% of their Claims under the Plan, as opposed to estimated returns of 63.7% to 86.5% for Holders of Claims in Class 3 H. However, these recoveries are not guaranteed and will be paid over a period of months or years. In contrast, Class 7 H Claims will be paid a guaranteed 65% of such Claims on the Effective Date. Any Holder of a Class 7 H Claim may opt in to Class 3 H or 4 H on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

**BECAUSE CLASS 7 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 7 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 8 H - Claims against Consolidated Holdco relating to Accredited Preferred Securities Trust I</u>: The Class 8 H Claims <u>are</u> impaired. Class 8 H consists of Allowed Claims against Holdco that relate to the Trust Preferred Securities, Trust Preferred Notes, the Trust Preferred Guarantee, and the Trust Preferred Note Claims, Claims held or asserted or that could be asserted by the Trust Preferred Holders or other Person, and Claims held or asserted or that could be asserted by the Trust Preferred Indenture Trustee. The Claims of Holders of Allowed Class 8 H Claims shall be fixed and Allowed as a single Unsecured Claim in favor of the Trust Preferred Indenture Trustee against Consolidated Holdco, and shall be deemed fully satisfied and paid in full by the Lone Star Trust Preferred Settlement Payment and the Trust Preferred Holdco Distributions to the Trust Preferred Indenture Trustee.

**BECAUSE CLASS 8 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 8 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 9 H - REIT Preferred Holders' Subordinated Guaranty Claims</u>: The Class 9 H Claims <u>are</u> impaired. Unless otherwise agreed to by the Committee and the REIT Committee, on the Effective Date (i) the Holders of Allowed Class 9 H Claims shall not be entitled to receive any direct distributions from Consolidated Holdco until all Holders of Allowed Claims in Classes 3 H, 4 H, and 6 H have been paid in full as provided under the Plan prior to the Consolidated Holdco Assets being fully administered, and (ii) the Holders of Allowed Class 9 H Claims shall not be entitled to any reports or notices from Consolidated Holdco or the Plan Administrator, until the Plan Administrator determines that such holders are likely to receive a direct distribution. If the Holders of Class 3 H, 4 H, and 6 H Claims are not paid in full as provided under the Plan, or if the Consolidated Holdco Assets are fully administered prior to the

time when such senior unsecured Claims are paid in full, then the Holders of Allowed Class 9 H Claims shall not receive any distribution under the Plan.

In the event the Plan Administrator determines that the Holders of Class 9 H Claims are likely to receive a direct distribution, the Plan Administrator shall seek an order of the Bankruptcy Court setting a bar date for the filing of proofs of Subordinated Guaranty Claims by REIT Preferred Security Holders. Such proofs of Subordinated Guaranty Claims shall contain a Creditor Release provision pursuant to which REIT Preferred Security Holders may opt out of the Creditor Release.

After the Holders of Class 3 H, 4 H, and 6 H Claims are paid in full as provided under the Plan prior to the full administration of the Consolidated Holdco Assets, the Holders of Allowed Class 9 H Claims shall receive a Pro Rata Share of any Subsequent Distributions made after such time, and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

The payment of Class 5 H Claims will be subordinated and junior to payments Holders of Class 9 H Claims who do not opt out of the Creditor Release. Any distributions that would have been made on a Pro Rata basis to Holders Class 5 H Claims shall instead be made to such Holders of Class 9 H Claims who do not opt out of the Creditor Release, and Class 5 H Claims shall not receive any distribution until such Class 9 H Claims are paid in full under the Plan.

In the event the REIT Committee shall advise the Debtors in writing not later than five (5) days before the Confirmation Hearing of their request to transfer title to the common stock of the REIT Pro Rata to the REIT Preferred Security Holders and the Debtors and the Committee consent to such request, Holdco shall abandon and transfer title to the common stock of the REIT Pro Rata to the REIT Preferred Shareholders.

**BECAUSE CLASS 9 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 10 H - Subordinated Claims against Holdco (including Late Filed Claims): The Class 10 H Claims are impaired. Class 10 H consists of Claims against Consolidated Holdco that are not separately classified and are subordinated for any reason under § 510 of the Bankruptcy Code, or are Late Filed Claims. Holders of Class 10 H Claims shall not receive any distributions until the Holders of Class 3 H, 4 H, 5 H, 6 H, and 9 H Claims against Consolidated Holdco have been satisfied, without any post-petition interest thereon, as provided under the Plan, in which event the holders of Class 10 H Claims shall receive their Pro Rata Share of Subsequent Distributions and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

**BECAUSE CLASS 10 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 10 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 11 H- Interests in Consolidated Holdco:  The Class 11 H Claims are impaired. Class 11 H consists of the Interests in Consolidated Holdco, including those Interests held by the Lone Star Entities.  All Interests, including those Interests held by the Lone Star Entities, shall be canceled after the Effective Date and in accordance with the terms of the Plan, and the Holders thereof shall receive no distribution under the Plan, unless Holders of all Class 9 H and 10 H Claims against Consolidated Holdco are satisfied, without any post-petition interest thereon, as provided under the Plan, in which event the holders of Class 11 H Interests shall receive their Pro Rata Share of Subsequent Distributions and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

**BECAUSE CLASS 11 H INTERESTS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 11 H INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

3.    Treatment of Classes of Claims against and Interests in the Consolidated Debtors

Class 1 C - Secured Claims against the Consolidated Debtors: Class 1 C Secured Claims are unimpaired.  Any Holder of a Class 1 C Allowed Secured Claim shall, at the sole option of the Consolidated Debtors, receive (a) the full amount of the Holder's Allowed Class 1 C Secured Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated.  A Class 1 C Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Class 1 C Secured Claim.  Upon the entry of a Final Order allowing the Allowed Class 1 C Secured Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall, at the sole option of the Liquidating Trustee, receive (a) the full amount of such Claim in one Cash payment from the Liquidating Trust, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) the reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim, subject to the requirements of § 1124(2) of the Bankruptcy Code.  The Liquidating Trustee or Consolidated Debtors and the Holder of an Allowed Class 1 C Secured Claim may agree to less favorable treatment of such Allowed Class 1 C Secured Claim.

**BECAUSE CLASS 1 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 2 C - Priority Claims, other than Priority Tax Claims, against the Consolidated Debtors:  The Class 2C Claims are unimpaired.  Any Holder of a Class 2C Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2C Allowed Priority Non-Tax Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors.  A Class 2C Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2C Allowed Priority Non-Tax Claim.

Upon the entry of a Final Order allowing the Class 2C Allowed Priority Non-Tax Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from the Liquidating Trust. The Liquidating Trustee or Debtor and the Holder of a Class 2C Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2C Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 3 C - General Unsecured Claims against the Consolidated Debtors Accepting the Creditor Release</u>: The Class 3 C Claims <u>are</u> impaired. Class 3 C consists of Allowed Unsecured Claims against the Consolidated Debtors whose Holders cast a timely Ballot affirmatively accepting and agreeing to the Creditor Release. Holders of Allowed Class 3 C and 4 C Claims shall be entitled to receive a Pro Rata Share of interests in the Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of the Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust in accordance with the Liquidating Trust Agreement and the Plan, and continuing on the dates of Subsequent Distributions, equal to their Pro Rata Share of any Subsequent Distributions of Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust, as provided under the Plan.

In addition to the distributions described above, Holders of Allowed Class 3 C General Unsecured Claims as of the Effective Date shall be entitled to receive a Pro Rata Share of the Lone Star Creditor Release Settlement Payment subject to the terms of this Plan. The Liquidating Trustee and the Disbursing Agent shall hold and distribute the Lone Star Creditor Release Settlement Payment pursuant to the terms of this Plan..

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Holder of the subject Claim shall receive its Pro Rata Share of interests in the Liquidating Trust, and the Liquidating Trustee, in his sole discretion, may make an Interim Distribution to the Holder of such Allowed Claim from the Liquidating Trust Reserve, or may release funds from the Liquidating Trust Reserve to such Holder in a Subsequent Distribution. The Holders of Allowed Class 3 C Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from the Liquidating Trust.

Upon full administration of the Assets vested in the Liquidating Trust, the Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Liquidating Trustee to the Holders of Allowed Class 3 C Claims shall be satisfied. In the event that the Holders of Allowed Class 3 C Claims are paid in full, without any post-petition interest, any funds remaining in the Liquidating Trust Account, net of expenses, shall be distributed first to the Holders of the Allowed Class 4 C Claims and then to the Holder of the Allowed Class 7 C Claim in accordance with the provisions of the Plan.

The Lone Star Entities have agreed to waive the right to receive distributions on their Claims and provide the Lone Star Creditor Release Settlement Payment to Holders of Class 3 C and 6 C Claims if the Plan is confirmed. Thus, Class 3 C Claims are expected to receive

increased recoveries if the Plan is confirmed—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Holders of Class 3 C Claims are estimated to recover between 98.3% and 100% of their Claims under the Plan, as opposed to 27% to 45.9% in liquidation.

**BECAUSE CLASS 3 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 3 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 4 C - General Unsecured Claims against the Consolidated Debtors, except for separately classified Claims</u>:  The Class 4 C Claims are impaired.  Class 4 C consists of Allowed Unsecured Claims against the Consolidated Debtors that are not separately classified under this Plan. Holders of Allowed Class 3 C and 4 C Claims shall be entitled to receive a Pro Rata Share of interests in the Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of the Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust in accordance with the Liquidating Trust Agreement, and continuing on each Subsequent Distribution Date, equal to their Pro Rata Share of any Subsequent Distributions of Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust.

For the avoidance of doubt, Holders of Allowed Class 4 C Claims  shall not be entitled to receive any distributions from the Lone Star Consolidated Creditor Release Payment because such Holders are not accepting the Creditor Release.  The Debtors estimate that Holders of Allowed Unsecured Claims against the Consolidated Debtors who elect for treatment in Class 3 C will receive an <u>additional 15%</u> of their Claims through distributions from the Lone Star Consolidated Debtors Creditor Release Payment**. Holders of Allowed Unsecured Claims against the Consolidated Debtors must cast a proper and timely Ballot electing for treatment in either Class 3 C or Class 6 C to receive distributions from the Lone Star Consolidated Debtors Creditor Release Payment.**

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Holder of the subject Claim shall receive its Pro Rata Share of interests in the Liquidating Trust, and the Liquidating Trustee, in his sole discretion, may make an Interim Distribution to the Holder of such Allowed Claim from the Liquidating Trust Reserve, or may release funds from the Liquidating Trust Reserve to such Holder in a Subsequent Distribution. The Holders of Allowed Class 4 C Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from the Liquidating Trust.

Upon full administration of the Assets vested in the Liquidating Trust, the Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Liquidating Trustee to the Holders of Allowed Class 4 C Claims shall be satisfied.  In the event that the Holders of Allowed Class 4C Claims are paid in full, without any post-petition interest thereon, any funds remaining in the Liquidating Trust Account, net of expenses, shall be distributed to the Holders of Allowed Class 7 C Claims in accordance with the provisions of the Plan.

**BECAUSE CLASS 4 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 5 C - Unsecured Claims Against the Consolidated Debtors held by the Lone Star Entities</u>: The Class 5 C Claims <u>are</u> impaired. The Claims of the Lone Star Entities shall be waived and released and shall receive no distributions under this Plan.

**BECAUSE CLASS 5 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 6 C - Consolidated Debtors Convenience Class Claims</u>: The Class 6 C Claims are impaired. On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Consolidated Debtor Convenience Claim in Class 6 C shall receive seventy-five percent (75%) of the Holder's Allowed Class 6 C Convenience Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors, or such other less favorable treatment as is agreed upon by the Consolidated Debtors and the Holder of such Allowed Consolidated Debtor Convenience Claim.

Any Holder of an Allowed General Unsecured Claim against the Consolidated Debtors, other than Claims in Class 5 C, 7 C, and 8 C, may make the Consolidated Debtors Convenience Class Election. Such election, which requires the acceptance of the Creditor Release, must be made on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

Holders of Class 6 C Claims will recover 75% of their Claims under the Plan, as opposed to estimated returns of 98.3% to 100% for Holders of Claims in Class 3 C. However, these recoveries are not guaranteed and will be paid over a period of months or years. In contrast, Class 6 C Claims will be paid a guaranteed 75% of such Claims on the Effective Date. Any Holder of a Class 6 C Claim may opt in to Class 3 C or 4 C on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

**BECAUSE CLASS 6 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 6 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 7 C - REIT Junior Claim</u>. The Class 7 C Claims are impaired. Class 7 C consists of the REIT Junior Claim, which is Allowed as a Class 7 C Claim in the fixed amount of Fifteen Million Dollars ($15,000,000) held by the REIT. The Holder of the Allowed Class 7 C Claims shall receive its Pro Rata Share of interests in the Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

Pursuant to the terms of the Plan, the Class 7 C Claim is subordinated and junior to the Class 3 C, 4 C, and 6 C Claims, and the Holder of the Class 7 C Claim will not receive any distributions until all Allowed Claims in Classes 3 and 4 C are paid in full, without any interest thereon, as provided under the Plan, and the Holders of Class 6 C Claims receive the distribution

they are entitled to receive under the Plan, in which event the holder of the Class 7 C Claim shall receive its Pro Rata Share of any Subsequent Distributions made by the Liquidating Trustee after such time, and its Pro Rata Share of the Liquidating Trust Residual Assets, as applicable.

**BECAUSE CLASS 7 C CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 7 C CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 8 C - Subordinated Claims against the Consolidated Debtors (including Late Filed Claims:  The The Class 8 C Claims are impaired.  Class 8 C consists of Subordinated Claims against the Consolidated Debtors, including Late Filed Claims.  Holders of Class 8 C Subordinated Claims shall receive no distribution under the Plan unless the Holders of Allowed Class 3 C, 4 C and 7 C Claims are paid in full as provided under the Plan and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 8 C Claims shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

**BECAUSE CLASS 8 C CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 8 C CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 9 C - Claims against Consolidated Debtors relating to Accredited Preferred Securities Trust I.  The Class 9 C Claims are impaired.  Class 9 C consists of Allowed Claims against the Consolidated Debtors that relate to the Trust Preferred Securities, Trust Preferred Notes, Trust Preferred Guarantee, and the Trust Preferred Note Claims.  All such Claims are reduced, fixed, and Allowed as a Class 9 C Claim in the amount of Five Million Dollars ($5,000,000) held by the Trust Preferred Indenture Trustee (the "Trust Preferred Junior Claims").  Holders of Allowed Class 9 C Claims shall receive their Pro Rata Share of interests in the Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

Pursuant to the terms of the Plan, the Class 9 C Claims are subordinated and junior to the Class 3 C, 4 C, 6 C 7 C and 8 C Claims, and Holders of Class 9 C Claims will not receive any distributions until all Claims in Classes 3 C, 4 C, 7 C, and 8 C are paid in full and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 9 C Claims shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

**BECAUSE CLASS 9 C CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 C CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 10 C - Interests in the Consolidated Debtors.  The Class 10 C Interests are impaired.  Class 10 C consists of the Interests in the Consolidated Debtors.  All Interests shall be

canceled after the Effective Date and the Holders thereof shall receive no distribution under the Plan, unless Holders of all Class 9 C Allowed Subordinated Claims against the Consolidated Debtors are paid in full with interest and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 10 C Interests shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

**BECAUSE CLASS 10 C INTERESTS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTIONS UNDER THE PLAN, THE HOLDERS OF CLASS 10 C INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

4. <u>Intercompany Claims</u>

(a) Inter-Debtor Waivers

By virtue of the compromises and settlement of the issues set forth in the Plan, on the Effective Date, (i) AHL Canada shall pay and satisfy the Claims of the Consolidated Debtors against AHL Canada, and, after giving effect to such payments, (ii) each Debtor shall waive any defense, including, without limitation, defenses arising under §§ 502(d) and 553(a) of the Bankruptcy Code, to Intercompany Claims asserted by another Debtor and such Claims shall be deemed Allowed Claims, (iii) Intercompany Claims between Debtors shall be deemed to be mutual claims arising prior to the Petition Date for purposes of setoff, (iv) except as provided in Section 3.1 of the Plan, each Debtor shall waive its right to receive any distribution on any Claims and Causes of Action such Debtor may have against another Debtor, and (v) except as provided in Section 3.1 of the Plan, each Debtor shall waive and forever release any right, Claim, or Cause of Action which has been or could have been asserted by such Debtor against any other Debtor.

(b) Non-Debtor Subsidiary Waivers

By virtue of the compromises and settlement of the issues set forth in the Plan and except as otherwise provided in this Plan, on the Effective Date, (i) AHL Canada shall pay and satisfy the claims of the Consolidated Debtors against AHL Canada, and, after giving effect to such payments, (ii) each Non-Debtor Subsidiary shall waive any defense, including, without limitation, defenses arising under §§ 502(d) and 553(a) of the Bankruptcy Code, to Intercompany Claims asserted by another Debtor or Non-Debtor Subsidiary against any Debtor and such Claims shall be deemed Allowed Claims, (iii) Intercompany Claims between Debtors and Non-Debtor Subsidiaries shall be deemed to be mutual claims arising prior to the Petition Date for purposes of setoff, (iv) each Non-Debtor Subsidiary, shall waive its right to receive any distribution on any Claims and Causes of Action such Non-Debtor Subsidiary may have against any Debtor, (v) except as provided in this Section 6.2 of the Plan, each Non-Debtor Subsidiary, except REIT, shall waive and forever release any right, Claim or Cause of Action which has been or could have been asserted by such Non-Debtor Subsidiary against any Debtor, and (vi) each Debtor shall waive its right to receive any distribution on any Claims and Causes of Action such

Debtor may have against any Non-Debtor Subsidiary, provided, however, that AHL Canada shall pay all amounts owing to the Consolidated Debtors on the Effective Date. Notwithstanding anything contained in this section to the contrary, the REIT shall have the allowed claims against the Debtors specified in Section 8.2 of the Plan and shall be entitled to distributions thereon as set forth in the Plan.

(c)      Asset Allocation

The allocation of certain Assets is an integral component of the comprehensive compromise and settlement concerning Intercompany Claims and intra-Debtor issues as determined in light of a number of facts, including, but not limited to, (i) respective legal claims, rights and entitlements of the Debtors, (ii) validity and enforceability of Intercompany Claims, (iii) Intercompany Claims not reflected as inter-company payables or receivables in the Debtors' books and records, (iv) relative value of Assets under administration in each Debtor, (v) Intercompany Claims for contribution or reimbursement, (vi) the necessity of resolving inter-Estate and inter-Debtor issues and disputes through the Plan, and (vii) administration and liquidation of Trust Assets unfettered or effected by inter-Estate or inter-Debtor conflicts of interest or multiple claims.

## B.      Convenience Classes

As discussed above, Holders of Consolidated Debtor Convenience Claims will be paid 75% of their Allowed Claims in full in Cash upon the Effective Date, and Holders of Consolidated Holdco Convenience Claims will be paid 65% of their Allowed Claims in full in Cash upon the Effective Date. The ultimate returns to Holders of Unsecured Claims against the Consolidated Debtors are expected to be higher than 75%, and the ultimate returns to Holders or Unsecured Claims against Consolidated Holdco may be higher than 65%. However, such recoveries are not guaranteed, and will be made over a period of months or years after the Effective Date. Thus, the Debtors believe that the treatment of the Convenience Claims proposed under the Plan is more favorable than the treatment proposed for holders of general Unsecured Claims. Further, any Holder of a Claim may opt out of the Convenience Class.

In exchange for this favorable Convenience Class treatment, such Holders will not be entitled to receive any further distributions. Holders of Allowed Claims against Consolidated Holdco must agree to reduce their Claims to $1,000,000 (if such Claims are greater than $1,000,000), vote to accept the Plan, and consent to the Creditor Release in order to receive this favorable treatment. Holders of Allowed Claims against the Consolidated Debtors must agree to reduce their Claims to $25,000 (if such Claims are greater than $25,000), vote to accept the Plan, and consent to the creditor release in order to receive this favorable treatment.

Eligible Creditors will have the opportunity to elect for Convenience Class treatment, or opt out of the Convenience Class, on the Ballot they receive as part of the process of voting upon the Plan.

## C.     Allowance and Disallowance of Claims and Interests

No distribution shall be made with respect to any Disputed Claim, even if a portion of the Claim is not disputed, until the entire Claim is resolved by a Final Order. At such time as a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive the Cash and/or other distributions to which such Holder is then entitled to under the Plan, but in no event prior to the later of (i) the Distribution Date, (ii) the date that an order regarding such Claim becomes a Final Order, or (iii) in accordance therewith when assets become available for distribution to the Holder of such Claim under the Plan.

The Liquidating Trustee or Plan Administrator shall file objections to Claims or Interests within one hundred eight (180) days of the Effective Date. The Liquidating Trustee or Plan Administrator may obtain an extension of this date by filing a motion in the Bankruptcy Court, based upon a showing of "cause." Once a Claim or Interest becomes an Allowed Claim or Interest, it will receive the treatment afforded by this Plan.

The deadline for filing with the Bankruptcy Court any and all Claims against the Debtor, other than Administrative Claims and Claims arising from the assumption or rejection of any executory contract or unexpired lease pursuant to the Plan, was October 6, 2009. Any such Claim that was not filed prior to that time, except as otherwise set forth in the Plan or order entered by the Court, is forever barred and shall be conclusively deemed discharged and disallowed for purposes of voting on this Plan or receiving any distributions hereunder.

## D.     Subordination of Late Filed Claims.

A Late Filed Claim is any Claim that was not filed prior to the applicable Bar Date, Rejection Claim Bar Date, Administrative Claim Bar Date, or Professional Fee Claim Bar Date, except for those Claims that are Allowed as timely under this Plan or under a Final Order entered by the Bankruptcy Court (which includes REIT Preferred Security Holder Subordinated Guaranty Claims). The Bar Date for filing Claims against the Debtors has passed, other than Administrative Claims, Professional Fee Claims, REIT Preferred Security Holder Subordinated Guaranty Claims, and Claims arising from the assumption or rejection of any executory contract or unexpired lease pursuant to this Plan. Late Filed Claims are automatically treated as Subordinated Claims, unless and until the Court enters an Final Order allowing or approving a stipulation allowing a Late Filed Claim, or the Plan allows such Claims..

## E.     Subordination and Subrogation Rights and Claims of Subordination and Subrogation

Pursuant to § 510(a) of the Bankruptcy Code, except as otherwise agreed to by a creditor, Class of creditors, or as otherwise provided under the Plan, nothing in this Plan is intended to affect the terms or enforceability of any subordination or subrogation agreement entered into prior to the Effective Date by any creditor or group of creditors in favor of any other creditors of the Debtors in respect of any obligations owing by the Debtors; provided, however, that any disagreement with the priorities or distributions set forth in the Plan shall be raised prior to, ahead of and decided at the hearing on confirmation of the Plan; that, absent any timely

objections or challenges, such priorities and distributions (including the waiver or subordination and subrogation) shall be deemed binding on such creditors and Classes of creditors; and, that if the decisions of the Bankruptcy Court relating to confirmation of the Plan differ from the priorities or treatment under the Plan, then all issues with respect to contractual subrogation and subordination shall be governed pursuant to such decision. To the extent that the priorities set forth in the Plan conflict with the contractual subordination and subrogation provisions of any Holders of Class of Claims, the Plan shall govern and control.

## F. Deemed Consent

By submitting a Ballot or receiving a Distribution under or any benefit pursuant to the Plan and not electing to withhold consent as provided under the Plan prior to the Confirmation Date, or by order of the Bankruptcy Court, each Holder of a Claim or Interest shall be deemed to have specifically consented to the terms of the Plan, including the releases and treatment contained in the Plan.

## G. Liquidating Trust

### 1. Appointment of Liquidating Trustee

(a)     On or before the Plan Supplement Filing Date, the Liquidating Trustee shall be selected by the Committee and be reasonably acceptable to the Debtors and REIT; provided, however, that none of the Lone Star Entities, the Trust Preferred Holders, the Trust Preferred Indenture Trustee, or their Affiliates, officers, directors, or employees shall serve as Liquidating Trustee. Prior to the Confirmation Date, the Person(s) designated as Liquidating Trustee shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the person so designated shall become the Liquidating Trustee of the Liquidating Trust on the Effective Date.

(b)     The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidating Trust Agreement and the Plan.

(c)     The Liquidating Trustee shall be deemed a party in interest and have standing to seek disgorgement or challenge or object to the allowance or payment of Professionals under any interim or final fee application and with respect to challenging any Claims for substantial contribution made under § 503(b) of the Bankruptcy Code or similar claims.

(d)     The Liquidating Trustee shall be the Disbursing Agent as provided under the Plan.

### 2. Funding of the Liquidating Trust

The Liquidating Trust shall consist of the Liquidating Trust Assets. The Liquidating Trust will be funded initially by a contribution to the Liquidating Trust Account by the Consolidated Debtors equal to their Effective Date Balance less any payments made to the Holders of Allowed Administrative Claims, Holders of Allowed Secured Claims, Holders of Allowed Priority Claims, Holders of Allowed Priority Tax Claims, and Holders of Allowed

Convenience Claims against the Consolidated Debtors on the Effective Date. The Liquidating Trust shall subsequently be funded from the other Proceeds of Consolidated Debtors Assets.

### 3. Lone Star Creditor Release Settlement Payment

Prior to or on the Effective Date, in the event that the Plan is confirmed, the Lone Star Entities shall cause the Lone Star Creditor Release Settlement Payment to be delivered to the Consolidated Debtors. The Consolidated Debtors shall use the Lone Star Creditor Release Settlement Payment to provide Holders of Allowed Class 3 C Claims with their Pro Rata Share of the Lone Star Creditor Release Settlement Payment, and then shall transfer the remainder of the Lone Star Creditor Release Settlement Payment to the Liquidating Trustee, who shall hold the Lone Star Creditor Release Settlement payment in trust in a segregated account for the benefit of Holders of Allowed Class 3 C Claims. If necessary, the Lone Star Creditor Release Settlement Payment shall be used by the Consolidated Debtors on the Effective Date or by the Liquidating Trustee or the Disbursing Agent subsequent to the Effective Date to pay Allowed Administrative Claims against the Consolidated Debtors, provided that, prior to making any Subsequent Distributions to any Unsecured Claims, the Liquidating Trustee shall fully repay any amounts used to pay Allowed Administrative Claims to the Lone Star Creditor Release Settlement Payment with Liquidating Trust Assets as funds become available. The Liquidating Trustee or Disbursing Agent shall hold the remaining Lone Star Creditor Release Settlement Payment in a segregated account in trust for the benefit of the remaining Holders of Class 3 C Claims. The Liquidating Trustee or Disbursing Agent shall use the remaining Lone Star Creditor Release Settlement Payment to fund Subsequent Distributions, in the same manner as set forth in this Plan, to Holders of Allowed Class 3 C Claims, with Holders of Allowed Class 3 C Claims continuing to receive their Pro Rata Share of the remaining Lone Star Creditor Release Settlement Payment. When the remaining Lone Star Creditor Release Settlement Payment is equal to or less than $200,000, it shall be transferred to the Liquidating Trust and deemed a Liquidating Trust Asset.

### 4. Lone Star Consolidated Debtors Settlement Payment.

On or before the Effective Date, one or more of the Lone Star Entities, other than LSF MRA, LLC, shall pay the Lone Star Consolidated Debtors Settlement Payment, which is a $150,000 payment in Cash., to the Consolidated Debtors.

### 5. Transfer of Liquidating Trust Assets to the Liquidating Trust

On the Effective Date, the Debtors shall transfer and shall be deemed to have irrevocably transferred the Liquidating Trust Assets to the Liquidating Trust, for payment of Claims as provided in this Plan, and, after payment of such Claims, on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors.

The Liquidating Trust Assets include, but are not limited to, (a) any Tax Refunds received by the Debtors, Consolidated Holdco, or the Plan Administrator, or any other Person, and any rights to receive any Tax Refunds, whether contingent, disputed, or unliquidated, and any proceeds of any Tax Refunds, shall be vested in the Liquidating Trust and shall be paid or

transferred to the Liquidating Trust, except for the first payments from the Tax Refunds, not to exceed Two Million Dollars ($2,000,000), which are designated in the Plan for the Trust Preferred Holdco Distributions, (b) the Trust Preferred Common Securities shall be transferred by Consolidated Holdco to the Liquidating Trust, and (c) all rights and interests in the Deferred Compensation Settlement shall be transferred to the Liquidating Trust.

      6.   <u>The Liquidating Trust</u>

      (a)   Without any further action of the directors or shareholders of the Debtors, on the Effective Date, the Liquidating Trust Agreement for the Liquidating Trust, substantially in the form included in the Plan Supplement, shall become effective. On or before the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take such other necessary steps to establish the Liquidating Trust. The Liquidating Trustee shall accept the Liquidating Trust Assets and sign the Liquidating Trust Agreement on the Effective Date and the Liquidating Trust will then be deemed created and effective.

      (b)   The Liquidating Trustee shall have full authority to take any steps necessary to administer the Liquidating Trust Assets and the Lone Star Creditor Release Settlement Payment, as applicable, including, without limitation, the duty and obligation to liquidate Liquidating Trust Assets, and to pursue and settle any other trust claims, subject to the approval of the Liquidating Trust Advisory Board and the procedures in the Liquidating Trust Agreement. Upon such transfer (which, as stated above, shall occur on the Effective Date), the Debtors and their Estates shall have no other rights or obligations with respect to the Liquidating Trusts.

      (c)   All Liquidating Trust Expenses shall be the responsibility of and paid by the Liquidating Trust from the Liquidating Trust Assets. Liquidating Trust Expenses may not exceed Two Million Dollars ($2,000,000), except pursuant to an order from the Bankruptcy Court approving an increase in this limit, which order may be obtained by the Liquidating Trustee with the consent of the Liquidating Trust Advisory Board and a showing of cause for such increase to the Bankruptcy Court.

      (d)   The Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraiser, auctioneers or other professionals as it may deem necessary (collectively, the "Liquidating Trustee Professionals"), in his sole discretion, and at the sole expense of the Liquidating Trust, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Liquidating Trust Assets and the Lone Star Creditor Release Settlement Payment, as applicable.

      (e)   The Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their interests in the Liquidating Trust, on a periodic basis, and at least once per year, all unrestricted Cash on hand (including any Cash received from the applicable Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 9.6(e)), except such amounts (i) as have been reserved on account of Disputed Claims, or are otherwise part of the claims reserve established by the Liquidating Trustee, (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) as are necessary to pay reasonable incurred or anticipated expenses

(including, but not limited to, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iv) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a distribution pursuant to this Section 9.6(e) if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Liquidating Trustee; and provided further that nothing in this Plan shall compel the Liquidating Trustee to treat any tentative Tax Refund(s) obtained pursuant to Tax Code Section 6411 as unrestricted Cash until completion of the associated audit by the relevant authorities.

(f)     For federal tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation Section 301.7701-4  and that the trust beneficiaries will be treated as grantors and deemed owners of the trust.  Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Liquidating Trust Assets and then contributed such interests to the Liquidating Trust.  The Liquidating Trust Agreement shall (i) state that the sole purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business and (ii) contain a fixed or determinable termination date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose.  Each such extension must be approved by the Bankruptcy Court within six (6) months before the beginning of the extended term..

(g)     The Liquidating Trustee shall be responsible for filing all federal, state and local tax returns for the Liquidating Trust.  The Liquidating Trustee shall file all federal tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4. The Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(h)     On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good-faith valuation of the Tax Refunds as of the Effective Date.  As soon as practical after the Effective Date, the Liquidating Trustee shall determine the fair market value, as of the Effective Date, of  all other Liquidating Trust Assets, and shall make all such values (including the Tax Refunds value) available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

(i)     The Liquidating Trustee shall have full and exclusive authority and responsibility with respect to all Tax Refunds to the same extent as if the Liquidating Trustee were the same entity, as applicable, the Consolidated Debtors, Consolidated Holdco, debtors, or debtors-in-possession, including the filing of tax returns (including amended tax returns), or requests for refunds for one or more of the Debtors.  Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Liquidating Trustee to correspond with any tax authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer the Tax Refunds, tax payments and tax returns.   The Consolidated Debtors (and the Liquidating Trustee, as assignee) shall be entitled to the Tax Refunds, other than the entitlement to a portion of the Tax Refunds from the Amended 2008 Tax Returns designated in this Plan for the Trust Preferred Holdco Distributions.  For the avoidance of doubt, Consolidated Holdco hereby waives and relinquishes any right or interest to the Tax Refunds and the Tax Refunds shall be and is hereby deemed assets and property of the Consolidated Debtors, other than the entitlement of that portion of Tax Refunds from the Amended 2008 Tax Returns designated in this Plan for the Trust Preferred Holdco Distributions.

(j)     Payments and Distributions on Disputed Claims:

(i)     From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Bankruptcy Court, the Liquidating Trustee shall retain, for the benefit of each holder of a Disputed Claim, interests in the Liquidating Trust and any dividends, gains or income attributable thereto, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee.   Any interest in the Liquidating Trust Interests retained and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in interests in the Liquidating Trust in the event the Disputed Claim ultimately becomes an Allowed Claim.  Such dividends, gains or income paid on account of the interests in the Liquidating Trust (if any) retained for the benefit of holders of Disputed Claims shall be retained by the Liquidating Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.

(ii)    At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together

with any earnings that has accrued on the amount of interests in the Liquidating Trust Interests so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, but in no event later than the next Subsequent Distribution date. The balance of any interests in the Liquidating Trust previously retained but not distributed to a Disputed Claim holder shall be included in future calculations of Cash, and interests in the Liquidating Trust, respectively, to holders of Allowed Claims.

(iii)     Tax Treatment of Retained Assets. The Liquidating Trustee shall treat any Assets retained pursuant to this Section 9.4 as part of the Liquidating Trust Claims Reserve.

7.     Limitation of Liability for Liquidating Trustee

Upon the Effective Date and execution of the Liquidating Trust, the Liquidating Trustee as trustee of the Liquidating Trust, and not personally, shall be vested in all right, title and interest in all Liquidating Trust Assets, and shall have all rights to enforce orders of the Bankruptcy Court entered in this Bankruptcy Proceeding. The Liquidating Trustee shall liquidate the Liquidating Trust Assets and distribute the proceeds thereof in accordance with this Plan and the Liquidating Trust Agreement.

8.     The Liquidating Trust Advisory Board

(a)     The Liquidating Trust Advisory Boards shall be comprised of up to three (3) members selected by the Committee, who shall be reasonably acceptable to the Consolidated Debtors and the REIT; provided, however, that none of the Lone Star Releasees, the Trust Preferred Holders, or the Trust Preferred Indenture Trustee, or their Affiliates, officers, directors or employees shall serve on either of the Liquidating Trust Advisory Board. Written notice of the identities of such members shall be filed with the Bankruptcy Court by the Plan Supplement Filing Date. The Liquidating Trust Advisory Board shall adopt such by-laws as it may deem appropriate. In the event written notice is not filed prior to the Plan Supplement Filing Date, there will be no Liquidating Trust Advisory Board, and compliance with the reporting, consulting and consent requirements under the Plan shall not be required and such terms shall be removed or deemed removed from the Trust Agreement and Plan. The Liquidating Trustee shall consult regularly with the Liquidating Trust Advisory Board when carrying out the purpose and intent of the Liquidating Trust. Members of the Liquidating Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Liquidating Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the Liquidating Trust Advisory Board shall be payable by the Liquidating Trust.

(b)     The Liquidating Trust Advisory Board shall advise and approve the material actions of the Liquidating Trustee and have the right and duties as more particularly set forth in

the Liquidating Trust Agreements, including, but not limited to, (a) authorize the Liquidating Trustee to commence, continue to prosecute or abandon any Causes of Action; (b) approve the settlement or compromise of any Cause of Action if the amount sought to be recovered in the complaint or other pleadings or documents initiating, evidencing, or stating such Cause of Action exceeds $1,000,000; (c) approve the sale, assignment, or other conveyance or abandonment of any Liquidating Trust Asset for an amount exceeding $1,000,000 or that has a value in excess of $1,000,000; (d) approve the allowance of any Disputed Claim, if the asserted amount of such Claim exceeds $250,000; (e) consult upon and approve all matters concern the Tax Refunds, (f) review, contest, or challenge to fees and expenses of the Liquidating Trustee and its professionals, and (g) approve any increase in the budget for Liquidating Trust Expenses.

(c)     In the case of an inability or unwillingness of any member of the Liquidating Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Liquidating Trust Advisory Board.  If the Liquidating Trust Advisory Board has only one member and any position on the Liquidating Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filed within fifteen (15) days thereafter by the designation of the Liquidating Trustee without the requirement of a vote by the other members of the Liquidating Trust Advisory Board.

(d)     Upon the certification by the Liquidating Trustee that all Liquidating Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the Liquidating Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(e)     The Liquidating Trust Advisory Board, in its discretion, may remove the Liquidating Trustee by majority vote.  In the event the requisite approval is not obtained, the Liquidating Trustee may be removed by the Bankruptcy Court for cause shown.  In the event of the resignation or removal of the  Liquidating Trustee, the Liquidating Trust Advisory Board shall, by majority vote, designate a person to serve as successor Liquidating Trustee.  In the event the Liquidating Trust Advisory Board does not designate a person to serve as successor Liquidating Trustee, the Bankruptcy Court shall make such selection.

(f)     Notwithstanding anything to the contrary in this Plan, neither the Liquidating Trust Advisory Board nor any of its members, designees, or any duly designated agent or representative of any such party shall be liable for the act, default or misconduct of any other member of the Liquidating Trust Advisory Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct.  The Liquidating Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions.  If the Liquidating Trust Advisory Board determines not to consult with its counsel, accountants or other professionals, that fact alone shall not be deemed to impose any liability on the Liquidating Trust Advisory Board, or its members and/or designees.

(g)     To the extent the Liquidating Trust Advisory Board adopts by-laws, no provisions of such by-laws shall supersede any express provision of the Plan.

9.    Transferability

The Debtors shall cause the interests in the Liquidating Trust to be non-transferrable and any such transfer shall be disregarded by the applicable Liquidating Trustee except with respect to a transfer by will or under laws of descent and distribution; provided, however, such transfer will not be effective until and unless the Liquidating Trustee receives written notice of such transfer under the law of descent and distribution.

10.    Final Administration of Liquidating Trusts

Upon the earlier of (i) payment in full of the Holders of Class 7 C Claims, or (ii) full administration of the Assets vested in the Liquidating Trust, and the satisfaction as far as possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee, shall: (i) terminate the Liquidating Trust, notwithstanding any applicable law, solely by filing written notice of termination with the Bankruptcy Court and providing such notice to the Beneficiaries and the United States Trustee; (ii) as soon as practicable after termination of the Liquidating Trust, provide to the United States Trustee, and file with the Bankruptcy Court, a final account and report of Liquidating Trust administration; and (iii) thereupon distribute the Liquidating Trust Residual Assets and be forever discharged of and released from all power, duties, and responsibilities arising under the Liquidating Trust Agreement and the Plan or relating to the Debtors or their Estates. Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating the Liquidating Trust Assets and distributing the proceeds thereof to the Beneficiaries in accordance with the Liquidating Trust Agreement and the Plan, and in no event shall the Liquidating Trust continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

**H.    Consolidated Holdco Plan Administrator.**

1.    Appointment of Plan Administrator

On or before the Plan Supplement Filing Date, the Plan Administrator shall be selected by the REIT and the Committee; provided, however, that none of the Lone Star Entities, Trust Preferred Holders, or Trust Preferred Indenture Trustee, or their Affiliates, officers, directors or employees shall serve as Plan Administrator. Prior to the Confirmation Date, the Person(s) designated as Plan Administrator shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the Person so designated shall become the Plan Administrator and be deemed sole director and officer of the Consolidated Holdco entities on the Effective Date, and shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan Administrator Retention Agreement.

2.    Authority of Plan Administrator & Plan Administration Agreement

The Plan Administrator shall have full authority to take any steps necessary to administer and distribute the Consolidated Holdco Assets, including, without limitation, the duty and obligation to liquidate Consolidated Holdco Assets, and to pursue and settle any other Estate

claims and Causes of Action constituting Consolidated Holdco Assets and as provided under the Plan Administration Agreement. Without further action of the directors or shareholders of Consolidated Holdco, on the Effective Date, the Plan Administration Agreement, substantially in the form included in the Plan Supplement, shall become effective.

3.     <u>Plan Administration Expenses</u>

The Consolidated Holdco Plan Administration Expenses shall be the responsibility of and paid by Consolidated Holdco from Consolidated Holdco Assets.

4.     <u>Plan Administrator Professionals</u>

The Plan Administrator may retain professionals, in its sole discretion, and at the sole expense of Consolidated Holdco, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Consolidated Holdco Assets.

5.     <u>Consolidated Holdco Tax Returns</u>

Except as provided in the Plan, the Plan Administrator shall be responsible for filing all federal, state and local tax returns for Consolidated Holdco.

6.     <u>Consolidated Holdco Distributions.</u>

Upon the Effective Date, the Cash of Consolidated Holdco (excluding any Cash belonging to the Consolidated Debtors, including, but not limited to the Tax Refunds and the Lone Star Consolidated Debtors Settlement Payment), including the Lone Star Trust Preferred Settlement Payment, shall be used to make (i) payment of or reserve for the Consolidated Holdco Professional Fee Claim Payment in an amount not to exceed Two Million Dollars ($2,000,000) combined, (ii) an appropriate reserve for Consolidated Holdco Plan Administration Expenses not to exceed One Million Dollars ($1,000,000) (unless after the Effective Date some other amount is agreed upon by the REIT, the Lone Star Entities, and the Plan Administrator), (iii) distributions to Holders of Class 7 H Consolidated Holdco Convenience Claims (including the Viera Claims against Holdco) in an amount not to exceed One Million Five Hundred Thousand Dollars ($1,500,000), and (iv) reserves, in an amount, not to exceed One Million Dollars ($1,000,000), for other Claims against Consolidated Holdco (if any) as provided under the Plan. The balance of the Cash of Consolidated Holdco, including the Lone Star Trust Preferred Settlement Payment, shall be distributed Pro Rata (after adjusting for the Lone Star Trust Preferred Settlement Payment to the Trust Preferred Indenture Trustee as if it were part of such distribution) on account of (a) the Allowed Class 8 H Claim of the Trust Preferred Indenture Trustee (not to exceed a total distribution upon such Claim, including the Lone Star Trust Preferred Settlement Payment, of $40 million), and (b) the Allowed Class 6 H Claim of the REIT, provided that REIT First Distribution shall not exceed Nine Million Dollars ($9,000,000) unless the Allowed Class 8 H Claim of the Trust Preferred Indenture Trustee has received distributions equal to or greater than Forty Million Dollars ($40,000,000) (including the Lone Star Trust Preferred Settlement Payment).

7. <u>Trust Preferred Holdco Distributions Shortfall.</u>

To the extent that the aggregate amount of the Trust Preferred Holdco Distributions plus the Lone Star Trust Preferred Settlement Payment is less than $40 million, such shortfall shall be paid to the Trust Preferred Indenture Trustee on the Effective Date from the following sources in the following priority (x) first, from any amount by which the REIT First Distribution would otherwise exceed Nine Million Dollars ($9,000,000), (y) next, to the extent of any remaining shortfall up to a maximum amount of Eight Million Dollars ($8,000,000), 50% from the Lone Star Advance (not to exceed Four Million Dollars ($4,000,000)), and 50% from the REIT First Distribution (not to exceed Four Million Dollars ($4,000,000)), and (z) thereafter, to the extent of any remaining shortfall, from the REIT First Distribution.

8. <u>Consolidated Holdco Priority Administrative Claims.</u>

From and after the Effective Date, and after the payment of or funding of (i) the Consolidated Holdco Reserves, (ii) the Lone Star Trust Preferred Settlement Payment and the first $10,000,000 of the Trust Preferred Holdco Distributions to the Trust Preferred Indenture Trustee, (iii) the REIT First Distribution, and (iv) other payments due under the Plan, any funds collected by the Plan Administrator from any source constituting Consolidated Holdco Assets shall be distributed on a monthly basis in the following order and priority:  (a) first, to the REIT on account of any unpaid portion of the REIT First Distribution, if any, until paid in full; (b) next, 50% to the Lone Star Entities that funded the Lone Star Advance to repay the Lone Star Advance until it is repaid in full, and 50% to Holders of Allowed Class 3 H, 4 H, and 6 H Claims, which shall be divided on a Pro Rata basis amongst such Holders; and (c) once the Lone Star Advance has been repaid in full, to Holders of Allowed Class 3 H, 4 H, and 6 H Claims, which shall be divided on a Pro Rata basis amongst such Holders until such Claims have been paid in full; and (d) the balance, if any, shall be used in accordance with the terms of this Plan. Subject to the distribution priorities set forth above, including the payment of or reserve for the Consolidated Holdco Reserves, the claims for (a) repayment of the Lone Star Advance, and (b) payment of the unpaid deficiency from the REIT First Distribution shall be entitled to an Administrative Claim against the Consolidated Holdco Distributable Cash under § 503 of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code.

9. <u>Final Administration of Consolidated Holdco Assets</u>

Upon full administration of the Consolidated Holdco Assets, and the satisfaction as far as possible of all remaining liabilities of Consolidated Holdco, in accordance with the Plan, the Plan Administrator, shall: (i) dissolve and terminate Consolidated Holdco, notwithstanding any applicable law, solely by filing written notice of termination with the Bankruptcy Court and providing such notice to the Holders of Allowed Claims against Consolidated Holdco and the United States Trustee; (ii) as soon as practicable after termination and dissolution of Consolidated Holdco, provide to the United States Trustee, and file with the Bankruptcy Court, a final account and report of the administration of the Consolidated Holdco Assets; and (iii) thereupon distribute the Consolidated Holdco Residual Assets and be forever discharged of and released from all power, duties and responsibilities arising under the Plan or relating to the

Debtors or their Estates. Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the purpose of liquidating the Consolidated Holdco Assets and distributing the proceeds thereof to the creditors of Consolidated Holdco in accordance the Plan, and in no event shall Consolidated Holdco continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

## I. Global Settlement and Compromise of Disputes

The Plan is deemed to be a motion pursuant to §§ 363, 502, and 1123 of the Bankruptcy Code and Fed. R. Bankr. P 9019 to approve the settlements provided for in § 8.2 of the Plan between and among the Debtors, their major creditor constituencies, including the Trust Preferred Holders and the Trust Preferred Indenture Trustee, the REIT, the REIT Committee, and the Lone Star Entities. Upon the occurrence of the Effective Date, the Plan Support Agreement and Term Sheet shall be deemed superseded by the confirmed Plan and Confirmation Order and shall have no further force or effect.

     1. <u>Terms of the Global Settlement.</u>

     (a) <u>REIT Adversary Settlement</u>. Prior to the Bar Date, the REIT Committee filed on behalf of the REIT proofs of claim against all the Debtors asserting unsecured claims in the amount of at least $227 Million, which claims have been contested by the Committee in the REIT Adversary. The Confirmation Order shall include approval of the settlement of the REIT Adversary, and, upon the Effective Date, the REIT Adversary shall be dismissed or withdrawn with prejudice and the REIT shall have as Allowed Claims: (1) an Allowed Unsecured Claim against the Consolidated Debtors in the amount of $37.5 Million, which Claim shall be included in and receive the treatment provided for in Class 3 C; (2) the REIT Junior Claim in the amount of $15 Million in Class 7 C; which Claim shall be included in and receive the treatment provided for in Class 7 C; and (3) an Allowed Unsecured Claim against Consolidated Holdco in the amount of $20 Million in Class 6 H, which Claim shall receive the treatment provided under the Plan, including the REIT First Distribution. The REIT Committee shall continue to have the right to file a Claim for its substantial contribution in these proceedings pursuant to § 503(b) of the Bankruptcy Code, which application shall be provided to the Debtors and the Committee prior to filing for review. Nothing contained in the Plan shall prohibit any party-in-interest from filing an objection to such Claim. To the extent the Claims of the REIT, or any Claims asserted by other Persons on behalf of the REIT, against the Debtors, the Estates, and the Assets of the Debtors, are not otherwise Allowed under the Plan, such Claims are disallowed, expunged, and released.

Absent the proposed settlement of the REIT Adversary Proceeding, the estates would be required to continue to finance the Committee's prosecution of its litigation efforts to subordinate and otherwise contest the allowance of the claims asserted on behalf of the REIT. Due to the risks inherent in litigation, the parties to the Plan Support Agreement and Term Sheet have concluded that the REIT Adversary Proceeding should be settled. The Debtors believe that the proposed settlement of the REIT Adversary Proceeding is in the best interests of the Estates.

(b)　__Citigroup Settlement__.  Citigroup Global Markets Realty Corp. filed a proof of claim against the AHL, Inc. alleging claims and damages in excess of $43 million arising from the sale of mortgage loans to it by AHL, Inc., including, but not limited to, claims for breach of contract, fraud, unjust enrichment and indemnification.  The Confirmation Order shall include approval of the settlement of the Claims of Citigroup, and, upon the Effective Date, Citigroup shall have an Allowed Unsecured Claim against Debtor AHL in the amount of $12.1 Million, which Claim shall be classified as an Allowed Class 3 C Claim.  Citigroup shall continue to have the right to file a Claim for its substantial contribution in these proceedings pursuant to § 503(b) of the Bankruptcy Code which Application shall be provided to Debtors and the Committee prior to filing for review.  Nothing contained in the Plan shall prohibit any party-in-interest from filing an objection to such Claim.  Except as to its Claim under § 503(b) of the Bankruptcy Code, Citigroup shall not have the right to otherwise amend their Proof of Claim or file or assert any new Claims against the Debtors and the Claims of Citigroup and its affiliates against the Debtors that are not otherwise Allowed under this Plan, such Claims are disallowed, released, and expunged.

(c)　__Trust Preferred Settlement__.  The Confirmation Order shall include approval of the settlement of the Claims relating to the Trust Preferred Securities, Trust Preferred Notes, the Trust Preferred Guarantee, and the Trust Preferred Note Claims (which includes any claims that have been or could be asserted by the Trust Preferred Holders or the Trust Preferred Indenture Trustee), and, upon the Effective Date, all such Claims against Consolidated Holdco, whether direct, indirect, or derivative, including any claims by the Trust Preferred Indenture Trustee for compensation and indemnity under the Trust Preferred Indenture, Trust Declaration, and Trust Preferred Guarantee shall be deemed satisfied and paid in full by the Lone Star Trust Preferred Settlement Payment and the Trust Preferred Holdco Distributions, all such Claims against the Consolidated Debtors, whether direct, indirect, or derivative, shall be reduced, consolidated, subordinated, and Allowed as a Class 9 C Claim in the amount of Five Million Dollars ($5,000,000) held by the Trust Preferred Indenture Trustee.　Accordingly, upon the Effective Date, all scheduled claims and proofs of claim held by Wells Fargo Bank, N.A., in its capacity as Indenture Trustee and Property Trustee, Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., and/or JP Morgan Funding LLC will be satisfied, discharged, and expunged in accordance with this Global Settlement and the Plan.  Further, the Trust Preferred Adversary Proceeding shall be dismissed or withdrawn, with prejudice.  Further, the Trust Preferred Indenture Trustee and the Trust Preferred Holders waive any right, claim, or entitlement to seek reimbursement of any fees and expenses incurred in connection with these Chapter 11 Cases from the Debtors or their Estates (including the Liquidating Trustee or Plan Administrator) under § 503(b) of the Bankruptcy Code or any other applicable section of the Bankruptcy Code or applicable law.

(d)　__Lone Star Settlement__.  Provided that less than 25% in amount of the Allowed Unsecured Claims against the Consolidated Debtors eligible to vote on the Plan as of the Confirmation Date elect treatment as Class 4 C Creditors (rather than Class 3 C Creditors) and to withhold releases of direct and personal claims under the Plan:

(i)　one or more of the Lone Star Entities (other than LSF MRA, LLC) shall make the Lone Star Creditor Release Settlement Payment to the Consolidated Debtors on or before the Effective Date;

(ii)    one or more of the Lone Star Entities (other than LSF MRA, LLC) shall make the Lone Star Advance to Consolidated Holdco on or before the Effective Date;

(iii)    one or more of the Lone Star Entities (other than LSF MRA, LLC) shall pay the Lone Star Consolidated Debtors Settlement Payment to the Consolidated Debtors on or before the Effective Date;

(iv)    one or more of the Lone Star Entities (other than LSF MRA, LLC), their insurers, and the Debtors' insurers under the D&O Policies shall make their respective portion of the Lone Star Trust Preferred Settlement Payment, as provided under the Trust Preferred Indenture and related documents, to the Trust Preferred Indenture Trustee on behalf of the Trust Preferred Holders in satisfaction of the Claims of the Trust Preferred Indenture Trustee, the Trust Preferred Holders or any other Person holding a Claim arising under or related, directly or indirectly, to the Trust Preferred Indenture and related documents against Holdco (including any claims that have been asserted or could be asserted by the Trust Preferred Indenture Trustee or the Trust Preferred Holders) as provided under the Plan;

(v)    the Lone Star Entities and their Affiliates shall be deemed to have waived, for purposes of the Plan and receiving distributions under the Plan, either directly or indirectly, all Claims against the Consolidated Debtors or their respective properties, including those asserted in the Lone Star Proofs of Claim and all such Claims shall be expunged, discharged and released; and

(vi)    the Lone Star Entities and their Affiliates shall be deemed to have subordinated, for purposes of the Plan and receiving distributions hereunder, all Claims asserted against Consolidated Holdco in favor of Classes 3 H and 6 H if those applicable Classes do not vote to reject the Plan, and potentially Class 9 H, to the extent such Claims of the Lone Star Entities are not disallowed, so that any distributions that would be made to the Lone Star Entities on account of Claims against Consolidated Holdco on a pro rata basis (the "Subordinated Distributions") will first be distributed in accordance with this Plan to such non-rejecting Classes, or, with respect to the Holders of Class 9 H Claims, to Holders who elect to provide the Creditor Release, until such Claims are paid in full (which Subordinated Distributions shall not be subject to disgorgement). The Plan Administrator shall distribute the Subordinate Distributions pursuant to the terms of the Plan and the Lone Star Entities and Affiliates have waived any rights of subrogation.

**(e)    Release of Settling Parties' Claims against the Lone Star Releasees.**

**Upon the Effective Date of the Plan, for good and valuable consideration, pursuant to the Plan, except as otherwise specifically provided for in the Plan, the Lone Star Releasees shall be released from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which any releasor identified below has or may have, or which have been asserted or could be asserted in the future, which are based upon, arise**

out of, or in any way relate to the Debtors or their business or operations (including the business or operations of the REIT and the other Non-Debtor Subsidiaries and any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law), by (i) the estates of the Consolidated Debtors and Consolidated Holdco, (ii) the non-debtor Affiliates of the Debtors, (iii) the REIT (subject to the carveout for certain insurance coverage claims set forth below), and (iv) the Committee.

(f)      <u>Release of Creditors' Claims against the Lone Star Releasees</u>.

Upon the Effective Date of the Plan, for good and valuable consideration, pursuant to the Plan, except as otherwise specifically provided for in the Plan, the Lone Star Releasees shall be released from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which any releasor identified below has or may have, or which have been asserted or could be asserted in the future, which are based upon, arise out of, or in any way relate to the Debtors or their business or operations (including the business or operations of the REIT and the other Non-Debtor Subsidiaries and any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law), by (i) individual creditors of the Consolidated Debtors in Class 3 C, (ii) individual creditors of Consolidated Holdco in Class 3 H, and, if applicable, Class 9 H, (iii) individual creditors making the Consolidated Debtors Convenience Class Election, and (iv) individual creditors making the Consolidated Holdco Convenience Class Election.

(g)      <u>Mutual Releases Amongst Settling Parties</u>.

Upon the Effective Date, for good and valuable consideration, each of the Trust Preferred Holders, the Trust Preferred Indenture Trustee, the REIT, the Lone Star Releasees, the Debtors, the Non-Debtor Subsidiaries, the Committee, members of the Committee acting in their capacity as such, the REIT Committee, the members of the REIT Committee acting in their capacity as such, and Citigroup, effective pursuant to the Confirmation Order, shall, except as otherwise specifically provided for in the Plan, grant a full and complete release to each of the Lone Star Releasees, the Trust Preferred Holders, the Trust Preferred Indenture Trustee, the REIT, the Debtors, the Non-Debtor Subsidiaries, the Committee, the members of the Committee acting in their capacity as such, the REIT Committee, the members of the REIT Committee acting in their capacity as such, and Citigroup and to their predecessor entities, Affiliates, successors and assigns and their respective professionals and advisors from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which the releasor has or may have, or which have been asserted or may be asserted in the future, that are based upon, arise out of, or in any way relate to the Debtors or their business or operations related to the Debtors and their businesses (including related to the REIT and any other Non-Debtor Subsidiaries and Affiliates of the Debtors and their business or operations and any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law), including

**without limitation any and all claims or causes of action that were set forth or could have been set forth in any complaint or pleading filed by any of the foregoing in the Trust Preferred Adversary Proceeding, the REIT Adversary Proceedings or elsewhere; provided, however, that nothing contained herein or therein shall release any releasor's rights and claims under this Plan or the Allowed Claims granted to it under the Plan.**

(h)     Notwithstanding any other provisions of the Plan, no current or former officer or director of any of the Lone Star Entities or of their Affiliates or subsidiaries or of the Debtors shall receive a release from the Debtors without providing (i) a mutual release to the Debtors and their estates, and (ii) a full release to the insurers set forth in Schedule B to the Plan Support Agreement and Term Sheet, the REIT and the other non-debtor subsidiaries of the Debtors for the matters released in the Plan, which for the convenience of the officers and directors shall be deemed granted as of the Effective Date of the Plan unless such officer or director objects on or prior to the hearing to consider confirmation of the Plan and a Final Order is entered sustaining such objection; provided, however, that restructuring advisors retained as officers of the Debtors pursuant to an order entered by the Bankruptcy Court shall retain any claims against the Insurers pursuant to any valid insurance policy.

(i)     Notwithstanding any other provisions of the Plan, the release of the Debtors' pre- and post-petition professionals and restructuring advisors retained or employed pursuant to §§ 363 and 327 of the Bankruptcy Code set forth in the Plan shall not include the release (i) of any claim for the avoidance of a preferential transfer under § 547 of the Bankruptcy Code, (ii) of any claim for the return of an unused retainer, or (iii) of any postpetition claim against a restructuring advisor employed under § 363 or an estate professional retained under § 327 and compensated under § 330 of the Bankruptcy Code (which restructuring advisors and retained professionals shall received the benefit of and the corresponding exclusion to the exculpation set forth in the Plan).

(j)     Notwithstanding any other provisions of the Plan, the foregoing releases shall not be construed to release any claims, rights or causes of action that any professional or restructuring advisor retained pre- or post-petition by the Debtors or their non-debtor Affiliates may have against its current or former employees.

(k)     Nothing in the Plan shall release any party from any of its obligations under the Plan.

(l)     Upon or after the Effective Date, the Liquidating Trustee, the Plan Administrator, and the parties to the Plan Support Agreement and Term Sheet will comply, without cost or expense to them, with any reasonable requests received from each other for written confirmation of the effectiveness of the releases as set forth herein.

(m)     The Consolidated Debtors, the Liquidating Trustee, Consolidated Holdco,. and the Holdco Plan Administrator shall agree and covenant not to make, assert or pursue any claim or commence any action or litigation against the Lone Star Releasees or the current and former directors and officers of the Debtors released as set forth herein or under or against the applicable D&O Policies; provided, however, that any release of current or former Directors and Officers of

the Debtors as set forth in the Plan shall also be conditioned on such officer or director granting a full release of claims against the Consolidated Debtors and their respective properties (including all claims under or that could be asserted under filed proofs of claim, which claims shall be deemed expunged and relinquished). Notwithstanding the foregoing, this provision will not limit, release or modify any Retained Advisor Indemnification Obligations or any rights of a restructuring advisor retained pursuant to an order of the Bankruptcy Court to coverage from an insurance policy of the Debtors for acts occurring during the period from the Petition Date through and including the Confirmation Date.

(n)     Each of these release provisions is an integral part of the Plan and is essential to its implementation. These release provisions shall be effective pursuant to the Confirmation Order, without any further action.

## J.     Means for Implementation of the Plan

### 1.     Substantive Consolidation

Substantive consolidation is an equitable remedy that the Bankruptcy Court may be asked to apply in cases that involve affiliated debtors. As contrasted with procedural consolidation, substantive consolidation may affect the substantive rights and obligations of creditors and debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the debtors in the substantively consolidated group; all of the debtors in that group are treated as if they were a single corporate and economic entity for purposes of the plan. The consolidated assets create a single fund from which all claims against each of the consolidated debtors is satisfied. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors and issues of corporate ownership of property and individual corporate liability on obligations are ignored. However, substantive consolidation does not affect the debtors' separate corporate existence or independent ownership of property for any purposes other than for making distributions of property under a plan of reorganization or otherwise as necessary to implement the plan.

The power to substantively consolidate interrelated bankruptcy estates arises from the general equitable powers of a Bankruptcy Court established in section 105(a) of the Bankruptcy Code. Within this framework, the principal factors to which courts have looked to determine the propriety of substantive consolidation include: (i) whether creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit, and (ii) whether the affairs of the debtors are so entangled that the consolidation will benefit all creditors of the debtors' estates. Additional factors to be considered include: (i) the presence or absence of consolidated financial statements; (ii) the existence of inter-company guaranties or loans; (iii) the unity of interest and ownership between the various corporate entities; (iv) the transfer of assets without formal observance of corporate formalities; (v) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (vi) common directors and/or officers shared by the parents, affiliates and subsidiaries; (vii) a parent or its affiliates financing one another; and (viii) commingling of assets and business functions.

The Plan provides for the Estates of AHL, Inc., Inzura Services, Inc., and Windsor Management Co., d/b/a AHL Foreclosure Services Co. to be substantively consolidated for purposes related to the Plan and any distributions made thereunder. The Plan also provides for the Estate of Accredited Home Lenders Holding Co. to be substantively consolidated with the Estate of its wholly-owned subsidiary, Vendor Management Services, L.L.C, d/b/a Inzura Settlement Services. As discussed above, Intercompany Claims amongst the Estates being consolidated shall be released, all Claims against any of the Estates being consolidated shall be deemed filed against the relevant consolidated Estate, which shall be deemed a single obligation of the relevant Estate, and the Estates shall be effectively treated as one entity for purposes of distribution. The Debtors believe that the substantive consolidation of these Estates in this manner will facilitate confirmation of the Plan, foster similarity and fairness of treatment of Holders of Claims of similar priority, and will not have a materially adverse impact upon the distributions to unsecured creditors.

2. Settlement Amongst the Estates

The allocation of certain Assets is an integral component of the comprehensive compromise and settlement concerning Intercompany Claims and intra-Debtor issues as determined in light of a number of facts, including, but not limited to, (i) respective legal claims, rights and entitlements of the Debtors, (ii) validity and enforceability of Intercompany Claims, (iii) Intercompany Claims not reflected as inter-company payables or receivables in the Debtors' books and records, (iv) relative value of Assets under administration in each Debtor, (v) Intercompany Claims for contribution or reimbursement, (vi) the necessity of resolving inter-Estate and inter-Debtor issues and disputes through the Plan, and (vii) administration and liquidation of Trust Assets unfettered or effected by inter-Estate or inter-Debtor conflicts of interest or multiple claims. As part of the process of settling the Intercompany Claims and intra-Debtor issues, AP Services performed an analysis of the administrative claims incurred by the Debtors on a project by project basis, the results of which have been factored into the proposed settlement among the estates.

In order to facilitate an orderly wind down of these estates, the Debtors have agreed to settle a number of disputes that may exist among the Debtors. Among the disputes that exist are the following:

- The potential cause of action between Holdco and AHL, Inc. relating to the transfer of ownership of AHL Canada from Holdco to AHL, Inc. and the transfer of ownership of the REIT from AHL, Inc. and Holdco;

- Intercompany Claims between AHL, Inc. and Holdco, including the scheduled Claim of Holdco against AHL, Inc.;

- A potential dispute among the Debtors over the ownership of the Tax Refunds;

- A potential dispute over the allocation of professional fees and administrative expenses among the various Debtors.

The general terms of the settlement set forth in the Plan include the following:

- The interests of AHL, Inc. in AHL Canada, the subsidiaries thereof, and the proceeds therefrom shall be transferred to Consolidated Holdco, and AHL Canada shall repay its obligations to AHL, Inc. By unwinding this transfer without litigation, AHL Canada's assets, which have an estimated undiscounted value of $25 to $30 million, will be distributed to the Consolidated Holdco Creditors;

- All Cash held by Vendor Management Services, Inc. will be transferred to Consolidated Holdco;

- The Consolidated Debtors shall be responsible for payment of Professional Fee Administrative Claims and CRO fees and expenses after receiving a $2 Million contribution from Consolidated Holdco;

- Any Tax Refunds received by the Debtors, any rights to receive any Tax Refunds, whether contingent, disputed, or unliquidated, and any proceeds of any Tax Refunds, shall be vested in the Liquidating Trust and shall be paid to the Liquidating Trust in the same manner that such Tax Refunds would be paid to the Debtors or original taxpayers, and shall be distributed to the Consolidated Debtors' Creditors, except for the portion of the Tax Refunds designated in the Plan for the Trust Preferred Holdco Distributions;

- The Common Securities in the Accredited Preferred Securities Trust I shall be transferred by Holdco to the Consolidated Debtors;

- The equity interest in the REIT held by Holdco shall be abandoned or abandoned and transferred to the REIT Preferred Holders as provided for in the Plan; and

- All rights and interests in the First American Trust FSB Deferred Compensation Trust settlement payment shall be transferred to the Liquidating Trust.

Further, all intercompany claims between and among the Debtors shall be released.

3. <u>Injunction</u>

Since the Petition Date, the Debtors and their Assets have enjoyed the protection of the "automatic stay," a provision in section 362 of the Bankruptcy Code. The automatic stay prohibits, among other things, the commencement or continuation of a judicial, administrative, or other action or proceeding against the Debtors. The automatic stay also prohibits the enforcement of any judgment against the Debtors, any act to obtain possession of the Debtors' property or to exercise control over the Debtors' property, and any act to collect, assess, or recover a Claim against the Debtor. The automatic stay channels the Claims of Creditors through the bankruptcy process, thereby ensuring that equally-situated creditors receive equal treatment.

Under the Plan, the Court will enter an Injunction that will continue to provide the Debtors, the Liquidating Trust, the Liquidating Trustee, and their agents, successors, and assigns with the protections of the automatic stay until all distributions are made from the Liquidating Trust and the Bankruptcy Proceeding is closed.

However, this continuing Injunction shall not prohibit the commencement or continuation of any proceedings against the Debtors or real property in which the Debtors may have an interest, provided that those proceedings do not affect or give rise to any enforceable Claims against the Debtors, the Plan Administrator, the Liquidating Trust, the Liquidating Trustee, their respective agents, successors, and assigns, and their property. To the extent an un-stayed legal proceeding does give rise to a judgment, order, declaration, or claim that affects the Debtors, the Liquidating Trust, the Liquidating Trustee, the Plan Administrator their respective agents, successors, and assigns, and their property, such judgment, order, declaration, or claim shall be void.

This exception to the Injunction is designed to allow legal proceedings in which the Debtors must be included as nominal parties to continue as normal without further order of the Bankruptcy Court, while protecting the Assets of the Debtors and the Liquidating Trusts and ensuring that similarly-situated Claim Holders continue to receive equal treatment.

4.     United States Trustee Fees

On and after the Effective Date, all fees payable to the United States Trustee shall be paid as and when due by the Liquidating Trustee, which payments shall be considered a reasonable expense of the Liquidating Trust.

5.     Continued Cooperation

On or after the Effective Date, the Debtors, the Liquidating Trust, the Plan Administrator, the Liquidating Trustee, the Lone Star Releasees, the REIT, the REIT Committee, the Trust Preferred Indenture Trustee, and the Trust Preferred Holders shall provide each other with such reasonable cooperation to effectuate the provisions of the Plan as may be reasonably requested, including, but not limited to, executing such documents as might be reasonably requested to carry out the terms of the Plan.

6.     Consolidated Debtors' Continued Existence

From and after the Effective Date, the Consolidated Debtors shall remain in existence for the sole purpose of winding up the Debtors' businesses and transferring the Assets to the applicable Liquidating Trust and the Liquidating Trustee or its nominee shall be appointed officer and director of the Consolidated Debtors. Upon or before the completion of such liquidation, the Liquidating Trustee may file a certificate of dissolution as to each of the Consolidated Debtors. The Liquidating Trustee shall not be compelled to dissolve any Debtor if to do so would unduly burden the Liquidating Trust, notwithstanding any applicable law. On the Effective Date, the officers and the directors of the Debtors shall cease to serve and the Liquidating Trustee shall be deemed the sole director and officer of each Consolidated Debtor for all purposes. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Consolidated Holdco or Consolidated Debtors, shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order or rule. Without limiting the foregoing, from and after the Effective Date, Consolidated Holdco or the

Consolidated Debtors shall take any and all actions deemed necessary or appropriate to consummate the transactions under the Plan, and such Entities shall not require the affirmative vote of the Holders of Interests in order to take any corporate action.

7. Consolidated Holdco's Continued Existence

From and after the Effective Date, Consolidated Holdco shall remain in existence for the sole purpose of winding up the Debtors' businesses, liquidating Consolidated Holdco Assets, and making distributions in accordance with this Plan. Upon or before the completion of such liquidation, the Plan Administrator may file a certificate of dissolution as to each of the Consolidated Holdco entities. The Plan Administrator shall not be compelled to dissolve any Debtor if to do so would unduly burden Consolidated Holdco, notwithstanding any applicable law. On the Effective Date, the officers and the directors of the Consolidated Holdco shall cease to serve and the Plan Administrator shall be deemed the sole director and officer of each Consolidated Holdco entity for all purposes. On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Consolidated Debtors, shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order or rule. Without limiting the foregoing, from and after the Effective Date, Consolidated Holdco or the Consolidated Debtors shall take any and all actions deemed necessary or appropriate to consummate the transactions under the Plan, and such Entities shall not require the affirmative vote of the Holders of Interests in order to take any corporate action.

8. Debtors' Books and Records

On the Effective Date, the Consolidated Debtors' books and records, in any form, including all electronic records, shall be transferred to the Liquidating Trust, and the Consolidated Holdco books and records shall be vested with the Plan Administrator. Books and records that cannot be allocated amongst the Debtors shall be vested with the Consolidated Debtors. The Liquidating Trustee or the Plan Administrator shall be free, in his or her discretion, to abandon, destroy, or otherwise dispose of those books and records in compliance with applicable non-bankruptcy law, provided, however that, in the sole discretion of the Plan Administrator or the Liquidating Trustee, as applicable, these books and records may be destroyed or disposed of beginning two (2) years after the Effective Date notwithstanding any applicable laws, rules, or regulations that would have required the Debtors to retain such books and records. While these books and records are retained, the Liquidating Trustee and the Plan Administrator shall take all reasonable steps necessary to comply with requests of the other to share the information contained therein with or provide copies of those books and records, at the expense of the requesting party.

9. Privileges

All Privileges shall be transferred, assigned and delivered to the Liquidating Trust, or shall remain with Consolidated Holdco, as applicable without waiver or release, and shall vest with the Liquidating Trustee or Plan Administrator, as applicable. The Liquidating Trustee and Plan Administrator shall hold and be the beneficiary of all Privileges and entitled to assert all

Privileges. No Privilege shall be waived by disclosures to the Liquidating Trustee or Plan Administrator of the Debtors' documents, information or communications subject to attorney-client privileges, work product protections or immunities or protections from disclosure jointly held by the Debtors and the Committee.

10. Dissolution of Committee

On the fifth (5th) Business Date following the Effective Date, and provided the Liquidating Trust has become effective as provided under the Plan, the Committee will be dissolved and the Committee and its members shall be released and discharged from the rights and duties arising from or related to these chapter 11 cases and the retention or employment of the Committee professionals shall terminate, except with respect to final applications for professionals' compensation, provided that the Committee shall continue for the sole purpose of reviewing and taking any appropriate action (including, without limitation, filing objections thereto) in connection with Professional Fee Claims. The professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the fifth (5th) Business Day following the Effective Date, except for (i) services rendered and expenses incurred in connection with any applications by such professionals or Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date as provided in this Plan, as approved by the Court, (ii) services rendered and expenses incurred as requested by the Committee in connection with Professional Fee Claims and (iii) services rendered or expenses incurred with respect to implementation or enforcement of the Plan. Notwithstanding the foregoing, the Committee may, at its own discretion, continue or resume its duties arising from or related to any pending litigation, contested matter, adversary proceeding or appeal to which it is a party and, in such a case, the Liquidating Trustee shall compensate the post-Effective Date fees and expenses of the Committee's professionals.

11. Accredited Preferred Securities Trust I Termination.

On the Effective Date all of the agreements and other documents evidencing the claim or right of any Holder against the Debtors pursuant to or related to the Trust Preferred Common Securities, Trust Preferred Guarantee, Trust Preferred Indenture, Trust Preferred Note, Trust Preferred Note Claims, and/or Trust Preferred Securities shall be (i) automatically cancelled, discharged, terminated, and of no further force and effect, and (ii) deemed surrendered without any further act by the Debtors or the Trust Preferred Indenture Trustee under any applicable agreement, law, regulation, order, or rule. However, the Trust Preferred Common Securities, Trust Preferred Guarantee, Trust Preferred Indenture, Trust Preferred Note, Trust Preferred Note Claims, and Trust Preferred Securities shall continue in effect solely for the purposes of (A) (i) permitting the Trust Preferred Indenture Trustee to make any distributions on account of Allowed Class 7 H Claims pursuant to this Plan and perform such other necessary administrative functions with respect thereto, (ii) permitting the Trust Preferred Indenture Trustee to receive any payments it is entitled to under the Trust Preferred Indenture and exercise any rights it is entitled to exercise under the Trust Preferred Indentures; and (B) permitting Kodiak CDO I Ltd., Kodiak CDO II Ltd., and the Trust Preferred Indenture Trustee (i) to continue to participate in the prosecution, mediation, or settlement of the Trust Preferred Adversary Proceeding, or to appeal

any order or decision arising from the Trust Preferred Adversary Proceeding, and (ii) to bring any other action, suit, or proceeding against the Lone Star Entities or any other persons or entities (other than the Debtors) relating to, arising from, or in connection with the Trust Preferred Common Securities, Trust Preferred Guarantee, Trust Preferred Indenture, Trust Preferred Note, Trust Preferred Note Claims, and/or Trust Preferred Securities, and to participate in the prosecution, mediation, and/or settlement of such action, suit, or proceeding, or to appeal any order or decision in such action, suit, or proceeding, provided that such action is not a Consolidated Holdco Asset or Consolidated Debtors Asset.

## K.   Executory Contracts and Unexpired Leases

The following shall be the treatment of Executory Contracts:

### 1.   Rejection of Certain Executory Contracts

All executory contracts and unexpired leases, other than those executory contracts and unexpired leases which (i) were executed subsequent to the Petition Date, (ii) have not expired by their own terms prior to the Confirmation Date, (iii) were assumed prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, or (iv) were identified in the Plan Supplement as being assumed and assigned under this Plan, shall be deemed rejected upon the Confirmation Date. Upon the Effective Date, all executory contracts and unexpired leases that (i) were executed subsequent to the Petition Date, (ii) were assumed prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, or (iii) were identified in the Plan Supplement as being assumed and assigned under this Plan, shall either (i) be assumed by Consolidated Holdco, if such leases and contracts are with Consolidated Holdco, or (ii) be assumed by the Consolidated Debtors and assigned to the Liquidating Trust, if such leases and contracts are with the Consolidated Debtors. Unless otherwise agreed to by the parties to such lease or contract, or required by an Order of the Court, there shall be no cure costs or adequate protection payments required in connection with the assumption and assignment of such leases and contracts.

### 2.   Indemnification Agreements.

The obligations of the Debtors to indemnify any Person having served as an officer or director of the Debtors, to the extent provided in any of the Debtors' corporate governance documents or by written or other agreement or applicable law, shall be terminated and extinguished and, to any extent necessary, deemed an executory contract, terminated and rejected under the Plan, and such Person's rights to assert rejection damages claims arising there from, if any, shall be governed by Section 7.3 of the Plan. Notwithstanding the foregoing, this provision will not limit, release or modify any indemnification obligations to those persons who have served, during the period from and after the Petition Date, as officers of the Debtors pursuant to a court-approved retention or engagement letter (the "Retained Advisor Indemnification Obligations"). Notwithstanding any provision herein, no person making a claim with respect to indemnification obligation approved by the Bankruptcy Court shall be required to file a proof of claim with respect to such Retained Advisor Indemnification Obligations, and any right to payment with respect to such Retained Advisor Indemnification Obligations shall not be impacted by this Plan.

3. Employee Agreements.

On or before the Plan Supplement Filing Date, the Debtors will negotiate employment or consulting contracts with any current employees necessary to wind down the Debtors' Estates, with such contracts to be reasonably acceptable to the Committee. On the Effective Date, the Debtors' remaining employees will receive a payment equal to five (5) months' salary from the Consolidated Debtors, which payment shall be in satisfaction of any prior arrangements, agreements, or employment policies with the Debtors.

4. Insurance Policies.

To the extent that any and all insurance policies are considered executory contracts, then notwithstanding anything contained in the Plan to the contrary, such insurance policies that are policies of the Consolidated Debtors shall be deemed assumed and assigned to the Liquidating Trust, and such policies that are policies of Consolidated Holdco shall be assumed by Consolidated Holdco. Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such policy. For the avoidance of any doubt, all rights under any insurance policy that is not an executory contract, and all rights under any other insurance policies under which the Debtors may be beneficiaries, shall be preserved, and, nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered persons under such insurance policies.

5. Bar Date For Rejection Damage Claims

Any party to an executory contract or unexpired lease not previously assumed or rejected and to which no bar date has been established, which is assumed or rejected pursuant to this Plan or is the subject of a pending rejection motion, is required under the terms of this Plan to file a proof of claim for amounts due as a result of such assumption or rejection by the Rejection Bar Date; provided, however, if a motion seeking assumption or rejection is not heard and determined prior to the Effective Date, any Claim based thereon shall be filed within thirty (30) days of entry of an Order ruling on the motion. Any Allowed Cure Claim relating to the assumption of executory contracts or leases pursuant to the Plan shall be paid in full from the Effective Date Distribution to the extent Finally Determined as of the Effective Date, or, to the extent thereafter, from an Interim Distribution or Subsequent Distribution by the Liquidating Trustee or Plan Administrator. Any such claim not filed by the Rejection Bar Date as provided in the Plan shall be forever barred and shall not be enforceable against the Debtors or their properties or the Liquidating Trust, and the Debtors and the Liquidating Trust shall have no obligation to pay the same.

## L. Vesting of Assets

1. Consolidated Debtors

Except as otherwise provided in the Plan, the Liquidating Trustee shall be vested, as of the Effective Date, with all of the Liquidating Trust Assets free and clear of all claims, liens,

encumbrances, charges, and other interests of holders of Claims against, or Interests in, the Debtors and their Property.

## 2. Consolidated Holdco

Except as otherwise provided in this Plan, Consolidated Holdco shall be vested, as of the Effective Date, with all of the Consolidated Holdco Assets free and clear of all claims, liens, encumbrances, charges, and other interests of Holders of Claims against, or Interests in, the Debtors and their Property.

## 3. Unclaimed Property

Notwithstanding any local, state, federal, or other laws or regulations regarding unclaimed property or escheatment of property, all funds or other property possessed by the Debtors on the Effective that is unclaimed, subject to escheatment, or potentially subject to escheatment shall be treated as Assets of such Debtors under this Plan, and shall accordingly be transferred to, vested with, and become the property of the Debtors, Plan Administrator, or Liquidating Trustee to be held and distributed pursuant to the terms of this Plan free and clear of all such laws or regulations, and free and clear of any other claims, liens, encumbrances, charges, and other interests in such property.

## M. Distributions

As set forth in the Plan, the Debtors, the Liquidating Trustee, or the Plan Administrator shall make all distributions under this Plan. To the extent required by applicable law, distributions that are Cash shall be in compliance with all tax withholding and reporting requirements imposed by any governmental unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. The Debtors, the Disbursing Agent, the Liquidating Trustee, and the Plan Administrator may withhold the entire Cash distribution due to any holder of an Allowed Claim or Allowed Interest until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.

## 1. Manner of Cash Payments Under this Plan

Cash payments to domestic persons holding Allowed Claims or Allowed Interests will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank. Any domestic person holding a Claim or Interest that wishes to receive a Cash payment by wire transfer shall provide wire instructions to the Debtors, the Liquidating Trustee, the Disbursing Agent, or the Plan Administrator. In any such case, the Debtors, the Liquidating Trustee, the Disbursing Agent, or the Plan Administrator shall make the Cash payment(s) by wire transfer in accordance with the wire instructions, provided that the costs of such wire transfer shall be deducted from such entity's distribution. Payments made to foreign creditors holding Allowed Claims or Allowed Interests may be paid or caused to be paid, at the option of the Debtors, the Disbursing Agent, the Plan Administrator, or the Liquidating Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

2.    No *De Minimis* Distributions

Notwithstanding anything to the contrary in this Plan, no Cash payment of less than Fifty Dollars ($50) will be made to any Person.  No consideration will be provided in lieu of the *de minimis* distributions that are not made under this provision, and the Debtors, the Liquidating Trustee after consultation with the Liquidating Trust Advisory Board, the Disbursing Agent, or the Plan Administrator shall be authorized to pay such amounts to the other holders of Allowed Claims or Allowed Interests.

3.    Distributions to Holders as of the Distribution Record Date

At the close of business on the Distribution Record Date, the claims register shall be closed, and there shall be no further changes in the record Holder of any Claim or Interest.  The Debtors, Plan Administrator, Liquidating Trustee, the Disbursing Agent, or any other party responsible for making distributions under this Plan shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date; and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register and stock transfer books as of the close of business on the Distribution Record Date.

4.    Deemed Distributions to Subordinated Creditors

Wherever this Plan effectuates contractual or Plan subordination rights by requiring distributions that would be made to subordinated creditors to be distributed to other creditors, including but not limited to the provisions in Article 4 of this Plan, those distributions shall be deemed to have been made to the subordinated creditors and then transferred by those subordinated creditors to the creditors receiving those distributions pursuant to this Plan.

5.    Delivery of Distributions and Undeliverable/Unclaimed Distributions

(a)    Delivery of Distributions in General.

The Debtors, Plan Administrator, Disbursing Agent, or Liquidating Trustee shall make distributions to each Holder of an Allowed Claim by mail as follows: (a) to the address set forth on the proof of claim filed by such holder of an Allowed Claim; (b) to the address set forth in any written notice of address change delivered to counsel to the Debtors, Plan Administrator, Disbursing Agent, or Liquidating Trustee, as applicable, after the date of any related proof of claim; and (c) to the address reflected in the Schedules if no proof of claim is filed and the Debtors, Plan Administrator, Disbursing Agent, or Liquidating Trustee has not received a written notice of a change of address; provided, however, that the distributions to the Trust Preferred Holders shall be made to the Trust Preferred Indenture Trustee.

The Debtors, Plan Administrator, or Liquidating Trustee may withhold the entire distribution due to any Holder of an Allowed Claim or Allowed Interest until such time as the holder provides the Debtors, Plan Administrator, or Liquidating Trustee with the information necessary to make a distribution to such holder in accordance with this Plan and applicable law,

and Holders of Allowed Claims or Allowed Interests who do not provide such information may be barred from participating in distributions under the Plan.

(b)     Undeliverable and Unclaimed Distributions.

If the distribution to the Holder of any Allowed Claim or Allowed Interest is returned as undeliverable, no further distribution shall be made to such Holder unless and until the Liquidating Trustee, Disbursing Agent, or Plan Administrator is notified in writing of such Holder's then current address. Insofar as a distribution is returned to the Liquidating Trustee or Plan Administrator as undeliverable, the Liquidating Trustee, Disbursing Agent, or Plan Administrator shall remit the undeliverable distribution back to the account established by the Liquidating Trustee or Plan Administrator as soon as is practicable.  Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Liquidating Trustee or Plan Administrator until such time as a distribution becomes deliverable. All undeliverable Cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions.  These entities will be entitled to any interest actually earned on account of the undeliverable distributions.  The bank account will be maintained in the name of the Liquidating Trustee, Disbursing Agent, or Plan Administrator, but it will be accounted for separately.

Any Holder of an Allowed Claim or Allowed Interest who does not assert a claim <u>in writing</u> for any undeliverable distribution within one (1) year after such distribution was first made shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under this Plan, or from asserting a Claim against or Interest in the Debtors, the Estate, or their respective property, and the Claim or Interest giving rise to the undeliverable distribution will be barred.

Any undeliverable distributions that are not claimed under this Section will be transferred to the account maintained by the Liquidating Trustee, Disbursing Agent, or Plan Administrator to be paid or caused to be paid to the other holders of Allowed Claims or Allowed Interests.

(c)     Distributions of Consolidated Holdco Residual Assets and Liquidating Trust Residual Assets

The Plan Administrator shall hold the Consolidated Holdco Residual Assets in trust for the Holders of Claims against and Interests in Consolidated Holdco who are entitled to receive the same.   The Plan Administrator shall hold no economic or beneficial interests in the Consolidated Holdco Residual Assets.  The Liquidating Trustee shall hold the Liquidating Trust Residual Assets in trust for the Holders of Claims against and Interests in the Liquidating Trust and Consolidated Debtors, as applicable, who are entitled to receive the same.  The Liquidating Trustee shall hold no economic or beneficial interests in the Liquidating Trust Residual Assets. With regard to these Residual Assets, the Plan Administrator and Liquidating Trustee shall be empowered to (i) take all steps and execute all documents and instruments necessary to effectuate the Plan, (ii) make distributions contemplated by the Plan, (iii) comply with the Plan and obligations thereunder, and (iv) exercise such powers as may be vested by the Plan, order of

the Bankruptcy Court, or deemed by the Plan Administrator or Liquidating Trustee to be necessary and proper to implement the provisions of the Plan.

> (d) Fees and Expenses Incurred in Distributing Consolidated Holdco Residual Assets and Liquidating Trust Residual Assets.

The reasonable fees and expenses incurred by the Plan Administrator, including, without limitation, reasonable fees and expenses of counsel, in disbursing the Consolidated Holdco Residual Assets shall be paid in Cash from such assets without further application to or approval from the Bankruptcy Court. The reasonable fees and expenses incurred by the Liquidating Trustee, including, without limitation, reasonable fees and expenses of counsel, in disbursing the Liquidating Trust Residual Assets shall be paid in Cash from such assets without further application to or approval from the Bankruptcy Court.

## N. Exculpations

**Neither the Debtors nor their officers, directors, managers, employees, professionals, restructuring advisors, or the Committee and its professionals and advisors and members in their capacity as members of the Committee and their respective professionals and advisors, the Liquidating Trust, the Liquidating Trustee, Disbursing Agent, nor the Plan Administrator will have or incur any liability to any holder of a Claim or Interest or any other entity for any act or omission in connection with, in preparation for, or arising out of, the Bankruptcy Proceeding or the cases, including but not limited to the formulation, preparation, dissemination, approval, confirmation, execution, administration, or consummation of the Plan Support Agreement and Term Sheet, the Plan or the Disclosure Statement, the solicitation of votes for or confirmation of the Plan, or implementation, consummation, or administration of the Plan or the property to be distributed under the Plan, or any compromises and settlements under the Plan, except for liability arising from conduct constituting willful misconduct or gross negligence pursuant to a Final Order; provided, however, that except as provided in Section 3.1(b) of the Plan, such exculpation shall not be deemed or construed in any way to limit or impair a party in to object or challenge the allowance or payment or seek disgorgement of any professional's fees and expenses in connection with any interim or final fee application including resolution or adjudication of any pending objections or reservations by any such party in interest. The foregoing parties will be entitled to rely upon the advice of counsel in all respects regarding their duties and responsibilities under the Plan. Notwithstanding the foregoing, Sec. 12.3 of the Plan shall not be construed to release any claims, rights or causes of action that any professional or restructuring advisor retained pre- or post-petition by the Debtors or their non-debtor Affiliates may have against its current or former employees.**

## O. Preservation of Debtors' Causes of Action

The Plan provides for the continuance of Consolidated Holdco and establishment of the Liquidating Trusts to, in part, prosecute or settle and reduce to Cash Debtor and estate claims not released under the Plan. The assets of the Liquidating Trust will include Debtor and estate

claims. The resolution and recovery of these Debtor and estate claims and the process and mechanisms to litigate or settle these claims are significant and important aspects of the Plan. These claims include, but are not limited to, Debtor and estate claims against non-released officers and directors of the Debtors, professionals of the Debtors, accountants and auditors of the Debtors and affiliates and insiders of the Debtors. Unless a claim against a Creditor or other Entity or Cause of Action is expressly waived, relinquished, released, compromised or settled in this Plan, or any Final Order, the Debtors expressly reserve such claim or Cause of Action for later enforcement by the Consolidated Holdco or the Liquidating Trust (including, without limitation, claims and Causes of Action not specifically identified or which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those which the Debtors no believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the confirmation or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, expect where such claims or Causes of Action have been expressly released in this Plan or other Final Order. In addition, the Consolidated Holdco and the Liquidating Trust expressly reserve the right to pursue or adopt any claim, crossclaim or counterclaims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of this Plan or any Final Order.

**P.      Plan Injunction**

**From and after the Confirmation Date, and as provided for by the Confirmation Order, there shall be in place with regard to the Debtors, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Assets, the Disbursing Agent, the Consolidated Debtors, the Consolidated Debtors Assets, the Plan Administrator, Consolidated Holdco, Consolidated Holdco Assets, and any Claims, the Injunction, which shall have the same extent and with the same effect as the stay imposed by § 362 of the Bankruptcy Code, as modified by orders entered by the Bankruptcy Court in this Bankruptcy Proceeding, except as provided in this Plan. The Injunction will remain in effect until the Bankruptcy Proceeding is closed pursuant to § 350 of the Bankruptcy Code except as otherwise expressly provided. Except as provided elsewhere in the Plan, all Holders of Claims or Interests shall be precluded and enjoined by the Injunction from asserting any Claim against the Debtors, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Assets, the Consolidated Debtors, the Consolidated Debtors Assets, the Plan Administrator, Consolidated Holdco, Consolidated Holdco Assets, and their respective agents, successors, and assigns, and also from asserting any other and further Claim based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, against the Debtors, the Liquidating Trust, the Liquidating Trustee, and the Plan Administrators, as representatives of the Estates, as well as their successors or their respective agents, successors, and assigns, whether or not the holder filed a proof of claim, and shall be enjoined from commencing or continuing, directly or indirectly, in any manner, any action or proceeding of any kind on any such Claim or Interest, or the enforcement, attachment, collection, or recovery by any manner or means, or creating,**

**perfecting, or enforcing any encumbrance. Nothing in the Plan shall prohibit an action against the Debtors and only the Debtors and their assets after dissolution of the Injunction.**

**Notwithstanding the rest of the Plan, the Injunction imposed herein shall not apply to prevent the commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtors or any real property in which the Debtors may have an interest; <u>provided, however,</u> that any order entered or judgment, fine, sanction, penalty, declaration, determination, or monetary award assessed against the Debtors in such an action proceeding may not be enforced against the Debtors, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust, the Plan Administrator, their Assets, and their respective agents, successors, and assigns, that such an award or determination shall not give rise to an Allowed Claim, and that any judgment, fine, sanction, penalty, declaration, determination, award, or other action which affects property of the Debtors, the Liquidating Trust, the Liquidating Trustee, or the Plan Administrator, creates personal liability for the agents, successors, and assigns of the Debtors, or creates personal liability for the Consolidated Debtors, the Liquidating Trust, the Liquidating Trustee, the Plan Administrator, and their respective agents, successors, and assigns, shall be void. Nothing in the Plan shall prevent the Court from modifying the Injunction at the request of any party, upon notice and a hearing.**

**Q.** **Conditions Precedent to Effective Date of Plan.**

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to the satisfaction of the following conditions precedent:

(a)    The receipt by the Consolidated Debtors, the Disbursing Agent, or the Liquidating Trustee of (i) the Lone Star Creditor Release Settlement Payment, (ii) the Lone Star Consolidated Debtors Settlement Payment, and (iii) the Consolidated Holdco Professional Fee Claim Payment;

(b)    The receipt by Consolidated Holdco or the Plan Administrator of the Lone Star Advance;

(c)    The Confirmation Order shall be entered by the Bankruptcy Court;

(d)    The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Committee, the REIT, and the Lone Star Entities;

(e)    The Plan Support Agreement and Term Sheet shall not have terminated by its terms;

(f)    The Bankruptcy Court shall have determined that the compromises and settlements set forth in the Plan are appropriate, reasonable, and fair, and such compromises and settlements have been approved;

(g)     The Debtors and the parties to the Plan Support Agreement and Term Sheet shall have sufficient Cash and assets to permit compliance with the terms and conditions of the Plan and the Plan Support Agreement and Term Sheet, including but not limited to projected fees and expenses, and payment of the Trust Preferred Holdco Distributions plus the Lone Star Trust Preferred Settlement Payment in an amount equal to Forty Million Dollars ($40,000,000);

(h)     The Bankruptcy Court shall have approved and authorized the documents and agreements in the Plan Supplement;

(i)     The Liquidating Trust is created pursuant to the terms of the Plan once the Bankruptcy Court has appointed the Liquidating Trustee and approved the Liquidating Trust Agreement in form and substance acceptable to the Committee;

(j)     The Bankruptcy Court has appointed the Plan Administrator and approved the Plan Administrator Retention Agreement in form and substance acceptable to the Committee and the REIT; and

(k)     All other actions and documents necessary to implement the Plan shall have been executed and effected.

To the extent practicable and legally permissible, each of the conditions, other than 11.1(a), (b), (c), (d), (e), and (f) may be waived, in whole or in part, by the Debtors, subject to approval of the Committee and, the Lone Star Entities, the REIT, and the Trust Preferred Indenture Trustee.

## R.     Retention of Jurisdiction

### 1.     General Scope of Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over these Cases to the extent legally permissible, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

### 2.     Claims and Actions

The Bankruptcy Court shall retain jurisdiction (a) to classify, resolve objections to, and determine or estimate pursuant to Bankruptcy Code § 502(c) all Claims against, and Interests in, the Debtors and (b) to adjudicate and enforce all claims and causes of action owned by the Debtors or the Liquidating Trust.

### 3.     Specific Jurisdiction

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over these Cases as otherwise set forth in the Plan, the Bankruptcy Court shall retain jurisdiction for the following specific purposes:

(a) To determine the classification, allowance or disallowance of all Claims or Interests, including, without limitation, Claims and objections relating to the assumption or rejection of executory contracts or unexpired leases pursuant to this Plan, and to hear and determine any and all objections to such Claims or Interests including, without limitation, Claims and objections relating to the assumption of executory contracts or unexpired leases pursuant to this Plan;

(b) To enable the Liquidating Trustee or Plan Administrator to commence, prosecute, settle, compromise, or abandon any and all claims or Causes of Action of the Debtors;

(c) To adjudicate all Claims to a security or ownership interest in any Property of the Debtors or in any proceeds thereof;

(d) To liquidate damages or estimate Claims in connection with any Disputed Claims or contingent or unliquidated Claims;

(e) To hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, consummation, or performance of this Plan including, but not limited to, any matters related to the Plan Support Agreement and Term Sheet, as well as all controversies, suits, and disputes that may be pending before the Bankruptcy Court on or before the Confirmation Date or may be brought thereafter;

(f) To determine and Allow all expenses of administration of the Bankruptcy Proceeding, including, without limitation, all requests for Professional Fees for periods prior to the Effective Date;

(g) To recover all Assets and Property of the Debtors, wherever located;

(h) To interpret, construe or enforce this Plan, the Confirmation Order or any order previously entered by the Bankruptcy Court in this case;

(i) To hear, determine and enforce any and all Causes of Action, to set aside liens or encumbrances, to recover any transfers, assets or damages to which the Estate may be entitled, to avoid or recover any preferences, fraudulent conveyances, or obligations, or other obligations or transfers voidable or subject to avoidance under applicable provisions of the Bankruptcy Code or other federal, state, or local law, or to subordinate or disallow, in whole or in part, any Claim, under applicable provisions of the Bankruptcy Code or other federal, state, or local law;

(j) To consider and determine any proposed modification or amendment of the Plan;

(k) To make any determination necessary or appropriate under § 505 of the Bankruptcy Code or other determination relating to taxes paid or payable by the Debtors, Plan Administrator, or Liquidating Trust, Tax Refunds due to the Debtors, Plan Administrator, or the Liquidating Trusts, and tax returns filed or to be filed by the

Debtors, Plan Administrator, or the Liquidating Trusts, for all periods through the end of the fiscal year in which the Effective Date occurs;

(l)  To implement the provisions of this Plan and enter any orders in aid of its implementation or in furtherance of its purposes and intent;

(m)  To make such orders as the Bankruptcy Court deems necessary or appropriate to carry out the provisions, purposes, or intent of this Plan;

(n)  To adjudicate any dispute with respect to any obligations of the Debtors, the Liquidating Trust, and the Plan Administrator, including any fees requested by professionals employed by the Liquidating Trust or Plan Administrator; and

(o)  To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

4. Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Cases, the provisions of the Plan shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

5. Modification of the Plan

At any time before the Confirmation Date, the Plan or Plan Supplement may be modified by the Debtors, subject to the consent of the Committee, the Lone Star Entities, the Trust Preferred Holders, the Trust Preferred Indenture Trustee, the REIT, and the REIT Committee which consent, to the extent such modifications do not adversely affect the rights, treatment, benefits or obligations of the respective parties or constituencies,  or the substance of the economic provisions set forth in the Plan, shall not be unreasonably withheld, upon approval of the Bankruptcy Court, provided that the Plan, as modified, does not fail to meet the requirements of §§ 1122 & 1123 of the Bankruptcy Code.  In the event that there is a modification of the Plan, then the Plan as modified shall become the Plan.

At any time after the Confirmation Date, but before substantial consummation of the Plan, the Plan or Plan Supplement may be modified by the Debtors, subject to the consent of the Committee, the Lone Star Entities, the Trust Preferred Holders, the Trust Preferred Indenture Trustee, the REIT, and the REIT Committee, which consent, to the extent such modifications do not adversely affect the rights, treatment, benefits or obligations of the respective parties or constituencies,  or the substance of the economic provisions set forth in the Plan, shall not be unreasonably withheld, upon approval of the Bankruptcy Court, provided that the Plan, as modified, does not fail to meet the requirements of §§ 1122 &1123 of the Bankruptcy Code.  The Plan, as modified under this section, becomes a Plan only if the Court, after notice and hearing, confirms such Plan, as modified, under § 1129 of the Bankruptcy Code.

At any time after the Confirmation Date, the applicable Debtors may, without the approval of the Court, remedy any defect or omission, or reconcile any such inconsistencies in the Plan or Plan Supplement or in the Confirmation Order, as such matters may be necessary to carry out the purposes, intent, and effect of this Plan, provided that they do not materially or adversely affect the interests of creditors or other entities, subject to the terms of the Lone Star Settlement and the Plan Support and Term Sheet and upon consultation with the Committee.

6. Revocation and Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time before entry of a Confirmation Order.  If the Debtors, or one of the individual Debtors, as the case may be, revoke or withdraw the Plan prior to the Confirmation Date, or if the confirmation or the Effective Date does not occur with respect to one or more of the Debtors, then the Plan shall be deemed to be null and void as to that Estate.  In such event, nothing contained herein, in the Plan or in any document relating to the Plan shall be deemed to constitute an admission of validity, waiver or

release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in any proceeding involving the Debtors.

7. <u>Sections 1145 and 1146(a) Exemption</u>

To the maximum extent provided by § 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the beneficial interests in the Liquidating Trust will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, or the re-vesting, transfer or sale of any real or personal property of the Debtors or the Liquidating Trust pursuant to, in implementation of, or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

8. <u>No Admission of Liability.</u>

The submission of the Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in the Plan.

None of the Plan (including, without limitation, the Exhibits thereto), or any settlement entered, act performed or document executed in connection with the Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the related actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against the Debtors, or any other Person or Entity with respect to the validity of any Claim. None of the Plan or any settlement entered, act performed or document executed in connection with the Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of the Plan Support Agreement and Term Sheet and the Plan, and except that, once confirmed, any Entity may file the Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

9. <u>Plan Governs</u>

To the extent that the terms of this Disclosure Statement or the Plan are inconsistent with the terms of any agreement or instrument concerning any Claim, any Interest or any other matter, the terms of the Plan shall control.

10. <u>Governing Law</u>

Expect to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent any document entered into in connection with the Plan so provides, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Delaware, without giving effect to the principles of conflicts of law.

# VI. CONFIRMATION AND CONSUMMATION PROCEDURE

## A.    Disclosure and Solicitation

This Disclosure Statement is presented to the Holders of Claims and Interests that are entitled to vote on the Plan to satisfy the requirements Sections 1125 and 1126 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that full disclosure be made to all Holders of Claims and Interests in impaired Classes that receive or retain property pursuant to a plan at the time, or before, solicitation of acceptances of such plan is commenced.

## B.    Acceptance of the Plan

As more fully stated in Section III of this Disclosure Statement, the Bankruptcy Code defines acceptance of a plan by a Class of creditors or interest-holders as acceptance by holders of more than two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted on a plan. A vote may be disregarded if the Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A vote to accept or reject the Plan can only occur by proper submission of a duly executed Ballot. Failure of a holder to vote does not constitute a vote to reject the Plan by that holder. Each Holder of a Claim or Interest should seek such independent legal and/or business advice as it deems appropriate regarding whether to vote to accept or reject the Plan.

## C.    Classification

The Debtors are required under Section 1122 of the Bankruptcy Code to classify the Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims or Interests in such Class. The Plan can be confirmed so long as there is at least one consenting Class of impaired Claims under the Plan (not including the votes of insiders), and so long as the other requirements for confirmation are met.

## D.    Confirmation

The Bankruptcy Code requires the Court, after notice, to hold a Confirmation Hearing. At the Confirmation Hearing, the Court will confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation of a plan are that the Plan be (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "not discriminate unfairly" and be "fair and

equitable" as to such impaired Class; (ii) feasible; and (iii) in the "best interests" of rejecting Holders of Claims and Interest impaired under the Plan.

      1.   <u>Acceptance</u>

In order for the Plan to be Confirmed, one impaired class of Consolidated Holdco and one impaired class of the Consolidated Debtors (not including the votes of insiders) must accept the Plan. For classes of Claims that have rejected the Plan, the Court must determine that the Plan is "fair and equitable" with respect to the rejecting classes. The "fair and equitable" test is described below under the heading *Confirmation Without Acceptance by All Impaired Classes*.

      2.   <u>Feasibility</u>

Under Section 1129(a)(11) of the Bankruptcy Code, to confirm the Plan, the Court must find that the Plan is feasible—that is, that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization unless such liquidation or reorganization is proposed in the Plan. Since the Plan proposes liquidation, and since the Liquidating Trust will have the assets necessary to accomplish this liquidation, the Debtors believe that the Plan is feasible.

      3.   <u>Best Interests Test</u>

With respect to each impaired Class, confirmation of the Plan requires that each Holder of an Allowed Claim or Allowed Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Under the Debtor's Liquidation Analysis attached as <u>Exhibit B</u> hereto, the Debtors estimate that each class of creditors will receive at least as much property under this Plan as they would receive in a Chapter 7. See Section IX, *Alternatives to Confirmation and Consummation of the Plan*, and the Debtors' Liquidation Analysis attached as <u>Exhibit B</u> hereto for a further discussion of why Debtors believe that the Plan is in the best interests of Holders of Claims and Interests.

      4.   <u>Confirmation Without Acceptance By All Impaired Classes</u>

The Bankruptcy Code provides that, so long as at least one Class of Claims that is impaired under the Plan accepts the Plan (without respect to the votes cast by insiders), the Debtors may seek confirmation of the Plan over the objections of any non-consenting Class, provided that the Debtors demonstrate that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Classes. These "cramdown" provisions for confirmation of the Plan, despite the non-acceptance of one or more impaired Classes of Claims or Interests, are set forth in Bankruptcy Code § 1129(b).

The Bankruptcy Code establishes different "fair and equitable" tests for Holders of Secured Claims, Unsecured Claims and Interests. The respective tests are as follows:

(a)     Secured Creditors

Either (i) each impaired Holder of Secured Claim of the rejecting Class (a) retains its liens in the collateral securing such Claim or in the proceeds thereof to the extent of the Allowed amount of the Secured Claim and (b) receives deferred Cash payments in at least the Allowed amount of such Secured Claim with a present value at the Effective Date at least equal to such creditor's interest in its collateral or in the proceeds thereof or (ii) the Plan provides each impaired Holder of a Secured Claim with the "indubitable equivalent" of its Secured Claim.

(b)     Unsecured Creditors

Either (i) each impaired Holder of an Unsecured Claim of the rejecting Class receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class do not receive or retain any property under the Plan.

(c)     Interest Holders

Either (i) each Interest Holder of the rejecting Class receives or retains under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prices, if any, of the Interest it holds or (b) the value of such Interest or (ii) the Holders of Interests that are junior to such Interest do not receive or retain any property under the Plan.

The Debtors believe that the Plan meets the applicable tests described above, even in the event that it is rejected by the Holders of one or more Classes of Claims and Interests.

## VII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a general summary of certain material U.S. federal income tax consequences of the Plan to the Debtors and the Holders of certain Claims and Interests. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a contrary view. No ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the Holders of Claims or Interests and the Debtors. It cannot be predicted whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders of Claims or Interests and the Debtors.

The following discussion is for general information only. The tax treatment of a Holder of a Claim or Interest may vary depending upon such Holder's particular situation. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it address federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, U.S. persons whose functional currency is not the U.S. dollar, traders that mark-to-market their securities, taxpayer subject to the alternative minimum tax, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale, hedge, conversion transaction or straddle, pass-through entities and investors in pass-through entities). Furthermore, this summary does not address U.S. federal taxes other than income taxes.

**EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF THE PLAN, INCLUDING THE APPLICABILITY OF ANY U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX LAWS.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY UNITED STATES FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTION OR MATTERS ADDRESSED HEREIN AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.**

A.     **Tax Treatment of the Liquidating Trust**

The Liquidating Trust is intended to be treated for federal income tax purposes as a grantor trust. Assuming the Liquidating Trust qualifies as a grantor trust for federal income tax purposes, the Holders of Class 3 C Claims, Class 4 C Claims and Class 5 C Claims may be treated as the grantors of the Liquidating Trust, the Liquidating Trust should be disregarded for tax purposes as an entity separate from the grantors, and the grantors would report the income and loss from the Liquidating Trust. Under the Plan, the transfer of Cash and any remaining assets of the Consolidated Debtors to the Liquidating Trust may be treated for federal income tax purposes as if the Consolidated Debtors distributed an interest in each of the assets transferred directly to the Holders of Class 3 C Claims, Class 4 C Claims and Class 5 C Claims in exchange for their outstanding Claims against the Consolidated Debtors. The Holders of Class 3 C Claims, Class 4 C Claims and Class 5 C Claims would then be deemed to contribute their interest in these assets to the Liquidating Trust.

If the Liquidating Trust is not treated for federal income tax purposes as a grantor trust, then the Liquidating Trust may be classified as a partnership for federal income tax purposes, in which case the Holders of Class 3 C Claims, Class 4 C Claims, and Class 5 C Claims would be treated as partners in the partnership.  Unlike a grantor trust, the partnership would be treated as an entity required to compute income and loss, file tax returns, and make tax elections, but income and loss would pass through to the partners to be reported by them on their separate tax returns.  If the Liquidating Trust is treated as a partnership for federal income tax purposes, the transfer of Cash and any remaining assets of the Consolidated Debtors to the Liquidating Trust under the Plan may be treated for federal income tax purposes as if the Consolidated Debtors had distributed an interest in each of the assets so transferred directly to the Holders of Class 3 C Claims, Class 4 C Claims and Class 5 C Claims in exchange for their outstanding Claims against the assets or stock of the Consolidated Debtors.  The Holders of Class 3 C Claims, Class 4 C Claims and Class 5 C Claims would then be deemed to contribute their interest in these assets to the Liquidating Trust in for an interest in the Liquidating Trust.

## B.      Federal Income Tax Consequences of the Plan to the Debtors

Generally, a debtor will recognize gain or loss on the sale of its assets in an amount equal to the sum of the Cash and the fair market value of property received less the debtor's adjusted tax basis in the assets sold.  A debtor that transfers an asset in payment for a debt will be treated for federal income tax purposes as having sold the asset for its fair market value.  Under the Plan, each of the Debtors will recognize gain or loss the transfer of its assets to the Holders of Claims to the extent that the difference between fair market value of the assets transferred and that Debtor's tax basis in such assets.

In addition, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price.  The amount of COD income is, in general, the excess of (i) the amount of the indebtedness satisfied, over (ii) the amount of Cash and the fair market value of any other consideration (including any new indebtedness issued by the taxpayer or stock of the taxpayer) given in exchange for the indebtedness satisfied.  Under this rule, Consolidated Holdco would recognize COD income under the Plan to the extent the amount of the Consolidated Holdco debt cancelled exceeds the sum of the fair market value of the assets (including Cash) used to pay the Holders of Class 6 H Claims.  Similarly under this rule, the Consolidated Debtors would recognize COD income under this Plan to the extent the amount of Consolidated Debtors' debt cancelled exceeds the sum of the fair market value of the assets (including Cash) contributed to the Liquidating Trust and the fair market value of the assets (including Cash) used to pay the Holders of Class 6 C Claims. However, COD income is not included in gross income to a debtor if the discharge occurs in a formal Title 11 bankruptcy case.  The Plan, if approved, would enable both Consolidated Holdco and the Consolidated Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If debt is discharged in a formal Title 11 bankruptcy case, however, certain tax attributes otherwise available and of value to the debtor are reduced, in most cases by the principal amount of the indebtedness forgiven.  Tax attributes subject to reduction include:  (a) NOLs and NOL carryforwards; (b) most credit carryforwards, including the general business credit and minimum

tax credit; and (c) capital losses and capital loss carryforwards. Attribute reduction is calculated only after the tax for the year of discharge has been determined.

The Debtors anticipate that none of the Debtors will not incur any taxable income for federal income tax purposes as a result of the transfer of assets as provided in the Plan that will not be offset by NOLs. Accordingly, the implementation of the Plan should not result in any federal income tax liability (other than AMT liability) to any of Debtors.

In general, an alternative minimum tax ("AMT") is imposed on a corporation to the extent such corporation's tentative minimum tax, determined by multiplying its "alternative minimum taxable income" by the corporate AMT rate of 20%, exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryovers, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryovers (as computed for AMT purposes) and subject to the AMT at a 20% rate, yielding an effective rate of 2% (calculated by multiplying the 20% tax rate by the 10% of alternative minimum taxable income not offset by NOL carryovers). The Debtors do not anticipate that the Plan will generate a significant amount, if any, of federal AMT liability.

## C.     Federal Income Tax Consequences of the Plan to Holders of Claims or Interests

In general, Holders of Claims or Interests will recognize income, gain or loss on their Claims or Interests as set forth below. The character of any gain or loss as capital or ordinary gain or loss (or ordinary income) and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim or Interest; (ii) the tax status of the Holder of the Claim or Interest; (iii) whether the Claim or Interest has been held for more than one year; and (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim.

### 1.     Consequences to Holders of Claims Against Consolidated Holdco

(a)     Consequences to Holders of Class 1 H and Class 2 H Claims

Holders of Class 1 H or Class 2 H Claims may receive specified fixed amounts from Consolidated Holdco in exchange for these Claims on the date of payment thereof. Accordingly, the Debtors believe that a Holder of a Class 1 H or Class 2 H Claim should generally recognize gain or loss in an amount equal to the Cash received (plus the fair market value of other property received, if any) with respect to its Claim (other than any amounts attributable to accrued by unpaid interest) less its adjusted tax basis in its Claim (other than for accrued but unpaid interest).

(b)     Consequences to Holders of Class 3 H Claims, Class 4 H Claims, Class 5 H Claims, and Class 6 H Claims

The Debtors believe that a Holder of a Class 3 H Claim, Class 4 H Claim, Class 5 H Claim or Class 6 H Claim (collectively, a "Consolidated Holdco Claim") as of the Effective Date should be treated as receiving from Consolidated Holdco their share of the Consolidated Holdco Assets in satisfaction of each such Consolidated Holdco Claim. A Holder of a Consolidated Holdco Claim may recognize a taxable loss (or gain) to the extent the amount realized by such Holder in respect of its Consolidated Holdco Claim, excluding accrued interest, is less (or greater) than the Holder's tax basis in such Consolidated Holdco Claim, excluding any Claim for accrued interest. The amount realized by a Holder of a Consolidated Holdco Claim should be equal to the amount of Cash and the fair market value of any other consideration received pursuant to the Plan. If a Holder of a Consolidated Holdco Claim receives distributions from Consolidated Holdco in more than one tax year, such Holder should consult with its own tax advisor as to the timing of the recognition of income, gain, or loss.

Notwithstanding the foregoing, it is possible that the Service may assert that any income, gain, or loss by Holders of Consolidated Holdco Claims should be deferred until Plan Administrator makes the final distributions of the Consolidated Holdco Assets. In addition, a Holder's ultimate share of the Consolidated Holdco Assets may differ from the initial estimates thereof. This may result in a Holder having to recognize additional or offsetting income or gain or loss if, and to the extent, that, the aggregate amount of Cash and the fair market value of property received by that Holder differs from the amount used in initially determining that Holder's any income, gain or loss. Holders of Consolidated Holdco Claims should consult their own tax advisors regarding the possibility that the recognition of income, gain or loss may be accelerated or deferred.

(c)     Consequences to Holders of Class  7 H Claims

Holders of Class 7 H Claims will receive specified fixed amounts from Consolidated Holdco in an amount equal to 65% of each such Claim in exchange for these Claims on the date of payment thereof. Accordingly, the Debtors believe that a Holder of a Class 7 H Claim should generally recognize gain or loss in an amount equal to the Cash received (plus the fair market value of other property received, if any) with respect to its Claim (other than any amounts attributable to accrued by unpaid interest) less its adjusted tax basis in its Claim (other than for accrued but unpaid interest).

(d)     Consequences to Holders of Class 8 H Claims

Holders of Class 8 H Claims will receive their proportionate part of the Lone Star Trust Preferred Settlement Payment and the Trust Preferred Holdco Distributions. A holder of a Class 8 H Claim will recognize a taxable loss (or gain) to the extent that the amount realized by such Holder in respect to its Class 8 H Claim, excluding accrued interest, is less (or greater) than the Holder's tax basis in such Class 8 H Claim, excluding any Claim for accrued interest. The amount realized by a Holder of a Class 8 H Claim should be equal to the amount of Cash and the fair market value of any other consideration received pursuant to the Plan. If a Holder of a Class 8 H Claim receives distributions with respect to its Class 8 H Claim in more than one tax year, such Holder should consult with its own tax advisor as to the timing of the recognition of income, gain, or loss.

(e)    Consequences to Holders of Class 9 H and 10 H Claims

Under the Plan, Holders of Class 9 H and 10 H Claims will recognize a taxable loss (or gain) to the extent that amount realized by each such Holder in exchange for their Class 9 H or 10 H Claim is less (or greater) than such Holder's tax basis in their Class 9 H or 10 H Claim exchanged therefor.  The amount realized by a Holder of a Class 9 H  or 10 H Claim should be equal to the amount of Cash and the fair market value of any other consideration received from Consolidated Holdco, if any, pursuant to the Plan, in the event the Holders of Class 3 H, Class 4 H, and Class 6 H Claims are paid in full.

(f)    Consequences to Holders of Class 11 H Interests

Under the Plan, Holders of Class 11 H Interests will recognize a taxable loss (or gain) to the extent the amount realized by each such Holder in exchange for their Interest is less (or greater) than such Holder's tax basis in their Interest exchanged therefore.  The amount realized by the Holder of a Class 11 H Interest should be equal to the amount of Cash and the fair market value of any other consideration received from Consolidated Holdco if any, pursuant to the Plan, in the event the Holders of Class 3 H, Class 4 H, Class 5 H, Class 6 H, Class 9 H, and Class 10 H Claims are paid in full.  The gain or loss should be a capital gain provided the Holder held their Class 11 H Interest as a capital assets within the meaning of Tax Code Section 1221 at the effective time of the Plan.

2.    Consequences to Holders of Claims Against Consolidated Debtors

(a)    Consequences to Holders of Class 1 C  and Class 2 C Claims

Holders of Class 1 C or Class 2 C Claims may receive specified fixed amounts from Consolidated Debtors in exchange for these Claims on the date of  payment thereof.  Accordingly, the Debtors believe that a Holder of a Class 1 C or Class 2 C Claim should generally recognize gain or loss in an amount equal to the Cash received (plus the fair market value of other property received, if any) with respect to its Claim (other than any amounts attributable to accrued by unpaid interest) less its adjusted tax basis in its Claim (other than for accrued but unpaid interest).

(b)    Consequences to Holders of Class 3 C Claims

The Debtors believe that a Holder of a Class 3 C Claim as of the Effective Date should be treated as receiving from the Consolidated Debtors their share of the respective assets transferred to the Liquidating Trust in satisfaction of each such Class 3 C Claim and simultaneously transferring such assets to the Liquidating Trust.  Assuming the Liquidating Trust is taxed as a grantor trust or as a partnership for federal income tax purposes, under the Plan, a Holder of a Class 3 C Claim may recognize a taxable loss (or gain) to the extent the amount realized by such Holder in respect of its Class 3 C Claim, excluding accrued interest, is less (or greater) than the Holder's tax basis in such Class 3 C Claim, excluding any Claim for accrued interest.  The amount realized by a Holder of a Class 3 C Claim should be equal to the amount of Cash and the fair market value of any other consideration received pursuant to the Plan (including any amounts received from the Lone Star Creditor Release Settlement Payment).  If a Holder of a

Class 3 C Claim receives distributions from the Liquidating Trust in more than one tax year, such Holder should consult with its own tax advisor as to the timing of the recognition of income, gain, or loss. Additionally, the Debtors believe that Holders of Class 3 C Claims should recognize their allocable share of taxable income on the assets transferred to the Liquidating Trust on an annual basis.

Notwithstanding the foregoing, it is possible that the Service may assert that any income, gain, or loss by Holders of Class 3 C Claims should be deferred until the Liquidating Trustee makes the final distributions from the Liquidating Trust. In addition, a Holder's ultimate share of the assets of the Liquidating Trust based on its Class 3 C Claim may differ from the initial estimates thereof. This may result in a Holder having to recognize additional or offsetting income or gain or loss if, and to the extent, that, the aggregate amount of Cash and the fair market value of property received by that Holder from the Liquidating Trust differs from the amount used in initially determining that Holder's any income, gain or loss. Holders of Class 3 Claims should consult their own tax advisors regarding the possibility that the recognition of income, gain or loss may be accelerated or deferred.

(c)     Consequences to Holders of Class 4 C Claims

The Debtors believe that a Holder of a Class 4 C Claim as of the Effective Date should be treated as receiving from the Consolidated Debtors their share of the respective assets transferred to the Liquidating Trust in satisfaction of each such Class 4 C Claim and simultaneously transferring such assets to the Liquidating Trust. Assuming the Liquidating Trust is taxed as a grantor trust or as a partnership for federal income tax purposes, under the Plan, a Holder of a Class 4 C Claim may recognize a taxable loss (or gain) to the extent the amount realized by such Holder in respect of its Class 4 C Claim, excluding accrued interest, is less (or greater) than the Holder's tax basis in such Class 4 C Claim, excluding any Claim for accrued interest. The amount realized by a Holder of a Class 4 C Claim should be equal to the amount of Cash and the fair market value of any other consideration received pursuant to the Plan. If a Holder of a Class 4 C Claim receives distributions from the Liquidating Trust in more than one tax year, such Holder should consult with its own tax advisor as to the timing of the recognition of income, gain, or loss. Additionally, the Debtors believe that Holders of Class 4 C Claims should recognize their allocable share of taxable income on the assets transferred to the Liquidating Trust on an annual basis.

Notwithstanding the foregoing, it is possible that the Service may assert that any income, gain, or loss by Holders of Class 4 C Claims should be deferred until the Liquidating Trustee makes the final distributions from the Debtors Liquidating Trust. In addition, a Holder's ultimate share of the assets of the Liquidating Trust based on its Class 4 C Claim may differ from the initial estimates thereof. This may result in a Holder having to recognize additional or offsetting income or gain or loss if, and to the extent, that, the aggregate amount of Cash and the fair market value of property received by that Holder from the Liquidating Trust differs from the amount used in initially determining that Holder's any income, gain or loss. Holders of Class 4 Claims should consult their own tax advisors regarding the possibility that the recognition of income, gain or loss may be accelerated or deferred.

(d)     Consequences to Holders of Class 5 C Claims

The Debtors believe that a Holder of a Class 5 C Claim as of the Effective Date should be treated as receiving from the Consolidated Debtors their share of the respective assets transferred to the Liquidating Trust in satisfaction of each such Class 5 C Claim and simultaneously transferring such assets to the Liquidating Trust.  Assuming the Liquidating Trust is taxed as a grantor trust or as a partnership for federal income tax purposes, under the Plan, a Holder of a Class 5 C Claim may recognize a taxable loss (or gain) to the extent the amount realized by such Holder in respect of its Class 5 C Claim, excluding accrued interest, is less (or greater) than the Holder's tax basis in such Class 5 C Claim, excluding any Claim for accrued interest.  The amount realized by a Holder of a Class 5 C Claim should be equal to the amount of Cash and the fair market value of any other consideration received from the Liquidating Trust, if any, pursuant to the Plan in the event the Holders of Class 3 C and Class 4 C Claims are paid in full.  If a Holder of a Class 5 C Claim receives distributions from the Liquidating Trust in more than one tax year, such Holder should consult with its own tax advisor as to the timing of the recognition of income, gain, or loss.  Additionally, the Debtors believe that Holders of Class 5 C Claims should recognize their allocable share of taxable income on the assets transferred to the Liquidating Trust on an annual basis.

Notwithstanding the foregoing, it is possible that the Service may assert that any income, gain, or loss by Holders of Class 5 C Claims should be deferred until the Liquidating Trustee makes the final distributions from the Liquidating Trust.  In addition, a Holder's ultimate share of the assets of the Liquidating Trust based on its Class 5 C Claim may differ from the initial estimates thereof.  This may result in a Holder having to recognize additional or offsetting income or gain or loss if, and to the extent, that, the aggregate amount of Cash and the fair market value of property received by that Holder from Liquidating Trust differs from the amount used in initially determining that Holder's any income, gain or loss.  Holders of Class 5 Claims should consult their own tax advisors regarding the possibility that the recognition of income, gain or loss may be accelerated or deferred.

(e)     Consequences to Holders of Class 6 C Claims

Holders of Class 6 C Claims will receive specified fixed amounts from Consolidated Holdco in an amount equal to 75% of each such Claim in exchange for these Claims on the date of payment thereof.  Accordingly, the Debtors believe that a Holder of a Class 6 C Claim should generally recognize gain or loss in an amount equal to the Cash received (plus the fair market value of other property received, if any) with respect to its Claim (other than any amounts attributable to accrued by unpaid interest) less its adjusted tax basis in its Claim (other than for accrued but unpaid interest).

(f)     Consequences to Holders of Class 7 C Claims

Under the Plan, Holders of Class 7 C Claims will recognize a taxable loss (or gain) to the extent that amount realized by each such Holder in exchange for their Class 7 C Claim is less (or greater) than such Holder's tax basis in their Class 7 C Claim exchanged therefor.  The amount realized by a Holder of a Class 7 C Claim should be equal to the amount of Cash and the fair

market value of any other consideration received from the Liquidating Trust, if any, pursuant to the Plan, in the event the Holders of Class 3 C, Class 4 C, and Class 5 C Claims are paid in full.

      (g)     Consequences to Holders of Class 8 C Claims

Under the Plan, Holders of Class 8 C Claims will recognize a taxable loss (or gain) to the extent that amount realized by each such Holder in exchange for their Class 8 C Claim is less (or greater) than such Holder's tax basis in their Class 8 C Claim exchanged therefor.  The amount realized by a Holder of a Class 8 C Claim should be equal to the amount of Cash and the fair market value of any other consideration received from the Liquidating Trust, if any, pursuant to the Plan, in the event the Holders of Class 3 C, Class 4 C, Class 5 C Claims, and Class 7 C Claims are paid in full.

      (h)     Consequences to Holders of Class 9 C Claims

Under the Plan, Holders of Class 9 C Claims will recognize a taxable loss (or gain) to the extent that amount realized by each such Holder in exchange for their Class 9 C Claim is less (or greater) than such Holder's tax basis in their Class 9 C Claim exchanged therefor.  The amount realized by a Holder of a Class 9 C Claim should be equal to the amount of Cash and the fair market value of any other consideration received from the Liquidating Trust, if any, pursuant to the Plan, in the event the Holders of Class 3 C, Class 4 C, Class 5 C Claims, Class 7 C, and Class 8 C Claims are paid in full.

      (i)     Consequences to Holders of Class 10 C Interests

Under the Plan, Holders of Class 10 C Interests will recognize a taxable loss (or gain) to the extent the amount realized by each such Holder in exchange for their Interest is less (or greater) than such Holder's tax basis in their Interest exchanged therefore.  The amount realized by the Holder of a Class 10 C Interest should be equal to the amount of Cash and the fair market value of any other consideration received from the Liquidating Trust, if any, pursuant to the Plan, in the event the Holders of Class 3 C, Class 4 C, Class 5 C, Class 8 C, and Class 9 C Claims are paid in full.  The gain or loss should be a capital gain provided the Holder held their Class 9 C Interest as a capital assets within the meaning of Tax Code Section 1221 at the effective time of the Plan.

      3.     <u>Interest Income</u>

Taxable interest income earned on the assets held by the Liquidating Trust will be reported as taxable income to the Holders of Class 3 C, Class 4 C and Class 5 C Claims on an annual basis and will be taxable to such Holders in accordance with their method of tax accounting.  In addition, Holders of Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Claim.  Each Holder should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).

4.  <u>Gain or Loss from Subsequent Sales</u>

Any taxable gains or losses on a subsequent sale of assets (other than Cash) held by the Liquidating Trust will be reported as taxable gain or taxable loss to the Holders with interests in the liquidating trust on an annual basis and will be taxable to such Holders in accordance with their method of tax accounting.  The amount of such gain or loss realized by each Holder with respect to each such sale will be the difference between the portion of the amount realized on such sale allocable to such Holder and the portion of the tax basis in such asset sold allocable to such Holder.  Each Holder should consult its own tax advisor regarding the possibility of recognizing gain or loss on any assets (other than Cash) owned by the Liquidating Trust and the timing and character of any income or loss recognized with respect to any such sales.

5.  <u>Backup Withholding and Information Reporting</u>

In general, a Holder of a Claim may be subject to backup withholding at the applicable rate with respect to any "reportable" payments received pursuant to the Plan unless (i) such Holder is a corporation or comes within certain other tax exempt categories and, when required, demonstrates this fact or (ii) provides to the Debtor and/or the Liquidating Trust (on IRS Form W-9) a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and complies with applicable requirements of backup withholding rules.  A Holder that does not provide a correct taxpayer identification number may be subject to penalties imposed by the Service.  Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the Service.

The Liquidating Trustee will report annually to each Holder of a Class 3 C, Class 4 C , Class 5 C, and Class 6 C Claim such Holder's share of income, gains and losses of the Consolidated Liquidating Trust during the calendar year to the extent required by law.

The Debtors and the Liquidating Trust will withhold from distributions provided under the Plan any amount which is required by law to be withheld, and will also comply with all applicable reporting requirements of the United States Tax Code and other applicable law.  In order to receive distributions, creditors must provide the Debtors and/or the Liquidating Trust with the information needed to allow the Debtors and/or the Liquidating Trust to comply with applicable law.

# VIII.  <u>CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS</u>

## A.  **Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate**

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Debtors.  These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms.  These statements are

based on the beliefs of management as well as assumptions made using information currently available to management. Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by management. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements do not guarantee future performance. You should recognize these statements for what they are and not rely on them as facts. None of the Debtors undertakes any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

## IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated and considered several alternatives to the Plan including other plan structures. After studying and considering these alternatives, the Debtors have concluded that the Plan is the best option and will maximize recoveries to creditors.

If the Plan is not confirmed or consummated, the alternatives include, in addition to dismissal of the Cases, (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (ii) an alternative chapter 11 plan.

### A. Liquidation Under Chapter 7

If no plan can be confirmed or the Court determines other cause exists for conversion, the bankruptcy cases may be converted to cases under chapter 7 of the Bankruptcy Code. In this event, a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with priorities established by the Bankruptcy Code.

The Debtors believe that conversion to chapter 7 and the appointment of one or more chapter 7 trustees would result in substantial additional Administrative Claims related to the attorneys and other professionals necessary to assist such trustee(s) and their need to study extensively these bankruptcy cases in order to fulfill their fiduciary duties, as well as the significant delays attendant to the chapter 7 trustee's need to analyze issues and research the background of the Debtors, their assets, their liabilities, their intra-debtor claims, and make a recovery analysis. Indeed, the Debtors' Liquidation Analysis concludes that under a chapter 7 liquidation, creditors would not recover as much as they would under the Plan. If the cases were converted the intra-debtor and inter-estate claims and issues would not be resolved. The Debtors believe that there would be additional costs and expense and risks and uncertainties with respect to intra-debtor and intra-estate disputes and issues that would need to be resolved or litigated. A copy of the Liquidation Analysis is Annexed hereto as Exhibit B.

### B. Alternative Plan(s) of Reorganization

If the Debtors' exclusive period to file a plan of reorganization and solicit acceptances of a plan of reorganization expires pursuant to § 1121 of the Bankruptcy Code, other parties could propose their own plans of reorganization for the Debtors. The Debtors believe that the

transactions reflected in the Plan and this Disclosure Statement will result in quicker and higher recoveries for all constituencies than any alternative scenario.

The Debtors believe that confirmation and implementation of the Plan are preferable to either of the above-described alternatives and recommend that all Creditors vote in favor of the Plan.

## X. CONCLUSION

The Debtors believe that acceptance of the Plan is in the best interest of Creditors and recommend that you vote to accept the Plan.

Date: March 29, 2011

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
kmakowski@pszjlaw.com

-and-

**HUNTON & WILLIAMS LLP**

Gregory G. Hesse (Texas Bar No. 09549419)
Lynnette R. Warman (Texas Bar No. 20867940)
Jesse T. Moore (Texas Bar No. 24056001)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
Email: ghesse@hunton.com
lwarman@hunton.com
jtmoore@hunton.com

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION