# EXHIBIT C

# COMPREHENSIVE GLOBAL SETTLEMENT BETWEEN DEBTORS, LONE STAR, THE REIT, THE REIT COMMITTEE, THE TRuP ENTITIES AND THE COMMITTEE RELATING TO A CONSENSUAL PLAN OF LIQUDATION

February 14, 2011

This Term Sheet (this "Term Sheet") summarizes certain of the critical terms, elements and conditions of a plan to be proposed by the Accredited Home Lenders Holding Co, et al. (the "Debtors") and supported by the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "Committee") and LSF MRA LLC, LSF5 Mortgage Line LLC, Caliber Funding LLC, Vericrest Financial Inc., LSF5 Accredited Investments LLC, LSF5 Accredited Holdings, LLC, Lone Star Funds V (U.S.) L.P., Hudson Americas LLC, Hudson Advisors LLC, Lone Star U.S. Acquisitions LLC, (collectively, the "Lone Star Entities"), the REIT[1], and the Ad Hoc Committee of REIT Preferred Holders (the "REIT Committee")[2], Wells Fargo Bank, N.A., in its capacity as Indenture Trustee and Property Trustee ("Wells"), Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., and JP Morgan Funding LLC (collectively with Wells, the "TRuP Entities"). Notwithstanding the foregoing, this Term Sheet remains subject to, among other things, (a) resolution of any terms or items set forth herein that are bracketed or indicated as "to be provided" or "to be determined"; (b) resolution of technical and non-substantive terms not specifically set forth herein; and (c) acceptable definitive documentation of all matters contemplated herein, including a revised Plan and any agreements contemplated under the Plan or under the Term Sheet. The Debtors, Lone Star Entities, the Committee, the REIT, the REIT Committee and the TRuP Entities have agreed to work together in good faith to attempt to complete negotiations of the terms of the Plan and to resolve other outstanding issues. No vote in favor of any plan is being solicited by or agreed to by this Term Sheet, with such votes to be solicited in connection with a Disclosure Statement approved by the Bankruptcy Court and in accordance with Section 1125 of the Bankruptcy Code.

The Term Sheet is provided in connection with ongoing discussions between the Lone Star Entities, the Debtors, the Committee, the REIT, the REIT Committee and the TRuP Entities regarding a consensual plan of liquidation. Terms used but not defined herein have the meaning set forth in the Debtors' First Amended Chapter 11 Plan of Liquidation, filed on October 29, 2010 (the "Plan"). This Term Sheet supersedes and replaces the Term Sheet dated as of September 2, 2010, as amended.

Based on confidential discussions between the parties as part of a comprehensive compromise, each element of which is consideration for the other elements and an integral aspect of the proposed terms of a plan of liquidation and settlement of certain claims and disputes, this Term Sheet reflects the understanding that (a) certain of the Debtors are entitled to a tax refund in an amount not less than $62 million, (b) the REIT has always maintained its REIT status under the tax code, and (c) the foregoing discussions and is provided on a confidential basis as part of a comprehensive compromise, each element of which is consideration for the other elements and an integral aspect of the proposed terms of a plan of liquidation and settlement of certain claims

---

[1] Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.
[2] The members of the REIT Committee are set forth on Schedule A attached hereto.

and disputes. Nothing contained herein shall obligate the REIT to maintain its REIT status under the tax code following the Effective Date of the Plan. This term sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions. No party shall be deemed to make or have made any admission by virtue of entry into this Term Sheet or through the settlement of any disputes pursuant to the terms hereof.

The Debtors believe that prompt confirmation and consummation of the Plan in accordance with the provisions of this Term Sheet is in the best interest of their creditors and other parties-in-interest.

The terms of the settlement proposal are as follows:

1.      The REIT and REIT Committee will support the Plan and take such action as is reasonably necessary to support confirmation and consummation of the Plan and, subject to Section 3 below, will receive for purposes of the Plan (x) an allowed general unsecured claim against the Consolidated Debtors (as defined in the Plan) of $37.5 million; (y) an allowed subordinated unsecured claim against the Consolidated Debtors, subordinated and junior to the claims of general unsecured creditors of the Consolidated Debtors (other than the TRuP Junior Claim defined below) in the amount of $15 million (the "REIT Junior Claim"); and (z) an allowed unsecured claim against Accredited Home Lenders Holding Company ("Holdco") of $20 million (the "REIT Allowed Holdco Claim"). Any subordination rights the REIT may have will be waived under the terms of the Plan (excluding any benefits the REIT may receive as a result of Lone Star's agreement to subordinate its claim against Holdco as provided in Section 2 below). The REIT will not receive any distribution on account of the REIT Junior Claim until allowed unsecured claims against the Consolidated Debtors (other than the TRuP Junior Claim) are paid in full (without any post-petition or post-emergence interest or costs). All agreements, contracts and obligations between the REIT and the Debtors will be terminated or rejected pursuant to the Plan without further liability on the part of the Debtors unless otherwise agreed by the Debtors, the REIT and the Committee. The Plan shall provide for a separate class of claims against Holdco comprised of the guaranty claims of the preferred shareholders of the REIT (the "Preferred Holder's Subordinated Guaranty Claims"), which class shall be subordinate to unsecured claims against Holdco to the extent those claims are contractually senior and deemed to reject the Plan and not entitled to vote. Unless otherwise agreed to by the Committee and REIT Committee, at the Effective Date (i) the Class of Preferred Holder's Subordinated Guaranty Claims in the aggregate amount of approximately $102 million plus any accrued, unpaid interest (the "Preferred Holders Subordinated Class") shall not receive a direct distribution from the Holdco Plan Administrator until all holders with allowed senior unsecured claims against Holdco have been paid in accordance with the terms of the Plan, (ii) the Preferred Holders Subordinated Class shall not be entitled to any reports or notices from the Holdco Plan Administrator until the Holdco Plan Administrator determines that such holders are likely to receive a direct distribution. In the event the senior unsecured creditors of Holdco are not paid in accordance with the terms of the Plan, then the Preferred Holders Subordinated Class shall not receive any distribution under the Plan. If the senior unsecured creditors of Holdco are paid in

accordance with the terms of the Plan and the Holdco Plan Administrator has or receives cash available for further distribution, then Holders of Preferred Holder's Subordinated Guaranty Claims shall receive *pro rata* distributions as provided under the Plan.

2. Provided that less than 25% in amount of the estimated allowed general unsecured claims against the Consolidated Debtors eligible to vote on the Plan (other than claims of the Lone Star Releasees) elect to withhold releases of direct and personal claims (as set forth in Section 3 below) (the "Release Requirement") and the other conditions to the occurrence of the Effective Date under the Plan are met, under the Plan:

(x) one or more of the Lone Star Entities (other than LSF MRA, LLC) shall make (i) a payment to the Consolidated Debtors on or before the Effective Date of the Plan in the amount of $15.6 million (the "Plan Payment") to be made available to those unsecured creditors (including the REIT but not the TRuP Junior Claim) who grant releases as set forth in Section 1[3] (the "Releasing GUCs"), (ii) a payment to the Consolidated Debtors on or before the Effective Date in the amount of $150,000.00 and (iii) a non-interest bearing advance to Holdco in an amount not to exceed $4.0 million (the "Lone Star Advance"), the proceeds of which shall be used in connection with the TRuP Holdco Distribution (defined below) and which shall be repaid as set forth in Section 7 below;

(y) the Lone Star Entities shall be deemed to have waived, for purposes of the Plan and receiving distributions thereunder, all claims against the Consolidated Debtors or their respective properties, including those asserted in their Proofs of Claim; and

(z) the Lone Star Entities shall be deemed to have subordinated, for purposes of the Plan and receiving distributions thereunder, all of their claims asserted against Holdco in favor of those holders of allowed nonpriority general unsecured claims against Holdco (other than claims of the Lone Star Releasees) who do not (i) elect to withhold releases of direct and personal claims (as set forth in Section 3 below) and/or (ii) vote to reject the Plan, so that any distributions to the Lone Star Entities on account of claims against Holdco will first be distributed to such non-electing/non-rejecting claims on a pro-rata basis until such claims (other than the claims of the TRuP Entities and any Subordinated Guaranty Claims) are paid in full (which distributions shall not be subject to disgorgement).[4]

3. Upon the Effective Date of the Plan (and provided the Lone Star Entities fund their respective obligations under Sections 2 and 4), pursuant to the Plan, the Lone Star Entities and their current and former subsidiaries and affiliates (including the Debtors' non-debtor

---

[3] Lone Star is amenable to the Debtors' request (subject to the consent of the Committee) that, after the Effective Date, a portion of this payment be made available to fund administrative expense claims of the Consolidated Debtors; provided that such payment is treated as an advance to be repaid by the Consolidated Debtors and used to fund distributions to the Releasing GUCs.

[4] The treatment under the Plan with respect to any claims of TRuP Entities against Holdco shall be as provided in Section 4 hereof. The Preferred Holders Subordinated Class will not be eligible to receive the benefit of the subordination of claims asserted against Holdco by the Lone Star Entities. The Lone Star Entities shall be deemed to have waived any rights of subrogation with respect to subordination of their claims against Holdco.

subsidiaries but excluding the Debtors themselves) and all of their respective current and former officers and directors, agents, employees, attorneys, other professionals, representatives, predecessors, successors and assigns (including current and former officers and directors and pre-petition agents, attorneys and other professionals and restructuring advisors of the Debtors and the Debtors' non-debtor subsidiaries) and the insurers of the Lone Star Entities and of the Debtors (with the insurers included among the Lone Star Releasees set forth on <u>Schedule B</u> attached hereto and the current and former Officers and Directors of the Debtors included among the Lone Star Releasees set forth on <u>Schedule C</u> attached hereto, collectively the "<u>Lone Star Releasees</u>") shall be released from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which any releasor, as identified in clauses (i)-(vi), below has or may have, or which have been asserted or could be asserted in the future, that are based upon, arise out of, or in any way relate to the Debtors or their business or operations (including the business or operations of the REIT and the other non-debtor subsidiaries of the Debtors and any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law), by (i) the estates of the Consolidated Debtors and Holdco, (ii) the non-debtor affiliates of the Debtors, (iii) individual creditors of the Consolidated Debtors that elect to receive a distribution from the Plan Payment by not electing to withhold releases of direct and personal claims as of the Effective Date, (iv) the REIT (subject to the carveout for certain insurance coverage claims set forth below), (v) individual creditors of Holdco that elect to receive the benefits of the Lone Star subordination of its claims set forth in Section 2(z) above by not electing to withhold releases of direct and personal claims as of the Effective Date and (vi) the Committee.

The foregoing notwithstanding:

(a) no current or former officer or director of any of the Lone Star Entities or of their affiliates or subsidiaries or of the Debtors shall receive a release from the Debtors without providing (i) a mutual release to the Debtors and their estates and (ii) a full release to the Insurers set forth in <u>Schedule B</u>, the REIT and the other non-debtor subsidiaries of the Debtors for the matters released in this Section 3, which for the convenience of the officers and directors shall be deemed granted as of the Effective Date of the Plan unless such officer or director objects on or prior to the Confirmation hearing; <u>provided</u>, <u>however</u>, that restructuring advisors retained as officers of the Debtors pursuant to order of the Bankruptcy Court shall retain any rights to coverage under any insurance policy issued by the Insurers;

(b) the release of the Debtors' pre- and post-petition professionals and restructuring advisors retained or employed pursuant to Sections 363 and 327 of the Bankruptcy Code set forth above shall not include the release (i) of any claim for the avoidance of a preferential transfer under Section 547 of the Bankruptcy Code (ii) of any claim for the return of an unused retainer or (iii) of any postpetition claim against a restructuring advisor employed under section 363 or an estate professional retained under Section 327 and compensated under Section 330 of the Bankruptcy Code (which restructuring advisors and retained professionals shall receive standard exculpation provisions under the Plan; <u>provided</u>, <u>however</u>, that such exculpation shall not be deemed or construed in any way to limit or impair any party in interest's right to seek disgorgement or challenge or object to the allowance or payment of such professional's fees and

expenses in connection with any interim or final fee application for such professional including resolution or adjudication of any pending objections or reservations by any such party in interest);

(c) it is expressly understood and agreed that, except for the transactions contemplated by this Term Sheet and the claims and potential claims (and associated expenses) released pursuant to this Term Sheet, the proposed releases shall in no way release, limit or impair the REIT's and any of its past, future or present Trustees' rights to coverage as an insured pursuant to any policy of insurance issued by any of the insurers set forth on Schedule B which lists Accredited Home Lenders Holding Co. as the Named Insured and provides coverage for the REIT or any of its Trustees, it being expressly understood that all such rights are expressly reserved;

(d) the foregoing releases shall not be construed to release any claims, rights or causes of action that any professional or restructuring advisor retained pre- or post-petition by the Debtors or their non-debtor affiliates may have against its current or former employees; and

(e) no party shall be released of any of its obligations under this Settlement Term Sheet or to perform its obligations under the Plan set forth herein.

4.    In settlement of all claims of the TRuP Entities against any of the Debtors, the REIT, the REIT Committee and the Lone Star Entities and their pending disputes and litigation with the Debtors and the Committee, and provided the TRuP Entities vote in favor of the Plan as set forth in Section 5 hereof:

(a)    on the Effective Date, Wells, will receive $26,950,000 in cash from certain insurers of the Lone Star Entities and the Debtors pursuant to a confidential agreement between such insurers and certain of the Lone Star Entities (the "Insurer Agreement") substantially in the form previously provided to the Debtors and the Committee, as well as $3,050,000 in cash from one or more of the Lone Star Entities (this $3,050,000 payment together with the $26,950,000 Insurers' payment are collectively referred to hereinafter as the "TRuP/Holdco Settlement Payment");

(b)    on the Effective Date, Wells will receive from the Holdco estate a $10 million first and final cash distribution (the "TRuP Holdco Distribution") on its claim filed against Holdco in the amount of approximately $60 million, including accrued unpaid prepetition interest (the "Wells Holdco Claim");

(c)    upon the later of the Effective Date or the date of the first receipts of amounts on account of the Tax Refund due on the amended 2008 return dated November 2010 received by the Consolidated Debtors after December 1, 2010, which Tax Refund is final and not subject to further disgorgement or audit, Wells will receive the amount of such Tax Refund up to a maximum aggregate amount of $2 million (for the avoidance of doubt, the distribution is from the amounts received in excess of the $54 million tentative refund and shall not be paid from such tentative refund); and

(d)      on the Effective Date, Wells will receive a claim against the Consolidated Debtors for $5.0 million, which claim shall be subordinated and junior in payment to all other claims against the Consolidated Debtors (including the REIT Junior Claim) (the "TRuP Junior Claim"). Holders of the TRuP Junior Claim will not receive any distribution until all senior claims against the Consolidated Debtors (including the REIT Junior Claim) are paid in full.

5.      None of the TRuP Entities will assert any further claims against any of the Debtors' estates or properties or assets of the Debtors' estates or against the REIT or the Debtors' other non-debtor subsidiaries. Upon the Effective Date, all scheduled claims and proofs of claim held by any of the TRuP Entities will be satisfied and discharged and expunged in accordance with this settlement. For the avoidance of doubt, nothing herein shall result in the withdrawal of the TRuP Junior Claim. On or before the confirmation date, all pending motions (including the motion to convert [Docket No. 173] and the motions to intervene and assert standing [Docket Nos. 16 and 29 in Adversary Case No. 10-50980]) filed by any of the TRuP Entities shall be withdrawn. The TRuP Entities will (i) cause Kodiak and JPMC or any other person holding a TRuP Claim, and, to the extent applicable, any person or entity who serves as a nominee, investment manager or advisor, to vote in favor of the Plan, as amended consistent with this Term Sheet, (ii) not elect to withhold releases of direct and personal claims (as set forth in Section 3 above), (iii) not object to confirmation of the Plan and (iv) take such action as is reasonably necessary to formulate and facilitate confirmation and consummation of the Plan and the transactions contemplated hereby. The TRuP Entities shall withdraw the subpoenas issued to Bart Brown and Dave Osborne. None of the TRuP Entities shall seek to recover their professional fees and expenses from the Debtors or their estates, and the TRuP Entities will waive any right to seek substantial contribution under Section 503(b) of the Bankruptcy Code or include such a provision in the Plan under Section 1129(a)(4) of the Bankruptcy Code.

6.      The Lone Star Entities and the TRuP Entities represent and warrant (as to themselves only) that (a) they are duly organized, validly existing and in good standing under the laws of the jurisdiction of their organization with all requisite power and authority to carry out the business in which they are engaged and to own or manage the properties that they won or manage; and (b) they have the power and authority to enter into this Term Sheet and be bound by the term hereof. Further the TRuP Entities represent and warrant that Kodiak CDO I, Ltd., Kodiak CDO II, Ltd., JP Morgan Chase Bank, N.A. collectively hold all the preferred beneficial interests in the Accredited Preferred Securities Trust I.

7.      On the Effective Date, the cash in the Holdco Estate (which shall be deemed to include the proceeds of TRuP/Holdco Settlement Payment) shall be used to make (i) payment of or reserve for the administrative priority claim of the Consolidated Debtors (as set forth in Section 8 hereof) and Viera Claims[5] in an aggregate amount not to exceed $2.[5] million for the administrative priority and Viera Claims combined, (ii) an appropriate reserve for post-Effective

---

[5] "Viera Claims" means the claims asserted by Class Representatives Michael Viera, Lori Scott, Helen Hayes and Aaron Smith, on their own behalf and on behalf of the other similarly situated former employees of Accredited Home Lenders, Inc. "Viera Claimants" means holders of Viera Claims.

Date expenses not to exceed $1 million (unless some other amount is agreed to by the REIT, the Lone Star Entities and the Holdco Plan Administrator after the Effective Date), and (iii) the distribution to the Holdco convenience class (other than any of the Viera Claimants) not to exceed $1 million ((i) through (iii), collectively, the "Holdco Reserves"). The balance of the Holdco Estate cash (which shall be deemed to include the proceeds of the TRuP/Holdco Settlement Payment) shall be distributed pro rata (after adjusting for the TruP/Holdco Settlement Payment to Wells as if it were part of such distribution) on account of (a) the Wells Holdco Claim (not to exceed a total distribution, including the TruP/Holdco Settlement Payment, of $40 million) (the "TRuP First Distribution") and (b) the REIT Allowed Holdco Claim, as potentially adjusted below (the "REIT First Distribution"). To the extent that the cash available for the TRuP First Distribution together with the TruP/Holdco Settlement Payment is less than $40 million (the "TRuP Distribution Shortfall"), such TRuP Distribution Shortfall shall be paid to Wells on the Effective Date from the following sources in the following priority (x) first, from any amount by which the REIT First Distribution exceeds $9 million, (y) next, to the extent of any remaining TRuP Distribution Shortfall up to a maximum amount of $8 million, 50% from the Lone Star Advance (not to exceed $4 million) and 50% from the REIT First Distribution (not to exceed $4 million), and (z) thereafter, to the extent of any remaining TRuP Distribution Shortfall from the REIT First Distribution (any amount paid from the REIT First Distribution pursuant to this Subsection "(z)" is hereinafter referred to as the "REIT First Distribution Deferred Claim"). In the event that there are insufficient funds in the Holdco Estate to make the TRuP First Distribution of $40 million (including from the TRuP/Holdco Settlement Payment and as set forth from items (x), (y) and (z) above), the Plan shall not become Effective until funds have been collected from the Canadian Residuals (net of Canadian taxes) or other sources sufficient to make such payment.

From and after the Effective Date, and after the payment of or funding of (i) the Holdco Reserves, (ii) $40 million to Wells from the TruP/Holdco Settlement Payment and the TRuP First Distribution and (iii) the REIT First Distribution, any funds collected by the Holdco Administrator, including from the Canadian Residuals (net of Canadian taxes) or release of any reserves ("Holdco Distributable Cash"), shall be distributed on a monthly basis in the following order and priority: (a) first, to the REIT on account of the REIT First Distribution Deferred Claim, if any, until paid in full; (b) next, 50% to the Lone Star Entities that funded the Lone Star Advance to repay the Lone Star Advance until it is repaid in full and 50% to the REIT on the REIT Allowed Holdco Claim, (c) once the Lone Star Advance has been repaid in full, 100% to the REIT on account of the REIT Allowed Holdco Claim until it has been paid in full; and (d) the balance, if any, pro rata on the Preferred Holder's Subordinated Guaranty Claims. All unused reserved funds shall be distributed in accordance with this Section.

Subject to the distribution priorities set forth above, including the payment of or reserve for the Holdco Reserves, each of (a) the Lone Star Advance, (b) the REIT First Distribution Deferred Claim and (c) the amount by which the REIT First Distribution was used to satisfy the TRuP Distribution Shortfall shall receive an administrative priority claim against Holdco Distributable Cash under Section 503 of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

8.     On the Effective Date, in consideration of the settlements set forth above, the Allowed Administrative Expense claim of the Consolidated Debtors against Holdco set forth in Section 3.1(a) of the Plan (relating to allocation of CRO and professional fee expenses), including any substantial contribution claim, shall be fixed at $2.0 million and such amount shall be paid on the Effective Date by Holdco to the Consolidated Debtors.

9.     On the Effective Date:

(a)     The adversary proceeding (the "Adversary Proceeding") captioned *Wells Fargo Bank, N.A. v LSF5 Accredited Investments LLC,* Adv. No. 09-53276 (MFW), which is pending in the United States Bankruptcy Court for the District of Delaware shall be dismissed or withdrawn, with prejudice.

(b)     Pursuant to the Plan, each of the TRuP Entities, the REIT, the Lone Star Entities, the Debtors and affiliated non-debtors, the Committee, the REIT Committee and the members of the REIT Committee acting in their capacity as such, shall grant a full and complete release to each of the Lone Star Releasees, the TRuP Entities, the REIT, the Debtors and affiliated non-debtors, the Committee and the members of the REIT Committee acting in their capacity as such, and to their predecessor entities, affiliates, successors and assigns and their respective professionals from all claims, potential claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, rights, costs, expenses, actions, causes of action, and damages of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which the releasor has or may have or which have been asserted or may be asserted in the future, that are based upon, arise out of, or in any way relate to the Debtors or their business or operations related to the Debtors and their businesses (including related to the REIT and any other non-debtor subsidiaries and affiliates of the Debtors and their business or operations and any claims under Chapter 5 of the Bankruptcy Code or similar State or Federal law), including without limitation any and all claims or causes of action set forth in any complaint or pleading filed by any of the foregoing in the Adversary Proceeding or elsewhere; provided, however, that nothing contained herein or therein shall release any releasor's rights and claims under this Term Sheet or the Plan or the allowed claims granted to it under the Plan or effect a release of the Debtors' post-petition retained professionals for claims of the kind described in Section 3(b) hereof.  To the extent requested by a releasee, each of the releasors shall deliver written confirmation of the effectiveness of the release as set forth above.

10.     In order to resolve inter-estate issues, disputed or challenged debtor assets shall be contributed or allocated as follows:

(a)     Canadian Cash and Residual Value or equity in Canadian subsidiaries to Holdco or other liquidation vehicle, consistent with tax considerations and efficiency.

(b)     Cash held by Vendor Management Services LLC ("Vendor") to Holdco.

(c)    Trust Common Securities to Accredited Home Lenders, Inc. ("Inc.") or Consolidated Debtors Liquidating Trust.

(d)    Ownership of equity interest in REIT [to be discussed].

(e)    Proceeds of Tax Refunds to Inc. or to the Consolidated Debtors Liquidating Trust; provided, however, that $2.0 million of the first payments to any of the Debtors on the Tax Refund due to the Consolidated Debtors as set forth in the amended 2008 tax return filed in November, 2010 and received after December 1, 2010, which Tax refund is final and not subject to further disgorgement or audit, shall be made available to Holdco to be paid to the TRuP Entities as set forth in Section 4 above

(f)    First American Trust, FSB Deferred Compensation settlement payment to Inc.

(g)    Vendor or its assets shall either be merged into Holdco or consolidated with Holdco consistent with tax considerations and efficiency.

(h)    The definition of Consolidated Debtors shall not include Vendor or Vendor's assets.

(i)    Non-Debtor subsidiaries (other than Canadian and REIT subsidiaries) shall be wound down and dissolved prior to the Effective Date, subject to tax considerations and efficiency after review by the Debtors and the Committee.

11.    IRS Tax Claim shall be satisfied by the Consolidated Debtors out of Tax Refunds.

12.    The Consolidated Debtors and Consolidated Liquidating or Litigation Trustee and Holdco and the Holdco Plan Administrator shall agree and covenant not to make, assert or pursue any claim or commence any action or litigation against the Lone Star Releasees or the current and former Directors and Officers of the Debtors released as set forth herein or under or against the D&O Policies; provided, however, that any release of current or former Directors and Officers of the Debtors as set forth herein shall also be conditioned on such officer or director granting a full release of claims against the Consolidated Debtors and their respective properties (including all claims under or that could be asserted under filed proofs of claim, which claims shall be deemed expunged and relinquished) as set forth in Section 3(a) hereof. Notwithstanding anything to the contrary herein, nothing in this Term Sheet shall release or be deemed or construed to require the release of any indemnification obligation to those persons who have served as officers of the Debtors pursuant to a court-approved retention or engagement letter (the "Retained Advisor Indemnification Obligations"). All parties hereto agree that no person shall be required to file a proof of claim with respect to the Retained Advisor Indemnification Obligations and that any right to payment with respect to such Retained Advisor Indemnification Obligations shall not be impacted or impaired by this Term Sheet or the Plan.

13.    Continuation and/or wind down of the Debtors and their respective non-debtor subsidiaries, and governance and post-emergence structure of the Consolidated Debtors and Holdco will be discussed further between the Debtors and the Parties. After giving effect to the

transactions set forth in this Term Sheet, it is contemplated that all remaining cash, assets, interests and properties, including claims, actions, suits, counterclaims, or cross claims of the Consolidated Debtors and their Estates, whether asserted or unasserted or pending as of the Effective Date, or direct, indirect, derivative or otherwise or known or unknown (other than claims specifically released pursuant to Sections 3 and 12 hereof) shall be assigned, conveyed and transferred to the Consolidated Liquidating Trust or similar structure or other liquidating vehicle. After giving effect to the transactions set forth hereunder, it is further contemplated that all remaining cash, assets, interests, and properties of Holdco shall be administered by a Holdco Plan Administrator. The Consolidated Debtors Liquidating Trustee shall be deemed a party in interest and have standing to seek disgorgement or challenge or object to the allowance or payment of estate professionals under any final fee application and with respect to challenging any claims for substantial contribution made under 503(b) of the Bankruptcy Code or similar claims.

14. Except as specifically provided hereunder, mechanics and structure related to Debtor common estate claims or settling inter-debtor disputes or issues regarding these claims or rights are to be determined.

15. The Consolidated Debtors Liquidating or Litigation Trustee shall be selected by the Committee and be reasonably acceptable to the Debtors and the REIT. The Holdco Plan Administrator shall be selected by the REIT and the Committee.

16. The Consolidated Debtor Trust Advisory Board shall be selected by the Committee, be reasonably acceptable to the REIT, and be authorized to retain professionals (and such professionals shall be reimbursed by the Consolidated Debtor Liquidating Trust). None of the Lone Star Entities or the TRuP Entities or their respective affiliates, officers, directors or employees shall serve on the Consolidated Debtor Trust Advisory Board or as Trustee or as Holdco Plan Administrator.

17. Debtors will negotiate employment or consulting contracts with current employees necessary to wind-down the Debtors' estates, with such contracts to be reasonably acceptable to the Committee.

18. Upon the Effective Date, the Debtors' employees remaining employed by the Debtors as of the Effective Date be given a payment equal to five (5) months' salary, which payout shall be in satisfaction of any prior arrangements, agreements or employment policies with the Debtors.

19. The obligations of the Consolidated Debtors to indemnify any person having served as an officer or director of the Consolidated Debtors, to the extent provided in any of the Consolidated Debtors' corporate governance documents or by written or other agreement or applicable law, shall be terminated and extinguished and, to any extent necessary, deemed an executory contract, terminated and rejected under the Plan. For the avoidance of doubt, this provision does not act as a release, termination or extinguishment of the Retained Advisorl Indemnification Obligations.

20. Each holder of a claim that receives a ballot or a distribution or any other benefit under the Plan shall be deemed to consent to and grant the releases under the Plan as set forth herein

unless it timely returns its ballot marked to indicate that it has opted out of the release set forth in the Plan.

21.     Contractual, equitable and legal subordination shall not be altered or affected under the Plan except as specifically set forth therein consistent with this Term Sheet; provided, that any disagreement with the priorities or distributions set forth herein or to the Plan shall be raised prior to and ahead of the Confirmation Hearing and the Debtors shall seek approval of a process that complies with the foregoing.

22.     The Plan Supplement Documents including the Holdco Plan Administration Agreement, the Consolidated Debtors Liquidating Trust Agreement, and all other material agreements, instruments and documents relating to or in conjunction with the Plan shall be reasonably acceptable to the Debtors, the Committee and (a) to the Lone Star Entities to the extent relevant to the Lone Star Entities; (b) to the TRuP Entities to the extent relevant to the TRuP Entities and (c) the REIT and the REIT Committee to the extent relevant to the REIT and the REIT Committee. The Plan Supplement Filing Date shall be filed at least ten (10) days prior to the Voting Deadline.

23.     Consolidated Debtors Convenience Claim shall include creditors electing to reduce and fix their claim at $25,000.

24.     Holdco Convenience Class (other than the VIERA Claims) shall include creditors holding claims of less than $1 million or who elect to reduce their claims to $1 million and shall receive a first and final distribution on their claims of the lesser of (a) 65% of the allowed amount of their claim or (b) their pro rata share of $1,000,000.

25.     The claims of REIT Preferred Holders held in their individual capacities and not assertable on their behalf by the REIT shall not be affected, limited or released except as specifically set forth herein.

26.     Holders of Lone Star's equity interests in Holdco shall not receive any distribution under the Holdco Plan and such interests shall be extinguished.

27.     The EPD/Breach Claim Protocol, if any,[6] contained in the Plan shall be reasonably acceptable to the Committee, after consultation with the REIT, and approved by the Bankruptcy Court.

28.     The Insurer Agreement shall be executed on or before the entry of the order approving the disclosure statement with respect to the Plan.

---

[6] Under the terms of the Plan, the "EPD/Breach Claim Protocol" shall mean the protocol (to be attached as an Exhibit to the Plan) by which the amount of damages for EPD/Breach Claims are calculated. "EPD/Breach Claim" shall mean a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

29.     Holdco, the Committee, the Lone Star Entities, the REIT, the REIT Committee and the TRuP Entities shall take such reasonable steps as may be requested by the Debtors (or the Consolidated Debtors Liquidating Trust or Trustee) to cooperate with and assist the Consolidated Debtors in obtaining the tax refund; provided, however, that none of such parties shall be obligated to incur any material liability or unreimbursed cost in connection with such assistance. The Debtors shall take reasonable steps to collect and maximize the amount of the tax refund and, if necessary, direct all taxing authorities to pay the refunds to the Consolidated Debtors Liquidating Trust. Should Holdco or any successor of Holdco receive the tax refund, Holdco or such successor shall immediately deposit or remit such tax refund to the Consolidated Debtors Liquidating Trust. From and after the date hereof, the Debtor shall consult with and keep the Committee and the REIT fully informed (including on-going discussions with the IRS and any relevant taxing agency) about the tax refunds and any tax controversy. The Debtors shall timely file or cause to be filed a motion(s) under Section 505 of the Bankruptcy Code in form and substance satisfactory to the Committee and use their best efforts to distribute the tentative tax refund on the Effective Date of the Plan.

30.     The Plan, as amended consistent herewith, shall not be modified by the Debtors without the consent of the Committee, the Lone Star Entities, the TRuP Entities, the REIT, and the REIT Committee which, to the extent such modifications do not adversely affect the rights, treatment, benefits or obligations of the respective parties or constituencies, may not be unreasonably withheld.

31.     The Debtors shall promptly amend the Plan and related disclosure statement to provide for the terms and distributions consistent with the terms of this Term Sheet and use reasonable best efforts to prosecute confirmation and consummation thereof. Upon the occurrence of the Effective Date, this Term Sheet shall be deemed superseded by the confirmed Plan and shall have no further force or effect.

32.     Provided this Term Sheet is still in effect and has not been made void as provided hereunder, the Lone Star Entities, the Committee, the REIT, the REIT Committee and the TRuP Entities (a) will support prosecution, confirmation and consummation of the Plan consistent with the Term Sheet and (b) will not, and will not encourage any other person or entity to, object to, delay, impede, appeal, or take any other action, directly or indirectly, with the confirmation or consummation of the Plan consistent with this Term Sheet.

33.     None of the parties hereto shall sell, assign, transfer or pledge their respective claims against the Debtors or any right to vote such claims prior to the occurrence of the Effective Date, except that (i) the members of the REIT Committee may do so if the acquirer of such claim expressly agrees in writing to be bound by the REIT Committee member's obligations under this Term Sheet to support and not object to, and vote in favor of the Plan and consent to the releases specified herein, and (ii) any parties other than the Lone Star Entities and members of the REIT Committee may do so if the acquirer of such claim expressly agrees in writing to be bound by the terms of this Term Sheet and assume the rights and obligations of the selling, assigning or otherwise transferring party.

34.     Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Committee or the Debtors and nothing shall affect the right of the Committee or the Debtors to object to the allowance and the payment of such fees and expenses. It is further understood and agreed that from and after the Effective Date, the Lone Star Entities and the TRuP Entities shall not object to the allowance and payment of the fees and expenses of the Debtors, the Committee, or any other person or entity or encourage any other person or entity to object.

35.     The Lone Star Entities agree to toll, and use reasonable efforts to cause the REIT, Holdco, and Canada former and current directors and officers that are also employed by or are agents of the Lone Star Entities to toll, any applicable statute of limitations applicable to claims that may be brought by any of the Debtors or their estates (or their respective successors) to and including the earlier of the first business day after the Effective Date or 60 days after the termination of this Term Sheet by its terms. At the Debtors/ or Committee's request, the Lone Star Entities shall deliver a tolling agreement prior to the earlier of the Disclosure Hearing and April 30, 2011. Any tolling agreement shall be reasonably acceptable to the Lone Star Entities, Debtors and Committee and contain ordinary and customary terms to effectuate the foregoing.

36.     Nothing herein shall be interpreted to conflict with or to restrict the performance of any fiduciary duty of the Committee or Committee members or impede or restrict a Committee member, not in its capacity as a member of the Committee but in its individual capacity, from objecting to or contesting confirmation of the Plan. The Debtors shall use their reasonable best efforts to file the amended Plan and attendant Disclosure Statement by February 18, 2011 and obtain confirmation by May 16, 2011. In the event the amended plan is not effective by June 15, 2011 (unless extended by written consent of the parties hereto) or the Release Requirement is not satisfied (unless the Release Requirement is waived in writing by the Lone Star Entities), then the settlement and proposal hereunder shall be void and of no effect and all parties hereto shall revert to their prior positions without prejudice.

[Signature pages follow]

Accepted and agreed to this 14th day of January, 2010.

> **DEBTORS**
> **ACCREDITED HOME LENDERS HOLDING COMPANY**
>
> *Meade Monger*
>
> By:_____
>       Meade A. Monger
>       Its: Chief Restructuring Officer
>
> **ACCREDITED HOME LENDERS, INC.,**
> **VENDOR MANAGEMENT SERVICES, LLC,**
> **INZURA INSURANCE SERVICES, INC., and**
> **WINDSOR MANAGEMENT CO.**
>
> *Meade Monger*
>
> By:     _____
>       Meade A. Monger
>       Their: Chief Restructuring Officer

## LONE STAR ENTITIES

**LSF MRA, LLC**

By: _____
    Sandra Collins
    Vice President


**LSF5 MORTGAGE LINE LLC**


By: _____
    Name: Marc L. Lipshy
    Title: President


**CALIBER FUNDING LLC**


By: _____
    Name:
    Title: Vice President


**VERICREST FINANCIAL INC.**


By: _____
    Name: Terry Purchal
    Title: Chief Financial Officer & Treasurer

**LSF5 ACCREDITED INVESTMENTS LLC**
**LSF5 ACCREDITED HOLDINGS, LLC**


By: _____
    Name: Marc L. Lipshy
    Title: President

## LONE STAR ENTITIES

**LSF MRA, LLC**

By: _____
    Sandra Collins
    Vice President

**LSF5 MORTGAGE LINE LLC**

By: _Marc L. Lipshy_
    Name: Marc L. Lipshy
    Title: President

**CALIBER FUNDING LLC**

By: _____
    Name:
    Title: Vice President

**VERICREST FINANCIAL INC.**

By: _____
    Name: Terry Purchal
    Title: Chief Financial Officer & Treasurer

**LSF5 ACCREDITED INVESTMENTS LLC**
**LSF5 ACCREDITED HOLDINGS, LLC**

By: _Marc L. Lipshy_
    Name: Marc L. Lipshy
    Title: President

## LONE STAR ENTITIES

**LSF MRA, LLC**

By: _____
    Sandra Collins
    Vice President


## LSF5 MORTGAGE LINE LLC

By: _____
    Name:  Marc L. Lipshy
    Title:  President


## CALIBER FUNDING LLC

By: _____
    Name:  Missy Hubbell
    Title:  Vice President


## VERICREST FINANCIAL INC.

By: _____
    Name:  Terry Purchal
    Title:  Chief Financial Officer & Treasurer


## LSF5 ACCREDITED INVESTMENTS LLC
## LSF5 ACCREDITED HOLDINGS, LLC

By: _____
    Name:  Marc L. Lipshy
    Title:  President

**LONE STAR FUNDS V (U.S.) L.P.**

By: Lone Star Partners V, L.P., its general partner

    By:    Lone Star Management Co. V, Ltd., its
          general partner

          By: _____

          Name: Steven R. Shearer
          Title: Vice President


**HUDSON AMERICAS LLC**
**HUDSON ADVISORS LLC**
**LONE STAR U.S. ACQUISITIONS LLC**

By: _____
Name: Marc L. Lipshy
Title: Vice President

**COMMITTEE**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED BY THE UNITED STATES TRUSTEE IN THE CHAPTER 11 CASES OF ACCREDITED HOME LENDERS HOLDING COMPANY AND CERTAIN OF ITS AFFILIATES**

By:  Arent Fox LLP, its counsel


By: _Andrew Silfen_
Name:
Title



**REIT**

**ACCREDITED MORTGAGE LOAN REIT TRUST**

By: _____
Name:
Title

## COMMITTEE

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED BY THE UNITED STATES TRUSTEE IN THE CHAPTER 11 CASES OF ACCREDITED HOME LENDERS HOLDING COMPANY AND CERTAIN OF ITS AFFILIATES**

By: Arent Fox LLP, its counsel

By: _____
Name:
Title

## REIT

**ACCREDITED MORTGAGE LOAN REIT TRUST**

By: _____
Name:
Title        Thomas J Sullivan
            Trustee.

## THE REIT COMMITTEE

**FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,**
*On behalf of itself and various other preferred shareholders*

By: _____
    Name: Stephen J. Lococo
    Title: President

## DUPONT CAPITAL MANAGEMENT

By: _____
    Name:
    Title:

_____
**SCOTT J. WEBER**

_____
**ANTHONY J. SUTTON**

**THE REIT COMMITTEE**

**FOOTPRINT ASSET MANAGEMENT &
RESEARCH, INC.,**
*On behalf of itself and various other preferred
shareholders*

By: _____
    Name:
    Title

**DUPONT CAPITAL MANAGEMENT**

By: _____ 2/18/11
    Name: MING SHAO
    Title Director of Fixed Income Investments

---

**SCOTT J. WEBER**

---

**ANTHONY J. SUTTON**

## THE REIT COMMITTEE

**FOOTPRINT ASSET MANAGEMENT &
RESEARCH, INC.,**
*On behalf of itself and various other preferred
shareholders*

By: _____
    Name:
    Title

## DUPONT CAPITAL MANAGEMENT

By: _____
    Name:
    Title

_____
**SCOTT J. WEBER**


_____
**ANTHONY J. SUTTON**

**COMPREHENSIVE GLOBAL SETTLEMENT BETWEEN DEBTORS, LONE STAR, THE REIT, THE REIT COMMITTEE, THE TRuP ENTITIES AND THE COMMITTEE RELATING TO A CONSENSUAL PLAN OF LIQUDATION**

February 14, 2011

**THE REIT COMMITTEE**

**FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,**
*On behalf of itself and various other preferred shareholders*

By: _____
    Name:
    Title

**DUPONT CAPITAL MANAGEMENT**

By: _____
    Name:
    Title

_____
**SCOTT J. WEBER**

_____
**ANTHONY J. SUTTON**

**FOR THE TRuP ENTITIES**

**KODIAK CDO I, LTD. and KODIAK CDO II, LTD.**

By:    Kodiak    CDO    Management,    LLC,   as Collateral Manager

By:    Kodiak Funding, LP
Its:    Sole Member

By:    Kodiak Funding Company, Inc.
Its:    General Partner

By:         _____

    Name: Robert M. Hurley
    Title: Chief Financial Officer

## <u>Members of the REIT Committee</u>

FOOTPRINT ASSET MANAGEMENT & RESEARCH, INC.,
*On behalf of itself and various other preferred shareholders*

DUPONT CAPITAL MANAGEMENT

SCOTT J. WEBER

ANTHONY J. SUTTON

## **INSURERS**

Arch Specialty Insurance Company

Illinois National Insurance Company

Axis Insurance Company

Twin City Fire Insurance Company

Zurich American Insurance Company

U.S. Specialty Insurance Company

Federal Insurance Company

Catlin Insurance Company, Inc.

Liberty Mutual Insurance Company

RSUI Indemnity Company

ACE American Insurance Company

AIG Casualty Company

Arch Insurance Company

Nutmeg Insurance Company

AIG Excess Liability Insurance Company Ltd.

Allied World Assurance Company (U.S.) Inc.

National Union Fire Insurance Company of Pittsburgh, Pa

XL Specialty Insurance Company

1

**Current and Former Officers and Directors of the Debtors**

**Accredited Home Lenders Holding Company**

| Name | Position |
|---|---|
| A. Jay Meyerson (AHL) | Director |
| Benjamin D. Velvin III (LS) | Director |
| Bowers Espy (AHL) | Director |
| Catharon Miller (LS) | Director |
| Chad Patton (LS) | Director |
| Gary Erickson (AHL) | Director |
| Greg Russell (LS) | Director |
| Greg Strong (LS) | Director |
| James Berglund (AHL) | Executive Treasurer |
| James Konrath (AHL) | Director |
| James M. Moran (LS) | Chief Executive Officer & Director |
| James Ransom (AHL) | Director |
| Jeff Walton (AHL) | Controller, Vice President & Ass't Secretary |
| Jody Gunderson (AHL) | President & CEO |
| John Buchanan (AHL) | Director |
| Joseph Lydon (AHL) | Chief Financial Officer |
| Karen Shields (AHL) | President & Chief Operations Officer, Director |
| Kevin Mirasola (AHL) | President, COO and Secretary |
| Leigh Rea (LS) | Senior Acct. Manager, Tax, Ass't Vice President & Ass't Secretary |
| Len W. Allen, Jr. (LS) | Director |
| Marc L. Lipsby (LS) | Director |
| Mary Jane Moran (AHL) | Director |
| Meade Monger (APS) | Senior Counsel - Regulatory Compliance, Ass't Vice President & Ass't Secretary |
| Michael Murphy (APS) | Chief Restructuring Officer |
| Michael Thompson (LS) | Chief Administrative Officer |
| Michael A. Prushan (LS) | Director |
| Richard Pratt (AHL) | Director |
| Stephen Wall (AHL) | Director |
| Stuart Marvin (AHL) | Executive Vice President & Secretary |

**Accredited Home Lenders, Inc.**

| Name | Position |
| --- | --- |
| A. Jay Meyerson (AHL) | Director |
| Bowers Espy (AHL) | Director |
| Chad Patton (LS) | Director |
| Gary Erickson (AHL) | Director |
| Greg Strong (LS) | Executive Treasurer |
| James Berglund (AHL) | Director |
| James Konrath (AHL) | Chief Executive Officer & Director |
| James M. Moran (LS) | CEO |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jeff Walton (AHL) | Director |
| Jody Gunderson (AHL) | Director |
| John Buchanan (AHL) | Chief Financial Officer |
| John M. Robbins, Jr. (AHL) | Director |
| Joseph Lydon (AHL) | President & Chief Operations Officer |
| Karen Shields (AHL) | President, COO and Secretary |
| Kevin Mirasola (AHL) | Senior Accounting Manager, Tax, Ass't Vice President & Ass't Secretary |
| Marc L. Lipsby (LS) | Director |
| Mary Jane Moran (AHL) | Senior Counsel - Regulatory Compliance, Ass't Vice President & Ass't Secretary |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |
| Michael A. Prushan (LS) | Director |
| Ray W. McKewon (AHL) | Executive Vice President |
| Richard Pratt (AHL) | Director |
| Stephen Wall (AHL) | Director |
| Stuart Marvin (AHL) | Executive Vice President, Secretary & Director |

## Inzura Insurance Services

| Name | Position |
|------|----------|
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jeff Walton (AHL) | Director and Officer |
| Joseph Lydon (AHL) | Director and Officer |
| Karen Shields (AHL) | President, COO and Secretary |
| Kevin Mirasola (AHL) | Officer |
| Mary Jane Moran (AHL) | Officer |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |
| Stuart Marvin (AHL) | Officer |

**Vendor Management Services, LLC**

| Name | Position |
|------|----------|
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| James W. Potter (AHL) | Director & Officer |
| Karen Shields (AHL) | President, COO and Secretary |
| Kevin Mirasola (AHL) | Officer |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |

## Windsor Management Co.

| Name | Position |
|---|---|
| Chad Patton (LS) | Director |
| James Ransom (AHL) | Controller, Vice President & Ass't Secretary |
| Jeff Walton (AHL) | Director and Officer |
| Joseph Lydon (AHL) | Officer |
| Karen Shields (AHL) | President, COO and Secretary |
| Kevin Mirasola (AHL) | Officer |
| Marc L. Lipsby (LS) | Director |
| Mary Jane Moran (AHL) | Officer |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |
| Michael A. Prushan (LS) | Director |
| Stuart Marvin (AHL) | Director & Officer |

| REIT Name | Position |
|---|---|
| A. Jay Meyerson (AHL) | Trustee |
| Benjamin D. Velvin III (LS) | Trustee |
| Bowers Espy (AHL) | Trustee |
| Catharon Miller (LS) | Trustee |
| Chad Paton (LS) | Trustee |
| Gary Erickson (AHL) | Trustee |
| Greg Russell (LS) | Trustee |
| Greg Strong (LS) | Executive Treasurer & Trustee |
| James Berglund (AHL) | Trustee |
| James Konrath (AHL) | Chief Executive Officer & Trustee |
| James M. Moran (LS) | Trustee |
| James Ransom (AHL) | Ass't Controller, Ass't Vice Pres. & Ass't Sec'y |
| Jeff Walton (AHL) | President/CEO/Secretary/Trustee |
| Jody Gunderson (AHL) | Trustee |
| John Buchanan (AHL) | Chief Financial Officer |
| Joseph Lydon (AHL) | President, Chief Operations Officer & Trustee |
| Karen Shields (AHL) | President & COO |
| Kevin Mirasola (AHL) | Director, Tax & Assistant Vice President |
| Leigh Rea (LS) | Trustee |
| Len W. Allen, Jr. (LS) | Trustee |
| Marc L. Lipsby (LS) | Trustee |
| Meade Monger (APS) | Chief Restructuring Officer |
| Michael Murphy (APS) | Chief Administrative Officer |
| Michael Thompson (LS) | Trustee |
| Michael A. Prushan (LS) | Trustee |
| Richard Pratt (AHL) | Trustee |
| Stephen Wall (AHL) | Trustee |
| Stuart Marvin (AHL) | Executive Vice President, Secretary & Trustee |

28