IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS HOLDING CO., et al. | § | Case No. 09-11516 (MFW) |
| | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |

**FIFTH AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE
DEBTORS' FOURTH AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Dated: April 4, 2011

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 120, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AS COMPLYING WITH THE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT. THE DEBTORS INTEND TO REQUEST APPROVAL OF THIS DISCLOSURE STATEMENT CONCURRENTLY WITH CONFIRMATION OF THE PROPOSED LIQUIDATING PLAN OF ACCREDITED HOME LENDERS, INC. AND ITS AFFILIATED DEBTORS.

## IMPORTANT NOTICE

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND ALL EXHIBITS HERETO, INCLUDING THE PLAN, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE

DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTOR SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT, RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR.

> **PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISERS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

74392.000009 EMF_US 29471070v30

# TABLE OF CONTENTS

                                                                                    **Page**

I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ..................................1
II. SHORT SUMMARY OF THE PLAN.................................................................................1
III. SOLICITATION AND VOTING PROCEDURES...........................................................8
    A.    CHAPTER 11 GENERALLY ..............................................................................8
    B.    SOLICITATION OF ACCEPTANCES OF THE PLAN ............................................9
    C.    VOTING ON THE PLAN ...............................................................................10
    D.    OTHER GENERAL INFORMATION ..................................................................12
IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO
THE COMMENCEMENT OF THE CASES .................................................................13
    A.    EXPLANATION OF AHL's BUSINESS ...........................................................13
    B.    EVENTS LEADING UP TO THE LONE STAR ACQUISITION .............................15
    C.    MAJOR EVENTS FROM LONE STAR ACQUISITION TO AHL BANKRUPTCY .............17
    D.    REVIEW OF MAJOR TRANSACTIONS AND POTENTIAL ESTATE CLAIMS
        AGAINST THE LONE STAR ENTITIES ...........................................................20
    E.    SIGNIFICANT POST-PETITION DATE FILINGS AND EVENTS .......................26
V. THE PLAN ...............................................................................................................43
    A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS..................43
    B.    CONVENIENCE CLASSES .............................................................................58
    C.    ALLOWANCE AND DISALLOWANCE OF CLAIMS AND INTERESTS .................58
    D.    SUBORDINATION OF LATE FILED CLAIMS. .................................................59
    E.    SUBORDINATION AND SUBROGATION RIGHTS AND CLAIMS OF
        SUBORDINATION AND SUBROGATION .........................................................59
    F.    DEEMED CONSENT ....................................................................................59
    G.    LIQUIDATING TRUST .................................................................................59
    H.    CONSOLIDATED HOLDCO PLAN ADMINISTRATOR.......................................67
    I.    GLOBAL SETTLEMENT AND COMPROMISE OF DISPUTES .........................69
    J.    MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................75
    K.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................81
    L.    VESTING OF ASSETS ..................................................................................83
    M.    DISTRIBUTIONS ........................................................................................83
    N.    EXCULPATIONS ..........................................................................................86
    O.    PRESERVATION OF DEBTORS' CAUSES OF ACTION......................................87
    P.    PLAN INJUNCTION .....................................................................................87
    Q.    CONDITIONS PRECEDENT TO EFFECTIVE DATE OF PLAN. .........................88
    R.    RETENTION OF JURISDICTION......................................................................89
VI. CONFIRMATION AND CONSUMMATION PROCEDURE .........................................94
    A.    DISCLOSURE AND SOLICITATION ...............................................................94
    B.    ACCEPTANCE OF THE PLAN .......................................................................94
    C.    CLASSIFICATION .......................................................................................94
    D.    CONFIRMATION.........................................................................................94
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN......................96
    A.    TAX TREATMENT OF THE LIQUIDATING TRUST .......................................97

74392.000009 EMF_US 29471070v30

# TABLE OF CONTENTS

**Page**

  B. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS ................98

  C. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF
    CLAIMS OR INTERESTS ..................................................................................99

VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ...................105

  A. FORWARD LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT MAY
    PROVE TO BE INACCURATE ........................................................................105

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .....................................................................................................................106

  A. LIQUIDATION UNDER CHAPTER 7 ............................................................106

  B. ALTERNATIVE PLAN(S) OF REORGANIZATION......................................106

X. CONCLUSION ....................................................................................................107

# EXHIBITS

Exhibit A     Debtors' Fourth Amended Chapter 11 Plan of Liquidation

Exhibit B     Liquidation Analysis

Exhibit C     Plan Support Agreement and Term Sheet

# I. PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Fifth Amended Disclosure Statement (the "Disclosure Statement") is submitted by the Debtors, which are the proponents of the Debtors' Fourth Amended Chapter 11 Plan of Liquidation (the "Plan"). The purpose of the Disclosure Statement is to provide Creditors and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan. The purpose of the Plan is to effect a liquidation of the Debtors' Assets and to distribute the proceeds of the Debtors' Assets to Creditors in a manner that will maximize recoveries by Creditors. *Defined terms used, but not defined in this Disclosure Statement, shall have the meaning ascribed to such terms in the Plan. Accordingly, please refer to the Plan for definitions of certain important terms used in this Disclosure Statement.*

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Creditors under the Plan (Section V, *The Plan*);
- Describes the procedures for soliciting and casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);
- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Information Regarding the Debtors and Events Leading to the Commencement of the Cases*);
- Reviews the Debtors' major transactions with and the Estates' potential claims against the Lone Star Entities (Section IV.D, *Review of Major Transactions and Possible Estate Claims against the Lone Star Entities*);
- Describes the significant events that have occurred during the Chapter 11 Cases (Section IV.E, *Significant Events During the Chapter 11 Cases*);
- Describes the means for implementing the Plan (Section VI.E, *The Liquidation of the Debtors*);
- Projects the total percentage recovery that each Class of Allowed Claims and Interests is likely to receive (Section II, *Short Summary of the Plan*); and
- Evaluates liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX.A, *Liquidation Under Chapter 7*).

# II. SHORT SUMMARY OF THE PLAN

At the beginning of these bankruptcy cases in May 2009, the Debtors and their advisors expected returns of 5-10% to unsecured creditors. The housing crisis had increased the Debtors' liabilities while depleting the value of the Debtors' remaining assets, and the Debtors were faced with the prospect of initiating and funding prolonged, expensive, and risky litigation in an effort to increase recoveries to creditors. Now, the Debtors and their advisors expect unsecured creditors of the operating companies to receive significant recoveries that very well may reach 100%, and expect unsecured creditors of the holding company to receive recoveries of approximately 65%.

These drastic improvements should be attributed in no small part to the partial recovery of the housing market and economic stimulus measures, including tax cuts, enacted by Congress. These improvements can also be attributed to the Debtors' successes in liquidating assets, minimizing ongoing expenses, and reducing claims through negotiation and litigation.

More importantly, however, the improvements in estimated unsecured creditor recoveries from 5-10% to 65-100% should be attributed to the global settlement reached between the Debtors, their major creditor constituencies, and their potential litigation targets. This settlement cuts through the knots entangling the Debtors' assets, freeing those assets for distributions to creditors, if the Plan is confirmed. If the Plan is confirmed, this settlement will prevent the resources of the Debtors' estates and creditors from being used to fund risky and expensive litigation, instead of payments to creditors. This settlement will provide fair and equitable treatment to the numerous and varied creditors in these cases, if the Plan is confirmed. **However, confirmation of the Plan and approval of this global settlement does depend upon a sufficient number of creditors casting Ballots to accept the Plan and this global settlement, including the Creditor Release.**

The Plan is a liquidating plan. It does not contemplate the continuation of the Debtors' collective businesses, although it does contemplate the continuation of Consolidated Holdco (defined below) for the limited purposes provided for under the Plan. The Plan:

(i) incorporates and implements the Plan Support Agreement and Term Sheet entered by the Debtors, the Committee, and various creditors and parties-in-interest;

(ii) substantively consolidates the assets and liabilities of Accredited Home Lenders Holding Co. ("Holdco") with those of its wholly owned subsidiary, Vendor Management Services, LLC (collectively referred to herein with Holdco as "Consolidated Holdco");

(iii) appoints a Plan Administrator to liquidate the assets of Consolidated Holdco and distribute the proceeds of those assets to creditors of Consolidated Holdco pursuant to the terms of the Plan;

(iv) substantively consolidates the assets and liabilities of Accredited Home Lenders, Inc., Inzura Insurance Services, Inc. and Windsor Management Co. (collectively referred to herein as the "Consolidated Debtors");

(v) establishes a Liquidating Trust that will acquire the Consolidated Debtors Assets, liquidate those assets, and distribute the proceeds of those assets to the creditors of the Consolidated Debtors pursuant to the terms of this Plan;

(vi) resolves the intercompany claims of the Consolidated Debtors and Consolidated Holdco;

(vii) settles all claims that the Debtors may have against Lone Star Releasees and Plan Releasees (including certain potential claims against current and former officers and directors of the Debtors and pre-petition professionals of the Debtors) in exchange for cash payments from the Lone Star Entities, their insurers, and insurers of the Debtors to

2

certain of the Debtors and certain creditors in amounts exceeding of $49,750,000, including the $4 million Lone Star Advance, and the subordination or waiver of the Claims asserted by the Lone Star Entities that have been asserted in the approximate amount of $100,000,000; and

(viii) provides for the release of certain claims of the Debtors and certain creditors against the Lone Star Releasees and Plan Releasees and for the mutual release of various potential claims amongst the Debtors, the Lone Star Releasees, the Plan Releasees, and various parties to the Plan Support Agreement and Term Sheet, as discussed below in Section V.I.

The releases in the Plan are (i) essential to the success of the Debtors' liquidation and maximization of the value of their assets, (ii) based upon critical financial or other contributions of or on behalf of the parties being released, (iii) necessary to make the Plan feasible, (iv) fair to creditors, and (v) integral to obtaining the value provided under the settlement with the Lone Star Releasees and Plan Releasees. The Debtors will seek at the Confirmation Hearing to bind and enforce these releases.

The following table briefly summarizes the treatment of Allowed Claims and Interests and the provisions of the Plan. **Most of the claims of borrowers, employees, and vendors will be initially classified in Class 4 C. Such claimants will have the option to elect for treatment under Class 3 C or Class 6 C. The REIT itself will have claims in Classes 6 H, 3 C, and 7 C. All of the claims of REIT Preferred Shareholders relating to or arising from their ownership of REIT shares will be classified in Class 9 H.** For a more detailed description of the terms and provisions of the Plan, see Section V below.

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified under the Plan. Similarly, Professional Fee Claims are not classified under the Plan. Section V.A.1 below describes the treatment of such Unclassified Claims.

| *Class* | *Impairment and Entitlement to Vote* | *Estimated Allowed Claims* | *Estimated Recovery* |
|---|---|---|---|
| **Class 1 H Secured Claims against Consolidated Holdco** | Unimpaired.<br>Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |

74392.000009 EMF_US 29471070v30

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 2 H**<br>**Priority Claims Other than Priority Tax Claims against Consolidated Holdco** | Unimpaired.<br>Not Entitled to Vote and Deemed to Accept the Plan. | $0 | 100% |
| **Class 3 H**<br>**All Allowed Unsecured Claims against Consolidated Holdco Accepting the Creditor Release** | Impaired.<br>Entitled to Vote. | $0 | Unknown[2] |
| **Class 4 H**<br>**All Allowed Unsecured Claims against the Consolidated Holdco, except for separately classified Claims** | Impaired.<br>Entitled to Vote. | $ Unknown | Unknown%[3] |
| **Class 5 H**<br>**All Allowed Unsecured Claims against Holdco held by LSF-MRA, LLC** | Impaired.<br>Entitled to Vote. | $97 Million[4] | 0% |

---

[2] The estimated recovery for Class 3 H is listed as unknown because the Debtors believe that there will be no creditors holding claims in Class 3 H. To the extent there are creditors holding Allowed Class 3 H Claims, this estimated recovery may be adjusted and be less than 100%.

[3] The amount of Allowed Claims in Class 4 H and recoveries obtained by Holders of such Claims cannot be estimated since participation in Class 4 H is optional for Holders of Unsecured Claims against Consolidated Holdco. Moreover, as discussed above in footnote 2, the Debtors do not believe there will be creditors who will hold Allowed General Unsecured Claims against Consolidated Holdco other than those creditors that are separately classified pursuant to the Plan.

[4] Various parties have questioned the amount of this Claim and this Claim has not been determined or allowed by the Court. In accordance with the terms of the settlement embodied in the Plan Term Sheet and Support Agreement, this Claim will be subordinated as provided under the Plan. Therefore an objection to the allowance of this Claim is not contemplated at this time.

4

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 6 H**<br>**All Allowed Unsecured Claims against Consolidated Holdco held by the REIT** | Impaired.<br>Entitled to Vote. | $20 Million | 76% - 87% |
| **Class 7 H**<br>**All Convenience Claims against Consolidated Holdco** | Impaired.<br>Entitled to Vote. | $1.9 - 2.0 Million | 65% |
| **Class 8 H**<br>**All Claims against Consolidated Holdco arising from or related to any securities or promissory notes issued by the Accredited Preferred Securities Trust I** | Impaired.<br>Entitled to Vote. | $60 Million | 70% |
| **Class 9 H**<br>**All Claims against Consolidated Holdco arising from the REIT Preferred Holder's Subordinated Guaranty Claims** | Impaired.<br>Not Entitled to Vote and Deemed to Reject Plan. | $102 Million | 0 %[5] |

---

[5] Under the Plan, the REIT itself will be receiving large distributions from both Consolidated Holdco and the Consolidated Debtors. After paying expenses, the REIT has advised the Debtors that it intends on distributing these funds, together with other funds it is holding, to the REIT's creditors, if any, and to its Preferred Shareholders in accordance with the contracts governing the REIT and its Preferred Shareholders. The REIT is not a Debtor in the Bankruptcy Cases. The REIT has separate management and legal counsel. Nothing in the Plan affects or modifies the REIT's obligations to its creditors and the REIT Preferred Shareholders, including any claims held by REIT Preferred Shareholders against the REIT for unpaid dividends.

74392.000009 EMF_US 29471070v30

| _Class_ | _Impairment and Entitlement to Vote_ | _Estimated Allowed Claims_ | _Estimated Recovery_ |
|---|---|---|---|
| **Class 10 H** **All other Subordinated Claims (including Late Filed Claims) against Consolidated Holdco** | Impaired. Not Entitled to Vote and Deemed to Reject Plan. | $0 | 0% |
| **Class 11 H** **All Interests in Consolidated Holdco** | Impaired. Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |
| **Class 1 C** **Secured Claims against the Consolidated Debtors** | Unimpaired. Not Entitled to Vote and Deemed to Accept the Plan. | $80,000 | 100% |
| **Class 2 C** **All Allowed Unsecured Claims against the Consolidated Debtors entitled to priority under §§ 507(a)(3) through (a)(7) of the Bankruptcy Code** | Unimpaired. Not Entitled to Vote and Deemed to Accept the Plan. | $363,000[6] | 100% |
| **Class 3 C** **All Allowed Unsecured Claims against the Consolidated Debtors Accepting the Creditor Release** | Impaired. Entitled to Vote. | $104-108 Million[7] | 100%[8] |

---

[6] This estimate excludes the IRS Priority Tax Claim and includes the expected Viera Claims.

[7] Includes a Claim of the REIT for $37,500,000.

[8] The 100% expected recovery for Holders of Allowed General Unsecured Claims against the Consolidated Debtors in Class 3 C is premised upon the assumptions that (a) the Debtors will receive the full Tax Refunds they have requested, and (b) the Allowed Claims against the Consolidated Debtors will

74392.000009 EMF_US 29471070v30

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 4 C** **All Allowed Unsecured Claims against the Consolidated Debtors, except for separately classified Claims** | Impaired. Entitled to Vote. | $ Unknown | Unknown %[9] |
| **Class 5 C** **All Allowed Unsecured Claims against the Consolidated Debtors held by the Lone Star Entities** | Impaired. Entitled to Vote. | $97 Million[10] | 0% |
| **Class 6 C** **All Convenience Claims against the Consolidated Debtors** | Impaired. Entitled to Vote. | $3.8 Million | 75% |
| **Class 7 C** **REIT Junior Claim** | Impaired. Entitled to Vote. | $15.0 Million | 0% - 4% |
| **Class 8 C** **All Subordinated Claims (including Late Filed Claims) against the Consolidated Debtors** | Impaired. Not Entitled to Vote and Deemed to Reject Plan. | $Unknown | 0% |

be resolved and liquidated within the estimated ranges. The Committee believes that creditors' recoveries could range from 70% to 100%.

[9] The amount of Allowed Claims in Class 4 C and recoveries obtained by Holders of such Claims cannot be estimated since participation in Class 4 C is optional for Holders of Unsecured Claims against the Consolidated Debtors in Class 3 C and Holder of Convenience Claims against the Consolidated Debtors in Class 6 C.

[10] Various parties have questioned the amount of this Claim and this Claim has not been determined or allowed by the Court. In accordance with the terms of the settlement embodied in the Plan Term Sheet and Support Agreement, the Lone Star Entities are waiving their right to receive distributions on this Claim. Therefore an objection to the allowance of this Claim is not contemplated at this time.

74392.000009 EMF_US 29471070v30

| Class | Impairment and Entitlement to Vote | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 9 C** <br><br> **All Claims against the Consolidated Debtors arising from or related to Trust Preferred Note, Trust Preferred Guarantee, Trust Preferred Note Claim, or the Trust Preferred Securities** | Impaired. <br><br> Not Entitled to Vote and Deemed to Reject Plan. | $5 Million | 0% |
| **Class 10 C** <br><br> **All Interests in the Consolidated Debtors** | Impaired. <br><br> Not Entitled to Vote and Deemed to Reject Plan. | N/A | 0% |

## III. SOLICITATION AND VOTING PROCEDURES

### A.     Chapter 11 Generally

Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to take certain actions to reorganize or sell its business for the benefit of its creditors, shareholders and other parties in interest. The confirmation and consummation of a plan of reorganization is the objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor, and is implemented only after it has been confirmed by the Bankruptcy Court. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of the debtor. Subject to certain limited exceptions, the confirmation order discharges the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan.

Generally, the holders of claims against or interests in a debtor that are classified under the plan are permitted to vote to accept or reject the Plan. For the Bankruptcy Court to confirm a plan, the plan must be accepted by at least one class of creditors whose interests or rights are impaired under the plan. The Bankruptcy Code provides that a plan has been accepted by a class of claimants if holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed claims of that class have voted in favor of the plan.

**ONLY THE VOTES OF HOLDERS WHO SUBMIT PROPERLY COMPLETED BALLOTS VOTING FOR OR AGAINST THE PLAN WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER THE REQUISITE ACCEPTANCES OF THE CLASSES OF CLAIMS AND INTERESTS HAVE BEEN RECEIVED. FAILURE**

BY A HOLDER TO DELIVER A DULY SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY THAT HOLDER WITH RESPECT TO THE VOTE ON THE PLAN. ABSTENTIONS WILL NOT BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN AND THEREFORE WILL HAVE NO EFFECT. FURTHERMORE, THE DEBTORS RESERVE THE RIGHT PRIOR TO CONFIRMATION OF THE PLAN TO SEEK TO HAVE ANY PARTY'S VOTE ESTIMATED SOLELY FOR PURPOSES OF COUNTING SUCH VOTE IN ACCORDANCE WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018.

The Bankruptcy Code also requires that the solicitation of acceptances of the proposed plan must be accompanied by a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. That is the purpose of this Disclosure Statement.

The Plan provides for specified distributions to the various Classes of Holders of Claims and Interests, which are described in detail herein. The Debtors believe that the Plan provides consideration to all Classes of Claims and Interests that reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of Claims and Interests. In addition to the voting requirements discussed above, the Bankruptcy Court must find that various statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed.

**B. Solicitation of Acceptances of the Plan**

Under the Plan, all Claims and Interests have been placed in various Classes based on the nature and priority of the Claim or Interest. Each Class is either impaired or unimpaired under the Plan, as such terms are defined in § 1124 of the Bankruptcy Code. A Class of Claims or Interests that is unimpaired is conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in impaired Classes that are to receive distributions under the Plan or are entitled to the right to vote as provided under the Plan Support Agreement and Term Sheet. As discussed above, for impaired Classes, § 1126 of the Bankruptcy Code provides that an impaired Class of Claims or Interests is deemed to accept the Plan if Holders of at least two-thirds in dollar amount and a majority in number of the Claims who cast Ballots vote to accept the Plan.

Only those Holders who vote to accept or reject the Plan will be counted for purposes of determining whether the Plan is accepted or rejected. Therefore, the Plan could be accepted by any impaired Class of Claims with the affirmative vote of significantly less than two-thirds in dollar amount and a majority in number of the Claims in a Class.

9

## C. Voting on the Plan

The Debtors have requested that the Bankruptcy Court set May 9, 2011 as the deadline for casting ballots approving or rejecting the Plan.

### 1. Who May Vote

Only Holders of Claims in Classes that are impaired are eligible to vote on the Plan. Accordingly, only Holders of Claims in Classes 3 H, 4 H, 5 H, 6 H, 7 H, 8 H, 3 C, 4 C, 5 C, 6 C and 7 C are eligible to vote.

> **The Ballot Deadline is May 9, 2011 at 4:00 p.m. prevailing Pacific Time. You must return your completed Ballot to the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, so that it is actually received by 4:00 p.m., prevailing Pacific Time, on May 9th, 2011.**

### 2. Voting Deadline and Extensions

To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, and after consultation with the Committee and the Lone Star Entities, to extend the Ballot Deadline, in which case the term "Ballot Deadline" will mean the latest date on which a Ballot will be accepted. To extend the Ballot Deadline, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that the Debtors are extending the Ballot Deadline for a specified period of time, or on a daily basis until 5:00 p.m., Eastern Time, on the date on which we have received sufficient acceptances to seek confirmation of the Plan.

### 3. Voting Procedures

An appropriate Ballot is enclosed in the solicitation package included with this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by the Court-appointed balloting agent in this case, Kurtzman Carson Consultants, LLC, at the address indicated on the Ballot, by no later than 4:00 p.m., prevailing Pacific Time, on May 9, 2011.

If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions thereon, being sure to fill in the amount of your Claim in the appropriate space provided and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

In the event that a Ballot is properly executed, but leaves the amount of the Claim blank, the aggregate amount of the Claim for voting purposes will be the amount shown on the Debtors' books and records and listed in the Debtors' Schedules of Assets and Liabilities, unless otherwise ordered by the Bankruptcy Court. If the aggregate amount of the Claims filled in on

your Ballot exceeds the amount indicated by the Debtors' books and records and listed in the Debtors' schedules, the Debtors reserve the right to seek an order of the Bankruptcy Court determining the proper amount of your Claims for voting purposes pursuant to Bankruptcy Rule 3018. Failure of a Holder to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan. Abstentions will not be counted as either acceptances or rejections of the Plan. Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your Ballot to indicate whether you accept or reject the Plan.

The Plan provides for a settlement of (a) the Debtors' and Estates' claims and (b) certain unsecured creditors' claims against the Loan Star Entities (including claims against current and former officers and directors). The Ballot for creditors in Classes 3 H and 3 C will give such creditors the option to release that creditor's claims against the Loan Star Entities in exchange for higher recoveries. Creditors who do not cast a Ballot consenting to such release will be placed in to Classes 4 H and 4 C, as applicable. While creditors in Classes 4 H and 4 C will receive Pro-Rata distributions of their respective Debtor's assets, *creditors of the Consolidated Debtors that do not provide the release of the Lone Star Releasees and Plan Releasees will not receive distributions from the Lone Star Consolidated Debtors Settlement Payment, and creditors of Consolidated Holdco that do not provide the release of the Lone Star Releasees and Plan Releasees will not share in LSF MRA, LLC's distributions from Consolidated Holdco. However, creditors who do not provide this release will preserve their right to bring an action against the Lone Star Releasees and Plan Releasees.*

Submission of all Ballots must be made directly to the balloting agent appointed in the Bankruptcy Proceeding, Kurtzman Carson Consultants, LLC, in accordance with the instructions on the Ballots. In all cases, sufficient time should be allowed to assure timely delivery. You may receive multiple solicitation packages. You should only vote one Ballot for each Class of which you are a member.

If you must return your Ballot to your bank, broker, agent, or nominee, then you must return your Ballot to such bank, broker, agent, or nominee in sufficient time for them to process your Ballot and return it to the above address before the deadline. Your Ballot will not be counted if received after this deadline.

Should you have any questions regarding voting, please contact counsel to the Debtors, Gregory G. Hesse, at (214) 979-3000, or counsel to the Committee, Jeffrey N. Rothleder, at (202) 828-3472.

4.    Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Ballot Deadline. A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to Kurtzman Carson Consultants, LLC at its address set forth on the Ballot at any time prior to the Ballot Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

74392.000009 EMF_US 29471070v30

To be valid, a notice of withdrawal must:

- specify the name of the Holder who submitted the votes on the Plan to be withdrawn;
- contain the description of the Claim; and
- be signed by the Holder in the same manner as on the Ballot.

The Debtors expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to withdrawal as specified above, any Holder who has previously submitted a properly completed Ballot may revoke and change its vote by submitting to Kurtzman Carson Consultants, LLC prior to the Ballot Deadline a subsequent properly completed Ballot. If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted. If more than one Ballot is submitted, and the later dated Ballot(s) supplement rather than supersede the earlier Ballot(s), the subsequent Ballot(s) must be marked with the words "Additional Votes" or other language customarily used to indicate additional votes that are not meant to revoke earlier votes.

## D.    Other General Information

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS THAN OTHER AVAILABLE ALTERNATIVES. A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE IS ANNEXED HERETO AS **EXHIBIT B**. THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN AND PROVIDE THE RELEASES PROVIDED UNDER THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE APPLICABLE DEBTOR AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN AND TO DETERMINE WHETHER TO PROVIDE THE RELEASES SET FORTH IN THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS

74392.000009 EMF_US 29471070v30

ONLY A SUMMARY, AND HOLDERS OF CLAIMS, INTERESTS, AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

General information regarding the Debtors, their businesses and material events leading to their commencement of the Cases and the proposal of the Plan is set forth in Section IV. Except where otherwise noted, this information is provided by the Debtors and their management. **THE STATEMENTS AS TO THE APPLICABLE DEBTOR'S FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF APRIL 4, 2011 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE, NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Certain risk factors and other considerations are described in Section VII below. Alternatives to confirmation and consummation of the Plan are described in Section IX below.

**THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE APPLICABLE DEBTOR AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

## IV. GENERAL INFORMATION ON THE DEBTORS AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASES

### A. Explanation of AHL's Business

Accredited Home Lenders, Inc. ("AHL, Inc.") was founded in San Diego, California in 1990. It grew to become one of the nation's premier mortgage banking institutions with over 5,000 employees engaged in the business of originating, servicing, and selling residential mortgage loans that did not generally conform to the credit or other criteria established by the Federal National Mortgage Corp. and the Federal Home Loan Mortgage Corp. At its peak in 2006, AHL, Inc. originated in excess of $2 billion in residential home mortgages per month. AHL, Inc.'s parent company, Accredited Home Lenders Holding Co. ("Holdco"), became a public company in 2003 and its initial public offering was the NASDAQ's best-performing IPO that year.

AHL, Inc. was a mortgage lender specializing in providing non-prime residential loans in the United States.[11]  It worked with potential borrowers and lenders to arrange loans for the

---

[11] A wholly owned subsidiary of Holdco, Accredited Home Lenders Canada, Inc. ("AHL Canada") conducted operations similar to AHL, Inc. in Canada. AHL Canada was a subsidiary of Holdco until

purchase of residential property secured by mortgages on such properties. The key market drivers for AHL, Inc's loan origination business were home prices and interest rates. Increasing home prices drove higher collateral values and more demand for financing new mortgages and refinancing existing mortgages. Low interest rates resulted in more affordable mortgage payments and also drove new loan origination and refinancing demand.

AHL, Inc. focused its business operations in three areas: (i) retail originations; (ii) wholesale originations; and (iii) servicing. In the retail business, AHL, Inc. served as both the mortgage broker and lender working directly with the borrower to obtain, underwrite and close the mortgage loan, and AHL, Inc. typically received a fee for both of these services. AHL, Inc. targeted new borrowers for its retail business through branch retail offices until September 2007 and also through its call center operations responding to internet and phone leads from customers. In the wholesale business, AHL, Inc. only served as the lender and had account executives that targeted third party retail mortgage brokers that originated the loans.

In 2004, AHL, Inc. formed the Accredited Mortgage Loan REIT Trust (the "REIT"), which was a wholly owned subsidiary of AHL, Inc. As part of its formation, the REIT issued $102 million of 9.75% perpetual, cumulative preferred shares. After originating loans and mortgages, AHL, Inc. would contribute as capital the loans to the REIT, which would in turn securitize the mortgages, sell the securities backed by those mortgages and upstream the proceeds from the securitizations to AHL, Inc. as either dividends or inter-company loans. The securitization process was a major source of cash for continuing AHL, Inc.'s lending operations. The REIT retained a residual income stream from these mortgage-backed securities. Pursuant to agreements between AHL, Inc. and the REIT (including the Administration and Services Agreement dated October 1, 2004 between AHL, Inc. and the REIT),[12] AHL. Inc. earned and received a management fee for managing the REIT. Further, as payments were received from the residuals, the REIT transferred the cash to AHL, Inc. in the form of dividends and transfers recorded as inter-company loans. As of the end of 2007, the REIT had allegedly transferred over $190 million to AHL, Inc. and by the end of 2008, the REIT had allegedly transferred over $220 million to AHL, Inc. However, there were no explicit plans made at any time for repayment of the accumulated balance of the transfers from the REIT to AHL. The REIT and the REIT Committee assert that the non-dividend transfers described above were loans and to the extent any party asserts to the contrary, the REIT and the REIT Committee reserve all of their rights, claims and defenses. The transactions involving REIT are the subject of the REIT Adversary, which is discussed below in Section III.D.7.

Pending the sale of any loan, and after securitizing the loans and mortgages it originated, AHL, Inc. often retained the role of servicing these loans for the benefit of the owner of the loan. AHL, Inc.'s servicing activities included collecting and applying the payments from borrowers and policing the borrowers' obligations under the mortgages and loans. The owners of these

---

September 2008, at which time Holdco transferred the ownership of the equity interests in AHL Canada to AHL, Inc.

[12] A copy of the Administration and Services Agreement between AHL, Inc. and the REIT is available upon request made to Debtors' counsel.

14

loans compensated AHL, Inc. for providing these services. As was customary in the loan servicing business, AHL, Inc. often advanced funds (1) to the holders of the securitization bonds/certificates for principal, interest and fee payments, (2) to pay taxes and insurance on behalf of the borrower to protect the collateral and (3) for corporate advances. These servicing advances were regularly recorded on AHL, Inc.'s books as receivables and were generally considered to be collectible.

In addition, AHL, Inc. and its affiliates provided other services relating to residential mortgages, such as servicing and managing foreclosures, providing various insurance-related services such as core title and settlement services, and providing expanded insurance services for mortgage brokerage and mortgage lending operations.

## B.     Events Leading Up To The Lone Star Acquisition

On or about September 29, 2006, AHL, Inc., as borrower, Holdco, as guarantor, and JPMorgan Chase Bank, as lender ("JP Morgan") entered into that certain $75 million revolving senior secured facility (the "Senior Secured Facility"). The Senior Secured Facility was secured by (1) AHL, Inc.'s master servicing rights and (2) servicer advances made by AHL, Inc.

On or about October 1, 2006, Holdco acquired a competing subprime lender, Aames Investment Corporation ("Aames") for stock valued at the time at approximately $235 million and cash in the amount of $94 million. Holdco acquired Aames in order to expand its retail lending operations.

The year 2007 brought a severe downturn in the United States' real estate markets and a subprime mortgage crisis. In the midst of this crisis, the secondary market for non-prime residential loans ceased to exist for all practical purposes, which in turn resulted in the cessation of originations of non-prime residential mortgages. Since the origination and sale of non-prime residential mortgages was AHL, Inc.'s primary area of business, the Debtors suffered severe liquidity issues and became distressed because of their inability to sell the loans they originated.

In January, 2007, Holdco established an affiliate, Accredited Preferred Securities Trust I, a Delaware statutory trust ("APS"), and issued debentures to APS (the "Trust Preferred Note"). APS is not a debtor in these chapter 11 proceedings. APS in turn sold trust preferred securities to the public (the "Trust Preferred Securities"). The current owners of the Trust Preferred Securities are the Kodiak CDOs and JP Morgan (the "Trust Preferred Holders "). As a result of these transactions, Holdco raised approximately $56 million and Holdco became liable to APS for the amount raised plus interest. Thus, APS itself, through the Trust Preferred Indenture Trustee, has a claim against Holdco for approximately $56 million. Further, since Holdco also guaranteed payments of dividends to the Trust Preferred Holders (the "Trust Preferred Guarantee"), the Trust Preferred Holders have direct claims against Holdco for approximately $56 million[13]. However, the Trust Preferred Holders and the Trust Preferred Indenture Trustee

---

[13] To the extent any party in interest would like additional information relating to the claims of the Trust Preferred Security Holders, a complete set of documents is attached to Proof of Claim No. 837 filed by the Trust Preferred Indenture Trustee.

74392.000009 EMF_US 29471070v30

would not be entitled to double recovery from Holdco on their respective claims. The claims arising under the Trust Preferred Note and the Trust Preferred Guarantee are contractually subordinated to certain claims. The REIT has asserted and the Trust Preferred Holders dispute that the claims arising under the Trust Preferred Note and the Trust Preferred Guaranty are subordinate to the intercompany loan to AHL, Inc. In turn, other claims are contractually subordinated to the claims arising under the Trust Preferred Note and the Trust Preferred— including the claims of the REIT Preferred Security Holders[14].

In early 2007, AHL, Inc's warehouse lenders reduced collateral values and placed large margin calls on AHL, Inc. that totaled over $200 million. In order to create liquidity, in March, 2007, AHL, Inc. sold mortgages to Citigroup with an unpaid principal balance of approximately $2.7 billion at a discount of approximately 7%. To provide further liquidity, around this time, Holdco, AHL, Inc., and the REIT obtained a $230 million bridge loan from Farallon Capital Management, LLC ("Farallon"), which loan was secured by all or substantially all of the assets of Holdco, AHL, Inc. and the REIT (the "Farallon Loan").

On or about March 30, 2007, Wachovia Bank ("Wachovia") agreed to provide AHL, Inc. with a $750 million warehouse line of credit that was in the form of a master repurchase agreement (the "Wachovia MRA"). Subsequently, the Wachovia MRA was amended numerous times, including an amendment that increased the maximum availability from $750 million to $1 billion.

As 2007 progressed, the sub-prime lending industry was imploding. For example HSBC took an $11 billion write down due to subprime mortgages, marking the first of many write downs for large banks. New Century Financial and American Home Mortgage collapsed and filed for bankruptcy. Most major banks closed subprime lending arms. Overall, almost all of the top 25 subprime originators from 2006 ceased to exist.

In June, 2007, Lone Star Fund V, a fund that targets distressed investments, made an offer to buy all of the outstanding shares of Holdco for $15.10 per share (approximately $400 million).

Lone Star Fund V subsequently announced that it believed that the conditions of the tender offer would not be met and that it would not tender for shares. As a result, Holdco and Lone Star Fund V sued each other in Delaware Chancery Court.

On or about August 22, 2007, Holdco issued a press release announcing steps that it was taking to respond to the "ongoing turmoil in the non-prime mortgage industry." Among the operational restructuring initiatives were (1) the closing of 60 retail branch locations and 5

---

[14] During the Hearing on the Debtors Disclosure Statement conducted on March 30, 2011, Mark Power, counsel to the REIT Committee (consisting of REIT Preferred Security Holders) represented to the court that it was his opinion that the Claims of the REIT Preferred Security Holders are subordinate the claims arising from the Trust Preferred Note and the Trust Preferred Guaranty. The Trust Preferred Security Holders deny that the Claims arising from the Trust Preferred Notes and the Trust Preferred Note and the Trust Preferred Guaranty are subordinate to the Claims of the REIT.

centralized retail support locations; (2) the closing of 5 wholesale lending divisions; and (3) ceasing to accept new loan applications.

In September, 2007, Holdco and Lone Star Fund V resumed negotiations which culminated on September 18, 2007, with Holdco and LSF5 Accredited Investments, LLC ("LSF5 Investments") executing an amended merger agreement. Pursuant to the terms of the amended merger agreement, on September 18, 2007, LSF5 Mortgage Line, LLC, a Lone Star affiliate, ("LSF5 Mortgage Line") purchased the Senior Secured Facility at par from JP Morgan for $33 million. Furthermore, on September 18, 2007, LSF5 Mortgage Line advanced approximately $15 million in additional funds under the Senior Secured Facility to AHL, Inc. and extended the maturity date until September, 2008.

On October 12, 2007, LSF5 Investments, a Lone Star affiliate, acquired Holdco for $11.75 per share (approximately $300 million).

## C.     Major Events From Lone Star Acquisition To AHL Bankruptcy

### 1.     Market Conditions

Since the Lone Star Entities acquired the Debtors, the United States has suffered through one of the worst economic down turns since the Great Depression. The economic down turn initially started in the non-prime mortgage lending arena and has spread to almost every other segment of the economy. Among the major events that occurred after the Lone Star Entities acquired the Debtors, but before the Debtors filed for bankruptcy, are:

- December, 2007--the U.S. economy enters into a recession as announced by the Business Cycle Dating Committee on December 11, 2008.

- January, 2008--Bank of America acquires Countrywide Financial.

- March 17, 2008--Bear Stearns is acquired by JP Morgan with financial assistance from the Federal Reserve Bank of New York.

- July 11, 2008--IndyMac Bank, a large residential mortgage lender, fails.

- September 7, 2008--Fannie Mae and Freddie Mac are placed into government conservatorship.

- September 15, 2008--Lehman Brothers files for bankruptcy.

- September 15, 2008--Bank of America announces that it will purchase Merrill Lynch.

- September 16, 2008--AIG avoids collapse as a result of an $85 billion bailout by the Federal Reserve Bank of New York.

- September 25, 2008--Washington Mutual Bank, a large residential mortgage lender, fails.

- September 29, 2008--The FDIC announces that Citigroup will buy the assets of Wachovia, financed in part by the FDIC.

74392.000009 EMF_US 29471070v30

- October 3, 2008--Wells Fargo Bank makes a competing offer for Wachovia, which is ultimately accepted.

- October 3, 2008--Congress passes and President Bush signs legislation establishing the $700 billion Troubled Asset Relief Program ("TARP").

- October 24, 2008--PNC Financial Services Group purchases National City Corporation.

- October 28, 2008--U.S. Treasury purchases a total of $125 billion of preferred stock in nine U.S. banks. This is the first of many purchases by the U.S. Treasury of preferred stock in U.S. banks with funds from TARP.

- November 23, 2008--U.S. Treasury, the Federal Reserve Board and the FDIC jointly announce an agreement with Citigroup to provide a package of guarantees, liquidity access and capital, including an investment of $20 Billion by the U.S. Treasury.

- December 19, 2008--the U.S. Treasury authorizes loans of up to $13.4 billion for General Motors and $4 Billion for Chrysler from TARP.

- December 22, 2008--Federal Reserve Board approves application of CIT Group to become a bank holding company.

- December 24, 2008--Federal Reserve Board approves application of GMAC to become a bank holding company.

- December 29, 2009--U.S. Treasury announces that it will purchase $5 billion of equity in GMAC.

- January 16, 2009--U.S. Treasury, Federal Reserve and FDIC jointly announce an agreement with Bank of America to provide a package of guarantees, liquidity access and capital, including an investment of $20 billion by the U.S. Treasury.

- March 19, 2009--U.S. Treasury announces the Auto Supplier Support Program that will provide up to $5 billion of financing to the automotive industry.

2. Management and Governance of AHL

Immediately after LSF5 Investments acquired Holdco, the board of directors of Holdco consisted of two pre-acquisition directors, Jim Konrath and Joe Lydon, and six directors affiliated with the Lone Star Entities, Len Allen, Marc Lipshy, Catharon Miller, Leigh Rea, Michael Thompson and Benjamin Velvin. The members of the board of directors changed frequently until finally in March, 2009, each Debtor had only one director, Chad Patton, a Lone Star affiliate. At all times after the acquisition at least a majority of the members of the Debtors' boards of directors were affiliated with the Lone Star Entities.

3. Operations

Through the first half of 2008, AHL, Inc. focused its efforts on restarting its loan origination business, which was stopped prior to the acquisition of Holdco by LSF5 Investments. In order for the loan origination business to be successful, a secondary market for the mortgages must exist. AHL, Inc. had very limited success in identifying a secondary market for its loans.

74392.000009 EMF_US 29471070v30

So, the Lone Star Entities attempted to provide a portion of the secondary mortgage market and it purchased the securities issued by three "residential loan pools" (each a "RLP" and collectively, the "RLPs") established by AHL, Inc. at a total purchase price of $193 million.

The first, and largest, sale was $133 million of loans sold at 101.6% ($62 million "legacy" loans (pre-Lone Star) at 100% and $71 million "new" loans at 103%) in March, 2008. Because these loans were generally financed on the Wachovia MRA at less than par, the sale of the March, 2008 RLP resulted in excess cash paid to AHL, Inc. in the amount of approximately $31 million. The second sale in May 2008, was $39 million of loans sold at par, which resulted in excess cash paid to AHL, Inc. in the amount of $9 million. The third, and final, sale in June was $17 million of loans sold at 99%, which resulted in excess cash paid to AHL, Inc. in the amount of $4 million.

As part of the transaction, the RLPs had typical repurchase rights. AHL, Inc. honored approximately $2.5 million of repurchases from the RLPs, which benefitted certain Lone Star Entities, during a period when it was generally not honoring repurchase demands from other parties. AHL, Inc.'s honoring of these repurchase demands could give rise to an action under Chapter 5 of the Bankruptcy Code against the Lone Star Entities, which, if pursued could result in a recovery for the Estates. AHL, Inc. serviced these loans on behalf of the RLPs, on terms substantially similar to those available in an arm's length transaction, until the RLPs terminated AHL, Inc.'s right to service the loans on or about March 17, 2009. Those servicing rights were transferred to Vericrest, a Lone Star Entity, on or about March 17, 2009.

As a result of limited success in identifying a secondary market for its loans, in June, 2008, AHL, Inc. implemented certain operational restructurings, including the closing of four of its five wholesale operations centers and consolidating its wholesale business in San Diego. In addition, AHL, Inc. laid off close to one-half of its workforce.

AHL, Inc. commenced further operational restructuring initiatives beginning in the second half of August, 2008. The restructurings included the suspension by AHL, Inc. of its wholesale operations that had been previously consolidated into the San Diego office in June. However, AHL, Inc. retained 40 wholesale personnel that were repurposed for other tasks. The retail operations were consolidated in Irving, Texas, and the San Diego and Cincinnati retail operations were shut down. Overall, AHL, Inc. terminated another one-third of its workforce at this time, leaving under 400 people employed.

After the August, 2008, restructuring, AHL, Inc. had approximately 40 wholesale staff including account executives positioned throughout housing markets, 40 retail staff that were focusing on FHA and conventional loan activity, and a servicing team of approximately 185 people. In addition to the retail, wholesale and servicing personnel, AHL, Inc. also employed approximately 90 corporate personnel and approximately 25 personnel at its Inzura business providing insurance services. At this time, AHL, Inc. was trying to develop synergies with other of the Lone Star Entities' mortgage-related resources.

Throughout the summer 2008, AHL, Inc. worked on a number of loan sales including sales to Countrywide ($30 million) and Beal Bank ($46 million). As part of the transaction with

Countrywide, LSF5 Mortgage Line arranged a $1 million guarantee to Countrywide, which was executed in August, 2008. The Countrywide guarantee was a material term included in the July 21, 2008 Amendment to the Senior Secured Facility. Since both sales closed after LSF MRA, LLC, a Lone Star Affiliate ("LSF MRA"), purchased the Wachovia MRA from Wachovia on August 13, 2008,[15] LSF MRA had the right under that former Wachovia MRA to require all proceeds be used to pay down the former Wachovia MRA (the "Amended MRA"). However, LSF MRA chose not to exercise that right and allowed AHL, Inc. to retain approximately $9 million of proceeds, which was the excess of the sale price over the advance rate under the Amended MRA.

AHL, Inc. appeared to be executing its business strategies during the months of September and October of 2008 while its liquidity position continued to place pressure on the company. As noted above, external market conditions took a dramatic turn for the worse in September, 2008, when Lehman Brothers filed for bankruptcy and AIG was, effectively, taken under government control. In an effort to provide liquidity to the company, in mid October, AHL, Inc. was in negotiations with Caliber Funding, LLC ("Caliber"), a Lone Star affiliate, regarding the potential sale of Inzura and Windsor to Caliber Funding, LLC, which sales never materialized.

## D.     Review of Major Transactions and Potential Estate Claims against the Lone Star Entities

### 1.     Repayment of Farallon

On or about October 12, 2007, Farallon delivered to Holdco written notice demanding payment in full of the Farallon Loan, which Farallon accelerated under the loan agreement's change-in-control provisions. Immediately after acquiring Holdco, LSF5 Investments contributed $100 million into Holdco as equity and, on or about November 21, 2007, LSF5 Affiliate Finance, LLC, a Lone Star affiliate, ("Affiliate Finance") made an unsecured short term loan in the amount of $130 million to Holdco (the "$130 Million Unsecured Loan"). While the promissory note evidencing the $130 Million Unsecured Loan was executed solely by Holdco, the companies' accounting records reflect the debt as an obligation of AHL, Inc. The proceeds of the capital contribution and the $130 Million Unsecured Loan along with cash on hand was used to satisfy, in full, the Farallon Loan, including principal, interest in the amount of $6.7 million, pre-payment fees of $4 million, and expenses of $581,000. The $130 Million Unsecured Loan was a five month loan with interest payable at 13%, which the parties anticipated would be paid from an expected tax refund in excess of the loan amount.

In January 2008, a tax refund in the approximate amount of $150 million was received by Holdco as the named taxpayer, due to its status as agent of the Debtors' consolidated corporate group. While Holdco received the funds, the refund was primarily based on the operations of AHL, Inc., and the tax refund was listed as an asset of AHL, Inc. on each of the company's internal accounting records. On January 31, 2008, Holdco made a payment in the amount of $65

---

[15] The loan sale to Beal Bank closed on August 28, 2008. The loan sale to Countrywide had multiple closings throughout September, 2008.

million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to partially satisfy the principal balance of the $130 Million Unsecured Loan. On or about January 31, 2008, Holdco transferred most of the remaining proceeds from the tax refund to AHL, Inc. On February 25, 2008, AHL, Inc. made a payment in the amount of $65 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, to satisfy the remaining principal balance of the $130 Million Unsecured Loan. Both payments were made in advance of the maturity of the underlying loan. During the period of time that the $130 Million Unsecured Loan was outstanding, it accrued interest in the total amount of approximately $3.9 million. On or about July 30, 2008, within the one year period prior to the commencement of these chapter 11 cases, AHL, Inc. paid $3 million to LSF5 Mortgage Line, as successor-in-interest to Affiliate Finance, in partial satisfaction of the outstanding interest owed and Holdco converted to equity the remaining $900,000 in interest owing on the $130 Million Unsecured Loan. Had the Debtors sought protection under the Bankruptcy Code before January 31, 2009, the entire $130 Million Unsecured Loan repayment would have been within the one year period in which the Debtors' bankruptcy estates could have sought to recover such payments as preferences under § 547 of the Bankruptcy Code. Since the Debtors did not file bankruptcy until May 1, 2009, the $130 Million Unsecured Loan repayment is not avoidable as a preference under § 547 of the Bankruptcy Code; however, as discussed below in Section IV.E.9, the Committee asserts that the Debtors, under Lone Star's direction and control, delayed commencement of these cases so as to prevent subjecting Lone Star to these potential avoidance claims, in violation of their fiduciary duties, during which time the Debtors' insolvency deepened by tens of millions of dollars. The Lone Star Entities dispute these allegations.

    2.   Senior Secured Facility

As was noted above, in September, 2007, LSF5 Mortgage Line acquired the Senior Secured Facility from JP Morgan. From September, 2007 through early March, 2009,

    (1) LSF5 Mortgage Line and/or Affiliate Finance made several advances to AHL, Inc. under the Senior Secured Facility,

    (2) AHL, Inc. made several payments to LSF5 Mortgage Line on the Senior Secured Facility,

    (3) LSF5 Mortgage Line agreed to convert to equity certain amounts owing under the Senior Secured Facility, and

    (4) the parties amended the Senior Secured Facility several times.

Pursuant to the amendment to the Senior Secured Facility executed on March 19, 2008, AHL, Inc. granted LSF5 Mortgage Line a lien on all its property (except property pledged by AHL to Wachovia on the Servicer Advance Facility). LSF5 Mortgage Line did not fully perfect its lien until July 2008, which the Committee believes is a potentially avoidable transfer. LSF5 Mortgage Line also received a $3 million payment on the Senior Secured Facility in July 2008, which the Committee also believes may be avoidable. An amendment to the Senior Secured Facility dated July 21, 2008, which is about the time the Committee believes that the Debtors

74392.000009 EMF_US 29471070v30

were considering filing bankruptcy petitions, reduced the principal amount of this line of credit from $150 million to $62 million, required all of AHL, Inc.'s affiliates to become guarantors, and restricted AHL, Inc.'s ability to use its assets. The Committee believes that this amendment may be potentially avoidable as well.

The Lone Star Entities disagree. They have argued that they provided new value to the Debtors after July 2008 in the form of unrepaid cash advances to the Debtors, releasing perfected liens upon assets of the Debtors, and advances to certain creditors of the Debtors, which in turn provided value to the Debtors due to those advances.

On or about March 9, 2009, less than two months before the Debtors initiated the Bankruptcy Cases, LSF5 Mortgage Line and AHL, Inc. agreed to payoff the Senior Secured Facility. At that time, the total amount outstanding on the Senior Secured Facility was approximately $58 million. LSF5 Mortgage Line agreed to release its liens on all the assets of all AHL entities in exchange for a discounted cash payment in the amount of $30 million, and a non-recourse lien in the amount of $5 million on a receivable owed to AHL, Inc. by Select Portfolio Services, Inc. ("SPS"). Chad Patton, director of the Debtors and Lone Star Affiliate, along with certain of the Debtors' employees and officers, negotiated this agreement on behalf of AHL, Inc. The Committee has raised questions about the value of the assets securing the liens in favor of LSF5 Mortgage Line and the validity of some of the liens themselves, but it should be noted that the assets securing the liens included all the Debtors' Assets, which included the owned portfolio of loans, which were sold during the course of the bankruptcy case for approximate $3.5 million (see Sec. IV.E.5 below) and the stock of AHL Canada, which the Debtors now estimate has a value of approximately $30 million (see Sec. IV.D.6 below). As is noted in more detail below, ultimately, the Debtor compromised the amount of the SPS receivable for $1.25 million, and the lien asserted by LSF5 Mortgage Line will be released pursuant to the Plan.

3. Wachovia Servicer Advance Facility

On February 20, 2008, Wachovia and Accredited Receivables Funding, LLC ("ARF"), a subsidiary of AHL, Inc., entered into a one-year $100 million Credit Agreement (the "Servicer Advance Facility").[16] Under the Servicer Advance Facility, AHL, Inc. was able to borrow against advances it made as servicer for payment of principal and interest ("P&I"), corporate advances, and taxes and insurance ("T&I") at advance rates up to 90%. Structurally, AHL, Inc sold its advances to ARF pursuant to a Receivables Purchase Agreement, which was guaranteed by Holdco. ARF would then borrow against these advances and upstream the cash to AHL, Inc. The Servicer Advance Facility resulted in upwards of $70 million of fresh liquidity to AHL, Inc. in early 2008. In order to complete this transaction, LSF5 Mortgage Line released its lien on the Servicer Advances, which were previously collateral under the Senior Secured Facility.

The facility was amended from time to time (often in conjunction with the Wachovia MRA). On January 19, 2009, Wachovia granted an extension of the maturity date to April 2,

---

[16] Wachovia Capital Markets, LLC was Agent and Accredited Home Lenders, Inc. was Servicer on the Servicer Advance Facility.

2009, which allowed for the close of a transaction with SPS (which is discussed in detail below.) Prior to the Petition Date, AHL, Inc. repaid the $85 million outstanding on the Servicer Advance Facility with proceeds from the sale by AHL, Inc. of certain Master Servicing Rights to SPS (discussed below).

4. Wachovia MRA

As was noted above, on or about March 30, 2007, Wachovia agreed to provide AHL, Inc. with the Wachovia MRA, a $750 million warehouse line of credit in the form of a repurchase agreement. Throughout the third quarter of 2007 and into 2008, Wachovia exercised its rights under the Wachovia MRA to make margin calls on AHL, Inc., which ultimately totaled approximately $115 million. In the face of a $36 million margin call delivered on July 29, 2008, AHL, Inc. initiated a lawsuit against Wachovia seeking a temporary restraining order to prevent Wachovia from exercising its rights under the Wachovia MRA. To resolve the disputes and the litigation, on August 13, 2008, LSF MRA, one of the Lone Star Entities, purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 million. This transaction included 2,583 mortgages with an unpaid principal balance of $621 million. AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.

After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA, which converted the Amended MRA into a term facility, provided for accelerated payment, eliminated the right of LSF MRA to make margin calls, and terminated the obligation of LSF MRA to purchase mortgage loans from AHL, Inc. LSF MRA, AHL, Inc. and the REIT entered into several amendments to the Amended MRA to extend the maturity dates four times to terminate in November, 2008, December, 2008, February 2009 and on March 17, 2009. When the Amended MRA finally matured on March 17, 2009, AHL, Inc. and the REIT defaulted on the Amended MRA due to their failure to repurchase the mortgages. According to LSF MRA, LSF MRA retained the mortgages in partial satisfaction of the damages that it sustained, and to mitigate its damages. In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 million.[17] The Lone Star Entities subsequently offset from this damage claim about $1.3 million it owed to AHL, Inc. for mortgage servicing rights, which are further described below. LSF MRA subsequently filed a proof of claim in an amount of approximately $96 million.

5. The Mortgage Servicing Rights

Part of AHL, Inc's business model was to service the mortgages that it originated and securitized. In the role of servicer, AHL, Inc. would earn fee income. Throughout 2008, AHL, Inc. was the servicer for the 17 securitizations that it created, the Residential Loan Pools, the loans subject to the Wachovia MRA and Amended MRA and the mortgages that AHL owned.

---

[17] The Committee asserts that this $96 Million figure is based on a fraction of the value placed on the mortgages by the Lone Star Entities a few months before. The Lone Star Entities dispute this assertion. As provided in the Term Sheet and Plan Support Agreement, the parties will not challenge the valuation, at this time.

In August, 2008, AHL, Inc. began actively marketing its servicing rights to its securitizations ("MSRs"). Initially, Ocwen Financial expressed an interest in purchasing the MSRs, but Ocwen terminated its discussions with AHL, Inc. in mid-September, 2008. On September 24, 2008, AHL, Inc. engaged Phoenix Capital to sell the MSRs.

With the assistance of Phoenix Capital, SPS was identified as a purchaser of the MSRs. The purchase price to be paid by SPS was the reimbursement to AHL, Inc. of the outstanding servicer advances (approximately $117 million) plus a $7 million premium. As the negotiations progressed, the parties agreed that the payment of the premium would be conditioned upon delivery on or before May 1, 2009, of "no downgrade letters" for each of the securitizations from the various rating agencies. The first closing of this sale occurred on February 2, 2009 when AHL, Inc. received proceeds in the approximate amount of $85 million. On March 2, 2009, the final SPS closing occurred, and AHL, Inc. received $32 million of additional cash. From the proceeds of the sale of the MSR's to SPS, AHL, Inc. repaid approximately $85 million owed to Wachovia under the Servicer Advance Facility.

AHL, Inc. and SPS did not receive the no-downgrade letters from all the ratings agencies. Consequently, SPS did not pay the $7 million premium to AHL, Inc., which caused AHL, Inc. to retain the law firm of Quinn Emmanuel. On or about April 30, 2009, AHL, Inc. initiated a lawsuit against SPS to collect the unpaid $7 million premium arising from the sale of the MSRs. After the commencement of this suit and the Petition Date, AHL, Inc. and SPS have agreed to settle this litigation with SPS making a payment to AHL, Inc. in the amount of $1.25 million, which payment was received on January 15, 2010, after approval of the settlement by the Bankruptcy Court. The pleading further detailing this settlement can be found at Docket No. 1112.

With regard to the servicing rights for the mortgages subject to the Amended MRA, LSF MRA exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. LSF MRA did not pay AHL, Inc. approximately $1.3 million for servicer advances. On April 27, 2009, LSF MRA sent AHL, Inc. a notice that it set off the damages under the Amended MRA against those unpaid servicer advances. The Committee questions the right of LSF MRA to exercise this setoff.

With regard to the servicing rights for the mortgages subject to the Residential Loan Pools, the trustee for the Residential Loan Pools at the direction of the holders of the securities (an affiliate of Lone Star Fund VI) exercised its rights to replace AHL, Inc. with Vericrest, a Lone Star affiliate, as the servicer on March 17, 2009, effective as of April 1, 2009. The Residential Loan Pools paid AHL, Inc. for all fees and reimbursed AHL, Inc. for all servicer advances.

6.  Transfer of AHL Canada

To conduct lending operations in Canada, Holdco formed AHL Canada. In general terms, the operations of AHL Canada were very similar to the operations of AHL, Inc.

74392.000009 EMF_US 29471070v30

Ultimately, AHL Canada stopped originating loans in 2008. Effective as of September 30, 2008, Holdco transferred the ownership of AHL Canada to AHL, Inc.[18]

The Debtors estimate the value of AHL Canada at approximately $30 million, which consists of $10.5 million in cash and the value of two loan portfolios, net of tax obligations. Summary financial information relating to AHL Canada is included in the Liquidation Analysis attached hereto as Exhibit B.

Since the stock of AHL Canada was contributed by Holdco to AHL, Inc. as a capital contribution at a time when both AHL, Inc. and Holdco were potentially insolvent, the Debtors believe that such transfer may be avoidable as a fraudulent transfer. The Plan proposes to resolve the potential fraudulent transfer by transferring ownership of AHL Canada from AHL, Inc. to Consolidated Holdco to be monetized for the benefit of Consolidated Holdco Creditors.

7.   REIT Claim

As was noted above, in 2004 AHL, Inc. formed the REIT. Subsequently, the REIT transferred cash to AHL, Inc. (as either a dividend or as an intercompany loan) and, ultimately, the accounting records reflect an intercompany payable from AHL, Inc. to the REIT of approximately $227 million.[19] Effective as of December 31, 2008, AHL, Inc. executed a promissory note in the amount of approximately $227 million payable to the order of the REIT to evidence the intercompany obligation. Also on December 31, 2008, AHL, Inc. and Holdco entered into a transaction pursuant to which (1) AHL, Inc. transferred ownership of the common stock of the REIT to Holdco; (2) Holdco assumed AHL, Inc.'s obligation to the REIT under the terms of the promissory note; (3) Holdco's obligations to AHL, Inc. for loans made on an intercompany basis in the amount of $56,051,718 were cancelled and (4) AHL, Inc. executed and delivered to Holdco a promissory note in the amount of $18,275,245.[20] The ad hoc committee of REIT preferred shareholders filed proofs of claims against both Holdco and AHL, Inc. reflecting this alleged intercompany debt that were unliquidated but stated that the amounts due exceeded $227,000,000 (the "REIT Claims").

In early 2010, the Debtors consented to the Bankruptcy Court granting the Committee standing to investigate, pursue, prosecute and settle any and all causes of action that may arise out of the transactions with REIT. The Bankruptcy Court entered an order approving the Committee standing (Docket No. 1323) and, on May 11, 2010, after further investigation and due diligence, the Committee initiated an adversary proceeding styled *Official Committee of Unsecured Creditors v. Accredited Mortgage Loan REIT*, Adversary No. 10-50980-MFW (the

---

[18] Copies of the documents relating to the transfer by Holdco to AHL, Inc. of the AHL Canada Stock are available upon request made to Debtors' counsel.

[19] The amount of the intercompany payable owing by AHL, Inc. to the REIT was (a) $15,213,849 on December 31, 2004; (b) $99,642,119 on December 31, 2005; (c) $112,419,435 on December 31, 2006; (d) $191,561,044 on December 31, 2007 and (e) $225,997,810 on December 31, 2008.

[20] Copies of the promissory note and other documents relating to the December 31, 2008, transaction are available upon request made to Debtors' counsel.

"REIT Adversary"). In the REIT Adversary, the Committee has, among other things, objected to the REIT Claims, seeks to subordinate the REIT Claims, and seeks to recharacterize the REIT Claim as equity. The REIT has answered the complaint filed in the REIT Adversary and denies that the Committee is entitled to any of the relief sought in the REIT Adversary. The Plan will settle the REIT Adversary by compromising the Allowed amount of the REIT Claims in the manner described below.

Commencing on March 9, 2009, through September, 2009, the REIT was managed by Chad Patton, an employee of one of the Lone Star Entities and he was appointed by Holdco, which is the owner of the outstanding common shares of stock in the REIT and thus has the responsibility of appointing the trustee or trustees for the REIT.. Since September, 2009, the REIT has been managed by Thomas J. Sullivan, an independent trustee appointed by Holdco, which is the owner of the outstanding common shares of stock in the REIT. Mr. Sullivan is not an employee or Affiliate of the Lone Star Entities. Mr. Sullivan has obtained independent counsel to provide him with legal advice and represent him and the REIT in these bankruptcy proceedings, and has consulted with the REIT Committee. Mr. Sullivan can be contacted through and information relating to the REIT's finances[21] and governance may be requested from counsel for the REIT, Mark Chevallier, McGuire, Craddock & Strothers, 2500 N. Harwood St., Suite 1800, Dallas, Texas 75201, mchevallier@mcguirecraddock.com, (214) 954-6800. All other trustees for the REIT since October 12, 2007, are identified on Schedule C to the Plan Support Agreement and Term Sheet attached as an exhibit to the Plan, and all of the trustees were appointed by the common shareholder of the REIT.

E.    **Significant Post-Petition Date Filings and Events**

    1.    First Day Motions

On the Petition Date, the Debtors filed a number of "first day" motions, which were designed to ensure the Debtors' ability to continue to operate with minimal disruption following the filing of these Cases. The Bankruptcy Court granted many of these first day motions, entering various orders, that, among other things:

- authorized the Debtors to make payments related to outstanding wage, vacation, severance and related withholding tax obligations;
- allowed the Debtors' various bankruptcy cases to be jointly administered;
- excused the Debtors from the U.S. Trustee's requirements that their pre-petition bank accounts be closed and new post-petition bank accounts be opened;
- prohibited utility service providers from refusing to provide services;
- allowed the Debtors to promise their employees a modest severance payment to induce those employees to remain with the Debtors through this bankruptcy process; and

---

[21] Summary financial information relating to the REIT is included in the Liquidation analysis attached hereto as Exhibit B.

- appointed Kurtzman Carson Consultants as noticing, claims, and solicitation agent for these cases.

2. <u>Debtors' Retention and Payment of Professionals and Advisors</u>

In order to liquidate their operations and assets and administer these chapter 11 cases, the Debtors retained various professionals and advisors, including Hunton & Williams, LLP as lead bankruptcy counsel, Pachulski Stang Ziehl & Jones LLP as co-counsel for the Debtors, AP Services, LLC to provide restructuring and management services to the Debtors, and Deloitte Tax LLP to provide tax and accounting services to the Debtors. The Debtors also retained the law firm of Quinn Emanuel Urquhart Oliver & Hedges, LLP as litigation counsel to advise the Debtors in matters in which Hunton & Williams is disqualified, and the law firms of Kirkland & Ellis LLP and Luce, Forward, Hamilton & Scripps LLP to represent the Debtors in an ongoing class-action securities fraud case, which the Debtors settled for an amount covered by their insurance carriers  Finally, the Debtors retained Phoenix Capital, Inc. to help market and sell certain assets.

The Debtors have been paying these professionals and advisors, and the professionals and advisors retained by the Committee, in accordance with applicable law and orders of the Court. Most of these professionals and advisors are required to file monthly and quarterly fee statements and applications with the Court.  The Court has thus far approved all of the interim fee applications of the estates' professionals and advisors. The Committee has filed reservations of rights with respect to interim applications of Hunton & Williams, LLP.  Other than the final application of Quinn Emanuel, the Court has not approved any final fee applications of these professionals, and thus the final allowance of these applications and payments remains subject to further Court approval.

3. <u>The Official Committee of Unsecured Creditors</u>

On June 16, 2009 the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"), consisting of a commercial institution, a trade vender, and an individual borrower.  The Committee has retained the law firm of Arent Fox, LLP as lead bankruptcy counsel, Elliott Greenleaf as co-counsel, and Weiser LLP as financial advisors. Subsequently, on July 23, 2009, the U.S. Trustee reconstituted the Committee such that it currently consists of two financial institutions, a trade vendor, an individual borrower, and a litigation claimant.[22]  The Committee has been an active participant in these bankruptcy cases, including, among other things:

- participating in sales of the Debtors' Assets;

---

[22] The claim of the borrower has been disallowed. *See* Order Disallowing Certain Claim Filed by Carrie L. Luft and Denying as Moot Movant Luft's Motion for Relief from the Automatic Stay, March 30, 2010, Docket No. 1430.  Further, it appears that the trade vendor has sold its claim to a third party. *See* Notice of Transfer for Sonar Credit Partners, LLC re: Transcontinental Valuations, Inc (Claim No. 1), November 2, 2010, Docket No. 2122.  The Debtors have been informed that, pursuant to the Committee's by-laws and the consent of such members, such persons have ceased to act as members of the Committee.

74392.000009 EMF_US 29471070v30

- reviewing and analyzing the Debtors' motions relating to Asset sales and attending hearings on the same;
- reviewing and analyzing the Debtors' motions relating to Claim settlements and attending hearings on the same;
- investigating potential claims against the Debtors' current and former directors and officers, the Lone Star Entities, the REIT, and other potential target defendants;
- commencing litigation against the REIT;
- negotiating the proposed settlement with the Lone Star Entities, the REIT, the REIT Committee, the Trust Preferred Holders, and the Trust Preferred Indenture Trustee that is set forth in the Plan Support Agreement and Term Sheet and is included in the Plan; and
- participating with the Debtors in the formulation of the Plan and this Disclosure Statement.

    4.    <u>Rejection of Leases and Contracts</u>

On the Petition Date, the Debtors filed a motion to reject approximately 56 leases of real property throughout the United States that had been used as local branch offices for the Debtors' loan origination and servicing operations. This motion was granted, relieving the Debtors' estates from the burden of paying for such leases, immediately relieving the Debtors of millions of dollars in monthly operating expenses. Also, on the Petition Date, the Debtors filed motions to reject almost 300 other executory contracts for the supply of various goods and services that the Debtors no longer required. These motions were also granted. The Debtors have also relocated their offsite electronic data storage systems to a smaller and more cost effective facility.

    5.    <u>Asset Sales</u>

On July 2, 2009, the Court approved the sale of the Debtors' residential mortgage servicing platform for a purchase price of $495,000 plus the assumption of certain liabilities to Vericrest Financial, a Lone Star Affiliate, which sale closed on or about July 6, 2009. After this sale, the Debtors were left with less than fifteen employees, who are essential to completing the liquidation of the assets of the Debtors and their subsidiaries and the wind-up of the Debtors' affairs.

On July 7, 2009, the Court entered an order approving the procedures for auctioning the Debtors' remaining 90 mortgage loans. This auction was a success. The winning bidder, NPA I, LLC, offered $3.525 million for these loans, and the Court entered approved this sale by an order entered on July 31, 2009. The sale of the mortgage loan pool closed on or about August 19, 2009.

On December 1, 2009 and January 28, 2010 the Court entered orders permitting the Debtors to sell their remaining mortgage loans and real estate assets.

Pursuant to the *de minimis* asset sale motion, the Debtors have sold various assets generating proceeds for the estate in excess of $250,000. The Debtors continue to market and

sell the remaining *de minimis* assets, although the Debtor's remaining tangible personal property, such as office equipment and computer components, has minimal value.

### 6. Motion to Convert

On June 19, 2009, the Trust Preferred Holders, Kodiak and JP Morgan Chase Bank, N.A., filed a motion to convert these cases to chapter 7, arguing that chapter 7 would yield greater returns for creditors. Citigroup Global Realty Markets, Inc. joined in this motion to convert. The Committee and the Debtors objected, arguing that a liquidation in chapter 11 could produce better results for creditors, and that cause did not exist for conversion. The movants have not pressed forward with the motion to convert.

### 7. Atlas Class Action Settlement

Prior to the Petition Date, Holdco was a defendant in a class action securities fraud case styled, *Atlas v. Accredited Home Lenders Holding Co.*, Case No. 3:07-CV-00488-H-CAB pending in the United States District Court for the Southern District of California (the "Atlas Litigation"). The parties to the Atlas Litigation settled the matter within the policy limits of a prior D & O insurance policy. The Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. The Bankruptcy Court approved the settlement on August 27, 2009. As a result of the settlement of the Atlas Litigation, proceeds in the amount of $994,068.09 from the applicable D & O insurance were paid to reimburse the Debtors for defense costs previously advanced.

### 8. SPS Settlement

Prior to the Petition Date, and as discussed above, AHL, Inc. sued SPS seeking payment of $7 million arising from the sale of the MSRs to SPS. AHL, Inc. and SPS settled the dispute and SPS made a payment to AHL, Inc. in the amount of $1.25 million. The Committee reviewed and analyzed the proposed settlement and elected not to object to the approval thereof. On November 25, 2009, the Debtors filed a motion seeking approval of the SPS settlement, which motion was approved. The Debtors and SPS consummated the settlement on or about January 15, 2010. One of the Lone Star Entities, LSF5 Mortgage Line, has asserted that it has a lien against the proceeds of the SPS settlement. As part of the Plan Support Agreement and Term Sheet, LSF5 LSF5 Mortgage Line has agreed to release its alleged lien on the proceeds of the SPS settlement.

### 9. Kodiak Litigation

Kodiak and Wells Fargo Bank, N.A., as indenture trustee under the indenture agreement Trust Preferred Securities, also initiated a separate lawsuit in the Bankruptcy Court against certain of the Lone Star Entities asserting direct causes of action (Adversary Proceeding 09-53276, the "Kodiak Adversary"). Both before and after initiating the Kodiak Adversary, Kodiak diligently and thoroughly investigated both its direct causes of action against the Lone Star Entities and the Debtors' causes of action against the Lone Star Entities, participating in the extensive discovery process discussed below.

74392.000009 EMF_US 29471070v30

The parties to the Kodiak Adversary eventually requested the Court to order mediation amongst those parties and the Debtors' insurers. The Committee and the Debtors filed limited objections to this request, concerned that the Debtors' insurance policies would be affected by this mediation. The Court ultimately granted the request for mediation, with certain terms and conditions designed to protect the interests of the Debtors' bankruptcy estates. This mediation, which was extended several times, helped lead to the global settlement provided in the Plan. The claims asserted in the Kodiak Adversary will be settled under the Plan and related agreements, discussed below.

### 10. Discovery Issues

In June, 2009, the holders of Trust Preferred Securities served upon each of the Debtors and the Lone Star Entities a request for production of documents under Fed. R. Bankr. P 2004. After the Committee was formed, it joined the document requests. By agreement, the Debtors produced over 17,784 documents consisting of 145,612 pages in response to this request. Additionally, the Lone Star Entities voluntarily produced to Kodiak, other holders of Trust Preferred Securities, and the Committee over 10,595 documents consisting of 205,285 pages. The Committee analyzed certain of these documents in its investigation into claims and causes of action that could be asserted against the Lone Star Entities and the Debtors' officers and directors, which are highlighted in the Authority Motion that is available on the Bankruptcy Court's docket.

### 11. Tax Issues

The Debtors are part of a consolidated group for the purpose of filing income tax returns, with the named taxpayer being Holdco. The consolidated income tax return includes all of the Debtors and most of the non-debtor subsidiaries of the Debtors. The REIT is not a member of the consolidated tax reporting group, therefore it files its own, separate tax return. While Holdco is the "named taxpayer," it historically has had negligible operations which resulted in nomimal profits and losses. Therefore, historically, the profits and losses reported to the taxing authorities were primarily generated by AHL, Inc.

For the 2007 tax year, the Debtors filed a consolidated federal income tax return reflecting net operating losses ("NOLs") in the amount of approximately $757 million. The Debtors elected to carry back the NOLs for 2007 to offset all net income for tax years 2005 and 2006, resulting in a tax refund received by the Debtors in January 2008, in the approximate amount of $144 million[23]. After the Petition Date, the Internal Revenue Service filed priority claims in excess of $144 million against the Debtors. The Debtors objected to these claims and the Internal Revenue Service responded, arguing that the claims should not be adjusted by the Court without the normal auditing process being concluded. The Debtors agreed with this position and objections to the Internal Revenue Service's claims have accordingly been abated. This audit process has been concluded, and on October 22, 2010 the Debtors received a letter from the IRS stating that the Congressional Joint Committee on Taxation has completed its

---

[23] For the 2007 tax year, approximately $352 million of NOLs have not been used to offset net operating income.

consideration of the special report of the IRS on this audit and did not take exception to the conclusions reached by the IRS. As a result of this audit process, the Internal Revenue Service has concluded that the claims of the Internal Revenue Service will be significantly reduced, to the appropriate amount of $4 million. The IRS has withdrawn its $144 million priority claim, although the IRS has filed a "protective" administrative priority claim in the amount of the refund it provided to the Debtors, as discussed below. Further, the Debtors overpaid the Internal Revenue Service the total amount of approximately $2.4 million in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, which amounts the Debtors have requested be refunded by the Internal Revenue Service. The Internal Revenue Service refunded the overpayment of the alternative minimum tax in March, 2011.

On or about September 15, 2009, the Debtors filed their consolidated tax return for 2008 reflecting NOLs of approximately $163 million. Subsequently, in early November, 2009, Congress passed and President Obama signed legislation that allows businesses that incurred NOLs in 2008 or 2009 to elect to increase the carry back period for either the 2008 NOL or the 2009 NOL from two years to three, four or five years. In March, 2010, the Debtors requested a refund of about $57 million based upon the previously filed 2008 consolidated federal income tax return. After this refund claim was netted against amounts owing by the Debtors to the IRS described in the previous paragraph, the Debtors received a refund of approximately $54 million by wire on November 4, 2010. The Debtors also receeived a further refund relating to the overpayments made in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, as described in the paragraph above.

After wiring the $54 million tax refund to the Debtors, the IRS withdrew its priority tax claim in the amount of approximately $144 million. However, the IRS subsequently filed a priority claim for administrative expenses in the amount of the $54 million tax refund, explaining that such claim is a "protective claim" with respect to the "refund received by Debtor[s]."

Further, on or about November 23, 2010, the Debtors, with the assistance of the accounting firm Deloitte, filed the Amended 2008 Tax Return, which requests an additional refund in the amount of $39.77 million as a result of additional losses identified with respect to the 2008 tax year. The Amended 2008 Tax Return remains pending. As of the date hereof, the IRS has begun the preliminary audit procedures by issuing a preliminary information data request, to which the Debtors have responded. At this time, the Debtors do not know when the audit process will be completed.

Since the tax refund is the result of NOLs being offset against prior years' income, all or substantially all of the refund belongs to the Consolidated Debtors. Certain parties have argued that Holdco may be entitled to a portion of the Tax Refunds. As will be discussed in more detail below, the Plan resolves this dispute, provides that the Tax Refunds belong to the Consolidated Debtors, and provides that all Tax Refunds will be distributed to the creditors of the Consolidated Debtors, except for a payment of up to $2 million payment to be made to the Trust Preferred Indenture Trustee from any further Tax Refunds the Debtors may receive in the future from the amounts requested in the Amended 2008 Tax Return.

74392.000009 EMF_US 29471070v30

12. Other Asset Recoveries

The Debtors have obtained Court approval of settlements with various workers compensation insurance carriers that lead to those insurers returning over $1 million in cash collateral to the Debtors' estates. The Debtors have also recovered over $1 million from a Court -approved settlement with the trustee for the Debtors' terminated deferred compensation trust. The Debtors have also retained experts who are in the process of recovering unclaimed property held by various governmental authorities. These assets will be vested with the Consolidated Debtors pursuant to the Plan.

13. Remaining Employees

The Debtors currently have five full time employees remaining—a controller, an information technology support expert, a tax expert, a Canadian asset coordinator, and an administrative assistant. These employees are necessary to review Claims and related business records, ensure the estates' compliance with applicable laws, and complete the wind-down of the Debtors, among other things. These employees are entitled to certain severance payments, and under the Plan will receive payment equal to five (5) months' salary from the Consolidated Debtors, which payment shall be in satisfaction of such severance obligations. Further, prior to the Effective Date, the Debtors will negotiate employment or consulting contracts with any current employees necessary to wind down the Debtors' Estates, with such contracts to be reasonably acceptable to the Committee.

14. Claims Administration

The Bar Dates for creditors to file proofs of claim have passed. The Debtors have received over 1132 proofs of claim. Approximately 190 of these were filed after the applicable Bar Dates. Many of the proofs of claims were grossly inflated, unsupported, or incorrectly asserted secured or priority status. The Debtors' schedules listed approximately $555 million in claims, although a significant portion of these amounts were disputed. The Debtors subsequently received proofs of claim amounting to more than $2.7 billion.

The Debtors have made substantial progress in reviewing, evaluating, and objecting, where appropriate, to the numerous claims filed against their estates. The large majority of these objections have been either sustained by the Court or consensually resolved. The Debtors have been working on resolving and liquidating the numerous unliquidated claims filed by various investment vehicles for contractual claims relating to the mortgages sold to those investment vehicles by the Debtors. Twenty-one omnibus claims objections have been filed, along with various other objections to specific claims. Further, many claims have been resolved consensually without the need for objection. Out of the approximately 1132 proofs of claim filed, almost 727 have been Allowed in reduced amounts, reclassified, expunged, or withdrawn pursuant to agreements or orders entered by the Court. In addition, objections remain pending to almost 260 claims, and various other settlements are still expected to be finalized and submitted to the Court for approval. So far, over $2.5 billion in Claims have been either disallowed by the Court, subjected to disallowance by pending claim objections filed by the Debtors, or subjected to disallowance pursuant to agreements reached by the Debtors, including the agreements

embodied in the Plan. The Debtors estimate that the ultimate pool of allowed unsecured claims against the Consolidated Debtors will be between $104 million to $107 million, and that the ultimate pool of allowed unsecured claims against Consolidated Holdco will be around $82 million, including the claims that will be granted in favor of the REIT and the Trust Preferred Indenture Trustee if the Plan is confirmed.

Among the major Claims settlements in this case are three settlements of class actions brought by former employees alleging violations of California, New Jersey, and federal Worker Adjustment and Retraining Notification Acts and violations of California wage and hour laws. These settlements have been either approved by the Court or presented to the Court for approval. Further, the Plan includes settlements of the major unresolved Claims in these Cases, including the Claims of the REIT, the Claims of the Trust Preferred Holders and Trust Preferred Indenture Trustee, the Claims of Citigroup, and the Claims of the Lone Star Entities.

Generally speaking, the Debtors have been settling Claims that are relatively indisputable—such as WARN Act claims, lease rejection claims, or trade claims—for the dollar amounts that are appropriate under applicable law. For Claims that are less capable of being easily determined—such as repurchase claims, class wage-and-hour claims, and litigation claims—the Debtors have been able to negotiate significant reductions, especially where those Claims as filed were inflated or unliquidated. A summary of the allowed and expected allowable claims is included in the Liquidation Analysis attached hereto as Exhibit B.

Based on the notices of transfer of Claims filed with the Court, it appears that there are several claims traders who have been actively buying Claims in these Bankruptcy Cases.

15. Preference Claims

The Debtors, their advisors, the Committee and its advisors, have also begun the process of investigation whether any payments made by the Debtors prior to the commencement of these cases are avoidable under Chapter 5 of the Bankruptcy Code. The Debtors have presented the Committee with a high-level initial analysis of potential avoidable payments; however, the Debtors have not completed that analysis and are working with the Committee's financial advisors to do so. A complete list of creditors receiving payments within 90 dates prior to the petition date are identified in each of the Debtor's statement of financial affairs filed with the court.

Pursuant to Section 546 of the Bankruptcy Code, the Debtors must commence any action to avoid such pre-Petition Date payments on or before two (2) years after the Petition Date, *i.e.*, April 30, 2011. Given this upcoming statute of limitations, the Debtors will endeavor to either commence such avoidance actions or enter into tolling agreements with such creditors that received the payments so as to preserve these claims for the benefit of creditors (unless the Debtors and the Committee agree that such actions should not be brought).

16. REIT Adversary

The Committee commenced the REIT Adversary to, in part, disallow or significantly to reduce the REIT's large asserted Claims against all of the Debtors. The holders of the Trust

Preferred Securities and the Trust Preferred Indenture Trustee filed motions to intervene and/or obtain derivative standing to pursue the claims asserted in the REIT Adversary. The Committee filed oppositions to those motions, which are currently pending before the Bankruptcy Court. The REIT Adversary will be resolved by the Plan and related agreements, discussed below.

### 17. Revised Plan and Disclosure Statement

As discussed above, after further negotiations between the Debtors, the Committee, the REIT, the REIT Committee, the Lone Star Entities, and the Trust Preferred Holders lead to a near-global settlement in December 2010, embodied in the *Plan Support Agreement and Term Sheet*, which is attached to this Disclosure Statement as *Exhibit C*. The Debtors modified the prior versions of the Plan and this Disclosure Statement to reflect the terms of this new agreement.

The Debtors also modified this Disclosure Statement to address certain issues raised by the informal comments and formal objections received to the prior disclosure statement and to the Third Amended Disclosure Statement, which was filed on February 24, 2011. Changes include:

- clarifying the classifications that will most likely apply to the Claims of borrowers, employees, and REIT shareholders,

- highlighting the release and exculpation provisions of this Disclosure Statement,

- providing more information about the post-confirmation existence of the Trust Preferred Indenture, and

- providing more information regarding the conduct of the Lone Star Entities with regard to the Debtors, the potential legal claims of the Debtors against the Lone Star Entities arising from this conduct, which this Plan proposes to settle, and the extensive negotiation and settlement processes leading to this settlement

### 18. Investigation of Insider Causes of Action and Evolution of Settlement Discussions

Prior to the Petition Date, the Lone Star Entities approached the Debtors about purchasing the Debtors' remaining assets and obtaining a release of all claims that the Debtors may have had against any of the Lone Star Entities. The sole director of each of the Debtors was at that time, and still is, Chad Patton, an employee of one of the Lone Star Entities. Due to Mr. Patton's employment with one of the Lone Star Entities, he recused himself from all negotiations between the Debtors and any of the Lone Star Entities,[24] and Meade Monger, the Chief Restructuring Officer of the Debtors (the "CRO"), was charged by the boards of directors of the Debtors with the responsibility of representing the Debtors in all negotiations between any of the

---

[24] To be clear, Mr. Patton did not participate in any of the negotiations described herein.

74392.000009 EMF_US 29471070v30

Debtors and any of the Lone Star Entities.[25] The Debtors declined the initial offers from the Lone Star Entities to engage in settlement negotiations because Mr. Monger and the Debtors' professionals, including its primary counsel Hunton & Williams, concluded they needed time to identify and investigate any potential causes of action that might be asserted against the Lone Star Entities.[26]

After the Petition Date, during the late spring and summer of 2009, the Debtors conducted an investigation of potential causes of action against the Lone Star Entities. The investigation included (a) interviews of current and former employees of the Lone Star Entities, (b) interviews of current and former employees of the Debtors and (c) a review of the Debtors' documents and records.

In August and September, 2009, Mr. Monger represented the Debtors in negotiations with the Lone Star Entities and presented a proposal to settle all of the Debtors' potential claims against all of the Lone Star Entities for $60 million, subject to Court approval. After several weeks of negotiations, the Loan Star Entities made the following counter proposal: (a) a cash payment from the Lone Star Entities to the Debtors in the amount of $10,050,000; (b) subordination of all claims asserted by the Lone Star Entities in the amount of approximately $100 million;[27] and (c) releases by the Debtors of the Lone Star Entities, except that any causes of action that could be asserted against directors and officers of the Debtors would be preserved against the D&O insurance coverage up to the amount of the insurance coverage (the "Sept. 2009 Settlement Proposal"). The expectation was that additional material recoveries from insurance would be possible. Upon receipt of the offer, the Debtors advised the Lone Star Entities that it would be presented to the Committee, and if a global agreement was ultimately reached, the

---

[25] Mr. Monger is an employee of AP Services, which was engaged by the Debtors on or about March 24, 2009.

[26] The relationships between Hunton & Williams and various parties in interest in the case (including the Lone Star Entities) have been disclosed in the various Declarations filed in support of the retention application of Hunton & Williams. See Docket Nos. 22, 1822, 2092, 2161, 2203 and 2285. With regard to the Lone Star Entities, Hunton & Williams disclosed the following in paragraph 11 of its initial declaration (Docket No. 22):

> *Beneficial Holders of the Debtors' Equity Securities*
>
> 11.    The ultimate principal beneficial holder of the Debtors' equity securities is Lone Star Fund V (US), L.P. Hunton has performed or is performing legal services on unrelated matters for affiliates of Lone Star Fund V (US), L.P., including Bruno's Super Market, LLC, BI-LO, LLC, Vericrest Financial, Inc. and LSF5 Cookeville, LLC. Hunton has not represented Lone Star Fund V (US), LP or any of its affiliates with regards to the Debtors.

Subsequently, in its Fourth Supplemental Declaration, Hunton & Williams disclosed that subsequent to the Petition Date, it was retained by Caliber Funding, a "Lone Star Entity", to perform real estate work unrelated to the Debtors and the Bankruptcy Cases. *See* Docket No. 2203.

[27] The Lone Star Entities filed proofs of claim against: (1) AHL, Inc. in the approximate amount of $100 million and (2) Holdco in the approximate amount of $97 million. AHL, Inc., as primary obligor, and Holdco, as guarantor, were jointly liable on the most significant claim, which relates to the LSF MRA.

Debtors would propose a plan of liquidation that would substantively consolidate all the Debtors into one estate.

The Debtors presented Lone Star Entities' proposal to the Committee in September, 2009. The Committee neither approved nor rejected the September 2009 Settlement Proposal because it did not have sufficient information to make an informed decision on fairness and reasonableness of the proposed terms.

To assist the Committee in its evaluation, on or about October 12, 2009, the Debtors delivered to counsel for the Committee a comprehensive confidential report summarizing the Debtors' preliminary findings from its investigation of the Lone Star Entities (the "Investigative Report"). Both before and after receiving the report from the Debtors, the Committee conducted its own investigation of potential causes of action against the Lone Star Entities, including its review of the numerous documents produced by the Debtors and the Lone Star Entities.

In the fall of 2009, two significant events occurred that significantly affected the value of the potential claims against the Lone Star Entities and the related settlements proposed in this Plan. First, on October 6, 2009, the Bar Date for filing proofs of claim passed. Once the Debtors began reviewing and evaluating the proofs of claim filed against the estate, it became apparent that the amount of valid claims that would ultimately be allowed against the Debtors was significantly less than the Debtors' initial estimates prior to the Petition Date and at the time of the Debtors initial $60 million demand. .[28]

Second, on or about November 6, 2009, President Obama signed the "Worker, Homeowner and Business Assistance Act of 2009," which provided, among other things, for expanding the net operating loss carryback rules to allow the Debtors to carryback 2008 net operating losses for up to five years. As is discussed more fully *supra,* as a result of the change in the net operating loss carryback rules, AHL, Inc. is entitled to a tax refund of approximately $94 million.

As a result of reduced valid claims and increased assets due to the tax refund, the course of the negotiations among the Debtors, the Committee and the Lone Star Entities changed dramatically. For example, these changed circumstances exacerbated a fissure between creditors that had claims solely against AHL, Inc. and other creditors that had claims solely against Holdco. Further, as a result of the additional assets and fewer claims, the value of the potential claims against the Lone Star Entities were not worth as much as initially believed.

In addition, as a result of the continued discovery engaged in by the Debtors, the Committee, the Trust Preferred Security Holders and Lone Star, the analysis of potential claims that could be asserted against the Lone Stare Entities continued to change.

---

[28] Prior to the Petition Date, the Debtors estimated that total claims against the Debtors would exceed $500 million. After taking into consideration the settlements proposed in this Plan, the total claims against the Debtors will be approximately $180 million.

74392.000009 EMF_US 29471070v30

After obtaining the Sept. 2009 Settlement Proposal, the Debtors continued to evaluate its feasibility and ultimately concluded that it was structurally deficient. In December, 2009 the Debtors advised the Committee about the structural deficiencies and the Committee and the Debtors concluded that the Sept. 2009 Settlement Proposal should not be accepted.

On January 6, 2010, the Committee filed its *Motion for Entry of An Order Granting Leave, Standing and Authority to Investigate and Prosecute Claims and Causes of Action on Behalf of the Committee, Debtors and Debtors' Estates and Settle Claims on Behalf of the Debtors' Estates* (Docket No. 1203, the "Authority Motion"). In the Authority Motion, the Committee alleged that the Debtors and their professionals may have conflicts of interest resulting from, among other things, the Debtors' sole director being an employee of a Lone Star Entity, and the Committee sought standing to investigate, prosecute, and settle claims on behalf of the Debtors against the Debtors' officers and directors and the Lone Star Entities.

In the Authority Motion, the Committee outlined some of the Debtors' potential causes of action against the Debtors' officers and directors and the Lone Star Entities, including: (a) breaches of fiduciary duty and aiding and abetting a breach of fiduciary duty resulting from the delay in the Debtors' filing for bankruptcy protection in order to protect the financial interest of the Lone Star Entities (for example delaying the bankruptcy filing so as not to subject the repayment of the $130 Million Unsecured Loan with Affiliate Finance to preference claims), (b) breaches of fiduciary duty and aiding and abetting breaches of fiduciary duties relating to the pre-bankruptcy transactions between the Debtors and the Lone Star Entities, which benefitted the Lone Star Entities and were not reviewed for fairness by persons independent of Lone Star, (c) veil-piercing, alter-ego, and/or substantive consolidation; (d) breach of representation regarding the Debtors' financing condition, negligent misrepresentation, and/or willful misrepresentation; (e) equitable subordination; (f) fraudulent transfers for, among other things, the value of the collateral seized in March 2009, the repayment of the $130 Million Unsecured Loan, payments made under the Senior Secured Facility, payments in connection with the Caliber transaction, servicing advances, and sales of the residential loan pools, as well as the restructuring of the REIT claim to Holdco from a subsidiary; (g) conversion; (h) tortious interference with business relationships; (i) preference recoveries for, among other things, the perfection of additional collateral in July 2008 under the Senior Secured Facility; and (j) corporate waste. Moreover, the Authority Motion asserted that in March 2008, one of the Lone Star Entities provided a letter to the Debtors' auditors, stating that the Lone Star Entities intended to support the Debtors through December 31, 2008, thereby avoiding a qualification in the 2007 audit by the auditor on the Debtors' ability to remain a going concern. Both the Debtors and the Lone Star Entities opposed the Authority Motion. The Authority Motion remains pending and, to the extent creditors desire additional information, they should consult the Authority Motion, which is available on the Bankruptcy Court docket.

Also in January of 2010, after extensive analyses performed by the Debtors, the Debtors presented the Committee with options on a deconsolidated plan of liquidation. The Debtors had concluded the following from their analyses: (i) substantive consolidation may not be appropriate; (ii) accepting Lone Star's proposal at AHL, Inc. could potentially provide full recoveries to the AHL, Inc. creditors; and (iii) preserving Consolidated Holdco's claims against the Lone Star Entities and the directors and officers of Consolidated Holdco would allow for the

creditors of Holdco to pursue these claims and have direct decision making control of their own recoveries. The Committee was receptive to this approach and agreed that, while it continued its investigation, the Debtors should undertake discussions with Lone Star about a possible settlement under this construct.

In early 2010, the Debtors, represented by Mr. Monger as CRO, continued settlement negotiations with the Lone Star Entities, which resulted in the following settlement proposal: (a) a cash payment from the Lone Star Entities to the AHL, Inc. in the amount of $10,050,000; (b) a waiver of all claims filed by the Lone Star Entities against the AHL, Inc. in the asserted amount of approximately $100 million; (c) releases by AHL, Inc. of the Lone Star Entities and certain of their affiliates and current and former employees; (d) preservation of all claims that could be asserted by Holdco against the Lone Star Entities and the officers and directors of Holdco; and (e) subordination of all claims filed by the Lone Star Entities against Holdco in the asserted amount of approximately $97 million in the event that creditor classes accepted the plan. (the "Deconsolidated Settlement Proposal"). The Deconsolidated Settlement Proposal was to be incorporated into "deconsolidated plans" for the Consolidated Debtors (*i.e.*, AHL, Inc., Inzura and Windsor) and Consolidated Holdco (*i.e.*, Holdco and Vendor Management).

The Debtors presented the Deconsolidated Settlement Proposal to the Committee and various major creditors including the Trust Preferred Holders (creditors of Holdco), Citigroup (a creditor of AHL, Inc.), the Sierra class action claimants (creditors of AHL, Inc.), the REIT (a creditor of both AHL, Inc. and Holdco) and the REIT Committee (consisting of REIT Preferred Security Holders with subordinated claims against Holdco). Negotiations based on the Deconsolidated Settlement Proposal continued through the winter and spring of 2010 until an agreement in principle was reached at a meeting in New York on May 26, 2010 among the Debtors, the Committee and the Lone Star Entities. In general terms, the agreement in principal was nearly identical to the Deconsolidated Settlement Proposal except that it increased the payment from the Lone Star Entities to AHL, Inc. from $10,050,000 to the amount of $15.6 million.

During the summer of 2010, the negotiations expanded to include the REIT and the REIT Committee resulting in the *Settlement Between Accredited Home Lenders Holding Co., et . al. (the "Debtors"), Lone Star, Debtors, the REIT, the REIT Committee and the Official Committee of Unsecured Creditors ("Committee") relating to a Consensual Plan of Liquidation* dated September 2, 2010 (the "September 2010 Term Sheet"). The September 2010 Term Sheet was incorporated into the first Chapter 11 Plan of Liquidation filed on September 15, 2010, which provided for (a) a cash payment in the amount of $15.6 million from the Lone Star Entities to the Consolidated Debtors, (b) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million, (c) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million, (d) releases by the Consolidated Debtors of all claims that it could assert against the Lone Star Releasees and Plan Releasees, and (e) the preservation of all claims that could be asserted by Consolidated Holdco against its officers and directors and the Lone Star Entities.

38

Also, while settlement negotiations continued throughout the summer of 2010, the Debtors continued to conduct their claims review and analysis and commenced objecting to claims that should be reduced or disallowed. As a result of the claims objection, the Debtors reduced the amount of Allowed General Unsecured Claims against the Consolidated Debtors to approximately $107 million to $110 million. Further, the Debtors and the Committee reduced the amount of Allowed General Unsecured Claims (other than the Trust Preferred Claims) against Consolidated Holdco to approximately $22 million

In October, 2010, the Lone Star Entities and the Trust Preferred Holders entered into a three day mediation of the Trust Preferred Adversary Proceeding in New York. As a result of the mediation and subsequent negotiations, the Lone Star Entities, their D&O insurance carriers and the Debtors insurance carriers agreed to pay $30 million to the Trust Preferred Security Holders to be applied to the claims asserted by the Trust Preferred Security Holders against the Debtors and to settle the Trust Preferred Adversary Proceeding. This amount was not acceptable to the Trust Preferred Security Holders. While the mediation was not completely successful, it resulted in further negotiations among the Debtors, the Committee, the Lone Star Entities, the Trust Preferred Holders, the REIT and the REIT Committee, including an all hands meeting in New York on December 8, 2010, which culminated in the final agreement that is incorporated into the Plan.

A former officer of the Debtor has expressed concerns as to the reasonableness of the various settlements contained in the Plan and as to whether the process to obtain the settlement resulted in a settlement that is fair, equitable and in the best interests of the Estates. The Debtors dispute such allegations and believe that each contention is unfounded.

As is set forth in more detail below, the Plan proposes to settle any Claims that the Debtors may have against the Debtors' officers and directors and the Lone Star Releasees and Plan Releasees. This settlement is the product of substantial investigation performed by the Debtors, the preparation and submission of the Debtors' findings to the Committee, the Committee's own substantial investigation, and protracted arms'-length negotiations amongst the Debtors, the Committee, the Lone Star Entities, Citigroup, the REIT, REIT Committee, and the Trust Preferred Security Holders, all occurring over the past 18 months. These parties all believe that the resulting settlement proposed in the Plan and embodied in the Plan Support Agreement and Term Sheet is reasonable, appropriate, and in the best interests of their constituents and the Debtors' estates and creditors. Accordingly all these parties are supporting the Plan.

The settlement of the Claims that could be asserted against the Lone Star Releasees and Plan Releasees will result in (a) cash payments to the Consolidated Debtors in the amount of $15,750,000 from the Lone Star Entities; (b) cash payments to the Trust Preferred Holders of $30,000,000 from a combination of the Lone Star Entities, the D&O insurance carriers of the Lone Star Entities and the D&O insurance carriers of the Debtors; (c) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million; (d) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million and (e) the releases as set forth in more detail *supra*. The settlement of the Claims that could be asserted against the Lone Star Releasees and Plan Releasees further provides a foundation for the

settlement between the Estates of the Consolidated Debtors and Consolidated Holdco. It should be emphasized that the Lone Star Releasees and Plan Releasees will receive no distributions of cash or property under the Plan.

As a result of this settlement, the creditors of all the estates will receive significant, if not extraordinary, distributions without the delays and risks that would have attended any litigation against the Lone Star Releasees and Plan Releasees. Thus, the Debtors believe that the settlement proposed in the Plan is reasonable, appropriate, and in the best interests of the Debtors' Estates and Creditors.

19. <u>Weiss Objection</u>

Josh Weiss ("Mr. Weiss") is a former acting General Counsel, Vice President and Assistant Secretary of the Debtors[29] who was employed prior to the Petition Date through December 15, 2010, when his employment was terminated. While the Debtors were originating loans, Mr. Weiss was involved in secondary market transactions, including the selling of loans to other financial institutions or into securitizations and other commercial activities of the Debtors. As of the Petition Date, Mr. Weiss was the only lawyer employed by the Debtors and he was appointed acting General Counsel. As acting General Counsel, Mr. Weiss was present at some of the meetings and negotiations of the settlements that have ultimately been incorporated into the Plan. For example, Mr. Weiss was present at the meetings in New York on May 26, 2010, and the Debtors assert the Mr. Weiss agreed with the settlement in principal that was reached that day among the Debtors, the Committee and the Lone Star Entities. Mr. Weiss denies that he agreed with the settlement in principal that was reached on May 26, 2010.

The Debtors assert that as Mr. Weiss noted in his Response to the Debtor's Motion to Strike (Doc No. 2522), he has not complied with the requirements of the court approved severance policy (Doc No. 325), which requires Mr. Weiss to execute and return to the Debtors a release, and he has refused to do this unless the Debtors pay him significantly more money than authorized under the severance policy. Notwithstanding his failure to comply with the severance policy, Mr. Weiss alleges that he is still entitled to receive a severance payment under the severance policy plus he alleges that he is entitled to undisclosed damages arising from unlawful termination. The Debtors deny that Mr. Weiss has any claim against the Estates arising from the termination of his employment.

In order to resolve Mr. Weiss' objection to the Disclosure Statement, the Debtors have agreed to include the following statement from Mr. Weiss:

> Although several major constituents support the Plan and the settlement contained therein, the proposed settlement is not without objection at this stage of the case. Joshua Weiss ("Mr. Weiss"), a creditor and party in interest in these cases, questions the bona fides of the settlement process and therefore whether that process produced a settlement that is in the best interests of the Debtors. In

---

[29] All officers of the Debtors, including Mr. Weiss, were appointed by the board of directors consisting of employees of the Lone Star Entities.

74392.000009 EMF_US 29471070v30
74392.000009 EMF_US 34870988v4

particular, Mr. Weiss alleges that no independent fiduciary negotiated the settlement on behalf of the Debtors, and that the process therefore may not have produced a fair result. Mr. Weiss alleges that Hunton and Williams had and has an irreconcilable conflict of interest in that it has represented and represents the Lone Star Entities, while at the same time representing the Debtors and particularly in representing the Debtors in their alleged negotiations with the Lone Star Entities that led to the Settlement.[30] In particular, Mr. Weiss alleges that Hunton and Williams (which was put in place as Debtors' counsel by Lone Star) failed to disclose that it is unable or unwilling to sue the Lone Star Entities, and that Hunton and Williams therefore had an irreconcilable conflict in negotiating on behalf of the Debtors against the Lone Star Entities. In addition, while Mr. Monger was appointed as the CRO by Mr. Patton (a Lone Star employee), Mr. Weiss alleges that Mr. Monger is not independent under the facts or as a matter of law because, among other things, he reports directly to a board of directors that consists of only one member who is a Lone Star employee. At a minimum, Mr. Weiss alleges that the Court should apply a higher scrutiny to the transaction and this plan of reorganization since it is an insider agreement.

Mr. Weiss also questions whether the settlement is in the best interests of the estates and believes that the payment from the Lone Star entities should be closer to the original $60 million settlement proposal than the $15.6 million being proposed as part of the Plan. Mr. Weiss believes that distributions to creditors would increase significantly if the Lone Star Entities paid a larger settlement

---

[30] Hunton has represented the Debtors in these cases in negotiations with the Lone Star Entities. Mr. Weiss alleges that as a result of Hunton's significant attorney client relationship with the Lone Star Entities, Hunton was incapable of independently representing the Debtors in issues related to the Lone Star Entities. Mr. Weiss alleges in particular that in an engagement letter dated August 19, 2008 between Hunton and AHL, Inc., Hunton and AHL, Inc. agreed that Hunton could not assert any position that is contrary to the interests of Lone Star and further provided that in the event AHL, Inc. filed for bankruptcy, Hunton could not serve as AHL, Inc.'s general bankruptcy counsel. A copy of the August 19, 2008 engagement letter is attached to the Third Supplementary Declaration in Support of the Application to Retain Hunton & Williams. Doc. No. 2092. Mr. Weiss alleges that this pre-petition engagement letter and the referenced language was not disclosed or filed of record by Hunton until after David Osborn and Bart Brown sent a letter dated October 26, 2010, to Judge Walrath (the "Brown Letter"), which was posted on the docket of this case on October 27, 2010 (Doc. No. 2081), which is after the May 26, 2010 agreement in principal was reached and the September, 2010 Term Sheet were agreed upon. Additionally, Mr. Weiss alleges that throughout the negotiations and settlement process with the Lone Star Entities, Hunton has been in a conflicted position where they could or would not have been able to pursue litigation on behalf of the Debtors in a manner adverse to the Lone Star Entities.

Hunton denies the allegations of Mr. Weiss as it relates to any alleged conflict of interest or lack of disclosure. Further, Hunton refers parties in interest to the Declaration in Support of the Application to Employ Hunton & Williams (Doc. No. 22) and the Third Supplemental Declaration in Support of the Application of Hunton & Williams (Doc. No. 2092) for a complete discussion of its representation of the Debtors and disclosure of representation of parties in interest. Finally, Hunton would note that Mr. Weiss has been aware of the August 19, 2008, retainer letter since August, 2008 and, on information and belief, Mr. Brown has been aware of the August 19, 2008, retainer letter since the summer of 2009.

41

payment to the Debtors under the Plan. Mr. Weiss also questions the viability of the Lone Star Entities' claims being subordinated under the Plan, based on Lone Star's own valuation analysis, and submits that they may have been subject to equitable subordination notwithstanding the settlement, even if the claims were valid. Accordingly, Mr. Weiss believes that the true value of Lone Star's release of these claims must be examined closely to determine whether settlement with Lone Star is in the best interest of the Debtors' creditors and estates.

In particular, Mr. Weiss asserts that a summary of the claims that the Debtors have against the Lone Star Entities and the approximate amount of these claims are as follows:

- Payments to Lone Star in January and February, 2008 ($130 Million)
- Deepening Insolvency Claim (from August 1, 2008 to May 1, 2009 ($80 Million)
- Senior Secured Claim ($30 Million)
- Miscellaneous claims ($10 Million)
- Total Claims Against Lone Star Entities ($260 Million)

Mr. Weiss asserts that the Miscellaneous Claims of $10 Million are extremely strong claims in favor of the Debtors. As a result, the proposed Settlement with Lone Star of $15.75 Million represents its concession of the$10 Million in Miscellaneous Claims plus $5.75 Million in settlement of the remaining $250 Million of claims against the Lone Star Entities. Consequently, according to Mr. Weiss this settlement only represents an approximate 2% recovery of $250 Million claims against Lone Star.

20.    Lone Star Entities' Response to Weiss Objection

The Lone Star Entities deny any wrongdoing with respect to the Debtors.

21.    Debtors' Response to Weiss Objection

The Debtors, the Debtors' Professionals and the CRO dispute the allegations asserted by Mr. Weiss. The Debtors assert that the claims identified by Mr. Weiss above were initially disclosed to the Committee in September, 2009, and the facts surrounding the claims were provided to the Committee on October 12, 2009 in the Investigative Report. Further, the claims identified by Mr. Weiss were disclosed in the Brown Letter that was filed on the court's docket on October 26, 2010 (Doc. No. 2081). Subsequent to the Brown Letter being filed of record and with full knowledge of the claims asserted therein, the major constituents in the case, including the Debtors, the Committee, the Trust Preferred Security Holders, the REIT, the REIT Committee entered into the global settlement that is encompassed in the Plan.

It should be highlighted that the Debtors believe Mr. Weiss underestimates the full amount of value being made on account of the claims that may be asserted against the Lone Star

74392.000009 EMF_US 29471070v30

Entities. Specifically, the Debtors assert that the settlements proposed by the Plan ultimately result in (a) payments by the Lone Star Entities, their insurers and the Debtors' D& O insurers in excess of $49 million including a loan from the Lone Star Entities in the amount of $4 million, (b) the release of claims asserted by the Lone Star Entities against the Consolidated Debtors in the approximate amount of $100 million and (c) the subordination of claims asserted by the Lone Star Entities against Consolidated Holdco in the amount of approximately $97 Million. Mr. Weiss disagrees with this assertion.

Further, the Debtors believe that the assertions made by Mr. Weiss fail to take into consideration significant events that have changed the course of negotiations since the original offer to settle the Debtors potential claims against the Lone Star Entities in exchange for a cash payment of $60 million. The significant events include (a) the Consolidated Debtors right to a Tax Refund in the amount of approximately $97 million and (b) reduction in the amount of allowed claims against the Estates through the claim objection process. As a result of these events, the Debtors assert that the recoveries to Creditors have increased significantly and the value of any potential claims against the Lone Star Entities has been greatly reduced. Mr. Weiss disagrees with this assertion.

The Debtors also assert that the settlements proposed in the Plan are the result of extensive investigation by the Debtors and the Committee and negotiations among the Debtors, the Committee, the Lone Star Entities, the Trust Preferred Security Holders, the REIT and the REIT Committee to resolve all potential causes of action that could be asserted by and against the Debtors without the risk inherent in litigations, and that the Plan is in the best interests of creditors and the estates. Mr. Weiss disagrees with this assertion.

## V. THE PLAN

> THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED DISCUSSION APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.

**A.    Classification and Treatment of Claims and Interests**

The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

### 1.   Unclassified Claims – Administrative Claims and Priority Tax Claims

(a)    Administrative Claims

Any Holder of an Allowed Administrative Claim shall receive the full amount of the Holder's Allowed Administrative Claim in one Cash payment from the Consolidated Debtors, or Consolidated Holdco, Liquidating Trustee, or Plan Administrator, as applicable, as part of the Effective Date Distribution. An Administrative Claim that is a Disputed Claim shall not receive

any distribution unless and until such Claim becomes an Allowed Administrative Claim. Upon the entry of a Final Order allowing an Administrative Claim, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from the Liquidating Trust, Plan Administrator, Consolidated Debtors, or Consolidated Holdco, as applicable. The Debtors, Liquidating Trustee, or Plan Administrator, as applicable, may agree to less favorable treatment of such Allowed Administrative Claim. An Administrative Claim not filed prior to the Administrative Claim Bar Date as provided in this Plan shall be deemed forever waived and barred, the Holder thereof shall not be entitled to a distribution under the Plan, and the Debtors, their Estates, the Plan Administrator, and the Liquidating Trustee shall have no obligation with respect thereto.

With regard to fees and expenses owed by the Debtors in connection with services provided by AP Services, LLC, including those provided by the Chief Restructuring Officer (collectively the "CRO Expenses"), since the Petition Date, such CRO Expenses shall be paid pursuant to the terms of the *Order Under Bankruptcy Code Sections 105(a) and 363(B) Authorizing the Retention and Employment of AP Services, LLC to Provide Interim Management and Restructuring Services and Designating Meade Monger as Chief Restructuring Officer and Michael Murphy as Chief Administrative Officer to the Debtors,* Nunc Pro Tunc *to the Petition Date* entered by the Bankruptcy Court on or about July 2, 2009, Docket No. 282.

      (b)     Professional Fee Claims

Professional Fees Claims need to be asserted on or before forty-five (45) days after the Effective Date (the "Professional Fee Bar Date"). The Debtors or the Liquidating Trustee will pay or cause to be paid an Allowed Professional Fee Claim, in Cash, within the later of (i) five (5) days after the conditions specified in Section 3.1(b) of the Plan are satisfied, or (ii) five (5) days after the entry of a Final Order allowing such Allowed Professional Fee Claims.

Any party in interest, including the Liquidating Trustee, but excluding the Plan Administrator, may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes and as provided under the Plan, except that the Lone Star Entities, the Trust Preferred Indenture Trustee, and the Trust Preferred Holders waive their right to object to or challenge the allowance or award of any Professional Fee Claims. Entities holding Professional Fee Claims that do not timely file and serve a fee application will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, the Plan Administrator, or their respective property.

Consolidated Holdco shall make the Consolidated Holdco Professional Fee Claim Payment in the amount of $2 Million ($2,000,000) to the Consolidated Debtors, which shall fully satisfy Consolidated Holdco's liabilities for Professional Fee Claims and CRO Expenses. Consolidated Holdco shall not be entitled to any refund of the Professional Fee Claim Payment based on any reductions or disallowance of such Claims. All Professional Fee Claims and CRO Expenses will be paid by the Consolidated Debtors or the Liquidating Trustee.

The proposed allocation of CRO Expenses and Professional Fee Claims amongst the different Debtors is based on an analysis performed by AP Services of the tasks performed by those professionals and the estates benefitting from such tasks. This allocation is something of an estimate. Many of these professional services benefitted all of the Debtors' estates, rendering a more precise allocation impossible. The fixing of the Consolidated Holdco Professional Fee Claim Payment at $2 Million was also part of the settlement compromise reached among the parties to the Plan Support Agreement and Term Sheet.

      (c)     Priority Tax Claims

Any Holder of an Allowed Priority Tax Claim shall receive the full amount of the Holder's Allowed Priority Tax Claim in one Cash payment from Consolidated Holdco or the Consolidated Debtors, as applicable, as part of the Effective Date Distribution. A Priority Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Priority Tax Claim. Upon the entry of a Final Order allowing an Priority Tax Claim after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from Consolidated Holdco or the Liquidating Trust, as applicable, except as otherwise provided under Section 3.3 of the Plan. The applicable Liquidating Trustee, Plan Administrator, or Debtor and the Holder of an Allowed Priority Tax Claim may agree to less favorable treatment of such Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, it will be classified as a Class 1 Secured Claim.

      (d)     IRS Priority Tax Claim

The Holder of the IRS Priority Tax Claim shall be paid in full from the Tax Refunds, and the IRS Priority Claim will be considered an obligation of the Consolidated Debtors or the Liquidating Trust. For the avoidance of doubt, the "protective" administrative priority claims filed by the IRS, including Claim No. 1123 in the approximate amount of $54 million, are Disputed Claims pending resolution of issues relating to the Debtors' Amended 2008 Tax Return.

      2.     Treatment of Classes of Claims against and Interests in Consolidated Holdco

Class 1 H - Secured Claims: Class 1 H Secured Claims are unimpaired. Any Holder of a Class 1 H Allowed Secured Claim shall, at the sole option of Consolidated Holdco, receive (a) the full amount of the Holder's Class 1 H Allowed Secured Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1 H Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 1 H Allowed Secured Claim. Upon the entry of a Final Order allowing the Class 1 H Allowed Secured Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall, at the sole option of the Plan Administrator, receive (a) the full amount of such Claim in one Cash payment  from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or

74392.000009 EMF_US 29471070v30