directors, which are highlighted in the Authority Motion that is available on the Bankruptcy Court's docket.

### 11. ~~12.~~ Tax Issues

The Debtors are part of a consolidated group for the purpose of filing income tax returns, with the named taxpayer being Holdco. The consolidated income tax return includes all of the Debtors and most of the non-debtor subsidiaries of the Debtors. The REIT is not a member of the consolidated tax reporting group, therefore it files its own, separate tax return. While Holdco is the "named taxpayer," it historically has had negligible operations which resulted in nomimal profits and losses. Therefore, historically, the profits and losses reported to the taxing authorities were primarily generated by AHL, Inc.

For the 2007 tax year, the Debtors filed a consolidated federal income tax return reflecting net operating losses ("NOLs") in the amount of approximately $757 million. The Debtors elected to carry back the NOLs for 2007 to offset all net income for tax years 2005 and 2006, resulting in a tax refund received by the Debtors in January 2008, in the approximate amount of $144 million[24][23]. After the Petition Date, the Internal Revenue Service filed priority claims in excess of $144 million against the Debtors. The Debtors objected to these claims and the Internal Revenue Service responded, arguing that the claims should not be adjusted by the Court without the normal auditing process being concluded. The Debtors agreed with this position and objections to the Internal Revenue Service's claims have accordingly been abated. This audit process has been concluded, and on October 22, 2010 the Debtors received a letter from the IRS stating that the Congressional Joint Committee on Taxation has completed its consideration of the special report of the IRS on this audit and did not take exception to the conclusions reached by the IRS. As a result of this audit process, the Internal Revenue Service has concluded that the claims of the Internal Revenue Service will be significantly reduced, to the appropriate amount of $4 million. The IRS has withdrawn its $144 million priority claim, although the IRS has filed a "protective" administrative priority claim in the amount of the refund it provided to the Debtors, as discussed below. Further, the Debtors ~~believe they~~ overpaid the Internal Revenue Service the total amount of approximately $2.4 million in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, which amounts the Debtors have requested be refunded by the Internal Revenue Service. **The Internal Revenue Service refunded the overpayment of the alternative minimum tax in March, 2011.**

On or about September 15, 2009, the Debtors filed their consolidated tax return for 2008 reflecting NOLs of approximately $163 million. Subsequently, in early November, 2009, Congress passed and President Obama signed legislation that allows businesses that incurred NOLs in 2008 or 2009 to elect to increase the carry back period for either the 2008 NOL or the 2009 NOL from two years to three, four or five years. In March, 2010, the Debtors requested a refund of about $57 million based upon the previously filed 2008 consolidated federal income tax return. After this refund claim was netted against amounts owing by the Debtors to the IRS described in the previous paragraph, the Debtors received a refund of approximately $54 million

---

[24][23] For the 2007 tax year, approximately $352 million of NOLs have not been used to offset net operating income.

by wire on November 4, 2010. The Debtors ~~still expect to receive~~**also receiveed** a further refund relating to the overpayments made in the tax years 2005 and 2006 due to a miscalculation of the alternative minimum tax, as described in the paragraph above.

After wiring the $54 million tax refund to the Debtors, the IRS withdrew its priority tax claim in the amount of approximately $144 million. However, the IRS subsequently filed a priority claim for administrative expenses in the amount of the $54 million tax refund, explaining that such claim is a "protective claim" with respect to the "refund received by Debtor[s]."

Further, on or about November 23, 2010, the Debtors, with the assistance of the accounting firm Deloitte, filed the Amended 2008 Tax Return, which requests an additional refund in the amount of $39.77 million as a result of additional losses identified with respect to the 2008 tax year. The Amended 2008 Tax Return remains pending. As of the date hereof, the IRS has ~~issued~~**begun the preliminary audit procedures by issuing** a preliminary information data request, to which the Debtors have responded. **At this time, the Debtors do not know when the audit process will be completed.**

Since the tax refund is the result of NOLs being offset against prior years' income, all or substantially all of the refund belongs to the Consolidated Debtors. Certain parties have argued that Holdco may be entitled to a portion of the Tax Refunds. As will be discussed in more detail below, the Plan resolves this dispute, provides that the Tax Refunds belong to the Consolidated Debtors, and provides that all Tax Refunds will be distributed to the creditors of the Consolidated Debtors, except for a payment of up to $2 million payment to be made to the Trust Preferred Indenture Trustee from any further Tax Refunds the Debtors may receive in the future from the amounts requested in the Amended 2008 Tax Return.

### **12.** ~~13.~~ Other Asset Recoveries

The Debtors have obtained Court approval of settlements with various workers compensation insurance carriers that lead to those insurers returning over $1 million in cash collateral to the Debtors' estates. The Debtors have also recovered over $1 million from a Court -approved settlement with the trustee for the Debtors' terminated deferred compensation trust. The Debtors have also retained experts who are in the process of recovering unclaimed property held by various governmental authorities. These assets will be vested with the Consolidated Debtors pursuant to the Plan.

### **13.** ~~14.~~ Remaining Employees

The Debtors currently have five full time employees remaining—a controller, an information technology support expert, a tax expert, a Canadian asset coordinator, and an administrative assistant. These employees are necessary to review Claims and related business records, ensure the estates' compliance with applicable laws, and complete the wind-down of the Debtors, among other things. These employees are entitled to certain severance payments, and under the Plan will receive payment equal to five (5) months' salary from the Consolidated Debtors, which payment shall be in satisfaction of such severance obligations. Further, prior to the Effective Date, the Debtors will negotiate employment or consulting contracts with any

current employees necessary to wind down the Debtors' Estates, with such contracts to be reasonably acceptable to the Committee.

### 14. ~~15.~~ Claims Administration

The Bar Dates for creditors to file proofs of claim have passed. The Debtors have received over 1132 proofs of claim. Approximately 190 of these were filed after the applicable Bar Dates. Many of the proofs of claims were grossly inflated, unsupported, or incorrectly asserted secured or priority status. The Debtors' schedules listed approximately $555 million in claims, although a significant portion of these amounts were disputed. The Debtors subsequently received proofs of claim amounting to more than $2.7 billion.

The Debtors have made substantial progress in reviewing, evaluating, and objecting, where appropriate, to the numerous claims filed against their estates. The large majority of these objections have been either sustained by the Court or consensually resolved. The Debtors have been working on resolving and liquidating the numerous unliquidated claims filed by various investment vehicles for contractual claims relating to the mortgages sold to those investment vehicles by the Debtors. Twenty-one omnibus claims objections have been filed, along with various other objections to specific claims. Further, many claims have been resolved consensually without the need for objection. Out of the approximately 1132 proofs of claim filed, almost 727 have been Allowed in reduced amounts, reclassified, expunged, or withdrawn pursuant to agreements or orders entered by the Court. In addition, objections remain pending to almost 260 claims, and various other settlements are still expected to be finalized and submitted to the Court for approval. So far, over $2.5 billion in Claims have been either disallowed by the Court, subjected to disallowance by pending claim objections filed by the Debtors, or subjected to disallowance pursuant to agreements reached by the Debtors, including the agreements embodied in the Plan. The Debtors estimate that the ultimate pool of allowed unsecured claims against the Consolidated Debtors will be between $104 million to $107 million, and that the ultimate pool of allowed unsecured claims against Consolidated Holdco will be around $82 million, including the claims that will be granted in favor of the REIT and the Trust Preferred Indenture Trustee if the Plan is confirmed.

Among the major Claims settlements in this case are three settlements of class actions brought by former employees alleging violations of California, New Jersey, and federal Worker Adjustment and Retraining Notification Acts and violations of California wage and hour laws. These settlements have been either approved by the Court or presented to the Court for approval. Further, the Plan includes settlements of the major unresolved Claims in these Cases, including the Claims of the REIT, the Claims of the Trust Preferred Holders and Trust Preferred Indenture Trustee, the Claims of Citigroup, and the Claims of the Lone Star Entities.

Generally speaking, the Debtors have been settling Claims that are relatively indisputable—such as WARN Act claims, lease rejection claims, or trade claims—for the dollar amounts that are appropriate under applicable law. For Claims that are less capable of being easily determined—such as repurchase claims, class wage-and-hour claims, and litigation claims—the Debtors have been able to negotiate significant reductions, especially where those

Claims as filed were inflated or unliquidated. **A summary of the allowed and expected allowable claims is included in the Liquidation Analysis attached hereto as Exhibit B.**

Based on the notices of transfer of Claims filed with the Court, it appears that there are several claims traders who have been actively buying Claims in these Bankruptcy Cases.

### 15. ~~16.~~ Preference Claims

The Debtors, their advisors, the Committee and its advisors, have also begun the process of investigation whether any payments made by the Debtors prior to the commencement of these cases are avoidable under Chapter 5 of the Bankruptcy Code. The Debtors have presented the Committee with a high-level initial analysis of potential avoidable payments; however, the Debtors have not completed that analysis and are working with the Committee's financial advisors to do so. **A complete list of creditors receiving payments within 90 dates prior to the petition date are identified in each of the Debtor's statement of financial affairs filed with the court.**

Pursuant to Section 546 of the Bankruptcy Code, the Debtors must commence any action to avoid such pre-Petition Date payments on or before two (2) years after the Petition Date, *i.e.*, April 30, 2011. Given this upcoming statute of limitations, the Debtors will endeavor to either commence such avoidance actions or enter into tolling agreements with such creditors that received the payments so as to preserve these claims for the benefit of creditors (unless the Debtors and the Committee agree that such actions should not be brought).

### 16. ~~17.~~ REIT Adversary

The Committee commenced the REIT Adversary to, in part, disallow or significantly to reduce the REIT's large asserted Claims against all of the Debtors. The holders of the Trust Preferred Securities and the Trust Preferred Indenture Trustee filed motions to intervene and/or obtain derivative standing to pursue the claims asserted in the REIT Adversary. The Committee filed oppositions to those motions, which are currently pending before the Bankruptcy Court. The REIT Adversary will be resolved by the Plan and related agreements, discussed below.

### 17. ~~18.~~ Revised Plan and Disclosure Statement

As discussed above, after further negotiations between the Debtors, the Committee, the REIT, the REIT Committee, the Lone Star Entities, and the Trust Preferred Holders lead to a near-global settlement in December 2010, embodied in the *Plan Support Agreement and Term Sheet*, which is attached to this Disclosure Statement as *Exhibit C*. The Debtors modified the prior versions of the Plan and this Disclosure Statement to reflect the terms of this new agreement.

The Debtors also modified this Disclosure Statement to address certain issues raised by the informal comments and formal objections received to the prior disclosure statement and to the Third Amended Disclosure Statement, which was filed on February 24, 2011. Changes include:

- clarifying the classifications that will most likely apply to the Claims of borrowers, employees, and REIT shareholders,

- highlighting the release and exculpation provisions of this Disclosure Statement,

- providing more information about the post-confirmation existence of the Trust Preferred Indenture, and

- providing more information regarding the conduct of the Lone Star Entities with regard to the Debtors, the potential legal claims of the Debtors against the Lone Star Entities arising from this conduct, which this Plan proposes to settle, and the extensive negotiation and settlement processes leading to this settlement.

### 18. Investigation of Insider Causes of Action and Evolution of Settlement Discussions

Prior to the Petition Date, the Lone Star Entities approached the Debtors about purchasing the Debtors' remaining assets and obtaining a release of all claims that the Debtors may have had against any of the Lone Star Entities. The sole director of each of the Debtors was at that time, and still is, Chad Patton, an employee of one of the Lone Star Entities. Due to Mr. Patton's employment with one of the Lone Star Entities, he recused himself from all negotiations between the Debtors and any of the Lone Star Entities,[24] and Meade Monger, the Chief Restructuring Officer of the Debtors (the "CRO"), was charged by the boards of directors of the Debtors with the responsibility of representing the Debtors in all negotiations between any of the Debtors and any of the Lone Star Entities.[25] The Debtors declined the initial offers from the Lone Star Entities to engage in settlement negotiations because Mr. Monger and the Debtors' professionals, including its primary counsel Hunton & Williams, concluded they needed time to identify and investigate any potential causes of action that might be asserted against the Lone Star Entities.[26]

---

[24] To be clear, Mr. Patton did not participate in any of the negotiations described herein.

[25] Mr. Monger is an employee of AP Services, which was engaged by the Debtors on or about March 24, 2009.

[26] The relationships between Hunton & Williams and various parties in interest in the case (including the Lone Star Entities) have been disclosed in the various Declarations filed in support of the retention application of Hunton & Williams. See Docket Nos. 22, 1822, 2092, 2161, 2203 and 2285. With regard to the Lone Star Entities, Hunton & Williams disclosed the following in paragraph 11 of its initial declaration (Docket No. 22):

*Beneficial Holders of the Debtors' Equity Securities*

11.    The ultimate principal beneficial holder of the Debtors' equity securities is Lone Star Fund V (US), L.P. Hunton has performed or is performing legal services on unrelated matters for affiliates of Lone Star Fund V (US), L.P., including Bruno's Super Market, LLC, BI-LO, LLC, Vericrest Financial, Inc. and LSF5

After the Petition Date, during the late spring and summer of 2009, the Debtors conducted an investigation of potential causes of action against the Lone Star Entities. The investigation included (a) interviews of current and former employees of the Lone Star Entities, (b) interviews of current and former employees of the Debtors and (c) a review of the Debtors' documents and records.

In August and September, 2009, Mr. Monger represented the Debtors in negotiations with the Lone Star Entities and presented a proposal to settle all of the Debtors' potential claims against all of the Lone Star Entities for $60 million, subject to Court approval. After several weeks of negotiations, the Loan Star Entities made the following counter proposal: (a) a cash payment from the Lone Star Entities to the Debtors in the amount of $10,050,000; (b) subordination of all claims asserted by the Lone Star Entities in the amount of approximately $100 million;[27] and (c) releases by the Debtors of the Lone Star Entities, except that any causes of action that could be asserted against directors and officers of the Debtors would be preserved against the D&O insurance coverage up to the amount of the insurance coverage (the "Sept. 2009 Settlement Proposal"). The expectation was that additional material recoveries from insurance would be possible. Upon receipt of the offer, the Debtors advised the Lone Star Entities that it would be presented to the Committee, and if a global agreement was ultimately reached, the Debtors would propose a plan of liquidation that would substantively consolidate all the Debtors into one estate.

The Debtors presented Lone Star Entities' proposal to the Committee in September, 2009. The Committee neither approved nor rejected the September 2009 Settlement Proposal because it did not have sufficient information to make an informed decision on fairness and reasonableness of the proposed terms.

To assist the Committee in its evaluation, on or about October 12, 2009, the Debtors delivered to counsel for the Committee a comprehensive confidential report summarizing the Debtors' preliminary findings from its investigation of the Lone Star Entities (the "Investigative Report"). Both before and after receiving the report from the Debtors, the Committee conducted its own investigation of potential causes of action against the Lone Star Entities, including its review of the numerous documents produced by the Debtors and the Lone Star Entities.

---

Cookeville, LLC. Hunton has not represented Lone Star Fund V (US), LP or any of its affiliates with regards to the Debtors.

Subsequently, in its Fourth Supplemental Declaration, Hunton & Williams disclosed that subsequent to the Petition Date, it was retained by Caliber Funding, a "Lone Star Entity", to perform real estate work unrelated to the Debtors and the Bankruptcy Cases. *See* Docket No. 2203.

[27] The Lone Star Entities filed proofs of claim against: (1) AHL, Inc. in the approximate amount of $100 million and (2) Holdco in the approximate amount of $97 million. AHL, Inc., as primary obligor, and Holdco, as guarantor, were jointly liable on the most significant claim, which relates to the LSF MRA.

74392.000009 EMF_US 29471070v2730

In the fall of 2009, two significant events occurred that significantly affected the value of the potential claims against the Lone Star Entities and the related settlements proposed in this Plan. First, on October 6, 2009, the Bar Date for filing proofs of claim passed. Once the Debtors began reviewing and evaluating the proofs of claim filed against the estate, it became apparent that the amount of valid claims that would ultimately be allowed against the Debtors was significantly less than the Debtors' initial estimates prior to the Petition Date and at the time of the Debtors initial $60 million demand. .[28]

Second, on or about November 6, 2009, President Obama signed the "Worker, Homeowner and Business Assistance Act of 2009," which provided, among other things, for expanding the net operating loss carryback rules to allow the Debtors to carryback 2008 net operating losses for up to five years. As is discussed more fully *supra*, as a result of the change in the net operating loss carryback rules, AHL, Inc. is entitled to a tax refund of approximately $94 million.

As a result of reduced valid claims and increased assets due to the tax refund, the course of the negotiations among the Debtors, the Committee and the Lone Star Entities changed dramatically. For example, these changed circumstances exacerbated a fissure between creditors that had claims solely against AHL, Inc. and other creditors that had claims solely against Holdco. Further, as a result of the additional assets and fewer claims, the value of the potential claims against the Lone Star Entities were not worth as much as initially believed.

In addition, as a result of the continued discovery engaged in by the Debtors, the Committee, the Trust Preferred Security Holders and Lone Star, the analysis of potential claims that could be asserted against the Lone Stare Entities continued to change.

After obtaining the Sept. 2009 Settlement Proposal, the Debtors continued to evaluate its feasibility and ultimately concluded that it was structurally deficient. In December, 2009 the Debtors advised the Committee about the structural deficiencies and the Committee and the Debtors concluded that the Sept. 2009 Settlement Proposal should not be accepted.

On January 6, 2010, the Committee filed its *Motion for Entry of An Order Granting Leave, Standing and Authority to Investigate and Prosecute Claims and Causes of Action on Behalf of the Committee, Debtors and Debtors' Estates and Settle Claims on Behalf of the Debtors' Estates* (Docket No. 1203, the "Authority Motion"). In the Authority Motion, the Committee alleged that the Debtors and their professionals may have conflicts of interest resulting from, among other things, the Debtors' sole director being an employee of a Lone Star Entity, and the Committee sought standing to investigate, prosecute, and settle claims on behalf of the Debtors against the Debtors' officers and directors and the Lone Star Entities.

---

[28] Prior to the Petition Date, the Debtors estimated that total claims against the Debtors would exceed $500 million. After taking into consideration the settlements proposed in this Plan, the total claims against the Debtors will be approximately $180 million.

74392.000009 EMF_US 29471070v2730

In the Authority Motion, the Committee outlined some of the Debtors' potential causes of action against the Debtors' officers and directors and the Lone Star Entities, including: (a) breaches of fiduciary duty and aiding and abetting a breach of fiduciary duty resulting from the delay in the Debtors' filing for bankruptcy protection in order to protect the financial interest of the Lone Star Entities (for example delaying the bankruptcy filing so as not to subject the repayment of the $130 Million Unsecured Loan with Affiliate Finance to preference claims), (b) breaches of fiduciary duty and aiding and abetting breaches of fiduciary duties relating to the pre-bankruptcy transactions between the Debtors and the Lone Star Entities, which benefitted the Lone Star Entities and were not reviewed for fairness by persons independent of Lone Star, (c) veil-piercing, alter-ego, and/or substantive consolidation; (d) breach of representation regarding the Debtors' financing condition, negligent misrepresentation, and/or willful misrepresentation; (e) equitable subordination; (f) fraudulent transfers for, among other things, the value of the collateral seized in March 2009, the repayment of the $130 Million Unsecured Loan, payments made under the Senior Secured Facility, payments in connection with the Caliber transaction, servicing advances, and sales of the residential loan pools, as well as the restructuring of the REIT claim to Holdco from a subsidiary; (g) conversion; (h) tortious interference with business relationships; (i) preference recoveries for, among other things, the perfection of additional collateral in July 2008 under the Senior Secured Facility; and (j) corporate waste. Moreover, the Authority Motion asserted that in March 2008, one of the Lone Star Entities provided a letter to the Debtors' auditors, stating that the Lone Star Entities intended to support the Debtors through December 31, 2008, thereby avoiding a qualification in the 2007 audit by the auditor on the Debtors' ability to remain a going concern. Both the Debtors and the Lone Star Entities opposed the Authority Motion. The Authority Motion remains pending and, to the extent creditors desire additional information, they should consult the Authority Motion, which is available on the Bankruptcy Court docket.

Also in January of 2010, after extensive analyses performed by the Debtors, the Debtors presented the Committee with options on a deconsolidated plan of liquidation. The Debtors had concluded the following from their analyses: (i) substantive consolidation may not be appropriate; (ii) accepting Lone Star's proposal at AHL, Inc. could potentially provide full recoveries to the AHL, Inc. creditors; and (iii) preserving Consolidated Holdco's claims against the Lone Star Entities and the directors and officers of Consolidated Holdco would allow for the creditors of Holdco to pursue these claims and have direct decision making control of their own recoveries. The Committee was receptive to this approach and agreed that, while it continued its investigation, the Debtors should undertake discussions with Lone Star about a possible settlement under this construct.

In early 2010, the Debtors, represented by Mr. Monger as CRO, continued settlement negotiations with the Lone Star Entities, which resulted in the following settlement proposal: (a) a cash payment from the Lone Star Entities to the AHL, Inc. in the amount of $10,050,000; (b) a waiver of all claims filed by the Lone Star Entities against the AHL, Inc. in the asserted amount of approximately $100 million; (c) releases by AHL, Inc. of the Lone Star Entities and certain of their affiliates and current and former employees; (d) preservation of all claims that could be asserted by Holdco against the Lone

Star Entities and the officers and directors of Holdco; and (e) subordination of all claims filed by the Lone Star Entities against Holdco in the asserted amount of approximately $97 million in the event that creditor classes accepted the plan. (the "Deconsolidated Settlement Proposal"). The Deconsolidated Settlement Proposal was to be incorporated into "deconsolidated plans" for the Consolidated Debtors (*i.e.*, AHL, Inc., Inzura and Windsor) and Consolidated Holdco (*i.e.*, Holdco and Vendor Management).

The Debtors presented the Deconsolidated Settlement Proposal to the Committee and various major creditors including the Trust Preferred Holders (creditors of Holdco), Citigroup (a creditor of AHL, Inc.), the Sierra class action claimants (creditors of AHL, Inc.), the REIT (a creditor of both AHL, Inc. and Holdco) and the REIT Committee (consisting of REIT Preferred Security Holders with subordinated claims against Holdco). Negotiations based on the Deconsolidated Settlement Proposal continued through the winter and spring of 2010 until an agreement in principle was reached at a meeting in New York on May 26, 2010 among the Debtors, the Committee and the Lone Star Entities. In general terms, the agreement in principal was nearly identical to the Deconsolidated Settlement Proposal except that it increased the payment from the Lone Star Entities to AHL, Inc. from $10,050,000 to the amount of $15.6 million.

During the summer of 2010, the negotiations expanded to include the REIT and the REIT Committee resulting in the *Settlement Between Accredited Home Lenders Holding Co., et. al. (the "Debtors"), Lone Star, Debtors, the REIT, the REIT Committee and the Official Committee of Unsecured Creditors ("Committee") relating to a Consensual Plan of Liquidation* dated September 2, 2010 (the "September 2010 Term Sheet"). The September 2010 Term Sheet was incorporated into the first Chapter 11 Plan of Liquidation filed on September 15, 2010, which provided for (a) a cash payment in the amount of $15.6 million from the Lone Star Entities to the Consolidated Debtors, (b) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million, (c) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million, (d) releases by the Consolidated Debtors of all claims that it could assert against the Lone Star Releasees and Plan Releasees, and (e) the preservation of all claims that could be asserted by Consolidated Holdco against its officers and directors and the Lone Star Entities.

Also, while settlement negotiations continued throughout the summer of 2010, the Debtors continued to conduct their claims review and analysis and commenced objecting to claims that should be reduced or disallowed. As a result of the claims objection, the Debtors reduced the amount of Allowed General Unsecured Claims against the Consolidated Debtors to approximately $107 million to $110 million. Further, the Debtors and the Committee reduced the amount of Allowed General Unsecured Claims (other than the Trust Preferred Claims) against Consolidated Holdco to approximately $22 million

In October, 2010, the Lone Star Entities and the Trust Preferred Holders entered into a three day mediation of the Trust Preferred Adversary Proceeding in New York. As a result of the mediation and subsequent negotiations, the Lone Star Entities, their D&O insurance carriers and the Debtors insurance carriers agreed to pay $30 million to the

Trust Preferred Security Holders to be applied to the claims asserted by the Trust Preferred Security Holders against the Debtors and to settle the Trust Preferred Adversary Proceeding. This amount was not acceptable to the Trust Preferred Security Holders. While the mediation was not completely successful, it resulted in further negotiations among the Debtors, the Committee, the Lone Star Entities, the Trust Preferred Holders, the REIT and the REIT Committee, including an all hands meeting in New York on December 8, 2010, which culminated in the final agreement that is incorporated into the Plan.

A former officer of the Debtor has expressed concerns as to the reasonableness of the various settlements contained in the Plan and as to whether the process to obtain the settlement resulted in a settlement that is fair, equitable and in the best interests of the Estates. The Debtors dispute such allegations and believe that each contention is unfounded.

As is set forth in more detail below, the Plan proposes to settle any Claims that the Debtors may have against the Debtors' officers and directors and the Lone Star Releasees and Plan Releasees. This settlement is the product of substantial investigation performed by the Debtors, the preparation and submission of the Debtors' findings to the Committee, the Committee's own substantial investigation, and protracted arms'-length negotiations amongst the Debtors, the Committee, the Lone Star Entities, Citigroup, the REIT, REIT Committee, and the Trust Preferred Security Holders, all occurring over the past 18 months. These parties all believe that the resulting settlement proposed in the Plan and embodied in the Plan Support Agreement and Term Sheet is reasonable, appropriate, and in the best interests of their constituents and the Debtors' estates and creditors. Accordingly all these parties are supporting the Plan.

The settlement of the Claims that could be asserted against the Lone Star Releasees and Plan Releasees will result in (a) cash payments to the Consolidated Debtors in the amount of $15,750,000 from the Lone Star Entities; (b) cash payments to the Trust Preferred Holders of $30,000,000 from a combination of the Lone Star Entities, the D&O insurance carriers of the Lone Star Entities and the D&O insurance carriers of the Debtors; (c) waiver of all claims filed by the Lone Star Entities against the Consolidated Debtors in the asserted amount of approximately $100 million; (d) subordination of all claims filed by the Lone Star Entities against Consolidated Holdco in the asserted amount of approximately $97 million and (e) the releases as set forth in more detail *supra*. The settlement of the Claims that could be asserted against the Lone Star Releasees and Plan Releasees further provides a foundation for the settlement between the Estates of the Consolidated Debtors and Consolidated Holdco. It should be emphasized that the Lone Star Releasees and Plan Releasees will receive no distributions of cash or property under the Plan.

As a result of this settlement, the creditors of all the estates will receive significant, if not extraordinary, distributions without the delays and risks that would have attended any litigation against the Lone Star Releasees and Plan Releasees. Thus, the Debtors believe

that the settlement proposed in the Plan is reasonable, appropriate, and in the best interests of the Debtors' Estates and Creditors.

### 19. Weiss Objection

Josh Weiss ("Mr. Weiss") is a former acting General Counsel, Vice President and Assistant Secretary of the Debtors[29] who was employed prior to the Petition Date through December 15, 2010, when his employment was terminated. While the Debtors were originating loans, Mr. Weiss was involved in secondary market transactions, including the selling of loans to other financial institutions or into securitizations and other commercial activities of the Debtors. As of the Petition Date, Mr. Weiss was the only lawyer employed by the Debtors and he was appointed acting General Counsel. As acting General Counsel, Mr. Weiss was present at some of the meetings and negotiations of the settlements that have ultimately been incorporated into the Plan. For example, Mr. Weiss was present at the meetings in New York on May 26, 2010, and the Debtors assert the Mr. Weiss agreed with the settlement in principal that was reached that day among the Debtors, the Committee and the Lone Star Entities. Mr. Weiss denies that he agreed with the settlement in principal that was reached on May 26, 2010.

The Debtors assert that as Mr. Weiss noted in his Response to the Debtor's Motion to Strike (Doc No. 2522), he has not complied with the requirements of the court approved severance policy (Doc No. 325), which requires Mr. Weiss to execute and return to the Debtors a release, and he has refused to do this unless the Debtors pay him significantly more money than authorized under the severance policy. Notwithstanding his failure to comply with the severance policy, Mr. Weiss alleges that he is still entitled to receive a severance payment under the severance policy plus he alleges that he is entitled to undisclosed damages arising from unlawful termination. The Debtors deny that Mr. Weiss has any claim against the Estates arising from the termination of his employment.

In order to resolve Mr. Weiss' objection to the Disclosure Statement, the Debtors have agreed to include the following statement from Mr. Weiss:

> Although several major constituents support the Plan and the settlement contained therein, the proposed settlement is not without objection at this stage of the case. Joshua Weiss ("Mr. Weiss"), a creditor and party in interest in these cases, questions the bona fides of the settlement process and therefore whether that process produced a settlement that is in the best interests of the Debtors. In particular, Mr. Weiss alleges that no independent fiduciary negotiated the settlement on behalf of the Debtors, and that the process therefore may not have produced a fair result. Mr. Weiss alleges that Hunton and Williams had and has an irreconcilable conflict of interest in that it has represented and represents the Lone Star Entities, while at the

---

[29] All officers of the Debtors, including Mr. Weiss, were appointed by the board of directors consisting of employees of the Lone Star Entities.

74392.000009 EMF_US 29471070v2730

same time representing the Debtors and particularly in representing the Debtors in their alleged negotiations with the Lone Star Entities that led to the Settlement.[30] In particular, Mr. Weiss alleges that Hunton and Williams (which was put in place as Debtors' counsel by Lone Star) failed to disclose that it is unable or unwilling to sue the Lone Star Entities, and that Hunton and Williams therefore had an irreconcilable conflict in negotiating on behalf of the Debtors against the Lone Star Entities. In addition, while Mr. Monger was appointed as the CRO by Mr. Patton (a Lone Star employee), Mr. Weiss alleges that Mr. Monger is not independent under the facts or as a matter of law because, among other things, he reports directly to a board of directors that consists of only one member who is a Lone Star employee. At a minimum, Mr. Weiss alleges that the Court should apply a higher scrutiny to the transaction and this plan of reorganization since it is an insider agreement.

Mr. Weiss also questions whether the settlement is in the best interests of the estates and believes that the payment from the Lone Star entities should be closer to the original $60 million settlement proposal than the $15.6 million being proposed as part of the Plan. Mr. Weiss believes that distributions to creditors would increase significantly if the Lone Star Entities paid a larger settlement payment to the Debtors under the Plan. Mr. Weiss also questions

---

[30] Hunton has represented the Debtors in these cases in negotiations with the Lone Star Entities. Mr. Weiss alleges that as a result of Hunton's significant attorney client relationship with the Lone Star Entities, Hunton was incapable of independently representing the Debtors in issues related to the Lone Star Entities. Mr. Weiss alleges in particular that in an engagement letter dated August 19, 2008 between Hunton and AHL, Inc., Hunton and AHL, Inc. agreed that Hunton could not assert any position that is contrary to the interests of Lone Star and further provided that in the event AHL, Inc. filed for bankruptcy, Hunton could not serve as AHL, Inc.'s general bankruptcy counsel. A copy of the August 19, 2008 engagement letter is attached to the Third Supplementary Declaration in Support of the Application to Retain Hunton & Williams, Doc. No. 2092. Mr. Weiss alleges that this pre-petition engagement letter and the referenced language was not disclosed or filed of record by Hunton until after David Osborn and Bart Brown sent a letter dated October 26, 2010, to Judge Walrath (the "Brown Letter"), which was posted on the docket of this case on October 27, 2010 (Doc. No. 2081), which is after the May 26, 2010 agreement in principal was reached and the September, 2010 Term Sheet were agreed upon. Additionally, Mr. Weiss alleges that throughout the negotiations and settlement process with the Lone Star Entities, Hunton has been in a conflicted position where they could or would not have been able to pursue litigation on behalf of the Debtors in a manner adverse to the Lone Star Entities.

Hunton denies the allegations of Mr. Weiss as it relates to any alleged conflict of interest or lack of disclosure. Further, Hunton refers parties in interest to the Declaration in Support of the Application to Employ Hunton & Williams (Doc. No. 22) and the Third Supplemental Declaration in Support of the Application of Hunton & Williams (Doc. No. 2092) for a complete discussion of its representation of the Debtors and disclosure of representation of parties in interest. Finally, Hunton would note that Mr. Weiss has been aware of the August 19, 2008, retainer letter since August, 2008 and, on information and belief, Mr. Brown has been aware of the August 19, 2008, retainer letter since the summer of 2009.

74392.000009 EMF_US 29471070v2730

the viability of the Lone Star Entities' claims being subordinated under the Plan, based on Lone Star's own valuation analysis, and submits that they may have been subject to equitable subordination notwithstanding the settlement, even if the claims were valid. Accordingly, Mr. Weiss believes that the true value of Lone Star's release of these claims must be examined closely to determine whether settlement with Lone Star is in the best interest of the Debtors' creditors and estates.

In particular, Mr. Weiss asserts that a summary of the claims that the Debtors have against the Lone Star Entities and the approximate amount of these claims are as follows:

- Payments to Lone Star in January and February, 2008 ($130 Million)
- Deepening Insolvency Claim (from August 1, 2008 to May 1, 2009 ($80 Million)
- Senior Secured Claim ($30 Million)
- Miscellaneous claims ($10 Million)
- Total Claims Against Lone Star Entities ($260 Million)

Mr. Weiss asserts that the Miscellaneous Claims of $10 Million are extremely strong claims in favor of the Debtors. As a result, the proposed Settlement with Lone Star of $15.75 Million represents its concession of the$10 Million in Miscellaneous Claims plus $5.75 Million in settlement of the remaining $250 Million of claims against the Lone Star Entities. Consequently, according to Mr. Weiss this settlement only represents an approximate 2% recovery of $250 Million claims against Lone Star.

20.    Lone Star Entities' Response to Weiss Objection

The Lone Star Entities deny any wrongdoing with respect to the Debtors.

21.    Debtors' Response to Weiss Objection

The Debtors, the Debtors' Professionals and the CRO dispute the allegations asserted by Mr. Weiss. The Debtors assert that the claims identified by Mr. Weiss above were initially disclosed to the Committee in September, 2009, and the facts surrounding the claims were provided to the Committee on October 12, 2009 in the Investigative Report. Further, the claims identified by Mr. Weiss were disclosed in the Brown Letter that was filed on the court's docket on October 26, 2010 (Doc. No. 2081). Subsequent to the Brown Letter being filed of record and with full knowledge of the claims asserted therein, the major constituents in the case, including the Debtors, the Committee, the Trust Preferred Security Holders, the REIT, the REIT Committee entered into the global settlement that is encompassed in the Plan.

74392.000009 EMF_US 29471070v2730

It should be highlighted that the Debtors believe Mr. Weiss underestimates the full amount of value being made on account of the claims that may be asserted against the Lone Star Entities. Specifically, the Debtors assert that the settlements proposed by the Plan ultimately result in (a) payments by the Lone Star Entities, their insurers and the Debtors' D& O insurers in excess of $49 million including a loan from the Lone Star Entities in the amount of $4 million, (b) the release of claims asserted by the Lone Star Entities against the Consolidated Debtors in the approximate amount of $100 million and (c) the subordination of claims asserted by the Lone Star Entities against Consolidated Holdco in the amount of approximately $97 Million. Mr. Weiss disagrees with this assertion.

Further, the Debtors believe that the assertions made by Mr. Weiss fail to take into consideration significant events that have changed the course of negotiations since the original offer to settle the Debtors potential claims against the Lone Star Entities in exchange for a cash payment of $60 million. The significant events include (a) the Consolidated Debtors right to a Tax Refund in the amount of approximately $97 million and (b) reduction in the amount of allowed claims against the Estates through the claim objection process. As a result of these events, the Debtors assert that the recoveries to Creditors have increased significantly and the value of any potential claims against the Lone Star Entities has been greatly reduced. Mr. Weiss disagrees with this assertion.

The Debtors also assert that the settlements proposed in the Plan are the result of extensive investigation by the Debtors and the Committee and negotiations among the Debtors, the Committee, the Lone Star Entities, the Trust Preferred Security Holders, the REIT and the REIT Committee to resolve all potential causes of action that could be asserted by and against the Debtors without the risk inherent in litigations, and that the Plan is in the best interests of creditors and the estates. Mr. Weiss disagrees with this assertion.

## V. THE PLAN

THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE PLAN AND THE MORE DETAILED DISCUSSION APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT.

A.      **Classification and Treatment of Claims and Interests**

The following sections describe more fully the classification and treatment of Claims and Interests under the Plan.

1.      Unclassified Claims – Administrative Claims and Priority Tax Claims

        (a)      Administrative Claims

74392.000009 EMF_US 29471070v2730

Any Holder of an Allowed Administrative Claim shall receive the full amount of the Holder's Allowed Administrative Claim in one Cash payment from the Consolidated Debtors, or Consolidated Holdco, Liquidating Trustee, or Plan Administrator, as applicable, as part of the Effective Date Distribution. An Administrative Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Administrative Claim. Upon the entry of a Final Order allowing an Administrative Claim, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from the Liquidating Trust, Plan Administrator, Consolidated Debtors, or Consolidated Holdco, as applicable. The Debtors, Liquidating Trustee, or Plan Administrator, as applicable, may agree to less favorable treatment of such Allowed Administrative Claim. An Administrative Claim not filed prior to the Administrative Claim Bar Date as provided in this Plan shall be deemed forever waived and barred, the Holder thereof shall not be entitled to a distribution under the Plan, and the Debtors, their Estates, the Plan Administrator, and the Liquidating Trustee shall have no obligation with respect thereto.

With regard to fees and expenses owed by the Debtors in connection with services provided by AP Services, LLC ("APS"), including those provided by the Chief Restructuring Officer (collectively the "CRO Expenses"), since the Petition Date, such CRO Expenses shall be paid pursuant to the terms of the *Order Under Bankruptcy Code Sections 105(a) and 363(B) Authorizing the Retention and Employment of AP Services, LLC to Provide Interim Management and Restructuring Services and Designating Meade Monger as Chief Restructuring Officer and Michael Murphy as Chief Administrative Officer to the Debtors,* Nunc Pro Tunc *to the Petition Date* entered by the Bankruptcy Court on or about July 2, 2009, Docket No. 282.

    (b)    Professional Fee Claims

Professional Fees Claims need to be asserted on or before forty-five (45) days after the Effective Date (the "Professional Fee Bar Date"). The Debtors or the Liquidating Trustee will pay or cause to be paid an Allowed Professional Fee Claim, in Cash, within the later of (i) five (5) days after the conditions specified in Section 3.1(b) of the Plan are satisfied, or (ii) five (5) days after the entry of a Final Order allowing such Allowed Professional Fee Claims.

Any party in interest, including the Liquidating Trustee, but excluding the Plan Administrator, may file an objection to such application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes and as provided under the Plan, except that the Lone Star Entities, the Trust Preferred Indenture Trustee, and the Trust Preferred Holders waive their right to object to or challenge the allowance or award of any Professional Fee Claims. Entities holding Professional Fee Claims that do not timely file and serve a fee application will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Trust, the Plan Administrator, or their respective property.

Consolidated Holdco shall make the Consolidated Holdco Professional Fee Claim Payment in the amount of $2 Million ($2,000,000) to the Consolidated Debtors, which shall fully satisfy Consolidated Holdco's liabilities for Professional Fee Claims and CRO Expenses. Consolidated Holdco shall not be entitled to any refund of the Professional Fee Claim Payment

based on any reductions or disallowance of such Claims. All Professional Fee Claims and CRO Expenses will be paid by the Consolidated Debtors or the Liquidating Trustee.

The proposed allocation of CRO Expenses and Professional Fee Claims amongst the different Debtors is based on an analysis performed by AP Services of the tasks performed by those professionals and the estates benefitting from such tasks. This allocation is something of an estimate. Many of these professional services benefitted all of the Debtors' estates, rendering a more precise allocation impossible. The fixing of the Consolidated Holdco Professional Fee Claim Payment at $2 Million was also part of the settlement compromise reached among the parties to the Plan Support Agreement and Term Sheet.

(c)     Priority Tax Claims

Any Holder of an Allowed Priority Tax Claim shall receive the full amount of the Holder's Allowed Priority Tax Claim in one Cash payment from Consolidated Holdco or the Consolidated Debtors, as applicable, as part of the Effective Date Distribution. A Priority Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Priority Tax Claim. Upon the entry of a Final Order allowing an Priority Tax Claim after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from Consolidated Holdco or the Liquidating Trust, as applicable, except as otherwise provided under Section 3.3 of the Plan. The applicable Liquidating Trustee, Plan Administrator, or Debtor and the Holder of an Allowed Priority Tax Claim may agree to less favorable treatment of such Allowed Priority Tax Claim. To the extent that some or all of an Allowed Secured Claim for taxes does not qualify as a Priority Tax Claim, it will be classified as a Class 1 Secured Claim.

(d)     IRS Priority Tax Claim

The Holder of the IRS Priority Tax Claim shall be paid in full from the Tax Refunds, and the IRS Priority Claim will be considered an obligation of the Consolidated Debtors or the Liquidating Trust. For the avoidance of doubt, the "protective" administrative priority claims filed by the IRS, including Claim No. 1123 in the approximate amount of $54 million, are Disputed Claims pending resolution of issues relating to the Debtors' Amended 2008 Tax Return.

2.     Treatment of Classes of Claims against and Interests in Consolidated Holdco

Class 1 H - Secured Claims: Class 1 H Secured Claims are unimpaired. Any Holder of a Class 1 H Allowed Secured Claim shall, at the sole option of Consolidated Holdco, receive (a) the full amount of the Holder's Class 1 H Allowed Secured Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1 H Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 1 H Allowed Secured Claim. Upon the entry of a Final Order allowing the Class 1 H Allowed Secured Claim against

Consolidated Holdco after the Effective Date, the Holder of that Claim shall, at the sole option of the Plan Administrator, receive (a) the full amount of such Claim in one Cash payment from Consolidated Holdco, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated, at the sole option of the Plan Administrator. The Plan Administrator or Debtor and the Holder of a Class 1 H Allowed Secured Claim may agree to less favorable treatment of such Class 1 H Allowed Secured Claim.

**BECAUSE CLASS 1 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 2 H - Priority Claims, other than Priority Tax Claims: Class 2 H Priority Claims are unimpaired. Subject to §§ 3.1 and 3.2 of the Plan, any Holder of a Class 2 H Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2 H Allowed Priority Non-Tax Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco. A Class 2 H Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2 H Allowed Priority Non-Tax Claim. Upon the entry of a Final Order allowing the Class 2 H Allowed Priority Non-Tax Claim against Consolidated Holdco after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from Consolidated Holdco. The Plan Administrator or Debtor and the Holder of a Class 2 H Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2 H Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 H CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 H CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 3 H - General Unsecured Claims against Consolidated Holdco Accepting the Creditor Release: The Class 3 H Claims are impaired. Class 3 H consists of Allowed Unsecured Claims against Consolidated Holdco whose Holders cast a timely Ballot affirmatively accepting and agreeing to the Creditor Release or provide written consent for to the Creditor Release to Consolidated Holdco. Subject to §§ 3.1 and 3.2 of the Plan, Holders of Class 3 H Allowed Claims shall receive distributions equal to their Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 3 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 3 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 3 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Plan Administrator in his sole discretion may make an Interim Distribution to the Holder of such Allowed Claim from the reserve established for such Disputed Claim, with the

52

balance of the reserve, if any, held for such Disputed Claim to be released from the reserve and made part of Consolidated Holdco Assets available for general distribution under the Plan. The Holders of Class 3 H Allowed Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from Consolidated Holdco.

In the event Class 3 H votes in favor of the Plan, the payment of Class 5 H Claims will be subordinated and junior to the payment of Class 3 H Claims, any distributions that would have been made to Holders of Allowed Class 5 H Claims shall instead be made to Holders of Class 3 H Claims and Class 6 H Claims (if Class 6 H also votes to in favor of the Plan) on a Pro Rata Basis, and Holders of Allowed Class 5 H Claims shall not receive any distribution until Class 3 H Claims (and possibly Classes 6H and 9H claims) are paid in full under the Plan, and all subrogation rights of Class 5 H shall be deemed waived and released. In calculating, for a Holder of an Allowed Class 3 H Claim, its Pro Rata Share of the distribution to which Holders of Class 5 H Claim would be entitled, the Plan Administrator or Consolidated Holder, as applicable shall aggregate the total amount of the Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

**BECAUSE CLASS 3 H CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 3 H CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 4 H - General Unsecured Claims against Consolidated Holdco, except for separately classified Claims</u>. The Class 4 H Claims <u>are</u> impaired. Class 4 H consists of Allowed Unsecured Claims against Consolidated Holdco that are not separately classified under the Plan. Subject to §§ 3.1 and 3.2 of the Plan, Holders of Class 4 H Allowed Claims shall receive distributions equal to their Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 4 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 4 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 4 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Plan Administrator in his sole discretion may make an Interim Distribution to the Holder of such Allowed Claim from the reserve established for such Disputed Claim, with the balance of the reserve, if any, held for such Disputed Claim to be released from the reserve and made part of Consolidated Holdco Assets available for general distribution under the Plan. The Holders of Class 4 H Allowed Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from Consolidated Holdco.

For the avoidance of doubt, Holders of Allowed Class 4 H Claims opting out of the Creditor Release shall not be entitled to receive any distributions that would have been made to Holders of Allowed Class 5 H Claims.

**BECAUSE CLASS 4 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 5 H - Unsecured Claims Against Consolidated Holdco held by LSF-MRA, LLC: The Class 5 H Claims are impaired. Class 5 H is the Allowed Claim of LSF-MRA, LLC in the amount of $96,764,904.97. Subject to the provisions of §§ 3.1, 3.2, 4.3, 4.5 and 4.6 of the Plan, Holders of Allowed Class 5 H Claims shall receive a Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to the Holders of Class 5 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holders of the Class 5 H Allowed Claims are satisfied in full without any post-petition interest thereon, the Holder of Class 5 H Allowed Claims shall be entitled to receive their Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan.

Notwithstanding the foregoing, in the event Class 3 H votes in favor of the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of Class 3 H Claims, and Holders of Allowed Class 5 H Claims shall not receive any distribution until Holders of Allowed Class 3 H Claims are paid in full or paid as otherwise provided under the Plan, and such distributions shall be treated and distributed as provided under this Plan.

In the event Class 6 H votes in favor of the Plan and does not object to the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of Class 6 H Claims and Holders of Allowed Class 5 H Claims shall not receive any distribution until Holders of Class 6 H Claims (and potentially Class 3 H and Class 9 H Claims) are paid in full under the Plan, and such distributions shall be treated and distributed as provided under this Plan and all subrogation rights of Class 5 H Claims shall be deemed waived and released. In calculating, for a Holder of an Allowed Class 3 H or Allowed Class 6 H Claim, its Pro Rata Share of the Distribution to which Holders of Class 5 H Claims would be entitled, the Plan Administrator or Consolidated Holdco, as applicable, shall aggregate the total amount of Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

The Holders of Class 5 H Claims shall be deemed to have waived any rights of subrogation with respect to the subordination of their Class 5 H Claims.

**BECAUSE CLASS 5 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 6 H - Unsecured Claims Held by the REIT: The Class 6 H Claim is impaired. The Class 6 H Claim of the REIT shall be fixed and Allowed as an Unsecured Claim against Consolidated Holdco in the amount of Twenty Million Dollars ($20,000,000) and, on account of such Claim, the Holder of the Allowed Class 6 H Claim shall receive a Pro Rata Share of any distributions of Consolidated Holdco Assets made by the Plan Administrator in accordance with the Plan, and continuing on each Subsequent Distribution Date. In calculating the distribution to

54

the Holder of Class 6 H Claims, the Pro Rata Share shall include in the calculation the Allowed Claims and Disputed Claims included in Class 3 H, 4 H, 5 H, and 6 H. Until the Holder of the Class 6 H Claim is satisfied in full, without any post-petition interest thereon, the Holder of the Class 6 H Claim shall be entitled to receive its Pro Rata Share of distributions made by the Plan Administrator in accordance with the Plan. The Holder of Allowed Class 6 H Claims will waive its right to enforce any subordination provisions relating to Class 8 H Claims.

In the event Class 6 H votes in favor of the Plan, the payment of Allowed Class 5 H Claims will be subordinated and junior to the payment of the Class 6 H Claim, any distributions that would have been made to Holders of Allowed Class 5 H Claims shall instead be made to Holder of the Class 6 H Claim (and Class 3 H Claims (if Class 3 H also votes to in favor of the Plan) and Class 9 H Claims) on a Pro Rata Basis, and Class 5 H Claims shall not receive any distribution until Class 3 H, Class 6 H, and Class 9 H Claims are paid in full under the Plan. In calculating, for a Holder of an Allowed Class 6 H Claim, its Pro Rata Share of the Distribution to which Holders of Class 5 H Claims would be entitled, the Plan Administrator or Consolidated Holdco, as applicable, shall aggregate the total amount of Class 3 H and Class 6 H Claims, whether Allowed or Disputed, on the Effective Date.

The REIT is expected to receive increased recoveries if the Plan is confirmed with this voluntary subordination by the Lone Star Entities and payment of other creditors by the Lone Star Entities—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Holders of Class 6 H Claims are estimated to recover between ~~63.7~~**76.4**% and ~~86.5~~**86.8**% of their Claims under the Plan, as opposed to ~~2.1~~**2.4**% to 14.3% in liquidation.

**BECAUSE THE CLASS 6 H CLAIM IS IMPAIRED UNDER THE PLAN, THE HOLDER OF THE CLASS 6 H CLAIM IS ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 7 H - Convenience Class Claims: The Class 7 H Claims are impaired. Each Holder of an Allowed Consolidated Holdco Convenience Claim in Class 7 H shall receive the lesser of (a) sixty-five percent (65%) of the Holder's Allowed Class 7 H Convenience Claim in one Cash payment as part of the Effective Date Distribution from Consolidated Holdco or (b) their Pro Rata Share of One Million Five Hundred Thousand Dollars ($1,500,000), or such other, less favorable treatment as is agreed upon by Consolidated Holdco and the Holder of such Consolidated Holdco Convenience Claim. Any Holder of an Allowed General Unsecured Claim against Consolidated Holdco, other than Claims in Class 4 H, 5 H, 6 H, 8 H, and 9 H, may make the Consolidated Holdco Convenience Class Election. Such election must be made on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

Holders of Class 7 H Claims will recover 65% of their Claims under the Plan, as opposed to estimated returns of ~~63.7~~**76.4**% to ~~86.5~~**86.8**% for Holders of Claims in Class 3 H. However, these recoveries are not guaranteed and will be paid over a period of months or years. In contrast, Class 7 H Claims will be paid a guaranteed 65% of such Claims on the Effective Date. Any Holder of a Class 7 H Claim may opt in to Class 3 H or 4 H on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

74392.000009 EMF_US 29471070v~~27~~**30**

**BECAUSE CLASS 7 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 7 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 8 H - Claims against Consolidated Holdco relating to Accredited Preferred Securities Trust I: The Class 8 H Claims are impaired. Class 8 H consists of Allowed Claims against Holdco that relate to the Trust Preferred Securities, Trust Preferred Notes, the Trust Preferred Guarantee, and the Trust Preferred Note Claims, Claims held or asserted or that could be asserted by the Trust Preferred Holders or other Person, and Claims held or asserted or that could be asserted by the Trust Preferred Indenture Trustee. The Claims of Holders of Allowed Class 8 H Claims shall be fixed and Allowed as a single Unsecured Claim in favor of the Trust Preferred Indenture Trustee against Consolidated Holdco, and shall be deemed fully satisfied and paid in full by the Lone Star Trust Preferred Settlement Payment and the Trust Preferred Holdco Distributions to the Trust Preferred Indenture Trustee.

**BECAUSE CLASS 8 H CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 8 H CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 9 H - REIT Preferred Holders' Subordinated Guaranty Claims: The Class 9 H Claims are impaired. Unless otherwise agreed to by the Committee and the REIT Committee, on the Effective Date (i) the Holders of Allowed Class 9 H Claims shall not be entitled to receive any direct distributions from Consolidated Holdco until all Holders of Allowed Claims in Classes 3 H, 4 H, and 6 H have been paid in full as provided under the Plan prior to the Consolidated Holdco Assets being fully administered, and (ii) the Holders of Allowed Class 9 H Claims shall not be entitled to any reports or notices from Consolidated Holdco or the Plan Administrator, until the Plan Administrator determines that such holders are likely to receive a direct distribution. If the Holders of Class 3 H, 4 H, and 6 H Claims are not paid in full as provided under the Plan, or if the Consolidated Holdco Assets are fully administered prior to the time when such senior unsecured Claims are paid in full, then the Holders of Allowed Class 9 H Claims shall not receive any distribution under the Plan.

In the event the Plan Administrator determines that the Holders of Class 9 H Claims are likely to receive a direct distribution, the Plan Administrator shall seek an order of the Bankruptcy Court setting a bar date for the filing of proofs of Subordinated Guaranty Claims by REIT Preferred Security Holders. Such proofs of Subordinated Guaranty Claims shall contain a Creditor Release provision pursuant to which REIT Preferred Security Holders may opt out of the Creditor Release.

After the Holders of Class 3 H, 4 H, and 6 H Claims are paid in full as provided under the Plan prior to the full administration of the Consolidated Holdco Assets, the Holders of Allowed Class 9 H Claims shall receive a Pro Rata Share of any Subsequent Distributions made after such time, and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

The payment of Class 5 H Claims will be subordinated and junior to payments Holders of Class 9 H Claims who do not opt out of the Creditor Release. Any distributions that would have

been made on a Pro Rata basis to Holders Class 5 H Claims shall instead be made to such Holders of Class 9 H Claims who do not opt out of the Creditor Release, and Class 5 H Claims shall not receive any distribution until such Class 9 H Claims are paid in full under the Plan.

In the event the REIT Committee shall advise the Debtors in writing not later than five (5) days before the Confirmation Hearing of their request to transfer title to the common stock of the REIT Pro Rata to the REIT Preferred Security Holders and the Debtors and the Committee consent to such request, Holdco shall abandon and transfer title to the common stock of the REIT Pro Rata to the REIT Preferred Shareholders.

**BECAUSE CLASS 9 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 10 H - Subordinated Claims against Holdco (including Late Filed Claims): The Class 10 H Claims are impaired. Class 10 H consists of Claims against Consolidated Holdco that are not separately classified and are subordinated for any reason under § 510 of the Bankruptcy Code, or are Late Filed Claims. Holders of Class 10 H Claims shall not receive any distributions until the Holders of Class 3 H, 4 H, 5 H, 6 H, and 9 H Claims against Consolidated Holdco have been satisfied, without any post-petition interest thereon, as provided under the Plan, in which event the holders of Class 10 H Claims shall receive their Pro Rata Share of Subsequent Distributions and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

**BECAUSE CLASS 10 H CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 10 H CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 11 H- Interests in Consolidated Holdco: The Class 11 H Claims are impaired. Class 11 H consists of the Interests in Consolidated Holdco, including those Interests held by the Lone Star Entities. All Interests, including those Interests held by the Lone Star Entities, shall be canceled after the Effective Date and in accordance with the terms of the Plan, and the Holders thereof shall receive no distribution under the Plan, unless Holders of all Class 9 H and 10 H Claims against Consolidated Holdco are satisfied, without any post-petition interest thereon, as provided under the Plan, in which event the holders of Class 11 H Interests shall receive their Pro Rata Share of Subsequent Distributions and their Pro Rata Share of the Consolidated Holdco Residual Assets, as applicable.

**BECAUSE CLASS 11 H INTERESTS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 11 H INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

74392.000009 EMF_US 29471070v2730

3.    Treatment of Classes of Claims against and Interests in the Consolidated Debtors

Class 1 C - Secured Claims against the Consolidated Debtors: Class 1 C Secured Claims are unimpaired. Any Holder of a Class 1 C Allowed Secured Claim shall, at the sole option of the Consolidated Debtors, receive (a) the full amount of the Holder's Allowed Class 1 C Secured Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) subject to the requirements of § 1124(2) of the Bankruptcy Code, the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim shall be reinstated. A Class 1 C Secured Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes an Allowed Class 1 C Secured Claim. Upon the entry of a Final Order allowing the Allowed Class 1 C Secured Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall, at the sole option of the Liquidating Trustee, receive (a) the full amount of such Claim in one Cash payment from the Liquidating Trust, (b) all or a portion of the Assets securing the Allowed Secured Claim or (c) the reinstatement of the legal, equitable and contractual rights of the Holder of such Allowed Secured Claim, subject to the requirements of § 1124(2) of the Bankruptcy Code. The Liquidating Trustee or Consolidated Debtors and the Holder of an Allowed Class 1 C Secured Claim may agree to less favorable treatment of such Allowed Class 1 C Secured Claim.

**BECAUSE CLASS 1 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 1 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 2 C - Priority Claims, other than Priority Tax Claims, against the Consolidated Debtors: The Class 2C Claims are unimpaired. Any Holder of a Class 2C Allowed Priority Non-Tax Claim shall receive the full amount of the Holder's Class 2C Allowed Priority Non-Tax Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors. A Class 2C Priority Non-Tax Claim that is a Disputed Claim shall not receive any distribution unless and until such Claim becomes a Class 2C Allowed Priority Non-Tax Claim. Upon the entry of a Final Order allowing the Class 2C Allowed Priority Non-Tax Claim against the Consolidated Debtors after the Effective Date, the Holder of that Claim shall receive the full amount of such Claim in one Cash payment from the Liquidating Trust. The Liquidating Trustee or Debtor and the Holder of a Class 2C Allowed Priority Non-Tax Claim may agree to less favorable treatment of such Class 2C Allowed Priority Non-Tax Claim.

**BECAUSE CLASS 2 C CLAIMS ARE NOT IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 2 C CLAIMS ARE NOT ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

Class 3 C - General Unsecured Claims against the Consolidated Debtors Accepting the Creditor Release: The Class 3 C Claims are impaired. Class 3 C consists of Allowed Unsecured Claims against the Consolidated Debtors whose Holders cast a timely Ballot affirmatively accepting and agreeing to the Creditor Release. Holders of Allowed Class 3 C and 4 C Claims shall be entitled to receive a Pro Rata Share of interests in the Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of the Liquidating Trust

74392.000009 EMF_US 29471070v2730

Assets made by the Liquidating Trustee out of the Liquidating Trust in accordance with the Liquidating Trust Agreement and the Plan, and continuing on the dates of Subsequent Distributions, equal to their Pro Rata Share of any Subsequent Distributions of Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust, as provided under the Plan.

In addition to the distributions described above, Holders of Allowed Class 3 C General Unsecured Claims as of the Effective Date shall be entitled to receive a Pro Rata Share of the Lone Star Creditor Release Settlement Payment subject to the terms of this Plan. The Liquidating Trustee and the Disbursing Agent shall hold and distribute the Lone Star Creditor Release Settlement Payment pursuant to the terms of this Plan..

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Holder of the subject Claim shall receive its Pro Rata Share of interests in the Liquidating Trust, and the Liquidating Trustee, in his sole discretion, may make an Interim Distribution to the Holder of such Allowed Claim from the Liquidating Trust Reserve, or may release funds from the Liquidating Trust Reserve to such Holder in a Subsequent Distribution. The Holders of Allowed Class 3 C Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from the Liquidating Trust.

Upon full administration of the Assets vested in the Liquidating Trust, the Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Liquidating Trustee to the Holders of Allowed Class 3 C Claims shall be satisfied. In the event that the Holders of Allowed Class 3 C Claims are paid in full, without any post-petition interest, any funds remaining in the Liquidating Trust Account, net of expenses, shall be distributed first to the Holders of the Allowed Class 4 C Claims and then to the Holder of the Allowed Class 7 C Claim in accordance with the provisions of the Plan.

The Lone Star Entities have agreed to waive the right to receive distributions on their Claims and provide the Lone Star Creditor Release Settlement Payment to Holders of Class 3 C and 6 C Claims if the Plan is confirmed. Thus, Class 3 C Claims are expected to receive increased recoveries if the Plan is confirmed—as explained in more detail in the Liquidation Analysis attached as Exhibit B, Holders of Class 3 C Claims are estimated to recover between 98.3~~97.9~~% and 100% of their Claims under the Plan, as opposed to 27~~27.4~~% to 45.9~~46~~% in liquidation.

**BECAUSE CLASS 3 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 3 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 4 C - General Unsecured Claims against the Consolidated Debtors, except for separately classified Claims</u>: The Class 4 C Claims are impaired. Class 4 C consists of Allowed Unsecured Claims against the Consolidated Debtors that are not separately classified under this Plan. Holders of Allowed Class 3 C and 4 C Claims shall be entitled to receive a Pro Rata Share of interests in the Liquidating Trust and are entitled to receive distributions equal to their Pro Rata Share of any distributions of the Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust in accordance with the Liquidating Trust Agreement, and continuing

on each Subsequent Distribution Date, equal to their Pro Rata Share of any Subsequent Distributions of Liquidating Trust Assets made by the Liquidating Trustee out of the Liquidating Trust.

For the avoidance of doubt, Holders of Allowed Class 4 C Claims shall not be entitled to receive any distributions from the Lone Star Consolidated Creditor Release Payment because such Holders are not accepting the Creditor Release. The Debtors estimate that Holders of Allowed Unsecured Claims against the Consolidated Debtors who elect for treatment in Class 3 C will receive an <u>additional 15%</u> of their Claims through distributions from the Lone Star Consolidated Debtors Creditor Release Payment. **Holders of Allowed Unsecured Claims against the Consolidated Debtors must cast a proper and timely Ballot electing for treatment in either Class 3 C or Class 6 C to receive distributions from the Lone Star Consolidated Debtors Creditor Release Payment.**

In the event of entry of a Final Order determining a Disputed Claim to be an Allowed Claim, the Holder of the subject Claim shall receive its Pro Rata Share of interests in the Liquidating Trust, and the Liquidating Trustee, in his sole discretion, may make an Interim Distribution to the Holder of such Allowed Claim from the Liquidating Trust Reserve, or may release funds from the Liquidating Trust Reserve to such Holder in a Subsequent Distribution. The Holders of Allowed Class 4 C Claims shall thereafter receive their Pro Rata Share of Subsequent Distributions from the Liquidating Trust.

Upon full administration of the Assets vested in the Liquidating Trust, the Liquidating Trustee shall make the Final Distribution, and all obligations under the Plan of the Liquidating Trustee to the Holders of Allowed Class 4 C Claims shall be satisfied. In the event that the Holders of Allowed Class 4C Claims are paid in full, without any post-petition interest thereon, any funds remaining in the Liquidating Trust Account, net of expenses, shall be distributed to the Holders of Allowed Class 7 C Claims in accordance with the provisions of the Plan.

**BECAUSE CLASS 4 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 4 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 5 C - Unsecured Claims Against the Consolidated Debtors held by the Lone Star Entities</u>: The Class 5 C Claims are impaired. The Claims of the Lone Star Entities shall be waived and released and shall receive no distributions under this Plan.

**BECAUSE CLASS 5 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 5 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 6 C - Consolidated Debtors Convenience Class Claims</u>: The Class 6 C Claims are impaired. On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Consolidated Debtor Convenience Claim in Class 6 C shall receive seventy-five percent (75%) of the Holder's Allowed Class 6 C Convenience Claim in one Cash payment as part of the Effective Date Distribution from the Consolidated Debtors, or such other less favorable

treatment as is agreed upon by the Consolidated Debtors and the Holder of such Allowed Consolidated Debtor Convenience Claim.

Any Holder of an Allowed General Unsecured Claim against the Consolidated Debtors, other than Claims in Class 5 C, 7 C, and 8 C, may make the Consolidated Debtors Convenience Class Election. Such election, which requires the acceptance of the Creditor Release, must be made on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

Holders of Class 6 C Claims will recover 75% of their Claims under the Plan, as opposed to estimated returns of ~~98.3~~**97.9**% to 100% for Holders of Claims in Class 3 C. However, these recoveries are not guaranteed and will be paid over a period of months or years. In contrast, Class 6 C Claims will be paid a guaranteed 75% of such Claims on the Effective Date. Any Holder of a Class 6 C Claim may opt in to Class 3 C or 4 C on a Ballot that is properly and timely cast in accordance with applicable law and orders of the Bankruptcy Court.

**BECAUSE CLASS 6 C CLAIMS <u>ARE</u> IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 6 C CLAIMS <u>ARE</u> ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 7 C - REIT Junior Claim</u>. The Class 7 C Claims are impaired. Class 7 C consists of the REIT Junior Claim, which is Allowed as a Class 7 C Claim in the fixed amount of Fifteen Million Dollars ($15,000,000) held by the REIT. The Holder of the Allowed Class 7 C Claims shall receive its Pro Rata Share of interests in the Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

Pursuant to the terms of the Plan, the Class 7 C Claim is subordinated and junior to the Class 3 C, 4 C, and 6 C Claims, and the Holder of the Class 7 C Claim will not receive any distributions until all Allowed Claims in Classes 3 and 4 C are paid in full, without any interest thereon, as provided under the Plan, and the Holders of Class 6 C Claims receive the distribution they are entitled to receive under the Plan, in which event the holder of the Class 7 C Claim shall receive its Pro Rata Share of any Subsequent Distributions made by the Liquidating Trustee after such time, and its Pro Rata Share of the Liquidating Trust Residual Assets, as applicable.

**BECAUSE CLASS 7 C CLAIMS ARE IMPAIRED UNDER THE PLAN, HOLDERS OF CLASS 7 C CLAIMS ARE ENTITLED TO VOTE FOR OR AGAINST CONFIRMATION OF THE PLAN.**

<u>Class 8 C - Subordinated Claims against the Consolidated Debtors (including Late Filed Claims</u>: ~~The~~ The Class 8 C Claims are impaired. Class 8 C consists of Subordinated Claims against the Consolidated Debtors, including Late Filed Claims. Holders of Class 8 C Subordinated Claims shall receive no distribution under the Plan unless the Holders of Allowed Class 3 C, 4 C and 7 C Claims are paid in full**, without any post-petition interest thereon,** as provided under the Plan and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 8 C Claims shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

61

**BECAUSE CLASS 8 C CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 8 C CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 9 C - Claims against Consolidated Debtors relating to Accredited Preferred Securities Trust I. The Class 9 C Claims are impaired. Class 9 C consists of Allowed Claims against the Consolidated Debtors that relate to the Trust Preferred Securities, Trust Preferred Notes, Trust Preferred Guarantee, and the Trust Preferred Note Claims. All such Claims are reduced, fixed, and Allowed as a Class 9 C Claim in the amount of Five Million Dollars ($5,000,000) held by the Trust Preferred Indenture Trustee (the "Trust Preferred Junior Claims"). Holders of Allowed Class 9 C Claims shall receive their Pro Rata Share of interests in the Liquidating Trust subject to the enforcement of the applicable subordination provisions as described herein.

Pursuant to the terms of the Plan, the Class 9 C Claims are subordinated and junior to the Class 3 C, 4 C, 6 C 7 C and 8 C Claims, and Holders of Class 9 C Claims will not receive any distributions until all Claims in Classes 3 C, 4 C, 7 C, and 8 C are paid in full, **without any post-petition interest thereon, as provided under the plan,** and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 9 C Claims shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

**BECAUSE CLASS 9 C CLAIMS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTION, THE HOLDERS OF CLASS 9 C CLAIMS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN, AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Class 10 C - Interests in the Consolidated Debtors. The Class 10 C Interests are impaired. Class 10 C consists of the Interests in the Consolidated Debtors. All Interests shall be canceled after the Effective Date and the Holders thereof shall receive no distribution under the Plan, unless Holders of all Class 9 C Allowed Subordinated Claims against the Consolidated Debtors are paid in full with, **without any post-petition** interest **thereon, as provided under the Plan,** and the Liquidating Trust is terminated, as provided under the Plan, in which event the holders of Class 10 C Interests shall receive their Pro Rata Share of the Liquidating Trust Residual Assets, which distributions shall be made by the Disbursing Agent.

**BECAUSE CLASS 10 C INTERESTS ARE IMPAIRED AND WILL ALMOST CERTAINLY RECEIVE NO DISTRIBUTIONS UNDER THE PLAN, THE HOLDERS OF CLASS 10 C INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE REJECTED THE PLAN AND THEREFORE ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

    4.    Intercompany Claims

        (a)    Inter-Debtor Waivers

By virtue of the compromises and settlement of the issues set forth in the Plan, on the Effective Date, (i) AHL Canada shall pay and satisfy the Claims of the Consolidated Debtors against AHL Canada, and, after giving effect to such payments, (ii) each Debtor shall waive any defense, including, without limitation, defenses arising under §§ 502(d) and 553(a) of the Bankruptcy Code, to Intercompany Claims asserted by another Debtor and such Claims shall be deemed Allowed Claims, (iii) Intercompany Claims between Debtors shall be deemed to be mutual claims arising prior to the Petition Date for purposes of setoff, (iv) except as provided in Section 3.1 of the Plan, each Debtor shall waive its right to receive any distribution on any Claims and Causes of Action such Debtor may have against another Debtor, and (v) except as provided in Section 3.1 of the Plan, each Debtor shall waive and forever release any right, Claim, or Cause of Action which has been or could have been asserted by such Debtor against any other Debtor.

     (b)    Non-Debtor Subsidiary Waivers

By virtue of the compromises and settlement of the issues set forth in the Plan and except as otherwise provided in this Plan, on the Effective Date, (i) AHL Canada shall pay and satisfy the claims of the Consolidated Debtors against AHL Canada, and, after giving effect to such payments, (ii) each Non-Debtor Subsidiary shall waive any defense, including, without limitation, defenses arising under §§ 502(d) and 553(a) of the Bankruptcy Code, to Intercompany Claims asserted by another Debtor or Non-Debtor Subsidiary against any Debtor and such Claims shall be deemed Allowed Claims, (iii) Intercompany Claims between Debtors and Non-Debtor Subsidiaries shall be deemed to be mutual claims arising prior to the Petition Date for purposes of setoff, (iv) each Non-Debtor Subsidiary, shall waive its right to receive any distribution on any Claims and Causes of Action such Non-Debtor Subsidiary may have against any Debtor, (v) except as provided in this Section 6.2 of the Plan, each Non-Debtor Subsidiary, except REIT, shall waive and forever release any right, Claim or Cause of Action which has been or could have been asserted by such Non-Debtor Subsidiary against any Debtor, and (vi) each Debtor shall waive its right to receive any distribution on any Claims and Causes of Action such Debtor may have against any Non-Debtor Subsidiary, provided, however, that AHL Canada shall pay all amounts owing to the Consolidated Debtors on the Effective Date. Notwithstanding anything contained in this section to the contrary, the REIT shall have the allowed claims against the Debtors specified in Section 8.2 of the Plan and shall be entitled to distributions thereon as set forth in the Plan.

     (c)    Asset Allocation

The allocation of certain Assets is an integral component of the comprehensive compromise and settlement concerning Intercompany Claims and intra-Debtor issues as determined in light of a number of facts, including, but not limited to, (i) respective legal claims, rights and entitlements of the Debtors, (ii) validity and enforceability of Intercompany Claims, (iii) Intercompany Claims not reflected as inter-company payables or receivables in the Debtors' books and records, (iv) relative value of Assets under administration in each Debtor, (v) Intercompany Claims for contribution or reimbursement, (vi) the necessity of resolving inter-Estate and inter-Debtor issues and disputes through the Plan, and (vii) administration and

liquidation of Trust Assets unfettered or effected by inter-Estate or inter-Debtor conflicts of interest or multiple claims.

## B. Convenience Classes

As discussed above, Holders of Consolidated Debtor Convenience Claims will be paid 75% of their Allowed Claims in full in Cash upon the Effective Date, and Holders of Consolidated Holdco Convenience Claims will be paid 65% of their Allowed Claims in full in Cash upon the Effective Date. The ultimate returns to Holders of Unsecured Claims against the Consolidated Debtors are expected to be higher than 75%, and the ultimate returns to Holders or Unsecured Claims against Consolidated Holdco may be higher than 65%. However, such recoveries are not guaranteed, and will be made over a period of months or years after the Effective Date. Thus, the Debtors believe that the treatment of the Convenience Claims proposed under the Plan is more favorable than the treatment proposed for holders of general Unsecured Claims. Further, any Holder of a Claim may opt out of the Convenience Class.

In exchange for this favorable Convenience Class treatment, such Holders will not be entitled to receive any further distributions. Holders of Allowed Claims against Consolidated Holdco must agree to reduce their Claims to $1,000,000 (if such Claims are greater than $1,000,000), vote to accept the Plan, and consent to the Creditor Release in order to receive this favorable treatment. Holders of Allowed Claims against the Consolidated Debtors must agree to reduce their Claims to $25,000 (if such Claims are greater than $25,000), vote to accept the Plan, and consent to the creditor release in order to receive this favorable treatment.

Eligible Creditors will have the opportunity to elect for Convenience Class treatment, or opt out of the Convenience Class, on the Ballot they receive as part of the process of voting upon the Plan.

## C. Allowance and Disallowance of Claims and Interests

No distribution shall be made with respect to any Disputed Claim, even if a portion of the Claim is not disputed, until the entire Claim is resolved by a Final Order. At such time as a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive the Cash and/or other distributions to which such Holder is then entitled to under the Plan, but in no event prior to the later of (i) the Distribution Date, (ii) the date that an order regarding such Claim becomes a Final Order, or (iii) in accordance therewith when assets become available for distribution to the Holder of such Claim under the Plan.

The Liquidating Trustee or Plan Administrator shall file objections to Claims or Interests within one hundred eight (180) days of the Effective Date. The Liquidating Trustee or Plan Administrator may obtain an extension of this date by filing a motion in the Bankruptcy Court, based upon a showing of "cause." Once a Claim or Interest becomes an Allowed Claim or Interest, it will receive the treatment afforded by this Plan.

The deadline for filing with the Bankruptcy Court any and all Claims against the Debtor, other than Administrative Claims and Claims arising from the assumption or rejection of any

executory contract or unexpired lease pursuant to the Plan, was October 6, 2009. Any such Claim that was not filed prior to that time, except as otherwise set forth in the Plan or order entered by the Court, is forever barred and shall be conclusively deemed discharged and disallowed for purposes of voting on this Plan or receiving any distributions hereunder.

**D.     Subordination of Late Filed Claims.**

A Late Filed Claim is any Claim that was not filed prior to the applicable Bar Date, Rejection Claim Bar Date, Administrative Claim Bar Date, or Professional Fee Claim Bar Date, except for those Claims that are Allowed as timely under this Plan or under a Final Order entered by the Bankruptcy Court (which includes REIT Preferred Security Holder Subordinated Guaranty Claims). The Bar Date for filing Claims against the Debtors has passed, other than Administrative Claims, Professional Fee Claims, REIT Preferred Security Holder Subordinated Guaranty Claims, and Claims arising from the assumption or rejection of any executory contract or unexpired lease pursuant to this Plan. Late Filed Claims are automatically treated as Subordinated Claims, unless and until the Court enters an Final Order allowing or approving a stipulation allowing a Late Filed Claim, or the Plan allows such Claims..

**E.     Subordination and Subrogation Rights and Claims of Subordination and Subrogation**

Pursuant to § 510(a) of the Bankruptcy Code, except as otherwise agreed to by a creditor, Class of creditors, or as otherwise provided under the Plan, nothing in this Plan is intended to affect the terms or enforceability of any subordination or subrogation agreement entered into prior to the Effective Date by any creditor or group of creditors in favor of any other creditors of the Debtors in respect of any obligations owing by the Debtors; provided, however, that any disagreement with the priorities or distributions set forth in the Plan shall be raised prior to, ahead of and decided at the hearing on confirmation of the Plan; that, absent any timely objections or challenges, such priorities and distributions (including the waiver or subordination and subrogation) shall be deemed binding on such creditors and Classes of creditors; and, that if the decisions of the Bankruptcy Court relating to confirmation of the Plan differ from the priorities or treatment under the Plan, then all issues with respect to contractual subrogation and subordination shall be governed pursuant to such decision. To the extent that the priorities set forth in the Plan conflict with the contractual subordination and subrogation provisions of any Holders of Class of Claims, the Plan shall govern and control.

**F.     Deemed Consent**

By submitting a Ballot or receiving a Distribution under or any benefit pursuant to the Plan and not electing to withhold consent as provided under the Plan prior to the Confirmation Date, or by order of the Bankruptcy Court, each Holder of a Claim or Interest shall be deemed to have specifically consented to the terms of the Plan, including the releases and treatment contained in the Plan.

**G.     Liquidating Trust**

1. Appointment of Liquidating Trustee

(a)    On or before the Plan Supplement Filing Date, the Liquidating Trustee shall be selected by the Committee and be reasonably acceptable to the Debtors and REIT; provided, however, that none of the Lone Star Entities, the Trust Preferred Holders, the Trust Preferred Indenture Trustee, or their Affiliates, officers, directors, or employees shall serve as Liquidating Trustee. Prior to the Confirmation Date, the Person(s) designated as Liquidating Trustee shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the person so designated shall become the Liquidating Trustee of the Liquidating Trust on the Effective Date.

(b)    The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Liquidating Trust Agreement and the Plan.

(c)    The Liquidating Trustee shall be deemed a party in interest and have standing to seek disgorgement or challenge or object to the allowance or payment of Professionals under any interim or final fee application and with respect to challenging any Claims for substantial contribution made under § 503(b) of the Bankruptcy Code or similar claims.

(d)    The Liquidating Trustee shall be the Disbursing Agent as provided under the Plan.

2. Funding of the Liquidating Trust

The Liquidating Trust shall consist of the Liquidating Trust Assets. The Liquidating Trust will be funded initially by a contribution to the Liquidating Trust Account by the Consolidated Debtors equal to their Effective Date Balance less any payments made to the Holders of Allowed Administrative Claims, Holders of Allowed Secured Claims, Holders of Allowed Priority Claims, Holders of Allowed Priority Tax Claims, and Holders of Allowed Convenience Claims against the Consolidated Debtors on the Effective Date. The Liquidating Trust shall subsequently be funded from the other Proceeds of Consolidated Debtors Assets.

3. Lone Star Creditor Release Settlement Payment

Prior to or on the Effective Date, in the event that the Plan is confirmed, the Lone Star Entities shall cause the Lone Star Creditor Release Settlement Payment to be delivered to the Consolidated Debtors. The Consolidated Debtors shall use the Lone Star Creditor Release Settlement Payment to provide Holders of Allowed Class 3 C Claims with their Pro Rata Share of the Lone Star Creditor Release Settlement Payment, and then shall transfer the remainder of the Lone Star Creditor Release Settlement Payment to the Liquidating Trustee, who shall hold the Lone Star Creditor Release Settlement payment in trust in a segregated account for the benefit of Holders of Allowed Class 3 C Claims. If necessary, the Lone Star Creditor Release Settlement Payment shall be used by the Consolidated Debtors on the Effective Date or by the Liquidating Trustee or the Disbursing Agent subsequent to the Effective Date to pay Allowed Administrative Claims against the Consolidated Debtors, provided that, prior to making any Subsequent Distributions to any Unsecured Claims, the Liquidating Trustee shall fully repay any amounts used to pay Allowed Administrative Claims to the Lone Star Creditor Release

66

Settlement Payment with Liquidating Trust Assets as funds become available. The Liquidating Trustee or Disbursing Agent shall hold the remaining Lone Star Creditor Release Settlement Payment in a segregated account in trust for the benefit of the remaining Holders of Class 3 C Claims. The Liquidating Trustee or Disbursing Agent shall use the remaining Lone Star Creditor Release Settlement Payment to fund Subsequent Distributions, in the same manner as set forth in this Plan, to Holders of Allowed Class 3 C Claims, with Holders of Allowed Class 3 C Claims continuing to receive their Pro Rata Share of the remaining Lone Star Creditor Release Settlement Payment. When the remaining Lone Star Creditor Release Settlement Payment is equal to or less than $200,000, it shall be transferred to the Liquidating Trust and deemed a Liquidating Trust Asset.

4. <u>Lone Star Consolidated Debtors Settlement Payment.</u>

On or before the Effective Date, one or more of the Lone Star Entities, other than LSF MRA, LLC, shall pay the Lone Star Consolidated Debtors Settlement Payment, which is a $150,000 payment in Cash., to the Consolidated Debtors.

5. <u>Transfer of Liquidating Trust Assets to the Liquidating Trust</u>

On the Effective Date, the Debtors shall transfer and shall be deemed to have irrevocably transferred the Liquidating Trust Assets to the Liquidating Trust, for payment of Claims as provided in this Plan, and, after payment of such Claims, on behalf of the beneficiaries of the Liquidating Trust, with no reversionary interest in the Debtors.

The Liquidating Trust Assets include, but are not limited to, (a) any Tax Refunds received by the Debtors, Consolidated Holdco, or the Plan Administrator, or any other Person, and any rights to receive any Tax Refunds, whether contingent, disputed, or unliquidated, and any proceeds of any Tax Refunds, shall be vested in the Liquidating Trust and shall be paid or transferred to the Liquidating Trust, except for the first payments from the Tax Refunds, not to exceed Two Million Dollars ($2,000,000), which are designated in the Plan for the Trust Preferred Holdco Distributions, (b) the Trust Preferred Common Securities shall be transferred by Consolidated Holdco to the Liquidating Trust, and (c) all rights and interests in the Deferred Compensation Settlement shall be transferred to the Liquidating Trust.

6. <u>The Liquidating Trust</u>

(a)     Without any further action of the directors or shareholders of the Debtors, on the Effective Date, the Liquidating Trust Agreement for the Liquidating Trust, substantially in the form included in the Plan Supplement, shall become effective. On or before the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take such other necessary steps to establish the Liquidating Trust. The Liquidating Trustee shall accept the Liquidating Trust Assets and sign the Liquidating Trust Agreement on the Effective Date and the Liquidating Trust will then be deemed created and effective.

(b)     The Liquidating Trustee shall have full authority to take any steps necessary to administer the Liquidating Trust Assets and the Lone Star Creditor Release Settlement Payment, as applicable, including, without limitation, the duty and obligation to liquidate Liquidating Trust

Assets, and to pursue and settle any other trust claims, subject to the approval of the Liquidating Trust Advisory Board and the procedures in the Liquidating Trust Agreement. Upon such transfer (which, as stated above, shall occur on the Effective Date), the Debtors and their Estates shall have no other rights or obligations with respect to the Liquidating Trusts.

(c)     All Liquidating Trust Expenses shall be the responsibility of and paid by the Liquidating Trust from the Liquidating Trust Assets. Liquidating Trust Expenses may not exceed Two Million Dollars ($2,000,000), except pursuant to an order from the Bankruptcy Court approving an increase in this limit, which order may be obtained by the Liquidating Trustee with the consent of the Liquidating Trust Advisory Board and a showing of cause for such increase to the Bankruptcy Court.

(d)     The Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraiser, auctioneers or other professionals as it may deem necessary (collectively, the "Liquidating Trustee Professionals"), in his sole discretion, and at the sole expense of the Liquidating Trust, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Liquidating Trust Assets and the Lone Star Creditor Release Settlement Payment, as applicable.

(e)     The Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their interests in the Liquidating Trust, on a periodic basis, and at least once per year, all unrestricted Cash on hand (including any Cash received from the applicable Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 9.6(e)), except such amounts (i) as have been reserved on account of Disputed Claims, or are otherwise part of the claims reserve established by the Liquidating Trustee, (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) as are necessary to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iv) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a distribution pursuant to this Section 9.6(e) if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Liquidating Trustee; and provided further that nothing in this Plan shall compel the Liquidating Trustee to treat any tentative Tax Refund(s) obtained pursuant to Tax Code Section 6411 as unrestricted Cash until completion of the associated audit by the relevant authorities.

(f)     For federal tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under Treasury Regulation Section 301.7701-4 and that the trust beneficiaries will be treated as grantors and deemed owners of the trust. Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution of an undivided interest in the Liquidating Trust Assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust Agreement shall (i) state that the sole purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets with no objective to continue or engage in the conduct of a trade or business and (ii) contain a fixed or determinable termination

date that is not more than five (5) years from the date of creation of the Liquidating Trust, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court within six (6) months before the beginning of the extended term..

(g)     The Liquidating Trustee shall be responsible for filing all federal, state and local tax returns for the Liquidating Trust. The Liquidating Trustee shall file all federal tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4. The Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(h)     On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good-faith valuation of the Tax Refunds as of the Effective Date. As soon as practical after the Effective Date, the Liquidating Trustee shall determine the fair market value, as of the Effective Date, of all other Liquidating Trust Assets, and shall make all such values (including the Tax Refunds value) available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

(i)     The Liquidating Trustee shall have full and exclusive authority and responsibility with respect to all Tax Refunds to the same extent as if the Liquidating Trustee were the same entity, as applicable, the Consolidated Debtors, Consolidated Holdco, debtors, or debtors-in-possession, including the filing of tax returns (including amended tax returns), or requests for refunds for one or more of the Debtors. Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Liquidating Trustee to correspond with any tax authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer the Tax Refunds, tax payments and tax returns. The Consolidated Debtors (and the Liquidating Trustee, as assignee) shall be entitled to the Tax Refunds, other than the entitlement to a portion of the Tax Refunds from the Amended 2008 Tax Returns designated in this Plan for the Trust Preferred Holdco Distributions. For the avoidance of doubt, Consolidated Holdco hereby waives and relinquishes any right or interest to the Tax Refunds and the Tax Refunds shall be and is hereby deemed assets and property of the Consolidated Debtors, other than the entitlement of that portion of Tax Refunds from the Amended 2008 Tax Returns designated in this Plan for the Trust Preferred Holdco Distributions.

(j)     Payments and Distributions on Disputed Claims:

(i)     From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Bankruptcy Court, the Liquidating Trustee shall retain, for the benefit of each holder of a Disputed Claim, interests in the Liquidating Trust and any dividends, gains or income attributable thereto, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee. Any interest in the Liquidating Trust Interests retained and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in interests in the Liquidating Trust in the event the Disputed Claim ultimately becomes an Allowed Claim. Such dividends, gains or income paid on account of the interests in the Liquidating Trust (if any) retained for the benefit of holders of Disputed Claims shall be retained by the Liquidating Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.

(ii)    At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that has accrued on the amount of interests in the Liquidating Trust Interests so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, but in no event later than the next Subsequent Distribution date. The balance of any interests in the Liquidating Trust previously retained but not distributed to a Disputed Claim holder shall be included in future calculations of Cash, and interests in the Liquidating Trust, respectively, to holders of Allowed Claims.

(iii)   Tax Treatment of Retained Assets. The Liquidating Trustee shall treat any Assets retained pursuant to this Section 9.4 as part of the Liquidating Trust Claims Reserve.

7.    Limitation of Liability for Liquidating Trustee

Upon the Effective Date and execution of the Liquidating Trust, the Liquidating Trustee as trustee of the Liquidating Trust, and not personally, shall be vested in all right, title and

interest in all Liquidating Trust Assets, and shall have all rights to enforce orders of the Bankruptcy Court entered in this Bankruptcy Proceeding. The Liquidating Trustee shall liquidate the Liquidating Trust Assets and distribute the proceeds thereof in accordance with this Plan and the Liquidating Trust Agreement.

8.   The Liquidating Trust Advisory Board

(a)   The Liquidating Trust Advisory Boards shall be comprised of up to three (3) members selected by the Committee, who shall be reasonably acceptable to the Consolidated Debtors and the REIT; provided, however, that none of the Lone Star Releasees, **the Plan Releasees,** the Trust Preferred Holders, or the Trust Preferred Indenture Trustee, or their Affiliates, officers, directors or employees shall serve on either of the Liquidating Trust Advisory Board. Written notice of the identities of such members shall be filed with the Bankruptcy Court by the Plan Supplement Filing Date. The Liquidating Trust Advisory Board shall adopt such by-laws as it may deem appropriate. In the event written notice is not filed prior to the Plan Supplement Filing Date, there will be no Liquidating Trust Advisory Board, and compliance with the reporting, consulting and consent requirements under the Plan shall not be required and such terms shall be removed or deemed removed from the Trust Agreement and Plan. The Liquidating Trustee shall consult regularly with the Liquidating Trust Advisory Board when carrying out the purpose and intent of the Liquidating Trust. Members of the Liquidating Trust Advisory Board shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of the Liquidating Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the Liquidating Trust Advisory Board shall be payable by the Liquidating Trust.

(b)   The Liquidating Trust Advisory Board shall advise and approve the material actions of the Liquidating Trustee and have the right and duties as more particularly set forth in the Liquidating Trust Agreements, including, but not limited to, (a) authorize the Liquidating Trustee to commence, continue to prosecute or abandon any Causes of Action; (b) approve the settlement or compromise of any Cause of Action if the amount sought to be recovered in the complaint or other pleadings or documents initiating, evidencing, or stating such Cause of Action exceeds $1,000,000; (c) approve the sale, assignment, or other conveyance or abandonment of any Liquidating Trust Asset for an amount exceeding $1,000,000 or that has a value in excess of $1,000,000; (d) approve the allowance of any Disputed Claim, if the asserted amount of such Claim exceeds $250,000; (e) consult upon and approve all matters concern the Tax Refunds, (f) review, contest, or challenge to fees and expenses of the Liquidating Trustee and its professionals, and (g) approve any increase in the budget for Liquidating Trust Expenses.

(c)   In the case of an inability or unwillingness of any member of the Liquidating Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the Liquidating Trust Advisory Board. If the Liquidating Trust Advisory Board has only one member and any position on the Liquidating Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filed within fifteen (15) days thereafter by the designation of the Liquidating Trustee without the requirement of a vote by the other members of the Liquidating Trust Advisory Board.

(d)     Upon the certification by the Liquidating Trustee that all Liquidating Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the Liquidating Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(e)     The Liquidating Trust Advisory Board, in its discretion, may remove the Liquidating Trustee by majority vote.  In the event the requisite approval is not obtained, the Liquidating Trustee may be removed by the Bankruptcy Court for cause shown.  In the event of the resignation or removal of the  Liquidating Trustee, the Liquidating Trust Advisory Board shall, by majority vote, designate a person to serve as successor Liquidating Trustee.  In the event the Liquidating Trust Advisory Board does not designate a person to serve as successor Liquidating Trustee, the Bankruptcy Court shall make such selection.

(f)     Notwithstanding anything to the contrary in this Plan, neither the Liquidating Trust Advisory Board nor any of its members, designees, or any duly designated agent or representative of any such party shall be liable for the act, default or misconduct of any other member of the Liquidating Trust Advisory Board, nor shall any member be liable for anything other than such member's own gross negligence or willful misconduct.  The Liquidating Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions.  If the Liquidating Trust Advisory Board determines not to consult with its counsel, accountants or other professionals, that fact alone shall not be deemed to impose any liability on the Liquidating Trust Advisory Board, or its members and/or designees.

(g)     To the extent the Liquidating Trust Advisory Board adopts by-laws, no provisions of such by-laws shall supersede any express provision of the Plan.

9.     Transferability

The Debtors shall cause the interests in the Liquidating Trust to be non-transferrable and any such transfer shall be disregarded by the applicable Liquidating Trustee except with respect to a transfer by will or under laws of descent and distribution; provided, however, such transfer will not be effective until and unless the Liquidating Trustee receives written notice of such transfer under the law of descent and distribution.

10.     Final Administration of Liquidating Trusts

Upon the earlier of (i) payment in full of the Holders of Class 7 C Claims, or (ii) full administration of the Assets vested in the Liquidating Trust, and the satisfaction as far as possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee, shall: (i) terminate the Liquidating Trust, notwithstanding any  applicable law, solely by filing written notice of termination with the Bankruptcy Court and providing such notice to the Beneficiaries and the United States Trustee; (ii) as soon as practicable after termination of the Liquidating Trust, provide to the United States Trustee, and file with the Bankruptcy Court, a final account and report of Liquidating Trust administration; and (iii)

thereupon distribute the Liquidating Trust Residual Assets and be forever discharged of and released from all power, duties, and responsibilities arising under the Liquidating Trust Agreement and the Plan or relating to the Debtors or their Estates. Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating the Liquidating Trust Assets and distributing the proceeds thereof to the Beneficiaries in accordance with the Liquidating Trust Agreement and the Plan, and in no event shall the Liquidating Trust continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

## H. Consolidated Holdco Plan Administrator.

### 1. Appointment of Plan Administrator

On or before the Plan Supplement Filing Date, the Plan Administrator shall be selected by the REIT and the Committee; provided, however, that none of the Lone Star Entities, Trust Preferred Holders, or Trust Preferred Indenture Trustee, or their Affiliates, officers, directors or employees shall serve as Plan Administrator. Prior to the Confirmation Date, the Person(s) designated as Plan Administrator shall file an affidavit demonstrating that such Person is disinterested. If approved by the Bankruptcy Court in the Confirmation Order, the Person so designated shall become the Plan Administrator and be deemed sole director and officer of the Consolidated Holdco entities on the Effective Date, and shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan Administrator Retention Agreement.

### 2. Authority of Plan Administrator & Plan Administration Agreement

The Plan Administrator shall have full authority to take any steps necessary to administer and distribute the Consolidated Holdco Assets, including, without limitation, the duty and obligation to liquidate Consolidated Holdco Assets, and to pursue and settle any other Estate claims and Causes of Action constituting Consolidated Holdco Assets and as provided under the Plan Administration Agreement. Without further action of the directors or shareholders of Consolidated Holdco, on the Effective Date, the Plan Administration Agreement, substantially in the form included in the Plan Supplement, shall become effective.

### 3. Plan Administration Expenses

The Consolidated Holdco Plan Administration Expenses shall be the responsibility of and paid by Consolidated Holdco from Consolidated Holdco Assets.

### 4. Plan Administrator Professionals

The Plan Administrator may retain professionals, in its sole discretion, and at the sole expense of Consolidated Holdco, to aid in the performance of its responsibilities pursuant to the terms of this Plan including, without limitation, the liquidation and distribution of Consolidated Holdco Assets.

73

5.     Consolidated Holdco Tax Returns

Except as provided in the Plan, the Plan Administrator shall be responsible for filing all federal, state and local tax returns for Consolidated Holdco.

6.     Consolidated Holdco Distributions.

Upon the Effective Date, the Cash of Consolidated Holdco (excluding any Cash belonging to the Consolidated Debtors, including, but not limited to the Tax Refunds and the Lone Star Consolidated Debtors Settlement Payment), including the Lone Star Trust Preferred Settlement Payment, shall be used to make (i) payment of or reserve for the Consolidated Holdco Professional Fee Claim Payment in an amount not to exceed Two Million Dollars ($2,000,000) combined, (ii) an appropriate reserve for Consolidated Holdco Plan Administration Expenses not to exceed One Million Dollars ($1,000,000) (unless after the Effective Date some other amount is agreed upon by the REIT, the Lone Star Entities, and the Plan Administrator), (iii) distributions to Holders of Class 7 H Consolidated Holdco Convenience Claims (including the Viera Claims against Holdco) in an amount not to exceed One Million Five Hundred Thousand Dollars ($1,500,000), and (iv) reserves, in an amount, not to exceed One Million Dollars ($1,000,000), for other Claims against Consolidated Holdco (if any) as provided under the Plan. The balance of the Cash of Consolidated Holdco, including the Lone Star Trust Preferred Settlement Payment, shall be distributed Pro Rata (after adjusting for the Lone Star Trust Preferred Settlement Payment to the Trust Preferred Indenture Trustee as if it were part of such distribution) on account of (a) the Allowed Class 8 H Claim of the Trust Preferred Indenture Trustee (not to exceed a total distribution upon such Claim, including the Lone Star Trust Preferred Settlement Payment, of $40 million), and (b) the Allowed Class 6 H Claim of the REIT, provided that REIT First Distribution shall not exceed Nine Million Dollars ($9,000,000) unless the Allowed Class 8 H Claim of the Trust Preferred Indenture Trustee has received distributions equal to or greater than Forty Million Dollars ($40,000,000) (including the Lone Star Trust Preferred Settlement Payment).

7.     Trust Preferred Holdco Distributions Shortfall.

To the extent that the aggregate amount of the Trust Preferred Holdco Distributions plus the Lone Star Trust Preferred Settlement Payment is less than $40 million, such shortfall shall be paid to the Trust Preferred Indenture Trustee on the Effective Date from the following sources in the following priority (x) first, from any amount by which the REIT First Distribution would otherwise exceed Nine Million Dollars ($9,000,000), (y) next, to the extent of any remaining shortfall up to a maximum amount of Eight Million Dollars ($8,000,000), 50% from the Lone Star Advance (not to exceed Four Million Dollars ($4,000,000)), and 50% from the REIT First Distribution (not to exceed Four Million Dollars ($4,000,000), and (z) thereafter, to the extent of any remaining shortfall, from the REIT First Distribution.

8.     Consolidated Holdco Priority Administrative Claims.

From and after the Effective Date, and after the payment of or funding of (i) the Consolidated Holdco Reserves, (ii) the Lone Star Trust Preferred Settlement Payment and the

first $10,000,000 of the Trust Preferred Holdco Distributions to the Trust Preferred Indenture Trustee, (iii) the REIT First Distribution, and (iv) other payments due under the Plan, any funds collected by the Plan Administrator from any source constituting Consolidated Holdco Assets shall be distributed on a monthly basis in the following order and priority: (a) first, to the REIT on account of any unpaid portion of the REIT First Distribution, if any, until paid in full; (b) next, 50% to the Lone Star Entities that funded the Lone Star Advance to repay the Lone Star Advance until it is repaid in full, and 50% to Holders of Allowed Class 3 H, 4 H, and 6 H Claims, which shall be divided on a Pro Rata basis amongst such Holders; and (c) once the Lone Star Advance has been repaid in full, to Holders of Allowed Class 3 H, 4 H, and 6 H Claims, which shall be divided on a Pro Rata basis amongst such Holders until such Claims have been paid in full; and (d) the balance, if any, shall be used in accordance with the terms of this Plan. Subject to the distribution priorities set forth above, including the payment of or reserve for the Consolidated Holdco Reserves, the claims for (a) repayment of the Lone Star Advance, and (b) payment of the unpaid deficiency from the REIT First Distribution shall be entitled to an Administrative Claim against the Consolidated Holdco Distributable Cash under § 503 of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code.

9.    Final Administration of Consolidated Holdco Assets

Upon full administration of the Consolidated Holdco Assets, and the satisfaction as far as possible of all remaining liabilities of Consolidated Holdco, in accordance with the Plan, the Plan Administrator, shall: (i) dissolve and terminate Consolidated Holdco, notwithstanding any applicable law, solely by filing written notice of termination with the Bankruptcy Court and providing such notice to the Holders of Allowed Claims against Consolidated Holdco and the United States Trustee; (ii) as soon as practicable after termination and dissolution of Consolidated Holdco, provide to the United States Trustee, and file with the Bankruptcy Court, a final account and report of the administration of the Consolidated Holdco Assets; and (iii) thereupon distribute the Consolidated Holdco Residual Assets and be forever discharged of and released from all power, duties and responsibilities arising under the Plan or relating to the Debtors or their Estates. Every effort shall be made to effectuate such termination no later than the time reasonably necessary to accomplish the purpose of liquidating the Consolidated Holdco Assets and distributing the proceeds thereof to the creditors of Consolidated Holdco in accordance the Plan, and in no event shall Consolidated Holdco continue for more than five (5) years after the Effective Date without further order of the Bankruptcy Court.

I.    **Global Settlement and Compromise of Disputes**

The Plan is deemed to be a motion pursuant to §§ 363, 502, and 1123 of the Bankruptcy Code and Fed. R. Bankr. P 9019 to approve the settlements provided for in § 8.2 of the Plan between and among the Debtors, their major creditor constituencies, including the Trust Preferred Holders and the Trust Preferred Indenture Trustee, the REIT, the REIT Committee, and the Lone Star Entities. Upon the occurrence of the Effective Date, the Plan Support Agreement and Term Sheet shall be deemed superseded by the confirmed Plan and Confirmation Order and shall have no further force or effect.

74392.000009 EMF_US 29471070v2730