**Andrey Mutchnik**
17, de la Poudrière # 105
Montreal, Quebec, Canada H4G 3J5
Email: andre.mutchnik@hotmail.com

PRO SE

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**ACCREDITED HOME LENDERS HOLDING CO., et al.**<br><br>Debtors. | Case No. 09-11516 (MFW)<br><br>Chapter 11<br><br>**DECLARATION OF ANDREY MUTCHNIK IN SUPPORT OF THE MOTION FOR A FRBP 2004 EXAMINATION** |

# Declaration of Andrey Mutchnik

I, Andrey Mutchnik, do hereby declare as follows, to the best of my knowledge and belief:

1. I am over eighteen years of age. If called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

2. I am filing this Declaration in support of the Motion for a FRBP 2004 Examination ("Motion"), which I drafted myself and am prosecuting in a *pro se* capacity.

3. I have been a holder of preferred shares of Accredited Mortgage Loan REIT Trust ("REIT") since September 2007. I still hold those shares as of the date of this Declaration.

4. At no point in time have I received any reports (annual or other) of Accredited Home Lenders Holding Co. ("Holdco") or the REIT.

5. I have made several informal requests for FRBP 2004 discovery prior to filing the present Motion.

6. My first attempt to make an informal FRBP 2004 request was on April 22, 2011 ("April 22 email") when I emailed (1) counsel for the Debtors (Hunton & Williams), (2) counsel for the REIT (McGuire, Craddock & Strother), (3) counsel for the Ad Hoc Committee of Preferred Shareholders (Hahn & Hessen), (4) counsel for the Creditors' Committee (Arent Fox), and (5) representatives of AP Services, LLC. Annexed to the April 22 Email was the "FRBP 2004

Grocery List", which is appearing as Annex I of the present Declaration. As of the date of the Motion, I have not received a response to the April 22 Email.

7. On April 26, 2011 I emailed ("April 26 Email") (1) counsel for the Debtors (Hunton & Williams), (2) counsel for the REIT (McGuire, Craddock & Strother), (3) counsel for the Ad Hoc Committee of Preferred Shareholders (Hahn & Hessen), (4) counsel for the Creditors' Committee (Arent Fox), and (5) representatives of AP Services, LLC (M. Monger and M. Haftl) with a reminder that I have not received any response to the April 22 Email. I have not received any response to the April 26 Email. As of the date of the Motion, I have not received a response to the April 26 Email.

8. On April 28, 2011 I emailed ("April 28 Email") (1) counsel for the Debtors (Hunton & Williams and, this time, Pachulski Stang Ziehl & Jones), (2) counsel for the REIT (McGuire, Craddock & Strother), (3) counsel for the Ad Hoc Committee of Preferred Shareholders (Hahn & Hessen), (4) counsel for the Creditors' Committee (Arent Fox), (5) representatives of AP Services, LLC (M. Monger and M. Haftl), and (6) the United States Trustee (Mr. T. Patrick Tinker) with a reminder that I have not received any response to the April 22 Email and the April 26 Email. Attached to the April 28 Email was a "FRBP 2004 Grocery List Supplement", which is appearing as Annex II of the present Declaration. As of the date of the Motion, I have not received a response to the April 28 Email.

9. The April 22 Email, April 26 Email, and April 28 Email are attached to the present Declaration as Annex III.

10. On April 30, 2011, I have attempted to contact Mr. Norman Pernick, counsel for Joshua A. Weiss (former General Counsel of the Debtors), and Messrs. David Osborne and Bart Brown

-3-

(also former insiders) in order to request information in connection with the Trustee of the REIT, Mr. Thomas J. Sullivan as well as the counsel of the REIT, McGuire, Craddock & Strother. Messrs. Brown, Osborne, and Pernick all refused to provide any information voluntarily.

11. Prior to filing the Motion (on May 5, 2011), I have contacted the Help Desk of the Court to inquire whether I can schedule the present Motion on May 19, 2011, at 10:30 am or whether I need to file a separate request for scheduling. I was informed by the Help Desk that I can schedule the Motion on May 19, 20011 at 10:30 am[1].

12. The information contained in this Declaration is true and correct to the best of my knowledge and belief.

Declared on May 5, 2011 at Montreal (Canada),

*A. Mutchnik*

Andrey Mutchnik

---

[1] To the extent that my understanding is incorrect, I respectfully request the Court to schedule the hearing of my Motion on May 19, 2011 at 10:30 am. Indeed, the Confirmation Hearing is scheduled on May 19, 2011 at 10:30 am and in the event the present Motion is scheduled after the hearing, it will effectively become moot!

-4-

## Annex I – April 22, 2011 "Grocery List"

# FRBP 2004 "Grocery List"[1]

## Table of contents

1. REIT Governance...............................................................................1

2. Holdco governance and business.........................................................2

3. Financial Information of the REIT and Holdco....................................2

4. Cash transfers made pursuant to the October 1, 2004 Administration and Servicing Agreement (ASA).....................................................................3

5. Various MRAs and transactions...........................................................4

   5.1 Farallon..........................................................................................4

   5.2 Wachovia MRA.............................................................................5

   5.3 JPM Senior Secured Facility.........................................................6

   5.4 Wachovia Servicer Advance Facility............................................8

## 1. REIT Governance

(a) Please provide me with the Resume of Thomas J. Sullivan, the sole Trustee of the REIT.

(b) Who recommended Mr. Sullivan as the REIT Trustee and/or requested his appointment? Was it the ad hoc REIT Committee? Was it someone else?

(c) When exactly in September 2009 was he appointed (what day)?

(d) Historical Trustees of the REIT: please provide a table in substantially the following form (note that the table is copied from my email time-stamped April 4, 2011 2:24:39 AM):

| Period | Names | Details |
|---|---|---|
| Provide beginning date and end date | List the names of all trustees during that period | Provide at least the following details:<br><br>• Who appointed them?<br><br>• What is that individual's current title and employer (especially if affiliated with Lone Star)? Name of the employer(s) must be exactly |

---
[1] Dated Friday, April 22, 2011

|  |  | stated (including "Inc.", "LLC", etc).<br><br>· How can they be contacted?<br><br>· Who requested their appointment? |
|---|---|---|
| October 12, 2007 – April 30, 2011 | · Mike Prushan<br><br>· Marc Lipshy<br><br>· Jeff Walton | Messrs. Prushan, Lipshy, and Walton have been appointed by Holdco, which is the owner of the outstanding common shares of stock in the REIT. They have all been appointed at the request of LSF5 Accredited Investments LLC.<br><br>Messrs. Walton and Prushan are Vice Presidents at LSF5 Accredited Investments LLC, Vericrest Financial, Inc., and Caliber Funding LLC. Mr. Lipshy is Senior Vice President at LSF5 Accredited Investments LLC, Vericrest Financial, Inc., Caliber Funding LLC, and Hudson Advisors LLC.<br><br>They can be contacted at their respective employers [insert office address + phone number] or via their attorneys [if applicable - insert office address + phone number] |

(e) Historical <u>officers</u> of the REIT: Please provide a similar table for the <u>officers</u> of the REIT since the Lone Star Acquisition.

## 2. Holdco governance and business

(f) Please provide me with the same information as requested in points (d) and (e) above, but with respect to Holdco.

(g) Please provide me with figures of the loan originations made by the Debtors over time since the Lone Star takeover.

## 3. Financial Information of the REIT and Holdco

(h) Annual reports of Holdco and the REIT

Pursuant to section 4.01 of the Guarantee Agreement, Holdco (the Guarantor) had several reporting duties:

> *The Guarantor shall, at its expense, provide Holders of Series A Preferred Shares with copies of its annual report contemporaneously with its distribution to Holders of the Guarantor's Common Stock. Each Holder of Series A Preferred Shares shall also be entitled to receive copies of any additional information (other than proxy solicitation materials) that Holders of the Guarantor's Common Stock may be entitled to receive, on the same terms as such Holders are entitled to receive such information.*

Also, pursuant to section 11 of the REIT Bylaws:

> *Section 11. REPORTS TO SHAREHOLDERS. The Trustees shall submit to the shareholders at or before the annual meeting of shareholders a report of the business and operations of the Trust during such fiscal year, containing a balance sheet and a statement of income and surplus of the Trust, accompanied by the certification of an independent certified public accountant, and such further information as the Trustees may determine is required pursuant to any law or regulation to which the Trust is subject. Within the earlier of 20 days after the annual meeting of shareholders or 120 days after the end of the fiscal year of the Trust, the Trustees shall place the annual report on file at the principal office of the Trust and with any governmental agencies as may be required by law and as the Trustees may deem appropriate.*

As stated on the record, I've been a shareholder since September 2007. Yet, to the best of my recollection, I have never received any kind of report from Accredited or the REIT.

Accordingly, please provide me a copy of the annual reports of Holdco and the REIT for the years 2007 to 2010 (provide the 2010 annual report if available).

(i) Please update the Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Accredited Home Lenders Holding Co. et al. Holds a Substantial or Controlling Interest [Docket 428], which is dated 7/22/2009.

### 4. Cash transfers made pursuant to the October 1, 2004 Administration and Servicing Agreement (ASA)

(j) Mr. Hesse previously provided me with a yearly breakout of the ASA Advances.

Please provide me with an excel spreadsheet listing every cash advance made by the REIT since the Lone Star acquisition.

I understand that this request may seem burdensome, but in the Initial Disclosures Filed by Official Committee of Unsecured Creditors [Adv. No. 10-50980, Docket 20], dated August 2, 2010, the Creditors' Committee requested General Ledger Sheets for "Accredited Home Lenders AHL/REIT Intercompany Transactions" for the years 2004 to 2008. I would be very surprised if the Debtors and/or the REIT don't have in their possession such a spreadsheet that they probably furnished to the Creditors' Committee at some point.

Incidentally, Mr. Hesse's spreadsheet was helpful, but included a line titled "Cash transfers/expenses paid for REIT/other". I would be interested to see that line broken down to know how much of that line pertained to actual cash advances made by the REIT (note that I first made the request to "break down" that line in my email time-stamped April 4, 2011 2:24:39 AM).

(k) Please explain how exactly were the transfers of cash from REIT to Accredited authorized and by whom.

(l) Please clarify whether cash payments were made by the REIT to Accredited for management fees or whether the fees were offset against the balance due to the REIT pursuant to the ASA. In the event there were <u>cash payments</u> (and not just offsets) for management fees, please list such payments.

# 5. Various MRAs and transactions

(m) Please provide me with a list of debts of other Accredited entities that were guaranteed, assumed or incurred by the REIT at any point in time after the Lone Star Acquisition, along with the dates on which such liabilities were incurred.

For example (based on what I gleaned from the Disclosure Statement):

- JPM Senior Secured Facility became guaranteed by the REIT on July 21, 2008;

## 5.1 Farallon

According the quarterly report (form 10-Q) of Accredited Home Lenders Holding Co. for the quarter ended June 30, 2007, page 31:

> On October 10, 2007, the Company received a letter from the lender under the Farallon Loan in which the lender stated that it was exercising its option under the change of control provisions of the Loan Agreement to demand payment, by the 30th business day following the Company's receipt of the letter, of the entire $230 million outstanding balance of the loan, accrued interest thereon, and the 2% change of control premium provided for under the Loan Agreement. The Company expects to repay all amounts when due from available working capital, by financing certain assets currently securing the Farallon Loan, and with additional amounts contributed by Lone Star.

According the quarterly report (form 10-Q) of Accredited Mortgage Loan REIT Trust for the quarter ended June 30, 2007, page 15:

> On October 10, 2007, Accredited received a letter from the lender under the Farallon Loan in which the lender stated that it was exercising its option under the change of control provisions of the Loan Agreement to demand prepayment of the entire $230 million loan amount, which $100 million is owed by the REIT, plus the 2% change of control premium provided for under the Loan Agreement. Accredited and the REIT expects to repay all amounts due under the loan by the 30th business day following the date of the Farallon demand letter from available working capital, with additional amounts to be contributed by Lone Star and by financing certain assets currently securing the Farallon Loan.

Pursuant to section 2.01 of the Farallon loan[2]:

> (a) Loans. Subject to the terms and conditions set forth in this Agreement, each Lender severally agrees to make (i) a term loan to the REIT (each individually, a "Term A Loan" and, collectively, the "Term A Loans") on the Closing Date in an amount not to exceed at any time such Lender's Term A Loan Commitment, (ii) a term loan to AHL (each individually, a "Term B Loan" and, collectively, the "Term B Loans") on the Closing Date in an amount not to exceed at any time such Lender's Term B Loan Commitment and (iii) a term loan to REIT (each individually, a "Term C Loan" and, collectively, the "Term C Loans") on the

---

[2] A copy of the Farallon Agreement is available online at
http://www.sec.gov/Archives/edgar/data/1174735/000119312507075523/dex101.htm

*Closing Date in an amount not to exceed at any time such Lender's Term C Loan Commitment.*

(n) Please advise as to (1) what portion of the amount due <u>by the REIT</u> was paid with cash held at the REIT level and (2) what portion (if any) of the amount due <u>by Accredited and other affiliates</u> was paid with advances made by the REIT pursuant to the ASA or otherwise.

*5.2 Wachovia MRA*

According to page 16 of the Disclosure Statement:

> *On or about March 30, 2007, Wachovia Bank ("Wachovia") agreed to provide AHL, Inc. with a $750 million warehouse line of credit that was in the form of a master repurchase agreement (the "Wachovia MRA"). Subsequently, the Wachovia MRA was amended numerous times, including an amendment that increased the maximum availability from $750 million to $1 billion.*

According to pages 19 and 20 of the Disclosure Statement:

> *Throughout the summer 2008, AHL, Inc. worked on a number of loan sales including sales to Countrywide ($30 million) and Beal Bank ($46 million). As part of the transaction with Countrywide, LSF5 Mortgage Line arranged a $1 million guarantee to Countrywide, which was executed in August, 2008. The Countrywide guarantee was a material term included in the July 21, 2008 Amendment to the Senior Secured Facility. Since both sales closed after LSF MRA, LLC, a Lone Star Affiliate ("LSF MRA"), purchased the Wachovia MRA from Wachovia on August 13, 2008,' LSF MRA had the right under that former Wachovia MRA to require all proceeds be used to pay down the former Wachovia MRA (the "Amended MRA"). However, LSF MRA chose not to exercise that right and allowed AHL, Inc. to retain approximately $9 million of proceeds, which was the excess of the sale price over the advance rate under the Amended MRA.*

According to page 23 of the Disclosure Statement:

> *As was noted above, on or about March 30, 2007, Wachovia agreed to provide AHL, Inc. with the Wachovia MRA, a $750 million warehouse line of credit in the form of a repurchase agreement. Throughout the third quarter of 2007 and into 2008, Wachovia exercised its rights under the Wachovia MRA to make margin calls on AHL, Inc., which ultimately totalled approximately $115 million. In the face of a $36 million margin call delivered on July 29, 2008, AHL, Inc. initiated a lawsuit against Wachovia seeking a temporary restraining order* [n.b. upon information and belief, the case is Accredited Home Lenders v. Wachovia, case number 37-2008-00089001-CU-BC-CT before the California Superior Court – county of San Diego. Accredited was represented by Susman Godfrey in that case] *to prevent Wachovia from exercising its rights under the Wachovia MRA. To resolve the disputes and the litigation, on August 13, 2008, LSF MRA, one of the Lone Star Entities, purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 million. This transaction included 2,583 mortgages with an unpaid principal balance of $621 million. AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.*

> *After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA, which converted the*

> *Amended MRA into a term facility, provided for accelerated payment, eliminated the right of LSF MRA to make margin calls, and terminated the obligation of LSF MRA to purchase mortgage loans from AHL, Inc. LSF MRA, AHL, Inc. and the REIT entered into several amendments to the Amended MRA to extend the maturity dates four times to terminate in November, 2008, December, 2008, February 2009 and on March 17, 2009. When the Amended MRA finally matured on March 17, 2009, AHL, Inc. and the REIT defaulted on the Amended MRA due to their failure to repurchase the mortgages. According to LSF MRA, LSF MRA retained the mortgages in partial satisfaction of the damages that it sustained, and to mitigate its damages. In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 million. 17 The Lone Star Entities subsequently offset from this damage claim about $1.3 million it owed to ARL, Inc. for mortgage servicing rights, which are further described below. LSF MRA subsequently filed a proof of claim in an amount of approximately $96 million.*

(o) Please provide me with a copy of the Master Repurchase Agreement with Wachovia Bank, N.A. dated March 29, 2007 and all subsequent amendments to that agreement (including the amendments dated May 1, 2007 and on July 5, 2007).

I note that Form 8-K Reports of Holdco mentioned, referencing Wachovia MRA, that "the Amendment, to the extent required by the federal securities laws and regulations, will be filed as an exhibit to the Company's next periodic report" (see e.g. the 8-K dated July 5, 2007) but, to the best of my knowledge, were never filed.

(p) Please provide me with a copy of the transaction pursuant to which Lone Star acquired the rights of Wachovia under the Wachovia MRA and eventually asserted an unsecured claim of $97 M.

(q) Of particular concern to me is the following excerpt of the Disclosure Statement states that:

> *After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA [...] In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 million."*

Please explain how come the REIT was "on the hook" for the entire amount drawn under the Wachovia MRA by Accredited and other affiliates.

(r) Please advise as to (1) whether, and in what amount, did the REIT draw upon the Wachovia MRA (including the Lone Star term facility) in which case what portion of the amount due by the REIT was paid with cash held at the REIT level and (2) what portion of the amount due under the Wachovia MRA (including the Lone Star term facility) by Accredited and affiliates was paid with cash held at the REIT level or was paid with advances made by the REIT pursuant to the ASA or otherwise.

*5.3 JPM Senior Secured Facility*

(s) According to page 15 of the Disclosure Statement:

> *On or about September 29, 2006, AHL, Inc., as borrower, Holdco, as guarantor, and JPMorgan Chase Bank, as lender ("JP Morgan") entered into that certain*

> $75 million revolving senior secured facility (the "Senior Secured Facility"). The Senior Secured Facility was secured by (1) AHL, Inc.'s master servicing rights and (2) servicer advances made by AHL, Inc.

According to page 17 of the Disclosure Statement:

> In September, 2007, Holdco and Lone Star Fund V resumed negotiations which culminated on September 18, 2007, with Holdco and LSF5 Accredited Investments, LLC ("LSF5 Investments") executing an amended merger agreement. Pursuant to the terms of the amended merger agreement, on September 18, 2007, LSF5 Mortgage Line, LLC, a Lone Star affiliate, ("LSF5 Mortgage Line") purchased the Senior Secured Facility at par from JP Morgan for $33 million. Furthermore, on September 18, 2007, LSF5 Mortgage Line advanced approximately $15 million in additional funds under the Senior Secured Facility to AHL, Inc. and extended the maturity date until September, 2008.

According to pages 21 and 22 of the Disclosure Statement:

> Pursuant to the amendment to the Senior Secured Facility executed on March 19, 2008, AHL, Inc. granted LSF5 Mortgage Line a lien on all its property (except property pledged by AHL to Wachovia on the Servicer Advance Facility). LSF5 Mortgage Line did not fully perfect its lien until July 2008, which the Committee believes is a potentially avoidable transfer. LSF5 Mortgage Line also received a $3 million payment on the Senior Secured Facility in July 2008, which the Committee also believes may be avoidable. An amendment to the Senior Secured Facility dated July 21, 2008, which is about the time the Committee believes that the Debtors were considering filing bankruptcy petitions, reduced the principal amount of this line of credit from $150 million to $62 million, required all of AHL, Inc.'s affiliates to become guarantors, and restricted AHL, Inc.'s ability to use its assets. The Committee believes that this amendment may be potentially avoidable as well.

According to page 22 of the Disclosure Statement:

> On or about March 9, 2009, less than two months before the Debtors initiated the Bankruptcy Cases, LSF5 Mortgage Line and AHL, Inc. agreed to payoff the Senior Secured Facility. At that time, the total amount outstanding on the Senior Secured Facility was approximately $58 million. LSF5 Mortgage Line agreed to release its liens on all the assets of all AHL entities in exchange for a discounted cash payment in the amount of $30 million, and a non-recourse lien in the amount of $5 million on a receivable owed to AHL, Inc. by Select Portfolio Services, Inc. ("SPS")...

(t) Please provide me with a copy of the Senior Secured Facility and all subsequent amendments to that agreement.

(u) Please advise as to (1) whether, and in what amount, did the REIT draw upon the Senior Secured Facility, in which case what portion of the amount due <u>by the REIT</u> was paid with cash held at the REIT level and (2) what portion of the amount due under the Senior Secured Facility <u>by Accredited and other affiliates</u> was paid with cash held at the REIT level or was paid with advances made by the REIT pursuant to the ASA or otherwise.

## 5.4 Wachovia Servicer Advance Facility

According to pages 22 and 23 of the Disclosure Statement:

> *On February 20, 2008, Wachovia and Accredited Receivables Funding, LLC ("ARF"), a subsidiary of AHL, Inc., entered into a one-year $100 million Credit Agreement (the Servicer Advance Facility"). 16 Under the Servicer Advance Facility, AHL, Inc. was able to borrow against advances it made as servicer for payment of principal and interest ("P&I"), corporate advances, and taxes and insurance ("T&I") at advance rates up to 90%. Structurally, AHL, Inc sold its advances to ARF pursuant to a Receivables Purchase Agreement, which was guaranteed by Holdco. ARF would then borrow against these advances and upstream the cash to AHL, Inc. The Servicer Advance Facility resulted in upwards of $70 million of fresh liquidity to AHL, Inc. in early 2008. In order to complete this transaction, LSF5 Mortgage Line released its lien on the Servicer Advances, which were previously collateral under the Senior Secured Facility.*
>
> *The facility was amended from time to time (often in conjunction with the Wachovia MRA). On January 19, 2009, Wachovia granted an extension of the maturity date to April 2, 2009, which allowed for the close of a transaction with SPS (which is discussed in detail below.) Prior to the Petition Date, AHL, Inc. repaid the $85 million outstanding on the Servicer Advance Facility with proceeds from the sale by AHL, Inc. of certain Master Servicing Rights to SPS (discussed below).*

(v) Please provide me with a copy of the Servicer Advance Facility and all subsequent amendments to that agreement.

## Annex II – April 28, 2011 "Grocery List Supplement"

# **FRBP 2004 "Grocery List Supplement"[1]**

## 6. REIT Trustee

(w) Please detail the involvement (if any) of (i) the present REIT Trustee, Mr. Thomas J. Sullivan, (ii) McGuire, Craddock & Strother, counsel for the REIT with any Lone Star Entities.

Information should be provided in details that are comparable to the ones provided by professionals seeking employment in a bankruptcy case under section 327 of the Bankruptcy Code and FRBP 2014:

> *The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.*

## 7. Lone Star Claim

Page 23 of the Disclosure Statement describes the origins of the Lone Star Claim:

> *As was noted above, on or about March 30, 2007, Wachovia agreed to provide AHL, Inc. with the Wachovia MRA, a $750 million warehouse line of credit in the form of a repurchase agreement. Throughout the third quarter of 2007 and into 2008, Wachovia exercised its rights under the Wachovia MRA to make margin calls on AHL, Inc., which ultimately totaled approximately $115 million. In the face of a $36 million margin call delivered on July 29, 2008, AHL, Inc. initiated a lawsuit against Wachovia seeking a temporary restraining order to prevent Wachovia from exercising its rights under the Wachovia MRA. To resolve the disputes and the litigation, on August 13, 2008, LSF MRA, one of the Lone Star Entities, purchased all of the rights, title and interests in the Wachovia MRA from Wachovia at par for $413 million. This transaction included 2,583 mortgages with an unpaid principal balance of $621 million. AHL, Inc. was not required to pay the $36 million margin call to either Wachovia or LSF MRA.*
>
> *After acquiring the Wachovia MRA, on or about August 22, 2008, LSF MRA, the REIT and AHL, Inc. entered into the Amended MRA, which converted the Amended MRA into a term facility, provided for accelerated payment, eliminated the right of LSF MRA to make margin calls, and terminated the obligation of LSF MRA to purchase mortgage loans from AHL, Inc. LSF MRA, AHL, Inc. and the REIT entered into several amendments to the Amended MRA to extend the maturity dates four times to terminate in November, 2008, December, 2008, February 2009 and on March 17, 2009. When the Amended MRA finally matured*

---

[1] Dated Wednesday, April 28, 2011. This "Grocery List Supplement" supplements the "Grocery List" dated Friday, April 22, 2011.

> on March 17, 2009, AHL, Inc. and the REIT defaulted on the Amended MRA due to their failure to repurchase the mortgages. According to LSF MRA, LSF MRA retained the mortgages in partial satisfaction of the damages that it sustained, and to mitigate its damages. In addition, on or about April 7, 2009, LSF MRA sent AHL, Inc. and the REIT a demand for payment of damages under the Amended MRA in the amount of approximately $96 million. 17 The Lone Star Entities subsequently offset from this damage claim about $1.3 million it owed to AHL, Inc. for mortgage servicing rights, which are further described below. LSF MRA subsequently filed a proof of claim in an amount of approximately $96 million.

Response to the Disclosure Statement filed by David Osborn and Bart A. Brown, Jr. [Docket 2081] states on page 4:

> In March 2009 Lone Star exercised its right to require Accredited to re-purchase these mortgages for the approximate $287 million owed. Accredited was unable to do so and as a result Lone Star retained the mortgages and asserted a claim against Accredited for $96 million representing what it claimed was the difference between the amount owed by Accredited to Lone Star and the value of the collateral it retained. The $96 million claim implied a value of $.45 per dollar of the unpaid principal balance of the mortgage loans that were collateral for the MRA loan. About six weeks before asserting its $96 million claim, in February 2009 Lone Star provided Accredited with an analysis that Lone Star prepared, that valued the loans housed in the MRA at $.79 per dollar of the unpaid principal balance of the loans that were collateral for the MRA.

(w) Please provide a copy of the In the lawsuit initiated in the face of a $36 million margin call delivered on July 29, 2008, seeking a temporary restraining order to prevent Wachovia from exercising its rights under the Wachovia MRA.

(x) Please provide a copy of the Lone Star analysis that's referenced by Messrs. Brown and Osborn.

(y) Please provide internal servicing reports with respect to the loans.

(z) Please provide a copy of the demand for payment made by Lone Star on April 7, 2009.

(aa)    Have there been any other analyses of the loan portfolio? If so, please provide copies.

***

As stated on pp. 19 and 20 of the Disclosure Statement, Accredited was able to sell loans in up to September 2008:

> Throughout the summer 2008, AHL, Inc. worked on a number of loan sales including sales to Countrywide ($30 million) and Beal Bank ($46 million) [...]

> *The loan sale to Beal Bank closed on August 28, 2008. The loan sale to Countrywide had multiple closings throughout September, 2008.*

(bb)  Please provide sales prices of the above-mentioned transactions.

(cc)  Were there any loan sales after September 2008? If so, please provide details (including the amount of loans sold, the sale price, etc).

## Annex III – April 22, 26, and 28 Emails

N.B. (1) No response was received to any of those emails.
(2) The "Grocery List" was attached to the April 22 Email; the "Grocery List Supplement" was attached to the April 28 Email.

**WITHOUT PREJUDICE**

Ladies and Gentlemen,

This is the third time I'm contacting you in my attempts to conduct informal discovery in connection with the pending plan. My prior emails of April 22 and 26, 2011 were both unanswered. As was first stated in my April 22, 2011 email, feel free to contact me in order to arrange for a mutually agreeable date, time, and scope of production (I do not intend to request a live examination at this point).

As stated in my April 26, 2011 email, I intended to supplement my original "Grocery List". Attached please find the April 28, 2011 supplement as well as my earlier "Grocery List" attached again for your convenience.

Finally, to the extent that FRBP 7028-7037 are more suitable to one or more of the items requested, feel free to consider such a request as a request under FRBP 7037.

Yours very truly,

Andrey Mutchnik

From: andre.mutchnik@hotmail.com
To: ghesse@hunton.com; mchevallier@mcslaw.com
CC: mpower@hahnhessen.com; mhaftl@alixpartners.com; mmonger@alixpartners.com; lwarman@hunton.com; jtmoore@hunton.com; silfen.andrew@arentfox.com; rothleder.jeffrey@arentfox.com
Subject: RE: In re Accredited Home Lenders - FRBP 2004 Request
Date: Tue, 26 Apr 2011 13:15:25 -0400

**WITHOUT PREJUDICE**

Ladies and Gentlemen,

I have not received a response to my April 22nd, 2011 email.

As a reminder, pursuant to LBR 2004-1, feel free to contact me in order to arrange for a mutually agreeable date, time, and scope of production (I do not intend to request a live examination at this point). **As a starting point, Mr. Thomas' J. Sullivan's resume should be easy to provide.**

I would like to reiterate my belief that some of the information I request herein the Debtors are legally or contractually <u>required</u> to provide, in particular: (1) the annual reports of Holdco and the REIT,which must be forwarded to preferred shareholders pursuant to section 4.01 of the Guarantee Agreement, (2) an update to the Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Accredited Home Lenders Holding Co. et al. Holds a Substantial or Controlling Interest [Docket 428], which have to be updated at least every six months (FRBP 2015.3(d)), unless court permission is obtained to vary that requirement (FRBP 2015.3 (b)) which court permission, to the best of my knowledge, the Debtors have not sought.

As stated in my prior email, I reserved the right to add additional items to the "grocery list" I sent you on April 22nd. I'm considering to add some additional items to that list, in particular with respect to the prelude to the Lone Star $96 M claim and with respect to Mr. Sullivan's background.

I assure you that my request is not made for the purpose of harrassing or unduly burdening the Debtors. As a party in interest, regardless of the size of my holdings, I have certain rights and I am not required to rely upon or defer to counsel of the Debtors, counsel of the REIT, counsel for the Creditors Committee and/or counsel for the Ad Hoc Commitee. To the extent that the relevance of a particular item I'm requesting appears unclear or questionable to you, feel free to ask.

I appreciate the time you devote to that matter and thank you in advance for your attention.

Yours very truly,

Andrey Mutchnik

---

From: andre.mutchnik@hotmail.com
To: ghesse@hunton.com; mchevallier@mcslaw.com
CC: mpower@hahnhessen.com; mhaftl@alixpartners.com; mmonger@alixpartners.com; lwarman@hunton.com; jtmoore@hunton.com; silfen.andrew@arentfox.com; rothleder.jeffrey@arentfox.com
Subject: In re Accredited Home Lenders - FRBP 2004 Request
Date: Fri, 22 Apr 2011 15:55:49 -0400

**WITHOUT PREJUDICE**

Ladies and Gentlemen,

Attached please find a list of items that I intend to request pursuant to FRBP 2004. I hope that this issue would be resolved informally, without me having to file a FRBP 2004 motion in Court. Thus far, I think the attorneys of the Debtors have been reasonably cooperative; not sure if the same can be said with respect to attorneys of the REIT. I sent one simple question <u>three times</u> to REIT's attorneys that can be answered in one sentence and have yet to get any response from REIT counsel.

Pursuant to LBR 2004-1, feel free to contact me in order to arrange for a mutually agreeable date, time, and scope of production (I do not intend to request a live examination at this point). Some of the items I request (e.g. the MRAs) might take a bit longer; some others should be very easy to provide. In the nearest term, I'm keenly interested in the resume of Mr. Thomas J. Sullivan, which should be very easy to obtain.

Some of the items I request are better suited for the REIT; some of them are better suited for the Debtors. In any event, I'm sending the present request to counsel of the Debtors and the REIT. Please note that part of my request consists of Annual Reports of Holdco and the REIT to which I, as a preferred shareholder, would be contractually entitled to pursuant to section 4.01 of the Guarantee Agreement and that I never received (see e.g. item (h) on the list).

I have endeavored to compile a "grocery list" of items that I hope will be exhaustive; nevertheless, I reserve the right to add additional items to that list. I also attempted to make a request that's sufficiently detailed so as to minimize the burden upon the estate and/or the REIT.

Yours very truly,

Andrey Mutchnik