IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ACCREDITED HOME LENDERS | § | Case No. 09-11516 (MFW) |
| HOLDING CO., et al. | § | |
| | § | |
| Debtors.[1] | § | JOINTLY ADMINISTERED |
| | § | *Related To Docket No. 2547* |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF DEBTORS' FOURTH AMENDED CHAPTER 11 PLAN OF LIQUIDATION

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

**HUNTON & WILLIAMS LLP**
Gregory G. Hesse
Lynnette R. Warman
Jesse T. Moore
Caroline R. Penninck
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Accredited Home Lenders Holding Co., a Delaware corporation (9482), Accredited Home Lenders, Inc., a California corporation (6859), Vendor Management Services, LLC d/b/a Inzura Settlement Services, a Pennsylvania limited liability company (8047), Inzura Insurance Services, Inc., a Delaware corporation (7089), and Windsor Management Co., d/b/a AHL Foreclosure Services Co., a California corporation (4056). The address for all Debtors is 9915 Mira Mesa Blvd., Ste. 120, San Diego, CA 92131. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

# I.  **PRELIMINARY STATEMENT**

This Memorandum of Law (the "<u>Memorandum</u>") presents a comprehensive analysis of the legal and factual issues before the Court in support of the confirmation of the *Fourth Amended Chapter 11 Plan of Liquidation* (as it may have been amended or supplemented from time to time, the "<u>Plan</u>"),[2] dated as of  April 4, 2011, proposed by the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), pursuant to § 1129 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").[3]

After more than two years of investigation, litigation, mediation, negotiation and compromise, the Debtors, the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), and several major creditors holding diverse and conflicting interests have reached a global settlement to resolve the major issues in these cases.  These compromises are reasonable, fair, and in the bests interests of the Debtors' creditors and bankruptcy estates.  By making the mutual concessions embodied in the global settlement and the Plan, these parties avoid the delays, risks, and expenses of further litigation, thereby obtaining greater, more certain distributions, than they would likely receive after prolonged, complex commercial litigation.

Creditors voted to accept the Plan and the global settlement in a unanimous vote of more than 85% (in amount) of the general unsecured creditors eligible to vote. Therefore, because these settlements have been accepted by all voting Classes, and are fair, reasonable, and in the best interests of the Debtors' estates and creditors, the Plan should be confirmed.

# II.  **FACTUAL BACKGROUND**

## A.    **Plan & Global Settlement Formulation.**

On September 15, 2010, the Debtors filed the first *Chapter 11 Plan of Liquidation*, Docket No. 1946 and a related disclosure statement.  That plan proposed treating the Debtors as two

---

[2]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan.

[3] Unless otherwise noted, the factual statements in this Brief are supported by the Declaration of Meade A. Monger, which shall be filed prior to the Confirmation Hearing.

separate entities—the Consolidated Debtors and Consolidated Holdco. As in the current Plan, that plan would have implemented a settlement offer made by the ultimate parent of the Debtors and its affiliates—the Lone Star Entities—that would have paid general unsecured creditors of the Consolidated Debtors a recovery of nearly 100%, and would have preserved Consolidated Holdco's rights to pursue litigation against the Lone Star Entities. After some negotiation and modifications, the Committee filed a letter indicating its support of that plan. *See* Docket No. 2102 (Committee Plan Support Letter); Docket No. 2101 (Debtors' First Amended Chapter 11 Plan of Liquidation). However, that plan lacked the support of several major creditor groups.

As a consequence, the Debtors, the Committee, and several creditor groups, in various combinations, commenced further rounds of negotiations and mediations, which achieved the global settlement embodied in the Plan. The *Declaration of Meade Monger in Support of Confirmation of Debtors' Fourth Amended Chapter 11 Plan of Liquidation*, which being filed as a separate pleading prior to the Confirmation Hearing.

The Debtors filed the *Second Amended Chapter 11 Plan of Liquidation*, Docket No. 2418, incorporating this global settlement, and then a *Third Amended Chapter 11 Plan of Liquidation*, Docket No. 2518, to incorporate various changes requested by the Committee, other parties to the global settlement, and other creditors. Finally, the Debtors filed the current Plan, which incorporated certain changes to the Plan's nomenclature, which the Court had requested for the sake of clarity, and other minor modifications. The Committee has filed a letter indicating its support of the Plan. *See Notice of Filing of Form of Plan Support Letter by Creditors Committee*, Docket No. 2507.

## B. Approval of Disclosure Statement.

In connection with the Plan, the Debtors filed their *Fifth Amended Disclosure Statement with Respect to the Debtors' Fourth Amended Chapter 11 Plan of Liquidation*, Docket No. 2551 (the "Disclosure Statement"). The Court approved the Disclosure Statement and the voting and balloting procedures for the Plan on April 7, 2011. *See Revised Order (I) Approving the Disclosure*

74392.000009 EMF_US 35554861v4

*Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Establishing Deadline and Procedures for Filing Objections; (IV) Approving Publication Notice Regarding the Plan and Other Deadlines; and (V) Granting Related Relief*, Docket No. 2579 (the "Approval Order").

**C.      Plan Solicitation.**

On April 9, 2011, the Debtors completed the mailing of their solicitation materials to all parties entitled to vote on the Plan and certain notices to other creditors and parties in interest in accordance with the terms of the Approval Order. *See Affidavit of Service of Karen M. Wagner re: Documents Served on or Before April 9, 2011*, Docket No. 2601. Publication notice required by the Approval Order was made on April 11, 2011. *See Affidavit of Publication in the Wall Street Journal - National Edition*, Docket No. 2597.

**D.      Plan Voting.**

All Classes eligible to vote, Classes 3 H, 4 H, 5 H, 6 H, 7 H, 3 C, 4 C, 5 C, and 6 C, have unanimously voted to accept the Plan. *See Certification of Karen M. Wagner with Respect to the Tabulation of Votes on the Debtors' Fourth Amended Plan of Liquidation*, Docket No. 2700 (the "Wagner Declaration").

**E.      Modifications to the Plan Do Not Materially or Adversely Affect Any Holders of Claims.**

In accordance with the terms of the Plan, the Debtors made certain non-material supplements to the Plan,[4] and may make certain other, non-material modifications to the Plan prior to confirmation. Section 1127(a) of the Bankruptcy Code permits a plan proponent to modify the plan "at any time" before confirmation, and § 1127(d) provides that all stakeholders that previously have accepted the plan also should be deemed to have accepted the modified plan. Courts routinely allow plan proponents to make non-material changes to a plan without requiring the proponent to re-solicit the plan for acceptances. *See, e.g., In re New Power Co.*, 438 F.3d 1113, 1117-18 (11th Cir. 2006)

---

[4] *See Amended Supplement to Debtors' Chapter 11 Plan of Liquidation*, Docket No. 2658 (the "Plan Supplement").

("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated.").

The Debtors submit that the modifications to the Plan do not materially or adversely affect creditors. The Plan Supplement identifies (i) the Plan Administrator and Liquidating Trustee—Mr. Meade Monger, the Debtors' current chief restructuring officer, (ii) Wilmington Trust Company as the Delaware Resident Trustee, (iii) the Liquidating Trust Advisory Board, consisting of Tom Sullivan on behalf of the REIT, Jim Goddard on behalf of Citigroup, and Tom Fox on behalf of Ricky Sierra and the certified class of former employees Mr. Sierra represents, (iv) the sole executory contract to be assumed and assigned under the Plan, and (v) provides the forms of the Plan Administrator Retention Agreement and the Liquidating Trust Agreement. The proposed further amendments to the Plan are limited and non-material. These amendments:

1. reiterate that the bar-date for filing pre-petition claims arising under § 503(b)(9) remains in place, pursuant to prior order of the Court;[5]

2. explicitly reserve the rights of the Trust Preferred Indenture Trustee to assert a charging lien and obtain reimbursement for fees and expenses;[6]

3. revise the Plan to exclude governmental units from being required to assert formal applications for Administrative Claims, in accordance with § 503(b)(1)(D) of the Bankruptcy Code;[7] and

4. provide the Liquidating Trust Advisory Board with the duty of reviewing the Professional Fee Claims of Debtors' lead counsel and the CRO Expenses of the Debtors' restructuring advisors.[8]

These changes are not material and do not adversely affect any Creditors or other parties-in-interest. As such, the Debtors are not required to re-solicit for Plan acceptances, and all Creditors that previously voted to accept the Plan should be deemed to accept the Plan as modified.

---

[5] Plan, §§ 1.3, 1.7, & 1.17.
[6] *Id*. § 10.18.
[7] *Id*. § 1.7.
[8] *Id*. § 9.7(b).

74392.000009 EMF_US 35554861v4

## III. THE PLAN SATISFIES THE REQUIREMENTS OF 11 U.S.C. § 1129

Section 1129 of the Bankruptcy Code sets forth the requirements that must be satisfied before the Court may confirm a plan of reorganization. To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the provisions of § 1129(a) of the Bankruptcy Code by a preponderance of the evidence. *See In re Armstrong World Indus.*, 348 B.R. 111, 120-22 (D. Del. 2006); *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001). As illustrated below, all of the applicable subsections of § 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

**A.     The Plan Complies With All of the Provisions of § 1129(a).**

1.      Section 1129(a)(1) (Compliance with the Bankruptcy Code).

Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "the plan complies with the applicable provisions of this title."

(i)      *The Plan Complies With Bankruptcy Code § 1122.*

Section 1122 of the Bankruptcy Code governs the classification of claims and interests. Section 1122(a) requires that a plan "place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class." 11 U.S.C. § 1122(a). Article 2 of the Plan designates twenty-one classes of Claims and Interests based upon differences in the legal nature and/or priority of such Claims and Interests.[9]

Classes 1 H and 1 C provide for the separate classification of  Secured Claims.[10] Separate classification of each secured creditor is necessary and appropriate under § 1122 of the Bankruptcy Code.

Classes 2 H and 2 C provide for the separate classification of Priority Claims entitled to priority under § 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims, which are not classified under the Plan and are separately treated.[11] Class 2 C and 2 H

---

[9] Plan, art. 2.
[10] *Id*. §§ 2.2 & 2.3.
[11] *Id*. §§ 2.1, 2.2. & 2.3.

Claims are appropriately classified separately because, pursuant to § 1129(a)(9) of the Bankruptcy Code, each holder of a Priority Claim must receive cash equal to the full amount of the Priority Claim or, if the claim is of a kind specified in §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, and the class has accepted the Plan, each holder of a Priority Claim may receive deferred cash payments having a present value equal to the full amount of the Priority Non-Tax Claim. *See* 11 U.S.C. § 1129(a)(9).

Classes 3 H, 4 H, 5 H, 6 H, 3 C, 4 C, and 5 C provide for the separate classification of general Unsecured Claims against the Debtors.[12] The Debtors submit that separate classification of these general Unsecured Claims is appropriate because each such Class holds claims against different Debtors and because each Class is treated separately by the Plan with respect to distributions from the Liquidation Trust and the Plan Administrator, as applicable.[13] Further, the separate classification of creditors accepting the Creditor Release from creditors not accepting the Creditor Release is permissible because every creditor had the opportunity to accept the Creditor Release and resulting reclassification. "Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by [§] 1123(a)(4)," as long as "each claimant within a class have the same opportunity to receive equal treatment." *In re Washington Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011).

Additionally, Classes 7 H and 6 C provide for the separate classification of holders of Consolidated Debtors Convenience Claims and Consolidated Holdco Conveniences Claims, respectively.[14] Holders of Class 7 H and 6 C Claims will receive direct, fixed distributions from the applicable Debtors on the Effective Date, instead of Pro Rata distributions over longer periods of time, as expressly permitted by § 1122(b) of the Bankruptcy Code.[15] Separate classification of convenience claims is necessary to effectuate this treatment.

---

[12] *Id.*, §§ 2.2 & 2.3.
[13] *See id.* arts. 4 & 5 (treatment of claims).
[14] *Id.* §§ 2.2 & 2.3.
[15] *Id.* §§ 4.7 & 5.6.

74392.000009 EMF_US 35554861v4

Classes 8 H, 9 H, 10 H, 7 C, 8 C, and 9 C provide for the separate classification of Claims that are subordinated under the Bankruptcy Code, applicable law, or applicable agreements reached among the parties.[16]  The Debtors submit that such separate classification of these subordinated Classes is necessary for the Plan to effectuate that subordination through its treatment of these Classes, as called for by the Bankruptcy Code and applicable contracts.  *See also* 11 U.S.C. § 510(a) (preserving subordination in bankruptcy); § 726(a)(3) (subordinating late-filed claims).  Without the separate classification and different treatment of subordinated creditors, the Plan would violate the absolute priority rule and may be subject to confirmation objections.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

Finally, the Plan separates the various Interests in the Debtors into Classes 11 H and 10 C.[17] The Debtors submit that such separate classification of these Interests is also necessary because without the separate treatment of holders of Interests, the Plan would violate the absolute priority rule and cannot be confirmed.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

As the terms of the Plan demonstrate, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  The classification of Claims and Interests in the Plan therefore complies with § 1122 of the Bankruptcy Code.

(ii)     *The Plan Complies With Bankruptcy Code § 1123(a)*

Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents of a plan.  As demonstrated below, the Plan contains each of the mandatory provisions listed in § 1123(a) of the Bankruptcy Code, and other provisions permissible under the Bankruptcy Code.

(a)     *Section 1123(a)(1) (Designation of Classes of Claims and Interests)*

Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims and interests, other than claims of a kind specified in, among other things, § 507(a)(2) of the Bankruptcy Code—*i.e.*, Administrative Claims—and § 507(a)(8) of the Bankruptcy Code—*i.e.*,

---

[16] Plan, §§ 2.2-2.3.
[17] Plan, §§ 2.2-2.3.

74392.000009 EMF_US 35554861v4

Priority Tax Claims. Section 2.1 of the Plan classifies Classes of Claims and Interests other than Priority Tax Claims and Administrative Claims.[18]

  (b)  *Section 1123(a)(2) (Specification of Unimpaired Classes)*

Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan." Articles 2, 4, and 5 of the Plan specify the Classes of Claims and Interests that are either impaired or unimpaired under the Plan within the meaning of § 1124 of the Bankruptcy Code.[19]

  (c)  *Section 1123(a)(3) (Specification of Treatment of Impaired Classes)*

Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." Articles 4 and 5 of the Plan specify the Plan's treatment of each Class of Claim and Interest that is impaired under the Plan.[20]

  (d)  *Section 1123(a)(4) (Same Treatment of Claims Within a Class)*

Pursuant to § 1123(a)(4) of the Bankruptcy Code, a plan must "provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Articles 4 and 5 of the Plan detail the treatment for Holders of Claims and Interests in each Class, and the treatment within each Class is not disparate among the Class members.[21]

  (e)  *Section 1123(a)(5) (Adequate Means for Implementation of the Plan)*

Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation." Articles 6 through 12 of the Plan and various other provisions of the Plan set forth the means for implementation of the Plan.[22]

  (f)  *Section 1123(a)(6) (Charter of Reorganized Debtors)*

---

[18] *Id.* § 2.1.
[19] *Id.* arts. 2, 4, & 5.
[20] *Id.* arts. 4 & 5.
[21] *Id.*

Section 1123(a)(6) does not apply because the Debtors are not issuing any securities under the Plan and because the Plan calls for the cancellation of all interests in the Debtors after the Effective Date.[23]

(g)     *Section 1123(a)(7) (Selection of Officers and Directors)*

Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan, and any successor to such officer, director, or trustee. Section 9.1 of the Plan contemplates the Committee appointing the Liquidating Trustee, subject to approval by the Debtors and the REIT. The Liquidating Trustee must file an affidavit of disinterestedness, as all bankruptcy estate professionals must do, and must not be affiliated with certain creditor groups. Similarly, § 10.1 of the Plan provides that the Committee and the REIT will appoint the Plan Administrator, who must also provide an affidavit of disinterestedness and be free from affiliation with certain creditor groups. These processes ensured that the selection of the Liquidating Trustee and Plan Administrator was made by the creditors, and in compliance with the disclosure and disinterestedness requirements of the Bankruptcy Code, which embodies applicable public policy. These parties selected Meade Monger, the current Court-approved Chief Restructuring Officer of the Debtors, to serve as Liquidating Trustee and Plan Administrator. His present capacity as chief executive of the Debtors further indicates his suitability for serving as Liquidating Trustee and Plan Administrator.

The officers, members, and directors of the Debtors will cease to serve immediately after the Effective Date. However, a certain current officer—Mr. James Ransom—may continue to provide services to the Liquidating Trust and the Plan Administrator as an officer. Mr. Ransom has dutifully discharged his duties to the Debtors as Vice President/Controller since prior to the Petition Date, and his continued employment as an officer after the Petition Date is necessary for efficient

---

[22] *See generally* Plan, arts. 6-12.
[23] *Id.*, § 4.11(cancelling Consolidated Holdco Interests) & § 5.10 (cancelling Consolidated Debtors Interests).

administration, given his unique, invaluable, and irreplaceable knowledge of the Debtors and experience. Further, Michael Haftl, an employee of AP Services, LLC who has worked extensively in these cases and accordingly has gained intimate familiarity with the Debtors may be appointed as an officer of the Liquidating Trust or the Consolidated Debtors. Accordingly, the Plan complies with § 1123(a)(7) of the Bankruptcy Code.

(iii) <em>Section 1123(b) (Permissive Provisions)</em>

Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents of a plan. Section 1123(b) of the Bankruptcy Code lists numerous provisions that a plan may contain, including provisions relating to contract assignment, settlements of claims, sales of assets, modification of liens, and, finally, the catch-all "any other provisions not inconsistent with" the Bankruptcy Code. 11 U.S.C. § 1123(b). The Plan contains various exculpations, releases, settlements, and an injunction, as permitted by § 1123(b). These provisions are extensively analyzed below in Section III(C) of this Brief

2.    <u>Section 1129(a)(2) (Debtors' Compliance with the Bankruptcy Code)</u>

Section 1129(a)(2) of the Bankruptcy Code provides that a court may confirm a plan only if "[t]he proponent of the plan complies with the applicable provisions of this title." Section 1125 of the Bankruptcy Code governs the requirements for a disclosure statement that is to be issued to classes of claims and interests entitled to vote on a plan of reorganization. Section 1126 of the Bankruptcy Code, in turn, governs the requirements and parameters to determine whether creditors have accepted or rejected a plan of reorganization. The Debtors solicited votes from impaired Classes entitled to vote in accordance with the Bankruptcy Code and orders of this Court, including the Approval Order and caused the Disclosure Statement and the Plan, together with the applicable ballots and other materials, to be mailed accordingly.[24]

Further, the Debtors have materially complied with all other applicable provisions of the Bankruptcy Code, and any instances of non-compliance were non-material and unintentional. Based

---

[24] Wagner Declaration, ¶ 5.

11

on this record, the Debtors have satisfied both §§ 1125 and 1126, and the other provisions of the Bankruptcy Code, and thus have satisfied § 1129(a)(2).

      3.    <u>Section 1129(a)(3) (Plan Proposed in Good Faith)</u>

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." The good faith standard requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (finding good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11).

Generally, a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Bankruptcy Code. *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (*quoting In re Texaco, Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988) (internal quotations omitted)). The "important point of inquiry [under § 1129(a)(3)] is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998).

The Plan has been proposed with the legitimate and honest purpose of maximizing the value of the Debtors' assets for the benefit the Debtors' creditors and other stakeholders. The negotiations leading to the global settlement and subsequent formulation of the Plan were extensive, adversarial, and at arms'-length. Moreover, the Plan was accepted by an overwhelming vote of creditors, making clear that the Plan embodies the goals of the Bankruptcy Code.

Indeed, failure to confirm the Plan and consummate the global settlement will result almost certainly in the conversion of this case to chapter 7 of the Bankruptcy Code and appointment of

74392.000009 EMF_US 35554861v4

competing trustees to engage in expensive, protracted, and uncertain litigation. Such a result would cause significant delays in the distribution of assets and dramatic increases in administrative expenses. The major concessions offered by numerous creditors in the global settlement will not remain in place if the global settlement falls through, because these concessions were made expressly conditioned on confirmation of the Plan.

Because the Plan has been proposed for the legitimate purpose of maximizing the value returned to the Debtors' creditors and other stakeholders and is wholly consistent with the objectives and purposes of the Bankruptcy Code, it complies with § 1129(a)(3) of the Bankruptcy Code.

4.  Section 1129(a)(4) (Disclosure of Payments)

Bankruptcy Code § 1129(a)(4) provides that the Court shall confirm a plan only if "[a]ny payment made or to be made by the proponent, by the debtor, . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." Both the Plan and the proposed Confirmation Order provide that this Court will retain jurisdiction after the Effective Date of the Plan to hear and determine all estate professionals' applications for allowance of compensation or reimbursement of expenses connection with the Debtors' cases, and that those normal procedures will remain in place.

5.  Section 1129(a)(5) (Disclosure of Officers, Directors and Insiders)

Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a court may confirm a plan only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor . . . or a successor to the debtor under the plan." As discussed above, the Plan does not propose the post-confirmation appointment or retention of any officers or directors in such capacity, other than the Liquidating Trustee and Plan Administrator, Mr. Michael Haftl, and Mr. James Ransom, whose identities have been identified, and whose compensation will be identified at or before the Confirmation Hearing.

6.  Section 1129(a)(6) (Rate Change Approved by Regulatory Commission)

74392.000009 EMF_US 35554861v4

Section 1129(a)(6) of the Bankruptcy Code is inapplicable.

7.     Section 1129(a)(7) (The "Best Interest of Creditors Test")

Bankruptcy Code Section 1129(a)(7) requires that a plan be in the best interests of creditors and equity security holders in impaired classes. Specifically, Section 1129(a)(7) provides that, with respect to each impaired class of claims or interests,

> (A) each holder of a claim or interest of such class –
>     (i) has accepted the plan; or
>     (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
> (B) if § 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7).

As set forth in the Liquidation Analysis attached as Exhibit B to the Disclosure Statement, a liquidation of these Debtors under chapter 7 of the Bankruptcy Code would not provide a greater recovery for any Holders of Claims against the Debtors, nor for any Interests. As such, § 1129(a)(7) of the Bankruptcy Code has been satisfied.

8.     Section 1129(a)(8) (Class Acceptance or Unimpaired)

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either have accepted the plan or not be impaired under the plan. Although all voting Classes have accepted the Plan, certain non-voting Classes are deemed to have automatically rejected the Plan—Classes 9 H, 10 H, 11 H, 8 C, 9 C, and 10 C (the "Rejecting Classes"). The Debtors, therefore, seek confirmation of the Plan pursuant to the "cram down" provision of § 1129(b) of the Bankruptcy Code. As set forth below in Section III(B) of this Brief , the requirements of § 1129(b) have been satisfied with respect to each of the Rejecting Classes.

9.     Section 1129(a)(9) (Administrative and Priority Claims)

14

Section 1129(a)(9) of the Bankruptcy Code requires specific treatment for persons holding claims entitled to priority. In accordance with § 1129(a)(9)(A) of the Bankruptcy Code, the Plan provides that all Administrative Claims, Priority Non-Tax Claims and Priority Tax Claims, to the extent they are Allowed Claims on the Effective Date, will be paid on the Effective Date or as otherwise agreed to by the Debtors and the Holders of such Claims.[25] There will also be sufficient reserves to fund operating expenses and set aside reserves for Disputed Claims.

10. Section 1129(a)(10) (Acceptance by One Impaired Class)

Section 1129(a)(10) of the Bankruptcy Code provides, "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). Classes 3 H, 4 H, 5 H, 6 H, 7 H, 3 C, 4 C, 5 C, and 6 C, each of which are impaired, have unanimously voted to accept the Plan.[26]

11. Section 1129(a)(11) (Feasibility)

Section 1129(a)(11) of the Bankruptcy Code provides that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The feasibility test set forth in § 1129(a)(11) of the Bankruptcy Code requires the Court to determine whether a plan is workable, and has a reasonable likelihood of success. The Plan is premised upon the liquidation of the Debtors' assets, with sufficient funds to pay Administrative and Priority Claims, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

12. Section 1129(a)(12) (Fees)

Section 1129(a)(12) of the Bankruptcy Code provides that a court may confirm a plan only if "[a]ll fees payable under § 1930 of Title 28, as determined by the court at the hearing on

---

[25] Plan, § 3.1(a).
[26] Wagner Declaration, ¶ 12.

74392.000009 EMF_US 35554861v4

confirmation of the Plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." Section 10.13 of the Plan provides for such treatment.

13.    Section 1129(a)(13) (Retiree Benefits)

Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

14.    Sections 1129(a)(14), 1129(a)(15), and 1129(16).

Sections 1129(a)(14), 1129(a)(15), and 1129(16) of the Bankruptcy Code do not apply.

**B.    The Plan Satisfies the "Cram Down" Requirements of § 1129(b).**

A Plan that satisfies all the provisions of § 1129(a) of the Bankruptcy Code except for the provision that all impaired classes vote for the plan, *see* 11 U.S.C. § 1129(a)(8), is still confirmable if it satisfies § 1129(b). Even with the Rejecting Classes deemed to have voted to reject the Plan, all applicable requirements of § 1129(b) of the Bankruptcy Code have been satisfied under the Plan because the Plan does not unfairly discriminate against the Rejecting Classes and their treatment is fair and equitable.

1.    The Plan Does Not Unfairly Discriminate With Respect to Rejecting Classes.

Section 1129(b)(1) of the Bankruptcy Code provides that a chapter 11 plan may not unfairly discriminate against any impaired class of creditors that votes to reject the plan. The Bankruptcy Code does not provide a standard for what constitutes unfair discrimination. *See In re Exide Techs.*, 303 B.R. 48, 78 (Bankr. D. Del. 2003). Rather, courts typically examine the facts and circumstances of each particular case. *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Fremiller Trucking, Inc.,* 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of the circumstances"). Despite the numerous tests that courts have espoused, the commonality is that there is a sufficient basis for so discriminating and that the debtor would be unable to consummate a plan without the proposed discrimination. *In re Exide Techs.*, 303 B.R. at 78.

74392.000009 EMF_US 35554861v4

Here, the treatment of the Rejecting Classes does not constitute unfair discrimination because the Rejecting Classes all hold subordinated claims or equity interests:

- Class 9 H consists of REIT Preferred Shareholders, whose direct claims against Holdco are contractually subordinated to all other claims.

- Class 10 H consists of claims that are not separately classified and are subordinated for any reason under § 510 of the Bankruptcy Code, or are Late Filed Claims.

- Class 11 H consists of equity interests in Consolidated Holdco.

- Class 8 C consists of claims that are not separately classified and are subordinated for any reason under § 510 of the Bankruptcy Code, or are Late Filed Claims.

- Class 9 C consists of the Trust Preferred Note Junior Claim, which is a deeply subordinated claim that the Trust Preferred Indenture Trustee receives as part of the global settlement, and which will not receive distributions until *all* other creditors have been paid in full.[27]

- Class 10 C consists of equity interests in the Consolidated Debtors.

The Plan's classification and resulting treatment for these Rejecting Classes is proper, fair, and does not unfairly discriminate against those Classes. Indeed, this classification and treatment is necessary to avoid unfair discrimination against senior creditors, which would contradict of the Bankruptcy Code. Section 510(a) of the Bankruptcy Code requires the effectuation of subordination agreements in bankruptcy cases. Section 726(a) of the Bankruptcy Code supports the subordination of Late Filed Claims. Finally, § 726(a)(6) of the Bankruptcy Code permits payments to the Debtors, which would inure to the benefit of holders of Interests in the Debtors, only after all claims have been paid in full, with interest. Since the Plan's classification and treatment of Rejecting Classes is fair, equitable, and proper under the Bankruptcy Code itself, and the Plan cannot be characterized as unfairly discriminating against the Rejecting Classes.

2.    <u>The Plan Is Fair And Equitable</u>.

The Plan is fair and equitable with respect to the Rejecting Classes because no holder

17

of any claim junior to these Classes will receive any distribution. All of the Rejecting Classes hold Unsecured Claims or Interests.[28] Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that, for such unsecured creditors, the Plan is "fair and equitable" if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

The Plan satisfies this fair and equitable requirement as well because, for each Rejecting Classes, no junior creditors shall receive any distributions until that particular class is paid. Thus, Class 11 H does not receive distributions until Class 10 H is paid, which does not receive distributions until Class 9 H is paid, and Class 10 C does not receive distributions until Class 9 C is paid, which does not receive distributions until Class 8 C is paid.[29]

## C. The Plan's Settlements, Releases, Exculpations, and Injunction are appropriate and permissible under applicable law.

Pursuant to § 1123(b), the Plan incorporates various settlements, releases, exculpations, and an injunction. Namely, these are:

1. settlement of claims amongst the Debtors and their Non-Debtor Subsidiaries, *Plan* § 6;

2. settlement of claims amongst the Debtors and the REIT, *id*. § 8.2(a);

3. settlement of claims amongst the Debtors and Citigroup, *id*. § 8.2(b);

4. settlement of claims amongst the Debtors and the Trust Preferred Holders and Trust Preferred Indenture Trustee, *id*. § 8.2(c);

5. settlement of claims amongst the Debtors and the Lone Star Releasees and Plan Releasees, *id*. § 8.2(d);

6. settlement of claims of creditors who affirmatively accept the Creditor Release against the Lone Star Releasees and Plan Releasees, *id*. § 8.2(f);

7. post-confirmation injunction, *id*. § 12.2; and

---

[27] Plan, § 5.9.
[28] Plan, §§ 2.2 & 2.3.
[29] Plan, §§ 4.9, 4.10, 4.11, 5.8, 5.9, & 5.10.

74392.000009 EMF_US 35554861v4

8. exculpation for liability for conduct, other than willful misconduct and gross negligence, and without impairing the bankruptcy fee application process, for Debtors, Debtors' employees, professionals, and advisors, and other estate professionals, *id.* § 12.3.

Section 1123(b) permits the Plan to contain these provisions, where, as here, those provisions are acceptable under other applicable law.

    1.    <u>Settlement of Inter-Debtor and Non-Debtor Subsidiary Claims.</u>

Quantifying the existence and amount of any claims which may exist amongst the Debtors and their Non-Debtor Subsidiaries would be prohibitively expensive in this case. To facilitate an orderly wind down of these estates, the Debtors have agreed to settle a number of disputes that may exist among the Debtors. Among the disputes that exist are the following:

- the potential cause of action between Holdco and AHL, Inc. relating to the transfer of ownership of AHL Canada from Holdco to AHL, Inc. and the transfer of ownership of the REIT from AHL, Inc. to Holdco;

- Intercompany Claims between AHL, Inc. and Holdco, including the scheduled $19 million Claim of Holdco against AHL, Inc.;

- a potential dispute among the Debtors over the ownership of the Tax Refunds;

- a potential dispute over the allocation of professional fees and administrative expenses among the various Debtors; and

- potential claims for substantive consolidation/alter ego amongst all entities.

In addition, AHL, Inc. may have claims against all of the Debtors and Non-Debtor subsidiaries arising from expenses AHL, Inc., as the main operating company, incurred on behalf of those entities without receiving reimbursement.

The Plan settles all of these claims as follows:

- settles the substantive consolidation claims by substantively consolidating Holdco with Vendor Management Services, LLC and substantively consolidating Accredited Home Lenders, Inc., Inzura Insurance Services, Inc. and Windsor Management Co.;[30]

---

[30] *Id.* §§ 10.2 & 10.3.

- transfers the equity interests in AHL Canada, and the proceeds and subsidiaries thereof, from AHL, Inc. to Consolidated Holdco, with AHL Canada repaying its obligations to AHL, Inc.;[31]

- waives Inter-Company Claims;[32]

- the Consolidated Debtors shall be responsible for payment of Professional Fee Administrative Claims and CRO fees and expenses after receiving a $2 Million contribution from Consolidated Holdco;[33]

- any Tax Refunds received by the Debtors, any rights to receive any Tax Refunds, whether contingent, disputed, or unliquidated, and any proceeds of any Tax Refunds, shall be vested in the Liquidating Trust and shall be paid to the Liquidating Trust in the same manner that such Tax Refunds would be paid to the Debtors or original taxpayers, and shall be distributed to the Consolidated Debtors' Creditors, except for the portion of the Tax Refunds designated in the Plan for the Trust Preferred Holdco Distributions;[34]

- the Common Securities in the Accredited Preferred Securities Trust I shall be transferred by Holdco to the Consolidated Debtors;[35] and

- all rights and interests in the First American Trust FSB Deferred Compensation Trust settlement payment shall be transferred to the Liquidating Trust.[36]

Federal Rule of Bankruptcy Procedure 9019(a) authorizes the Court to approve compromises and settlements. "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)). Settlement proposals require the bankruptcy court "to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Id*. The Third Circuit recognizes "four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount

---

[31] *Id.* § 1.33, 1.38, 6.1, & 6.2
[32] *Id.* § 6.1.
[33] *Id.* § 3.1(c).
[34] *Id.* § 10.11.
[35] *Id.* § 10.18.
[36] *Id.* § 1.84.

20

interest of the creditors." *Id.* (following *Prot. Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)).

The Debtors do not have to prove that the compromise is the *best possible* potential outcome.

> [I]t is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement. Nor is the court required to make a determination that the settlement is the best possible compromise. In determining whether to approve a settlement, the court is not supposed to have a "mini-trial" on the merits, but should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.

*In re Key3Media Group, Inc.*, 336 B.R. 87, 92-93 (Bankr. D. Del. 2005) (internal quotations and citations omitted).

Deference to the Debtors' business judgment is proper, as long as the Debtors prove that the compromise is within the range of reasonableness:

> The Debtors carry a burden of persuasion to provide the court with sufficient information to conclude that the compromise falls within the reasonable range of litigation possibilities. This is not, however, a burden of proof regarding the underlying claim. While a court generally gives deference to a Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.

*Id.* at 93 (internal citations and quotations omitted).

When applied to the all aspects of the global settlement, the four *TMT Trailer Ferry* factors weigh in favor of approving the global settlement in all of its aspects. As established herein, the global settlement, including its inter-Debtor compromises, is within the Debtors' business judgment, and within the range of reasonableness, and accordingly should be approved in all respects.

(ii)     *Settlement of Substantive Consolidation Claims.*

As the Third Circuit has explained, substantive consolidation "emanates from equity" and

> "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005).

21

> Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

*In re Owens Corning*, 419 F.3d 195, 205 (3rd Cir. 2005). In *Owens Corning*, the Third Circuit criticized many substantive consolidation opinions from other circuits, and adopted this relatively narrow test, which provides only two grounds for substantive consolidation:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id*. at 211. A creditor that did rely on the entities' separateness can prevent substantive consolidation insofar as that substantive consolidation impairs its claims—"[i]f an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-à-vis the claims of that creditor." *Id*. at 210.

Here, the Debtors have each consented to substantive consolidation and no creditors objected to the substantive consolidation effectuated in the Plan. Moreover, the Plan's substantive consolidation provisions are unlikely to have a direct impact on creditor recoveries because the vast majority of creditors are either creditors of AHL, Inc. or Holdco, which remain separate and distinct under the Plan.

Further, the substantive consolidation of the Consolidated Debtors with each other and of Consolidated Holdco with its entities are reasonable and justified under the facts of the Cases. The Consolidated Debtors are operating entities and generally shared management, employees, and other resources, leading to some disregard of corporate form. The unscrambling of their assets would be difficult, and extremely prejudicial to the creditors of the entities other than AHL, Inc., which owns most of the valuable assets that will be vested in the Consolidated Debtors. These creditors of other entities, especially trade creditors, may have plausible arguments that they reasonably expected AHL, Inc. to pay the debts they were owed as a result of providing goods and services to the AHL corporate family.

For similar reasons, the consolidation of Consolidated Holdco is reasonable and justified,

22

especially in the absence of objections from creditors of Consolidated Holdco. Vendor Management Services, the entity being consolidated with Holdco, is a direct subsidiary of Holdco, unlike the Consolidated Debtors, which are AHL, Inc. and its subsidiaries. Holdco may have provided goods and services on behalf Vendor Management without receiving reimbursement, a fact which indicates both the presence of inter-company claims and some lack of regard for corporate formalities. As with the Consolidated Debtors, the creditors of Consolidated Holdco may have plausible arguments that they reasonably expected Holdco to pay the debts they incurred on behalf of the AHL corporate family.

The Debtors believe that the facts justify settling the substantive consolidation claims between AHL, Inc. and Holdco without consolidating Consolidated Holdco with the Consolidated Debtors. The vast majority of debts of Holdco are debts owed to a few sophisticated financial investors—the REIT, the TRUPs, and LSF MRA, LLC—who received full disclosure of the fact that their rights to payment lay against Holdco instead of its subsidiaries.

Further, the benefits of further prosecution of substantive consolidation claims would not be significantly greater than what the Plan and global settlement would provide. Substantive consolidation would (a) wipe out inter-company claims, and (b) wipe out the dual claims of parties who obtained guarantees of AHL, Inc. obligations from Holdco. However, the global settlement already results in (a) the waiver or subordination of the claims of LSF MRA, which has large claims against both AHL, Inc. and Holdco, and (b) the waiver of Holdco's inter-company claim against AHL, Inc. In addition, the global settlement, which requires the Plan's resolution of substantive consolidation issues, results in consideration being provided to Holdco that enables Holdco to make significant contributions to creditors.

Since the substantive consolidation proposed in the Plan is fair and reasonable and in the best interests of creditors, who have accepted it, and since prolonged, expensive litigation over substantive consolidation would be unlikely to produce materially better results for the estates, the Plan's settlement of these substantive consolidation claims is fair, reasonable, and in the bests

23

interests of all creditors.

        (iii)    *Settlement of AHL Canada fraudulent transfer claims.*

The Plan provides that the ownership of AHL Canada shall be transferred from AHL, Inc. and vested with Consolidated Holdco.[37] The value of this compromise for Consolidated Holdco is the value of AHL Canada, estimated at $25-30 million. The Debtors believe that this is a fair settlement for both the Consolidated Debtors and Consolidated Holdco of their competing claims arising out of the transfer of AHL Canada.

On or about September 30, 2008, Holdco transferred its stock in AHL Canada to AHL, Inc. This transfer is potentially avoidable as a constructively fraudulent transfer. *See* 11 U.S.C. § 548(a)(1)(B). However, there would be factual issues involving solvency, the value of the stock in AHL Canada at the time of the transfer, and the value of the transfers and benefits Holdco received from AHL, Inc, at this time. These factual issues would need to be determined in the course of this litigation.

In settlement of this claim, Consolidated Holdco regains ownership of AHL Canada. This is an advantageous settlement for Consolidated Holdco, as it resolves this claim completely in Consolidated Holdco's favor without further delay or litigation, and without a resulting increase in liabilities under § 502(h) of the Bankruptcy Code. As for the Consolidated Debtors, they are making several concessions by making this settlement—Consolidated Holdco is waiving its ability to make claims to other assets of the Consolidated Debtors, including tax refunds, and Consolidated Holdco is also waiving its inter-company claim against AHL, Inc. Given the totality of the circumstances, this aspect of the global settlement is fair and reasonable to all Debtors.

        (iv)    *Settlement of other Inter-Company Claims.*

The Plan waives all other Inter-Company Claims.[38] The primary ostensible Inter-Company Claim being waived is Holdco's claim against AHL, Inc. for approximately $19 million. While this

---

[37] Plan, § 1.33, 1.38, 6.1, & 6.2
[38] Plan, § 6.1.

claim was scheduled, its validity is disputable, since it appears to have been created on December 31, 2008 without AHL, Inc. receiving reasonably equivalent value. Further, the problems with collecting this claim, after the expense of litigation, are obvious—AHL, Inc. is bankrupt, and its creditors will not receive full recoveries if the Plan is not confirmed and the Debtors are thrown into inter-company litigation. The claim of Holdco against AHL, Inc. may be subject to disallowance under § 502(d) of the Bankruptcy Code if AHL, Inc. prevails in an avoidance action against Holdco. Thus, the $19 million stated amount of Holdco's claim should be seriously discounted.

In addition, other potential inter-Debtor claims can be identified. The main revenue-generating Debtor, AHL, Inc., likely has unjust enrichment or fraudulent transfer claims against all other Debtors arising from the costs and expenses AHL, Inc. incurred in using its employees and resources to manage and administer those entities. Further, fraudulent transfer claims could have arisen over the four-years prior to the Petition Date amongst various of the Debtors based on dividends, capital contributions, and other transfers. For example, it appears that on December 31, 2008, Holdco's intercompany obligations to AHL, Inc. in the amount of $56 million were cancelled without AHL, Inc. receiving reasonable equivalent value—indeed, as a result of this transaction, AHL, Inc. instead purportedly became indebted to Holdco for $18 million.

The Debtors have not invested meaningful resources in reviewing and researching these claims, and the value of fraudulent transfer claims in a case like this with high returns to unsecured creditors is diminished by § 502(h) of the Bankruptcy Code. *See, e.g., Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 97-98 (S.D.N.Y. 2008) (dismissing fraudulent transfer and preference claims where creditors were being paid in full). Nevertheless, there are likely other inter-Debtor claims that are being waived as well, and this waiver provides significant benefit to both Holdco and the other Debtors by removing potential liabilities and avoiding further litigation expenses.

Another Inter-Company claim being resolved in the Plan is an issue regarding the allocation of Professional Fee Claims and CRO Expenses amongst the Debtors. These claims and expenses

25

exceed $10 million in the aggregate. Consolidated Holdco's liability for these claims is capped at $2 million under the Plan.[39] Many of the services provided by estate professionals benefitted all Debtors, and therefore accurately allocating these costs amongst the Debtors is not possible. The Debtors' financial advisors performed an analysis of these costs, and determined that this allocation is a fair and reasonable rough estimate. Further, this allocation avoids the need for further analysis and litigation over this issue, and thus benefits the estates and creditors.

(v)    <em>Allocation of Tax Refunds, Deferred Compensation Settlement Proceeds, and Common Securities in the Accredited Preferred Securities Trust.</em>

The Plan provides the Consolidated Debtors with the Tax Refunds, estimated at $93 million, the Deferred Compensation Settlement Proceeds, estimated at $1 million, and the Common Securities in the Accredited Preferred Securities Trust, which are not estimated to have any value. These allocations are fair because the Consolidated Debtors have the strongest claims to these assets. The Tax Refunds are the proceeds of the corporate income taxes paid by the Debtors, and the operating entities—the Consolidate Debtors—generated the income leading to the assessment of these taxes. The Deferred Compensation Settlement Proceeds are the proceeds of a deferred compensation plan for employees of AHL, Inc. Finally, the Common Securities in the Accredited Preferred Securities Trust do not have any value. Thus, in light of the rights of the Consolidated Debtors to these assets, and the consideration being provided to Consolidated Holdco and its creditors under the Plan, these settlements are fair to and in the best interests of all of the Debtors and their estates and creditors, and should therefore be approved.

2.    <u>Settlement of Claims of the REIT and REIT Adversary</u>

The Plan and global settlement propose settling the REIT's claims against the Debtors, and the Debtors claims against the REIT, by waiving all of the Debtors' claims against the REIT and providing the REIT with (1) an Allowed Unsecured Claim against the Consolidated Debtors in the amount of $37.5 Million; (2) the REIT Junior Claim in the amount of $15 Million in subordinated

---

[39] Plan, § 3.1(c).

Class 7 C; and (3) an Allowed Unsecured Claim against Consolidated Holdco in the amount of $20 Million in Class 6 H, which Claim shall receive the treatment provided under the Plan, including the REIT First Distribution.  In addition, REIT Preferred Shareholders may have Consolidated Holdco's common shares in the REIT distributed to them on a Pro Rata basis.

The REIT's claim was initially scheduled as a $227 million contingent claim against AHL, Inc. and a $227 million non-contingent claim against Holdco.  The REIT's claims have been disputed by the Committee, which filed an adversary proceeding arguing that the REIT's claims should be recharacterized as equity contributions and/or equitably subordinated.  *See* Complaint, *Official Committee of Unsecured Creditors v. Accredited Mortgage Loan REIT Trust*, No. 10-50980 (Bankr. D. Del. May 11, 2010).  The arguments asserted in the REIT Adversary are colorable—the REIT's claims against the Debtors may be avoidable as preferential or fraudulent transfers.

Further, the REIT's advances may be properly characterized as dividends or return of this capital—the REIT derived tremendous value from the capital contributions received from the Debtors.  The REIT was an investment vehicle and its shareholders, who stood to profit if the value of the REIT increased, agreed to subordinate their claims to the general unsecured creditors of the Debtors.   Indeed, the REIT's preferred shareholders' capital contributions pale in comparison to the money invested into the REIT by the Debtors—the liquidation preference for all REIT shares only amounts to $106 million, and the actual contributions of REIT Preferred Shareholders are lower than this liquidation preference.  Thus, to the extent the Debtors did receive $227 million from the REIT, most of those funds were the proceeds of the capital invested in the REIT by the Debtors.  Many of these funds were used to pay the Debtors' operating expenses.  These facts make the REIT's claims vulnerable to recharacterization.  *See, e.g., In re SubMicron Systems Corp.*, 432 F.3d 448, 455-56 (3rd Cir. 2006) (noting that factors justifying recharacterizing loans as equity contributions include intent of parties, insiderness, lack of capitalization, and use of advances to pay operating expenses instead of for capital improvements).

Further, the Debtors may have claims against the REIT for the avoidance of the transfers and

27

contributions made to the REIT, if the Debtors did not receive reasonably equivalent value from such transfers and made the transfers at a time when the Debtors were insolvent. *See* 11 U.S.C. § 548(a)(1)(B). These fraudulent transfer claims could lead to the avoidance and recovery transfers going back to May 1, 2005 or earlier. However, the Debtors' ability to recover on these claims is questionable due to the REIT's own financial condition, and disallowance of the REIT's claims under § 502(d) of the Bankruptcy Code may be the best "recovery" the Debtors can obtain.

Prosecuting the REIT Adversary and the estates' other claims against the REIT would be risky, time-consuming, and expensive. Further, this prosecution may not bring additional benefits to the Debtors' estates—the REIT has agreed to settle for a reduced claim against the Consolidated Debtors that will enable other general unsecured creditors of the Consolidated Debtors to achieve estimated recoveries of near 100%, while providing surplus assets of the Consolidated Debtors to the REIT through the REIT Junior Claim. The REIT settlement on the Consolidated Holdco side provides the REIT with a $20 million claim, which will receive roughly equal treatment with other general unsecured creditors. In light of the substantial returns creditors will be receiving, and in light of the potential merits of the REIT's claims, these settlements are fair and reasonable and in the bests interests of the Debtors' estates and creditors.

3.    Settlement with Citigroup

In early 2007, AHL, Inc's warehouse lenders placed large margin calls on AHL, Inc. that totaled over $200 million. To create liquidity, in March, 2007, AHL, Inc. sold mortgages to Citigroup with an unpaid principal balance of approximately $2.7 billion at a discount of approximately 7%. As part of this loan sale, AHL, Inc. made various representations and warranties regarding the nature of these loans. Citigroup subsequently filed a proof of claim against AHL, Inc. asserting an unliquidated claim of more than $40 million arising from various breaches of these representations and warranties. As part of the global settlement, Citigroup has agreed to reduce this claim to $12.1 million. The Debtors are releasing Citigroup in exchange, but the Debtors are unaware of causes of action against Citigroup. Based on the evidence supporting this claim, and the

fact that this reduced claim is less than one-third of the original claim and less than one half of one percent of the principal balance of the loans sold, the Debtors believe that this compromise is fair and reasonable.

      4.      <u>Settlement with Trust Preferred Holders and the Trust Preferred Indenture Trustee</u>

In January, 2007, Holdco established an affiliate, Accredited Preferred Securities Trust I, a Delaware statutory trust ("APS"), and issued debentures to APS. APS is not a debtor in these chapter 11 proceedings. APS in turn sold trust preferred securities to the public. The current owners of the Trust Preferred Securities are the Kodiak CDOs and JP Morgan As a result of these transactions, Holdco raised approximately $56 million and Holdco became liable to APS for the amount raised plus interest. Thus, APS itself, through the Trust Preferred Indenture Trustee, has a claim against Holdco for approximately $60 million. Further, since Holdco also guaranteed payments of dividends to the Trust Preferred Holders, the Trust Preferred Holders have claims against Holdco for approximately $60 million.

The claims of the Trust Preferred Indenture Trustee and the Trust Preferred Holders are subordinated to some of Holdco's general unsecured debts, but not others. The effects of these subordination provisions are unclear—the Trust Preferred claims do appear to be subordinate to the claims of other long-term financial obligations, but the subordination provisions explicitly provide that the Trust Preferred claims are *not* subordinate to "trade accounts payable or other accrued liabilities arising in the ordinary course of business." The Trust Preferred Claims expressly have priority over the REIT Preferred Holders' Subordinated Guaranty Claims.

The Debtors believe that all of the Allowed Claims in Classes 3 H and 7 H could be characterized as trade accounts payable arising in the ordinary course of business, and thus on equal footing with the claims of the Trust Preferred Indenture Trustee and the Trust Preferred Holders. The Debtors believe that the Claims of LFS MRA, LLC may qualify as "Senior Debt" with priority over the Claims of the Trust Preferred Indenture Trustee and the Trust Preferred Holders because these Claims arise from long-term lending arrangements with the Debtors. The Debtors are unsure

as to whether the Claims of the REIT itself are "Senior Debt" with priority over the Claims the claims of the Trust Preferred Indenture Trustee and the Trust Preferred Holders.

The Trust Preferred Holders and Trust Preferred Indenture Trustee have agreed to settle their claims against the Debtors and the Lone Star Entities in exchange for Lone Star Trust Preferred Settlement Payment, which is $26,950,000, from the insurers of the Debtors and the Lone Star Entities, and $3,050,000 from the Lone Star Entities themselves, plus up to $12,000,000 from Holdco through the Trust Preferred Holdco Distributions, plus a subordinated Class 9 C Claim in the amount of $5,000,000 against the Consolidated Debtors.

The Debtors believe this settlement is fair and reasonable. The Trust Preferred Holders' $60,000,000 in claims against the Debtors' estates are being satisfied in full by the payment of no more than $38,950,000 from Consolidated Holdco and its insurers. This substantial discount— approximately 65%—approximates other distributions that unsecured creditors of Holdco are expected to receive. (The Class 9 C Claim against the Consolidated Debtors has no value, since it is junior to all Classes except for Holdco's equity Interests in the Consolidated Debtors.) Since the claims of the Trust Preferred Holders and Trust Preferred Indenture Trustee do not appear to be contractually subordinated to Claims in Classes 3 H and 7 H, the Plan is providing all such classes with fair and equal treatment. Moreover, none of those creditors have objected to the Plan or voted against the Plan. All votes from Consolidated Holdco general unsecured creditors have accepted the Plan and the Creditor Release, and only one claim opted for treatment as a general unsecured creditor in Class 3 H instead of convenience class treatment in Class 7 H.

    5.    Settlement of Lone Star Claims

The global settlement releases the Debtors' claims against the Lone Star Entities in exchange for cash payments from the Lone Star Entities, their insurers, and insurers of the Debtors to certain of the Debtors and certain creditors in amounts exceeding $49,750,000, including the Lone Star Advance up to $4 million and the subordination or waiver of the Claims asserted by the Lone Star Entities in the approximate amount of $100,000,000. The Debtors provided considerable

74392.000009 EMF_US 35554861v4

information about potential estate claims against the Lone Star Entities in their Disclosure Statement, pages 20-26, and provided information about the global settlement in their Disclosure Statement, pages 69-75.

The estates' claims against the Lone Star Entities are complicated because these claims mostly arise from the repayment of valid debts, and because there is difficulty in proving actual losses due to the timing of the Debtors' bankruptcy filings. Further, prosecuting these claims would require considerable time and resources. This litigation would not be an efficient use of estate resources, given the global settlement in hand, which clearly falls within the "range of reasonableness" by paving the way for significant, timely creditor recoveries instead of requiring these cases to sink into an uncertain quagmire of litigation that is not certain to produce better results. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (finding that factors such as "complexity, expense, and likely duration of such litigation" would supports a compromise).

Under the global settlement, the Lone Star Entities are waiving or subordinating *all* of their claims, which have a face value of more than $100 million, and which, as established above, have some merit. In addition, the Lone Star Entities, and their insurers and the Debtors' insurers, are providing the estates and creditors with $45,750,000. While most of the $45,750,000 goes to Classes of creditors who accept the Creditor Release, these payments nevertheless benefit all other creditors by reducing the estates' overall liabilities, thereby increasing distributions to all creditors. For example, even though the Class 4 C creditors are not releasing direct claims against the Lone Star Entities, those creditors may still achieve 100% recoveries, thanks to the payments the Lone Star Entities are making to Class 3 C creditors. Finally, the Lone Star Advance of up to $4 million will ensure the feasibility and confirmation of the Plan, and thus provides further consideration in exchange for the Plan's release of the Lone Star Entities. Given these facts, the global settlement as it relates to the Lone Star Entities is fair, reasonable, and in the best interests of the Debtors and their estates and creditors.

74392.000009 EMF_US 35554861v4

6. <u>Settlement of claims of creditors who affirmatively accept the Creditor Release against the Lone Star Releasees and Plan Releasees.</u>

For creditors who affirmatively return a ballot accepting the Creditor Release, the Plan will release the direct claims those creditors may have against the Lone Star Releasees and Plan Releasees. The releasing creditors are receiving additional consideration from non-Debtors in exchange for the Creditor Release. Also, the release provisions on the Ballot and other solicitation were clear and conspicuous, providing creditors with the notice needed to make an informed decision. Finally, creditors must affirmatively return a Ballot accepting the Creditor Release in order for their direct claims to be affected by the Plan. *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (concluding that "any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases").

7. <u>Plan Injunction.</u>

The Plan provides for a post-confirmation Injunction that generally continues the automatic stay provisions of § 362(a) of the Bankruptcy Code, except that the modification entered in the Bankruptcy Proceeding permitting *in rem* actions against certain real property in which the Debtors have only nominal interests shall continue to remain in place. The Debtors believe the Injunction is necessary and appropriate for consummating the Plan—to ensure equal distribution of estate property in accordance with the Plan, creditors must not be able to continue collection activities relating to Claims against the property of the Debtors, their estates, and their successors. The exception to this Injunction does not pose a danger to the Debtors' and their creditors because the Debtors have no interests in real property other than a few leases, which the Debtors are paying in the ordinary course.

The Injunction only prohibits creditors and other third-parties from asserting "Claims"—*i.e.,* claims against the Debtors—against the Debtors and third-parties related to the Debtors. The Injunction does not (and cannot) affect rights among or between third-parties.

74392.000009 EMF_US 35554861v4

This Injunction shall remain in effect until the Bankruptcy Proceeding is finally closed.[40] The Bankruptcy Proceeding will be finally closed after the Debtors and their successors have finished liquidating and distributing estate assets.[41]  Accordingly, the Injunction complies with § 1141(d)(3) of the Bankruptcy Code, which prevents a permanent discharge in a liquidating chapter 11 case such as this.  Since the Injunction is necessary, appropriate, and limited to what is permissible under the Bankruptcy Code, it should be approved by the Court.

8.    Exculpations

The Plan will exculpate the Debtors, their officers, directors, managers, employees, professionals, and restructuring advisors, the Committee, its professionals, advisors and members in their capacity as members of the Committee, Committee members' respective professionals and advisors, the Liquidating Trust, the Liquidating Trustee, the Disbursing Agent, and the Plan Administrator solely from liability other than liability for acts constituting willful misconduct or gross negligence.[42]  This exculpation provision is only limited to claims arising in relation to the Bankruptcy Proceedings.

Thus, the exculpation provision does not affect claims amongst third-parties that are not related to those parties' conduct in the Bankruptcy Proceeding itself.  The exculpation provision does not affect the liabilities of guarantors, sureties, responsible persons, or other persons who are liable with the Debtors.

"The Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence," because this exculpation "merely state[s] the standard to which such estate fiduciaries [are] held in a chapter 11 case."  *In re Washington Mutual, Inc.*, 442 B.R. 314 at 350 (following *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)).

---

[40] Plan, § 12.2.
[41] *Id.* § 10.20.
[42] Plan, § 12.3.

## IV.  CONCLUSION

As demonstrated above, the Plan meets each applicable requirement of Section 1129 of the Bankruptcy Code.  Accordingly, the Debtors respectfully submit that the global settlement and the Plan should be approved and confirmed, and any objections thereto should be overruled.

Dated: May 16, 2011.

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Kathleen P. Makowski*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:        ljones@pszjlaw.com
                  joneill@pszjlaw.com
                  kmakowski@pszjlaw.com

-and-

**HUNTON & WILLIAMS LLP**

Gregory G. Hesse (Texas Bar No. 09549419)
Lynnette R. Warman (Texas Bar No. 20867940)
Jesse T. Moore (Texas Bar No. 24056001)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
Email:        ghesse@hunton.com
                  lwarman@hunton.com
                  jtmoore@hunton.com

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

74392.000009 EMF_US 35554861v4